

FILED

2003 OCT 29  A  9: 59

US DISTRICT COURT
HARTFORD CT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWN POULIOT | : | CIVIL ACTION |
|    Plaintiff | : | NO. 3:02 CV1302 (DJS) |
| | : | |
|      v. | : | |
| | : | |
| PAUL ARPIN VAN LINES, INC. AND | : | |
| ARPIN LOGISTICS, INC. | : | |
|    Defendants/Third-Party Plaintiffs | : | |
| | : | |
|      v. | : | |
| | : | |
| FESTO CORPORATION, MICHAEL | : | |
| D. KOVAC, D/B/A TRANS-EXPO | : | |
| INTERNATIONAL, AND ERICA RAMIREZ | : | |
| IN HER CAPACITY AS EMPLOYEE | : | |
| OF TRANS-EXPO INTERNATIONAL | : | |
|    Defendants/Third-Party Defendants | : | OCTOBER 28, 2003 |

## _MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS_

Pursuant to Local Rule 7(d), Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc. hereby

submit this Memorandum of Law in Reply to Plaintiff's Opposition to Defendants' Motion to

Dismiss dated October 16, 2003.

### FEDERAL SUBJECT MATTER JURISDICTION

On page 1, footnote 1 of his Opposition Memo, Plaintiff states "The worker's

compensation exclusivity defense does not implicate the court's subject matter jurisdiction . . ."

1

Arpin refers the court to pages 4-5 of its Motion to Dismiss Plaintiff's Complaint For Lack of Subject Matter Jurisdiction. The Plaintiff's citations governing Connecticut state court procedure are unavailing. This case is in federal court pursuant to diversity jurisdiction and is governed by federal procedural law.

<u>JUDICIAL ADMISSIONS</u>

On page 2 of its Opposition Memo, Plaintiff states, "The defendants' *post hoc* attempt to recast Mr. Pouliot as an employee should be rejected on procedural and substantive grounds. Particularly where, in their "Eleventh Defense: Independent Contractor" asserted in the Amended Answer dated August 15, 2003, Arpin alleges that 'The Plaintiff Shawn Pouliot was an independent contractor who undertook the pickup and delivery of equipment in his capacity as an independent contractor . . .'" Plaintiff then asserts that this was a judicial admission. See page 2, footnote 2 of Plaintiff's Opposition Memo.

The Second Circuit law states, "This argument relies on a misunderstanding of the nature of judicial admissions, which are statements of fact rather than legal arguments made to a court. See M. Graham, Federal Practice and Procedure § 6726 (Interim ed. 1992); <u>United States v. McKeon</u>, 738 F.2d 26, 33 (2d. Cir. 1984). Plaintiffs' statement of their theory of the case do not constitute judicial admissions." See <u>New York State Natl. Org. For Women v. Terry</u>, 159 F.3d 86, 98 at note 7 (2nd. Cir. 1998).

Likewise, Arpin's assertion in its Eleventh Defense, that Pouliot was an independent contractor is a legal argument, not a statement of fact. Furthermore, it is consistent with Arpin's contention that Pouliot is an employee for purposes of the Federal Motor Carrier Safety Regulation. Federal Motor Carrier Safety Regulation §390.5 includes in its "employee" definition "a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle)". See Exhibit 1, 49 C.F.R. § 390.5. Arpin contends that even if Plaintiff would ordinarily be considered an independent contractor, he is still, nevertheless, an employee pursuant to the federal regulations.

On pages 2-5, of its Opposition Memo, the Plaintiff recounts the actions of Arpin employees in handling Plaintiff's worker's compensation claim. In essence, Plaintiff argues that Arpin's actions were inconsistent with Plaintiff's alleged status as an employee.

The Plaintiff does not state how this is relevant to the U.S. Department of Transportation's decision, made manifest through its own regulations, to characterize independent contractor drivers as "employees" as a matter of law. Arpin contends that the Plaintiff and itself are bound by the federal regulations regardless of their actions in this particular case. Even if all of the cited facts give rise to an inference that Pouliot was an independent contractor, nevertheless, the 49 C.F.R. 390.5 definition of employee converts the independent contractor status to that of an employee.

Furthermore, as noted in the cases cited by the Plaintiff, statements made in depositions are evidentiary, not judicial admissions. Therefore, Arpin may still assert that Pouliot was an employee under the federal regulations.

APPLICABILITY OF 49 C.F.R. § 390.5

On page 6 of Plaintiff's Opposition Memo, he states, "49 C.F.R. § 390.5 defines employee to include independent contractors 'for purposes of this sub-chapter' - a clear indication that the scope of the definition is limited to providing protections to the motoring public as set forth in Reliance Ins.Co., supra, or to provide additional protection to the motoring public under the MCS-90 endorsement. See e.g., Pierre v. Providence Washington Ins. Co., 784 N.E.2d 52, 55 (N.Y. 2002) (discussing purposes of motor carrier regulations); see also Integral Ins. Co. v. Lawrence Fulbright Trucking, Inc., 930 F.2d 258, 260 (2d.Cir. 1991)"

Admittedly, the above-cited cases set forth a policy of protecting the "motoring public". However, neither case discusses 49 C.F.R. §390.5 and its "employee" definition. There is no need to speculate, however, as to the applicable policies regarding 49 C.F.R. § 390.5, as Arpin has cited several cases addressing the issue in its Motion to Dismiss. See Arpin's Motion to Dismiss at pages 5-13.

