FILED

2004 SEP 21 A 9:40

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHAWN POULIOT<br>    Plaintiff, | :<br>: |
| v. | :   CIVIL ACTION NO.<br>:   3:02 CV 1302 (DJS) |
| PAUL ARPIN VAN LINES, INC.;<br>ARPIN LOGISTICS, INC.; THE FESTO<br>CORPORATION; MICHAEL D. KOVAC<br>d/b/a TRANS-EXPO INTERNATIONAL,<br>ERICA RAMIREZ, IN HER CAPACITY AS<br>EMPLOYEE OF TRANS-EXPO<br>INTERNATIONAL, | :<br>:<br>:<br>:<br>:<br>:<br>:   SEPTEMBER 20, 2004 |

## OBJECTION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER AND SANCTIONS AND REQUEST FOR EXPEDITED CONSIDERATION OF THIS MOTION

Plaintiff seeks the protection of this Court to preclude Defendant, Arpin from requesting certain documents and taking a deposition of the Nationwide Mutual Insurance Company as well as to impose a requirement that the deposition of William Tweedy be held in a U.S. District Courthouse with a U.S. Marshall due to Mr. Tweedy's behavior.

The issues will be considered separately in order to promote clarity.

Fed.R.Civ.P. 26(c) provides in part that, "(c) Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute

***ORAL ARGUMENT REQUESTED***

1

without court action, and *for good cause shown,* the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the disclosure or discovery not be had;

(1) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place;

(2) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(3) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters;

(4) that discovery be conducted with no one present except persons designated by the court;" [Italics added for emphasis]

Protective orders are entered for "good cause". Glenmede Trust Co. v. Thompson, 56 F.3d 476 (3d Cir. 1995) (good cause is established when disclosure will cause clearly defined and serious injury). The court has almost complete discretion in determining what constitutes good cause. Miscellaneous Docket Matter #1 v. Miscellaneous Docket Matter #2, 197 F.3d 922,

925 (8th Cir. 1999); <u>Wiggins v. Burge</u>, 173 F.R.D. 226, 229 (N.D. Ill. 1997) ("In deciding whether good cause exists, the district court must balance the interests involved: the harm to the parties seeking the protective order and the importance of disclosure to the public").

A court may grant a Protective Order prohibiting the taking of a deposition when it believes the information sought is wholly irrelevant to the issues or to prospective relief. <u>Leighr R. v. Beverly Enterprises – Kansas Inc.</u>, 164 F.R.D. 550, 551 (D. Kan. 1996).

In general the court will balance the need of the party seeking the discovery against the burden on the party responding. <u>In re Wilson</u>, 149 F.3d 249, 252 (4th Cir. 1998).

The party seeking the protective order has the burden of showing that good cause exists by stating particular and specific facts. See <u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 102, 101 S. Ct. 2193, 2201, 69 L.Ed.2d 693 (1981); <u>In re Terra Int'l, Inc.</u>, 134 F.3d 302, 306 (5th Cir. 1998) ("The burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements").

Courts rarely grant a protective order, which totally prohibits a deposition. See <u>Simmons Foods, Inc. v. Willis</u>, 191 F.R.D. 625, 630 (D.Kan. 2000).

1. <u>THE NATIONWIDE SUBPOENA DUCES TECUM FOR CLAIMS FILE OF NATIONWIDE MUTUAL INSURANCE COMPANY</u>.

On or about June 30, 2004, Charity Bibbee, the former wife of Plaintiff testified under oath as follows:

"Q. Was money a problem in the family? A. We fought about it, yes. Q. Did he ever make any threats to stage an accident and collect the insurance proceeds during the course of your marriage? A. Yes. Q. And on how many occasions? A. Once. Q. One? Do you remember when that was? A. Yes. Q. When was that? A. When we lived in South Carolina we owned a house and he told me that he threw a diaper in the toilet and flushed it...... [See Exhibit 1, page 12, line 11 through page 13, line 5]

F.R.E. 404(a) prohibits evidence of prior bad acts to show propensity. However, Rule 404(b) allows admission of prior acts to show "intent".... or absence of mistake or accident". Furthermore, such incidents are admissible to impeach the credibility of the Plaintiff with respect to his ability to be truthful pursuant to F.R.E. 608(b).

In any event, the ultimate decision with respect to admissibility is not made until the time of trial when the question is propounded. At this stage in the proceedings discovery should be permitted. Plaintiff has not alleged that the production of these documents create "annoyance, embarrassment, oppression, undue burden or expense" as Fed.R.Civ.P. 26(c) requires.

