UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SHAWN POULIOT,                                :
   Plaintiff,                             :
            v.                      :          C.A. No. 3:02 CV1302 (DJS)
                                      :
PAUL ARPIN VAN LINES, INC.                    :
AND ARPIN LOGISTICS, INC.,                    :
THE FESTO CORPORATION, MICHAEL :
D. KOVAC, D/B/A TRANS-EXPO                    :
INTERNATIONAL AND ERICA                       :
RAMIREZ,IN HER CAPACITY AS                    :
EMPLOYEE OFTRANS-EXPO                         :
INTERNATIONAL,                                :
   Defendants.                            :          December 15, 2004

## LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF FESTO CORPORATION'S MOTION FOR SUMMARY JUDGMENT AS TO THE COMMON-LAW INDEMNITY COUNTS ALLEGED BY PAUL ARPIN VAN LINES, INC. AND ARPIN LOGISTICS,INC.

Pursuant to Rule 56(a)1 of the Local Rules of the United States District Court for the

District of Connecticut, Defendant The Festo Corporation ("Festo") respectfully submits the

following statements of material fact to which there is no genuine issue to be tried, in support of

its Motion for Summary Judgment as to (1) Counts 1, 2, 9 and 10 asserted against Festo by

Defendants Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc. (hereinafter, collectively

"Arpin") in Arpin's Amended Answer and Cross-Claims dated October 6, 2004; and (2) Counts

1 and 4 asserted against Festo by Arpin in Arpin's Second Amended Third-Party Complaint

dated June 9, 2003.

Relevant documents and deposition testimony referred to herein are attached as exhibits

hereto and are referenced in the Affidavit of James R. Oswald ("Oswald Aff.") submitted

concurrently herewith.

The Parties

1.    In October 2001, Arpin Logistics, Inc. ("Arpin Logistics") was a foreign corporation with its corporate headquarters in Rhode Island. [Arpin's October 6, 2004 Answer to Plaintiff's Fifth Amended Complaint, ¶ 2]

2.    In October 2001, Arpin Logistics, Inc. did business in Connecticut as a mover and freight carrier. [Id, ¶ 3]

3.    In October 2001, Arpin Logistics operated as the "special commodities" division of Defendant Paul Arpin Van Lines. Inc. [Deposition of Joseph E. Rocha dated July 26, 2004 ("Rocha Dep.") at 11 (**Exhibit 1**)]

4.    Arpin Logistics specialized in "specialty products moves," meaning the transportation of fragile equipment that generally is not on a pallet or in a crate and that requires special handling and extra care. [Deposition of Michael P. Montgomery dated July 27, 2004 ("Montgomery Dep.") at 109 (**Exhibit 2**); Rocha Dep. (Exh. 1) at 11, 104]

5.    In October 2001, Arpin Logistics held itself out to the public as a "special products" mover, that is, a mover that has significant experience in handling, and is qualified to handle, items that were not on pallets and not in crates. [Rocha Dep. (Exh. 1) at 190; Montgomery Dep. (Exh. 2) at 86; Deposition of William Tweedy dated October 5, 2004 ("Tweedy Dep.") at 142 (**Exhibit 3**)]

6.    In October 2001, it was very common for Arpin Logistics to be moving cargo that was not on a pallet or not in a crate; indeed, that is what defined Arpin as a "specialty carrier." [Montgomery Dep. (Exh. 2) at 85-86]

7.    Moving equipment on wheels was not an unusual occurrence for Arpin Logistics. [Rocha Dep. (Exh. 1) at 101]

8.      Prior to October 2001, Arpin Logistics had moved hundreds of pieces of equipment on wheels. [Rocha Dep. (Exh. 1) at 101]

9.      In October 2001, Arpin did not require that wheeled cargo be on a pallet. [Rocha Dep. (Exh. 1) at 101]

10.     In October 2001, Shawn Pouliot was a truck driver for Arpin Logistics. [Deposition of Shawn Pouliot dated December 3, 2002 ("2002 Pouliot Dep.") at 31 (**Exhibit 4**)]

11.     In October 2001, Festo was a business with facilities located in Hauppauge, New York. [Festo's July 25, 2003 Answer to Second Amended Complaint, ¶ 1]

12.     In October 2001, Festo's business included the sale of training equipment to educational institutions. [Deposition of Fred Zierau dated March 30, 2004 ("Zierau Dep.") at 9 **Exhibit 5**)]

13.     In October 2001, Festo was the seller of equipment known as a Learnline mobile workstation (the "Learnline mobile workstation"). [Deposition of Petra Milks dated March 29, 2004 ("Milks Dep.") at 13-15, 57 (**Exhibit 6**)]

