# EXHIBIT 1

1

Volume I, Pages 1-250
Exhibits A-M

UNITED STATES DISTRICT
DISTRICT OF CONNECTICUT

C.A. NO. 3:02 CV1302 (DJS)

SHAWN POULIOT,
        Plaintiff,

**CERTIFIED COPY**

        vs.

PAUL ARPIN VAN LINES, INC.
AND ARPIN LOGISTICS,INC.,
        Defendants/Third-Party Plaintiffs,

vs.

THE FESTO CORPORATION,
MICHAEL D. KOVAC D/B/A TRANS-EXPO INTERNATIONAL
AND ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INTERNATIONAL,
        Third-Party Defendants

**DEPOSITION OF:  JOSEPH E. ROCHA**

LENIHAN, GRADY & STEELE
Six Canal Street
Westerly, Rhode Island 02891

July 26, 2004 9:00 a.m. - 3:27 p.m.

ATKINSON-BAKER, INC. COURT REPORTERS

330 North Brand Boulevard, Suite 250

Glendale, California   91203

800.228.3376

REPORTED BY:  Linda A. Menard
              Registered Professional Reporter
              Certified Shorthand Reporter
JOB NO. 9E05C32

249

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF BRISTOL, ss.


        I, Linda A. Menard, a Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, do hereby certify
that the foregoing transcript of the deposition of
Joseph E. Rocha, having been duly sworn, on Monday,
July 26, 2004, is true and accurate to the best of
my knowledge, skill and ability.

        IN WITNESS WHEREOF, I have hereunto set my
hand and seal this 9th day of August, 2004.


                    Linda A. Menard, RPR
                    Notary Public
                    My commission expires:
                    September 17, 2004

1          A.    East Greenwich, Rhode Island -- I'm sorry

2    West Warwick, Rhode Island.

3          Q.    How long had you been at that job?

4          A.    Eighteen years.

5          Q.    And what were the various roles you had

6    within Arpin during the time that you were there?

7          A.    I originally started as a customer service

8    rep, warehouse manager, for approximately 13 years,

9    fleet operations manager for the logistics division

10    for approximately 6 to 8 years.

11          Q.    And you left as a fleet operations

12    manager?

13          A.    Correct.

14          Q.    Do you have a CDL license?

15          A.    Yes, I do.

16          Q.    How long have you had that?

17          A.    Approximately 19 years.

18          Q.    Did you ever drive truck for Arpin?

19          A.    Yes.

20          Q.    And during what period of time?

21          A.    The whole time I was there.

22          Q.    What prompted you to leave Arpin?

23          A.    A better job offer.

24          Q.    And were you ever terminated from Arpin at

1    2001?

2        A.    Yes.

3        Q.    About how many more?

4        A.    There was approximately about 25 company

5    drivers.  There was roughly 40 owner/operators.

6        Q.    Now, are you familiar at all with how

7    Arpin Logistics is doing today?

8        A.    No.

9        Q.    Can you describe for me, if you know, the

10   difference between Arpin Logistics and Paul Arpin

11   Van Lines?

12       A.    Arpin Logistics is a division of Paul

13   Arpin Van Lines, their specialty commodities

14   division, electronics, trade shows, general

15   commodities.

16       Q.    And Paul Arpin Van Lines is --

17       A.    Strictly a household goods carrier.

18       Q.    Did you ever work for Paul Arpin Van

19   Lines --

20       A.    Yes.

21       Q.    -- during the time that you were with Paul

22   Arpin?

23       A.    Yes; 13 years Arpin Van Lines.

24       Q.    Then you went into Arpin Logistics?

18

1   cages on by hand.  The six boxes with a cart and

2   dolly, two-wheel pneumatic tires, put those in the

3   nose of the truck.  The two skids were put on with a

4   pallet jack.

5       Q.   Did you do this off a loading dock?

6       A.   Yes.

7       Q.   Where was the loading dock?

8       A.   1485 South County Trail, East Greenwich,

9   Rhode Island.

10      Q.   Where is that, Paul Arpin's headquarters?

11      A.   Logistics division.

12      Q.   How did you know where these -- the stuff

13  that you put on the truck, how did you know where it

14  was going?

15      A.   Bills of lading.

16      Q.   And where did you get the bills of lading?

17      A.   Dispatch.

18      Q.   And do you recall the date?

19      A.   That I loaded it?

20      Q.   Yeah.

21      A.   Yeah.  It was two o'clock, October 20,

22  a.m.  That was the last job I did that day.  I had

23  started in the morning, worked in the warehouse for

24  a few hours, went to the stadium, took the Patriots

to the airport, came back, did some more warehouse

work.  And that was the last load I did that night.

Q.    Was that a Saturday morning?

A.    Sunday morning.  It went from Saturday

into Sunday morning.

Q.    How often would you do that kind of work?

A.    Every weekend.

Q.    Every weekend?

A.    Every weekend.

Q.    52 times a year?

A.    50 out of the 52.

Q.    For how many years?

A.    About four to five with Logistics.

Q.    So you had done similar loading 200 to 250

times?

A.    At least.

Q.    Was it usually -- did it involve using

straight trucks?

A.    Everything, straight trucks, trailers, you

name it.

Q.    How often had you loaded this particular

straight truck?

A.    That particular truck was the first time I

ever loaded that truck.  We had just gotten that

1    vehicle.

2        Q.    And do you recall who that vehicle was

3    received from?

