# EXHIBIT 2

1                              Volume I, Pages 1-209
                               Exhibits N-P
2

3              UNITED STATES DISTRICT
               DISTRICT OF CONNECTICUT

4                        C.A. NO. 3:02 CV1302 (DJS)

5   SHAWN POULIOT,
                Plaintiff,          **CERTIFIED COPY**
6
                vs.
7

8   PAUL ARPIN VAN LINES, INC.
    AND ARPIN LOGISTICS,INC.,
                Defendants/Third-Party Plaintiffs,
9

10  vs.

11  THE FESTO CORPORATION,
    MICHAEL D. KOVAC D/B/A TRANS-EXPO INTERNATIONAL
    AND ERICA RAMIREZ IN HER CAPACITY
12  AS EMPLOYEE OF TRANS-EXPO INTERNATIONAL,
                Third-Party Defendants
13

14      DEPOSITION OF:  MICHAEL P.MONTGOMERY
                   LENIHAN, GRADY & STEELE
15                    Six Canal Street
                   Westerly, Rhode Island 02891
16
            July 27, 2004 9:00 a.m. - 2:20 p.m.
17

18  ATKINSON-BAKER, INC. COURT REPORTERS

19  330 North Brand Boulevard, Suite 250

20  Glendale, California  91203

21  800.228.3376

22  REPORTED BY:  Linda A. Menard
                     Registered Professional Reporter
23                   Certified Shorthand Reporter
    JOB NO. 9E05C35
24

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF BRISTOL, ss.


    I, Linda A. Menard, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript of the deposition of Michael P. Montgomery, having been duly sworn, on Tuesday, July 27, 2004, is true and accurate to the best of my knowledge, skill and ability.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 11th day of August, 2004.


Linda A. Menard, RPR
Notary Public
My commission expires:
September 17, 2004

1      A.    Yes.

2      Q.    Now, how did that process actually work at

3  Arpin Logistics back in October of 2001?

4      A.    Through the dispatcher.

5      Q.    So I'm imagining a phone call would come

6  in or a fax would be received from an agent.  Who

7  would actually get that information?

8      A.    Customer service.

9      Q.    What was customer service supposed to do

10  with that information?

11      A.    They input it into a computer and it went

12  onto what we call the unaccepted board.

13          MR. OSWALD:  Unaccepted board?

14          THE WITNESS:  Yes.

15      Q.    Was that an actual board, or is that more

16  of a computer screen?

17      A.    Yeah, it's a computer screen.

18      Q.    So you have the unaccepted board and you

19  have an accepted board?

20      A.    Right, and then you had a billing and then

21  you had a history.

22          MR. OSWALD:  What was the fourth one?

23          THE WITNESS:  Unaccepted, then operations,

24  then a billing screen and then a history.

1    board and their manifest pops up.  It has everything

2    that is on their truck and if it needs to be

3    assigned, it will say assign, A-S-N.  That means

4    that the dispatcher needs to communicate that to the

5    driver.

6         Q.   I want to show you what's been marked as

7    Exhibit F.  Can you tell me what that is?

8         A.   It looks like a printed screen of the

9    operations board.

10        Q.   Now, looking at Exhibit E, comparing that

11   to Exhibit F, does that appear to be the same job?

12        A.   Yes.

13        Q.   So Exhibit F is the information that Arpin

14   input into the computer from Exhibit E?

15        A.   Yes.

16        Q.   Now, looking at Exhibit F, is this all the

17   information that was available on the operations

18   board regarding this job?

19        A.   If you hit F7, if there are any additional

20   notes, it would pop up additional notes.  And I'm

21   not sure if there were any on this.

22        Q.   Let me show you what's been marked as

23   Exhibits G and H.  Would this represent the

24   additional notes?

1      Q.    And do you know why that is?

2      A.    No.

3      Q.    Is that information that should have made

4   it onto Exhibit F?

5      A.    Yes.

6      Q.    And also Exhibit F doesn't have any

7   information regarding the dimensions of the unit?

8      A.    No.  It's got dims, 400 cubes.

9      Q.    What does 400 cubes mean?

10     A.    400 cubic feet, which would represent

11   2,800 pounds.

12     Q.    Tell me about that.  That would mean --

13   where is that listed on Exhibit F?

14     A.    Weight, 400 pounds, dims, 400 cube.  Dims

15   is one hundred.  I'm sorry.

16     Q.    So the cubic weight was a hundred?

17     A.    Right.

18     Q.    Which would represent how much weight?

19     A.    400 pounds.

20     Q.    Now, was it typical for Arpin Logistics to

21   get exact weights for the various jobs that were

22   being done, or would they often get the kind of just

23   as-weight?

