# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT
    Plaintiff,

VS.

CIVIL ACTION
NO.3:02 CV 1302(DJS)

PAUL ARPIN VAN LINES, INC.;
ARPIN LOGISTICS, INC.;
THE FESTO CORPORATION; MICHAEL
D. KOVAC, d/b/a TRANS-EXPO
INTERNATIONAL, ERICA RAMIREZ,
IN HER CAPACITY AS EMPLOYEE
OF TRANS-EXPO INTERNATIONAL,
    Defendants.

        DEPOSITION OF WILLIAM TWEEDY, taken on behalf of the Defendants (Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc.) pursuant to Rule 30 of the Federal Rules of Civil Procedure, on October 5, 2004, at the offices of Adams & Haydon, 1050 Main Street, Suite 22, East Greenwich, Rhode Island, before Frances D. Young, Notary Public, convening at 9:45 a.m.

FRANCES D. YOUNG
Court Stenographer

**CONDENSED TRANSCRIPT**

# CERTIFICATION

I, Frances D. Young, RMR, do hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of Rhode Island and Providence Plantations that the foregoing is true and correct.

IN WITNESS WHEREOF I have hereunto set my hand this 8th day of October 2004.

_____
Frances D. Young, RMR

My commission expires:
August 26, 2005

Page 43

1      service board, let's see if I can find a page
2      number here. Well, it's the entry -- the "BILLT"
3      entry, the top one on the second page of notes.
4      Where it says "Confirmed on Board," what does that
5      mean?
6  A. Driver confirmed with me that the pickup was made
7      and the order was put on the truck.
8  Q. And when he says two pieces, weight 400 pounds,
9      he's confirming the weight, right?
10     MR. OSWALD: Objection.
11 A. No.
12 Q. He's not?
13 A. No.
14 Q. Okay.
15 A. He's confirming to me that that order that was
16     scheduled for pickup is on board. Now, he didn't
17     tell me any different, so it would go by what the
18     first rating screen was registered at, 400 pounds
19     and 2 pieces, unless he made any statements or
20     changes.
21 Q. When you say that he picked it up late, what do
22     you mean by that?
23 A. He picked it up a day late. It was scheduled for
24     pickup on the 22nd. He picked it up on the 23rd.

Page 61

1  A.  No.
2  Q.  Did he provide you any --
3  A.  He did want me to say something about the truck
4      that he used.
5  Q.  What --
6  A.  The truck was junk. I mean, I remember that. I
7      mean, the truck came up from West Virginia because
8      they couldn't use it down there. The truck wasn't
9      even supposed to be used.
10 Q.  But you had observed the operation of the rear
11     lift after the accident with Mark Pouliot, right?
12 A.  Yes.
13 Q.  And you wrote this statement after you conducted
14     that inspection with Mark Pouliot, right?
15 A.  Yes.
16 Q.  And the only thing that you could find wrong with
17     the liftgate after that inspection was that you
18     felt that the liftgate was too small for the unit,
19     right?
20 A.  Correct. It did tilt to the rear and it was too
21     small.
22 Q.  Well, you don't say in here that it tilted to the
23     rear, right?
24 A.  No, I don't say it on here, no, but it is shown on

Page 65

```
 1            accident occurred?
 2    A.      Yes.
 3    Q.      Where did you see it?
 4    A.      It was in the yard at Arpin Logistics.
 5    Q.      How long was it in the yard?
 6    A.      About a week or two.
 7    Q.      Did you ever inspect it?
 8    A.      No.
 9    Q.      Did you ever operate it before the accident?
10    A.      No. I did have many complaints about it, though.
11            The West Virginia terminal, they couldn't use it
12            down there. They weren't happy with it, so they
13            sent it up to our place in East Greenwich.
14    Q.      What were the complaints?
15    A.      The truck didn't run good, the liftgate wasn't any
16            good. Just --
17    Q.      Who told you that?
18    A.      What's his name? Bill -- I can't remember his
19            last name now. He ran Arpin in West Virginia.
20    Q.      King?
21    A.      No. Can't remember his last name now.
22    Q.      Was he the -- the head of the --
23    A.      Of West Virginia.
24    Q.      -- the operation in West Virginia?
```

Page 70

1  A. No.
2  Q. I'm going to show you a document entitled Shipment
3     Booking, Trans-Expo International Shipment
4     Booking, Defendant's G. Do you see that document?
5  A. Yes.
6  Q. Have you ever seen that document before?
7  A. No.
8  Q. This is the first time?
9  A. Yes.
10 Q. Would you like the opportunity to look at it?
11 A. Yes. Okay.
12 Q. Is this the first time you're seeing that
13    document?
14 A. Yes.
15 Q. You didn't refer to that document at the time you
16    prepared your manifest, did you?
17 A. No.
18 Q. Were you aware that in the middle approximately
19    third of the way from the bottom that this
20    Shipment Booking Order indicated that the actual
21    weight of these two pieces totaled 400 pounds? Do
22    you see that?
23        MR. OSWALD: Objection.
24 A. That's what it says, yes. Dispatch would never

