# EXHIBIT 4

2002 184E

FEB 27 2003

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - -

SHAWN POULIOT,                      )

     Plaintiff,                   ) CIVIL ACTION

     vs.                          ) Case No. 3:02 CV1302

PAUL ARPIN VAN LINES,    )

INC., and ARPIN               )

LOGISTICS, INC.,             )

     Defendants.                 )

- - -

Deposition of SHAWN L. POULIOT, Plaintiff herein, called by the Defendants for cross-examination pursuant to the Ohio Rules of Civil Procedure, taken before me, the undersigned, Kelley E. Spears, a Notary Public in and for the State of Ohio, at the offices of A. Russell Smith Law Offices, 159 South Main Street, Akron, Ohio, on Tuesday, the 3rd day of December, 2002, at 9:52 o'clock a.m.

-------------------------------------------------

BISH & ASSOCIATES, INC.
812 Key Building
Akron, Ohio  44308-1303
(330) 762-0031
(800) 332-0607
FAX (330) 762-0300
E-Mail: bishassociates@neo.rr.com

127

C E R T I F I C A T E

STATE OF OHIO,    )
                  ) SS:
SUMMIT COUNTY.    )

        I, Kelley E. Spears, a Notary Public within in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, SHAWN L. POULIOT, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the witness was by me reduced to Stenotype in the presence of said witness, afterwards transcribed upon a computer; and that the foregoing is a true and correct transcription of the testimony so given by the witness as aforesaid.

        I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

        I do further certify that I am not a relative, employee of or attorney for any of the parties in the above-captioned action; I am not financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

        IN WITNESS HEREOF, I have hereunto set my hand and affixed my seal of office at Akron, Ohio on this 9th day of December, 2002.

Kelley E. Spears, a Notary Public in and for the State of Ohio.
My Commission expires June 3, 2004.

5

1    A.    I'm on Neurontin.

2    Q.    Do you know how many milligrams and how

3    often?

4    A.    400 milligrams each pill, but I take 800

5    three times a day.  They're 400 milligram

6    pills.

7    Q.    Okay.

8    A.    And I have to look here.  Hold on.  Then

9    I take Ultracet which is 200 milligrams three

10   times a day.  I take Prilosec one time a day

11   which is 40 milligrams.  I take Zanaflex twice

12   a day which I believe is 50 milligrams.  I take

13   Xanax twice a day which is .5 milligrams.  And

14   for pain, Vicodins which are 500 milligrams,

15   pain as needed.  That should be all.

16   Q.    Okay.  And before I get into all the

17   questions that I have, why don't you tell me in

18   your own words as best you can how the accident

19   happened?

20   A.    Well, I brought the machine out of the

21   truck onto the lift gate, positioned it

22   completely on the lift gate, stepped out and I

23   lowered the -- I lowered the lift gate.  I

24   don't know the exact -- what extent or how high

25   from the ground it was at that point, but I

6

1    noticed a shift in the machine that I wasn't

2    particularly happy with.

3              So I stopped operating the lift.  I

4    walked around to assess the situation to see

5    what -- what could be corrected.  I positioned

6    the side opposite of the lever where I was

7    standing at the lever.  The other side is what

8    shifted.

9      Q.    Excuse me for interrupting.  Were you

10   standing on the lift at that stage?

11     A.    No.

12     Q.    You're standing on the ground?

13     A.    Yes.

14     Q.    Okay.

15     A.    So I walked around to the other side and

16   corrected the side that I felt had shifted.  I

17   positioned it more closer to the truck.

18     Q.    And you're doing this while you were on

19   the ground?

20     A.    Yes, sir.  I proceeded to the back, to

21   the other side where the lever was, and I

22   noticed that that side had shifted at that

23   point.  So I wanted to assess what was causing

24   this.

25              I stepped up onto the lift gate.  I

7

1  was on the side of the lift gate, the corner,

2  and I repositioned that side.  But at that

3  time, to -- my best knowledge is the other side

4  had swung around.  I noticed the drop in the

5  whole -- the whole machine and the lift gate.

6  It hit me.  I fell to the ground following the

7  machine hitting me, falling on me.

8     Q.   So where were you standing at the time

9  that the machine hit you?

10    A.    On the side of -- on the corner.  I was

11 on the side.  My leg and my arm were in the

12 corner of the machine.

13    Q.   So when you're standing on the corner,

14 was it the corner of the side where the lift

15 arm is or was it the opposite corner?

16    A.    On the corner.

17    Q.    The operating lever?

18    A.    Yes, sir.

19    Q.    And now you say you were standing -- I'm

20 not clear.  You're standing on the side, but at

21 the corner?

22    A.    Yes, sir.

23    Q.    So that your body was facing the side of

24 the machine?

25    A.    Yes, sir.

31

1    different kind of controls, what are you

2    talking about?

3        A.    You could -- you could control the --

4    the up and down motion of the lift and then you

5    can control it going in underneath the trailer

6    to put it away.

7        Q.    How long were -- how long were you a

8    driver for Arpin Logistics prior to the

9    accident?

10       A.    Approximately seven months.

11       Q.    Were you ever employed at any time by

12   Arpin Van Lines, Paul Arpin Van Lines, Inc.?

13              MR. STRATTON:    Just objection to the

14   term employment, but you can answer.

15              THE WITNESS:    You mean prior to

16   this?

17   BY MR. GRADY:

18       Q.    Well, at any time?

19       A.    No.

20       Q.    Now, did you ever do any work for Triton

21   Transport Services?

22       A.    Yes.

23       Q.    What kind of work did you do for them?

24       A.    Just general freight.

25       Q.    How long did you work for them?

68

1    invoice manifest lease form out of Rhode

2    Island, is this your handwriting with your name

3    at the top?

