# EXHIBIT 11

Volume I, Pages 1-80
Exhibits NONE

UNITED STATES DISTRICT
DISTRICT OF CONNECTICUT

C.A. NO. 3:02 CV1302 (DJS)

SHAWN POULIOT,
      Plaintiff,

vs.

**CERTIFIED COPY**

PAUL ARPIN VAN LINES, INC.
AND ARPIN LOGISTICS, INC.,
      Defendants/Third-Party Plaintiffs,

vs.

THE FESTO CORPORATION,
MICHAEL D. KOVAC D/B/A TRANS-EXPO INTERNATIONAL
AND ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INTERNATIONAL,
      Third-Party Defendants

DEPOSITION OF:  WILLIAM F. MOTTLA, JR.
LENIHAN, GRADY & STEELE
Six Canal Street
Westerly, Rhode Island 02891

July 27, 2004 2:25 p.m. - 3:58 p.m.

ATKINSON-BAKER, INC. COURT REPORTERS

330 North Brand Boulevard, Suite 250

Glendale, California  91203

800.228.3376

REPORTED BY:  Linda A. Menard
            Registered Professional Reporter
            Certified Shorthand Reporter
JOB NO. 9E05C35

# CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF BRISTOL, ss.


    I, Linda A. Menard, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript of the deposition of William F. Mottla, Jr., having been duly sworn, on Tuesday, July 27, 2004, is true and accurate to the best of my knowledge, skill and ability.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 11th day of August, 2004.


Linda A. Menard, RPR
Notary Public
My commission expires:
September 17, 2004

1          Q.   We have marked some exhibits here, I

2     believe they're A through O from other depositions

3     of various former Arpin personnel; and so if I refer

4     to an exhibit, it's something that's already been

5     pre-marked.

6          A.   Okay.

7          Q.   Can you tell me, when did you first start

8     working for Arpin?

9          A.   Let me think.  Wait a minute now.  I want

10    to say it was '97.

11         Q.   And when did you leave Arpin?

12         A.   May of 2001.

13         Q.   May of 2001.  This incident occurred in

14    October of 2001.

15         A.   So it was 2002 then.

16         Q.   So around May of 2002?

17         A.   Yes.

18         Q.   In October of 2001, what was your job at

19    Arpin Logistics?

20         A.   I was customer service manager.

21         Q.   And give me the job description of that,

22    the customer service manager?

23         A.   I had several people working for me.  I

24    also handled a vast amount of customers myself.  And

1    that would also include outside sales people who

2    would call orders in or fax orders in.  And we would

3    input those into the system, do the pricing,

4    interface with operations as to the feasibility of

5    handling the order.

6            MR. GRADY:  I ask you to speak up, please.

7        Q.    In October of 2001, how many people did

8    you have working under you within customer service?

9        A.    I believe it was three.

10       Q.    Was one of the people a Heidi?

11       A.    Yes.

12       Q.    What was her name?

13       A.    Heidi Hopkins.

14       Q.    Now her name is Heidi Kern?

15       A.    Okay.

16       Q.    Who else was in that department?

17       A.    There was a young man.  I don't recall his

18    name.  And then there was another woman.  I don't

19    recall her name either.

20       Q.    Now, did everybody, including yourself,

21    work Monday through Friday the day shift?

22       A.    Yes.

23       Q.    Was there anybody there on weekends?

24       A.    Not in customer service.

1        Q.   Now, you indicated that you would interact

2    with various sales people.  Are you talking about

3    various agents of Arpin that would generate business

4    for Arpin?

5        A.   Yes.

6        Q.   Was Trans-Expo one of those agents?

7        A.   Yes.

8        Q.   And that was a company that was Mr.

9    Kovac's company.  Do you know Michael Kovac?

10        A.   I know the name.

11        Q.   How about Erica Ramirez?

12        A.   Yeah, I know Erica.

13        Q.   And they would be the one of the sales

14    agents for Arpin?

15        A.   Correct.

16        Q.   Did Trans-Expo, to your knowledge, work

17    exclusively for Arpin?

18        A.   No.

19        Q.   Now, in the case of Trans-Expo, to your

20    way of thinking, was it their responsibility to get

21    all the information, relevant information about the

22    job they wanted Arpin to do?

23        A.   Yes.

24        Q.   And that information would be conveyed to

1  either yourself or someone in customer service?

2      A.   Yes.

3      Q.   It generally wouldn't go to somebody

4  outside of your department?

5      A.   Right.

6      Q.   And then all of that relevant information

7  would be input into a computer?

8      A.   Yes.

9      Q.   Now, taking a look at what's been marked

10 as Exhibit E, do you recognize this document?

