# EXHIBIT 13

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - -

SHAWN POULIOT,                )
        Plaintiff,            )
                              )
    vs.                       )    ORIGINAL
                              )
PAUL ARPIN VAN LINES,         )
INC., ARPIN LOGISTICS,        ) Case No. 3:02 CV1302
INC., FESTO CORPORATION,      )
MICHAEL D. KOVAC, D/B/A       )
TRANS-EXPO INTERNATIONAL,     )
and ERICA RAMIREZ,            )
        Defendants.           )

- - -

Deposition of SHAWN L. POULIOT, Plaintiff herein, called by the Defendants for cross-examination pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Kelley E. Spears, RPR and Notary Public in and for the State of Ohio, at the offices of James L. Wagner, 529 White Pond Drive, Akron, Ohio, on Tuesday, the 29th day of June, 2004, at 9:09 o'clock a.m.

------------------------------------------------

BISH & ASSOCIATES, INC.
812 Key Building
Akron, Ohio  44308-1303
(330) 762-0031
(800) 332-0607
FAX (330) 762-0300
E-Mail: bishassociates@neo.rr.com

284

C E R T I F I C A T E

STATE OF OHIO,      )
                    ) SS:
SUMMIT COUNTY.      )

     I, Kelley E. Spears, RPR and Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, SHAWN L. POULIOT, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the witness was by me reduced to Stenotypy in the presence of said witness, afterwards transcribed upon a computer; and that the foregoing is a true and correct transcription of the testimony so given by the witness as aforesaid.

     I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

     I do further certify that I am not a relative, employee of or attorney for any of the parties in the above-captioned action; I am not financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

     IN WITNESS HEREOF, I have hereunto set my hand and affixed my seal of office at Akron, Ohio on this 6th day of July, 2004.

*Kelley E. Spears*
Kelley E. Spears, RPR and Notary
Public in and for the State of Ohio.
My Commission expires June 4, 2009.

136

1   Q.   Okay.
2   A.   I believe I signed it. I pushed it. I
3 pushed it, pushed in the trailer, strapped it
4 to the wall and I left.
5   Q.   Okay. Now, you said when you testified
6 earlier too that you had done an inspection of
7 the machine. I think you said you walked
8 around the machine to look at it. Did you
9 notice at that time that the machine was on
10 wheels?
11   A.   Yes.
12   Q.   Okay. Now, there was a second thing
13 that you were transporting, a second item that
14 you were transporting from Festo as well,
15 correct?
16   A.   Yes.
17   Q.   It was a -- what's been described at
18 least in this lawsuit as a Tri-Wall. You ever
19 hear that expression before?
20   A.   No.
21   Q.   That's a Festo word, I think. Do you
22 remember it being a box basically that was on a
23 pallet?
24   A.   Yes.
25   Q.   And with stuff inside the box?

152

1   Valley Community College around 2:30 in the
2   afternoon on the afternoon of October 23rd?
3       A.   Yes.
4       Q.   And October 23rd, according to this
5   calendar, is Tuesday?
6       A.   Yes.
7       Q.   Tuesday afternoon you get there.  I
8   think you testified earlier, in your earlier
9   deposition, that you arrived at Naugatuck, you
10  stopped your truck.  I think you went in
11  someplace and asked where you should go to and
12  somebody directed you to the area where you
13  were to make the delivery; is that right?
14      A.   Yes.
15      Q.   When you went to that area where you
16  were to make the delivery, were you expecting
17  to find a loading dock?
18      A.   At that point, yes, I was expecting to
19  find a loading dock.  The gentleman told me
20  there would be a loading dock in the back.
21      Q.   The person who you spoke to at Naugatuck
22  you mean?
23      A.   Yes.
24      Q.   And, in fact, nobody at Arpin had told
25  you that you were going to need a lift gate for

153

1  this delivery, did they?

2  A. No.

3  Q. Okay. So you were expecting a loading

4  dock, in fact, from your information that you

5  were given from Arpin; is that right?

6  A. Yes.

7  Q. What did you -- what did you find when

8  you arrived at the place where you were

9  supposed to make the delivery?

10  A. When the gentleman told me to pull

11  around back behind the college -- and I don't

12  recall his name -- he said there's a loading

13  dock back there you can unload the machine to.

14       I pulled around back and proceeded

15  to back my truck up to or angle myself in to

16  get the truck up to the dock, but there was an

17  overpass in my way and the truck wouldn't fit

18  underneath this overpass. Truck was a little

19  too high for this overpass so there was no way

20  of getting this truck up to the loading dock.

21  Q. Okay. I assume at that point that you

22  stopped your truck. Is that fair to stay?

