UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWN POULIOT | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:02 CV 1302 (DJS) |
| | : | |
| PAUL ARPIN VAN LINES, INC.; | : | |
| ARPIN LOGISTICS, INC.; THE FESTO | : | |
| CORPORATION; MICHAEL D. KOVAC | : | |
| d/b/a TRANS-EXPO INTERNATIONAL, | : | |
| ERICA RAMIREZ, IN HER CAPACITY AS | : | |
| EMPLOYEE OF TRANS-EXPO | : | |
| INTERNATIONAL | : | December 15, 2004 |
| | : | |
| Defendants | : | |

### *MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PAUL ARPIN VAN LINES, INC.'S AND ARPIN  LOGISTICS, INC.'S MOTION FOR SUMMARY JUDGMENT*

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(a), Defendants

Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc. (hereinafter collectively "Arpin" or

"Arpin Defendants") submit this Memorandum of Law in support of their Motion for

Summary Judgment.

I.    FACTS

On March 16, 2001, Plaintiff Shawn Pouliot (hereinafter "Plaintiff") and Arpin

Logistics, Inc. entered into an Owner-Operator Agreement in Rhode Island.  Local Rule

56(a)(1) Statement, at ¶ 1.  Under the terms of the Owner-Operator Agreement, Plaintiff

agreed that he would "pick up, transport and deliver all shipments as directed and

instructed by" Arpin.  Local Rule 56(a)(1) Statement, at ¶ 5.  Plaintiff also agreed that

"all operations with the equipment are and shall be subject to the exclusive control and

direction of" Arpin.  Local Rule 56(a)(1) Statement, at ¶ 6.

Between October 20 and October 23, 2001, Plaintiff was driving a Paul Arpin Van Lines, Inc. truck because his own truck was being repaired.  Local Rule 56(a)(1) Statement, at ¶ 9.  On Saturday, October 20, 2001, Plaintiff was dispatched from Arpin's headquarters in Rhode Island with directions to pick up a shipment at Festo Corporation in Hauppauge, New York and deliver it to Naugatuck Valley Community College in Waterbury, Connecticut.  Local Rule 56(a)(1) Statement, at ¶ 19.  That day, Arpin dispatcher William Tweedy met with Plaintiff, gave him the printed bill of lading and manifest, and orally told him what was required of him.  Local Rule 56(a)(1) Statement, at ¶ 20.

At the time, Arpin knew that the delivery consisted of two items, together totaling 400 pounds according to the shipper, Festo; that one of the units for delivery had wheels; and that a truck with a liftgate would be needed to make the delivery.  Local Rule 56(a)(1) Statement, at ¶ 21.   At the time Plaintiff was dispatched to make the delivery, Arpin did not know that one of the items, the Festo Learnline 2000 unit, weighed 812 pounds.  Local Rule 56(a)(1) Statement, at ¶¶ 22, 29.

Arpin provided Plaintiff with equipment and tools necessary to pick up and deliver the Learnline 2000 unit, which is a machine used in teaching engineering students.  Local Rule 56(a)(1) Statement, at ¶¶ 23, 28.  Arpin gave him five or six straps to secure the Learnline 2000 unit during unloading.  Local Rule 56(a)(1) Statement, at ¶ 24.

On October 23, 2001, at approximately 9:00 a.m., Plaintiff picked up the Learnline 2000 unit and a piece of equipment called a Tri-Wall at Festo Corporation

headquarters in Hauppauge, New York.  Local Rule 56(a)(1) Statement, at ¶ 27.  Plaintiff inspected the Learnline 2000 unit at Festo headquarters.  Local Rule 56(a)(1) Statement, at ¶ 30.  He wheeled the Learnline 2000 unit into the Arpin truck, and noticed that the machine was "heavy."  Local Rule 56(a)(1) Statement, at ¶ 31.  He padded and strapped the Learnline 2000 unit to the side of the truck to secure it during transport.  Local Rule 56(a)(1) Statement, at ¶ 32.

After loading the Learnline 2000 unit and the Tri-Wall at Festo headquarters, Plaintiff transported them to Naugatuck Valley Community College in Waterbury, Connecticut.  Local Rule 56(a)(1) Statement, at ¶ 33.  College employees assisted with the unloading of the Tri-Wall, which was on a skid.  Local Rule 56(a)(1) Statement, at ¶ 34.

After the college employees brought the Tri-Wall inside, Plaintiff unstrapped the Learnline 2000 unit and rolled it onto the truck's liftgate by himself.  Local Rule 56(a)(1) Statement, at ¶¶ 32, 35.  He knew that the Learnline 2000 unit was unsecured and on wheels.  Local Rule 56(a)(1) Statement, at ¶ 36.  After he rolled the Learnline 2000 unit onto the platform of the liftgate, Plaintiff climbed down from the truck onto the ground.  Local Rule 56(a)(1) Statement, at ¶ 37.  He lowered the liftgate.  Local Rule 56(a)(1) Statement, at ¶ 38.  Before the liftgate touched the ground the unsecured Learnline 2000 unit shifted on the liftgate platform.  Local Rule 56(a)(1) Statement, at ¶¶ 36, 39.  Plaintiff walked around to the other side to adjust the Learnline 2000 unit.  Local Rule 56(a)(1) Statement, at ¶ 40.  When Plaintiff attempted to adjust the Learnline 2000 unit, the other side of the unit shifted forward on the liftgate platform.  Local Rule 56(a)(1) Statement, at ¶ 41.  When the Learnline 2000 unit started to move forward off the liftgate

platform, Plaintiff unsuccessfully tried to stop the falling load and was injured when the Learnline 2000 unit fell on top of him. Local Rule 56(a)(1) Statement, at ¶ 42.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Golden Pacific Bancorp v. FDIC*, 375 F.3d 196, 200 (2[d] Cir. 2004), *citing, Fed. R. Civ. P. 56(c)*. In ruling on a summary judgment the court

> first look[s] to the substantive law of the action to determine which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," i.e., unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

*Golden Pacific Bancorp*, 375 F.3d at 200.

To succeed on a motion for summary judgment, the moving party must demonstrate an absence of evidence to support the nonmoving party's case. *Id.*, *quoting*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). Where the moving party has made a *prima facie* showing, "the non-moving party must respond with 'specific facts showing that there is a genuine issue for trial.'" *Golden Pacific Bancorp,* 375 F.3d at 200, *quoting*, *Fed. R. Civ. P. 56(e)*. In this regard, the non-moving party cannot rely on conclusory allegations or speculation but "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2[d] Cir. 1998). In ruling on a motion for summary

4

judgment, all justifiable inferences are drawn in favor of the non-moving party. *Golden Pacific Bancorp*, 375 F.3d at 201.

