**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHAWN POULIOT                              :        CIVIL ACTION
                                                             NO. 3:02 CV1302 (DJS)

                                                    :

V.

PAUL ARPIN VAN LINES;
ARPIN LOGISTICS INC.

V.

THE FESTO CORPORATION;
MICHAEL D. KOVAC d/b/a
TRANS-EXPO INTERNATIONAL;
ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INT'L      :        DECEMBER 15, 2004


# EXHIBIT 1

1            THE UNITED STATES DISTRICT COURT

2             THE DISTRICT OF CONNECTICUT

3                                      CERTIFIED COPY

4                                    )

   SHAWN POULIOT,                    )

5                                    )

                 Plaintiff,          )

6                                    )

             vs.                     )   No. 3:02 CV 1302

7                                    )   (DJS)

   PAUL ARPIN VAN LINES, INC.; and ARPIN )

8  LOGISTICS, INC.,                  )

                                     )

9               Third Party/Defendants. )

             vs.                     )

10                                   )

   THE FESTO CORPORATION, MICHAEL D. KOVAK )

11 d/b/a TRANS-EXPO INTERNATIONAL, ERICA )

   RAMIREZ, in her capacity as employee of )

12 TRANS-EXPO INTERNATIONAL,         )

                                     )

13              Third Party Defendants.)

   _____)

14

15               DEPOSITION OF

16               MICHAEL KOVAK

17            SAN DIEGO, CALIFORNIA

18         THURSDAY, OCTOBER 23, 2003

19

20

21 ATKINSON-BAKER, INC.
   COURT REPORTERS

22 600 B Street, Suite 1480
   San Diego, California 92101

23 (800) 288-3376

24 Reported by:  Mauralee A. Ramirez, RPR, CSR NO. 11674

25 FILE No.: 9D08997

1

2

3                    CERTIFICATE OF CERTIFIED COPY

4

5

6

7            I, *Robert B. Ossio*, an employee of

8   Atkinson-Baker, Inc., Court Reporters,

9   certify that the foregoing pages 1 through 105,

10  constitute a true and correct copy of the original

11  deposition of Michael Kovak, taken on

12  October 23rd, 2003.

13            I declare under penalty of perjury under the

14  laws of the State of California that the foregoing

15  is true and correct.

16

17            Dated this 16th day of December, 2003.

18

19  _____

20                *Robert B. Ossio*

21

22

23

24

25

```
 1      SAN DIEGO, CALIFORNIA; THURSDAY, OCTOBER 23, 2003

 2                          1:09 p.m.

 3

 4              (Exhibits 1-49 were marked for

 5              identification.)

 6

 7                      MICAHEL KOVAK,

 8      having been administered an oath, testified as follows:

 9

10                      EXAMINATION

11      BY MR. STRATTON:

12          Q    It's Kovak, right?

13          A    That's correct.

14          Q    That's the correct pronunciation?

15          A    Yes.

16          Q    My name is Michael Stratton.  I represent

17      the plaintiff -- the plaintiff in this case.  I'm

18      going to be asking some questions.  If at any point

19      in time you don't understand the question that I ask

20      of you, please ask me to rephrase it, so you

21      understand the question before you give an answer.

22      If you are able to give an answer, I'll expect and

23      assume that that's a truthful answer.  Is that fair?

24          A    That's fair.

25          Q    One more ground rule.  It's very, very
```

```
 1   difficult for the court reporter -- if we both talk
 2   at the same time, it's almost impossible for her to
 3   pick up the testimony.  So let me ask my question.
 4   I'll give you a chance to answer the question.
 5   We'll try not to talk over each other.  Okay.  Can
 6   you tell me your full name and date of birth?
 7        A    Michael Dwayne Kovak, September 13th,
 8   1944.
 9        Q    Can you tell me your current address --
10   residential address?
11        A    1366 Etude Road, San Diego, California
12   92128.
13        Q    Do you have a business address that's
14   separate from that?
15        A    The lease on my former business is still
16   in effect until December, I believe, and I'm still
17   receiving some mail there; although the business is
18   closed down.  I don't know if that answers your
19   question.
20        Q    What was the name of that business which
21   is closing down?
22        A    Trans-Expo International.
23        Q    What was your position within that
24   company?
25        A    I owned the company.
```

1      Q    Was it a sole proprietorship?

2      A    Yes.

3      Q    It wasn't incorporated?  It wasn't a

4  partnership?  It was your business?

