UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWN POULIOT | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:02 CV 1302 (DJS) |
| | : | |
| PAUL ARPIN VAN LINES, INC.; | : | |
| ARPIN LOGISTICS, INC.; THE FESTO | : | |
| CORPORATION; MICHAEL D. KOVAC | : | |
| d/b/a TRANS-EXPO INTERNATIONAL, | : | |
| ERICA RAMIREZ, IN HER CAPACITY AS | : | |
| EMPLOYEE OF TRANS-EXPO | : | |
| INTERNATIONAL | : | December 15, 2004 |
| | : | |
| Defendants | : | |

**_LOCAL RULE 56(a)(1) STATEMENT IN SUPPORT OF PAUL ARPIN VAN LINES, INC.'S and ARPIN LOGISTICS, INC.'S MOTION FOR SUMMARY JUDGMENT_**

Pursuant to Local Rule 56(a)(1), Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc. (hereinafter "Arpin") hereby submit their Local Rule 56(a)(1) Statement with supporting exhibits.

SHAWN POULIOT/ ARPIN LOGISTICS RELATIONSHIP

1. On March 16, 2001, Shawn Pouliot and Arpin Logistics, Inc. entered into an Owner-Operator Agreement in Rhode Island.  Depo. of Shawn Pouliot, Page 43, Line 14-25; Page 44, Lines 1-24 *(Attached hereto at Tab A  is a copy of all referenced excerpts from the transcript of the deposition of Shawn Pouliot taken on December 3, 2002);* Depo. of Michael Montgomery, Page 51, Lines 23-25; Page 52, Line 1 *(Attached hereto at Tab B is a copy of all referenced excerpts from the transcript of the deposition of Michael Montgomery taken on July 27, 2004);* "Owner-Operator Agreement" between Shawn Pouliot and Arpin, previously identified as Exhibit A to Shawn Pouliot's December 3, 2002 deposition *(Attached hereto at Tab C is copy of the "Owner-Operator Agreement" between Shawn Pouliot and Arpin).*

2. Pursuant to his Owner-Operator Agreement with Arpin Logistics, Inc., Mr. Pouliot agreed that the Owner-Operator Agreement would be interpreted in light of United States Department of Transportation Regulations.  Owner-Operator Agreement, Page 16, ¶21; *See Tab* C.

3. Mr. Pouliot and Arpin Logistics, Inc. agreed that his Owner-Operator Agreement would be governed by Rhode Island law; Owner-Operator Agreement, Page 16, ¶21; *See Tab* C.

4. During the seven-month period during which the Owner-Operator Agreement was in force, Mr. Pouliot did not hold himself out to do work for the general public, and only made deliveries for Arpin. Depo. of Shawn Pouliot, Page 111, Lines 14-21; *See Tab A (December Depo.).*

5. Under the terms of his Owner-Operator Agreement, paragraph 2(c), Mr. Pouliot agreed "that he will pick up, transport and deliver all shipments as directed and instructed by the Carrier." Owner-Operator Agreement, Page 4, ¶2 (c); *See Tab* C.

6. In his Owner-Operator Agreement with Arpin, Mr. Pouliot agreed that "all operations with the equipment are and shall be subject to the exclusive control and direction of the Carrier….." Owner-Operator Agreement, Page 4, ¶2 (a); *See Tab* C.

7. Mr. Pouliot's Owner-Operator Agreement with Arpin Logistics, Inc. provides that "It is expressly understood by the Contractor that in no event does the Carrier assume any liability of any nature whatsoever to the contractor for any loss or damage which the Contractor may sustain in the operation of his Equipment whether such loss or damage may result from fire, theft, collision, or other casualty. Contractor may purchase insurance independently or through the Carrier." Owner-Operator Agreement, Page 11, ¶8(b); *See Tab C.*

8. Mr. Pouliot's Owner-Operator Agreement with Arpin Logistics, Inc. provides that Mr. Pouliot will "indemnify, save and hold Carrier free and harmless from and against any and all claims, demands, liabilities damages, losses, judgments, awards, causes of action at law or in equity, including but not limited to those involving injury to, or death of, Contractor's employees and/or third parties and damages to property including but not limited to, cargo, and attorney's fees and all reasonable costs of litigation and from and against any obligation, whatsoever arising out of or attributable to any act or omission of the Contractor in connection with the operation or maintenance of the Equipment, and in connection with Contractor's performance of transportation of other services hereunder." Owner-Operator Agreement, Page 12, ¶9; *See Tab* C.

