UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWN POULIOT | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:02 CV 1302 (JCH) |
| | : | |
| v. | : | JUDGE JANET C. HALL |
| | : | |
| PAUL ARPIN VAN LINES, INC. et al. | : | |
| | : | July 30, 2005 |
| Defendants | : | |

### *DEFENDANTS PAUL ARPIN VAN LINES, INC.'S AND ARPIN LOGISTICS, INC.'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES, ANTHONY M. GAMBOA, JR., Ph.D., GARY M. CRAKES, Ph.D., AND LAWRENCE S. FORMAN, WITH INCORPORATED MEMORANDUM OF LAW*

Defendants Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc. (hereinafter collectively "Arpin") hereby move *in limine* to preclude the testimony of Plaintiff's expert damages witnesses Anthony M. Gamboa, Jr., Ph.D.; Gary M. Crakes, Ph.D., and Lawrence S. Forman at trial. None of these proffered experts' testimony meets the *Daubert* requirements for admissibility. In addition, as set out in Arpin's separate motion *in limine* to preclude Dr. Crakes's testimony, filed simultaneously, Dr. Crakes's testimony should be excluded based on Plaintiff's representation to the Court that he would not use Dr. Crakes as an expert witness in this action. Moreover, Mr. Forman's testimony on Plaintiff's future care needs should be precluded under Fed. R. Evid. 403 because Plaintiff has not disclosed an expert who will testify about the present value of the cost of those future care needs and, absent such evidence, any probative value of Mr. Forman's testimony regarding the cost of Plaintiff's life care plan is substantially outweighed by the danger of confusion of the issues or of misleading the jury as to the value of Plaintiff's claim for damages.

*ORAL ARGUMENT REQUESTED*

**PLAINTIFF'S DAMAGES EXPERTS'
QUALIFICATIONS AND PROPOSED EVIDENCE**

1. **Anthony M. Gamboa, Jr., Ph.D.**

Plaintiff disclosed Dr. Gamboa as an expert in "vocational economics," who will testify about (a) Plaintiff's vocational impairments and abilities; (b) the difference between Plaintiff's before and after accident work capacity; (c) the present value of Plaintiff's economic losses; and (d) the present value of Plaintiff's life care needs and plan. *See* Plaintiff's Disclosure of Expert Witnesses dated June 28, 2004 (attached hereto as Exhibit A). Dr. Gamboa testified at his deposition that he was retained in this case to define the effect Plaintiff's injuries would have on his lifetime capacity to work and earn money and to do a present value calculation on the life care plan developed by Dr. Robert L. Thompson, a physiatrist working for Dr. Gamboa's company, Vocational Economics, Inc. Deposition of Anthony M. Gamboa, Jr., Ph.D. taken October 12, 2004 ("Gamboa Dep."), at pp. 100-102 (referenced excerpts from Dr. Gamboa's deposition are attached as Exhibit B hereto).

Dr. Gamboa's undergraduate degree is in Education. Gamboa Dep. at p. 15. He has a Master's in Education and Guidance and Counseling. Gamboa Dep. at p. 15. His doctorate is in Guidance and Counseling. Gamboa Dep. at p. 15. He has an M.B.A., which he obtained in order to better manage and plan Vocational Economics, Inc. Gamboa Dep. at p. 18. He does not have a degree in either vocational rehabilitation or economics.

2. **Gary M. Crakes, Ph.D.**

Although, to date, Plaintiff has not provided Arpin with a copy of Dr. Crakes's *curriculum vitae*, according to his January 7, 2004 expert disclosure, a copy of which is

2

attached as Exhibit C hereto, Dr. Crakes is an economist who was to have testified about Plaintiff's loss of earnings and lost earning capacity.[1]  As noted in Arpin's separate motion *in limine* to preclude Dr. Crakes's testimony, filed simultaneously, Plaintiff previously represented to the Court that he would not use Dr. Crakes as an expert witness in his case.

    **3.**    **Lawrence S. Forman**

Plaintiff disclosed Mr. Forman as a rehabilitation expert who will be testifying about (a) Plaintiff's need for future care, treatment, and living assistance; and (b) the costs associated with those needs.  *See* Plaintiff's Disclosure of Experts, dated December 15, 2003 (attached as Exhibit D hereto).  Mr. Forman has a bachelor's degree in sociology, a master's degree in education, and a law degree.  Mr. Forman is not an economist.  Deposition of Lawrence S. Forman, taken April 2, 2004 ("Forman Dep."), at p. 168. (referenced excerpts from Mr. Forman's deposition are attached as Exhibit E hereto).

