EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT,                          :
                                        :
           Plaintiff                    :
                                        :
v.                                      :  Civil Action No.
                                        :  3:02 CV 1302 (DIS)
PAUL ARPIN VAN LINES, INC.;             :
ARPIN LOGISTICS, INC.; THE              :
FESTO CORPORATION; MICHAEL              :
D. KOVAC d/b/a TRANS-EXPO               :
INTERNATIONAL, ERICA RAMIREZ,:
IN HER CAPACITY AS AN                   :
EMPLOYEE OF TRANS-EXPO                  :
INTERNATIONAL,                          :
                                        :
           Defendants.                  :

- 0 -

DEPOSITION OF ANTHONY M. GAMBOA, JR., Ph.D.

- 0 -

The deposition of ANTHONY M. GAMBOA, JR., Ph.D., taken before Andrea B. Grant, Court Reporter and Notary Public in and for the Commonwealth of Kentucky, on the 12th day of October, 2004, beginning at the hour of 10:20 A.M. at the Summit Executive Suites, 4350 Brownsboro Road, Suite 110, Louisville, Kentucky 40207.

- 0 -

A B GRANT & ASSOCIATES
Court Reporters & Legal Videographers
P.O. Box 437106
Louisville, KY  40253-7106
(502) 262-2580  Fax (502) 254-7030
Toll Free 1 (877) 582-2400

15

1      A      Same location, yes.
2      Q      And you got a B.S. in Education
3   with a major in English, right?
4      A      Yes.
5      Q      And so you got a -- really, a
6   teaching education, you were certified to be a
7   teacher coming out of there?
8      A      Yes. I believe you just said
9   with a major in English. The minor was in
10  English. The major was in History.
11     Q      Okay. And then you went to the
12  University of Miami at Ohio and obtained a
13  Masters in Education in Guidance and
14  Counseling; is that right?
15     A      Yes.
16     Q      And that took a year?
17     A      Yes.
18     Q      And then you went for your Ph.D.
19  in Guidance and Counseling?
20     A      Yes.
21     Q      And that took three years; is that
22  right?
23     A      Yes.
24     Q      That's Ohio State you went to?
25     A      Yes.

18

```
 1    in the curriculum vitae.  There's nothing in
 2    addition to that.
 3         Q    And you graduated with a degree
 4    from Chicago in business, right?
 5         A    Yes.
 6         Q    You got an MBA.
 7         A    Yes.
 8         Q    You're a businessman.
 9         A    I own a business, so that makes
10    me a businessman, yes.
11         Q    Right.  And that's what you set
12    out to be.
13         A    No, it's not.
14         Q    Well, why did you go to the
15    University of Chicago, School of Business?
16         A    I went to the University of
17    Chicago, School of Business to enable myself
18    to better manage and plan the company that was
19    in the process of growing.
20         Q    That was your business, right?
21         A    Yes.
22         Q    Now, attached to this exhibit is
23    a 22-page list of cases that you worked on in
24    the last four years.  Is it fair to say that
25    you're a professional expert witness?
```

```
 1      interpretation of what I said.  Otherwise, I
 2      wouldn't have made the comment that I did with
 3      regard to the rubber stamp reference.
 4           Q      He did not play any meaningful
 5      part in any of the analytical work that was
 6      done for Mr. Pouliot in the workup on this
 7      case, correct?
 8           A      That is correct.
 9           Q      All he did was review the report
10      that you prepared - -
11           A      The findings, yes.
12           Q      - - and determined that it was
13      done in accordance with your procedures.
14           A      Precisely.
15           Q      And so what you're telling me is
16      that substantively he really didn't have
17      anything to do with this project.
18           A      I suppose that depends on how you
19      define substance, but we've certainly
20      established his role and function on it in
21      terms of signing the report.
22           Q      And did you write the report?
23           A      No.
24           Q      Who wrote the report?
25           A      The report is - - well, the
```

