IN THE UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SHAWN POULIOT,                     )
                                   )
                Plaintiff,          )
                                   )
        -vs-                        ) No. 3:02 CV 1302 (DJS)
                                   )
PAUL ARPIN VAN LINES, INC. and     )
ARPIN LOGISTICS, INC.,             )
                                   )
                Defendants.         )
_____)
AND RELATED ACTIONS.                )
_____)

DEPOSITION OF ROLAND L. RUHL, PH.D., P.E.

Phoenix, Arizona
April 13, 2004



Prepared for:                       Reported by:

THOMAS J. GRADY, ESQ.               PAUL GROSSMAN
                                    Arizona Certified
                                    Court Reporter #50028
(Copy)                              CA CSR #1487

Cropper & Associates, Inc. - (602) 277-8882

EXHIBIT C

```
 1                          I N D E X
 2
 3   Examination:                                          Page
 4   BY MR. GRADY                                            5
     BY MR. GRADY                                          117
 5   BY MR. CURCIO                                         133
     BY MS. O'DONNELL                                      191
 6   BY MR. GRADY                                          201
 7
 8
 9
                            E X H I B I T S
10
     No.   Description                                     Page
11
     A     (Subpoena.)                                       5
12
     B     (Deponent's graphs.)                              5
13
     C     (Maxon Flipover Installation diagram.)            5
14
     D     (Platform Adjustment instructions.)               5
15
     E     (2002-184-E Notes.)                               5
16
     F     (Photos.)                                         5
17
     G     (Deponent's diagrams.)                            5
18
     H     (Three pages of animations.)                      5
19
     I     (Workstation systems.)                            5
20
     J     (Shipping Order.)                                 5
21
     K     (Trans-Expo International Shipment Booking.)      5
22
     L     (Deponent's Preliminary Report.)                  5
23
     M     (Deponent's load angles graphs.)                 33
24
25
```

| | | |
|---|---|---|
| N | (Excerpt of deposition of Shawn L. Pouliot.) | 53 |
| O | (Color laser photos.) | 57 |
| P | (Letter from Mr. Stratton to Dr. Ruhl, 12-17-03.) | 156 |
| Q | (Deponent's case list, 2000-2004.) | 166 |

```
 1        THE DEPOSITION OF ROLAND L. RUHL, PH.D., P.E.,
 2   taken at 9:40 a.m. on April 13, 2004, at the law offices
 3   of Mohr, Hackett, Pederson, Blakley & Randolph,
 4   Suite 1100, 2700 North Central Avenue, Phoenix, Arizona,
 5   before PAUL GROSSMAN, a Notary Public and Certified
 6   Court Reporter #50028 in and for the State of Arizona,
 7   pursuant to the Federal Rules of Civil Procedure.
 8              The plaintiff was represented by his
 9   attorneys, Stratton Faxon, by Michael A. Stratton, Esq.
10              The defendants Arpin were represented by
11   their attorneys, Lenihan, Grady & Steele, by Thomas J.
12   Grady, Esq. and Matthew J. Corcoran, Esq.
13              The defendant Festo Corporation was
14   represented by its attorneys, Adler, Pollack & Sheehan,
15   P.C., by Paul Curcio, Esq.
16              The defendants Trans-Expo, Kovac and Ramirez
17   were represented by their attorneys, Halloran & Sage,
18   LLP, by Susan O'Donnell, Esq.
19
20
21
22
23
24
25
```

1 Tuk-A-Way style.
2    Q.    And how many accidents have you been involved
3 in where you investigated rear lifts?
4    A.    Several. Two or three at least. Maybe more.
5    Q.    Were those rear lift accidents that you
6 investigated ones that involved trucks?
7    A.    I don't understand the question.
8    Q.    The rear lift that I'm talking about, I want
9 to narrow it down and find out whether or not you are
10 referring to two or three accidents involving rear lift
11 gates on trucks.
12    A.    Oh, yeah, yeah, sure. I mean, obviously I've
13 investigated accidents with a variety of material
14 handling equipment. This is just one of a specialized
15 material handling equipment.
16    Q.    With respect to the Tuk-A-Way lift, that is
17 the Maxon Tuk-A-Way lift --
18    A.    Yes.
19    Q.    -- can you describe all prior experience
20 you've had with the Maxon Tuk-A-Way lift?
21    A.    Well, as I said, my recollection is that I
22 have investigated other accidents that are Maxons and I
23 believe they are Tuk-A-Ways and I'm familiar with the
24 design and it's usage and have used them personally.
25    Q.    Okay. In this particular case did you or did

1   Q.   So your testimony now is you're not sure;
2   that's where you think it was?
3   A.   That's correct. That's my best estimate but
4   I would need to confirm that.
5   Q.   Okay. How did you apply the 200, 400 and 700
6   pound loads to the exemplar lift?
7   A.   It was done essentially the same way that it
8   was done at my inspection in Rhode Island and that is a
9   footprint, if you will, was created and that footprint
10  then had sandbags put on and they were loaded to
11  cumulative weights.
12  Q.   And what is the load platform referred to on
13  the data tables?
14  A.   That is a platform that our shop made here in
15  Phoenix more or less identical to the one which we had
16  in Rhode Island and which is used to get the weight onto
17  the platform.
18  Q.   What was it made of?
19  A.   I believe it was made of wood.
20  Q.   Do you know what the dimensions were?
21  A.   I believe it was -- it was essentially
22  patterned after the one in -- that we did in Rhode
23  Island.
24  Q.   Well, I'd like to know what the dimensions
25  were on the load platform.