When construing Federal Motor Carrier Safety Regulation § 390.5, the employment characterization of the Federal Motor Carrier Safety Regulations remains constant regardless of

the litigation context or the broader public policy goals of the regulations.  See <u>Consumers Cty.</u>

<u>Mut. Ins. v. PW Sons Trucking</u>, 307 F.3d 362, 366-7 (5th Cir. 2002); <u>Perry v. Harco National</u>

<u>Insurance Company</u>, 129 F.3d 1071, 1074-5 (9th Cir. 1997); See Exhibit 2, <u>Joyce v. Pederson,</u>

Civil Action No. 01-2609-GTV, Memorandum and Order (D. Kansas, February 14, 2003).

The Ninth Circuit Court of Appeals has held that "[W] hile the definition of employee in

§390.5 may well have been motivated by the policy rationale Appellant advances, nothing in the

Regulation suggests that the definition applies only where it directly fulfills the purposes she

cites.  To the contrary, the clear language of §390.1 indicates that the definition applies

throughout the chapter."  See <u>Perry v. Harco National Insurance Company</u>, 129 F.3d 1071, 1074-

75 (9th Cir. 1997).

<u>Joyce v. Pederson</u> is especially apt.  In <u>Joyce</u>, the U.S. District Court of Kansas found

that a motor carrier's attempt to create an independent contractor relationship through an owner-

operator agreement was subject to the "employee" definition of 49 C.F.R. § 390.5.  See Exhibit

2, <u>Joyce v. Pederson</u>

The court found that the Independent Contractor Agreement created an employer-

employee relationship despite its language.  See <u>Pedersen</u> at *5.

The Owner-Operator Agreement between Plaintiff and Arpin must also be construed to

create an employer-employee relationship which is governed by 49 C.F.R. § 390.5.  Given the

5

authority above, which has overruled the context specific definition of an "employee" and held it applicable to owner-operator agreements, Plaintiff must be considered an employee under Connecticut and Rhode Island worker's compensation law.

## VALIDITY OF WHITE V. EXCALIBUR

On page 7 at note 4, Plaintiff dismisses Arpin's citation of White v. Excalibur, 599 F.2d 50 (5th Cir.), cert. denied, 444 U.S. 965 (1979). Plaintiff claims that White is no longer persuasive authority on the statutory employee issue. Arpin, on the other hand claims that the recent cases defining § 390.5 should prompt the court to reconsider whether the underlying theories of the cases cited in the Plaintiff's footnote are still valid themselves. White is especially significant given that the Fifth Circuit Court of Appeals applied the statutory employee principle to a state worker's compensation regime. Given that the context-specific definition of "employee" has been roundly rejected, White should be construed as allowing 49 C.F.R. §390.5 to supply the applicable "employee" definition in the Connecticut and Rhode Island worker's compensation regimes.

## INDEPENDENT CAUSE OF ACTION

On page 9 of Plaintiff's Opposition Memo, he states "Mr. Pouliot has a cause of action for Arpin's violation of safety regulations promulgated under the Federal Motor Carrier Act, including 49 C.F.R. § 396.3(a) for Arpin's provision of a defective and dangerous vehicle."

Arpin contends that the Plaintiff's allegations do not implicate 49 C.F.R. § 396.3 (a). See Exhibit 3, 49 C.F.R. § 396.3 (a). Throughout this litigation and up to the date of this Memorandum, Plaintiff has contended that Arpin provided the Plaintiff with a defective liftgate, which caused the Plaintiff's injuries.

Arpin contends that the Plaintiff has not plead an independent cause of action under §396.3(a). Instead, the language of Plaintiff's pleading indicates that Arpin's alleged violation of §396.3(a), if found to be true constitutes evidence of Arpin's negligence. Paragraph 7 of Counts One and Two of Plaintiff's Complaint reads, "The injuries to Shawn Pouliot were the direct and proximate result of the defendant, Arpin Logistics' negligence and/or carelessness in *one or more* of the following ways. . ." [Italics added for emphasis]. See Exhibit 4, Plaintiff's Fifth Amended Complaint. A list of allegations (a)-(m) subsequently follows. Subparagraph (m) reads "failed to comply with federal safety requirements under the Motor Carrier Act, including 49 C.F.R. § 396.3(a), by providing plaintiff with a defective and dangerous vehicle *as set forth above*." [Italics added for emphasis]. See Exhibit 4, Plaintiff's Fifth Amended Complaint.

This is clearly not an independent cause of action as alleged. As alleged by the Plaintiff Arpin may be completely non-liable pursuant to 49 C.F.R. §396.3 (a), yet still be liable for common law negligence depending on resolution of the allegations contained in Paragraphs 7(a)-(l) of Counts One and Two.