As always, the scope of discovery is outlined by Fed.R.Civ.P. 26(b)(1) which states, "Relevant information need not be admissible at the trial if the discovery appears reasonably

calculated to lead to the discovery of admissible evidence".

Discovery is generally allowed of matters that would be used to impeach other parties' witnesses. See Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 394, 91 L.Ed.451 (1947).

It is not proper, we believe for this court to be making rulings on evidence at this time. All it has to determine is whether or not the evidence is "reasonably calculated to lead to the discovery of admissible evidence."

This discovery deposition of Nationwide Insurance Company is reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Motion for preclusion of the deposition and the production of the documents from Nationwide Insurance Company in this respect should be denied in its entirety.

2.   DEPOSITION OF WILLIAM TWEEDY

At or about the time that Defendant Arpin filed its Motion to Extend the Scheduling Order, Arpin sought to compel the Plaintiff to conduct the deposition of William Tweedy. At the hearing, counsel for Plaintiff said that he did not intend to depose William Tweedy but rather would subpoena him to appear as a witness at the trial. See Text of Transcript of Hearing attached Exhibit 2.

At that time, the court extended the discovery deadline to October 29, 2004. By all means, if Plaintiff wants to depose William Tweedy, he certainly has the option of, himself, for

his own client, and for his own reasons scheduling William Tweedy's deposition in a Federal Court and requesting that a Marshall be present.

Mr. Tweedy's deposition has been discussed with Mr. Tweedy's lawyer, Mr. Peter Haydon, a member of the Rhode Island Bar and I believe of the U.S. District Court Bar in Rhode Island and arrangements have been made with him to conduct the deposition in his conference room at 1050 Main Street, East Greenwich, RI 02818. Mr. Haydon is an officer of the court. He is aware of Mr. Tweedy's prior anger at Mr. Stratton because of Mr. Stratton's threats to the security of Mr. Tweedy. We are quite certain that he would not permit such a deposition to occur on his property and in his conference room were the same kind of responses to occur. We believe that there is able safeguard for the safety of Mr. Stratton and the obligation of Mr. Tweedy to truthfully respond to questions posed to him.

Mr. Haydon has been made aware of Plaintiff's Motion for Protective Order by facsimile transmission and this objection.

As an officer of the court, we are certain that Mr. Haydon's presence will guarantee the proper decorum of Mr. Tweedy during this deposition.

If Plaintiff is still not satisfied and wants to depose Mr. Tweedy in the U.S. District Court, he is always free to file his own notice of deposition and his own subpoena.

Mr. Haydon explained to counsel that Mr. Tweedy has a very sick child and the child's

sickness upsets him a lot. When Mr. Stratton found it necessary to threaten Mr. Tweedy's security, it threatened also the child's security and this made Mr. Tweedy, understandably, very angry.

With respect to persons present at a deposition there is authority that the court may exclude the public, the press, other witnesses, or other non-parties from a deposition under Rule 26(c)(5). See <u>Jones v. Circle Case Doors, Inc.</u>, 185 F.R.D. 223 (M.D. N.C. 1999). The court generally will not exclude parties or their attorneys. We could find no authority requiring a deposition to be conducted in a U.S. District Court with a Marshall present. Further, we are not aware of any grounds upon which one party may move to compel another party to notice a deposition in a U.S. District Court courthouse under the court's supervision.

In further support of this Objection, the undersigned has attached a sworn affidavit in response to the Affidavit attached by Plaintiff's counsel to his Motion. See Exhibit 3.

For the foregoing reasons, Arpin objects to the Plaintiff's requested relief and moves that such relief be denied.

Defendants<br>
By their attorney:<br>
<br>
_____<br>
Thomas J. Grady, Esq., CT 17139<br>
<b><i>LENIHAN, GRADY & STEELE</i></b><br>
Six Canal Street, P.O. Box 541<br>
Westerly, RI 02891<br>
(401) 596-0183<br>
(401) 596-6845 (Fax)

## **<u>CERTIFICATION OF NOTICE</u>**

I hereby certify that a copy of the foregoing was forwarded, via U.S. First Class Mail this 20th day of September 2004 to Michael A. Stratton, Esquire of *Stratton Faxon*, 59 Elm Street, New Haven, CT 06510, Roland F. Moots, Jr., Esquire of *Moots, Pellegrini, Mannion, Martindale & Dratch*, 46 Main Street, New Milford, CT 06776, Susan O'Donnell, Esquire *Halloran & Sage*, One Goodwin Square, 225 Asylum Street, Hartford, CT 06103 and James R. Oswald, Esquire of *Adler, Pollack & Sheehan,* P.C., 2300 Financial Plaza, Providence, RI 02903-2443, Peter Haydon, Esq. (counsel for William Tweedy), 1050 Main Street, East Greenwich, RI 02818, John Madden, Esq. (counsel for Nationwide Insurance Company), Law Offices of John T. Madden, 475 Kilbert Street, Suite 125, Warwick, RI 02886.