14.     In October 2001, Michael D. Kovac was a sole proprietor doing business as Trans-Expo International ("Trans-Expo"). [Deposition of Michael Kovac dated October 23, 2003 ("Kovac Dep.") at 7-9 (**Exhibit 7**)]

15.     In October 2001, Trans-Expo was a sales agent for Arpin Logistics. [Kovac Dep. (Exh. 7) at 9, 15]

16.     In October 2001, Erica Ramirez was an employee of Michael D. Kovac d/b/a Trans-Expo International [Kovac Dep. (Exh. 7) at 10; Deposition of Erica Ramirez dated October 24, 2003 ("Ramirez Dep.") at 5-7 (**Exhibit 8**)]

Festo Contacts Trans-Expo to
Arrange For the Festo Shipment

17.    In October 2001, Petra Milks was an employee of Festo with the title Product

Coordinator [Milks Dep. (Exh. 6) at 15]

18.    On or prior to October 18, 2001, Ms. Milks contacted Erica Ramirez of Trans-

Expo by telephone to arrange for the shipment of a Learnline mobile workstation, and a "tri-

wall," which is a heavy-duty, cardboard box with a lid.    [Milks Dep. (Exh. 6) at 10-11, 25-27]

(The October 2001 shipment of the Learnline mobile workstation and the tri-wall is referred to

herein as the "Festo shipment.")

19.    The Learnline mobile workstation and tri-wall were to be shipped from Festo's

facility in Hauppauge, New York to Naugatuck Valley Community College in Waterbury,

Connecticut.    [Ramirez Dep. (Exh. 8) at 19, 21, 24-25]

20.    On or before October 18, 2001, Petra Milks orally informed Erica Ramirez of

Trans-Expo about certain details of the Festo shipment, including the fact that the Learnline

mobile workstation was on wheels. [Ramirez Dep. (Exh. 8) at 24, 26; Milks Dep. (Exh. 6) at 29]

21.    On or after October 18, 2001, Erica Ramirez prepared a shipment booking form

(the "Shipment Booking Form"). [Ramirez Dep. (Exh. 8) at 21]

22.    A true and correct copy of the Shipment Booking Form prepared by Erica

Ramirez is attached hereto as **Exhibit 9** [Affidavit of Michael P. Montgomery dated February

28, 2003 ("Montgomery Aff.") at ¶ 4 (**Exhibit 10**), attaching Shipment Booking Form as Exhibit

A]; Ramirez Dep. (Exh. 8) at 21; Oswald Aff., ¶ 11]

23.    The Shipment Booking Form contains information that is relayed by the shipment

broker, in this case Trans-Expo, to the carrier, in this case Arpin Logistics, in order to pick up

and deliver a shipment. [Ramirez Dep. (Exh. 8) at 9-10]

4

24.     The Shipment Booking Form is what Trans-Expo would send via facsimile to Arpin Logistics regarding an order for inputting into the Arpin logistics computer system. [Deposition of William F. Mottla, Jr. dated July 27, 2004 ("Mottla Dep.") at 7-8 (**Exhibit 11**)]

The Shipment Booking Form

25.     In October 2001, William F. Mottla, Jr. was the Customer Service Manager of the customer service department and a customer service representative at Arpin Logistics. [Mottla Dep. (Exh. 11) at 5, 71]

26.     On October 18, 2001, Erica Ramirez faxed the Shipment Booking Form (Exh. 9) to William Mottla at Arpin Logistics. [Shipment Booking Form (Exh. 9); Montgomery Aff., ¶ 4 and Exhibit A thereto]

27.     On October 18, 2001, the Shipment Booking Form (Exh. 9) was received by Arpin Logistics. [Shipment Booking Form (Exh. 9); Montgomery Aff., ¶ 4 and Exhibit A thereto]

28.     The Shipment Booking Form states "2" under the item "Pieces". [Shipment Booking Form (Exh. 9)]

29.     The Shipment Booking Form states "1 workstation requires pads" and "1 pallet (protect corners of pallet please)". [Shipment Booking Form (Exh. 9)]

30.     No later than October 18, 2001, Arpin Logistics was informed that that the Festo shipment consisted of one workstation and one pallet. [Shipment Booking Form (Exh. 0)]

31.     The Shipment Booking Form states "Special Instructions:  Please take extra caution to protect workstation.  We are getting these orders because United damaged so  much of their shipments.  So please tell driver to have correct equipment and pad/strap well.  Call prior to

p/u and delivery. Ray @ the destination will provide delivery instructions/ Thanks Bill! Erica

Protect <u>wheels</u>!" [Shipment Booking Form (Exh. 9)]