4        A.    Someone from I believe it was Roland -- I

5    can't think of his last name.  He's a Logistics

6    driver out in our New Jersey office brought it up.

7        Q.    So this truck had been in New Jersey?

8        A.    It had been in New Jersey for a few

9    months.  Prior to that, it was in our Kearneysville,

10   West Virginia operation.  Prior to that it was a

11   Paul Arpin Van Lines -- it came to us from Paul

12   Arpin Van Lines out of our St. Louis, Missouri

13   company store.  Prior to that, it was in, I believe

14   in a Kentucky location.  There was a company store

15   in Kentucky, but I can't recall the name of it.

16       Q.    Back in October of 2001, were you familiar

17   with all this history of the truck?

18       A.    Yes.

19       Q.    And how was it that you became so familiar

20   with the history of the truck?

21       A.    I was a fleet operations manager.  That

22   was my job to know where these vehicles came from.

23       Q.    So, can you run through this for me again.

24   You knew that this vehicle had been in Kentucky at

22

```
 1          Q.    Now, did you actually drive the truck and
 2      put it against the loading dock?
 3          A.    Yes, I did.
 4          Q.    Had you actually performed any inspection
 5      on the truck?
 6          A.    No.  It had just been DOT'd not too long
 7      prior.
 8          Q.    You mean DOT inspection?
 9          A.    Yeah.
10          Q.    When had that been done?
11          A.    I think three or four months.
12          Q.    Does DOT do an inspection of the lift
13      gate?
14          A.    No.
15          Q.    Did anybody at Paul Arpin Van Lines do an
16      inspection of the lift gate in Connecticut?
17          A.    After the accident?
18          Q.    Before the accident.
19          A.    In Connecticut?
20          Q.    Right.
21          A.    It would never have been in Connecticut.
22          Q.    Why is that?
23          A.    The vehicle was based out of Virginia and
24      New Jersey and maybe for about a week in Rhode
```

23

1    Island.

2        Q.    Do you know when the lift gate would have

3    last been inspected?

4        A.    That I physically know, it would have been

5    in West Virginia.  There was a minor repair done to

6    it.  The latch that secures the gate to the

7    platform, they were having issues with it.  It was

8    getting stuck.  So it would have been inspected at

9    that time for its operation.

10       Q.    Did you utilize the lift gate at all in

11   the loading that you did?

12       A.    No.  I had no call for it.

13       Q.    Do you know anybody at Paul Arpin or Arpin

14   Logistics who did so here in Rhode Island?

15       A.    No.

16       Q.    Now you indicated that three new lift

17   gates had been put on?

18       A.    In West Virginia.  Brand new gates.  They

19   were welded to the existing body.

20       Q.    These are all straight trucks?

21       A.    Correct.

22       Q.    Did you order the addition of these three

23   new lift gates?

24       A.    Yes.

1    Q.    So that piece is at the edge of the lift

2    gate?

3    A.    Yes.

4    Q.    Towards the road?

5    A.    Yes.

6    Q.    If I said that that was a sort of like a

7    cart retention system, would that ring any bells?

8    A.    I have never heard the phrase used before.

9    Q.    Do you know whether -- the straight truck

10   that was involved in Shawn's accident, do you know

11   whether that lift gate -- do you know what type of

12   lift gate that was?

13   A.    I believe it was a Maxon gate.

14   Q.    Do you know what kind of lift gate it is?

15   A.    No.  Couldn't tell you.

16   Q.    Do you know whether it was a level lift?

17   A.    Couldn't tell you; never used it.

18   Q.    Do you know whether it had anyplace where

19   Logistics straps could be tied in?

20   A.    I have never seen a gate that had that

21   foundation.

22   Q.    Do you know whether it had any sort of --

23   you indicated on the Interlift that it had a flip-up

24   to prevent things from rolling off.  Do you know

1    gate?

2        A.    They dispatched -- and I can't remember

3    who in dispatch; I don't know if it was Mike or

4    Tweedy, said that the job he was picking up out of

5    New York going to Connecticut required a gate.

6        Q.    That was told to you orally?

7        A.    Yes.

8        Q.    It required a lift gate?

9        A.    Correct.

10       Q.    Did they tell you what the items were

11   going to be?

12       A.    A couple of pieces, 400 pounds.

13       Q.    Did anybody tell you whether that would be

14   on wheels or not on wheels?

15       A.    No.

16       Q.    Do you know -- did they tell you where the

17   lift gate would be needed, whether it would be

18   needed in New York or at the destination?

19       A.    No, they didn't.

20       Q.    Did you know where these items would be

21   going?

22       A.    No.

23       Q.    Did you talk to Shawn Pouliot?

24       A.    When?

29

1    Q.    At all before he left?

2    A.    No.

3    Q.    So the information that Mike Montgomery or

4    Bill Tweedy gave you about where Shawn would be

5    going, this wasn't information that you then

6    conveyed to Shawn Pouliot?

7    A.    No.

8    Q.    What did you do after you loaded the truck

9    at 2:00 a.m. on that Saturday?

10    A.    Went home.

11    Q.    Went to sleep presumably?

12    A.    Sleep.  A long day.

13    Q.    After a long day.  Did you see Shawn at

14    all before he left?

15    A.    No.  The last time I saw Shawn was, he had

16    gotten into an accident with our vehicle -- no, I'm

17    sorry, with his vehicle prior to that.  I want to

18    say that was probably like a Thursday before the

19    accident.  That was the last time I saw Shawn.