24     A.    The as-weight.

1    It came from West Virginia.

2        Q.    Was this a truck owned by Arpin Logistics?

3        A.    Coastal International I believe.

4        Q.    What is Coastal International?

5        A.    That's the truck dealership that Arpin

6    uses.

7        Q.    So it was leased from Coastal?

8        A.    Um-hm.

9        Q.    That's a yes?

10       A.    Yes.

11       Q.    And who was responsible for servicing that

12   truck and its components parts such as the lift

13   gate?  Was it Arpin Logistics?

14       A.    Yes.

15       Q.    But you didn't have any mechanics on

16   staff, right?

17       A.    No.  There's a garage three blocks away.

18       Q.    Do you have any particular expertise in

19   lift gates?

20       A.    I have been around them for 35 years.

21       Q.    Do you know what type of lift gate that

22   particular straight truck had on it?

23       A.    Yes.

24       Q.    What kind of lift gate is that?

1    have chosen this particular straight truck with this

2    particular lift gate; or would you have chosen some

3    other vehicle?

4        A.   It depends on the delivery site, so I

5    would have no problem delegating this truck.

6        Q.   But if you knew that a lift gate was going

7    to be required and there wasn't going to be a

8    loading dock, and you had other straight trucks that

9    actually had cart retention systems and were level

10   to the ground as they went up and down, would it

11   have been your choice to use one of those other

12   trucks or your choice to use the same truck that was

13   used?

14       A.   I probably would have used one of the

15   other trucks.

16       Q.   And that's all based on information that

17   you have on the operations screen or the bill of

18   lading?

19       A.   Yes.

20       Q.   Or word of mouth?

21       A.   Yes.

22       Q.   Now, Joe Rocha, was he a competent

23   employee of yours?

24       A.   Yes.

1        Q.    And he actually moonlighted loading

2    trucks?

3        A.    Yes.  Well, he was paid.

4        Q.    Right, right, not under the table.  But he

5    said he loaded this truck, it was like 2:00 a.m. on

6    a Sunday morning.  Would there have been anybody in

7    the Arpin office at that point in time?  Did you

8    have dispatchers working at that time?

9        A.    Not normally, but it's not to say that it

10   wouldn't happen.

11       Q.    But the normal course of events, Joe

12   wouldn't have somebody in dispatch to call or

13   somebody in customer service to call and say, Hey,

14   is there any additional information I should know?

15       A.    He has that available to him, but it's a

16   judgment call.

17       Q.    He also has access to the computer screens

18   and access to the files?

19       A.    Yes.

20       Q.    Do you know whether Shawn had ever used

21   any kind of lift gate while he was independently

22   contracting with Arpin?

23       A.    One more time.

24       Q.    Do you have any independent knowledge or

1     fault this was?

2          A.    No, I don't believe so.

3          Q.    As you sit here today, are you in a

4     position where you want to make judgments about this

5     case or are you just kind of a fact witness?

6               MR. GRADY:    Objection.

7          A.    Just a fact witness.

8          Q.    Do you believe, as you sit here today,

9     that the information that we saw on the shipment

10    booking form, that information should have been put

11    onto the unaccepted screen and should have made its

12    way to the operations screen?

13         A.    Yes.

14         Q.    And it's your opinion that the more

15    information that a driver has, the safer and more

16    efficient the job is going to be completed?

17         A.    Yes.

18         Q.    Now, are there any reasons that you can

19    think of that explain why that information didn't

20    make it to the screens?

21         A.    No.

22         Q.    And we've heard that Arpin did a lot of

23    jobs.  Was there a lot of jobs being done in October

24    of 2001?

85

1    as well?

2        A.    Yes.

3        Q.    So it's stuff that is kind of per se not

4    on a pallet or not in a crate, correct?

5        A.    Rephrase.

6        Q.    Specialized moves are moves that require

7    special handling; is that fair to say?

8        A.    Yes.

9        Q.    And special handling is required because

10    these items are not on a pallet or not in a crate?

11        A.    Not necessarily.

12        Q.    It could be on a pallet or could be in a

13    crate?

14        A.    Yes.

15        Q.    But very often are not on a pallet or very

16    often are not in a crate, right?

17            MR. GRADY:    Objection.

18        A.    I can't give you percentages.

19        Q.    I'm not asking you for percentages.  I'm

20    just asking is it common for a freight hauler such

21    as Arpin Logistics to be moving stuff that is not on

22    a pallet or not in a crate?