Page 91

1  Q. Why did you believe that, that you would have been
2     terminated?
3  A. With ongoing litigation and everything else, and
4     if I'm trying to help, you know, somebody else out
5     for any particular reason, then I just know the
6     way Mike Montgomery is, and I would have been
7     terminated.
8  Q. Now, this video was taken within days of the
9     accident, correct?
10 A. Yes.
11 Q. Did you anticipate at that point that there was
12    going to be some kind of lawsuit resulting from
13    this injury?
14 A. Oh, yeah.
15 Q. And that's the way Mike Montgomery was, he would
16    have fired you if he knew you helped out?
17 A. Yes.
18 Q. Now, this Shipment Booking Order that was
19    transmitted from my client's company to Arpin, my
20    understanding is you have never seen this prior to
21    today?
22 A. Correct.
23 Q. And it's your testimony that as a dispatcher you
24    would generally not see any Shipment Booking

Page 94

1  so --
2  Q. So would it be fair to say that the information
3     that you would have had is solely on this computer
4     screen?
5  A. Correct.
6  Q. So it's quite possible that you did not know to
7     tell anyone about a liftgate?
8  A. Correct.
9  Q. And I'm not going to go through every single piece
10    of information on this booking order, but let's
11    just pick another one. For example, you see how
12    under the "Shipment Information" it says, "must
13    have 10 to 12 pads"?
14 A. Okay.
15 Q. And that made it onto the shipment information,
16    correct?
17 A. Yes.
18 Q. Straps, that made it on as well?
19 A. Yes.
20 Q. And then it says "protect wheels", do you see
21    that?
22 A. Yes, and it doesn't say it on there.
23 Q. So nothing about wheels ever made it onto the
24    computer screen?

1  A.  Yes.
2  Q.  And this is the information on Exhibit C that you
3      had to formulate your dispatch plan?
4  A.  Yes. I go by the AS/400 system, and that's what
5      this is printed off of.
6  Q.  Right. And there were no oral communications
7      between yourself and either Ruth or anybody at
8      customer service to give you any more information
9      than was -- what was on the computer?
10 A.  No.
11 Q.  Let me understand what role you have in deciding
12     what type of equipment needs to go with the truck.
13 A.  Okay.
14 Q.  Would you be basing that on just whatever comes
15     onto the screen?
16 A.  Yes.
17 Q.  Okay. And that information would then be relayed
18     to or also available to whoever was in the
19     warehouse loading the truck?
20 A.  Yes.
21 Q.  Let me go back to your letter briefly. Do I
22     understand your testimony today that to the extent
23     that your letter indicates that you were told to
24     dispatch Shawn or dispatched Shawn on October 22,

Page 96

```
 1       having had a chance to review other documents and
 2       a calendar, you believe that was a mistake on your
 3       part?
 4   A.  No.
 5   Q.  No?
 6   A.  No. He was dispatched to go out to do his
 7       deliveries this day.
 8   Q.  On the 22nd?
 9   A.  He was sent out on the 21st. These are the days
10       he was supposed to make his deliveries.
11   Q.  Okay.
12   A.  He would leave the night of the 21st to make
13       deliveries on the 22nd.
14   Q.  Maybe I don't understand the phrase dispatch.
15       What does that mean, to be dispatched?
16   A.  Dispatch is basically convey information, relay
17       information. Tell the driver what to do, when to
18       do it. I don't have a, you know, dictionary to
19       give you the exact definition, but I was told to
20       have Shawn in New York for the 22nd, the morning
21       of the 22nd, which was this day. He was supposed
22       to make all three of his deliveries.
23   Q.  On the 22nd?
24   A.  On the 22nd. They were all within -- those three
```

Page 132

1   that job. And that's why Mike physically came up
2   with that plan.
3  Q. Would you have chosen this truck to do this job?
4  A. Myself, no.
5  Q. Why not?
6  A. The truck had many problems when it came up here.
7     It came from West Virginia, and they couldn't use
8     it down there because of mechanical problems. And
9     the truck's physical condition, I mean, it wasn't
10    supposed to be used. The truck was supposed to go
11    into the shop to see what could be repaired in
12    order to send it back to West Virginia.
13 Q. Is that why it had come up from West Virginia?
14 A. Yes.
15 Q. So it was not supposed to be part of the fleet --
16 A. No.
17 Q. -- it had come up for essentially a diagnostic to
18    get repaired, and then sent back to West Virginia?
19 A. Correct.
20 Q. And nonetheless, Mike used this truck --
21 A. Yes.
22 Q. -- on this job?
23 A. Yes.
24 Q. Is that -- is that -- I'll withdraw that question.