4       A.    No, it isn't.

5       Q.    Do you recognize whose handwriting it

6    is?

7       A.    No, I don't.

8       Q.    How about down below?  Do you recognize

9    the handwriting?

10              MR. STRATTON:  Where down below?

11              MR. GRADY:  All down in the three

12    lines.

13              MR. STRATTON:  The question is does

14    he recognize the handwriting anywhere on this

15    page?

16              THE WITNESS:  I recognize no

17    handwriting.

18    BY MR. GRADY:

19       Q.    No handwriting at all?  So what happened

20    when you arrived at Festo?

21       A.    Backed up to a dock, went inside the

22    building.  Found a dock worker, told him what I

23    need to pick up and where it was going.  He got

24    someone else.  I believe I signed some of their

25    paperwork.  I don't know.  I was in such a rush

69

1   because I had to get that machine to where it

2   had to go by strict orders from Mike

3   Montgomery.

4          I don't know if I signed any of

5   their paperwork, but I put it on the truck -- I

6   rolled it off of the truck on the dock onto my

7   truck or Arpin's truck, the Peterbuilt.  I

8   padded it, I strapped it to the wall and I

9   left.

10  Q.    Did anybody from Festo help you?

11  A.    They helped me get it to the back of the

12  truck.  I put it in the truck and I strapped it

13  and padded it.

14  Q.    So when you say how they helped you get

15  it to the back of the truck, are you telling me

16  that you -- how many people helped you?

17  A.    Just myself and one other.  He just

18  helped me move it four or five feet and that

19  was it.  I did the rest.

20  Q.    When you say on the back of the truck,

21  are you talking up behind the cab?  Is that

22  what you mean by back of the truck?  Where do

23  you mean by back of the truck?

24  A.    He never stepped off his dock.

25  Q.    He never stepped off his dock?

70

1    A.    No.    I'm the one that took it from the

2    dock to the back of the truck.    I rolled it in.

3    Q.    And after you rolled it in you said you

4    padded it and strapped it to the side?

5    A.    Yes, sir.

6    Q.    Which side did you strap it to?

7    A.    The driver's side.

8    Q.    Now, how many units were there?

9    A.    From where, Festo?

10    Q.    Yes.

11    A.    There was two.

12    Q.    Two units?

13    A.    Yes, sir.

14    Q.    What was the other unit?

15    A.    Just a skid with a few boxes on it, I

16    believe.    I don't know.    I just remember it was

17    a skid of some sort.

18    Q.    And how did that get onto the truck?

19    A.    I just pulled it on.    It was very --

20    very small, lightweight.

21    Q.    What size was the skid?

22    A.    Standard -- standard skid.    I wouldn't

23    be able to tell you how big, how small.

24    Q.    Can you describe the machine that was on

25    wheels?

73

1    know.

2        Q.    Did you lock the wheels?

3        A.    I don't recall.  If they had locks,

4    that's a standard protocol to lock them and I

5    would have.  But I don't remember if the

6    machine even had locks.

7                (Defendant's Exhibit F was

8                marked for identification.)

9    BY MR. GRADY:

10       Q.    I'm going to show you that document.

11   I'll ask you if you can identify that document.

12       A.    It's definitely my signature on the

13   document.  Looks familiar.

14       Q.    Other than your signature on the bottom

15   of that document which is marked as Defendant's

16   F, is any other handwriting yours?

17       A.    No, just the signature I believe.

18       Q.    Do you know where that document came

19   from?

20       A.    I can't recollect where it came from.

21       Q.    That's the document I received from your

22   lawyer.  Do you know how you got that document?

23                MR. STRATTON:  Objection, but you

24   can answer if you can.

25                THE WITNESS:  No.

79

1    A.    No.

2    Q.    Now, where were you when you got the

3    call from -- you said you were in Secaucus.

4    Now, before you left the Festo dock, is there

5    anything that the shipper told you about this

6    cargo at all, about the cargo on wheels,

7    anything about it being unusual or dangerous or

8    heavy or any kind of warning at all?

9    A.    No, not that I know of.

10    Q.    Did the shipper say anything to you

11    about what happens to the unit when it begins

12    to roll?

13    A.    No, not that I know of.

14    Q.    And nobody ever directed your attention

15    to the fact that there were brakes on the

16    wheels?

17          MR. STRATTON:  Object to the form.

18          THE WITNESS:  Nobody showed me

19    anything about that machine at all.

20    BY MR. GRADY:

21    Q.    Now, when you got to Festo -- strike

22    that.

23          When you got to Naugatuck, what's

24    the first thing you did?

25    A.    Parked in front.

80

1    Q.    Well, first of all, how did you know

2    where to go?

3    A.    Go where?

4    Q.    At Naugatuck?

5    A.    I don't know.  I have maps.

6    Q.    Let me help you.  Is there more than one

7    building at Naugatuck?

8    A.    I'm sure there is.  I don't remember how

9    I got there.  I was a truck driver.  I mean, I

10   had maps to get to places.  That's all I can

11   say.  I don't know if someone gave them to me

12   or not.  I can't remember.

13   Q.    Okay.  So you brought your truck to the

14   place of delivery?

15   A.    Yes.

16   Q.    And what's the first thing you did?

17   A.    I walked into one of the buildings there

18   and I can't remember, but I remember meeting

19   with some gentlemen that were there to receive

20   the machine.  They directed me to where I could

21   go around the building and deliver it there,

22   that I had the right place.

23   Q.    And how many gentlemen were there?

24   A.    I remember there were two gentlemen in

25   the office.