11     A.   This would be what Trans-Expo would fax

12 over regarding an order for input.

13     Q.   Now, this indicates -- in the upper

14 right-hand corner it says, Attention Bill and Heidi?

15     A.   Right.

16     Q.   I'm assuming that's you and Miss Hopkins?

17     A.   Yes.

18     Q.   So this document would have been sent to

19 your attention or to Heidi's attention?

20     A.   Correct.

21     Q.   Down in the bottom right-hand corner I see

22 there's a quoted $400 by Bill Mottla?

23     A.   Yes.

24     Q.   What does that mean?

1      A.    Based on the information, if my memory

2    serves me right, Erica would normally call and ask

3    for a quote based on what she might have.  In this

4    case, you know, based on the 400 pounds, I quoted

5    her a price of $400.

6      Q.    Now, the price that was quoted here on

7    Exhibit E, how can you be sure as to how that amount

8    was arrived at?

9      A.    We had some different formulas a lot of

10   times depending on the need of the operation.  We

11   would give spot pricing, where we would not

12   necessarily use any established rates.  It would be

13   at my discretion which Mike was fine with, Mike

14   Montgomery was fine with.

15     Q.    So spot pricing is pricing based on a

16   sense of what the market will bear?

17     A.    Correct.

18     Q.    And in this case, on Exhibit E, we see

19   various dimensions given here.

20     A.    Um-hm.

21     Q.    We see it's two pieces; we see an actual

22   weight of 400 pounds.

23     A.    Right.

24     Q.    We see there's going be an inside delivery

1    appears to be a new account in that you are just

2    starting to get this business.

3         A.    Okay.

4         Q.    Would that become a factor in your pricing

5    here?

6         A.    Yes.  I mean, we would be more aggressive.

7         Q.    Because you wanted to get the business?

8         A.    Correct.

9         Q.    Now, is there any information on Exhibit E

10   that you would -- that would not be input into the

11   computer?  I'm talking about Arpin's computer

12   system.

13        A.    No.  Normally we would enter everything

14   that was on the sheet that came to us.

15        Q.    Now, is it fair to say that part of the

16   job of customer service is to ensure that all

17   relevant information gets into a system that allows

18   the driver ultimately to get that information?

19        A.    Right.  I mean, it goes from customer

20   service and then into dispatch; and if my memory

21   serves me right, dispatch would either verbally

22   dispatch the order or they had a capability of

23   sending via Qual-Comm right from the system.  I am

24   not familiar with what this particular driver -- how

12

1  his dispatch happened or what his normal situation

2  would be.

3      Q.    We understand that the procedure -- and

4  tell me if I'm wrong -- is that information comes in

5  from an agent such as what we see here in Exhibit E;

6  that information is supposed to be put into the

7  computer so it appears on an unaccepted screen?

8      A.    Um-hm.

9      Q.    And then somebody in operations or Mike

10  Montgomery decides to accept the job?

11      A.    Yes.

12      Q.    And then it becomes part of the operations

13  screen?

14      A.    Yes.

15      Q.    And then drivers are assigned, vehicles

16  are assigned?

17      A.    Yes.

18      Q.    The job is done and then it ends up in a

19  billing screen?

20      A.    Yes.

21      Q.    And then after it's paid, it goes into a

22  history screen?

23      A.    Yes.

24      Q.    Is that all fair to say?

1          A.    Yes.

2          Q.    Were there any protocols or procedure,

3    handbooks or training that was done within customer

4    service to assure that the people who worked in

5    customer service put all the relevant information

6    into the unaccepted screen or into the computer?

7          A.    That was definitely a very crucial

8    element.  Now the one thing I will say is that on

9    the input screen, there was some limited space

10   basically to put down pertinent information; and

11   many times we had to go to second page or into notes

12   section to complete all of the information.  So it

13   wouldn't necessarily show on the first page of an

14   order.

15         Q.    Let me show you what's been marked as

16   Exhibit F.  And does this appear to be the same job

17   that we see described in Exhibit E?

18         A.    Yeah, it would appear to be.

19         Q.    And as I understand it, if we look at

20   Exhibit F down in the lower right-hand corner, we

21   see something called shipment information and

22   there's three lines here, very short lines?

23         A.    Yeah.

24         Q.    Is what you are saying that if -- the

1    information we see in Exhibit E, obviously that's

2    not all going to fit in that little space called

3    shipment information; is that fair to say?

4         A.    Correct.

5         Q.    So you are forced to go into the F7

6    function which is notes, correct?