23  A. Yes.

24  Q. Did you turn the truck off or did you

25  leave it running?

1  A.  I believe -- I don't know if I turned it
2  off or on really.
3  Q.  Okay. So at this point in time the
4  truck has its end pointed toward the loading
5  dock. That's where you were backing into
6  before you realized you couldn't fit under the
7  overpass; is that right?
8  A.  No. The dock's rear wasn't facing the
9  loading dock, I was facing the loading dock at
10  that point.
11  Q.  Oh, you were head-on to the loading
12  dock?
13  A.  Yeah.
14  Q.  So you wanted to come in and check it
15  out?
16  A.  I wanted to see if it would clear first.
17  Q.  And then it became apparent as you were
18  pulling in that it wouldn't clear. And at that
19  point did you pull your truck -- back it up a
20  little bit away from that overpass in that
21  area?
22  A.  Yes, I did.
23  Q.  And then, as you say, at some point you
24  stopped that truck?
25  A.  Yes.

155

1   Q. Now, from that point onward does the
2   truck move at all until the actual accident
3   occurs?
4   A. No. The truck was not at all -- I did
5   not move it at all after that.
6   Q. Okay. So the truck is in place then
7   when you start -- it's at that spot when you
8   start to do the unloading. What do you do
9   next?
10  A. Get out, and the gentleman met me and I
11  said, "Can you show me where this equipment is
12  going, where everything's going?"
13      So he walked me inside.
14  Q. I'm going to jump in as you're kind of
15  doing your narrative just again to fill in some
16  blanks.
17      Do you know the gentleman's name?
18  A. No, I don't.
19  Q. A guy from Naugatuck in any case?
20  A. Yes.
21  Q. And he goes inside?
22  A. We both go inside.
23  Q. I'm sorry. And what happens inside?
24  A. Shows me where he wants this learn lean
25  or whatever you want to call it. Showed me

156

1  right where he wanted it and where he wanted
2  the pallet.
3     Q.   Where he wanted the Learnline.  Was it
4  inside a room somewhere?
5     A.   It was a pretty big room.
6     Q.   Classroom maybe?
7     A.   I believe it was just a big room.  I
8  can't tell you if it was a classroom or not.
9     Q.   Okay.  Did he want the pallet in the
10 same place?
11    A.   Actually, I think he wanted the pallet
12 in another area.
13    Q.   Okay.  So this gentleman -- you said it
14 was a man, right?
15    A.   Yes.
16    Q.   This gentleman shows you where he wants
17 stuff, you nod your head and you go back
18 outside; is that fair?
19    A.   I recognized where this gentleman wanted
20 these two items and we proceeded to go outside.
21 And at that time I opened the doors to the
22 truck and he was talking about how he had a
23 flatbed cart to put this pallet on with this
24 so-called skid that's on -- on --
25    Q.   Exhibit E?

157

1  A.  He was explaining where so we can go
2  ahead and put this on this so-called thing on
3  wheels, this dolly.  I said, "That's fine."
4      He went inside the door and turned
5  around right away and came out with this.  By
6  then, while he's doing that, I lower the lift
7  gate.
8  Q.  Hang on right there for a second if you
9  can.  I think you said you opened the doors of
10 the truck.  Is that what you said?
11 A.  I opened the door.
12 Q.  When you say the door, do you mean the
13 back --
14 A.  Yes.
15 Q.  -- of the truck?
16 A.  Yes.
17 Q.  Not the passenger side door, you're
18 talking the --
19 A.  The rear door; the back of the truck.
20 Q.  Am I right, that's a door that kind of
21 lifts up and kind of rolls to the inside of
22 that truck?
23 A.  Yes, yes.
24 Q.  Okay.  So did you -- did you open that
25 up all the way?

175

1   lower the lift gate with the unit on it.
2       Q.   Okay.  You're standing on the ground at
3   this point?
4       A.   Yes.
5       Q.   Okay.  And so you start to lower the
6   lift gate down.  You stop before it reaches the
7   ground, right?
8       A.   Yes, at some point I did.
9       Q.   Okay.  And I know you've testified about
10  that in your earlier deposition, and I'm not
11  going to rehash all that point by point, just
12  to fill in a few things.
13           Why did you stop the lift gate?
14      A.   The unit itself shifted not to my
15  liking.
16      Q.   When you say the unit itself shifted, do
17  you mean that one end of it moved?
18      A.   Yes.
19      Q.   Is that the end away from where you were
20  standing?
21      A.   Yes.
22      Q.   Okay.  When you stopped the lift gate,
23  did that stop the movement of the machine?
24      A.   When I stopped the lift gate did what?
25      Q.   Did that stop the machine from moving or