As is discussed fully herein, even with all inferences drawn in favor of Plaintiff, there are no genuine issues of material fact and Arpin is entitled to judgment as a matter of law in its favor.

III.     ARGUMENT

    A.     PLAINTIFF WAS ARPIN'S EMPLOYEE, AND THEREFORE, HIS EXCLUSIVE REMEDY IS UNDER WORKERS' COMPENSATION LAW.

Under Rhode Island law, an injured employee may not maintain a common law action against an employer for his or her injuries.[1]  *Nunes v. Aiello*, 664 A.2d 1121, 1121-1122 (R.I. 1995).  Rather, the employee's exclusive remedy is under the Rhode Island Workers' Compensation statute, which provides:

> The right to compensation for an injury under…this title, and the remedy for an injury…, shall be in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise against an employer…; and those rights and remedies shall accrue to employees entitled to compensation under [workers' compensation statutes] while they are in effect…

R.I. Gen. Laws § 28-29-20.[2]  By virtue of this exclusivity provision, the remedy available

---

[1] As the Court noted in its November 26, 2003 Memorandum of Decision on Arpin's motion to dismiss, the Owner-Operator Agreement between Arpin and Plaintiff expressly incorporates the laws of the state of Rhode Island.  *Pouliot v. Paul Arpin Van Lines, Inc.*, No. 3:02CV1302 (DJS), 2003 U.S. Dist. LEXIS 21596, *26 (D. Conn. November 26, 2003).  *See also* Local Rule 56(a)(1) Statement, at ¶ 3.  For that reason, Arpin applies Rhode Island law in analyzing Plaintiff's status as an Arpin employee.

[2] The Rhode Island Workers' Compensation statute covers injury from an accident occurring outside the state where the contract of employment was entered into and is executed principally within the state.  *See Grinnell v. Wilkinson*, 39 R.I. 447, 463, 98 A. 103, 108 (1916).  Plaintiff and Arpin entered into the Owner-Operator Agreement in Rhode Island on March 16, 2001.  Local Rule 56(a)(1) Statement, at ¶ 1.  Pursuant to the Owner-Operator Agreement, Plaintiff was dispatched from Arpin's headquarters in Rhode Island.  Local Rule 56(a)(1) Statement, at ¶ 19.  Plaintiff was required to submit weekly driver logs to Arpin's Rhode Island headquarters.  Local Rule 56(a)(1) Statement, at ¶ 16.  The Owner-Operator Agreement was signed, implemented, and carried out in Rhode Island.  Accordingly, Plaintiff's remedy is Rhode Island

to Plaintiff in this case is Rhode Island workers' compensation benefits.

       1.      <u>Under Rhode Island law, Plaintiff was an employee of Arpin.</u>

The Rhode Island Workers' Compensation statute defines an "employee" as "any person who has entered into the employment of or works under contract of service or apprenticeship with any employer." R.I. Gen. Laws. §28-29-2(4).[3] Notwithstanding the provision of the Owner-Operator Agreement that purports to classify Plaintiff as an independent contractor, an analysis of Plaintiff's status under the test identified by the Rhode Island courts demonstrates that Plaintiff was Arpin's employee.[4]

The assessment of whether a worker is an employee or an independent contractor is a fact-driven analysis that depends largely on the employer's right to control the worker. *DiOrio v. R.L. Platter, Inc.*, 101 R.I. 117, 122, 211 A.2d 642, 645 (1965); *Croce v. Whiting Milk Co.*, 102 R.I. 89, 92, 228 A.2d 574, 576 (1967); *Martines v.Terminal Methods, Inc.*, 101 R.I. 599, 600, 225 A.2d 790, 791 (1967) ("the controlling test for determining the existence of an employer-employee relationship is the right of an employer to exercise control and superintendence over his employees."). *See also* Thurston, *The Right of Control – Proving the Employer-Employee Relationship in a Workers' Compensation Case*, 48 R.I. Bar Jnl. 9 (1999). "[T]he status of a person as an employee depends upon whether the employer has or has not retained power of control or

---

workers' compensation benefits.

[3] An independent contractor, on the other hand, is "one who undertakes the construction or performance of some unit or branch of a larger work." *O'Connor v. Narragansett Electric Co.*, 54 R.I. 317, 321, 172 A. 889, 891 (1934).

[4] The language of the Owner-Operator Agreement is not dispositive of whether Plaintiff was an employee or an independent contractor; rather, the key issue is whether Arpin had a right to control Plaintiff's work. *See Butler v. McDonald's Corp.*, 110 F. Supp. 2d 62, 67 (D. R.I. 2000) (party cannot rely on statements in agreement to establish or deny relationship; relationship is determined by examining whether one party has a right of control over another.) *See also Silvestri v. Pawtucket Memorial Hospital*, C.A. No. 89-7011, 1991 R.I. Super. LEXIS 178, *5 (R.I. Super. Ct. November 1, 1999).

superintendence over him.  The final test is the right of the employer to exercise power of control rather than the actual exercise of such power." *Sormanti v. Marsor Jewelry Co., Inc.*, 83 R.I. 438, 441, 118 A.2d 339, 340 (1955).  An employer has control if "the employer, in any showdown, would have the ultimate right to dictate the method of work if there were any occasion to do so."  3 A. LARSON & L.K. LARSON, LARSON'S WORKERS' COMPENSATION LAW, § 61.02 at 61-3 (1999).

The terms of the Owner-Operator Agreement, as well as the undisputed facts of this case, leave no doubt that Arpin had the right to control Plaintiff's work.  Under the terms of the Agreement, Plaintiff was required to "pick up, transport and deliver all shipments as directed and instructed by" Arpin.  Local Rule 56(a)(1) Statement, at ¶ 5 (emphasis added).  Pursuant to the Agreement, Plaintiff's work was "subject to the exclusive control and direction of" Arpin.  Local Rule 56(a)(1) Statement, at ¶ 6 (emphasis added).  Arpin required that Plaintiff, like all other Arpin drivers, take drug and driver's tests.  Local Rule 56(a)(1) Statement, at ¶ 17.  After entering into the Owner-Operator Agreement, Plaintiff worked exclusively for Arpin.  Local Rule 56(a)(1) Statement, at ¶ 4.  During that time, Plaintiff had uniforms for both Arpin Logistics, Inc. and Paul Arpin Van Lines, Inc.  Local Rule 56(a)(1) Statement, at ¶ 15.  Plaintiff was dispatched from Arpin's headquarters in Rhode Island.  Local Rule 56(a)(1) Statement, at ¶ 19.  Arpin gave Plaintiff job assignments and told him where to go; Plaintiff was required to perform the job according to Arpin's directions.  Local Rule 56(a)(1) Statement, at ¶ 11.  Plaintiff was required to submit weekly driver's logs to Arpin and Arpin monitored Plaintiff's activity.  Local Rule 56(a)(1) Statement, at ¶ 16.  Arpin placed its company name and its Department of Transportation licensing numbers on the

tractor Plaintiff drove for the company.  Local Rule 56(a)(1) Statement, at ¶ 12.