5      A    Correct.

6      Q    Now, tell me about how long that business

7  has been in existence for?

8      A    From October 1997 until more or less

9  officially October of last year.

10     Q    Any particular reason that the operation

11  was shut down?

12     A    Yes.  I needed capital to continue and

13  could not get it.

14     Q    Can you tell me generally the nature of

15  Trans-Expo International's business when it did

16  conduct business?  The types of things that

17  Trans-Expo would do.  What would you call yourself?

18  Sales agents?  Shippers?  Shippers agents?

19     A    I was primarily a sales agent for the

20  Airways Freight Corporation and towards the end of

21  the business, I became a sales agent for Arpin.

22     Q    Now, can you tell me what required you to

23  get additional capital?  Was it so you could do

24  additional marketing?

25     A    So I could hire additional staff.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHAWN POULIOT                              :        CIVIL ACTION
                                                   NO. 3:02 CV1302 (DJS)
                                          :
V.

PAUL ARPIN VAN LINES;
ARPIN LOGISTICS INC.

V.

THE FESTO CORPORATION;
MICHAEL D. KOVAC d/b/a
TRANS-EXPO INTERNATIONAL;
ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INT'L    :        DECEMBER 15, 2004


# EXHIBIT 2

     1   difficult for the court reporter -- if we both talk
     2   at the same time, it's almost impossible for her to
     3   pick up the testimony.  So let me ask my question.
     4   I'll give you a chance to answer the question.
     5   We'll try not to talk over each other.  Okay.  Can
     6   you tell me your full name and date of birth?
     7        A    Michael Dwayne Kovak, September 13th,
     8   1944.
     9        Q    Can you tell my your current address --
    10   residential address?
    11        A    1366 Etude Road, San Diego, California
    12   92128.
    13        Q    Do you have a business address that's
    14   separate from that?
    15        A    The lease on my former business is still
    16   in effect until December, I believe, and I'm still
    17   receiving some mail there; although the business is
    18   closed down.  I don't know if that answers your
    19   question.
    20        Q    What was the name of that business which
    21   is closing down?
    22        A    Trans-Expo International.
    23        Q    What was your position within that
    24   company?
    25        A    I owned the company.



# SALES AGENT AGREEMENT

AN AGREEMENT made this 20th day of September, 2001, by and between ARPIN LOGISTICS, INC., (hereinafter the Carrier) a Rhode Island Corporation located 141 James P. Murphy Highway, West Warwick, Rhode Island, 02893 and Trans - Expo (hereinafter the Sales Agent), having their principal place of business located at 16885 Via del Campo Court, San Diego, CA 92127.

### WITNESSETH

WHEREAS, the Sales Agent is engaged in the business of sales, marketing, and consulting in connection with the third proviso business. The Sales Agent represents that it has the ability and skill to generate sales and solicit new customers as an independent contractor of the Carrier.

WHEREAS, the Carrier represents that it and/or its affiliates have the resources, capabilities, and facilities necessary to properly service the transportation and storage needs of customers and accounts generated and solicited by the Sales Agent specifically with regard to the third proviso business.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and both parties desiring to enter into a mutually advantageous non exclusive relationship through the terms, conditions, and performance of this Agreement, the parties agree as follows:

1. SERVICES PROVIDED

   A.   The Sales Agent and/or its employee(s) shall act as an independent contractor to the Carrier. Sales Agent will be responsible for, and pay, all Federal and State Income Tax, Social Security taxes and insurance required by law including State Unemployment Insurance, Federal Insurance Compensation Act, Federal Unemployment Tax, and Workman's Compensation Insurance, if applicable to any such employees. Such insurance is to be sufficient in amount to fully protect the Sales Agent and the Carrier under all circumstances. Carrier will provide the Sales Agent with a Miscellaneous Income 1099 Statement on an annual basis. Also neither party shall have the authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for its own actions

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHAWN POULIOT                          :         CIVIL ACTION
                                                 NO. 3:02 CV1302 (DJS)
                                       :
V.