9. From October 20, 2001 to October 23, 2001, Mr. Pouliot was driving a Paul Arpin Van Lines, Inc. 1989 Peterbuilt straight truck because his motor vehicle was being repaired. Depo. of Shawn Pouliot, Page 47, Lines 10-25; Page 48, Lines 1-3; *See Tab A (December Depo.)*; Depo. of Joseph Rocha, Page 41, Lines 6-8 *(Attached hereto at Tab D is a copy of all referenced excerpts from the transcript of the deposition of Joseph Rocha taken on July 26, 2004).*

10. While Mr. Pouliot was operating for Arpin he performed functions that were incidental to delivering freight, including, but not limited to, driving a vehicle. Depo. of Terry Morgan, Page 32, Lines 13-19 *(Attached hereto at Tab E is a copy of all referenced excerpts from the transcript of the deposition of Terry Morgan taken on August 17, 2004).*

11. Arpin would give Mr. Pouliot the job, tell him where to go, and he had to perform the job according to Arpin's directions. Depo. of Shawn Pouliot, Page 110, Lines 15-18; *See Tab A (December Depo.).*

12. Arpin Logistics placed their name and Department of Transportation licensing numbers on the tractor Mr. Pouliot drove for the company. Depo. of Shawn Pouliot, Page 45, Lines 20-25; Page 46, Lines 1-4; *See Tab* A *(December Depo.).*

13. Arpin told Mr. Pouliot which jobs he would take. Depo. of Shawn Pouliot, Page 109, Lines 14-15; *See Tab* A *(December Depo.).*

14. Mr. Pouliot stated that he had no choice in whether or not he had to perform deliveries, including the delivery of the Festo unit. Depo. of Shawn Pouliot, Page 120, Lines 6-18; *See Tab* A *(December Depo.).*

15. As of October 23, 2001, Mr. Pouliot had uniforms for Arpin Logistics, Inc. and Paul Arpin Van Lines, Inc. Depo. of Shawn Pouliot, Page 110, Lines 4-14; *See Tab A (December Depo.).*

16. Mr. Pouliot was required to submit driver logs to Arpin every week, and Arpin monitored all drivers', including Mr. Pouliot's, weekly activity. Depo. of Shawn Pouliot, Page 111, Lines 1-11; *See Tab A (December Depo.)*; Depo. of Jessie Sears, Page 5, Lines 5-8 *(Attached hereto at Tab F is a copy of all referenced excerpts of the transcript of the deposition of Jessie Sears taken on September 16, 2003).*

17. Arpin requires that drivers, including Mr. Pouliot, take drug and driver's tests. Depo. of Joseph Rocha, Page 141, Lines 7-9; *See Tab D.*

FACTUAL CHRONOLOGY

18. Arpin provided Mr. Pouliot with a truck to perform several pick-ups and deliveries throughout the New York and Connecticut area. Depo. of Shawn Pouliot, Page 110, Lines 23-25; *See Tab A (December Depo.).*

19. On Saturday, October 20, 2001, Mr. Pouliot was dispatched from Arpin's headquarters in Rhode Island with directions to pick up the Festo shipment in Hauppauge, New York and deliver it to Naugatuck Valley Community College in Waterbury, Connecticut. Depo. of Shawn Pouliot, Page 51, Lines 23-25; *See Tab A (December Depo.)*; Depo. of William Tweedy Page 116, Lines 9-16 *(Attached*

*hereto at Tab G is a copy of all referenced excerpts from the transcript of the deposition of William Tweedy taken on October 5, 2004).*

20. On Saturday, October 20, 2001, Arpin dispatcher William Tweedy met with Mr. Pouliot, gave him the printed bill of lading and manifest and orally told him what was required of him. Depo. of William Tweedy Page 25, Lines 8-24; Page 26, Lines 1-14; *See Tab* G.