## APPLICABLE LAW

The Federal Rules of Evidence permit opinion testimony by an expert witness when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  In federal courts, the admissibility of expert testimony under Fed. R. Evid. 702 is determined in accordance with the standard set forth by the U.S. Supreme Court in

---

[1] Dr. Crakes's March 27, 2003 Report also includes an opinion on the value of Plaintiff's future care costs; however, Plaintiff's January 7, 2004 expert disclosure did not identify him as a testifying expert on that issue.  *See* Exhibit C.

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993).[2]  *Daubert* held that Rule 702 imposes a "gate keeping" responsibility on federal trial courts, requiring judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.  To fulfill that role, courts must assess both:  (1) scientific reliability — "whether the reasoning or methodology underlying the testimony is scientifically valid," and (2) relevance or "fitness" — "whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.  Factors to be considered include whether the expert's theory "can be (and has been) tested," the "known or potential rate of error," whether the theory "has been subjected to peer review and publication," and whether the theory has "[w]idespread acceptance." *Id*. at 593-94.

Thus, the *Daubert* touchstones for admissibility of expert testimony are reliability and relevance.  Under *Daubert*, expert testimony is not admissible unless there is "a valid scientific connection to the pertinent inquiry," so that the expert's reasoning can properly "be applied to the facts in issue." *Id.* at 592-93.[3]  The proponent of the expert testimony

---

[2] *Daubert* was expanded in *Kumho Tire  Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) to include not only scientific expert evidence but also technical or other specialized expert evidence.  In *Kumho*, the Court also decided that the trial court had the discretion to apply any one of the *Daubert* factors to nonscientific expert testimony in the same manner as in considering the admissibility of scientific based expert testimony.  *Kumho Tire*, 526 U.S. at 152-53.

[3] This Court has set out a three-part test for the admissibility of expert testimony under Rule 702 and *Daubert*:

> First, the court must consider whether "the testimony is based upon sufficient facts and data."  Second, the testimony must be the product of reliable principles and methods.  Finally, the witness must show that he has applied the principles and methods reliably to the facts of the case.  The purpose of the court's inquiry is to protect the courtroom from "junk science while admitting reliable expert testimony that will assist the trier of fact."

*Dunn v. Zimmer, Inc.*, No. 2:00CV1306 (DJS), 2005 WL 563096 (D. Conn. March 4, 2005), quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  *See also Pugliano v. United States*, 315 F. Supp. 2d 197, 199 (D. Conn. 2004) ("The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusions, *et alia*.  In deciding whether a step in an expert's analysis is reliable, the court

4

at issue has the burden to establish its admissibility "by a preponderance of proof." *Id.* at 593.

Under *Daubert*, trial judges are charged with ensuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Judges must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

*Daubert* recognizes that the "gate keeping" function of the trial judge is necessary because of the effect that expert testimony about complex scientific issues can have on a jury. *Daubert* stated that expert testimony is subject to such judicial scrutiny because it "can be both powerful and quite misleading" to jurors. *Daubert*, 509 U.S. at 595. In this case, where Plaintiff's unfortunate circumstances make him especially sympathetic, the gatekeeper's vigilance is particularly important.

## ARGUMENT

**1.    The Court should exclude Dr. Gamboa's testimony.**

Plaintiff disclosed Dr. Gamboa as an expert in "vocational economics," who will be testifying about (a) Plaintiff's vocational impairments and abilities; (b) the difference between Plaintiff's before and after accident work capacity; (c) the present value of Plaintiff's economic losses; and (d) the present value of Plaintiff's life care needs and plan. *See* Exhibit A.

---

must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand").

### a. Dr. Gamboa's opinions on Plaintiff's vocational impairments and work capacity do not meet *Daubert*'s standards for admissibility.