30

1    report has been written by a number of people.
2    The vocational economic rationale is a product
3    of maybe five or six people.
4                I initially wrote the rationale
5    maybe about, oh, seven or eight, nine years
6    ago, but since then that rationale has been
7    revised, I'm going to estimate for you, three
8    or four times.
9                So the rationale, itself, the
10   methodology that we employ, probably has
11   involved maybe six or seven people besides
12   myself.
13        Q    So did I understand you correctly
14   that the last five years or so that you've
15   been using that rationale?
16        A    Well, the rationale that's a part
17   of this report has been used, I'm going to
18   estimate for you, maybe for the past -- for
19   the past year.
20        Q    Past year?
21        A    That's what I would estimate, yes.
22        Q    Okay. We'll come back to that.
23   Now, please explain the relationship between
24   Vocational Economics, Inc. and Dr. Thompson.
25        A    Dr. Thompson is a consultant to

```
 1      Vocational Economics.  He is a contract
 2      employee.  He is not employed by the company
 3      per se.  He simply contracts with us on a
 4      case by case basis.
 5                  He's been with us for, I'd say,
 6      maybe four, five, six months.  We made a
 7      decision at the beginning of the year to
 8      retain the services of two physicians to
 9      assist with life care planning.
10          Q       Prior to that time, were you
11      doing it without physicians?
12          A       Yes, we've been doing life care
13      plans for about 10 years.  We've had
14      registered nurses primarily involved in
15      putting life care plans together.  We've also
16      had some life care plans put together by
17      rehabilitation professionals, not M.D.s, but
18      Ph.D.s.
19          Q       So is it fair to say that, in the
20      exercise of your vocational economic function,
21      you hire the doctor to work for you?
22          A       Vocational Economics retains a
23      medical doctor - -
24          Q       Right.
25          A       - - to produce life care plans,
```

1    in some instances not to necessarily give the
2    testimony but simply to work directly with the
3    nurse in putting together the life care plan.
4         Q    And so he works for Vocational
5    Economics.
6         A    On a contractual basis, that's
7    right.
8         Q    Right. Now, you know, of course,
9    that Dr. Thompson is not Board certified,
10   right?
11        A    You know, I would have to look at
12   his resume to answer that question. I don't
13   know the answer to the question.
14        Q    Have you ever discussed that with
15   him?
16        A    No, I haven't.
17        Q    Never discussed it with him?
18   Have you seen his resume?
19        A    Which question would you like me
20   to answer? The first?
21        Q    You indicated you never discussed
22   it with him, right?
23        A    Yes, that's correct.
24        Q    And then I asked you if you've
25   seen his resume.

33

```
 1          A      I have.
 2          Q      Do you know what the requirements
 3   are to be Board certified?
 4          A      Only in a general sense.  I'm not
 5   a medical doctor, so I'm not as familiar as a
 6   medical doctor would be with that issue.
 7          Q      That was not one of your
 8   inquiries when you hired him?
 9          A      Correct.
10          Q      You didn't ask him if he was Board
11   certified?
12          A      I never did.
13          Q      And Terri Petruska - -
14          A      Petruska.
15          Q      - - Petruska, she is an employee
16   of yours?
17          A      She is, a contract employee.
18          Q      And when you say contract
19   employee, I understand you to mean on a case
20   by case basis.
21          A      Your understanding is correct.
22          Q      You give her a 1099 at the end
23   of the year.
24          A      Correct.
25          Q      And she's been with your company
```

1   what do those employment levels look like
2   based on this person's gender and level of
3   educational attainment and based on their
4   labor market access.
5           Well, that's an area that I don't
6   consider to fall within the purview of medical
7   doctors.  I don't believe that if you asked a
8   medical doctor, what's the probability of
9   employment for a 29-year-old male with a
10  severe work disability they would be able to
11  say to you .19.  I don't believe they have
12  that knowledge.
13          Now, maybe some of them do, but
14  I've yet to see one that does.
15  Q       Isn't this Vocational Economic
16  Rationale a legal opinion?
17  A       No, it's an expert vocational
18  economic opinion.  Or, excuse me, it's not
19  even that.  It's not an opinion at all.  The
20  Vocational Economic Rationale is nothing more
21  than the methodology that we employ in
22  examining all cases.
23  Q       But the methodology that you
24  employ is based upon your interpretation of
25  law, is it not?

100

1         That's the sense that I have from
2    the interview.
3         MR. GRADY:  I don't have any more
4         questions at this time.
5         (OFF THE RECORD)
6         MR. OSWALD:  Mr. Gamboa, my name
7         is Jim Oswald.  I'm going to try to not
8         rehash the stuff that we've already
9         done, just kind of following up.
10   BY MR. OSWALD:
11        Q    Now, you were retained to provide
12   an expert opinion in this case, correct?
13        A    Yes.
14        Q    When were you retained?
15        A    June 23 of 2004.
16        Q    And you just said you were
17   retained to provide an expert opinion.  What
18   was your understanding at the time of the
19   expert opinion that you were to provide?
20        A    That I would define what effect
21   the injuries sustained by Shawn Pouliot would
22   have on his lifetime capacity to work and earn
23   money - -
24        Q    Sorry, you sped up at the end.
25   His lifetime capacity - -

1      A      To work and earn money.

2      Q      Thank you.

3      A      I also was asked to do a present
4  value calculation on a life care plan and then
5  the firm was asked also to our psychiatrist
6  involved in producing a life care plan.