1   see if we -- if the roll off angle is consistent with
2   what we found happened and the answer is yes, it shows
3   exactly what happened.
4   BY MR. GRADY:
5       Q.   I may have asked this already.  If I did, I
6   apologize.  But my understanding is that you did not
7   review Officer Blalock's deposition and the exhibits
8   appended to it in formulating your opinions in this
9   report, right?
10      A.   That's correct.  I have some of the police
11  photos and measurements.  Now, maybe they were also
12  marked in Blalock's dep, but I don't know that.
13      Q.   You're aware, of course, that Officer Blalock
14  under subpoena duces tecum never produced the
15  photographs that you have in your file with his -- when
16  he came to the deposition?
17      A.   I have never seen his deposition so I don't
18  know.
19          MR. GRADY:  I have no further questions.
20                      EXAMINATION
21  BY MR. CURCIO:
22      Q.   Mr. Ruhl, what was your assignment in this
23  case?  What were you asked to do?
24      A.   Basically to investigate the accident.  To
25  inspect the condition of the lift gate which is

1  suspected as being a component in the accident and --
2  and it was my suggestion to Mr. Stratton that we ought
3  to just to make sure we understand what is going on in
4  this accident and test it to the extent that we can
5  reproduce the accident and make sure that we thereby
6  sort of understand how this all occurred.
7       It also would be obvious I think that once
8  that is done the videotape of the falling off of the
9  object would be one way we could show all of this to the
10 Court so that he could see how does this occur.  I don't
11 suspect that most people probably intuitively understand
12 how the Tuk-A-Way works.
13      Q.    How the work -- what works?
14      A.    Tuk-A-Way.  That's the trade name for it.
15      Q.    Oh, the Tuk-A-Way.
16      A.    This is called the Tuk-A-Way because it has
17 at its root a couple features.  One is a four bar
18 linkage.  It has then a folding main platform and a
19 folding beaver tail on the platform that sort of rolls
20 up and goes up and under the bed of a straight struck.
21 It doesn't work too well on a trailer pulled by a
22 semi-tractor, pulled by a Class A tractor.
23      So that is somewhat unique and I think that
24 it's -- it's just in understanding how the accident
25 happened you really need to know something about a

1  obvious. That's all I can say.
2      Q.    In your opinion should they have been locked?
3      A.    Should they have been locked? I think I've
4  said I would prefer that they would have been locked.
5      I'm still not convinced that as a practice we
6  want to rely on those with a defective lift gate in a
7  rolling product. I don't look at the locking of the
8  wheels as a fail-safe remedy. It's not designed in a
9  life endangering situation. It's there to keep a
10 product from rolling around on a level floor.
11     We're asking it to do something when we
12 really don't have a performance back on it's use. It
13 may work, but it's not the way we should do it.
14     Q.    In your opinion should they have been locked?
15     MR. STRATTON: Objection. Asked and
16 answered.
17     THE WITNESS: All I can say is I think it
18 would help. It couldn't hurt. But it's -- we need to
19 do more than just that.
20 BY MR. CURCIO:
21     Q.    Do you plan on doing any testing to determine
22 whether your exemplar will roll off the lift gate if the
23 wheels are locked?
24     A.    That -- if Mr. Stratton wants me to do that
25 we will be more than happy to do that.

1  difference if you don't put them on and whether they
2  would work or not doesn't make any difference if you
3  don't put them on.
4      Q.    But prior to doing your tests you didn't know
5  whether there were locks on the wheels or not, is that
6  it?
7      A.    No, sir.  But I knew that he didn't have them
8  on.
9      Q.    You later found out that he did not have the
10 locks on?
11     A.    No.  I knew that he didn't have -- he could
12 not have had them on, but I didn't know whether the unit
13 actually had them or not at that time.
14     Q.    And who -- there were two series of tests
15 that were done, is that correct?
16     A.    Yes.
17     Q.    And who performed those tests?
18     A.    Well, I was at the scene and I --
19     Q.    When you say -- I'm sorry.  You were at the
20 scene?
21     A.    Of the test.
22     Q.    Okay.
23     A.    That was actually at the Arpin facility.
24     Q.    One series of tests were performed at the
25 Arpin facility?