As such, Plaintiff is still subject to the exclusionary provisions of Rhode Island and Connecticut which include claims of common law negligence under state law. See Conn.Gen.Stat. §31-284; R.I.G.L. §28-29-20.

Arpin contends that the scope of 49 C.F.R. §396.3 (a) does not include a liftgate within its definition of a "motor vehicle." The provision reads, "(a) - **General** - Every motor carrier shall systematically inspect, repair, and maintain or cause to be maintained, all vehicles subject to its control. (1) Parts and accessories shall be in safe and proper operating condition at all times. These include those specified in Part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels and rims and steering systems." See Exhibit 3, 49 C.F.R. 396.3(a).

All these parts are related to the actual driving of the vehicle. A liftgate is unlike any of the accessories above. It has nothing to do with the actual driving of the automobile. Thus it should not be considered as part of a "motor vehicle" pursuant to the regulation. It (the liftgate) is outside the scope of "these parts and accessories which may affect safety of operation", and therefore is not subject to the provisions of §396.3 (a).

Furthermore, Part 393 lists the parts and accessories which the Department of Transportation deems necessary for safe operation. See Exhibit 5, Part 393 of Federal Motor

Carrier Safety Regulation. A liftgate is not a US DOT listed part and/or accessory necessary for safe operation of the motor vehicle. Given the extensive use of liftgates in the motor carrier industry, this omission must be considered intentional. It is clear that the intent of that regulation is to encourage the safe operation of the motor vehicle itself, not some accessory part.

In addition 49 C.F.R. §396.11, which requires driver inspection reports, does not include liftgates as part of the inspection report process. See Exhibit 6, 49 C.F.R. §396.11. It is clear that the intent is directed at the safe operation of the principal moving parts of the motor vehicle, not some accessory part.

Under the rule of construction of ejusdem generis, general language in an enumeration of specific illustrations is construed in a fashion that limits the general language to the same class of matters as the thing illustrated. See United States v. Carrozzella, 103 F.3d 796, 800 (2nd Cir. 1997). Application of the rule of construction ejusdem generis here would limit the general language of §396.3(a) to equipment used in the actual driving process. Therefore, a liftgate is not included under the regulation.

In conclusion, §396.3 (a) does not include the maintenance of liftgates. As the Plaintiff has, until his Fifth Amended Complaint, failed to put forth this allegation and has consistently asserted only defects in the liftgate, this court should not allow this newfound allegation to defeat

9

Arpin's Motion to Dismiss until the allegation is supported by material facts so as to survive a summary judgment motion.

In addition, the §396.3 (a) allegation is not alleged as an independent cause of action. This creates difficulty in testing the allegation through Fed.R.Civ.P. 12 (b)(6) or Fed.R.Civ.P. 56. As such, this is still a cause of action based on common law negligence. Thus it is subject to the exclusionary provisions of Connecticut and Rhode Island. Unless, the Plaintiff amends his complaint to include this allegation as an independent cause of action, the court must not permit this late allegation of negligence to defeat Arpin's Motion to Dismiss, which was filed approximately four and one-half months prior to the new allegation.

For the foregoing reasons Arpin prays that its Motion to Dismiss dated May 12, 2003 be granted.

Defendants, Cross-Claim Plaintiffs
and Third-Party Plaintiffs,
By their Attorney

Thomas J, Grady, Esquire
Federal Bar No. CT 17139
*LENIHAN, GRADY & STEELE*
6 Canal Street, P.O. Box 541
Westerly, RI 02891
(401) 596-0183
(401) 596-6845 (Fax)

### *CERTIFICATION OF NOTICE*

I hereby certify that a copy of the foregoing was forwarded, via U.S. First Class Mail this ___ day of *October*, 2003, to Michael A. Stratton, Esquire of *Stratton Faxon*, 59 Elm Street, New Haven, CT 06510, Roland F. Moots, Jr., Esquire *of Moots, Pellegrini, Mannion, Martindale & Dratch*, 46 Main Street, New Milford, CT 06776, Susan O'Donnell, Esquire of *Halloran & Sage*, One Goodwin Square, 225 Asylum Street, Hartford, CT 06103 and John Tarantino, Esquire and James R. Oswald, Esquire of *Adler, Pollack & Sheehan*, P.C., 2300 Financial Plaza, Providence, RI 02903-2443.

_____
Thomas J. Grady

11

# EXHIBIT 1

for transportation performed by the Federal government, a State, or any political subdivision of a State, the exceptions are only applicable to government entities in the United States.

**Editor's Note:** The information was issued after the interactions were published in the *Federal Register* in April 1997.

## §390.5 Definitions.

Unless specifically defined elsewhere, in this subchapter:

**Accident means—**

(1) Except as provided in paragraph (2) of this definition, an occurrence involving a commercial motor vehicle operating on a highway in interstate or intrastate commerce which results in:

(i) A fatality;

(ii) Bodily injury to a person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or

(iii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicles to be transported away from the scene by a tow truck or other motor vehicle.