_____
Thomas J. Grady, Esq.

8

# EXHIBIT 1

Shawn Pouliot
vs.
Paul Arpin Van Lines, Inc., Arpin Logistics,
Inc., Festo Corporation, Michael D. Kovac
d/b/a Trans-Expo International and
Erica Ramirez

United States District Court
District of Connecticut
Case No. 3:02 CV 1302

Deposition of Charity L. Bibbee
Wednesday - June 30, 2004

# ORIGINAL

Bish & Associates, Inc.
Stenotype Reporters
159 South Main Street
Suite 812
Akron, Ohio 44308
(330) 762-0031
Fax (330) 762-0300
(800) 332-0607

1428 Market Avenue, North
Canton, Ohio 44714
(330) 580-9181
Fax (330) 580-9183

Email: bishassociates@neo.rr.com
www.bish-associates.com

**Page 9**

1 paragraph 24 on page 9 of the final entry it
2 says that "All restraining orders are released
3 except the restraining order remains in effect
4 with respect to the husband's personal injury
5 case."
6      Do you know what that means?
7 A. Not quite sure.
8 Q. Don't know?
9 A. (Witness shaking head from side to
10 side.)
11 Q. Okay. Did you discuss your testimony
12 this morning with anyone before you came?
13 A. No.
14 Q. What -- what was the state of your
15 marriage to Shawn Pouliot prior to October
16 23rd, 2001?
17 A. Fine, I guess.
18 Q. Were there any difficulties in the
19 marriage at all?
20 A. Yes.
21 Q. What kind of difficulties were there?
22 A. He was gone all the time. He drank a
23 lot.
24 Q. Did his drinking affect the marriage?
25 A. Yes.

**Page 10**

1 Q. And did you -- were there conversations
2 with him about his drinking?
3 A. Yes.
4 Q. And when did those conversations begin?
5 A. Exactly when -- exactly when do you
6 mean --
7 Q. Well --
8 A. What do you mean by "begin"?
9 Q. Well, how soon after you were married to
10 him did those conversations begin?
11 A. As soon as we were married.
12 Q. They did?
13 A. Yes.
14 Q. And what kind of drinking habits did he
15 have?
16 A. It was spontaneous; not expected.
17 Q. Not expected?
18 A. No.
19 Q. When you say spontaneous, you mean his
20 drinking or the results of his drinking?
21 A. When he would drink, I never knew when
22 he was going to. It would be when I -- I
23 wasn't expecting it.
24 Q. How often did he drink?
25 A. It varied.

**Page 11**

1 Q. Every day?
2 A. Well, I'm not sure because he was hardly
3 ever home. When he was home it wasn't every
4 day.
5 Q. And how did the -- his drinking
6 adversely affect your marriage?
7 A. It very -- it affected it, yes, a lot.
8 Q. Did -- did there come a point in time
9 when the marriage was in trouble?
10 A. It was always in trouble.
11 Q. It was always in trouble?
12 A. Uh-huh.
13 Q. From the -- from the time that you were
14 first married?
15 A. Yes.
16 Q. When -- when Shawn drank would he get
17 violent?
18 A. Yes.
19 Q. Did he ever hit you?
20 A. Once.
21 Q. Were you afraid of him?
22 A. Yes.
23 Q. Are you afraid of him now?
24 A. Yeah.
25 Q. Are you afraid of his brother, Mark?

**Page 12**

1 A. Yes.
2 Q. Does Mark have a drinking problem?
3 A. Not that I'm aware of.
4 Q. Now, you say he was away a lot. Why was
5 he away?
6 A. He was on the road driving.
7 Q. Driving a truck?
8 A. Yes.
9 Q. Did -- did he have a consistent income?
10 A. Yes, when he was driving.
11 Q. He did? Was money a problem in the
12 family?
13 A. We fought about it, yes.
14 Q. And did he ever make any threats to
15 stage an accident and collect the insurance
16 proceeds during the course of your marriage?
17      MR. STRATTON: Objection, but you
18 can answer.
19      THE WITNESS: Yes.
20 BY MR. GRADY:
21 Q. And on how many occasions?
22      MR. STRATTON: Same objection.
23      THE WITNESS: Once.
24 BY MR. GRADY:
25 Q. One? Do you remember when that was?