32.     The Shipment Booking Form states "must have 10-12 pads/Straps/protect wheels". [Shipment Booking Form (Exh. 9)]

33.     No later than October 18, 2001, Arpin Logistics was provided "special instructions" that it was to take extra caution to protect the workstation and to protect the wheels. [Shipment Booking Form (Exh. 9)]

34.     No later than October 18, 2001, Arpin Logistics was informed that the workstation had wheels. [Shipment Booking Form (Exh. 9)]

35.     The Shipment Booking Form states "L 59   W 33   H 72" and "L 47   W 32   H 37" under the heading "Dimensions". [Shipment Booking Form (Exh. 9)]

36.     No later than October 18, 2001, Arpin was informed that one item of the Festo shipment was 59 inches long by 33 inches wide by 72 inches high. [Shipment Booking Form (Exh. 9)]

37.     No later than October 18, 2001, Arpin was informed that the other item of the Festo shipment was 47 inches long by 32 inches wide by 37 inches high. [Shipment Booking Form (Exh. 9)]

38.     The Shipment Booking Form states "Naugatuck Valley Community College, 750 Chase Parkway" under the heading "Consignee." [Shipment Booking Form (Exh. 9)]

39.     The Shipment Booking Form states "Need palletjack and lift gate for delv." under "Naugatuck Valley Community College, 750 Chase Parkway". [Shipment Booking Form (Exh. 9)]

40.    No later than October 18, 2001, Arpin was informed that a palletjack and lift gate would be needed for the delivery at Naugatuck Valley Community College. [Shipment Booking Form (Exh. 9)]

41.    The Shipment Booking Form states "Ray Castellani – Must call in advance of delivery" as part of the information provided regarding the "Consignee" Naugatuck Valley Community College. [Shipment Booking Form (Exh. 9)]

42.    No later than October 18, 2001, Arpin was informed that it was required to call Ray Castellani in advance of its delivery of the Festo shipment. [Shipment Booking Form (Exh. 9)]

William Mottla of Arpin Logistics  Fails to Input Information
From the Shipment Booking Form Into the Computer System

43.    In October 2001, Arpin Logistics used a computer system to ensure that all relevant information about a particular shipment gets into a system that allows the driver ultimately to get that information. [Mottla Dep. (Exh. 11) at 9, 11-13]

44.    In October 2001, Arpin Logistics' customer service representatives were responsible for inputting information concerning a particular shipment into its computer system. [Montgomery Dep. (Exh. 2) at 23; Rocha Dep. (Exh. 1) at 35, 71, 143-44)]

45.    The information in the computer screen is inputted into the computer system by the customer service department; then someone in the operations department decides whether to accept the job; then drivers and vehicles are assigned to the job. [Mottla Dep. (Exh. 11) at 12-13]

46.     The Arpin Logistics dispatcher who dispatches a driver on a particular job relies solely on the information inputted into the computer system in formulating a dispatch plan. [Tweedy Dep. (Exh. 3) at 94, 95]

47.     As manager of the customer service department and as a customer service representative, it was William Mottla's responsibility to ensure that all relevant information from the Shipment Booking Form was inputted into the Arpin computer system.  [Mottla Dep. (Exh. 11) at 11]

48.     Ensuring that all relevant information from a Shipment Booking Form was inputted into the Arpin Logistics computer system was definitely a very crucial element.  [Mottla Dep. (Exh. 11) at 13]

49.     On October 18, 2001, Mr. Mottla received the Shipment Booking Form and input certain information from it into the Arpin Logistics computer system.  [Mottla Dep. (Exh. 11) at 5-6, 8, 12, 21-22, 30]

50.     A true and correct copy of a printout of the computer information screen which was created by Mr. Mottla upon inputting certain information from the Shipment Booking Form into the Arpin Logistics computer system is attached hereto as **Exhibit 12** (the "Information Screen"). [Rocha Dep. (Exh. 1) at 111-112; Montgomery Dep. (Exh. 2) at 34; Oswald Aff., ¶ 13)

51.     The notation "CSR:  BM" on the Information Screen refers to "Customer Service Representative Bill Mottla".  [Mottla Dep. (Exh. 11) at 13, 21-22; Information Screen (Exh. 12)]

52.     Mr. Mottla did not input the following information from the Shipment Booking Form into the Arpin Logistics system:

      ° 	the Festo shipment included a workstation and a pallet [Information Screen (Exh. 12)];

    o    these pieces' dimensions were 59 inches long by 33 inches wide by 72 inches high and 47 inches long by 32 inches wide by 37 inches high [Information Screen (Exh. 12)];

    o    the workstation was on wheels [Tweedy Dep. (Exh. 3) at 94-95; Information Screen (Exh. 12); Montgomery Dep. (Exh. 2) at 151] ;

    o    there were "special instructions" to "protect <u>wheels</u>!" of the workstation [Information Screen (Exh. 12)];

    o    Arpin Logistics "must . . . protect wheels" [Tweedy Dep. (Exh. 3) at 94-95; Information Screen (Exh. 12)];

    o    the Festo shipment required a lift gate for delivery at Naugatuck Valley Community College [Information Screen (Exh. 12)];

    o    there were "special instructions" to "take extra caution to protect [the] workstation" [Information Screen (Exh. 12)].