20    Q.    And that was, as I understand it -- tell

21    me if this refreshes your recollection.  This was an

22    accident that involved the trailer on his vehicle

23    hitting an underpass?

24    A.    An overpass.

1    that was just a generic screen.  Those are the

2    questions that are supposed to be asked -- the

3    customer service rep is supposed to ask whoever is

4    calling in.

5        Q.    The customer service rep for Paul Arpin

6    Van Lines?

7        A.    Arpin Logistics.

8        Q.    So the shipper, Festo, or whoever, is

9    supposed to be asked these questions that appear in

10   the box marked origin info and destination info?

11       A.    Correct.

12       Q.    And what is the customer service rep

13   supposed to do with that information?

14       A.    He's supposed to add it onto the

15   information screens as to what is required, lift

16   gate required, pad straps, are there loading docks,

17   pallet jacks, that type of thing.

18       Q.    So that goes onto the information screen

19   and presumably gets onto the bill of lading?

20       A.    Correct.

21       Q.    And this would have been -- would this

22   have been the only bill of lading that would have

23   been given to Shawn Pouliot, Exhibit A?

24       A.    Yeah.

37

1        A.    As it was told to me by dispatch, they

2    told me they needed a lift gate.

3        Q.    So you knew that the job required a lift

4    gate?

5        A.    Yes.

6        Q.    But based on this bill of lading, would

7    there be any way to know?

8        A.    No.

9        Q.    Were you aware of any prior problems that

10    the shipper, Festo, had had with the delivery of

11    those kinds of units?

12        A.    No.

13        Q.    Did you know what unit was going to be

14    delivered from Festo to Naugatuck?

15        A.    No.

16        Q.    Based on your conversations with the

17    dispatchers, did you know the units would be on

18    wheels?

19        A.    No.

20        Q.    They didn't tell you that?

21        A.    No.

22        Q.    Would that have been important for you to

23    know?

24        A.    Yeah.

38

1      Q.    Why?

2      A.    Depending on the size of the units and

3    that type of thing, the truck; that gate was a small

4    gate.  If it's a large unit, that gate's not going

5    to work and I could have sent another unit.  I had a

6    couple of other units at my disposal, Unit 267 which

7    had one of those Interlift gates and Unit 671 which

8    had a Maxon.

9      Q.    So you had some pretty good equipment at

10   your disposal?

11     A.    Yes.

12     Q.    And the 267 you said had the Interlift

13   lift gate?

14     A.    Yes.

15     Q.    And that's the company I think you said

16   was in Santa Fe, California?

17     A.    Yes.

18     Q.    And it's a $10,000 lift with a flip-up to

19   prevent something from falling off?

20     A.    Correct.

21     Q.    On Unit 267, would that also have, is that

22   a level lift gate --

23     A.    Yeah.  You can adjust the levels up, tilt

24   back, tilt forward.

1          Q.    And does that mean, Mr. Rocha -- let me

2    ask my full question or else it becomes very

3    difficult.    The Interlift lift gate, is that a lift

4    gate that stays the same angle to the ground,

5    whatever you set it for, stays at the same level to

6    the ground from the top all way to the bottom of the

7    maneuver?

8          A.    Correct.

9          Q.    Did you understand -- the lift gate that

10   was on the truck that Shawn was given, did you

11   understand that that lift gate would change its

12   angle to the ground as it went from top to bottom?

13         A.    Yes.

14         Q.    How did you know that?

15         A.    With my years of experience in the

16   business.

17         Q.    Just knowing about tuck-aways?

18         A.    Yes.

19         Q.    You actually had 267 at your disposal at

20   the Arpin Logistics lot?

21         A.    Yes.

22         Q.    Was that unit used at all to your

23   knowledge from the time that Shawn went out with

24   this truck to the time Shawn was injured?

40

1        A.    I don't understand the question.

2        Q.    I mean, do you know whether there was any

3    other assignment that truck was given during the

4    period of time from when Shawn left Arpin to when he

5    was injured?

6        A.    I utilized every vehicle at our disposal

7    on a daily basis.   I mean, if it wasn't used for one

8    thing, it would have been used for another.

9        Q.    So this was your call?

10       A.    Yeah.

11       Q.    And not knowing what the actual load was,

12   you just made a judgment call?

13       A.    Correct.

14       Q.    Was there anything on the truck that you

15   loaded on that you understood would require a lift

16   gate to take off?

17       A.    No.   Everything was dock delivery.

18       Q.    So the manifest we see here as Exhibit B

19   showing three deliveries, to Ademco, Air-Sea Pack

20   and TWI, these were all going to be loading dock

21   deliveries?

22       A.    Correct.

23       Q.    And these three loads that you loaded on

24   over that night between the 20th and the 21st, was

1    in October of 2001, I'm going to replace this Maxon

2    unit with the Interlift unit?

3         A.   It depends on the vehicle.  It depends on

4    what they want to do with the vehicle.  It depends

5    on if there's a lift gate that's going to fit that

6    body.  It just depends on the nature.

7         Q.   So if in your own mind you said, geez,

8    this needs to be replaced, I would like to put an

9    Interlift gate on, you would probably go to David

10   Arpin or somebody and say, is it okay to make this

11   $10,000 expenditure, I think we need it because we

12   don't have one in the fleet, or something like that?

13   Is that fair to say?

14        A.   Yeah.

15        Q.   You also indicated on Unit 671 you had a

16   Maxon rail unit?

17        A.   Rail gate, correct.

18        Q.   And we talked a little bit about the rail

19   gate.  But the rail gate, is that also a level unit?