23        A.    Yes.

24        Q.    Very common in fact?

1      A.    Yes.

2      Q.    In fact that's what defines a specialty

3  mover from an ordinary carrier, right?

4           MR. GRADY:    Objection.

5      A.    Yes.

6      Q.    Did Arpin hold itself out to the public as

7  being a special mover for these kind of specialty

8  moves?

9      A.    Yes.

10     Q.    Did Arpin hold itself out to the public in

11 that way in its advertising or brochures that it

12 had?

13     A.    Yes.

14     Q.    Can you think of any particularly -- are

15 you aware of any such brochures or advertisements in

16 which Arpin publicized its ability to handle these

17 kinds of specialty moves?

18     A.    Yes.

19     Q.    What are you referring to when you say

20 yes?

21     A.    We had a three-fold and a website.

22     Q.    A website as well?

23     A.    Yes.

24     Q.    You said a three-fold?

104

1    to need -- whether it's dock to dock or whether you

2    are unloading it from the back of the truck?

3        A.    Yes.

4        Q.    That's an important piece of information

5    to make that determination?

6        A.    Yes.

7        Q.    And that information was not, we saw,

8    relayed from the shipment booking order to the

9    unaccepted board in this case, correct?

10       A.    Yes.

11       Q.    That is correct?

12       A.    They didn't transfer it.

13       Q.    Did you interview Shawn Pouliot when he

14   came on board at Arpin?

15       A.    Yes.

16       Q.    Do you recall anything about that

17   interview?

18       A.    Absolutely.    I got a call from Gene Waters

19   and he said that he was with a guy down in

20   Connecticut, he was out of a job, he was broke, he

21   was looking for job.    He said he seemed like a

22   pretty nice kid.    Gene's been with me for ten years.

23   So I said, Okay, I'll talk with him.

24            COURT REPORTER    Could you slow down,

107

1        A.    He told me everything.

2        Q.    Did you talk about household goods?

3        A.    Yes.

4        Q.    Did you talk about the specialty products

5    moves that Arpin Logistics does?

6        A.    Yes.

7        Q.    And he said that he had experience in

8    that?

9        A.    Yes.

10       Q.    Did you talk to Shawn at all about his

11   experience in the use of lift gates?

12       A.    No.

13       Q.    Does Arpin -- when you were there, did

14   Arpin provide training to its drivers in the use of

15   lift gates?

16       A.    We normally required three years'

17   experience in the industry.  If you are in the

18   industry, you use lift gates.

19       Q.    I'm sorry, just so that we're clear, Arpin

20   required three years of experience in the use of

21   lift gates?

22       A.    In the use or field of electronics.

23       Q.    I'm still confused.  When Arpin hired a

24   driver, they required three years of experience in

108

1    what?

2        A.    Electronics and trade shows.

3        Q.    In moving electronics and trade shows?

4        A.    Yes.

5        Q.    Why did it require three years of

6    experience in the moving of electronics and trade

7    shows?

8        A.    Because I feel if somebody's been there

9    three years, they're qualified to move it.

10        Q.    But you did not specifically require

11    particular experience in the use of lift gates?

12        A.    That's electronics and trade shows.    If

13    you are in electronics and trade shows, you use lift

14    gates.

15        Q.    So when you required three years of

16    experience in electronics or trade show moves, you

17    are assuming that within that somebody is having

18    extensive experience in the use of lift gates?

19            MR. STRATTON:    Objection.

20        A.    Yes.

21        Q.    When Arpin hired its drivers, did it

22    provide those drivers any training in proper loading

23    or unloading procedures?

24        A.    Arpin Logistics, no.

1       Q.    Paul Arpin Van Lines?

2       A.    I believe so.  I'm not sure.

3       Q.    Paul Arpin Van Lines did, but Arpin

4  Logistics did not?

5       A.    Right.

6       Q.    Why is it that Paul Arpin Van Lines did

7  but Arpin Logistics did not?

8       A.    Different commodity.

9       Q.    That commodity being?

10      A.    Household.

11      Q.    But at the same time, Arpin Logistics is

12  doing specialty products moves, correct?

13      A.    Yes.

14      Q.    And those specialty products require

15  special handling, correct?

16      A.    Yes.

17      Q.    Because they're generally not on a pallet

18  or in a crate?

19      A.    Yes.

20      Q.    They're fragile, they need extra care,

21  correct?

22      A.    Yes.

23      Q.    So why aren't you also giving training to

24  your drivers at Arpin Logistics if they have to be

1    moving these pieces of equipment that require

2    special handling and extra care?

3        A.    Because they tell me they had three years'

4    previous experience.