Page 137

1       wheels, does that add a further element to it?
2 A. You would have to secure it. You would have to
3       strap it down and secure it.
4 Q. And you didn't know -- I'm sorry, let me direct
5       your attention to the -- to Exhibit G. That's the
6       Shipment Booking document.
7 A. Right.
8 Q. I think Bill Mottla testified that's what he used
9       to input information into the Arpin computer
10      system. AS/400, is that what it's called?
11 A. Yes.
12 Q. And there's nothing in the computer system, I
13      think you've already testified, about the -- what
14      the particular items are -- I don't know if you've
15      testified about this.
16        Is there anything in the computer printout
17      that we've seen about what these particular items
18      are?
19 A. No.
20 Q. So it is not reflected in the computer screen that
21      you're looking at that one of these items was a
22      trolly workstation, right?
23 A. Correct.
24 Q. And is it also correct that it's not reflected in

Page 138

```
 1      that computer screen that the trolly -- that one
 2      of these items is on wheels?
 3  A.  Correct.
 4  Q.  Would you have liked to know that as the
 5      dispatcher?
 6  A.  Yes.
 7  Q.  Why?
 8  A.  Because then you would mandate and make sure that
 9      the driver was aware that it was going to be on
10      wheels, and that he was fully aware that he should
11      secure that to the liftgate for lowering.
12  Q.  And the words trolly workstation, does that imply
13      something to you on wheels?
14  A.  Yes.
15  Q.  Okay. And again, you would have liked to have
16      known that one of these items was a trolly
17      workstation?
18  A.  Yes.
19  Q.  Regardless of the weight, correct?
20  A.  Yes.
21  Q.  And in fact, 400 pounds can crush somebody
22      probably pretty solidly, correct?
23  A.  One hundred pounds could, I mean, falling from six
24      feet high, yes.
```

Page 140

1  A.  Correct.
2  Q.  But if you had known that a liftgate was needed
3      are the dimensions of the items to be transported,
4      to be off-loaded using that liftgate, would that
5      have been important?
6  A.  Yes.
7  Q.  And again, you had no idea of the ultimate
8      dimensions of these items, correct?
9  A.  Correct.
10 Q.  You had -- the computer screen reflected, I think,
11     it says dims of 100, and I think you said that was
12     100 cubic feet, right?
13 A.  Yes.
14 Q.  The Shipping Booking document also notes that at
15     least one of these items is on a pallet, right?
16 A.  Yes.
17 Q.  And I think it also notes that -- strike that.
18         Is that also information that you would
19     have liked to have known as the dispatcher?
20 A.  If it's on a pallet then it would require a pallet
21     jack, and we didn't have one of those as well, so,
22     yes.
23 Q.  You see there's a box that says "Special
24     Instructions" on the bottom left. It says,

Page 142

1           with it to protect the wheels as far as going
2           across asphalt.
3   Q.   Okay. Would you have told the driver, hey,
4           this -- one of these pieces of equipment is on
5           wheels, you might want to have some blocks or some
6           chalks or something to block off the wheels with?
7               MR. GRADY: Objection.
8   A.   Well, no, you wouldn't really block anything off.
9           You would secure it and you would put something
10          underneath it.
11  Q.   Did Arpin provide its drivers with anything to
12          secure items or equipment that was on wheels?
13  A.   Straps.
14  Q.   But nothing for the wheels themselves?
15  A.   That would be a special request and it would be
16          either -- like I said, it would be either laminate
17          flooring or thin plywood or something of that
18          nature.
19  Q.   Okay. Would you agree with me that Arpin
20          Logistics at least holds itself out to having, you
21          know, significant experience in special handling
22          moves?
23  A.   Yes.
24  Q.   You said that the weight would be important to

Page 150

1     gets back.
2 Q. As soon as it gets back?
3 A. Yes.
4 Q. Not before it goes out?
5 A. Correct.
6     MR. DENISON: Mr. Tweedy, I'm sorry that
7 we used up all your time this morning. I have no
8 further questions, unless my colleagues do.
9     THE DEPONENT: Just took up my beauty
10 sleep, that was it. Took me out of my bed with
11 Playstation Two.
12     MR. GRADY: Now it's my turn.
13     THE DEPONENT: You already had your turn.
14     MR. GRADY: No, I got more.
15     EXAMINATION BY MR. GRADY
16 Q. Throughout your questioning you have been talking
17     about this truck as being a problem truck, but you
18     always used the word truck. You don't say that
19     the liftgate was mechanically --
20 A. The liftgate is attached to the truck so it's
21     constituted as the truck.
22 Q. But we already went through this. The only thing
23     that you said was wrong with the liftgate was it
24     tilted to the rear?