7         A.    Yes.

8         Q.    So if there's information that doesn't fit

9    in this small area, you go into notes and you put it

10   into notes?

11        A.    Yes.

12        Q.    Is there any reason here why an Arpin

13   customer service representative would leave out the

14   fact that this job required a lift gate?

15        A.    I can't answer that.

16        Q.    Well, rather than thinking about this

17   particular instance, why don't we just talk about

18   generally.  Was it proper standard procedure within

19   customer service that if a lift gate was needed,

20   that would be indicated in the computer system?

21        A.    Yes.

22        Q.    And if it was going to be an inside

23   delivery, would that also be information that should

24   be stored in the computer?

1       A.    Yes.

2       Q.    And the fact that the wheels needed to be

3    protected and that the unit was on wheels, would

4    that be something that needed to get into the

5    computer?

6       A.    Yes.   However, you know, drivers were

7    responsible for strapping, for padding and strapping

8    a unit anyway; so that would be pretty much standard

9    practice.

10      Q.    Right.   In fact Exhibit F says in the

11   shipment information, twelve pads required, straps?

12      A.    Um-hm.

13      Q.    But if a unit is on wheels, was going to

14   be delivered on wheels, is that something that

15   should generally make it into the computer screen?

16      A.    Not necessarily.

17      Q.    And why is that?

18      A.    Because that's the business that we were

19   in basically.   And that's why it would be pads and

20   straps.   Depending on the shipment, it could be

21   palletized; it could be on wheels.   That would not

22   necessarily be something that would be spelled out.

23      Q.    But if somebody in customer service was

24   provided with Exhibit E, for example, and knew that

1    this was going to be something that was going to be

2    transported by lift gate, would the fact that it

3    needed a lift gate and that it was a unit on wheels,

4    would the combination of those two factors make it

5    advisable to put all that information into the

6    computer?

7        A.    Yeah.

8        Q.    Because there are different sorts of

9    trucks and different sorts of lift gates, right?

10       A.    Right.

11       Q.    And there are some lift gates that are

12   appropriate for things on wheels and there are some

13   lift gates that are maybe not so appropriate; is

14   that fair to say?

15       A.    Yes.

16       Q.    And how about the dimensions, is that

17   something that ought to be included in the computer

18   system?

19       A.    Unless they're exceptional, we wouldn't

20   normally put those in.

21       Q.    How about the fact that these units have

22   been -- in the past have been getting damaged by

23   another carrier, is that something that would be

24   included?

1     A.    We would not put something like that on

2     the order because you don't want the customer to see

3     that on a bill of lading.  This would be kind of a

4     blind inside.

5     Q.    Were there things happening in Arpin

6     Logistics or within the customer service department

7     in October of 2001 that made it difficult for people

8     to be thorough, either a large volume of work, not

9     enough manpower, who knows?

10    A.    Yeah.  Manpower was always an issue; and

11    I'm not exactly sure of the dates, but I know that

12    we had a new operations manager and I forget if he

13    was there then or not.  So, yes, we were max'ed out.

14    Q.    When you say a new operations manager, you

15    mean somebody who didn't have a lot of experience,

16    was just learning the ropes?

17    A.    No.  He came from a really large

18    corporation and had different ideas.

19    Q.    What was his name?

20    A.    Gosh -- needless to say, he didn't make an

21    impression on me because I don't remember his name.

22    Q.    I got you.  At some point in time during

23    your time at Arpin, there was a new operations

24    manager that came from a big company.  How did that

1    show them and -- sit with them and show them how to

2    input orders.

3        Q.    Is it fair to say that the more

4    information you give about a particular load, the

5    better?

6        A.    Absolutely.

7        Q.    So when we see on Exhibit E here this

8    information that is being conveyed to Arpin, as far

9    as the better practice, you believe that most of

10   this information with some exceptions ought to have

11   been provided, put into the computer?

12       A.    Yes.

13       Q.    Do you have any idea of why it wasn't in

14   this case?

15       A.    I don't.

16       Q.    So it was some whatever, something that

17   occurred where it didn't happen?

18       A.    Yeah.    I don't know whether the original

19   fax came over from Trans-Expo.    This is dated, but

20   this came here, so...

21       Q.    This particular document, E, would that go

22   into a paper file?

23       A.    Yes.

24       Q.    Would people like Bill Tweedy and others

1　　left Arpin other than saying hi to him?

2　　　　A.　　No, not really.

3　　　　Q.　　And Heidi, you saw her here maybe last

4　　time?