On the day of the accident, and for the three days prior to the day of the accident, Plaintiff had been making deliveries using a van supplied to him by Arpin.  Local Rule 56(a)(1) Statement, at ¶¶ 9, 18, 27.  On Saturday, October 20, 2001, the Arpin dispatcher met with Plaintiff, gave him the printed bill of lading, and orally told him what was required of him on this job.  Local Rule 56(a)(1) Statement, at ¶ 20.  On October 22 and 23, 2001, the Arpin dispatcher contacted Plaintiff a number of times to instruct him to complete the delivery.  Local Rule 56(a)(1) Statement, at ¶¶ 25, 26.

Each of these factors demonstrates that Arpin had the right to control Plaintiff's work and that it exercised that right generally, and in connection with the delivery Plaintiff was making on the day of the accident.  Where, as here, the worker is subject to employer's right to control, the worker is an employee.  If injured on the job, as Plaintiff was, that employee's remedy is workers' compensation benefits.

> 2.    Plaintiff was an employee of Arpin pursuant to Federal Motor Carrier Safety Regulations.

Plaintiff was injured while he was engaged in interstate commerce, during the movement of freight from Hauppauge, New York to Waterbury, Connecticut in an Arpin truck.  Local Rule 56(a)(1) Statement, at ¶¶ 9, 18, 19, 27, 33.  The U.S. Department of Transportation's Federal Motor Carrier Safety Regulations apply to interstate carriers like Arpin.[5]  Those regulations define an employee as

> any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety.  Such term includes a driver of a commercial motor vehicle (including an independent contractor while in

---

[5] The Owner-Operator Agreement between Arpin and Plaintiff specifies that it is subject to the rules and regulations of the D.O.T.  Local Rule 56(a)(1) Statement, at ¶ 2.

the course of operating a commercial motor vehicle), a mechanic, and a freight handler.

49 C.F.R. § 390.5. *See also* 49 C.F.R. § 383.5 (defining an employee as "any operator of a commercial motor vehicle, including full time, regularly employed drivers; casual, intermittent, or occasional drivers; leased drivers and independent, owner-operator contractors (while in the course of operating a commercial motor vehicle) who are either directly employed by or under lease to an employer").

With due deference to the Court, which reviewed this issue when analyzing Arpin's earlier motion to dismiss,[6] Arpin asserts that the operation of a commercial motor vehicle includes more than just driving that vehicle. *See* 49 C.F.R. § 392.1 (regulation applicable to "[e]very motor carrier, its officers, agents, representatives, and employees responsible for the management, maintenance, operation, or driving of commercial motor vehicles").[7] The regulations identify non-driving related components of a truck, including the vehicle's tailgate, tailboard, doors, tarpaulins, and spare tire as "equipment used in [the vehicle's] operation." 49 C.F.R. § 392.9(a)(2). In addition, in order to obtain a commercial driver's license, a driver must have extensive knowledge of a number of non-driving topics, including "the principles and procedures for the proper handling of cargo." 49 C.F.R. § 383.111(d); 49 C.F.R. § 383, Appendix to Subpart G, ¶ (d) (drivers must have knowledge of the relationship of cargo to vehicle control. The

---

[6] The Court treated Arpin's May 12, 2003 Motion as a Motion for Judgment on the Pleadings. *Pouliot v. Paul Arpin Van Lines, Inc.*, No. 3:02CV1302 (DJS), 2003 U.S. Dist. LEXIS 21596, *5 (D. Conn. November 26, 2003).

[7] To limit "operation" to the act of driving would present impossible determinations as to where to draw the line. For example, would an individual be "operating" a motor vehicle only if the vehicle were moving? Would he be "operating" a motor vehicle for purposes of imposing liability for an accident that occurs because the vehicle is improperly parked while the driver is inside a truckstop? Would the individual be "operating" a motor vehicle if a door flew open during travel and freight escaped because the door was negligently left unlatched by the driver while at the warehouse?

principles and procedures for the proper handling of cargo include "the importance of proper cargo handling, e.g., consequences of improperly secured cargo…; principles of weight distribution; principles and methods of cargo securement."). *See also* 49 C.F.R. § 383.111(h) (drivers of combination vehicles must have knowledge of "the procedures for proper coupling and uncoupling a tractor to semi-trailer.").

Plaintiff was injured while he was unloading freight from a moving van supplied to him by Arpin.[8]  Local Rule 56(a)(1) Statement, at ¶¶ 9, 19, 27, 30-42.  Unloading freight is inevitably part of the operation of a moving van by a driver, such as Plaintiff, who works for a moving company.  Under the Federal Motor Carrier Safety Regulations, Plaintiff was employed by Arpin at the time of the accident.  49 C.F.R. § 390.5.  There can be no doubt that Plaintiff was therefore a person who in the course of his employment "directly affects commercial motor vehicle safety."  49 C.F.R. § 390.5.  As an employee, then, his remedy for injuries sustained in the October 23, 2001 accident is under the provisions of Rhode Island's Workers' Compensation statute.

---

[8] Freight handlers are employees under the Federal Motor Carrier Safety regulations.  49 C.F.R. § 390.5. The Occupational Safety and Health Administration addressed this issue in an interpretive letter, writing:

> The definition of "employee" helps in understanding the jurisdiction of the OMCS [Office of Motor Carrier Safety]; that is, this definition indicates that the OMCS jurisdiction is not confined to highways as a locale, as is commonly believed. While the OMCS' focus is on transportation over the highways, the interest, and hence jurisdiction, of the Office is on the safety of the vehicle even off the highways when for example, the vehicles are being repaired (definition's use of the term "mechanic"), or loaded (definition's use of the term "freight handler") and involve any other individual other than an employer where such individual's employment directly affects commercial motor vehicle safety.

OSHA, Interpretive Letter, Review of Policy on Section 4(b)(1) of the Act (July 10, 1989) at p. 2 (attached as Exhibit 1 to this memorandum of law).

B.     ARPIN IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE
       AGREEMENT BETWEEN ARPIN AND PLAINTIFF ABSOLVES
       ARPIN OF ANY NEGLIGENCE ARISING OUT OF THE
       PERFORMANCE OF THE OWNER-OPERATOR AGREEMENT.

The Rhode Island Supreme Court has concluded "that it is not violative of public

policy for individuals to limit liability for their own negligence through an exculpatory-

indemnification clause." *Rhode Island Hospital Trust National Bank v. Dudley Service

Corp.*, 605 A.2d 1326, 1327 (R.I. 1992).[9] To determine whether an exculpatory

provision shifts the burden of liability, the

> court does not simply mechanically search for the use of the term
> "negligence" in making a determination…but examines the intent of
> the parties as expressed in the contract….[a] provision that releases
> [the defendant] from "all liability from loss, injury (including death)
> or for damages to persons or property" absolve[s] the defendant
> from its own negligence.