PAUL ARPIN VAN LINES;
ARPIN LOGISTICS INC.

V.

THE FESTO CORPORATION;
MICHAEL D. KOVAC d/b/a
TRANS-EXPO INTERNATIONAL;
ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INT'L        :         DECEMBER 15, 2004


# EXHIBIT 3

DEPO. OF MICHAEL KOVAK - 10/23/03

1  Q Was it a sole proprietorship?

2  A Yes.

3  Q It wasn't incorporated?  It wasn't a

4 partnership?  It was your business?

5  A Correct.

6  Q Now, tell me about how long that business

7 has been in existence for?

8  A From October 1997 until more or less

9 officially October of last year.

10  Q Any particular reason that the operation

11 was shut down?

12  A Yes.  I needed capital to continue and

13 could not get it.

14  Q Can you tell me generally the nature of

15 Trans-Expo International's business when it did

16 conduct business?  The types of things that

17 Trans-Expo would do.  What would you call yourself?

18 Sales agents?  Shippers?  Shippers agents?

19  A I was primarily a sales agent for the

20 Airways Freight Corporation and towards the end of

21 the business, I became a sales agent for Arpin.

22  Q Now, can you tell me what required you to

23 get additional capital?  Was it so you could do

24 additional marketing?

25  A So I could hire additional staff.

DEPO. OF MICHAEL KOVAK - 10/23/03

```
 1    through Arpin.  And we discussed an arrangement and
 2    they said they would send me a sales agreement and
 3    they did.  Beyond that, I don't understand the
 4    question, I'm sorry.
 5         Q    Is it your understanding that you would
 6    only work on behalf of Arpin, or did you understand
 7    that you would be able to work with other companies?
 8         A    It was my understanding that we could work
 9    with other companies.
10         Q    Do you have any -- on page three here of
11    Exhibit Number 21, it talks about restrictive
12    covenants.  Do have you any knowledge what those
13    restrictive covenants required Trans-Expo to do or
14    not do?
15         A    Reading this now, I believe at the time I
16    read it, I understand this to mean their -- Arpin's
17    clients are off limits to me in terms of selling --
18    selling services.  Any kind of services.
19         Q    Did you understand by signing this
20    agreement that you would be a sales agent of Arpin?
21         A    That's correct.
22         Q    And I see a signature here on page five of
23    Exhibit Number 21.  It appears to be your signature
24    but only you can tell me whether it actually is.
25         A    Yes.  I'm sorry.  That is my signature.
```

15

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHAWN POULIOT                                    :        CIVIL ACTION
                                                          NO. 3:02 CV1302 (DJS)
                                                 :

V.

PAUL ARPIN VAN LINES;
ARPIN LOGISTICS INC.

V.

THE FESTO CORPORATION;
MICHAEL D. KOVAC d/b/a
TRANS-EXPO INTERNATIONAL;
ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INT'L        :        DECEMBER 15, 2004


# EXHIBIT 4

Volume I, Pages 1-209
Exhibits N-P

UNITED STATES DISTRICT
DISTRICT OF CONNECTICUT

C.A. NO. 3:02 CV1302 (DJS)

SHAWN POULIOT,
         Plaintiff,

**CERTIFIED COPY**

         vs.

PAUL ARPIN VAN LINES, INC.
AND ARPIN LOGISTICS, INC.,
         Defendants/Third-Party Plaintiffs,

vs.

THE FESTO CORPORATION,
MICHAEL D. KOVAC D/B/A TRANS-EXPO INTERNATIONAL
AND ERICA RAMIREZ IN HER CAPACITY
AS EMPLOYEE OF TRANS-EXPO INTERNATIONAL,
         Third-Party Defendants


     DEPOSITION OF:  MICHAEL P. MONTGOMERY
              LENIHAN, GRADY & STEELE
                 Six Canal Street
             Westerly, Rhode Island 02891

     July 27, 2004 9:00 a.m. - 2:20 p.m.