21. The information that Arpin possessed was that a liftgate would be needed to make the delivery, one of the units for delivery had wheels, and that the delivery consisted of two items, together equaling four hundred pounds. Depo. of Joseph Rocha, Page 28, Lines 2-12; *See Tab* D; Depo. of Michael Montgomery, Page 150, Lines 14-24; Page 151, Lines 1-6; *See Tab* B.

22. The fact that the Learnline 2000 unit weighed eight hundred twelve pounds was information that Arpin did not have at the time that Mr. Pouliot was dispatched to make the delivery. Depo. of William Tweedy, Page 71, Lines 2-8; *See Tab* G.

23. Arpin provided Mr. Pouliot with equipment and tools necessary to pick up and deliver the Festo Learnline 2000 unit. Depo. of Shawn Pouliot, Page 110, Lines 19-22; *See Tab A(December Depo.).*

24. Mr. Pouliot was provided five to six straps to secure the Learnline 2000 unit during unloading. Depo. of Joseph Rocha, Page 179, Lines 17-21; *See Tab* D.

25. On Monday, October 22, 2001, when Mr. Pouliot did not arrive at Festo, William Tweedy made numerous phone calls all afternoon with Festo and Mr. Pouliot. Depo. of William Tweedy, Page 37, Lines 11-24; Page 38, Lines 1- 24; Page 39, Lines 12-24; Page 40, Lines 1-3; *See Tab* G.

26. On Tuesday, October 23, 2001, William Tweedy called Mr. Pouliot and told him to complete the Festo delivery. Depo. of William Tweedy, Page 99, Lines 12-24; Page 100, Lines 1-7; *See Tab* G.

27. On October 23, 2001, Mr. Pouliot picked up a Festo Learnline 2000 and a Tri-Wall at the Festo Corporation headquarters in Hauppauge, New York at approximately 9 a.m. Depo. of Shawn Pouliot, Page 135, Lines 10-25; Page 136, Lines 1-25; Page 137, Line 1 *(Attached hereto at Tab H is a copy of all referenced excerpts from the transcript of the deposition of Shawn Pouliot taken on June 29, 2004)*; Plaintiff's Answers to Arpin's Interrogatories, ¶ 42 *(Attached hereto at Tab I are Plaintiff's Answers to Defendant Arpin's Interrogatories dated May 23, 2003)*; Festo Corporation's Answers to Arpin's Interrogatories, ¶ 4 *(Attached hereto at Tab J are Defendant Festo Corporation's Answers to Defendant Arpin's Interrogatories dated May 23, 2003).*

28. Festo Learnline 2000 is a machine used by places of learning in the instruction of engineering students.  Depo. of Fred Zierau, Page 34, Lines 13-17 *(Attached hereto at Tab T is a copy of all referenced excerpts from the transcript of the deposition of Fred Zierau taken on March 30, 2004)*.

29. The Festo Learnline 2000 weighed approximately 812 lbs.  Festo Corporation's Answers to Arpin's Interrogatories, ¶ 4; *See Tab J*.

30. At Festo headquarters in Hauppauge, New York, Mr. Pouliot inspected the Festo Learnline 2000 unit.  Depo. of Shawn Pouliot, Page 71, Lines 16-22; *See Tab A (December Depo.)*; Depo. of Shawn Pouliot, Page 144, Lines 1-5; *See Tab H (June Depo.)*.

31. When Mr. Pouliot arrived at Festo headquarters on October 23, 2001, he wheeled the Festo Learnline 2000 into the Arpin truck, and noticed that the machine was "heavy."  Depo. of Shawn Pouliot, Page 136, Lines 1-4; *See Tab H (June Depo.)*; Depo. of Shawn Pouliot, Page 72, Lines 14-20; See Tab A *(December Depo.)*.