In his July 30, 2004 report, Dr. Gamboa offered the opinion that "[a]s a result of injury, Mr. Pouliot is unable to perform any type of substantial, gainful work activity and, therefore, is 100% occupationally disabled." Vocational Economic Assessment for Shawn Pouliot, dated July 30, 2004 ("Gamboa Rept."), at p. 5. (Dr. Gamboa's July 30, 2004 report is attached hereto as Exhibit F). The basis for Dr. Gamboa's opinions on Plaintiff's vocational impairments and work capacity was Dr. Gamboa's own "Vocational Economic Rationale," which he developed and which he and his employees at Vocational Economics, Inc. apply in evaluating any case. Gamboa Rept., Vocational Economic Rationale, at p. 1; Gamboa Dep. at pp. 29, 33, 60, 169. Because Dr. Gamboa and his employees are the only ones who use the Vocational Economic Rationale, it has been neither tested nor subjected to peer review and publication. As such, Plaintiff cannot meet his burden of demonstrating that the Vocational Economic Rationale is a valid methodology as required under *Daubert*.

In the Vocational Economic Rationale, Dr. Gamboa asserts that:

> Two facts exist for persons with a disability. The first is that, on average, when such persons work year-round, full-time, they earn less than counterparts without a disability. Second, they experience lower levels of market participation and employment…These two facts combine to produce a probable reduction of lifetime expected earnings for persons with a disability.

Gamboa Rept., Vocational Economic Rationale, at p. 4. Dr. Gamboa goes on to state that support for these two "facts" is found in the Current Population Survey, the Survey of Income and Program Participation, and the "research conducted by numerous forensic researchers." *Id.* Dr. Gamboa's only analysis of the data and research on which he bases

6

his Vocational Economic Rationale is his assertion that "all known research on the subject shows that disability negatively affects earnings and employment rates." Gamboa Rept., Vocational Economic Rationale, at p. 5.

The Vocational Economic Rationale fails to set out any kind of reliable methodology; at most it is Dr. Gamboa's summary of selected research and of information contained in various work force surveys, applied without consideration of Plaintiff's particular circumstances. Where, as here, an expert merely provides cursory conclusions reached in some of the research on which he or she claims to have relied, the court may exclude that expert's opinions. *Pugliano v. United States*, 315 F. Supp. 2d 197, 200 (D. Conn. 2004).

      **b.** **Dr. Gamboa lacks the qualifications necessary to give expert opinions on the present value of Plaintiff's economic loss and future care needs.**

Dr. Gamboa does not have the knowledge, skill, experience, training, or education required under Fed. R. Evid. 702 of an expert proffered to give expert opinions on the present value of a plaintiff's economic loss and future care needs. Dr. Gamboa's undergraduate degree is in Education. Gamboa Dep. at p. 15. He has a master's in Education and Guidance and Counseling. Gamboa Dep. at p. 15. His doctorate is in Guidance and Counseling. Gamboa Dep. at p. 15. He has an M.B.A., which he obtained only in order to better manage and plan his business, Vocational Economics, Inc. Gamboa Dep. at p. 18. He does not have a degree in economics. Because Dr. Gamboa lacks the qualifications of an economist, this Court must exercise its "gate keeping" function by precluding Dr. Gamboa's testimony on the present value of a plaintiff's economic loss and future care needs.

      **c. <u>Dr. Gamboa's opinion on the present value of the cost of Plaintiff's future care needs should be excluded because it is based on a life care plan prepared by a witness who will not testify at trial.</u>**

    Despite his lack of qualifications as an economist, Dr. Gamboa provided Plaintiff with a present value calculation for the cost of a life care plan prepared by Dr. Robert L. Thompson, a physiatrist who consulted with Vocational Economics, Inc. Gamboa Dep. at pp. 30-32, 102, 105-106. Dr. Gamboa was not involved in the preparation of Dr. Thompson's life care plan; nor did he contribute to defining the cost of the kinds or degree of services or treatment Dr. Thompson called for under that plan. Gamboa Dep. at p. 106.

    Plaintiff does not intend to call Dr. Thompson as a witness at trial. *See* Plaintiff's List of "Definite" and "May Call" Witnesses, attached hereto as Exhibit G. Because Dr. Thompson will not be testifying, Dr. Gamboa should be precluded from testifying as to the cost of future care and rehabilitation. Dr. Gamboa was not involved in evaluating Plaintiff's future medical and rehabilitative needs. In Dr. Thompson's absence, Dr. Gamboa's opinion on the present value of the cost of Plaintiff's future care needs has no foundation and must be excluded.