7      Q      Okay.  So as far as the firm,
8  meaning Vocational Economics, is concerned,
9  Vocational Economics was retained to do three
10 things.  One was to define what effect the
11 injuries that Shawn Pouliot sustained would
12 have on his ability to work and earn money in
13 the future.

14     A      Yes.

15     Q      The second was to provide a
16 present value calculation based on a life care
17 plan, correct?

18     A      Yes.

19     Q      And third was to actually provide
20 or prepare a life care plan - -

21     A      Yes.

22     Q      - - just in kind of plain English.

23     A      Yes.

24     Q      And you, yourself, not the firm,
25 you were involved in only the first two of

```
 1    those aspects, correct?
 2         A    That is correct.
 3         Q    And it's Dr. Thompson who handled
 4    the third aspect of that.
 5         A    Yes.
 6         Q    Now, with respect to the second
 7    piece of what either you or the firm was
 8    doing, that is to provide the present value
 9    calculation on a life care plan, that is a
10    present value calculation on the life care
11    plan that was prepared by Dr. Thompson, the
12    third aspect of what you were asked to do,
13    correct?
14         A    Yes.
15         Q    You, the firm, asked to do,
16    correct?
17         A    Yes.
18         Q    Okay.  And, very briefly, your
19    expert opinion on the effect of the injuries
20    that Shawn Pouliot sustained on his ability to
21    work and earn money is what?
22         A    My opinion is that he sustained
23    the lifetime loss of ability to earn money
24    within a range of $1,738,530.00 to
25    $1,774,398.00, and those two figures are
```

1   the present value of the loss is in a range of
2   5.2 to 6.6 million, very, very similar to what
3   we have using a pure offset.
4              The actual numbers are
5   $5,270,964.00 to $6,615,283.00.
6       Q    So when you're answering this
7   question, you're referring to a piece of
8   paper.  Could I see what it is you're
9   referring to?
10      A    Yes.
11      Q    Thanks.  I see.  You're referring
12  to your July 30th, 2004, letter to Michael
13  Stratton, correct?
14      A    Yes.
15      Q    With respect to the second aspect
16  of what Vocational Economics was retained to
17  do and then your role in, that is to say the
18  present value calculation of the life care
19  plan, again you're working off the life care
20  plan that Dr. Thompson prepared, right?
21      A    Yes.
22      Q    So the report that's been
23  produced that Dr. Thompson/Vocational
24  Economics produced to Michael Stratton's
25  office which was produced to us, that's the

106

```
 1    report that we're talking about here.
 2         A    Yes.
 3         Q    Is it fair to say that you,
 4    yourself, Gamboa, did not participate in the
 5    preparation of the life care plan to the
 6    extent it deals with the kinds or degrees or
 7    quantities of medical services, et cetera that
 8    might need to be provided to Shawn in the
 9    future?
10         A    That's correct.
11         Q    Okay.  That was under the
12    jurisdiction of Dr. Thompson.
13         A    Yes.
14         Q    You're the numbers guy, the
15    dollars guy with respect to that aspect of
16    things; is that fair to say?
17         A    Yes, but only in the sense of
18    arriving at present value.  Dr. Thompson is
19    actually defining what the cost is - -
20         Q    Okay.  Fair enough.  So when Dr.
21    Thompson - - I'm not looking at his report
22    right now, but just as a hypothetical, I
23    guess, or maybe it's not depending upon
24    whether it's in the report.
25              If Dr. Thompson says it costs
```

169

```
 1    for 10, 12 years.
 2           Q      Right.  And I think that you said
 3    that you were the one who took the first - -
 4    drafted the first rationale and it's been
 5    updated or it's been modified since that time
 6    some years ago when you first did it; is that
 7    right?
 8           A      Yes, it's been expanded to
 9    include more information.
10           Q      Okay.  Now, the - - so, in other
11    words, this Vocational Economic Rationale that
12    appears here, the 12 pages, that is not
13    something specific to your case study of Shawn
14    Pouliot, that is something that you include in
15    any vocational economic assessment that you
16    are asked to perform; is that fair to say?
17           A      Yes.
18           Q      So another attorney who asked you
19    to perform one of these vocational economic
20    assessments in a different case, at least
21    right now, would get the same 12 pages as we
22    see here as part of your Vocational Economic
23    Rationale.
24           A      Yes.
25           Q      Okay.  Now, the first five pages
```