1    A.    On the actual unit.

2    Q.    And when you say "unit" you mean truck, is
3  that correct?

4    A.    The truck with this subject lift gate.

5    Q.    And when were those tests performed?

6    A.    I'll get something that's got a date on it
7  here.

8         They would have been performed on the 25th of
9  November, I believe.

10   Q.    What year?

11   A.    That would be 2002.

12   Q.    And would you describe what those tests
13 consisted of?

14   A.    Sure.  The unit was positioned in their lot
15 for us.  It was in a downhill slope, which is fine.  We
16 inspected the vehicle and took the relevant dimensions.
17 "We," I'm saying I.  And photographed it.

18        We had already prepared and had been prepared
19 under my direction a surrogate footprint, a platform
20 that holds sandbags.

21        The lift gate then was measured and various
22 slope measurements were taken generally in full up
23 position both loaded and empty.  Photographs were taken
24 of the load and the Smart Level in the picture.  Several
25 positions of the Smart Level in several positions.

1         The unit then was run down after it had been
2    lubricated and photographed and measured at the point
3    where the load would begin to move and roll off.
4         That test was conducted four times, and it
5    showed that there was -- essentially the unit would roll
6    at a value or an angle value that would not have
7    occurred with a properly adjusted lift gate at the
8    accident scene.  So that's -- that was the surmise.
9         Then also the damage was noted.  And I'm
10   talking primarily about maladjustment, misadjustment of
11   the parts, poor fitting of the beaver tail on the main
12   platform.  And let's see.  What else would there be?
13        The damage to the journals and the journal
14   alignment which also affected this inability to seat
15   properly and then basically the poor -- because of all
16   of this and wear, the fact that it was improperly
17   shimmed and did not hold anywhere near factory
18   recommended maintenance items.  And so that was the test
19   that we did.
20        Q.   Okay.  And who besides yourself was present
21   from your organization for those tests?
22        A.   I was the only one there.  Attorney Stratton
23   was with me.  Mr. Grady was there the whole time and he
24   had someone else from his office with him.  I don't
25   remember.  I think it was a lady engineer.  And there

1    Q.    Did the wheels have locks?

2    A.    I don't know for certain. I don't believe
3 so.

4    Q.    What was the purpose of the testing that was
5 done on 3-4 and 3-7 of 2003?

6    A.    The testing was to supplement -- the purpose
7 was to fill in the gaps that we couldn't get from the
8 actual unit due to the damage that it had. And the --
9 the question or the hypothesis that was trying to be
10 tested or posed was in a properly aligned position
11 without geometric distortion to it how much compliance
12 is there, measurable compliance in the Maxon design
13 itself such that some of the angles that were seen
14 cannot be predicted completely from the four bar linkage
15 curve?

16         The answer to that is they can be predicted
17 accurately from the four bar linkage curve; that the
18 stroke or the angle stroke is -- is very linear, nearly
19 linear. It is repeatable and it does not show any
20 correlation with load.

21    Q.    Did you put load on the lift?
22    A.    Oh, yes. It went up from -- they ran it at
23 varying loads. That was the whole point, to see if you
24 could detect any trend here and that there really is no
25 trend.

1   Q.   Did the loads fall off?
2   A.   No, no. There was no attempt to try and get
3   the load to fall off. It was either held on or blocked
4   or braced or something. It was just to put the load on
5   where it would be if it didn't fall off.
6   Q.   So that the load in the second test could
7   have been braced --
8   A.   Oh, yes.
9   Q.   -- in order to prevent it from falling off?
10   A.   Oh, sure. Absolutely. But, remember, also
11   because of the density of the load we are not
12   replicating the height factor.
13        In other words, there's a CG. There's no
14   attempt to make the CG that high. The CG is essentially
15   irrelevant to the onset of a rolling process.
16   Q.   What does "CG" mean?
17   A.   Center of gravity.
18        I would suspect that the Festo unit CG would
19   be higher up off the ground than ours was, but there is
20   no reason to control that. There's no reason to control
21   that in a rolling test.
22   Q.   So the center of gravity is irrelevant in a
23   rolling test?
24   A.   Yes, it is. If it were a tip-over test then
25   we would need to control that parameter. This was not a

1   indicated that it was the driver's responsibility to
2   secure the load under the federal motor carrier
3   regulations, right?
4       A.    With a few caveats, yes.
5       Q.    There's no requirement at all under the
6   federal motor carrier regulations that relates to the
7   fixation or the securement of a load during the
8   unloading phase, isn't that correct?
9       A.    That's correct. It's in transit.
10      Q.    So, as a result, insofar as you know in the
11  course of your investigation the applicability of the
12  federal motor carrier regulations as they apply to this
13  factual scenario don't apply?
14      A.    Essentially that is correct.
15      Q.    Thank you.
16      A.    That's correct.
17      MR. GRADY: Okay.
18      MR. STRATTON: Paul, do you have any more?
19      MR. CURCIO: No.
20      (Whereupon, the deposition was then
21      concluded at 3:35 p.m.)
22
23                              _____
                                    ROLAND L. RUHL
24  3016-P
25