(2) The term *accident* does not include:

(i) An occurrence involving only boarding and alighting from a stationary motor vehicle; or

(ii) An occurrence involving only the loading or unloading of cargo.

**Alcohol concentration (AC)** means the concentration of alcohol in a person's blood or breath. When expressed as a percentage it means grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath.

**Bus** means any motor vehicle designed, constructed, and or used for the transportation of passengers, including taxicabs.

**Business district** means the territory contiguous to and including a highway when within any 600 feet along such highway there are buildings in use for business or industrial purposes, including but not limited to hotels, banks, or office buildings which occupy at least 300 feet of frontage on one side or 300 feet collectively on both sides of the highway.

**Charter transportation of passengers** means transportation, using a bus, of a group of persons who pursuant to a common purpose, under a single contract, at a fixed charge for the motor vehicle, have acquired the exclusive use of the motor vehicle to travel together under an itinerary either specified in advance or modified after having left the place of origin.

— 311 —

**Commercial motor vehicle** means any self-propelled or towed motor vehicle used on a highway in interstate commerce to transport passengers or property when the vehicle—

(1) Has a gross vehicle weight rating or gross combination weight rating, or gross vehicle weight or gross combination weight, of 4,536 kg (10,001 pounds) or more, whichever is greater; or

(2) Is designed or used to transport more than 8 passengers (including the driver) for compensation; or

(3) Is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; or

(4) Is used in transporting material found by the Secretary of Transportation to be hazardous under 49 U.S.C. 5103 and transported in a quantity requiring placarding under regulations prescribed by the Secretary under 49 CFR, subtitle B, chapter I, subchapter C.

**Conviction** means an unvacated adjudication of guilt, or a determination that a person has violated or failed to comply with the law in a court of original jurisdiction or by an authorized administrative tribunal, an unvacated forfeiture of bail or collateral deposited to secure the person's appearance in court, a plea of guilty or nolo contendere accepted by the court, the payment of a fine or court cost, or violation of a condition of release without bail, regardless of whether or not the penalty is rebated, suspended, or probated.

**Direct Assistance** means transportation and other relief services provided by a motor carrier or its driver's incident to the immediate restoration of essential services (such as, electricity, medical care, sewer, water, telecommunications, and telecommunication transmissions) or essential supplies (such as, food and fuel). It does not include transportation related to long-term rehabilitation of damaged physical infrastructure or routine commercial deliveries after the initial threat to life and property has passed.

**Disabling damage** means damage which precludes departure of a motor vehicle from the scene of the accident in its usual manner in daylight after simple repairs.

(1) *Inclusions.* Damage to motor vehicles that could have been driven, but would have been further damaged if so driven.

(2) *Exclusions.*

(i) Damage which can be remedied temporarily at the scene of the accident without special tools or parts.

(ii) Tire disablement without other damage even if no spare tire is available.

(iii) Headlamp or taillight damage.

(iv) Damage to turn signals, horn, or windshield wipers which makes them inoperative.

**Driveaway-towaway operation** means any operation in which a motor vehicle constitutes the commodity being transported and one or more set of wheels of the motor vehicle being transported are on the surface

**Driving a commercial motor vehicle under the influence of alcohol** means committing any one or more of the following acts in a CMV: driving a CMV while the person's alcohol concentration is 0.04 or more; driving under the influence of alcohol, as prescribed by State law; or refusal to undergo such testing as is required by any State or jurisdiction in the enforcement of Table 1 to §383.51 or §392.5(a)(2) of this subchapter.

**Emergency** means any hurricane, tornado, storm (e.g. thunderstorm, snowstorm, icestorm, blizzard, sandstorm, etc.), high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, mud slide, drought, forest fire, explosion, blackout or other occurrence, natural or man-made, which interrupts the delivery of essential services (such as, electricity, medical care, sewer, water, telecommunications, and telecommunication transmissions) or essential supplies (such as, food and fuel) or otherwise immediately threatens human life or public welfare, provided such hurricane, tornado or other event results in:

(1) A declaration of an emergency by the President of the United States, the Governor of a State, or their authorized representatives having authority to declare emergencies; by the FMCSA Field Administrator for the geographical area in which the occurrence happens; or by other Federal, State or local government officials having authority to declare emergencies.

(2) A request by a police officer for tow trucks to move wrecked or disabled motor vehicles.

**Emergency relief** means an operation in which a motor carrier or driver of a commercial motor vehicle is providing direct assistance to supplement State and local efforts and capabilities to save lives or protect public health and safety as a result of an emergency as defined in this section.

**Employee** means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle), a mechanic, and a freight handler. Such term does not include an employee of the United States, any State, any political subdivision of a State, or any agency established under a compact between States and approved by the Congress of the United States who is acting within the course of such employment.

**Employer** means any person engaged in a business affecting interstate commerce who owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it, but such term does not include the United States, any State, any political subdivision of a State, or an agency established under a compact between States approved by the Congress of the United States.

**Combination weight rating (GCWR)** means the value specified by the manufacturer as the loaded weight of a combination (articulated) motor vehicle. In the absence of a value specified by the manufacturer, GCWR will be determined by adding the GVWR of the power unit and the total weight of the towed unit and any load thereon.