**Page 13**

1  A. Yes.
2  Q. When was that?
3  A. When we lived in South Carolina we owned
4  a house and he told me that he threw a diaper
5  in the toilet and flushed it.
6      MR. GRADY: Can you read that back
7  again?
8      (The last answer was read back.)
9  BY MR. GRADY:
10  Q. Okay. And did he tell you anything
11  about staging an accident so that there would
12  be insurance proceeds?
13  A. No.
14      MR. STRATTON: Objection.
15  BY MR. GRADY:
16  Q. He didn't? What did you mean when he
17  threw the diaper in the toilet?
18  A. He told me after, a long time after the
19  fact.
20  Q. After that?
21  A. After it happened, yes. We assumed it
22  was my daughter. I assumed it was my daughter.
23  Q. I see. And so was there insurance
24  proceeds as a result of that?
25  A. Yes.

**Page 14**

1  Q. And how much money was involved?
2  A. I don't remember the exact amount. It
3  wasn't a whole lot.
4  Q. Okay. Was there any difficulty with
5  impotency on his part during the marriage?
6  A. I'm sorry. I don't understand your
7  question.
8  Q. Okay. Do you know whether or not your
9  husband ever took Viagra during the course of
10  his marriage to you?
11  A. One time, yes.
12  Q. He did?
13  A. One time.
14  Q. And do you remember when that was?
15  A. No.
16  Q. Do you know why he took the Viagra?
17  A. No, I don't know why he did.
18  Q. Do you know what Viagra is?
19  A. Yes, I know what Viagra is.
20  Q. Now, were there any discussions during
21  the course of your marriage about any of his
22  medical conditions other than the alcohol
23  problem that he had?
24  A. Yes.
25  Q. What -- what were those discussions?

**Page 15**

1  A. He had to take medication and -- and he
2  hardly ever would.
3  Q. And what kind of medication was it?
4  A. Tegretol and Lithium.
5  Q. Did you ask him during the course of
6  your marriage to take that medication?
7  A. Yes.
8  Q. And was he depressed?
9  A. Yes.
10  Q. During the entire marriage was he
11  depressed?
12  A. He had his ups and downs.
13  Q. Was divorce discussed before October
14  23rd, 2001?
15  A. Yes.
16  Q. And how early on was divorce discussed?
17  A. It was always discussed.
18  Q. It was always discussed?
19  A. Yes.
20      MR. GRADY: Now, I'd like to have
21  these two documents marked for identification.
22      (Defendant's Exhibits Bibbee A
23      and B were marked for identification.)
24  BY MR. GRADY:
25  Q. Defendant's Exhibit A is a joint tax

**Page 16**

1  return, Shawn L. Pouliot and Charity L. Pouliot
2  for the year 1999. Have you ever seen that tax
3  return before?
4  A. Yes.
5  Q. Did you sign that tax return?
6  A. No.
7  Q. Is there any reason why you didn't sign
8  the tax return?
9  A. Yes.
10  Q. What was the reason?
11  A. Because he didn't file it.
12  Q. Because it wasn't filed?
13  A. No.
14  Q. I'll show you another tax return,
15  Defendant's Exhibit B, the tax return for the
16  year 2000 and ask if you've ever seen that tax
17  return before?
18  A. Uh-huh.
19  Q. You answered yes?
20  A. Yes.
21  Q. Did you sign that tax return?
22  A. No.
23  Q. Why didn't you sign that return?
24  A. Because it wasn't filed.
25  Q. It wasn't filed. When you say it wasn't

```
                    C E R T I F I C A T E              29
STATE OF OHIO,      )
                    ) SS:
SUMMIT COUNTY.      )
```

     I, Kelley E. Spears, RPR and Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, CHARITY L. BIBBEE, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the witness was by me reduced to Stenotypy in the presence of said witness, afterwards transcribed upon a computer; and that the foregoing is a true and correct transcription of the testimony so given by the witness as aforesaid.

     I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

     I do further certify that I am not a relative, employee of or attorney for any of the parties in the above-captioned action; I am not financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

     IN WITNESS HEREOF, I have hereunto set my hand and affixed my seal of office at Akron, Ohio on this 2nd day of July, 2004.

*Kelley E. Spears*
Kelley E. Spears, RPR and Notary
Public in and for the State of Ohio.
My Commission expires June 4, 2009.