**Lacking Information About the Festo Shipment, Joe Rocha Dispatches**
**Plaintiff in an Arpin Truck Equipped With a Maxon "Tilt-Down" Lift Gate**

53.     In October 2001, Arpin Logistics dispatched Shawn Pouliot with an Arpin straight truck equipped with a Maxon Tuk-A-Way lift gate for the transportation of the Festo shipment. [Tweedy Dep. (Exh. 3) at 94-95; Rocha Dep. (Exh. 1) at 26]

54.     The lift gate on the truck selected by Arpin Logistics for the Festo shipment was Maxon Tuk-A-Way lift gate which, according to Arpin, tilts downward, toward the rear, during descent by the nature of the way it operates. [Rocha Dep. (Exh. 1) at 39, 48-49].

55.     In October 2001, Joe Rocha was employed by Arpin Logistics as its Fleet Operations Manager. [Rocha Dep. (Exh. 1) at 5]

56.     Mr. Rocha selected the Arpin straight truck equipped with the Maxon "tilt-down" lift gate, for use for the Festo shipment which is the subject of this lawsuit [Rocha Dep. (Exh. 1) at 5, 99, 165]

57.     Mr. Rocha had the authority to choose the truck to be used by Plaintiff. [Rocha Dep. (Exh. 1) at 40]

58.     Mr. Rocha did not know what the actual load was when he chose the truck for the Festo shipment. [Rocha Dep. (Exh. 1) at 40]

59.     Mr. Rocha simply made a judgment call to have Plaintiff use this particular truck despite not having full information about the load. [Rocha Dep. (Exh. 1) at 40]

60.     The first time Joe Rocha ever loaded this particular truck was on October 20, 2001, just prior to Plaintiff's accident. [Rocha Dep. (Exh. 1) at 18, 19-20]

61.     He did not inspect the truck prior to loading it. [Rocha Dep. (Exh. 1) at 22]

62.     Arpin Logistics was responsible for servicing the truck and its components, including the lift gate. [Montgomery Dep. (Exh. 2) at 56]

63.     Prior to Arpin Logistics choosing this truck for the Festo shipment, the lift gate on it had been serviced in West Virginia. [Rocha Dep. (Exh. 1) at 23]

64.     Prior to Arpin Logistics choosing this truck for the Festo shipment, Arpin Logistics had been having issues with the latch that secures the lift gate to the platform. [Rocha Dep. (Exh. 1) at 23]

65.     In October 2001, William Tweedy was employed by Arpin Logistics as a dispatcher. [Tweedy Dep. (Exh. 3) at 10-11]

66.     Mr. Tweedy is the dispatcher who dispatched Plaintiff for the Festo shipment. [Tweedy Dep. (Exh. 3) at 95-96]

67.     The truck used for the Festo shipment had been sent up from an Arpin terminal in West Virginia because the truck dealership in West Virginia could not use it because of its poor condition. [Tweedy Dep. (Exh. 3) at 61]

10

68.    The truck used for the Festo shipment was not supposed to be in service in Rhode Island, and was instead supposed to go into the shop for repairs and be sent back to West Virginia. [Tweedy Dep. (Exh. 3) at 61, 132]

69.    Mr. Tweedy received many complaints about the truck used for the Festo shipment, including that the Arpin terminal in West Virginia could not use it because of its poor condition, and that the lift gate wasn't any good. [Tweedy Dep. (Exh. 3) at 65]

70.    Mr. Tweedy informed Mike Montgomery, the director of Arpin Logistics, that the truck should not be used. [Tweedy Dep. (Exh. 3) at 150]

°    The Fact That the Learnline Mobile Workstation Was on Wheels

71.    Mr. Mottla failed to input into the Arpin Logistics computer system the fact that one piece of the Festo shipment was a workstation. [Information Screen (Exh. 12)]

72.    Mr. Mottla also failed to input into the Arpin Logistics computer system the fact that the Learnline mobile workstation was on wheels. [Information Screen (Exh. 12)]

73.    The Information Screen for the Festo shipment contains no indication that one piece of the Festo shipment was a workstation. [Tweedy Dep. (Exh. 3) at 137; Information Screen (Exh. 12)]