20        A.   There's only one movement so it's straight

21   up and down, no tilting at all.  Whatever angle the

22   vehicle is at, that's the way that gate is coming

23   down.  So if he's on level ground, he's coming down

24   level.  If he's at an angle, it's going to go that

1   way.  If he's on a hill, it's going to tilt that

2   way.  There's no adjustments.

3        Q.   So it's the same thing going up and down

4   in terms of angulation to the road?

5        A.   Correct.

6        Q.   Did that also have any kind of what I call

7   a cart retention system?

8        A.   Yes.

9        Q.   It also had a flipper that came up?

10       A.   Yes.

11       Q.   And prevented the thing on wheels from

12   going off?

13       A.   Yes.

14       Q.   Did either of those two lift gates on

15   261 --

16       A.   267.

17       Q.   I'm sorry, 267 and 671, did either of

18   those lift gates have poles or places where you

19   could attach straps?

20       A.   No.

21       Q.   Was there any way to strap down an item on

22   a lift gate?

23       A.   Technically I mean you could strap the

24   whole unit down.  You would have to wrap it around

48

1    Q.    And the tuck-away lift gates that you had,

2    you think were on maybe around four percent of the

3    trailers?

4    A.    About that.

5    Q.    And those tuck-aways, were those larger

6    than the tuck-away that was on the straight truck

7    involved in this accident?

8    A.    About the same size platform.

9    Q.    Do you know whether those tuck-away lift

10   gates, whether they had any kind of cart retention

11   system?

12   A.    No, they did not.

13   Q.    If you had a job involving an item on

14   wheels, which type of trailer would you send out?

15   What kind of a --

16   A.    Either the rail gate or an Interlift type

17   gate.

18   Q.    You wouldn't send out the tuck-away gates?

19   A.    No.

20   Q.    Why not?

21   A.    Just because of the nature of the way it

22   operates.

23   Q.    In that its angle changes as it moves up

24   and down?

49

1      A.    Correct.

2      Q.    Do you know how tuck-away lift gates are

3   supposed to be maintained?

4      A.    No.

5      Q.    Have you ever done maintenance on a lift

6   gate?

7      A.    No.

8      Q.    Do you know what the proper angle at the

9   top of the tuck-away gate is at the top of its range

10  meaning level with the back of the truck?  Do you

11  know what angle it's supposed to be at?

12     A.    I would say flush with the floor of the

13  truck, so flat.

14     Q.    So it's your understanding that at the top

15  the tuck-away lift gate, it ought to be flat?

16     A.    Yes.

17     Q.    And so if you saw a lift gate that was a

18  tuck-away lift gate that was flat at the top,

19  meaning at the same angulation as the back of the

20  truck, you would say that was appropriate?

21     A.    Correct.

22     Q.    That would be your understanding back in

23  October of 2001?

24     A.    Yes.

63

1          Q.    If you had known the item was on wheels,

2     what would you have done differently?

3          A.    I probably would have asked how big it is.

4     That would be my next call, and determine it from

5     there.   But if I saw the bill of lading, if I saw a

6     weight of 400 pounds -- you do that morning, noon

7     and night; it's not a big deal.   But if I saw a

8     photo of that machine and saw how big it was, no, I

9     wouldn't have used that vehicle.

10         Q.    So you wouldn't have seen anything wrong

11    in moving a 400-pound item on wheels using that

12    particular lift gate?

13         A.    400 maybe, but it called for two pieces at

14    400 pounds.   In my mind 200, 200, that's not a big

15    deal.

16         Q.    So you wouldn't see anything wrong with

17    moving a 200-pound item on wheels?

18         A.    Or a 400-pound for that fact.   It's not

19    that big of a deal.

20         Q.    Would it matter whether or not -- whether

21    the item had locks on the wheels or didn't have

22    locks on the wheels?

23         A.    It would help if it did have locks on the

24    wheels.

1          Q.    So that would be 1:00 a.m. on the 22nd?

2          A.    Correct.

3          Q.    And at that time, what information did you

4     have about the job at Festo?

5          A.    Lift gate required at destination picking

6     up two pieces, 400 pounds total.

7          Q.    Were you told anything by dispatch about

8     the dimensions of the cargo?

9          A.    No.

10         Q.    No.  Were you told or in any way informed

11    by dispatch that the cargo involved a work station?

12         A.    No.

13         Q.    Were you told either by dispatch or in any

14    paperwork that one item was a pallet?

15         A.    No.

16         Q.    I'm going to show you a document.  I think

17    on this one it's got an exhibit sticker from a Miss

18    Kern's deposition.  Have you ever seen that document

19    before today, Mr. Rocha?

20         A.    Yes.

21         Q.    When is the first time that you saw that

22    document?

23         A.    Specific day, I couldn't tell you.

24    Attorney Grady showed me this document sometime

70

1    after the injury.

2         Q.    So would it be fair to say that the first

3    time you saw the document that you have in front of

4    you was after Arpin had retained counsel in

5    connection with Shawn's accident?

6         A.    Correct.

7              MS. O'DONNELL:  Can I have that marked as

8    the next exhibit by the court reporter.

9              (Marked for identification, Exhibit E,

10   Trans-Expo International Shipment Booking.)

11        Q.    Would you agree with me, Mr. Rocha, that

12   the documents that you have in front of you make

13   reference on at least two occasions to protecting

14   the wheels?