5        Q.    So, again the three years of experience in

6    electronics or trade shows, again you assume that

7    within that they have experience in loading and

8    unloading?

9        A.    Yes.

10        Q.    Does Arpin provide any training to its

11    drivers -- did Arpin provide any training to its

12    drivers when you were there about proper methods of

13    securing items within trucks?

14        A.    No.

15        Q.    Why not?

16        A.    Assuming again that they know what they're

17    doing.

18        Q.    I think you stated that you had never seen

19    this lift gate on the '89 Peterbilt prior to Shawn's

20    using it in October of 2001, correct?

21        A.    Correct.

22        Q.    And then after the accident, you never

23    operated that lift gate either; you saw it you

24    stated, but you didn't operate it?

1  pounds.

2      Q.   I see.  So if you take out the words 755

3  pounds from Paragraph 15, you would agree with me

4  that Arpin did know that the workstation was on

5  wheels?

6      A.   Yes.

7          MR. GRADY:  Objection.

8      Q.   Now you say it would have additionally

9  sent a rear lift with leveling capacity.  What do

10 you mean a rear lift with leveling capacity?

11     A.   It's the Maxon gate that comes down

12 straight.

13     Q.   Without any tilt to the back?

14     A.   Right.

15     Q.   Why would Arpin have provided a rear lift

16 with leveling capacity --

17     A.   For a machine --

18     Q.   -- in that instance?

19     A.   For a machine 800 pounds, I wouldn't take

20 it down on a smaller gate like that.

21     Q.   A smaller gate like that?

22     A.   Like the tuck-away gate.

23     Q.   What do you mean a smaller gate?

24     A.   It's not as solid as a Maxon lift gate.

154

1      A.    Question one more time.

2      Q.    Regardless of the weight of the unit,

3  would it have been safer to use a rear lift gate

4  with leveling capacity in this particular instance?

5      A.    Not necessarily.  If you had a two- or

6  three-hundred-pound machine, it would have been

7  fine.

8      Q.    But more than that, it would not have

9  been?

10      A.    Depends on the machine and how it handles.

11  You get a copier, it would be fine for a copier.  It

12  would be fine for a cabinet.  It wouldn't be fine

13  for a six-foot machine.

14      Q.    It wouldn't be fine for a six-foot

15  machine?

16      A.    Right.

17      Q.    But again nobody told -- the dispatcher

18  didn't relay to Shawn that it was a six-foot

19  machine?

20      A.    Right.  At that point Shawn should have

21  called when he looked at the machine.  If there's

22  any question with the delivery, that's when the

23  driver calls the dispatcher.

24      Q.    In any event you agree that a machine

155

1      above two or three hundred pounds that's on wheels

2      that's six feet, that ought to go down on a rear

3      lift gate with leveling capacity?

4              MR. GRADY:   Objection.

5          A.   Yes.

6          Q.   In Paragraph 16 of your affidavit, you

7      state that if Arpin Logistics had known that the

8      755-pound unit on wheels had brakes on two of the

9      wheels, it would have instructed Shawn Pouliot to

10     lock the wheels through use of the brakes during the

11     unloading process on the rear lift.  Did I read that

12     right?

13         A.   Yes.

14         Q.   I tried.  Is that part of Arpin's normal

15     procedure to tell its drivers about brakes on

16     wheels?

17         A.   The drivers should be aware of that and

18     know that, yeah.

19         Q.   So it's not part of Arpin's normal

20     procedure to tell its drivers about brakes on

21     wheels?

22         A.   Not in every shipment.  We don't know if

23     it has wheels.  That's just standard operating

24     procedure, if you have a machine on wheels, you lock

1    aren't good payers.  It might be a financial issue.

2         Q.    So if you had a customer with a history of

3    not paying its bills, you might decline that job?

4         A.    Right.

5         Q.    In October of 2001, did Arpin Logistics

6    have any procedures in place for verifying

7    information that came in on a shipment booking

8    order?

9         A.    No.

10        Q.    The sales agent agreement -- again that's

11   been marked as an exhibit -- indicates that the

12   sales agent would be an independent contractor of

13   the carrier.  Again I'm on the first page, the first

14   whereas.

15        A.    Okay.

16        Q.    Do you have any personal knowledge that

17   there's any other relationship between a sales agent

18   and Arpin other than independent contractor?

19        A.    None that I'm aware of.

20        Q.    Can you tell me, Mr. Montgomery, under

21   what circumstances a weight ticket is required for a

22   haul?

23        A.    A lot of trade shows, basically the weight

24   tickets are necessary.