5　　　　A.　　No, I didn't even see her.

6　　　　Q.　　And have you seen Bill Tweedy at all?

7　　　　A.　　No.

8　　　　Q.　　What was your relationship with Bill

9　　Tweedy like at Arpin?

10　　　　A.　　Professional.

11　　　　Q.　　I don't have any further questions for

12　　right now.

13　　　　　　MS. O'DONNELL:　Want me to go?

14　　**EXAMINATION BY MS. O'DONNELL:**

15　　　　Q.　　Mr. Mottla, good afternoon.　My name is

16　　Susan O'Donnell.　I represent Michael Kovac doing

17　　business as Trans-Expo and Erica Ramirez in this

18　　case.

19　　　　　　MR. STRATTON:　Go ahead, Susan.

20　　　　Q.　　Do you know, Mr. Mottla, which employee at

21　　Arpin was responsible for inputting the information

22　　that was transmitted from Trans-Expo into the

23　　computer system at Arpin with respect to the

24　　transaction that we have been referencing so far?

1      A.    Yes, I mean, in looking at this exhibit.

2      Q.    And that's which one?

3      A.    Exhibit F.  My initials are on it.

4      Q.    So may we assume from that that it was you

5    as opposed to Heidi or some of these other employees

6    who actually input the information into the

7    computer?

8      A.    Yes.

9      Q.    Do you recall any specific discussions

10   with either Mr. Kovac or Erica Ramirez regarding

11   this particular transaction?

12     A.    No.

13     Q.    Did you personally have any contact with

14   Erica Ramirez during the shipment window of this

15   particular Festo equipment?

16     A.    I don't recall.

17     Q.    Can you tell me what a registration number

18   is?

19     A.    That would be the pro number on the top of

20   the page on Exhibit F.

21     Q.    Exhibit F?

22     A.    Yes.

23     Q.    Where do you see that?

24     A.    Top of the page.  It's A-L and then

30

1  of the information that was received?

2      A.   No.

3      Q.   Would you take a look at Exhibit G as in

4  good, Grady, God.

5      A.   This one?

6      Q.   Yes.  Would you take a look at that.  The

7  first line is Mott, Bill.  We've been told that's

8  you, Bill Mottla, on October 18, 2001 at 1450,

9  there's an A-D-D.  What does that mean, Mr. Mottla?

10     A.   I believe that's the time of the

11  registration.

12     Q.   What does A-D-D mean?  Is that when the

13  order was booked into the computer by you?

14     A.   Yes.

15     Q.   Added to the system?

16     A.   Yes.

17     Q.   And about two hours later, Mike Montgomery

18  accepted the order?

19     A.   Yes.

20     Q.   So the order was called in on the 18th;

21  you input the information into the Arpin computer;

22  and then about two hours later, Mike got around to

23  accepting the order as a job for Arpin, correct?

24     A.   Correct.

1    information, you had to get out of the screen by

2    hitting F7, go into a notes screen and then add it

3    to that notes screen; is that right?

4         A.    Yes.

5         Q.    Did you like that system?

6         A.    No, but I didn't have a choice.

7         Q.    Well, I hear you.  What didn't you like

8    about that system?

9         A.    We had talked many times about

10   reconfiguring this to give more space for more

11   information.  I mean, a lot of times we had to

12   take -- we had to edit, if you know what I mean.

13        Q.    What do you mean actually?

14        A.    Well, I mean --

15        Q.    You had to choose information and put it

16   in?

17        A.    If somebody had a lot of pertinent

18   information on the order, we would either have to

19   edit it out or I would go ahead and type all that in

20   the notes and make a special indication, see notes.

21   Can I ask one question?

22        Q.    Sure.

23        A.    This document.

24        Q.    That's Exhibit E that you are pointing to.

1      A.    Yes.  And, you know, I mean, if for

2   instance there was a lot of information on here and

3   there were shipments with just a whole page of

4   information and you would have to put in, you know,

5   see notes, I mean, if somebody doesn't look at the

6   notes, now we've got a problem.

7      Q.    And the problem being that the relevant

8   information isn't getting passed along?

9      A.    Right.

10     Q.    Are you ever aware of instances in

11  customer service where people didn't write -- strike

12  that.  Let me ask a better question.

13          Are you aware of any instances in customer

14  service where the customer service people did in

15  fact edit down information that they were given, in

16  other words, to fit it in the space that was

17  provided in that first screen?

18     A.    Yes.

19     Q.    That happened?

20     A.    Yes.

21     Q.    I mean, to speak colloquially, was it kind

22  of a pain in the rear to write down, see notes, and

23  go to another screen and put it on another screen?

24     A.    It wasn't a pain.

1          Q.   But it wasn't the best system that you

2    could come up with?