*Best Impressions, Inc. v. Port Edgewood, Ltd.*, 641 A.2d 1323, 1324 (R.I. 1994).

Here, the Owner Operator Agreement and the parties' intent as delineated from

the language of the Agreement demonstrate that Arpin is absolved from liability.

Specifically, the Agreement states:

> Contractor agrees to indemnify, save and hold Carrier free and
> harmless from and against any and all claims, demands, liabilities,
> damages, losses, judgments, awards, cause of action at law or in
> equity, including but not limited to those involving injury to, or
> death of, Contractor's employees and/or third parties and damages
> to property including but not limited to, cargo, and attorney's fees
> and all reasonable costs of litigation, <u>and</u> from and against any
> obligation whatsoever arising out of or attributable to any act or
> omission of the Contractor or any of the persons engaged or
> employed by Contractor in connection with the operation or
> maintenance of the Equipment, and in connection with the
> Contractor's performance of transportation of [sic] other services
> hereunder.

---

[9] As noted in footnote 1, *supra*, this court has already observed that Rhode Island law applies to the Owner-Operator Agreement.

Local Rule 56(a)(1) Statement, at ¶ 8 (emphasis added).

This unambiguous provision of the Agreement demonstrates the parties' intent to absolve Arpin from liability even for its own negligence.  As noted by the court in *Best Impressions*, the court need not mechanically search for specific terms, but rather, should determine the parties' intent as expressed by the contract.  *Best Impressions, Inc.*, 641 A.2d at 1324.  In this instance, the parties' intent is established by the phrases "any and all" and "including but not limited to," which describe the liabilities and injuries for which Arpin will be indemnified.  *See, e.g., Best Impressions, Inc.*, 641 A.2d at 1324.  By indemnifying Arpin for "any and all" liabilities, including but not limited to particular injuries described, the parties clearly intended to release Arpin of liability for any claims arising out of the performance of the contract, even if these claims arose out of Arpin's alleged negligence.[10]

That the Agreement is intended to release Arpin for all claims, including its own negligence, is further supported by the subsequent phrase "<u>and</u> from and against any obligation whatsoever arising out of or attributable to any act or omission of the Contractor…in connection with the Contractor's performance of transportation of [sic] other services hereunder."  *See* Local Rule 56(a)(1) Statement, at ¶ 8.  If the first clause of the indemnity portion of the Owner-Operator Agreement were intended to limit indemnity of Arpin only to the claims arising out of negligence of the Plaintiff, this subsequent clause would be unnecessary and superfluous.  By acknowledging that Plaintiff was to indemnify Arpin for both "any and all claims" <u>and</u> any obligations

---

[10] The reference to Arpin's negligence in this section should not be construed as an admission of liability or that Arpin was negligent.  Rather, it is intended to show that even if Arpin were negligent, which it denies, it is absolved from liability by the terms of the Owner-Operator Agreement.

"arising out of or attributable to any act or omission" of Plaintiff, the parties make clear that the first phrase of the indemnity provision is intended to include the negligence of any person or entity, including Arpin, while the latter deals with the negligence of Plaintiff.

As contracts are to be read as a whole, and in a way that gives meaning to each provision without rendering any words superfluous, the appropriate reading of this provision is to provide indemnity to Arpin for its own alleged negligence through the first phrase, while providing indemnity to Arpin for the negligence of the Plaintiff through the subsequent phrase. *See Andrukiewicz .v Andrukiewicz,* 860 A.2d 235, __ (R.I. 2004)(When ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected.). To give full meaning and effect to every word of the indemnity provision, the indemnity provision should be read to include indemnification for Arpin's own alleged negligence. Consequently, even if a jury was to find Arpin negligent, Arpin is absolved from liability, and as such, is entitled to judgment as a matter of law.

      C.      <u>ARPIN IS NOT VICARIOUSLY LIABLE FOR THE ACTS OF TRANS-EXPO AND FESTO WHERE ARPIN IS NEITHER THE PRINCIPAL OF NOR IN A JOINT VENTURE WITH ANY OTHER DEFENDANT.</u>

Count Seven of the Plaintiff's Fifth Amended Complaint alleges that Arpin is vicariously liable to the Plaintiff for the negligence of Defendants Trans-Expo, Kovac and Ramires.[11] Specifically, Plaintiff alleges that

      Michael Kovac and Erica Ramirez (sic) acted as the agents, servants or employees of both Arpin Logistics and Paul Arpin Van Lines.

---

[11] Defendant Erica Ramires is incorrectly named by Plaintiff as Erica Ramirez.

> Further, the Arpin defendants and the Kovac/Ramirez (sic)
> defendants were performing a joint venture for Festo at the time of
> [Plaintiff's] injuries.  As such, Arpin Logistics and/or Paul Arpin
> Van Lines are vicariously responsible for the negligence of Kovac
> and Ramirez (sic).

Fifth Amended Complaint at ¶ 23.[12]  As is discussed herein, Trans-Expo, Kovac and

Ramires are not agents of Arpin.  Furthermore, there was no joint venture between Arpin

and any of the Defendants.  As there is neither an agency nor a joint venture, Count

Seven of Plaintiff's Fifth Amended Complaint fails as a matter of law.[13]

      1.        Trans-Expo, Kovac and Ramires are not Agents of Arpin.

Under the doctrine of respondeat superior, a principal or master is liable for the

negligent actions or omissions of his or her agent or servant.  *Toledo v. Van Waters &*

*Rogers, Inc.*, 92 F. Supp. 2d 44, 52 (D.R.I. 2000).  "Conversely it is also well settled that

an employer is not liable for the negligent acts of an independent contractor."  *Id.*

(citations omitted); *see also Pelletier v. Sordoni/Skanska Construction*, 264 Conn. 509,

517, 825 A.2d 72, 78 (Conn. 2003)(as a general rule an employer is not liable for the

negligence of its independent contractors).  Thus, if Trans-Expo, Kovac and Ramires are

---

[12] Plaintiff's allegation that Kovac and Ramires were agents of Arpin and allegation that Arpin and Trans-Expo were involved in a joint venture is rather inartfully pled.  It would appear that Plaintiff is attempting to use some combination of valid legal theories – agency and joint venture – to reach an invalid conclusion and thereby another potential Defendant who would not otherwise have liability.  First, Kovac and Ramires are employees of Trans-Expo, not Arpin and, as such, are not in any relationship whatsoever with Arpin.  Local Rule 56(a)(1) Statement, at ¶¶ 62, 63.  Second, Plaintiff alleges that Arpin and Trans-Expo were engaged in a joint venture "for" Festo.  Two parties do not, however, engage in a joint venture "for" a third party.  Perhaps Plaintiff intended to plead that Festo was a member of the joint venture.  Any suggestion by Plaintiff that Arpin is somehow in a joint venture with Festo must, however, fail for similar reasons to those that preclude any such relationship between Arpin and Trans-Expo.  Moreover, if Festo and Arpin were considered members of a joint venture, the logical conclusion to that argument would require a finding of joint venture between, for example, Federal Express and any person or entity that engages Federal Express to deliver a package.  To so find, goes beyond the strictures of logic and law.