ATKINSON-BAKER, INC. COURT REPORTERS

330 North Brand Boulevard, Suite 250

Glendale, California   91203

800.228.3376

REPORTED BY:  Linda A. Menard
              Registered Professional Reporter
              Certified Shorthand Reporter
JOB NO. 9E05C35

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF BRISTOL, ss.


     I, Linda A. Menard, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript of the deposition of Michael P. Montgomery, having been duly sworn, on Tuesday, July 27, 2004, is true and accurate to the best of my knowledge, skill and ability.

     IN WITNESS WHEREOF, I have hereunto set my hand and seal this 11th day of August, 2004.


Linda A. Menard, RPR
Notary Public
My commission expires:
September 17, 2004

A.    I can't recall the time.

Q.    Was it after the litigation had already commenced?

A.    That it was an issue?

Q.    Yes, that the issue regarding how much did this thing weigh first came up?

A.    Yes.

Q.    After the litigation had already started?

A.    Yes.

MS. O'DONNELL:    Tom, I would like to have the sales agreement marked next.

(Marked for identification, Exhibit P, Sales Agent Agreement.)

Q.    Mr. Montgomery, I have had marked as Exhibit P a document that's entitled Arpin Logistics Sales Agent Agreement.    Do you see that?

A.    Yes.

Q.    And that is a five-page document and it has one attachment; is that correct?

A.    Yes.

Q.    And the attachment says Arpin Logistics Booking Commission Schedule?

A.    Yes.

Q.    And directing your attention to the fifth

page of this document, do you see that page?

A.   Yes.

Q.   Is that your signature, sir?

A.   Yes, it is.

Q.   Do you know, Mr. Montgomery, if this document that you have before you, the five pages with a single attachment, is the complete sales agent agreement between Arpin Logistics and Trans-Expo?

A.   It looks like it, yes.

Q.   So there are no missing exhibits or additional attachments that you are aware of?

A.   No.

Q.   And did you sign that agreement?

A.   Yes.

Q.   And did Mr. Kovac sign the agreement?

A.   It looks like his signature, yes.

Q.   Is this a complete copy of the sales agent agreement between Arpin Logistics and Trans-Expo as you are aware of it?

A.   Yes, it is.

Q.   Do you know, Mr. Montgomery, when it was that Michael Kovac doing business as Trans-Expo first began acting in any kind of sales or sales

1    agent capacity doing business with Arpin?

2        A.   I would guess it's the 29th but there

3    might have been one or two transactions before that.

4        Q.   The 29th of what?

5        A.   '01.  Is that the 24th maybe?  I can't

6    make out the number.

7             MR. STRATTON:  23rd?

8        Q.   You are referring to the signature page,

9    correct?

10       A.   Yes.

11       Q.   And that scribble looks like it's Mike

12   Kovac?

13       A.   Yes.

14       Q.   And next to that, you can't tell whether

15   that's the 24th or 29th?

16       A.   Yes.

17       Q.   Your signature has a date?

18       A.   Yes.

19       Q.   What's the date you sign this document?

20       A.   10-23-01.

21       Q.   And that's the date that Shawn Pouliot was

22   injured, correct?

23       A.   Yes.

24       Q.   That's not the first day that Arpin

EXHIBIT



# SALES AGENT AGREEMENT

AN AGREEMENT made this 20th day of September, 2001, by and between ARPIN LOGISTICS, INC., (hereinafter the Carrier) a Rhode Island Corporation located 141 James P. Murphy Highway, West Warwick, Rhode Island, 02893 and Trans - Expo (hereinafter the Sales Agent), having their principal place of business located at 16885 Via del Campo Court, San Diego, CA 92127.

## WITNESSETH

WHEREAS, the Sales Agent is engaged in the business of sales, marketing, and consulting in connection with the third proviso business. The Sales Agent represents that it has the ability and skill to generate sales and solicit new customers as an independent contractor of the Carrier.