32. After Mr. Pouliot wheeled the Festo unit into the truck, he padded and strapped the Learnline 2000 to the side of the truck in order to secure it during transportation. Depo. of Shawn Pouliot, Page 69, Lines 4-25; Page 70, Lines 1-13; *See Tab A*.

33. On October 23, 2001, Mr. Pouliot transported the Festo Learnline 2000 and Tri-Wall from Festo headquarters in Hauppauge, New York to Naugatuck Valley Community College in Waterbury, Connecticut.  Depo. of Shawn Pouliot, Page 79, Lines 23-25; Page 80, Lines 1-15; *See Tab A (December Depo.)*; Plaintiff's Answers to Arpin's Interrogatories, ¶ 4; *See Tab I*; Festo Corporation's Answers to Arpin's Interrogatories, ¶ 4; *See Tab J*.

34. College employees assisted with the unloading of the Tri-Wall, which was on a skid.  Depo. of Shawn Pouliot, Page 82, Lines 6-19; *See Tab A (December Depo.)*; Depo. of Shawn Pouliot, Page 158, Lines 2-14; *See Tab H (June Depo.)*; Depo. of Barry Groman, Page 13, Lines 2-4; Page 15, Lines 8-13 *(Attached hereto at Tab K is a copy of all referenced excerpts from the transcript of the deposition of Barry Groman taken on March 13, 2003)*.

35. After college employees brought the Tri-Wall inside, Mr. Pouliot rolled the Learnline 2000 workstation onto the rear lift by himself. Depo. of Shawn Pouliot, Page 83, Lines 6-10; *See Tab A (December Depo.)*; Depo. of Shawn Pouliot, Page 158, Lines 2-13; *See Tab H (June Depo.)*; Depo. of Barry Groman Deposition, Page 13, Lines 9-10; *See Tab K*.

36. When Mr. Pouliot rolled the Learnline 2000 unit onto the liftgate platform at Naugatuck Valley Community College he knew that the Learnline 2000 unit was

5

unsecured and on wheels. Depo. of Shawn Pouliot, Page 94, Lines 18-21; *See Tab A (December Depo.)*.

37. After he rolled the Learnline 2000 unit onto the platform of the liftgate, Mr. Pouliot exited the truck onto the ground. Depo. of Shawn Pouliot, Page 169, Lines 13-24; *See Tab H (June Depo.)*.

38. After exiting the truck, Mr. Pouliot proceeded to lower the liftgate. Depo. of Shawn Pouliot, Page 174, Lines 19-25; Page 175, Lines 1-8; *See Tab H (June Depo.)*.

39. Before the liftgate touched the ground the Festo Learnline 2000 unit shifted on the liftgate platform. Depo. of Shawn Pouliot, Page 5, Lines 16-25; Page 6, Lines 1-8; *See Tab A (December Depo.)*.

40. When the Festo Learnline 2000 unit shifted on the liftgate platform, Mr. Pouliot walked around to the other side to adjust the Festo Learnline 2000 unit to his liking. Depo. of Shawn Pouliot, Page 176, Lines 3-25; Page 177, Lines 1-22; *See Tab H (June Depo.)*.

41. When Mr. Pouliot attempted to adjust the Festo Learnline 2000 unit, the other side of the machine shifted forward on the liftgate platform. Depo. of Shawn Pouliot, Page 5, Lines 16-25; Page 6, Lines 18-24; *See Tab A (December depo.)*; Depo. of Shawn Pouliot, Page 178, Lines 8-19; *See Tab H (June depo.)*.

42. When the Learnline 2000 unit started to move forward off the liftgate platform, Mr. Pouliot tried to stop the falling load, and was injured when the machine fell on top of him. Depo. of William Tweedy, Page 78, Lines 4-16; *See Tab* G; Depo. of James Blalock, Page 18, Lines 23-25; Page 19, Lines 1-4 *(Attached hereto at Tab L is a copy of all referenced excerpts from the transcript of the deposition of James Blalock taken on March 13, 2003)*; Plaintiff's Answers to Arpin's Interrogatories, ¶86; *See Tab I*.