    **2.     <u>Dr. Crakes's testimony must be excluded.</u>**

      **a. <u>Plaintiff represented to the Court that Dr. Crakes would not be an expert witness in this matter.</u>**

    As noted in Arpin's separate motion *in limine* to preclude Dr. Crakes's testimony, filed simultaneously, Plaintiff previously represented to the Court that he would not use Dr. Crakes as an expert witness in his case. The Court should hold Plaintiff to his representation by precluding Dr. Crakes's testimony at trial.

## b. **Dr. Crakes's opinions lack reliability under the *Daubert* standard because he misapplied the discount rate to Plaintiff's economic loss calculation.**

Dr. Crakes's opinions on Plaintiff's economic loss, as set out in his March 27, 2003 report, attached as part of Exhibit C hereto, are excessive because they were not properly discounted to present value. Future damages "must be discounted to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future." *Ramirez v. New York City Off-Track Betting Corp.,* 112 F.3d 38, 41 (2d Cir. 1997). Accordingly, the court should preclude Dr. Crakes from testifying, or mandate that he apply the appropriate discount rate to the economic losses.

Dr. Crakes committed a crucial error by failing to discount his calculations to present value at a proper discount rate. Instead, he assumed that the future average annual rate of growth of earnings would be equal to the discount rate, an approach that disregards sound economic principles. Properly discounting damages to present value is a matter of enormous significance because Plaintiff is a young man and thus, Dr. Crakes was projecting numbers for a very long period of time.

Dr. Crakes provided no sound economic data for his use of a 0% discount rate in calculating Plaintiff's vocational losses. In calculating lost future earning capacity, Dr. Crakes affirmatively acknowledged that the jury's award must take into account present value considerations. However, because he assumed that the future average annual rate of growth of earnings would be equal to the discount rate[4], he did not reduce his projected economic loss at all. Thus, Dr. Crakes's claims of "discounting" his numbers

---

[4] *See* Dr. Crakes's March 27, 2003 report (attached hereto as part of Exhibit C), at p. 4.

9

to present value are illusory. *See Marshall v. Kleinman,* 186 Conn. 67, 72 (1982). As shown below, given the absence of evidence supporting a 0% discount rate, estimated damages based on significantly less than a 2% discount rate are excessive, as a matter of law.

The time value of money would create an artificial benefit for a plaintiff receiving an award representing future incremental wages, if that award were not discounted to its present value. The discount rate is a response to that rate of return that a plaintiff will likely obtain. There are only two Connecticut Supreme Court decisions addressing the subject of discount rates. *See Mather v. Griffin Hosp.,* 207 Conn. 125, 138 (1988); *Kiniry v. Danbury Hosp.,* 183 Conn. 448, 462-64 (1981). The discussion in each is cursory, and neither is controlling here.

In *Kiniry,* there was no economic testimony. On appeal, the parties apparently made discount calculations concerning the plaintiff's earning capacity: the defendant at approximately 1½% to show the verdict was excessive, and the plaintiff at 0% to show it was not. *Kiniry*, 183 Conn. at 462-64. The *Kiniry* court noted that when the case was decided 0% reflected the current real rate of interest because the country had just gone through an extraordinary period of high inflation. However, the time period in which *Kiniry* was decided involved short-term economic aberrations. Thus, *Kiniry* has no application to the present case.

In *Mather,* only the plaintiff submitted economic testimony and the plaintiff's economist used a 0% discount rate for loss of earning capacity and cost of home health care. *Mather*, 207 Conn. at 145. While *Mather* is critical of the defendants for not presenting economic testimony of their own, the core of the reasoning rejecting the

10

defendants' argument for a 2% discount rate is as follows:

> The hospital urges us to adopt the so-called adjusted discount rate method using an interest rate of 2 percent, which, the hospital alleges, results in a "real rate of interest." The hospital offers no reason for preferring the adjusted discount rate method other than that it has been used by some federal courts, and that it results in a lower damages award. <u>The hospital has directed our attention to no case or other authority in which Kenison's method of [0%] has been discredited or rejected</u>.

*Id.* at 146 (emphasis added).