**Gross vehicle weight rating (GVWR)** means the value specified by the manufacturer as the loaded weight of a single motor vehicle.

# EXHIBIT 2

## LOIS Federal District Court Opinions

JOYCE v. PEDERSEN, (Kan. 2003)

TRACY JOYCE, Plaintiff, v. STEVE PEDERSEN, INDIVIDUALLY

AND AS AN AGENT FOR SMITHWAY MOTOR XPRESS, INC., AN IOWA

CORPORATION, AND SMITHWAY MOTOR XPRESS, INC., AN IOWA

CORPORATION, Defendants.

Civil Action No. 01-2609-GTV

United States District Court, D. Kansas.

February 14, 2003

### MEMORANDUM AND ORDER

G. THOMAS VANBEBBER, United States Senior District Judge

Plaintiff Tracy Joyce brings this diversity negligence action seeking recovery for injuries sustained when he was hit by a pipe that fell off a tractor-trailer truck while it was being loaded. Plaintiff brought suit against the truck driver, Steve Pedersen, and the company for which Defendant Pedersen was hauling the pipe, Smithway Motor Xpress, Inc. Both Defendants moved for summary judgment (Doc. 31). Defendants' arguments can be grouped into three categories: (1) Defendant Pedersen owed no duty to Plaintiff; (2) Defendant Pedersen's actions were not the proximate cause of Plaintiff's injuries; and (3) Defendant Smithway Motor Xpress, Inc., cannot be held vicariously liable for Defendant Pedersen's actions because Defendant Pedersen was an independent contractor. For the reasons stated below, the court rejects Defendants' arguments and denies their motion for summary judgment.

Also before the court is Plaintiff's motion to strike certain uncontroverted facts, which is embedded in Plaintiff's response to Defendants' summary judgment motion (Doc. 37). Although Plaintiff's "motion" is not one contemplated by the Federal Rules of Civil Procedure, the parties appear to have reached an agreement as to the disposition of the motion, and it is therefore denied as moot.

### I. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to the non-moving party's case. Immaterial facts and facts not properly supported by the record are omitted.

On February 24, 2000, employees of the Bennett Rogers Coating Company were loading pipes onto Defendant Pedersen's tractor-trailer truck with a forklift. Witnesses testified that one or more pipes slipped off the end of the forklift and struck Plaintiff's legs. The accident occurred on Bennett Rogers property, and Plaintiff was an employee of Bennett Rogers.

Defendant Pedersen had been hauling various sizes of pipes for over thirteen years, and was familiar with the practices of loading pipe on a trailer. However, he had not been to the Bennett Rogers facility before the date of the accident.

As the truck driver, Defendant Pedersen's role in the loading process
was to indicate where the pipe should go on the trailer, making sure the
pipe was not too far forward or off center. Matt Meyerhoff, Plaintiff's
expert witness, testified in deposition that Defendant Pedersen was the
"captain of the ship" during the loading process and the person most
knowledgeable of the tractor-trailer. Champ Bennett, President of Bennett
Rogers, testified in deposition that truck drivers often tell you where
they want the load "and [are], to some degree, part of the loading
effort." Grant Bennett, the person responsible for managing the outside
laborers, testified in deposition that while he did not recall that his
company had asked Defendant Pedersen for assistance or guidance in
loading the pipe, "[m]ost drivers will tell you how they want it
loaded."

A Bennett Rogers employee directed Defendant Pedersen where to park his
tractor-trailer truck and advised him that they would load the pipe from
the driver's side only. Pedersen had always observed loading from both
sides of the truck, but he did not protest Bennett Rogers's loading
procedure even though he regarded the procedure as "inappropriate" and
"clumsy."

While the pipe was being loaded, Defendant Pedersen was standing close
to Plaintiff. Two witnesses testified in deposition that they saw
Defendant Pedersen talking with Plaintiff before the pipe fell, although
Plaintiff himself testified that he was not paying any attention to
Defendant Pedersen. Plaintiff was putting cardboard between the pipes and
boards on the tractor-trailer while the pipe was being loaded. Defendant
Pedersen was doing nothing. Mr. Meyerhoff testified in deposition that
Plaintiff was standing in a position that was a "very obvious hazard to
anyone." When the pipe began to roll, Plaintiff and Defendant Pedersen
both ran toward the rear of the tractor-trailer, where Plaintiff alleges
that they collided with one another. At least one witness asserts that
Defendant Pedersen blocked Plaintiff's escape route. The accident
happened "very quickly," in what one Bennett Rogers employee estimated to
be three seconds. Plaintiff testified in deposition that "something"
knocked him down, but that he does not know that it was Defendant
Pedersen. He testified that he knows only that he "ran into somebody
trying to get out of the way."