74.    The Information Screen for the Festo shipment contains no indication that the Learnline mobile workstation was on wheels. [Tweedy Dep. (Exh. 3) at 137-38; Information Screen (Exh. 12)]

75.    The fact that the Learnline mobile workstation was on wheels should have been inputted into the Arpin Logistics computer system, but was not. [Montgomery Dep. (Exh. 2) at 36]

11

76.    It was proper standard procedure at Arpin Logistics to indicate in the computer system that equipment to be delivered was on wheels and that the wheels needed to be protected. [Mottla Dep. (Exh. 11) at 15]

77.    This was proper standard procedure at Arpin because there are some lift gates that are appropriate for things on wheels and there are lift gates that are maybe not so appropriate. [Mottla Dep. (Exh. 11) at 16]

78.    Arpin violated its proper standard procedure when it failed to input into its computer system the fact that the Festo workstation was on wheels and that the wheels on the Festo workstation needed to be protected. [Mottla Dep. (Exh. 11) at 15-16]

79.    If the Shipping Booking Document indicated that part of the Festo shipment was on wheels, it would be negligent on the part of the person inputting the information to fail to input this information into the Arpin Logistics computer system. [Mottla Dep. (Exh. 11) at 72]

80.    Mr. Rocha, the Arpin Logistics employee who selected the truck and "tilt-down" lift gate for the Festo shipment, did not know that the Festo shipment included a workstation. [Rocha Dep. (Exh. 1) at 69]

81.    Dispatch did not inform Mr. Rocha that the Festo shipment included a workstation. [Rocha Dep. (Exh. 1) at 69]

82.    William Tweedy, the dispatcher who dispatched Plaintiff for the Festo shipment, did not see the Shipment Booking Form. [Tweedy Dep. (Exh. 3) at 70, 91]

83.    Mr. Rocha, the Arpin Logistics employee who selected the truck and "tilt-down" lift gate for the Festo shipment, did not know that the Learnline mobile workstation was on wheels. [Rocha Dep. (Exh. 1) at 71]

84.    Mr. Rocha, the Arpin Logistics employee who selected the truck and "tilt-down" lift gate for the Festo shipment, never saw the Trans-Expo Shipment Booking form in October 2001. [ Dep. (Exh. 1) at 69-70]

85.    Mr. Rocha did not confirm the accuracy of any of the information in the Arpin computer system, or confirm that that information was all of the available information, by either consulting with Arpin customer service or by looking at the Shipment Booking Form in the Arpin files. [Montgomery Dep. (Exh. 2) at 69)]

86.    Mr. Rocha had access to the customer service representatives and to the Arpin files. [Montgomery Dep. (Exh. 2) at 69]

87.    Had Mr. Rocha known that the Learnline mobile workstation was on wheels, he would not have dispatched Plaintiff in this truck with its "tilt-down" Maxon lift gate. [Rocha Dep. (Exh. 1) at 48-49]

88.    Mr. Rocha would not use such a lift gate for an item on wheels because of the nature of the way such a lift gate operates, in that its angle changes as it moves up and down. [Rocha Dep. (Exh. 1) at 48]

89.    Instead, for an item on wheels he would have used either the rail gate or an Interlift type gate, which are lift gates that are designed to descend on a level plane. [Rocha Dep. (Exh. 1) at 39, 42-43, 48-49]

90.    Arpin Logistics had available other straight trucks with level-descending lift gates on the day that Plaintiff was dispatched. [Rocha Dep. (Exh. 1) at 38]

91.    The lift gates on certain of these other trucks also had cart retention systems, which is a flipper located on the outer edge of the lift gate platform to prevent items on wheels from rolling off. [Rocha Dep. (Exh. 1) at 43]

92.    The straight truck in which Arpin Logistics dispatched Plaintiff for the Festo shipment lacked such a cart retention system on its lift gate.  [Rocha Dep. (Exh. 1) at 48]

93.    The fact that the Learnline mobile workstation was on wheels would have been important for Mr. Rocha to know, because the lift gate on the truck that was used for the Festo shipment was a small gate, and if the mobile workstation is a large unit, the Maxon "tilt-down" lift gate would not work, and Mr. Rocha could have selected a different truck.  [Rocha Dep. (Exh. 1) at 37-38]

94.    For a six-foot unit on wheels weighing more than two or three hundred pounds, it was unsafe to use a Maxon tuck-away lift gate that tilts down as it descends to the ground.  [Montgomery Dep. (Exh. 2) at 154-55]

95.    A six-foot unit on wheels weighing more than two or three hundred pounds should be unloaded using a lift gate that descends on a level plane, without tilting.  [Montgomery Dep. (Exh. 2) at 154-55]