15        A.    Handwritten on the bottom of the form,

16   yes.

17        Q.    And do you see where it says shipper,

18   Festo Regional Logistics Center.

19        A.    Um-hm.

20        Q.    Would you agree with me at that location

21   of the document where it says address, there's an

22   indication on this order form to have ten to twelve

23   pads, slash, straps, slash, protect wheels?

24        A.    Um-hm.

71

1    Q.    Would you agree with me?

2    A.    Yes.

3    Q.    But at no point was any information put on

4    the bill of lading form that any piece of cargo

5    coming from Festo was on wheels; is that correct?

6    A.    Correct.

7    Q.    And you weren't told by dispatch that any

8    piece of cargo was on wheels, correct?

9    A.    Correct.

10    Q.    Now, you said something about a, I think

11    you called it an information screen?

12    A.    Um-hm.

13    Q.    What is the information screen?

14    A.    When the order is called in or faxed in,

15    there's certain information that's on the screen

16    that -- you know, where we're picking up, where

17    we're delivering to, contact names, phone numbers,

18    who we're billing, that type of stuff.

19    Q.    What is the screen?  What are you

20    referring to?

21    A.    In Arpin's computer system, there's a data

22    entry screen that you have to put all this

23    information into when you register an order.

24    Q.    Who has access to that information screen?

84

1        Q.    What is it particularly about the Wright

2    Line shipments that would cause you to use the

3    Interlift lift gate?

4        A.    The size of the pallets.  That's the only

5    gate that could handle that.  And the rail gate as

6    well could handle that size pallet.

7        Q.    So the dimensions of the cargo?

8        A.    Correct.

9        Q.    But it's true, is it not, that when you

10   were sending Shawn Pouliot out to the Festo job, you

11   personally didn't have any information as to what

12   the dimensions were of the cargo that Shawn was

13   going to pick up?

14       A.    That's correct, dimensions, no, nor

15   weight.

16       Q.    Dimensions nor weight?

17       A.    Nor weight.

18       Q.    Well, you at least had information that

19   there was a weight, at least a minimum weight of 400

20   pounds, correct?

21            MR. GRADY:   Objection.

22       A.    Correct.

23       Q.    And you didn't know, by the way, whether

24   that was one piece of cargo weighing 50 pounds and

1      or the lift gate that was on it; is that correct?

2          A.    Correct.

3          Q.    Would there have been a particular weight

4    where you have said, I'm not sending X pounds with

5    this Peterbilt with this particular lift gate?

6          A.    There's nothing in writing as to what the

7    cutoff is weightwise.  Obviously there is -- I mean,

8    if anything is over -- I think the gate's got a

9    capacity of maybe 25, 3,000 pounds, so obviously

10   that.  Personally I wouldn't move something over 600

11   pounds with it.

12         Q.    Why not?

13         A.    Just a safety factor.

14         Q.    If the lift itself --

15         A.    Can I rephrase?

16         Q.    Yeah.

17         A.    And I'm envisioning something on wheels.

18   Freightwise, yeah, I could move something in skids

19   of a couple of thousand pounds.  It all depends on

20   the nature of the freight.  We need specifics on it

21   in terms of what I'm going to be putting on that

22   gate.

23         Q.    So it's not the weight alone that would be

24   a factor?

1        A.    Yeah, right.  It's the item.

2        Q.    Is it on wheels, is it top heavy?  So

3    whether it was 400 pounds or 800 pounds, that

4    wouldn't alone have led you to make a change with

5    respect to this particular truck and lift gate?

6        A.    Correct.

7        Q.    Back in October of 2001, who did Arpin

8    rely on to provide them with information as to

9    whether an item was top heavy or not top heavy?

10       A.    The booker.

11       Q.    And when you say the booker, who are you

12   referring to?

13       A.    Whoever called in the shipment for

14   service, that they needed service.

15       Q.    In your experience, who does the booker --

16   is the booker, the shipper or some other source?

17       A.    The booker is whoever we're going to be

18   billing for services.

19       Q.    Is that, on occasion, the shipper of the

20   cargo?

21            MR. OSWALD:  Objection.

22       A.    Can I answer?

23       Q.    Yes.

24       A.    Yes.

99

1    operations.

2         Q.   And do you mean fleet operations?

3         A.   Dispatch operations.

4         Q.   But didn't I understand that it was you

5    who made the selection of this particular truck and

6    lift gate for this delivery circuit; is that

7    correct?

8         A.   For this particular situation, correct.

9         Q.   Why you for this particular situation as

10   opposed to dispatch?

11        A.   Because I'm responsible for the equipment

12   in our yard.  I was also in charge of local

13   operations.

14        Q.   Can you tell me if there's any other

15   information, other than what's provided to Arpin by

16   a booker, that is utilized in creating a shipping

17   plan by Arpin?

18        A.   No.

19        Q.   Just whatever the booker tells you?

20        A.   Yes.

21        Q.   Back in October of 2001, did Arpin

22   Logistics ever rely on any other source to determine

23   what type of equipment should go on a particular

24   job?  I mean, did you let someone else tell you what

1    A.    No.

2    Q.    Is it a shipper or manufacturer of the

3    equipment?

4    A.    No, I can't tell you what they are.

5    Q.    You don't know what the relationship is?

6    A.    No.

7    Q.    Would it be fair to say that prior to

8    October of 2001, Arpin Logistics had transported

9    cargo that was on wheels?