3          A.   No.

4          Q.   And in any event during the time that you

5    were at Arpin, that system wasn't changed?

6          A.   Correct.

7          Q.   I don't know if you were asked this

8    question yet, and I apologize if you were.  Do you

9    have any independent recollection at all about this

10   particular shipment yourself?

11         A.   No.  Just the fact that I recall Shawn

12   Pouliot getting hurt, which I had heard.

13         Q.   Right.  But other than seeing things with

14   your initials or other people's initials on it, you

15   don't have any independent recollection if you sit

16   here and close your eyes, oh, yeah, this is what I

17   did, this is what happened, etc.?

18         A.   On any given day, we could process 100,

19   125 orders per person.

20         Q.   Is that about the quantity you think you

21   were processing per person in around October of

22   2001?

23         A.   Certainly could be, yeah.

24         Q.   In your opinion, was that too many to be

1    processing during a day?

2        A.    In between all the phone calls, yeah.

3        Q.    How many people did you have processing

4    that information on a given shift?

5        A.    Three.

6        Q.    Could I ask you to look at Exhibit E which

7    is the shipment booking document, please.

8        A.    (Witness complied.)

9        Q.    Mr. Mottla, is it fair to say that prior

10   to getting faxed this document -- again there's the

11   fax line at the top and it says, Attention Bill and

12   Heidi.  Is it fair to say that prior to get faxed

13   this document, you had a conversation with somebody

14   from Trans-Expo regarding this job?

15       A.    Yes, and I would have to say it was

16   strictly on the pricing.

17       Q.    Okay.  Why would you say that it was

18   strictly on the pricing?

19       A.    That was Erica's standard.  She would call

20   and ask for a quote, and it might have been a week

21   ahead of time.  We'd give her the price and then I

22   could walk in on any given morning and this might

23   already be on the fax, her being on the West Coast,

24   us being on the East Coast, I don't know.

1          A.    Yes.

2          Q.    And would you state, please, for my own

3     clarification what the basis of your objection with

4     respect to the reliability of that document was?

5               MR. OSWALD:   Object to the form of the

6     question.

7          Q.    You may answer.

8          A.    Well, I'm looking at the date at the top

9     of the page and it's after the incident with Shawn

10    Pouliot, so this is not the original document that

11    was faxed to Arpin that the registration was taken

12    from, okay, not the original piece of paper.   I

13    mean, I don't know if things could have been added

14    after the fact.

15         Q.    Okay.

16         A.    Lift gate, inside delivery.   All those are

17    is extras.   Like I say, I'm a pretty accurate guy

18    in my job; and I mean, those are two pretty

19    important things and I just can't see myself

20    omitting them from the order.

21         Q.    So you think that the trustworthiness of

22    that document is in question?

23         A.    This particular piece of paper, yes.

24         Q.    I believe that Mrs. O'Donnell asked you

1    Q.    And you actually managed the department at

2    Arpin that handled customer service?

3    A.    Yes.

4    Q.    You made the call regarding estimates in

5    that department?

6    A.    Yes.

7    Q.    You made the call regarding whether

8    personnel within the department were doing an

9    adequate job?

10    A.    Yes.

11    Q.    Now, if a document like E came in, but it

12    didn't have -- let's assume that it didn't have

13    information about a lift gate or inside delivery or

14    wheels, it came in without that information.

15    A.    Yes.

16    Q.    If you were reviewing Exhibit F in

17    relationship to Exhibit E, would you say that that

18    was a proper and reasonable manner in which the

19    information was put down?

20    A.    Yes.

21    MR. GRADY:    Objection.

22    Q.    Now, you indicated earlier that if --

23    let's assume that lift gate and wheels and inside

24    delivery were on this document --

1       A.    Um-hm.

2       Q.    -- as we see it here today, and that has

3    not yet been established.  Let's say they were on

4    here.  If you were reviewing this as the manager of

5    the customer service department in Arpin and

6    comparing information on E to F, would you say that

7    that's careless or negligent on the part of the

8    person inputting the information?

9           MR. GRADY:  Objection; calls for a

10   conclusion of law.

11      A.    Yes.

12      Q.    And the computer system here, the computer

13   system that we see here on Exhibit F, if you put

14   information into notes -- you expressed a concern

15   before; you said people probably aren't even going

16   to look at notes or there's a risk that people won't

17   even look at notes.  Would the notes section be

18   superimposed onto the bill of lading?

19      A.    I do not believe so.

20      Q.    So, if you did put something into the

21   notes section that you see on Exhibit F here, that

22   in all likelihood is not going to make its way

23   automatically onto Exhibit F without the

24   intervention of somebody in operations?