[13] Paragraph 11 of the Sales Agent Agreement between Trans-Expo and Arpin states that the Agreement "shall be construed under the laws of the state of Rhode Island."  Local Rule 56(a)(1) Statement, at ¶ 60.  Therefore, Rhode Island law arguably applies to the interpretation of the relationship between Trans-Expo and Arpin.  As the laws of Rhode Island and Connecticut are substantially similar, if not identical, for both agency and joint venture, there is not truly a conflict or choice of law issue.  In any event, for the convenience of the Court, Arpin has cited to the law of both jurisdictions.

independent contractors rather than agents of Arpin, Arpin cannot be held vicariously liable for their negligence.

Three elements are necessary to establish an agency relationship. *Toledo*, 92 F. Supp. 2d at 53; *Gordon v. Tobias*, 262 Conn. 844, 849, 817 A.2d 683, 688 (Conn. 2003). First, "the principal must manifest that the agent will act for him." *Toledo*, 92 F. Supp. 2d at 53; *Gordon,* 262 Conn. at 849, 817 A.2d at 688. Second, "the agent must accept the undertaking." *Toledo*, 92 F. Supp. 2d at 53; *Gordon,* 262 Conn. at 849, 817 A.2d at 688. Third, "the parties must agree that the principal will be in control of the undertaking." *Toledo*, 92 F. Supp. 2d at 53; *Gordon,* 262 Conn. at 849, 817 A.2d at 688.

Though each of the three elements are necessary to a finding of an agency relationship, the "key element of an agency relationship is the right of the principal to control the work of the agent." *Butler v. McDonald's Corp.*, 110 F. Supp. 2d 62, 65 (D.R.I. 2000); *McLaughlin v. Chicken Delight, Inc.,* 164 Conn. 317, 323, 321 A.2d 456, 459 (Conn. 1973)(an essential factor in an agency relationship is the right of the principal to direct and control the performance of the work by the agent). Indeed, the very "existence of an agency relationship <u>turns</u> on whether or not one party has the right to control the other." *Russell v. Enterprise Rent-A-Car Company of Rhode Island*, 160 F. Supp. 2d 239, 251 (D.R.I. 2001)(citations omitted)(emphasis added).[14] Thus, if there is no control, there can be no agency. Here, Arpin could not control Trans-Expo, Kovac or Ramires and, as such, they were independent contractors, not agents of Arpin.[15]

---

[14] An independent contractor, on the other hand, is exemplified by an arrangement in which "one is retained to perform a task independent of and not subject to the control of the employer." *Butler v. McDonald's Corp.*, 110 F. Supp. 2d at 65.

[15] In addition to lack of control, it is arguable that Arpin does not meet the first two elements with regard to Kovac and Ramires. First, there is no manifestation that Kovac or Ramires will act for Arpin because the Sales Agent Agreement was solely between Arpin and Trans-Expo. Local Rule 56(a)(1) Statement, at ¶ 60.

Arpin had no ability to control either Kovac or Ramires because Trans-Expo did not, in any way, cede control over its employees to Arpin. In fact, the Sales Agent Agreement makes clear that Trans-Expo's employees act as independent contractors. Local Rule 56(a)(1) Statement, at ¶ 63. There is no evidence that Arpin was able to control Kovac or Ramires in any manner. As such, this crucial element of the agency relationship – the ability to exert control over the purported agent – is non-existent between Kovac/Ramires and Arpin.

Similarly, there is no evidence that Arpin had any control over Trans-Expo. The Sales Agent Agreement acknowledges that the relationship is one in which Trans-Expo will act as an independent contractor. Local Rule 56(a)(1) Statement, at ¶ 63. Moreover, the Sales Agent Agreement states that "neither party shall have the authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for its own action." Local Rule 56(a)(1) Statement, at ¶ 64. Thus, the intent of the parties, as unambiguously expressed in the Sales Agent Agreement, was that Trans-Expo would act as an independent contractor.

This intent is borne out by the conduct of the parties. At all times relevant, Trans-Expo acted on its own behalf. Trans-Expo was not required or compelled in any way to choose Arpin as the carrier for any of Trans-Expo's clients. Local Rule 56(a)(1) Statement, at ¶¶ 66-68. Trans-Expo was free to choose a carrier to serve its own best interest. Moreover, Arpin did not supervise or direct Trans-Expo's performance of its work as a sales/shipping agent. Local Rule 56(a)(1) Statement, at ¶ 73. In addition, Trans-Expo had sole control over the shipments, including preparation and content of

---

Second, as the contract was between Trans-Expo and Arpin, neither Kovac nor Ramires accepted an undertaking to individually act on behalf of Arpin. *Id.* As such, it is doubtful that Kovac and Ramires meet either of the first two elements for a finding of agency.

various shipping documents transmitted to Arpin. Local Rule 56(a)(1) Statement, at ¶ 74. While Arpin is headquartered in Rhode Island, Trans-Expo's operations are based in its own facilities in California. Local Rule 56(a)(1) Statement, at ¶ 75. Trans-Expo also employs its own individuals who use Trans-Expo's equipment and systems including, forms, telephones, fax machines, and computers to carry out the work of Trans-Expo. Local Rule 56(a)(1) Statement, at ¶ 76. Thus, Arpin lacked the key element of agency – control over Trans-Expo, Kovac and Ramires.

In sum, Trans-Expo, Kovac and Ramires were independent contractors, not agents of Arpin. Trans-Expo and its employees, Kovac and Ramires, were retained to perform and, in fact, did perform their tasks independent of Arpin and wholly without Arpin's control. Therefore, Arpin is not vicariously liable for the negligence, if any, of Trans-Expo, Kovac or Ramires.