WHEREAS, the Carrier represents that it and/or its affiliates have the resources, capabilities, and facilities necessary to properly service the transportation and storage needs of customers and accounts generated and solicited by the Sales Agent specifically with regard to the third proviso business.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and both parties desiring to enter into a mutually advantageous non exclusive relationship through the terms, conditions, and performance of this Agreement, the parties agree as follows:

1. **SERVICES PROVIDED**

   A. The Sales Agent and/or its employee(s) shall act as an independent contractor to the Carrier. Sales Agent will be responsible for, and pay, all Federal and State Income Tax, Social Security taxes and insurance required by law including State Unemployment Insurance, Federal Insurance Compensation Act, Federal Unemployment Tax, and Workman's Compensation Insurance, if applicable to any such employees. Such insurance is to be sufficient in amount to fully protect the Sales Agent and the Carrier under all circumstances. Carrier will provide the Sales Agent with a Miscellaneous Income 1099 Statement on an annual basis. Also neither party shall have the authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for its own actions

2.    COMPENSATION

A.    The Carrier shall, during the term hereof, pay the Sales Agent the Booking Commissions as expressly stated in the schedule attached hereto as "Schedule A", on accounts whose invoices have been paid.

B.    The parties agree that the discount rate is to be set by the Carrier and may be amended by the Carrier from time to time at its discretion.

C.    The Carrier may elect to establish spot pricing and related negotiated commission(s) on an individual basis for a specific shipment(s) or volume business.

D.    The Sales Agent shall be entitled to receive commission compensation from the Carrier for sales made during the term of the Agreement and not thereafter.

3.    ACCOUNTING PAYMENT

A.    The Carrier shall provide the Sales Agent with timely and accurate (monthly) statements of the total gross sales generated by or otherwise attributable to the Sales Agent during the previous calendar month.  Said monthly statements shall include all business revenues billed.

B.    The parties hereto agree faithfully and accurately to account to each other, and that each party may inspect any and all records of the other that relate either directly or indirectly to the performance of this Agreement.

C.    Any and all payments received by the Sales Agent on behalf of the Carrier, shall immediately be tendered to the Carrier and be endorsed over to the Carrier without being deposited in the Sales Agent's bank account.  In no event are any transportation payments tendered to the Sales Agent to be deposited to any account of the Sales Agent.

D.    There shall be statements of financial accounts (settlement sheets) representing financial transactions between the Carrier and the Sales Agent.  The statements shall be issued and distributed in the form and manner prescribed by the Carrier.  Statement entries made by the Carrier shall be presumed correct and final, if not disputed in writing by the Sales Agent within ninety (90) days after distribution thereof.  Further, said, statements shall constitute (ninety (90) days after distribution thereof) the primary business record between the Carrier and the Sales Agent with respect to financial transaction existing between the parties as reflected on the statements, and additional underlying documentation, in support thereof, shall not be required as a matter of proof before any administrative or judicial tribunal.

E.   The Carrier will pay the Sales Agent all amounts due (minus any advances or unreimbursable expenses) on all shipments that have been billed in the prior month on the 15th of the following month. However the Carrier will only pay on invoices which have been paid to Carrier.

4.   **CREDIT AND COLLECTIONS**

A.   All perspective and existing accounts shall be subject to the credit terms and conditions of Arpin Logistics, Inc. as evaluated through such credit reporting bureaus, including Dunn and Bradstreet.

B.   The Sales Contractor will be responsible for only their commission amount on any shipments that are not collectable after sixty (60) days, providing prior credit approval has been granted.

5.   **RESTRICTIVE COVENANTS**

A.   It is understood and agreed that the Sales Agent may in no event and at no time during the terms of this Agreement contact, solicit, or otherwise do business with customers solicited and attributable to the sales efforts of the Carrier. This restriction shall apply for a period of eighteen (18) months after the termination of this Agreement for whatever reason.

B.   The Sales Agent agrees that during the term of this Contract, and for a period of eighteen (18) months thereafter, it will not disclose to any person, customer, or other business information private and confidential business information of the Carrier such as customer lists, pricing and/or financial information, sales and marketing strategies dates, or opportunities for developing new customers. All such confidential information shall be returned upon termination of the agreement under section E.