## MAXON LIFT

43. Mr. Pouliot had experience with liftgates. Depo. of Joseph Rocha, Page 196, Lines 19-21; *See Tab* D.

44. At the time of the delivery, the liftgate on the truck involved in the accident was in working order. Depo. of Irving Ojalvo, Page 100, Lines 15-25 *(Attached hereto at Tab M is a copy of all referenced excerpts from the transcript of the deposition of Irving Ojalvo taken on July 29, 2004)*.

45. The Maxon 72-25A Tuk-A-Way liftgate is designed to tilt to the rear. Depo. of V. Paul Herbert, Page 39, Lines 23-25; Page 40, Lines 1-5 *(Attached hereto at Tab N is a copy of all referenced excerpts from the transcript of the deposition of V. Paul*

*Herbert taken on August 19, 2004); Depo. of Arnold Kowal, Page 32, Lines 10-19 (Attached hereto at Tab U is a copy of all referenced excerpts of the deposition transcript of Arnold Kowal taken on April 12, 2004);* Depo. of Terry Morgan, Page 41, Lines 20-24*; See Tab E.*

46. The liftgate used by Mr. Pouliot on the truck involved in the accident had a weight capacity up to 2,500 pounds. Depo. of Irving Ojalvo, Page 174, Lines 6-15; *See Tab M*.

47. Shawn Pouliot did not notice any sagging with respect to the liftgate after he placed the Festo unit onto the lift. Depo. of Shawn Pouliot, Page 168, Lines 24-25; Page 169, Lines 1-2; *See Tab H (June Depo.)*.

48. Based on the information provided to Arpin prior to delivery regarding the weight and size of the Festo unit, the liftgate on the truck was big enough to hold each unit of the delivery individually. Depo. of William Tweedy, Page 67, Lines 12-17; *See Tab G*; Depo. of Joseph Rocha, Page 63, Lines 10-24; Page 64, Lines 1-5; *See Tab D*.

DRIVER/CARRIER RESPONSIBILITIES

49. Interrogatory Seven of Paul Arpin Van Lines' Second Set of Interrogatories Propounded to the Plaintiff reads, "Explain fully and in detail the factual basis for Plaintiffs [sic] claim that "the injuries to Shawn Pouliot were the direct and proximate result of the defendant Paul Arpin Van Lines, Inc.'s recklessness in that they were provided with information by the shipper's agent that special equipment and packaging was necessary for the safe performance of the delivery" was alleged in Count Five, Paragraph 7 of Plaintiffs [sic] Fifth Amended Complaint and identify any documents in your custody or control in support thereof." *See* Plaintiff's Answers to Arpin's Interrogatories, ¶ 7; *See Tab I*.

50. The Plaintiff answered Interrogatory Seven of Paul Arpin Van Lines' Second Set of Interrogatories accordingly, "With the same caveat regarding the Arpin defendants, the plaintiff answers that Arpin was told that the load was on wheels, that a lift gate would be required; and they proceeded to not tell the plaintiff of these facts and provided him with an adequate (sic) liftgate. This information comes from the depositions and exhibits provided by Trans-Expo, Mark Kovacs [sic] and Mrs. Ramirez. It is also supported by the depositions given to date by Arpin employees and by the deposition of Shawn Pouliot." *See* Plaintiff's Answers to Arpin's Interrogatories, ¶ 7; *See Tab I*.

51. It was Festo and Trans Expo's duty to ensure that the correct weight of the Learnline Unit was provided to Arpin. Depo. of V. Paul Herbert, Page 61, Lines 20-25; Page 62, Lines 1-6; Page 63, Lines 20-25; *See Tab N*.

52. Arpin provided the proper equipment for raising, transporting, and lowering the Festo unit. Depo. of Irving Ojalvo, Page 100, Lines 5-14; *See Tab M*.

53. It is up to the drivers to evaluate the load and call for extra equipment and/or extra labor if the load is different than what had been estimated. Depo. of V. Paul Herbert, Page 93, Lines 15-25; Page 94, Lines 1-4; *See Tab N*.