Indeed, the great weight of authority since *Mather*, from economists and courts, rejects as economically unsound a 0% discount rate and Dr. Crakes's total offset method. Dr. Ward Curran, a Trinity College economics professor, has recently discussed in exhaustive detail the factors that go into determining a proper discount rate and has shown that a 0% rate is unsupportable. Ward S. Curran, "Present Value Analysis in Estimating Damages in Torts," 72 CONN. B.J. 375, 387-88, 396-406 (1998) (hereinafter "Curran"). As Professor Curran shows, over long periods of time (such as in this case) and based on government statistics, safe market interest exceeds inflation by an average of about 2%. *Id*. at 399-403 (citing Ibbotson Associates, STOCKS BONDS BILLS AND INFLATION (1996)).[5] In a detailed analysis, Dr. Rolando F. Pelaez has similarly concluded that the total offset rule utilized by Dr. Crakes "simplifies the calculation of damage awards by assuming equality between inflation and nominal interest, <u>ignoring a century of reasoning and empirical evidence</u>." Rolando F. Pelaez, "Pennsylvania's Offset Rule: Fantasy Masquerading as Economics," 5 J. Leg. Econ. 1, 8 (1995) (emphasis added).[6]

---

[5] These statistics are corroborated in the 1999 edition of the same publication.

[6] One of the principal defects in Dr. Crakes's 0% discount rate is that it is based on shorter term risk-free securities, such as federal treasury bills. As Professor Curran points out, risk-free assets do not need to be

11

As Professor Curran concludes, a real rate of interest 2% provides an economically sound determination of present value of future damages that ensures against over-compensation. This concept is embraced by the numerous cases decided in other jurisdictions since *Mather*. The discount law in the Second Circuit is particularly well-developed since *Mather*. In fact, two months after *Mather*, the Second Circuit decided *Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742 (2d Cir. 1988) (Newman, J.), in which the court held that not only future earnings but also future pain and suffering must be discounted to present value, *id*. at 749-52, and in which the court noted that a 2% discount rate was supported by "considerable historical data." *Id.* at 746. Because the trial court had not properly discounted the jury's verdict of future damages by 2%, the Second Circuit reversed and remanded for further proceedings.[7]

The Second Circuit also discussed the proper method of setting an appropriate adjusted discount rate in *Doca v. Marina Mercante Nicaraguense, S.A*. After a comprehensive discussion of the economic factors it deemed relevant, the court reasoned that an adjusted discount rate of 2% was an accurate estimate of the true value of money for computing the present value of lost future wages. *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39 (2d Cir. 1980); *see also Ferrarelli v. U.S.*, 1992 WL 893461 at * 55 (E.D. N.Y. Sept. 24, 1992) ("when . . . projections are combined, the adjusted discount rate of 2%, which was favored by the Second Circuit, is generated.").

Arpin acknowledges that a minority of courts do hold that, in the absence of evidence on discount rates, it is proper for the jury not to discount future

---

all shorter term, especially when the function of a damage award is to replace a stream of earnings over a number of years. Curran at 402-04. Since shorter term rates are almost always lower than longer term rates, Dr. Crakes's methodology artificially lowers the discount rate.

[7] The trial court had ordered a discount of 2% *in toto* (not per annum).

damages to present value. *See Kasper v. Saint Mary of Nazareth Hosp.,* 135 F.3d 1170 (7th Cir. 1998); *Meader v. United States,* 881 F.2d 1056 (11th Cir. 1989). On the contrary in this case, through Defendants' expert economist, Allan McCausland, Ph.D., there is compelling evidence on the application of discount rates. *See* Report of Allan McCausland, Ph.D., attached as Exhibit H; and Dr. McCausland's letter dated February 16, 2005, attached as Exhibit I. Moreover, the majority view makes particular sense here, where Dr. Crakes gave only vague justification for his conclusion that no discount rate was necessary. *See* Dr. Crakes's March 27, 2003 Report at p. 4.[8]

With the wealth of decisions and economic commentary since *Mather*, this Court should reject Dr. Crakes's discount rate method. Accordingly, Arpin requests that the Court preclude Dr. Crakes from testifying. In the alternative, the Court should mandate that Dr. Crakes apply the appropriate discount rate of 2% to Plaintiff's economic loss.

3. **Mr. Forman's testimony on Plaintiff's future care needs should be precluded because no economic expert will testify about the present value of the cost of those future care needs.**

As noted above, future damages, including future care needs, must be assigned a present value "to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future." *Ramirez*, 112 F.3d at 41. Economic evidence regarding the lump sum present value of the cost of his life care plan is a necessary element of Plaintiff's case. *See Androutsakos v. MV Psara*, No. 02-1173-KI, 2004 WL 1588224, *11 (D. Or. July 13, 2004). Plaintiff, however, has failed to disclose an expert economist who will provide that evidence.