"Pipe stakes," which are metal stakes that are stuck into holes in the
trailer bed to help prevent pipes from rolling off the trailer, were not
used in the loading process, but could have prevented the accident. Grant
Bennett testified in deposition that Defendant Pedersen denied having
pipe stakes to use at the time of loading, and that it was Bennett
Rogers's decision to proceed without using them.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue of material fact
and that the moving party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c). Lack of a genuine issue of material fact means that
the evidence is such that no reasonable jury could return a verdict for
the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986). Essentially, the inquiry is "whether the evidence presents a
sufficient disagreement to require submission to a jury or whether it is
so one-sided that one party must prevail as a matter of law." Id. at
251-52.

The moving party bears the initial burden of demonstrating the absence
of a genuine issue of material fact. This burden may be met by showing
that there is a lack of evidence to support the nonmoving party's case.
Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party

has properly supported its motion for summary judgment, the burden shifts
to the nonmoving party to show that there is a genuine issue of material
fact left for trial. Anderson, 477 U.S. at 256. "[A] party opposing a
properly supported motion for summary judgment may not rest on mere
allegations or denials of his pleading, but must set forth specific facts
showing that there is a genuine issue for trial." Id. Therefore, the mere
existence of some alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for summary judgment. Id.
The court must consider the record in the light most favorable to the
nonmoving party. Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir. 1984).

### III. DISCUSSION

   Plaintiff claims that Defendant Pedersen was negligent in several
ways: (1) he engaged Plaintiff in conversation, distracting Plaintiff so
that Plaintiff was slow in reacting to the falling pipe; (2) he failed to
observe the falling pipe and warn Plaintiff of it; (3) he positioned
himself in a dangerous location, blocking Plaintiff's escape route; (4)
he collided with Plaintiff as Plaintiff attempted to escape; (5) he did
not provide pipe stakes or demand their use; (6) he failed to suggest or
demand that his tractor-trailer be parked in an open area where it could
be loaded from either side of the trailer; and (7) he failed to object to
the loading process of Bennett Rogers.

   In order to prevail on any of his negligence claims, Plaintiff must
offer evidence establishing that Defendant Pedersen owed a duty to him,
that Defendant Pedersen breached that duty, that Plaintiff was injured,
and that a causal connection existed between the duty breached and the
injury sustained. See Napell v. Aten Dep't Store, Inc.,
115 F. Supp.2d 1275, 1278 (D.Kan. 2000).

#### A. Duty

   Defendants first claim that they are entitled to summary judgment
because Defendant Pedersen did not have a duty to prevent Plaintiff from
being harmed. Whether a duty exists is a question of law. Major by &
through Major v. Castlegate, Inc., 935 P.2d 225, 230 (Kan.Ct.App. 1997)
(citing Durflinger v. Artiles, 673 P.2d 86, 91 (Kan. 1983)). The Kansas
Supreme Court has indicated when it will recognize a duty:

> The probability of injury by one to another is the
> basis for the creation of the duty to avoid injury,
> and every person is under a duty to exercise his
> senses and intelligence in his actions to avoid injury
> to another, and it is no excuse that the one who
> created the peril did not intend or expect an injury
> to result. . . . If the circumstances are such that a
> person of ordinary common sense who thought about it
> would recognize at once that if he did not use
> ordinary care in his own conduct with regard to those
> circumstances, his act would place another in danger,
> the duty to use ordinary care to avoid the danger
> arises. If there is some probability of harm
> sufficiently serious that ordinary men would take
> precautions to avoid it, then failure to take such
> care is negligence.

Rowell v. City of Wichita, 176 P.2d 590, 595 (Kan. 1947) (citations
omitted).

   Defendant Pedersen was involved in a situation where heavy pipes were
being loaded onto his tractor-trailer truck. Mr. Meyerhoff acknowledged
that loading pipes in the manner they were loaded in this case was
"obvious[ly] hazardous." The court concludes that such a situation is one

where Defendant Pedersen should have realized that if he did not use
ordinary care in his own conduct with regard to those circumstances, his
act would place another in danger." See id. Based on the evidence before
it, the court concludes that Defendant Pedersen had the duty to act with
ordinary care.

What constitutes "ordinary care" is an issue for the jury. The summary
judgment record includes evidence that Defendant Pedersen was a veteran
in the trucking industry and considered the pipe-loading approach
employed by Bennett Rogers workers to be "inappropriate" and "clumsy."
There is also testimony suggesting that Defendant Pedersen had some role
to fulfill in the loading process. Furthermore, there is evidence
suggesting that Plaintiff was standing in a position that was a "very
obvious hazard to anyone." All of this evidence is sufficient to create
an issue of fact for the jury as to whether Defendant Pedersen acted with
ordinary care.

The court acknowledges Defendants' arguments that any injury to
Plaintiff was not foreseeable; that any danger was "obvious," eliminating
any duty by Defendant Pedersen to warn Plaintiff; and that Defendant
Pedersen was acting in the face of an emergency. All of these issues are
proper for resolution by a jury, not by the court.

The court determines that, based on the evidence before it, Defendant
Pedersen had a duty to act with ordinary care, but that the definition of
"ordinary care" is an issue for the jury. The court denies summary
judgment on this issue.