96.    The weight of the Learnline mobile workstation, alone, would not have caused Mr. Rocha to choose a different truck, with a different lift gate, for the Festo shipment.  [Rocha Dep. (Exh. 1) at 89-90]

97.    Whether the Learnline mobile workstation weighed 400 pounds or 800 pounds, alone, would not have caused Mr. Rocha to choose a different truck, with a different lift gate, for the Festo shipment.  [Rocha Dep. (Exh. 1) at 90]

98.    In deciding upon an appropriate lift gate for the Festo shipment, Mr. Rocha needed to know whether the workstation was on wheels, as well as its length, width, height and weight.  [Rocha Dep. (Exh. 1) at 246]

99.     In October 2001, Arpin had no procedures in place for verifying information that was provided to it via a Shipment Booking Form. [Montgomery Dep. (Exh. 2) at 204]

°       The Dimensions of the Festo Equipment

100.    Mr. Mottla failed to input into the Arpin Logistics computer the dimensions of the Learnline mobile workstation and the dimensions of the tri-wall. [Information Screen (Exh. 12)]

101.    The Arpin Logistics Information Screen contains no indication of the dimensions of the Learnline mobile workstation beyond the notation "100." [Information Screen (Exh. 12)]

102.    The dimensions of the Learnline mobile workstation is information that should have been inputted into the Arpin Logistics computer system. [Rocha Dep. (Exh. 1) at 224-25; Montgomery Dep. (Exh. 2) at 36]

103.    Dispatch failed to inform Mr. Rocha, the Arpin Logistics employee who selected the truck and "tilt-down" lift gate for the Festo shipment, of the dimensions of the Learnline 2000 unit. [Rocha Dep. (Exh. 1) at 37, 69, 84]

104.    William Tweedy, the dispatcher who dispatched Plaintiff for the Festo shipment, did not know the dimension of the items in the Festo shipment. [Tweedy Dep. (Exh. 3) at 140]

105.    Mr. Rocha did not know the dimensions of the Learnline mobile workstation when he chose this truck with its Maxon "tilt-down" lift gate for the Festo shipment. [Rocha Dep. (Exh. 1) at 69, 151-52]

106.    Mr. Rocha had access to the customer service representatives and to the Arpin files. [Montgomery Dep. (Exh. 2) at 69]

107.    Mr. Rocha did not confirm the accuracy of any of the information in the Arpin computer system, or confirm that that information was all of the available information, by either

15

consulting with Arpin customer service or by looking at the Shipment Booking Form in the Arpin files. [Montgomery Dep. (Exh. 2) at 69]

108.    Had Mr. Rocha known the dimensions of the Learnline mobile workstation, he would not have chosen this truck with its "tilt-down" Maxon lift gate for the Festo shipment. [Rocha Dep. (Exh. 1) at 63]

109.    If Mr. Rocha saw a photo of that machine and saw how big it was, he would not have chosen that truck with its Maxon "tilt-down" lift gate for the Festo shipment. [Rocha Dep. (Exh. 1) at 63]

110.    Mr. Rocha would not have chosen that truck with its Maxon "tilt-down" lift gate because the overall width of the workstation looks like, to be close to, if not more than, five foot wide, which is pretty close to the limit of the lift gate platform that Plaintiff did work on. [Rocha Dep. (Exh. 1) at 160]

111.    Even if the wheels on the Learnline mobile workstation were all locked, the small area of the Maxon lift gate made it just not good safety practice to move the Learnline mobile workstation using that particular lift gate. [Rocha Dep. (Exh. 1) at 161-62]

112.    The danger of using this lift gate is aggravated by the fact that the Learnline mobile workstation is on wheels, because even if the wheels are secured, it is just too close to the edge and too close for comfort. [Rocha Dep. (Exh. 1) at 161-62]

113.    Mr. Rocha needed to know the dimensions of the workstation in order to determine whether it was appropriate to use this truck with its Maxon "tilt-down" lift gate for the Festo shipment. [Rocha Dep. (Exh. 1) at 153, 220]

114.    William Tweedy, the Arpin dispatcher who dispatched Plaintiff for the Festo shipment, believed that the lift gate on the Arpin Logistics truck used for the Festo shipment was too small for the unit. [Tweedy Dep. (Exh. 3) at 61]

115.    It would have been important to know the dimensions of the items constituting the Festo shipment if a lift gate was needed. [Tweedy Dep. (Exh. 3) at 140]

°       The Fact That the Festo Shipment Required a Lift Gate at Delivery

116.    Mr. Mottla failed to input into the Arpin Logistics computer the fact that the Festo shipment required a lift gate at delivery. [Information Screen (Exh. 12)]