10    A.    Oh, yes.

11    Q.    Can you identify some of the types of

12    cargo that Arpin had transported that was on wheels

13    prior to October of 2001?

14    A.    Security cages, computer storage bays,

15    copy machines, hundreds of pieces of equipment.

16    Q.    So the movement of a piece of equipment on

17    wheels was not an unusual occurrence, correct, for

18    Arpin?

19    A.    Correct.

20    Q.    Prior to October of 2001, would Arpin

21    require that wheeled cargo be on a skid or be on a

22    pallet?

23    A.    Did we require it?

24    Q.    Right.

104

1    depend on a sales agent or a booker to tell you?

2         A.    Yes.

3         Q.    Whether an item needed to be pad wrapped?

4         A.    Yes.

5         Q.    I seem to recall from your prior

6    deposition you used the phrase, if I'm not mistaken,

7    that Arpin was a full pad-wrap carrier; is that

8    correct?

9         A.    Correct.

10        Q.    What did you mean by that?

11        A.    We're not just a general commodities

12   carrier.  A general commodities carrier, there's no

13   equipment on the truck.  Arpin Logistics is a

14   specialized carrier.  We'll have pads, straps and

15   that type of equipment at our disposal and our

16   drivers are trained and aware of how to protect

17   these items.  It's not forklift down and forklift

18   off.  It's more labor intensive.

19        Q.    So Arpin Logistics has the pad and strap

20   equipment available and the drivers are also trained

21   as to how to use this equipment?

22        A.    Drivers have experience.

23        Q.    Have experience, okay.  How do you know

24   that the drivers have experience?

1    is something that he would do if he didn't load it

2    himself.  So is that what you're asking?

3        Q.    If he didn't load the equipment himself?

4        A.    Yes.

5        Q.    What if he does load the equipment

6    himself?

7        A.    It would be a good idea, you know, to do a

8    walk-around and look because you never know if

9    someone else is tampering or someone else is looking

10   for something, someone wants a piece of equipment,

11   that type of thing.

12        Unless you have the doors locked and you

13   are confident that it's sealed, it's a good idea.

14   Does everyone do it?  No.

15        Q.    When you do load it yourself, does

16   everyone do it, no; correct?

17        A.    Correct.

18        Q.    Bear with me for one second.

19        (Pause.)

20        MS. O'DONNELL:  Can you show him these

21   three -- actually would you mark them before you

22   give them to him, so we have some reference,

23   separate, please.

24        (Marked for identification, Exhibit F,

112

1    Computer Printout.)

2          (Marked for identification, Exhibit G,

3    Computer Printout.)

4          (Marked for identification, Exhibit H,

5    Computer Printout.)

6    Q.    Mr. Rocha, would you look at those three

7    items that are in front of you.  Take your time.

8    And my question would be, do you recognize the

9    documents you have in front of you?  Have you ever

10   seen anything like that before?

11   A.    Yes.  These were screens in our computer

12   system at Arpin Logistics.

13          MR. OSWALD:  Can we identify what exhibits

14   they are?

15   Q.    Can you read the letters for us,

16   Mr. Rocha?

17   A.    Exhibits F, G and H.

18   Q.    Do those appear to be printed out of the

19   information screen that you were testifying about

20   earlier?

21   A.    Yes.

22   Q.    And the first paper that you have in front

23   of you, have you ever seen that printout before?

24   A.    Yes.

1    a few things that you were asked this morning.  I'll

2    try not to retread old ground so we can move this

3    forward.  I just want to make sure I understand,

4    Mr. Rocha, the flow of information when Arpin gets a

5    job.  First of all, Arpin has got people out beating

6    the bushes to try to get work for them, right?

7         A.    Correct.

8         Q.    And I think you referred to those people

9    as sales agents, right?

10        A.    Um-hm.

11        Q.    And Trans-Expo was one such sales agent?

12        A.    Yes.

13        Q.    And you mentioned some names of others?

14        A.    CTS.

15        Q.    Is another one?

16        A.    Yes.

17        Q.    And those sales agents provide information

18   to Arpin and that information comes in to whom?

19        A.    Customer service.

20        Q.    And customer service then -- again, I'm

21   trying to summarize but correct me if I'm wrong.

22   Customer service then inputs the information that

23   they are given into I think what's been referred to

24   this morning as an information screen?

144

1      A.    Correct.

2      Q.    And we saw one such information screen as

3   Exhibit F, correct, F like Frank?

4      A.    Correct.

5      Q.    Now, you have referred to I think Exhibit

6   G and Exhibit H as information screens as well; but

7   you also testified as to, I think there being kind

8   of a form screen that gets pulled up on the system

9   and with places to enter information?

10      A.    Correct.

11      Q.    When you were testifying about that, you

12   were testifying about Exhibit F, right, F like

13   Frank?

14      A.    No.

15           MR. GRADY:  Objection.

16      Q.    What were you testifying about then?

17      A.    There's another screen, I guess it would

18   be the first screen; and I'm really not the person

19   to ask on that.  I've just got generalities.  I

20   don't have specifics.

21      Q.    Let me ask you one quick question.  Who

22   would be the person to ask?

23      A.    Mike Montgomery.

24      Q.    I'm going to ask you regardless to see

151

1    of what?

2         A.    Cube.

3         Q.    When you say "of cube", is that sometimes

4    referred to as cubic weight?

5         A.    I don't know.

6         Q.    Have you ever heard it referred to as

7    dimensional weight?

8         A.    Yes, I have heard of the reference.  What

9    it means, I don't know.