2.    Arpin Was Not Engaged in a Joint Venture with Any of the Defendants.

In both Rhode Island and Connecticut, a joint venture "exists where two or more parties combine their property, money, efforts, skill or knowledge in some common undertaking." *Doe v. Yale University*, 252 Conn. 641, 672-73, 748 A.2d 834 (2000) citing *Dolan v. Dolan*, 107 Conn. 342, 349, 140 A. 745 (1928); *Fireman's Fund Ins. Co. v. E.W. Burman, Inc*., 120 R.I. 841, 844, 391 A. 2d. 99, 101 (1978) ("Under Rhode Island law, a joint venture is an association of two or more persons formed to carry out a single business enterprise for profit."). "The relationship cannot amount to a joint venture unless the parties so intend." *Id.* at pp. 672-673; *See also Travis v. St. John*, 176 Conn. 69, 72-73, 404 A. 2d 885 (1978) (Absent mutual assent, there can be no partnership.); *McAleer v. Smith*, 728 F. Supp. 857, 861 (D.R.I. 1990). The essential elements of a joint

venture or enterprise are: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965); *Doe v. Yale University*, 252 Conn. 641, 672-73, 748 A.2d 834 (2000); McAleer *v. Smith*, 728 F. Supp. 857, 861 (D.R.I. 1990). The undisputed facts of this case demonstrate that Arpin was not engaged in a joint venture with any of the other Defendants.

a.     <u>Arpin, Trans-Expo, and Festo Did Not Intend to Form a Joint Venture.</u>

As noted, the contracting parties must intend to create a joint venture. The best objective evidence of the relationship between Trans-Expo and Arpin is the Sales Agent Agreement entered into in October 2001. Local Rule 56(a)(1) Statement, at ¶¶ 63-64. The Agreement shows beyond any doubt that Arpin and Trans-Expo did <u>not</u> intend to form a joint venture since it specifies that Trans-Expo and its employees are independent contractors. Local Rule 56(a)(1) Statement, at ¶ 63.

Moreover, the fact that Trans-Expo may solicit business from other carriers, and that Arpin is not bound to exclusively use Trans-Expo as its shipping agent further demonstrates that the parties intended to operate independently, not as a joint venture. Local Rule 56(a)(1) Statement, at ¶ 66. Indeed, Arpin and Trans-Expo can and did engage in business transactions with other shippers, carriers, and manufacturers or clients. Local Rule 56(a)(1) Statement, at ¶ 67.

Similarly, there are no facts to support that Arpin intended to form a joint venture with Festo. There is simply no record evidence that Arpin and Festo ever entered into a

contract or agreement, express or implied, dictating that Arpin would exclusively act as the carrier for the delivery of Festo products.  As such, there is no record evidence establishing the existence of a joint venture.

In short, there are simply no facts that demonstrate an agreement, express or implied, that Arpin intended to form a joint venture with the other Defendants.

b.     There Was No Common Purpose.

As with every contract or agreement for the delivery of a parcel, each Defendant had its own unique interest.  Festo, as the shipper, sought to have its product, the Learnline 2000 Unit, delivered to Naugatuck Community College in the most economical, safest way. Local Rule 56(a)(1) Statement, at ¶ 85. Arpin, the carrier, acted for the sole purpose of moving the Learnline 2000 unit from point A to point B.  Local Rule 56(a)(1) Statement, at ¶ 88. Trans-Expo, the classic middleman, had the purpose of finding clients like Festo and bringing them together with a carrier.  Local Rule 56(a)(1) Statement, at ¶ 87. This temporary interaction between and among these three entities is simply not for a common purpose to be carried out by a group.

c.     There Was No Community of Pecuniary Interest.

There can be no joint enterprise without a common pecuniary interest.  *See* RESTATEMENT (SECOND) OF TORTS, § 491, cmt. d ("It is now commonly held that a common destination and a common purpose, without a common pecuniary interest in it, are not enough in themselves to constitute a joint enterprise.  A common destination for independent business purposes does not make the trip a joint enterprise.").  Here, there was no common pecuniary interest.

The sole basis of the arrangement between Trans-Expo and Arpin was for Trans-

Expo to receive a commission when, and if, it arranged for Arpin to deliver cargo from one location to another. Local Rule 56(a)(1) Statement, at ¶ 69. The Sales Agreement explicitly ensures that Arpin's revenues are not combined or commingled with Trans-Expo funds. Local Rule 56(a)(1) Statement, at ¶ 69. In fact, transportation payments that are tendered to the Sales Agent are prohibited from being deposited to any account of the Sales Agent. Local Rule 56(a)(1) Statement, at ¶ 70.

Moreover, Arpin and Festo did not share the fees and profits of each other. Festo, did not share Arpin's profits, and in fact, did not derive any pecuniary benefit from the act of shipping its product to the end-user. Its pecuniary interest was in the actual sale or lease of the unit. Conversely, Arpin did not profit from the actual sale or lease of that unit, but only from the transportation of the unit. The sale of the unit and the shipping of the unit are two wholly unrelated endeavors for which profits were clearly not shared by these Defendants. In short, the record contains absolutely no evidence of any agreement among the Defendants to share profits and losses. There can be no joint venture in this case.

    d.    <u>There Was No Equal Right to Direction and Control of an Enterprise.</u>

Trans-Expo and its employees handled their duties as sales/shipping agents without supervision or direction from Arpin. Local Rule 56(a)(1) Statement, at ¶ 73. (Trans-Expo also utilized its own employees and tools of the trade, such as forms, telephone, fax machine, and computer to carry out this work. Local Rule 56(a)(1) Statement, at ¶ 76.

In turn, Trans-Expo did not control how Arpin and the driver handled the actual pickup, transport, and delivery of an item. Arpin decided which one of its trucks to use,

loaded the equipment, and chose the driver to pick-up and deliver the freight. Local Rule 56(a)(1) Statement, at ¶ 78. Trans-Expo had no control over Arpin facilities, trucks or moving equipment. Local Rule 56(a)(1) Statement, at ¶ 77.

Similarly, there is no evidence that Arpin had any right to direct or control in any respect the operations of Festo Corporation. Arpin has no knowledge or interest in Festo's business or in the Learnline 2000 unit. Local Rule 56(a)(1) Statement, at ¶ 88. There are also no facts that Festo had any right to control Arpin's work or its employees. In this case, each party had its own separate and distinct responsibilities and duties as independent contractors with respect to delivery of the Festo Learnline 2000 unit.

There was simply no equal right among these independent contractors to direct or control each other generally or specifically as to the delivery of the Learnline 2000 unit. No joint venture therefore existed.

In summary, Arpin did not combine its "money, efforts, skill or knowledge in some common undertaking" with the other Defendants. *Doe v. Yale University*, 252 Conn. at 672-73, 748 A.2d at 853-54. Arpin did not form an association with the other Defendants "to carry out a single business enterprise for profit." *Fireman's Fund Ins. Co. v. E.W. Burman, Inc.*, 120 R.I. at 844, 391 A. 2d. at 101. Thus, Arpin cannot be liable for the negligence of Trans-Expo or Festo. Summary judgment on Count Seven of Plaintiff's Complaint should be granted.