6.   **TERM AND TERMINATION**

A.   The term of this Agreement shall be for one (1) year from the date of this Agreement. Thereafter, the term of this Agreement shall be automatically extended from year to year unless the Carrier shall notify the other at least 30 days prior to the end of a particular term that it does not want to renew this Agreement. Also this agreement constitutes the entire agreement between the parties and may only be amended in writing signed by both parties

B.   This Agreement can be canceled by either party, in writing, without cause, upon 30-days notice by Registered or Certified Mail, Return Receipt Requested, to the designated address

7. **TERMINATION OF PRIOR AGREEMENTS**

   A.  This Agreement cancels and terminates as of its effective date, all prior agreements between the parties hereto, whether written or oral or partially written or partially oral as of the date this Agreement commences.

   B.  This Agreement may be nullified by the Carrier if the Sales Agent is guilty of any of the following upon notification in writing by Registered or Certified Mail, Return Receipt Requested.

   a) Fraud;

   b) Dishonesty;

   c) Acts which put in jeopardy the governmental authority to transact the moving and storage business; and

   d) Any breach of this Agreement.

8. **ASSIGNMENT**

   A.  This Agreement shall not be assigned by the parties hereto without the express written consent of both parties to this Agreement.

9. **SEVERABILITY**

   A.  The invalidity, illegality, or unenforceability of any provision of this Agreement for any reason whatsoever, shall not affect the validity, legality, or enforceability of the remaining provisions hereof and such remaining provisions shall remain in full force and effect in the same manner as if the invalid, illegal, unenforceable provisions had not been contained herein.

10. **CONSIDERATION**

   A.  The Sales Agent specifically acknowledges that adequate, good and sufficient consideration has been granted the Sales Agent by the terms of this Agreement (and any written addendum thereto) to justify all the terms -of said Agreement.

11. **GOVERNING LAW**

   A.  This Agreement is delivered in and shall be construed under the laws of the state of Rhode Island, without reference to conflict of laws principles. *Any litigation in connection with or relating to this agreement or any endorsement or guaranty of this agreement shall be brought only in a court having jurisdiction and venue at providence, Rhode Island, and each of obligors waives trial by jury and consents to and confers personal jurisdiction on any such court or courts.* The term "Carrier" shall include Carrier's successors, endorsees and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed on the _____ day of _____, 2001.

_____     10/22/01
                                      _____
                                      Date

_____     10/22/01
Michael Montgomery                    _____
Director of Arpin Logistics, Inc.     Date

_____     _____
Jack Fuyat                            Date
Vice President of Corporate Affairs

4/27/01



## BOOKING COMMISSION SCHEDULE

| TRADESHOWS TS 1,2,3* | OVER 400 MILES | UNDER 401 MILES |
|---|---|---|
| DISCOUNT % | COMMISSION | COMMISSION |
| 00-20% | 17% | 14% |
| 21-30% | 14% | 12% |
| 31-40% | 12% | 10% |
| 41-45% | 10% | 8% |
| 46-50% | 8% | 5% |
| | | |
| TS-4 (TRADESHOWS,TRUCKLOAD) | | |
| 00-15% | 15% | 12% |
| 16-20% | 12% | 10% |
| 21-OVER | 10% | 8% |
| | | |
| TS-5 (BOXED OR SKIDDED FREIGHT) | | |
| 00-00% | 10% | 10% |
| 00-20% | 10% | 8% |
| | | |
| 300C SECTION 5 (ELECTRONICS) | | |
| 00-20% | 17% | 14% |
| 21-30% | 14% | 12% |
| 31-40% | 12% | 10% |
| 41-45% | 10% | 8% |
| 46-50% | 8% | 5% |
| | | |
| FLAT RATE PRICING | 15% | 10% |
| | | |
| Broker & General Freight | 10% | 8% |

| GENERAL TRUCKLOAD DOLLAR PER MILE | | MINIMUM CHARGE |
|---|---|---|
| $1.64 OR UNDER | | $1,250 |
| $1.65-$1.85 | NEGOTIABLE | |
| $1.86-$2.00 | NEGOTIABLE | |
| $2.01-$2.30 | 10% | |
| $2.31-$2.40 | 12% | |
| $2.41- OVER | 15% | |
| | 17% | |

TS-1 BLANKETWRAP SHIPMENTS
TS-2 PADWRAP AND CRATED SHIPMENTS
TS-3 CRATED DISPLAYS