54. Mr. Pouliot had enough experience to know that he could have and should have called for extra help and/or labor if he encountered difficulties during the delivery. Depo. of Joseph Rocha, Page 105, Lines 1-18; *See Tab D*. Depo. of William Tweedy, Page 35, Lines 2-4; Page 74, Lines 2-14; *See Tab G*; Depo. of Terry Morgan, Page 46, Lines 22-23; Page 46, Lines 16-23; *See Tab E*.

55. Mr. Pouliot never made a request for additional equipment or extra labor, although he was an experienced driver and should have known that he needed extra equipment and/or labor upon inspecting the Learnline 2000 unit. Depo. of Joseph Rocha, Page 105, Lines 1-18; *See Tab D*; Depo. of William Tweedy, Page 35, Lines 2-4; Page 74, Lines 2-14; *See Tab G*.

56. The driver is the "eyes and ears of the carrier . . . so if a driver finds something that is wrong or amiss in some way, the driver usually picks up the phone [and] calls his dispatcher." Depo. of Terry Morgan, Page 45, Lines 16-20; *See Tab E*.

57. Regarding the accident in question, Mr. Pouliot would have followed the same procedure both unloading and loading the machine had he known the true weight of the Festo unit, even if the machine weighed in excess of 1,000 pounds. Depo. of Shawn Pouliot, Page 197, Lines 2-25; Page 222, Lines 15-24; *See Tab H (June Depo.)*.

58. The accident would not have happened if the correct information had been provided by Festo and Trans-Expo to Arpin. Depo. of V. Paul Herbert, Page 65, Lines 17-20; *See Tab N*.

59. Mr. Pouliot placed himself right behind the Festo machine so that if the machine fell, it would fall right on top of him. Depo. of Irving Ojalvo, Page 99, Lines 6-14; *See Tab M*.

### RELATIONSHIP BETWEEN COMPANIES

60. Trans-Expo International and Arpin Logistics, Inc. signed a Sales Agent Agreement. Depo. of Michael D. Kovac, Page 15, Lines 22-25 *(Attached hereto at Tab O is a copy of all referenced excerpts from the transcript of the deposition of Michael D. Kovac taken on October 23, 2003)*; "Sales Agent Agreement" between Arpin and Trans-Expo, previously identified as Exhibit 21 to Michael D.

    Kovac's deposition (*Attached hereto at Tab P is copy of the "Sales Agent Agreement" between Arpin and Trans-Expo).*

61. At all relevant times to this litigation, Trans-Expo International, was an independent contractor of Arpin Logistics, Inc. Depo. of Michael Montgomery, Page 204, Lines 16-19; *See Tab B*; *See also* Sales Agent Agreement, Page 1, ¶1 (A); *See Tab P*.

62. Trans-Expo International and its employee, Erica Ramires, were acting as independent sales or shipping agents. *See* Plaintiff's Fifth Amended Complaint, Count Seven ¶¶ 5, 9, and 17.

63. Trans-Expo's Sales Agent Agreement with Arpin Logistics, Inc. provides that, "The Sales Agent and/or its employee(s) shall act as an independent contractor to the carrier." In the same section the contract reads in pertinent part, "it being intended that each [party to the contract] shall remain an independent contractor responsible for its own actions." Sales Agent Agreement, Page 1, ¶1 (A); *See Tab P*.

64. Trans-Expo's Sales Agent Agreement with Arpin Logistics, Inc. provides that, "…neither party shall have the authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for its own actions." Sales Agent Agreement, Page 1, ¶1 (A); *See Tab P*.

65. Independent Sales Agents, such as Trans-Expo, call the carrier, Arpin, ask if they can do a delivery, and get a price quote. Depo. of Michael P. Montgomery, Page 19, Lines 5-9; *See Tab B*.

66. The Sales Agent Agreement stipulates that this is a non–exclusive relationship. Sales Agent Agreement, Page 1, Introduction Paragraph 3; *See Tab P*.