---

[8] In calculating lost future earnings, he also apparently ignored the risk of death before age 65. *Id.*, at p. 3.

Dr. Crakes's March 27, 2003 report includes an opinion on the present value of Plaintiff's future care costs based on Mr. Forman's life care plan; however, Plaintiff's January 7, 2004 expert disclosure did not identify Dr. Crakes as a testifying expert on that issue. Moreover, given Plaintiff's representation to the Court that he would not be using Dr. Crakes as an expert witness in this case, Dr. Crakes should be precluded from testifying on any issue at trial. In addition, even if the Court were to find, over Arpin's objection, that Dr. Gamboa is qualified to offer an opinion on the present value of Plaintiff's future care needs, the fact is that Dr. Gamboa calculated the cost of Dr. Thompson's life care plan, <u>not Mr. Forman's</u>. Gamboa Dep. at pp. 102, 105. Thus, in addition to there being no foundation for his testimony, Plaintiff completely failed to designate and disclose during discovery, as required by the Scheduling Order, that Dr. Gamboa had even calculated the value of Mr. Forman's life care plan.

Mr. Forman cannot offer an opinion on the present value of his life care plan himself because he lacks the knowledge, skill, experience, training, or education required under Fed. R. Evid. 702 of an expert proffered to give expert economic opinions. Mr. Forman has a bachelor's degree, a master's in education, and a law degree; he is not an economist. Forman Dep., at p. 168.

Plaintiff cannot offer the necessary expert testimony on the present value of Mr. Forman's life care plan. Absent evidence about the present value of the cost of Plaintiff's future care needs, any probative value Mr. Forman's testimony regarding the cost of Plaintiff's life care plan has is substantially outweighed by the danger of confusion of the issues or of misleading the jury as to the value of Plaintiff's claim for damages. For this reason Mr. Forman's testimony should be precluded under Fed. R. Evid. 403.

**CONCLUSION**

The opinions of Plaintiff's expert damages witnesses Anthony M. Gamboa, Jr., Ph.D., Gary M. Crakes, Ph.D., and Lawrence S. Forman, wholly fail to pass muster under the *Daubert* standard for the admissibility of expert testimony. In addition, Dr. Crakes's testimony should be excluded based on Plaintiff's representation to the Court that he would not use Dr. Crakes as an expert witness in this action. Finally, Mr. Forman's testimony on Plaintiff's future care needs should be precluded under Fed. R. Evid. 403 because, in the absence of any expert testimony on the present value of Mr. Forman's life care plan, any probative value Mr. Forman's testimony has is substantially outweighed by the danger of confusion of the issues or of misleading the jury as to the value of Plaintiff's claim for damages.

For all of the foregoing reasons, Arpin respectfully requests that this Court exclude Dr. Gamboa, Dr. Crakes, and Mr. Forman as expert witnesses on behalf of Plaintiff at trial.

Dated this 30th day of July, 2005.

        Respectfully submitted,

        /s/ Karen Frink Wolf
        Harold J. Friedman, Esq. CT 23785
        Karen Frink Wolf, Esq. CT 26494
        FRIEDMAN GAYTHWAITE WOLF & LEAVITT
        Six City Center, P.O. Box 4726
        Portland, ME  04112-4726
        (207) 761-0900
        (207 761-0186 (Fax)
        hfriedman@fgwl-law.com
        kwolf@fgwl-law.com

CERTIFICATE OF SERVICE

      This is to certify that a copy of the foregoing was mailed via U.S. First Class Mail this 30th day of July, 2005 to the following:

| | |
|---|---|
| Michael A. Stratton, Esq.<br>Stratton Faxon<br>59 Elm Street<br>New Haven, CT 06510 | Roland F. Moots, Jr., Esq.<br>Moots, Pellegrini, Spillane & Mannion<br>46 Main Street, PO BOX 1319<br>New Milford, CT 06776-1319 |
| Thomas J. Grady, Esq.<br>Lenihan Grady & Steele<br>6 Canal Street<br>PO Box 541<br>Westerly, RI 02891-0541 | |

                                                      /s/ Karen Frink Wolf
                                      Karen Frink Wolf, Esq. CT 26494