### B. Proximate Cause

Defendants next argue that Defendant Pedersen's actions, as a matter of
law, were not the proximate cause of Plaintiff's injuries. Again,
Defendants argue, correctly, that Plaintiff's injuries must be reasonably
foreseeable. Calwell v. Hassan, 925 P.2d 422, 428 (Kan. 1996). They also
submit that Plaintiff's own actions (i.e., running into Defendant
Pedersen) were an intervening cause of the accident. Plaintiff has
presented enough evidence, however, to create an issue of fact for the
jury as to whether his injuries were foreseeable. The court denies
summary judgment on this issue.

### C. Vicarious Liability

Finally, Defendants argue that because Defendant Pedersen is an
independent contractor, Defendant Smithway Motor Xpress, Inc. is not
responsible for his actions or inaction. Defendants cite common law
principles of vicarious liability and respondeat superior in support of
their argument. They attach a copy of their "Independent Contractor
Agreement," which specifies that Defendant Smithway Motor Xpress, Inc.
leased the tractor-trailer truck at issue from Defendant Pedersen and
that the parties intended to create a carrier/independent contractor
relationship. Plaintiff responds summarily, stating only that "[u]nder
FMCSR 390.5, an Independent contractor is an employee for purposes of the
Federal Motor Carrier Safety Regulations." 49 C.F.R. § 390.5
eliminates the common law distinction between employees and independent
contractors for drivers of commercial motor vehicles, Consumers County
Mut. Ins. Co. v. P.W. & Sons Trucking, Inc., 307 F.3d 362, 366 (5th
Cir. 2002), defining an employee as:

   any individual, other than an employer, who is
   employed by an employer and who in the course of his
   or her employment directly affects commercial motor
   vehicle safety. Such term includes a driver of a
   commercial motor vehicle (including an independent
   contractor while in the course of operating a
   commercial motor vehicle), a mechanic, and a freight

handler.

Defendants submit that § 390.5 only makes an independent contractor an employee for purposes of "following safety regulations." The court disagrees. The court's research has revealed several cases that have applied the statutory employment concept in other instances. See, e.g., Consumers County Mut. Ins. Co., 307 F.3d at 366 (holding that the parties intended for the § 390.5 definition of employee to apply in insurance policy procured by trucking company). The court determines that, based on the evidence presently before it, federal law may impose a statutory employment relationship on Defendants. Although Plaintiff failed to direct the court to any relevant case law on the matter, the court's research has revealed the following body of law.

In the 1950s, trucking companies customarily used independent truck drivers as independent contractors. Fuller v. Riedel, 464 N.W.2d 97, 101 (Wis.Ct.App. 1990) (citing Wilson v. Riley Whittle, Inc., 701 P.2d 575, 578-79 (Ariz.Ct.App. 1984)); Wilson, 701 P.2d at 578. The drivers would lease their tractor-trailer trucks to a trucking company, and then drive the trucks for the company. By structuring the relationship in such a way, the trucking companies could insulate themselves from liability for the drivers' negligent acts. Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co., 868 F.2d 357, 362 (10th Cir. 1989); Fuller, 464 N.W.2d at 101 (citing Wilson, 701 P.2d at 578-79); Wilson, 701 P.2d at 579. To thwart this practice, Congress enacted 49 U.S.C. § 304(e), which was later reenacted as § 11107 and, most recently, § 14102. Empire Fire & Marine Ins. Co., 868 F.2d at 362; Fuller, 464 N.W.2d at 101 (citing Wilson, 701 P.2d at 578-79); Wilson, 701 P.2d at 578-79. This statute and its regulations were "intended to put the use and operation of leased equipment on a parity with the use of equipment owned by the authorized carrier and operated by its own employees, in effect making the driver of the leased unit a statutory employee of the lessee." Transp. Indem. Co. v. Carolina Cas. Ins. Co., 652 P.2d 134, 136 (Ariz. 1982).

Although it appears that under Tenth Circuit law, there may be an instance where a trucking company would not be held strictly liable for the actions of its drivers, Dietrich v. Coast to Coast Moving & Storage Co., No. 94-2103, 1995 WL 355246, at *8-9 (10th Cir. June 14, 1995), there is at least a rebuttable presumption of a statutory employment relationship between a trucking company and its drivers. Id.; Rodriguez v. Ager, 705 F.2d 1229, 1233-36 (10th Cir. 1983). But see Parker v. Erixon, 473 S.E.2d 421, 423-24 (N.C.Ct.App. 1996) (classifying Rodriguez as a case that held that there is an *irrebuttable* presumption of a statutory employment relationship and reviewing majority and minority views on statutory employment relationship); Wyckoff Trucking, Inc. v. Marsh Bros. Trucking Serv., Inc., 569 N.E.2d 1049, 1052-53 (Ohio 1991) (same); Patrick Phillips, Note, Common Law Respondeat Superior Versus Fed. Regulation of Motor Carrier Leases: Court Interpretation of the Interstate Commerce Comm'n Regulations of Motor Carrier Lease Requirements, 24 Okla. City U. L. Rev. 383, 394, 393-411 (1999) (same). Defendants have neither expressly argued nor met their burden of showing that such a relationship does not exist in this case.