117.    The Arpin Logistics computer screen contains no indication that the Festo shipment required a lift gate at delivery. [Information Screen (Exh. 12)]

118.    It was proper standard procedure at Arpin Logistics to indicate in the computer system if a particular shipment required a lift gate. [Mottla Dep. (Exh. 11) at 14]

119.    Arpin Logistics violated its proper standard procedure when it failed to input into its computer system that the Festo shipment required a lift gate. [Mottla Dep. (Exh. 11) at 14]

120.    The fact that the Festo shipment required a lift gate is important to know for a given shipment. [Mottla Dep. (Exh. 11) at 66]

121.    If the Shipping Booking Document indicated that the Festo shipment required a lift gate, it would be negligent on the part of the person inputting the information to fail to input this information into the Arpin Logistics computer system. [Mottla Dep. (Exh. 11) at 72]

122.    Joe Rocha, the Arpin Logistics Fleet Operations Manager who chose the truck for the Festo shipment, was told by either Mike Montgomery or William Tweedy that the job required a lift gate. [Rocha Dep. (Exh. 1) at 28, 37]

17

123.    However, Mr. Rocha failed to tell Plaintiff that a lift gate would be required. [Rocha Dep. (Exh. 1) at 29]

124.    The fact that the Festo shipment required a lift gate should have been inputted into the Arpin computer system, but was not.  [Montgomery Dep. (Exh. 2) at 36]

125.    Mr. Montgomery, the director of Arpin Logistics, would have chosen one of Arpin's other trucks for the Festo shipment if he knew that a lift gate was going to be required and there was not going to be a loading dock.  [Montgomery Dep. (Exh. 2) at 68]

126.    If he knew that a lift gate was going to be required and there was not going to be a loading dock, Mr. Montgomery, the director of Arpin Logistics, would have chosen a straight truck with a cart retention system and with a lift gate that remained level to the ground as it descended.  [Montgomery Dep. (Exh. 2) at 68]

127.    In order to know how many men to send out for a delivery, it is an important piece of information to know whether a lift gate is needed for the delivery.  [Montgomery Dep. (Exh. 2) at 104]

128.    All of the information on the Shipment Booking Form should have been inputted into the Arpin Logistics computer system, because it would have resulted in a safer and more efficient job.  [Montgomery Dep. (Exh. 2) at 71]

129.    Mr. Montgomery does not know of any reason why all of the information on the Shipment Booking Form was not inputted into the Arpin Logistics computer system. [Montgomery Dep. (Exh. 2) at 71]

130.    Mr. Mottla likewise has no explanation why all of the relevant information on the Shipment Booking Form was not inputted into the Arpin Logistics computer system.  [Mottla Dep. (Exh. 11) at 19]

18

131.    In October 2001, there were two people in the Arpin Logistics customer service department in addition to Mr. Mottla. [Mottla Dep. (Exh. 11) at 6]

132.    In October 2001, the three people in the Arpin Logistics customer service department were processing approximately 100-125 orders per person, per day. [Mottla Dep. (Exh. 11) at 40]

133.    Mr. Mottla, the Customer Service Manager of the customer service department, testified that this number was too many to be processing during a day. [Mottla Dep. (Exh. 11) at 40-41]

134.    It was Mr. Mottla's responsibility to determine whether the personnel in Arpin's customer service department were doing an adequate job. [Mottla Dep. (Exh. 11) at 71]

135.    In October 2001, Mr. Mottla believed that it was difficult for the three people in the Arpin Logistics customer service department to be thorough in handling the large number of shipment orders. [Mottla Dep. (Exh. 11) at 17]

136.    Because of limitations in the Arpin Logistics computer system, the customer service representatives would edit out pertinent information from Shipment Booking forms and not input the information into the computer system. [Mottla Dep. (Exh. 11) at 36, 39]

137.    The customer service representatives and Mike Montgomery talked many times about reconfiguring the computer system to give more space for more information. [Mottla Dep. (Exh. 11) at 36]

138.    During the time that Mr. Mottla worked at Arpin Logistics, Arpin Logistics never changed its computer system to provide more space for the inputting of more information. [Mottla Dep. (Exh. 11) at 40]

The October 23, 2001 Accident

139.    Sometime between October 18 and October 23, 2001, Arpin Logistics provided Shawn Pouliot with the straight truck equipped with a Maxon "tilt-down" lift gate and dispatched him to pick up the load at Festo Corporation in Hauppauge, New York and deliver it. [Arpin's October 6, 2004 Answer to Plaintiff's Fifth Amended Complaint, ¶ 5]

140.    Arpin Logistics did not provide Plaintiff with any training in proper loading procedures. [Montgomery Dep. (Exh. 2) at 108]