10        Q.    You don't know if that means cube or not?

11        A.    I don't.

12        Q.    So the number one hundred here is

13   referring to 100 cubic what, feet, meters, inches?

14        A.    Feet.

15        Q.    So one hundred equals 100 cubic feet.  So

16   that's not the true -- strike that.

17              What is the purpose of determining here the

18   cube?

19              MR. GRADY:  Objection.

20        A.    I don't know.

21        Q.    Is it for billing purposes?

22              MR. GRADY:  Objection.

23        A.    I don't know.

24        Q.    Is there any way of determining just from

152

1    Exhibit F what the actual length and weight and
2    height of the particular equipment was that was
3    shipped as part of this shipment?
4        A.   Unless you had a calculator and reversed
5    it, that would give you a rough idea of what you had
6    for size.
7        Q.   Even reversing it, though, would that give
8    you any idea of size if you have three variables,
9    the length, the weight and the height?
10       A.   No, it would not.
11       Q.   You really have no idea, do you?
12       A.   No.
13       Q.   Is it your understanding -- even if you
14   don't know, is it your understanding that the
15   dimensions there in Exhibit F is for billing
16   purposes to determine how much the rate is going to
17   be for a particular job?
18           MR. GRADY:  Objection.
19       A.   I don't know.
20       Q.   Okay.  After it says dims, D-I-M-S, you
21   see the notation PCS?
22       A.   Um-hm.
23       Q.   Correct?  That PCS refers to pieces?
24       A.   Correct.

153

1    Q.    There it says two pieces, correct?

2    A.    Yes.

3    Q.    So are the dimensions a hundred cubic feet

4    for one of those pieces, for the other of the pieces

5    or for both pieces together, or do you not know?

6    A.    Two pieces, two pieces combined.  It

7    should be for the entire shipment.

8    Q.    And that actually adds even a further

9    factor that you cannot really determine from Exhibit

10   F what the actual dimensions of the unit are,

11   correct?

12   A.    Correct.

13   Q.    For purposes of using a lift gate, is it

14   important to know what the dimensions are of the

15   item that is going to be raised or lowered on that

16   lift gate?

17   A.    Yes.

18   Q.    Why?

19   A.    The lift gates have different size

20   platforms, different lift gates have different size

21   platforms; so if you are getting a piece that

22   overlays that platform, for instance, something ten

23   feet long, it's just not going to work.  You are

24   going to need a dock or some other type of equipment

1    Q.    What is it about the picture that leads

2    you to conclude that you would not have sent out

3    that truck?

4    A.    Can I see it?

5    Q.    Absolutely.  In fact why don't we mark

6    that as the next exhibit.

7         (Marked for identification, Exhibit L, Copy

8    of Photograph.)

9    Q.    Mr. Rocha, what is the actual exhibit that

10   we've marked that as?

11   A.    I'm sorry, L.

12   Q.    L, okay.  Referring to Exhibit L -- go

13   ahead.

14   A.    Just the overall size, and you really

15   can't base it against anything; but just the overall

16   width of it looks like, to be close to, if not more

17   than, five foot wide which is pretty close to the

18   limit of that platform that he did work on.

19   Q.    When you say width of it, just so that

20   we're clear, are you talking the longest part of

21   that machine or the shorter part of that machine?

22   A.    Shorter part of the machine.

23   Q.    Another way to describe it would be from

24   front -- the back of the machine, the depth of the

161

1    machine?

2        A.    The depth of the machine.

3        Q.    You say that that is approaching the limit

4    of the lift gate that was on this particular truck,

5    right?

6        A.    Correct.

7        Q.    So you were given an example earlier where

8    you said if something was ten feet long, you

9    probably wouldn't have chosen this; but if something

10   is approaching the limits of the particular lift

11   gate, that would also discourage you from using this

12   particular lift gate, correct?

13       A.    Correct.

14       Q.    Why?

15       A.    From a safety standpoint, you are going to

16   be able to raise -- it's going to interfere with the

17   operation of the lift gate.  If it's overhanging,

18   it's going to hang off one way or the other and it's

19   just not good safety practice.

20       Q.    That safety issue that you just described,

21   is that accentuated by an item that is approaching

22   the limits of the lift gate that's on wheels?

23       A.    Yes.

24       Q.    In what sense?

1      A.    You are very close to the edge.  If those

2   wheels aren't secured or even if they are secured,

3   it's just too close to the edge, too close for

4   comfort.

5      Q.    Is there some sort of -- strike that.

6          Is there any policy or guideline that you

7   are aware of at Arpin that sets forth the size of a

8   particular item, how big, or the maximum size a

9   particular item can be to go on a particular lift

10  gate?

11         MR. GRADY:  Objection.

12     A.    No, there is not.

13     Q.    Do you know, Mr. Rocha, of any kind of

14  rule of thumb that you use with respect to size of

15  items versus size of lift gates?

16         MR. GRADY:  Objection.  He didn't do that.

17     A.    No.

18     Q.    I'm sorry?

19     A.    No.

20     Q.    Is it fair to say, Mr. Rocha, that had you

21  known the actual dimensions in terms of front to

22  back of this particular machine, you would not have

23  chosen this lift gate to use on this particular job?

24         MR. GRADY:  Objection.  You're working off

1    Maybe I'm not asking this clearly enough.  I

2    understand that you loaded the truck.  Who made the

3    decision to use this 1989 Peterbilt for this

4    particular equipment that had to be shipped?