     D.    <u>PLAINTIFF'S CLAIM THAT ARPIN WAS RECKLESS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO SHOW THAT ARPIN'S CONDUCT WAS WILLFUL OR WANTON.</u>

In Counts Five and Six of Plaintiff's Fifth Amended Complaint, Plaintiff claims that Arpin was reckless, in an effort to recover punitive damages. *See* Plaintiff's Fifth

Amended Complaint, Count Five, ¶ 7 and Count Six, ¶ 7. [16]  As Plaintiff cannot show that Defendant's conduct reached the high standard that is required to prove recklessness, these claims must fail.

Courts in Connecticut have explored the concept of recklessness and have held that it is a "state of consciousness with reference to the consequences of one's acts." *Maud v. John Donovan Enterprises*, 2002 Conn. Super. LEXIS 1221, *6 (quoting *Dubay v. Irish*, 207 Conn. 518 (1988)).   Also described as "willful" and "wanton", this state of mind is one in which there is a "design to injure either actually entertained or to be implied from the conduct and circumstances . . . [N]ot only the action producing the injury but the resulting injury must also be intentional."  *Dubay*, 207 Conn. at *532.

An inference of recklessness may be made only when there is "more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." *Harrison v. McPherson*, 2004 Conn. Super. LEXIS 266, *6.  "[T]here is a wide difference between negligence and reckless disregard of the rights or safety of others," and, courts, therefore, require a greater showing than that of negligence or even gross negligence.  *Maud*, *2002* Conn. Super. LEXIS at *5-6 (citing *Kostiuk v. Queally*, 159 Conn. 91, 94 (1970)).  To be recklessness, the "conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Elliott v. Waterbury*, 245 Conn. 385, *415 (1998).  Thus, "recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this

---

[16] If and only if the Plaintiff proves recklessness, he can recover punitive damages as defined by Connecticut case law. *See Harrison v. McPherson*, 2004 Conn. Super. LEXIS 266, *10.

danger to any reasonable man." *Matthiessen v. Vancech*, 266 Conn. 822, *831 (2003)

(citing *Begley v. Kohl & Madden Printing Ink Co.*, 157 Conn. 455, 450-51 (1969)).

Also, in making a recklessness claim, a complaint must "employ language explicit

enough to clearly inform the court and opposing counsel that reckless misconduct is

relied on." *Maud*, 2000 Conn. Super. LEXIS at *6 (citing *Kostiuk*, 159 Conn. at 94).  It is

not sufficient to merely use the words "reckless" or "recklessness." *Id.* at *7 (citing

*Dumond v. Denehy*, 145 Conn. 88, *91 (1958)).  Rather, "a specific allegation setting out

the conduct that is claimed to be reckless or wanton must be made." *Id.*  Such allegations

"should be pleaded separately and distinctly from those of negligence." *Id.* (citing

*Prudential Property & Casualty Co. v. Connecticut Light & Power Co.*, 19 Conn. L.

Rptr. 659, 660 (1997)).

Courts in Connecticut have examined cases in which claims of recklessness arise

from a failure to warn against dangerous circumstances or activities and have held that

such failures do not constitute recklessness.  *See Feehan v. McDonald's Corp.*, 2004

Conn. Super. LEXIS 67, *5 (Defendant's knowledge of a dangerous condition did not

constitute an intention to cause plaintiff's injury and, therefore, plaintiff's claim could not

be "construed as alleging highly unreasonable conduct, involving an extreme departure

from ordinary care, in such a situation where a high degree of danger is apparent.");

*Lopes v. Post*, Superior Court, 1994 Conn. Super. LEXIS 732, *9 (Plaintiff must show

that defendant "knew of the existence of [a dangerous condition], knew with relative

certainty that it was dangerous and intended for an injury to occur by failing to post a

warning."); *Watt v. Christi*, Superior Court, Judicial District of Fairfield at Bridgeport,

Docket No. CV 99 036 34 72 S (October 13, 1999, Melville, J.) (Plaintiff's allegations,

even if proven, did not constitute recklessness because "even viewed in the light of sustaining their legal sufficiency, the plaintiff's allegations [did] not provide a basis for inferring highly unreasonable conduct involving an extreme departure from ordinary care in a situation where a high degree of danger is apparent.").

Here, Plaintiff's Complaint, which must, as noted above, plead with specificity the allegations of recklessness, claims that Arpin (1) was provided with information by the shipper's agent that special equipment and packaging was required for safe delivery and did not convey this information to Plaintiff, and (2) supplied Plaintiff with a broken liftgate in complete disrepair.  *See* Plaintiff's Fifth Amended Complaint, Counts Five, ¶ 7 and Six, ¶7.[17]  These allegations, which are denied, are not separate and distinct from a general negligence claim, and in no event rise to the level of being willful or wanton, that is, reckless.  A close review of the undisputed facts bears out this point.  Plaintiff's allegations of recklessness essentially fall into two categories – first, the providing or failure to provide delivery information to Plaintiff and second, the quality and function of

---

[17] In Interrogatory Seven of  Paul Arpin Van Lines' Second Set of Interrogatories Propounded to the Plaintiff reads:

> Explain fully and in detail the factual basis for Plaintiffs [sic] claim that "the injuries to Shawn Pouliot were the direct and proximate result of the defendant Paul Arpin Van Lines, Inc.'s recklessness in that they were provided with information by the shipper's agent that special equipment and packaging was necessary for the safe performance of the delivery" was alleged in Count Five, Paragraph 7 of Plaintiffs [sic] Fifth Amended Complaint and identify any documents in your custody or control in support thereof.

> The Plaintiff answered as follows:
> With the same caveat regarding the Arpin defendants, the plaintiff answers that Arpin was told that the load was on wheels, that a lift gate would be required; and they proceeded to not tell the plaintiff of these facts and provided him with an adequate (sic) liftgate.  This information comes from the depositions and exhibits provided by Trans-Expo, Mark Kovacs [sic] and Mrs. Ramirez [sic].  It is also supported by the depositions given to date by Arpin employees and by the deposition of Shawn Pouliot.

*See* Local Rule 56(a)(1) Statement, at ¶¶49, 50.   An identical Interrogatory Answer was served in response to Arpin Logistics, Inc.'s Interrogatories at ¶8.  *See* Local Rule 56(a)(1) Statement, at ¶¶ 49, 50.

the liftgate.  The material facts will be analyzed in that order.