67. Arpin and Trans-Expo can and did engage in business transactions with other shippers, carriers, and manufacturers or clients. Depo. of Erica Ramires, Page 7, Lines 8-19; Page 10, Lines 16-24; Page 16, Lines 9-16 *(Attached hereto at Tab Q is a copy of all referenced excerpts from the transcript of the deposition of Erica Ramires taken on October 24, 2003)*; Depo. of Michael Kovac, Page 9, Lines 14-21; Page 15, Lines 5-9 ; Page 38, Lines 4-17; *See Tab O*.

68. Trans-Expo did not work exclusively with Arpin, and conducted business with other companies. Depo. of Michael Kovac, Page 15, Lines 5-9; *See Tab O*.

69. Trans-Expo and Arpin did not share profits or combine their property and money. Instead, according to the terms and conditions of the Sales Agent Agreement, Trans-Expo was paid a commission by Arpin for each job it booked with Arpin. Depo. of Michael P. Montgomery, Page 20, Lines 4-8 ; *See Tab B*; Depo. of

    Michael Kovac, Page 31, Lines 18-22; *See Tab O*; Depo. of Erica Ramires, Page 43, Lines 10-14; *See Tab Q*; Sales Agent Agreement, Page 2, ¶2 D; *See Tab P*.

70. In no event are any transportation payments tendered to the Sales Agent to be deposited to any account of the Sales Agent.  Sales Agent Agreement, Page 2, ¶3 C; *See Tab P*.

71. As the independent sales agent Trans-Expo would book an order for the Trans-Expo client, and then contact Arpin or some other carrier and ask if they could do the delivery. Depo of Michael P. Montgomery, Page 19, Lines 5-9; *See Tab B*.

72. Trans-Expo was solely responsible for contacting the shipper, Festo, to receive and accurately report all shipping information to the carrier. Depo. of Erica Ramires, Page 9, Lines 17-25; Page 10, Lines 1-15; *See Tab Q*; Depo. of Michael Kovac, Page 27, Lines 6-14; *See Tab O*; Depo. of Michael P. Montgomery, Page 20, Lines 17-24; Page 21, Lines 1-24; Page 22, Lines 1-6 ; *See Tab B*.

73. Trans-Expo and its employees handled its duties as sales/shipping agent without supervision or direction from the carrier. Depo. of Erica Ramires, Page 9, Lines 12-25; Page 10, Lines 1-15; *See Tab Q*; Depo. of Michael Kovac, Page 27, Lines 6-14; *See Tab O*; Depo. of Michael P. Montgomery, Page 20, Lines 17-24; Page 21, Lines 1-24; Page 22, Lines 1-6; *See Tab B*.

74. Trans-Expo controlled shipment, including what was listed on its shipping booking form and other shipping documents transmitted to Arpin. Depo. of Michael Kovac, Page 27, Lines 6-14; *See Tab O*; Depo. of Erica Ramires, Page 7, Lines 8-15; Page 9, Lines 17-25; Page 10, Lines 1-15; *See Tab Q*.

75. Trans-Expo maintained and worked from its own facilities in California. Depo. of Erica Ramires, Page 9, Lines 6-7; *See Tab Q*.

76. Trans-Expo also utilized their own employees and tools of the trade, such as forms, telephone, fax machine, and computer to carry out this work. Depo. of Erica Ramires, Page 9, Lines 8-20; *See Tab Q*.

77. Trans-Expo had no say in how the carrier and the driver handled the actual pickup, transport, and delivery of an item. Depo. of Joseph Rocha, Page 4, Lines 23-24; Page 5, Lines 1-6; *See Tab D*.

78. Arpin decided which one of its trucks to use, loaded the equipment, and chose the driver to pickup and deliver the freight. Depo. of Joseph Rocha, Page 17, Lines 3-21; Page 19, Lines 14-24; Page 20, Lines 1-24 ; Page 21, Lines 1-24; Page 165, Lines 1-5; *See Tab D*; Depo. of Michael P. Montgomery, Page 33, Lines 13-20; Page 52, Lines 7-14; Page 56, Lines 1-10; *See Tab B*.