IT IS, THEREFORE, BY THE COURT ORDERED that Defendants' motion for summary judgment (Doc. 31) is denied.

IT IS FURTHER ORDERED that Plaintiff's motion to strike (Doc. 37) is denied as moot.

Copies of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved

# EXHIBIT 3

# PART 396 — INSPECTION, REPAIR, AND MAINTENANCE

§396.1    Scope.
§396.3    Inspection, repair and maintenance.
§396.5    Lubrication.
§396.7    Unsafe operations forbidden.
§396.9    Inspection of motor vehicles in operation.
§396.11   Driver vehicle inspection report(s).
§396.13   Driver inspection.
§396.15   Driveaway-towaway operations and inspections.
§396.17   Periodic inspection.
§396.19   Inspector qualifications.
§396.21   Periodic inspection recordkeeping requirements.
§396.23   Equivalent to periodic inspection.*
§396.25   Qualifications of brake inspectors.

AUTHORITY: 49 U.S.C. 31133, 31136, and 31502; and 49 CFR 1.73.

## §396.1 Scope.

**General** — Every motor carrier, its officers, drivers, agents, representatives, and employees directly concerned with the inspection or maintenance of motor vehicles shall comply and be conversant with the rules of this part.

[44 FR 38526, July 2, 1979, as amended at 53 FR 18058, May 19, 1988]

## §396.3 Inspection, repair and maintenance.

**(a) General** — Every motor carrier shall systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles subject to its control.

(1) Parts and accessories shall be in safe and proper operating condition at all times. These include those specified in Part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels and rims, and steering systems.

(2) Pushout windows, emergency doors, and emergency door marking lights in buses shall be inspected at least every 90 days.

**(b) Required records** — For vehicles controlled for 30 consecutive days or more, except for a private motor carrier of passengers (nonbusiness), the motor carriers shall maintain, or cause to be maintained, the following record for each vehicle:

(1) An identification of the vehicle including company number, if so marked, make, serial number, year, and tire size. In addition, if the motor vehicle is not owned by the motor carrier, the record shall identify the name of the person furnishing the vehicle;

(2) A means to indicate the nature and due date of the various inspection and maintenance operations to be performed;

(3) A record of inspection, repairs and maintenance indicating their date and nature; and

(4) A record of tests conducted on pushout windows, emergency doors, and emergency door marking lights on buses.

**(c) Record retention** — The records required by this section shall be retained where the vehicle is either housed or maintained for a period of 1 year and for 6 months after the motor vehicle leaves the motor carrier's control.

[44 FR 38526, July 2, 1979, as amended at 48 FR 55868, Dec. 16, 1983; 53 FR 18058, May 19, 1988; 59 FR 23, 1994; 59 FR 60324, Nov. 23, 1994]]

### DOT Interpretations — §396.3

**Question 1.** What is meant by "systematic inspection, repair and maintenance"?

*Guidance:* Generally, systematic means a regular or scheduled program to keep vehicles in a safe operating condition. §396.3 does not specify inspection, maintenance, or repair intervals because such intervals are fleet specific and, in some instances, vehicle specific. The inspection, repair, and maintenance intervals are to be determined by the motor carrier. The requirements of §§396.11, 396.13, and 396.17 are in addition to the systematic inspection, repair, and maintenance required by §396.3.

**Question 2.** 396.3(b)(4) refers to a record of tests. What tests are required of pushout windows and emergency door lamps on buses?

*Guidance.* Generally, inspection of a push-out window would require pushing out the window. However, if the window may be destroyed by pushing out to test its proper functioning, a visual inspection may qualify as a test if the inspector can ascertain the proper functioning of the window without opening it. Checking to ensure that the rubber push-out molding is properly in place and has not deteriorated and that any handles or marking instructions have not been tampered with would meet the test requirement. Inspection of emergency door marking lights would require opening the door to test the lights.

**Question 3.** Who has the responsibility of inspecting and maintaining leased vehicles and their maintenance records?

*Guidance.* The motor carrier must either inspect, repair, maintain, and keep suitable records for all vehicles subject to its control for 30 consecutive days or more, or cause another party to perform such activities. The motor carrier is solely responsible for ensuring that the vehicles under its control are in safe operating condition and that defects have been corrected.

**Question 4.** Is computerized recordkeeping of CMV inspection and maintenance information permissible under §396.3 of the FMCSRs?

*Guidance.* Yes, if the minimum inspection, repair, and maintenance records required are included in the computer information system and can be reproduced on demand.

**Question 5.** Where must vehicle inspection and maintenance records be retained if a vehicle is not housed or maintained at a single location?

*Guidance.* The motor carrier may retain the records at a location of its choice. If the vehicle maintenance records are retained at a location apart from the vehicle, the motor carrier is not relieved of its responsibility for ensuring that the records are current and factual. In all cases, however, upon request of the FHWA the maintenance records must be made available within a reasonable period of time (2 working days).

## §396.5 Lubrication.

Every motor carrier shall ensure that each motor vehicle subject to its control is—

(a) properly lubricated; and

(b) free of oil and grease leaks.

# EXHIBIT 4