141.    Arpin Logistics did not provide Plaintiff with any training in the proper use of lift gates. [Montgomery Dep. (Exh. 2) at 107-08]

142.    Arpin Logistics did not provide Plaintiff with any training in the proper methods of securing equipment within trucks. [Montgomery Dep. (Exh. 2) at 110]

143.    Plaintiff arrived at Festo Corporation in Hauppauge, New York on October 23, 2001. [Tweedy Dep. (Exh. 3) at 43]

144.    On that date, Plaintiff rolled and/or pushed the Learnline mobile workstation from the dock at the Festo warehouse onto the Arpin truck. [2002 Pouliot Dep. (Exh. 4) at 68-70; Deposition of Shawn Pouliot dated July 29, 2004 ("2004 Pouliot Dep.") at 136 (**Exhibit 13**].

145.    No one from Festo helped Plaintiff load the Learnline mobile workstation onto the Arpin truck. [2002 Pouliot Dep. (Exh. 4) at 68-70]

146.    Plaintiff then padded the Learnline mobile workstation and strapped it to the wall of the truck. [2002 Pouliot Dep. (Exh. 4) at 68-70]

147.    No one from Festo helped Plaintiff strap the Learnline mobile workstation to the wall of the truck. [2002 Pouliot Dep. (Exh. 4) at 68-70]

148.    Plaintiff's signature appears on a Festo Bill of Lading which describes the subject cargo as 1 trolley (72H, 33W, 59L) and 1 tri-wall (47L, 32W, 37H). [2002 Pouliot Dep. (Exh. 4) at 73]

149.    A true and correct copy of the Festo Bill of Lading is attached hereto as **Exhibit 14**. [2002 Pouliot Dep. (Exh. 4) at 73; Oswald Aff., ¶ 15]

150.    The Festo Bill of Lading reflects the weight of the cargo as 755. [2002 Pouliot Dep. (Exh. 4) at 73; Deposition of Agatha DeVito dated March 30, 2004 ("DeVito Dep.") at 7 (**Exhibit 15**); Oswald Aff., ¶ 15]

151.    After loading the Festo shipment onto the Arpin truck, Plaintiff drove the truck to Naugatuck Valley Community College in Waterbury, Connecticut. [2002 Pouliot Dep. (Exh. 4) at 79-80]

152.    At a point in time after Shawn Pouliot arrived at the delivery location at Naugatuck Valley Community College, he stopped the Arpin truck, brought the Learnline mobile workstation out of the truck onto the lift gate, positioned the workstation on the lift gate, and began to lower the lift gate. [2002 Pouliot Dep. (Exh. 4) at 5]

153.    At some point during the descent of the lift gate, the Learnline mobile work station shifted in a way that was not to Plaintiff's liking, so he stopped the lift. [2002 Pouliot Dep. (Exh. 4) at 5-6; 2004 Pouliot Dep. (Exh. 13) at 175].

154.    No one from Festo was present for or otherwise supervised Plaintiff on-site while he unloaded the equipment at the Naugatuck Valley Community College. [2004 Dep. (Exh. 13) at 152-57]

155.    At some point during the process of unloading the Learnline mobile workstation, the workstation fell off the "tilt-down" lift gate and fell onto Plaintiff. [2002 Pouliot Dep. (Exh. 4) at 7]

156.    Plaintiff incurred severe injuries as a result of the accident, including a L1 burst fracture and paraplegia. [Plaintiff's Fifth Amended Complaint, ¶¶ 6, 8]

Defendant,
THE FESTO CORPORATION,
By Its Attorneys,

JOHN A. TARANTINO, #15980
JAMES R. OSWALD, #20936
ADLER POLLOCK & SHEEHAN P.C.
2300 Citizens Plaza, 8th Floor
Providence, RI 02903-2443
Tel:  (401) 274-7200
Fax: (401) 751-0604/351-4607
Dated:  December 15, 2004

## CERTIFICATION

TO:    Michael A. Stratton, Esq.               Thomas J. Grady, Esq.
       Stratton Faxon                          Lenihan, Grady & Steele
       59 Elm Street                           6 Canal Street
       New Haven, CT 06510                     P.O. Box 541
                                               Westerly, RI 02891

       Roland F. Moots, Jr., Esq.
       Moots, Pellegrini, Mannion, Martindale  Susan O'Donnell, Esq.
          & Dratch                             Halloran & Sage
       46 Main Street                          One Goodwin Square
       New Milford, CT 06776                   225 Asylum Street
                                               Hartford, CT 06103

        I hereby certify that I caused a true copy of the within, to be mailed, via regular First
Class mail, to the above-named counsel of record on this 15th day of December, 2004.

*317272_1.doc*