5        A.    I did.

6        Q.    So, going back to my earlier question, you

7    said at 800 pounds you had, I think an issue or a

8    problem with this you said.  And then I asked you at

9    400 pounds would you have an issue with it, if you

10    had known the actual depth, the actual front-to-back

11    depth of this machine?

12        A.    It depends on a lot of factors, the wheel

13    size, wheel brakes, is it 400 pounds, is it 300

14    pounds, is it 200 pounds.

15        Q.    Did you know that it was on wheels?

16        A.    No.

17        Q.    And you never had any discussions with

18    anybody, other than the attorneys, when you worked

19    for Arpin -- when you worked for Arpin, you never

20    had any discussions with anybody about the fact

21    that, hey, as it turns out, this thing was on wheels

22    and you didn't know that?

23        A.    No, I did not.  I never had a discussion

24    with anybody.

190

1    morning about Arpin Logistics, and I think you said

2    that they did a lot of -- I can't remember the

3    number that you gave -- moves of items on wheels,

4    correct?

5         A.    Yes.

6         Q.    Did Arpin Logistics hold itself out to be

7    kind of a special products mover, the kind of mover

8    that could handle items that were not on pallets or

9    not in crates?

10        A.    Yes.

11        Q.    It held itself out to the public as that?

12        A.    Yes.

13        Q.    Do you know if they did that in any of

14   their advertising literature or brochures or

15   anything?

16        A.    Yes, they did.

17        Q.    Do you have anything in mind when you say

18   that?

19        A.    They did a photo shoot in front of our

20   building, I remember, and they made some pamphlets.

21   I can remember them doing something of that nature.

22        Q.    Something you have actually seen?

23        A.    It was -- my friends modeled, were the

24   actual guys in the shoot.  We bust them up about it.

220

1      go back like I had no knowledge of the product, if

2      you know what I'm saying -- after seeing the

3      machine, there is nothing you can do to protect the

4      wheels.  I don't understand what they were talking

5      about that the wheels were getting damaged.

6          Q.    What I'm saying, if you had received this

7      certain instruction or seen it on the bill of

8      lading, would that have prompted more questions

9      before you made a choice as to what vehicle you were

10     going to use?

11         A.    Not necessarily.  The vehicle was more

12     than adequate to handle what they had called for.  I

13     would ask, what do you mean by protect the wheels.

14     That was the only thing that would stick out to me.

15         Q.    You wouldn't have any problem sending

16     somebody out to pick up a work station on wheels and

17     put it on a lift gate that had no retention system

18     or no flaps?

19         A.    It depends on the size, the piece itself.

20     I would need that information to make that

21     determination.

22         Q.    Now, when a dispatcher or someone at Arpin

23     communicates with the driver about a job that's

24     being done or planning on being done, does that make

224

1      A.    Not necessarily, no.

2      Q.    Why wouldn't it make it into the computer

3    file if a lift gate was needed?

4      A.    Couldn't tell you.  There were occasions

5    when they said a lift gate was absolutely needed and

6    you get there and it wasn't needed, so it was vice

7    versa.

8      Q.    So was it customer service's

9    responsibility at Arpin to make sure that all

10   relevant information got from the shipment bookings

11   or from conversations that they had with agents into

12   the computer system?

13     A.    I don't know what their procedure was as

14   far as that goes.  You would have to ask Mike or

15   Bill.

16     Q.    Should it have made its way into the

17   computer system?

18     A.    My opinion?

19     Q.    Yes.

20     A.    Yes.

21     Q.    So your opinion, if there was relevant

22   information regarding the dimensions of the units

23   being shipped, if that was available, that should

24   have made it onto the computer file?

225

1      A.    Yes.

2      Q.    If it was an inside delivery, that should

3  have made it onto the computer file?

4      A.    Yes.

5      Q.    And if there were going to be a lift gate

6  needed, that should have made it onto the computer

7  file?

8      A.    Yes.

9      Q.    How many pieces, that should have made it

10  into the computer file?

11      A.    Yes.

12      Q.    The actual weight should have made it into

13  the computer file?

14      A.    Yes.

15      Q.    How did information -- was there ever a

16  reason why the weight listed on a bill of lading was

17  less than the actual weight for pricing reasons?

18      A.    Was there ever a reason --

19      Q.    Right.  Let me strike the question.

20           You have indicated in your testimony that

21  sometimes if you had a really small object like an

22  ashtray, you couldn't make any money if you listed

23  the weight so you would use a thousand pounds even

24  when it weighs ten pounds?

1       MS. O'DONNELL:  I join.

2       THE WITNESS:  Correct.

3    Q.   What's your answer?

4    A.   My answer, it depends on all the

5  situation, the whole thing.  It depends on the whole

6  situation as to what I determine I need for

7  equipment.  I need to know all these factors we have

8  discussed, length, width, height, on wheels, weight,

9  that type of thing.

10   Q.   Supposing you had known only that this

11  work station weighed 812 pounds, would you have used

12  this lift gate?

13       MR. OSWALD:  Object to the form of the

14  question.  Same question you have asked three times.

15  Same objection.  He's already testified, just

16  testified ten seconds ago, that all of these factors

17  he would need to know to be able to make an adequate

18  determination.

19       MR. GRADY:  I'm changing the hypothetical.

20       MR. OSWALD:  It's the exact same question,

21  just asked a different way.

22   Q.   You can answer the question.

23   A.   If I knew this unit was 800 pounds and

24  just 800 pounds alone -- I need all the information.