Plaintiff was dispatched from Arpin's headquarters in Rhode Island with directions to pick up the Festo shipment in Hauppauge, New York and deliver it to Naugatuck Valley Community College in Waterbury, Connecticut.  Local Rule 56(a)(1) Statement, at ¶ 19.  The sole information that Arpin possessed was that a liftgate would be needed to make the delivery, that the delivery was on wheels, and that the delivery consisted of two items, together equaling 400 pounds.  Local Rule 56(a)(1)  Statement, at ¶ 21. In fact, the Learnline 2000 unit weighed 812 pounds, information not provided to Arpin by the shipper, Festo.  Local Rule 56(a)(1) Statement, at ¶¶ 21, 29.  In dispatching Plaintiff, Arpin provided him with five to six straps to secure the Festo Learnline 2000 unit during unloading.  Local Rule 56(a)(1) Statement, at ¶ 24.  In addition, Arpin provided Plaintiff with equipment and tools to aid him in the delivery of the Festo Learnline 2000 unit.  Local Rule 56(a)(1) Statement, at ¶ 23.

When Plaintiff arrived at Festo headquarters in Hauppauge, New York, he inspected the Learnline 2000 unit.  Local Rule 56(a)(1) Statement, at ¶ 30.  Plaintiff rolled the Learnline 2000 unit by himself onto the liftgate platform.  Local Rule 56(a)(1) Statement, at ¶ 35.  Upon wheeling the unit into the truck, Plaintiff noticed that the machine was "heavy."  Local Rule 56(a)(1) Statement, at ¶ 31.  Plaintiff rolled the Learnline 2000 unit onto the extended liftgate by himself.  Local Rule 56(a)(1) Statement, at ¶35.  Plaintiff did not seek assistance.  Local Rule 56(a)(1) Statement, at ¶ 55.  Though he knew the machine was "heavy" and on wheels, he did not secure it on the liftgate with the straps provided by Arpin.  Local Rule 56(a)(1) Statement, at ¶¶31, 36. Plaintiff would have followed the same procedure both unloading and loading the

machine, even if the machine weighed in excess of 1,000 pounds. Local Rule 56(a)(1) Statement, at ¶ 57.

The liftgate used by Plaintiff on the truck involved in the accident had a weight capacity up to 2,500 pounds. Local Rule 56(a)(1) Statement, at ¶ 46. The liftgate is designed to tilt to the rear. Local Rule 56(a)(1) Statement, at ¶ 45. At the time of the delivery, the liftgate on the truck involved in the accident was in working order, and indeed was operated by the Plaintiff. Local Rule 56(a)(1) Statement, at ¶ 44. In fact, Plaintiff, who had experience with liftgates, did not notice any sagging with respect to the liftgate after he placed the Festo unit onto the lift. Local Rule 56(a)(1) Statement, at ¶¶ 43, 47.

Drivers have a responsibility to evaluate the size of the delivery and call for extra help or adequate equipment if the trucks, liftgates, or equipment that they have are insufficient. Local Rule 56(a)(1) Statement, at ¶ 53. Plaintiff was an experienced driver. Local Rule 56(a)(1) Statement, at ¶ 54. Further, the driver is the eyes and ears of the carrier, so if a driver finds something that is wrong or amiss in some way, the driver usually picks up the phone and calls his dispatcher. Local Rule 56(a)(1) Statement, at ¶ 56. Plaintiff never did so. Local Rule 56(a)(1) Statement, at ¶ 56.

These facts demonstrate that not only was Arpin not reckless, it wasn't even negligent.[18] There was no knowledge of an allegedly dangerous condition. No information was withheld from Plaintiff by Arpin. Furthermore, the liftgate itself was working just as designed and intended.

The *Feehan*, *Lopes*, and *Watts* courts have all found that allegations of knowledge

---

[18] If any party can be charged with recklessness in the happening of the accident, under these circumstances, it is the Plaintiff himself.

of a danger or a failure to prevent an injury from occurring do not give rise to the level of consciousness and intent needed to prove recklessness.  In the case at bar then, which does <u>not</u> even involve knowledge of an allegedly dangerous condition, the same result must clearly be reached.

Finally, a close review of Plaintiff's Complaint, even if expanded by facts developed during discovery, demonstrates that the recklessness claims are exactly the same as those asserted in Plaintiff's negligence counts.  *See* Plaintiff's Fifth Amended Complaint, Count One, ¶7 (asserting that Arpin was negligent in that it "failed to adequately inspect the liftgate," "failed to equip the truck with proper equipment for securing loads," "failed to obtain all pertinent and/or correct information from the shipper and/or Festo," "failed to warn [Plaintiff] of the dangers of transporting the Learnline unit," "failed to inform Plaintiff of the information provided to them. . . that the unit was on wheels," and "provided [Plaintiff] with a truck with an inadequate liftgate").  In striking a recklessness count, the Connecticut Superior Court in *Carroll v. Village Park I Realty Co.*, 1998 Conn. Super. LEXIS 2559, stated:  "The plaintiff's recklessness count against [defendant] is essentially identical to her negligence count."  *Id.* at 2.  The same holds true here.  Simply shrouding the allegations in the word "recklessness" does not save the Plaintiff's claim.  *See Maud*, 2000 Conn. Super. LEXIS at *7.  Counts Five and Six of Plaintiff's Complaint must fail.

IV.     <u>CONCLUSION</u>

For the foregoing reasons, Arpin's Motion for Summary Judgment should be granted, and such other and further relief as the Court deems appropriate should be ordered.

Dated this 15th day of December, 2004.

Defendants Paul Arpin Van Lines, Inc. and
Arpin Logistics, Inc.,
By their attorneys:


_____

Thomas J. Grady, Esq. CT 17139
LENIHAN, GRADY & STEELE
6 Canal Street, P.O. Box 541
Westerly, R.I.  02891
(401) 596-0183
(401) 596-6845 (Fax)
tjg@aol.com


_____

Harold J. Friedman, Esq. CT 23785
Karen Frink Wolf, Esq. CT 26494
FRIEDMAN GAYTHWAITE WOLF &
LEAVITT
Six City Center, P.O. Box 4726
Portland, ME  04112-4726
(207) 761-0900
(207 761-0186 (Fax)
hfriedman@fgwl-law.com
kwolf@fgwl-law.com

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via U.S. First Class Mail this 15th day of December, 2004 to the following:


Michael A. Stratton, Esq.              Roland F. Moots, Jr., Esq.
Stratton Faxon                         Moots, Pellegrini, Spillane & Mannion
59 Elm Street                          46 Main Street, PO BOX 1319
New Haven, CT  06510                   New Milford, CT 06776-1319

Thomas J. Grady, Esq.
Lenihan Grady & Steele
6 Canal Street
PO Box 541
Westerly, RI 02891-0541
401-596-0183

James R. Oswald, Esq.
Adler, Pollock & Sheehan
2300 BankBoston Plaza
Providence, RI  02903

Susan O'Donnell, Esq.
Halloran & Sage
One Goodwin Sq., 225 Asylum St.
Hartford, CT  06103


                                       _____
                                       Karen Frink Wolf, Esq. CT 26494