79. The driver is responsible for making sure that the freight is properly loaded. Depo. of Joseph Rocha, Page 46, Lines 21-24; Page 47, Lines 1-6. *See Tab D*.

80. Arpin dispatch is responsible for monitoring the truck and confirming the freight is delivered. Depo. of Michael P. Montgomery, Page 52, Lines 7-14; *See Tab B*.

81. Trans-Expo had no control over Arpin facilities, trucks, and moving equipment. Depo. of Michael P. Montgomery, Page 56, Lines 2-14; *See Tab B.*

82. Arpin used other agencies in order to book deliveries, and did not use Trans-Expo exclusively. Depo. of Michael P. Montgomery, Page 27, Lines 10-21; *See Tab B.*

83. Here, the shipper of the Learnline 2000 Unit, Festo, needed the unit to be moved from Hauppauge, N.Y. to Waterbury, Connecticut. Depo. of Erica Ramires, Page 19, Lines 14-25; Page 20, Lines 1-4; *See Tab Q*.

84. Trans-Expo obtains the shipping information and then contacts another independent contractor, Arpin, and asks if they can move the unit. Depo. of Michael Montgomery, Page 19, Lines 1-9; *See Tab B*.

85. Festo's one and only interest was to have their Learnline 2000 Unit moved to Naugatuck Community College without any damage. Depo. of Erica Ramires, Page 19, Lines 14-25; Page 20, Lines 1-4; *See Tab Q*.

86. Festo used Trans-Expo only if it quoted the best price for the job. Depo. of Cheryl Sabatelli, Page 19, Lines 6-14 *(Attached hereto at Tab R is a copy of all referenced excerpts from the transcript of the deposition of Cheryl Sabatelli taken on March 29, 2004).*

87. Trans-Expo's interest was to make money by finding clients like Festo. Depo. of Erica Ramires, Page 43, Lines 7-14; *See Tab Q*.

88. Arpin's interest was to make money by doing the actual moving for various clients. Depo. of Michael P. Montgomery, Page 19, Lines 5-9; *See Tab B*.

89. It was not important to Festo that Trans-Expo acted as shipper/sales agent or that Arpin was the company that did the actual delivery. Depo. of Cheryl Sabatelli, Page 19, Lines 6-14; *See Tab R*.

90. Festo paid to have a service performed by these two independent contractors. Depo. of Cheryl Sabatelli, Page 19, Lines 6-14; *See Tab R*.

Defendants Paul Arpin Van Lines, Inc. and
Arpin Logistics, Inc.,
By their attorneys:

_____

Thomas J. Grady, Esq. CT 17139
LENIHAN, GRADY & STEELE
6 Canal Street, P.O. Box 541
Westerly, R.I.  02891
(401) 596-0183
(401) 596-6845 (Fax)
tjg@aol.com


_____

Harold J. Friedman, Esq. CT 23785
Karen Frink Wolf, Esq. CT 26494
FRIEDMAN GAYTHWAITE WOLF &
LEAVITT
Six City Center, P.O. Box 4726
Portland, ME  04112-4726
(207) 761-0900
(207 761-0186 (Fax)
hfriedman@fgwl-law.com
kwolf@fgwl-law.com

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via U.S. First Class Mail this 15th day of December, 2004 to the following:

Michael A. Stratton, Esq.
Stratton Faxon
59 Elm Street
New Haven, CT  06510

Thomas J. Grady, Esq.
Lenihan Grady & Steele
6 Canal Street
PO Box 541
Westerly, RI 02891-0541
401-596-0183

James R. Oswald, Esq.
Adler, Pollock & Sheehan
2300 BankBoston Plaza
Providence, RI  02903

Susan O'Donnell, Esq.
Halloran & Sage
One Goodwin Sq., 225 Asylum St.
Hartford, CT  06103

Roland F. Moots, Jr., Esq.
Moots, Pellegrini, Spillane & Mannion
46 Main Street, PO BOX 1319
New Milford, CT 06776-1319

_____
Karen Frink Wolf, Esq. CT 26494