UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT,                      :
                                    :
                Plaintiff           :
                                    :
v.                                  :    Civil Action No.
                                    :    3:02 CV 1302 (DIS)
PAUL ARPIN VAN LINES, INC.;         :
ARPIN LOGISTICS, INC.; THE          :
FESTO CORPORATION; MICHAEL          :
D. KOVAC d/b/a TRANS-EXPO           :
INTERNATIONAL, ERICA RAMIREZ,:
IN HER CAPACITY AS AN               :
EMPLOYEE OF TRANS-EXPO              :
INTERNATIONAL,                      :
                                    :
                Defendants.   :

– 0 –

**DEPOSITION OF ANTHONY M. GAMBOA, JR., Ph.D.**

– 0 –

The deposition of **ANTHONY M. GAMBOA, JR.,**

**Ph.D.**, taken before Andrea B. Grant, Court Reporter and

Notary Public in and for the Commonwealth of Kentucky,

on the 12th day of October, 2004, beginning at the hour

of 10:20 A.M. at the Summit Executive Suites, 4350

Brownsboro Road, Suite 110, Louisville, Kentucky 40207.

– 0 –

**A B GRANT & ASSOCIATES**
**Court Reporters & Legal Videographers**
P.O. Box 437106
Louisville, KY  40253-7106
(502) 262-2580  Fax (502) 254-7030
Toll Free 1 (877) 582-2400

TRUE COPY

1    to me.

2         Q    Okay.  You think that it makes no

3    difference what the treating physician says in

4    terms of medical opinion regarding ability to

5    work; is that correct?

6         A    I think that the medical doctor's

7    opinion regarding the ability to work contains

8    within it, whether or not the physician

9    realizes it, the issue of employability.

10             A person can retain the capacity

11   to work and perform some type of occupation,

12   but embedded in that is a probability called

13   employability.  We have that data.  We know

14   what the employment probabilities look like

15   for persons with work disability and for

16   persons with various types of impairment.

17             With that information, I'm able to

18   render opinions, within a reasonable degree of

19   professional probability or certainly, as to

20   whether or not a particular individual with a

21   specific type of work disability and a

22   specific type of physical disability, which in

23   this case includes issues associated with

24   being able to live independently and issues

25   associated with self care, we have the data.

1    We know, based on what the Census Bureau tells

2    us, what the probabilities look like for such

3    people.

4              And that's the real issue when

5    you talk about the ability to work.

6    Theoretically, anyone has the ability to work.

7    If they can even move their eyes, they

8    theoretically have the ability.

9         Q    So it's your position then that

10   this census material is of high priority and

11   that the treating physician's evaluation is of

12   no value; is that correct?

13        A    No, that's incorrect, what you

14   just said.  But what I'm saying is that it's

15   very important to take into consideration the

16   exertional restrictions that are defined by a

17   medical doctor.  It's very important to take

18   that into consideration.

19             When you take that into

20   consideration, you consider the individual's

21   labor market access, meaning what percentage

22   of the jobs existing in this person's local

23   economy do they realistically have the

24   capacity to perform.

25             And then you ask yourself the

1     question, given the nature of their

2     impairment, what's their probability look like

3     of employment, based on not just the census

4     data but based also on the unique qualities

5     and attributes of that individual.

6               So that if someone has the

7     capacity to perform less than one percent of

8     the jobs in his or her local labor market, my

9     conclusion is that that does not constitute

10    jobs existing in significant numbers and I

11    define such a person an unemployable.

12              Now, I will grant you that

13    unemployability is an absolute and there are no

14    absolutes in the area of social science - -

15         Q     You're basically giving a medical

16    opinion, aren't you?

17         A     Oh, no, not at all.  Not at all.

18    I'm giving a vocational opinion and then I'm

19    also defining loss of earning capacity in

20    terms of present value which has some

21    smattering of economics to it, but not much.

22         Q     You've been in the vocational

23    field for a long time, right?

24         A     Some people would say that, yes.

25         Q     You're not unfamiliar with

1    Lawrence Foreman?

2         A      I'm familiar with Larry Foreman,

3    yes.

4         Q      You're very familiar with Larry

5    Foreman, aren't you?

6         A      I know him.  I've met him on

7    probably a couple or three occasions.  I've

8    read many, many of his life care plans.  I

9    couldn't even tell you how many I've read,

10   many over the years.

11        Q      Did you read the one that he

12   provided in this case?

13        A      I did.

14        Q      And Defendant's Exhibit Six, you

15   read that plan?

16        A      Yes.

17        Q      And you know that he said that the

18   plaintiff, Shawn Pouliot, could work as a

19   dispatcher at a rate of $31,000.00 a year,

20   right?

21        A      That's right.

22        Q      And you know that Mr. Foreman's

23   background in the vocational field is as

24   extensive if not more so than yours, right?

25        A      I'm not that familiar with his

1    background in the vocational field.  I don't

2    know if - - if my memory serves me correctly,

3    he has a masters degree in rehabilitation

4    counseling and a law degree, if I'm not

5    mistaken.

6                I know he does primarily life care

7    plans and occasionally he will venture into the

8    vocational area as well.

9         Q     When you were retained by Mr.

10   Stratton in this case, were you told about

11   that up front?

12        A     When you say told about that, you

13   mean that Larry Foreman - -

14        Q     About Dr. Cremer's opinion that

15   Shawn Pouliot could work and about Larry

16   Foreman's opinion that he could work as a

17   dispatcher earning $31,000.00 a year.

18        A     No, I can assure that I was not

19   informed of that.

20        Q     When did you find out about that?

21        A     Sometime back in June when I read

22   the file.

23        Q     Do you have any idea why you were

24   retained in this matter after those opinions

25   had already been offered on behalf of the

1    plaintiff?

2         A    No.  I was retained because a

3    vocational economic assessment was requested

4    and then later a life care plan was requested.

5         Q    And in the preparation of your

6    report, you indicate that you rely on the

7    records of Comprehensive Rehab Consultants,

8    Inc., right?

9         A    I'm sorry?

10        Q    You rely on the records of

11   Comprehensive Rehab Consultants, Inc., right?

12        A    I considered those records, yes.

13        Q    And you discounted the opinion of

14   Mr. Foreman that Shawn Pouliot could work as a

15   dispatcher at $31,000.00 a year.

16        A    I didn't discount that.  I

17   considered that and I recognized that as

18   obviously an opinion that he has.  But, as I

19   said to you, that's only half the picture.

20             You know, theoretically, anyone,

21   unless they're comatose, has a capacity to

22   work.  The real issue is not work.  The issue

23   is how employable is the individual, how

24   likely is it that the individual will be able

25   to obtain and retain employment.  That's

1    what's critical.

2                    And when you have an individual

3    that has the severity of impairments that this

4    person has and when you consider the standard

5    off of which I'm asked to operate, which is

6    the standard of reasonable degrees of

7    professional probability or certainly, when

8    you consider that standard, when you consider

9    the severity of this man's impairments, I

10   believe from a practical perspective he's

11   unemployable.

12                   Now, true, the probability is not

13   zero, but it's so close to zero in terms of

14   the probability of obtaining and retaining

15   employment that justice is best served by

16   identifying this individual as unable to

17   perform any type of substantial gainful work

18   activity or jobs existing in insignificant

19   numbers; therefore, he is, from a practical

20   vocational perspective unemployable.

21          Q       Aren't Dr. Cremer and Mr. Johnson

22   bound by the same parameters as you are?

23          A       You'll have to ask them.  I don't

24   know what the parameters are.

25          Q       Well, they're giving the same

1     kind of opinions.

2           A      Well, first of all, I'm unaware

3     of what the standard off of which medical

4     people operate and it varies tremendously from

5     jurisdiction to jurisdiction.  I can say to

6     you that typically medical doctors define what

7     they believe to be the exertional capabilities

8     of an individual.

9                 Sometimes, when asked if the

10    person is capable of working, they will render

11    an opinion that's yes or no.  But, in

12    rendering an opinion that someone is capable

13    of working, whether it be as a dispatcher or

14    as a security guard lying flat on your back

15    looking at a monitor and then simply going

16    into a voice activated computer to say that

17    someone has made an illegal entry, all of

18    these things I've seen over the years being

19    expressed, you know, as proof positive that

20    someone has the capacity to work, but, as I

21    said, that's only half the picture.

22                The other half of the picture is

23    employability.  And when you look at the

24    employability of an individual who is as

25    limited as this person, it's pretty obvious to

1    me and I think to a jury, I think to any

2    reasonable person, that this is not an

3    individual who is employable, and that's my

4    opinion.

5         Q    Isn't really the basic

6    requirement in terms of employability for

7    somebody who's a paraplegic is whether he can

8    drive a car and get back and forth to work?

9         A    No, employability extends far

10   beyond the issue of whether or not the person

11   is capable of driving a vehicle that has been

12   modified to accommodate disability.

13             There are many other issues that

14   are -- you know, that need to be considered

15   besides the ability to drive.

16        Q    In your vocational economic

17   assessment, you have a section entitled

18   Vocational Economic Rationale running from

19   page - - nine pages and you've referred to

20   that several times in the course of your

21   testimony.  I guess it's longer, 10 or 11

22   pages.

23             Did Vocational Economics prepare

24   that?

25        A    You asked me that question

1       previously.  Do you recall?

2              Q       Yeah.

3              A       Okay.

4              Q       And you answered that a number of

5       different people were involved in it.

6              A       Right.

7              Q       Did a lawyer prepare that?

8              A       No.  There were no lawyers

9       involved in the preparation of that document.

10             Q       And in that document, you start

11      out by discussing the Daubert case and Kumho;

12      is that correct?

13             A       Yes.

14             Q       Basically, you're talking about

15      legal decisions and case decisions that call

16      for interpretation, right?

17             A       Yes.

18             Q       And is this not fairly stated,

19      this Vocational Economic Rationale, an

20      interpretation of those decisions and other

21      laws that relate to the definition of

22      disability from Social Security or the Census

23      Bureau or the ADA; isn't that a fair statement?

24             A       Yes, I think that is a fair

25      statement, but I think it would be important

1   not to confuse the reading of the material,

2   the interpretation of the material in

3   producing a narrative, it would be a mistake

4   to assume that that's a legal interpretation.

5        Obviously, none of the persons

6   involved in the interpretation of the material

7   that is written are lawyers.  So, therefore,

8   their frame of reference in terms of reading

9   that information is specific to their

10  profession as opposed to the legal community.

11       Q    But aren't you, when you attach

12  that package to your report, asking the court

13  to adopt your rationale in support of your

14  numbers?

15       A    No, we don't ask the trier of

16  fact or the court to adopt anything.  We are

17  presenting it and they can consider it and

18  weigh it.  That's what rational decision

19  making is about.

20       Q    But aren't you telling the court,

21  this is the way disability should be construed?

22       A    I'm defining for the court the

23  way in which persons with my expertise and the

24  expertise of other vocational rehabilitation

25  people and vocational experts define

1    disability.

2              I will say to you and to the

3    Court that the Census Bureau differentiates

4    between impairment, disability and work

5    disability - - those have three very different

6    meanings for people within my profession - -

7    and the Court can certainly consider that.

8         Q    But aren't you asking the Court to

9    adopt that position as opposed to the position

10   of the Court accepting the testimony of the

11   treating doctor?

12        A    No, I don't think so.  I think

13   what I'm saying to the Court is you have

14   medical doctors who are best at defining,

15   particularly orthopedic people or

16   neurosurgeons, the exertional capabilities of

17   an individual.

18              Once those exertional

19   capabilities are defined, the next question

20   then becomes that of defining two things; are

21   there jobs the person can perform, number one,

22   and then, number two, what does employability

23   look like for someone with the type of

24   impairment that we're talking about that

25   results in a disability and a work disability,

1   what do those employment levels look like
2   based on this person's gender and level of
3   educational attainment and based on their
4   labor market access.
5           Well, that's an area that I don't
6   consider to fall within the purview of medical
7   doctors.  I don't believe that if you asked a
8   medical doctor, what's the probability of
9   employment for a 29-year-old male with a
10  severe work disability they would be able to
11  say to you .19.  I don't believe they have
12  that knowledge.
13          Now, maybe some of them do, but
14  I've yet to see one that does.
15      Q       Isn't this Vocational Economic
16  Rationale a legal opinion?
17      A       No, it's an expert vocational
18  economic opinion.  Or, excuse me, it's not
19  even that.  It's not an opinion at all.  The
20  Vocational Economic Rationale is nothing more
21  than the methodology that we employ in
22  examining all cases.
23      Q       But the methodology that you
24  employ is based upon your interpretation of
25  law, is it not?

1       A       It's based on all of the things

2   that are contained within that rationale.

3       Q       Right.  And the things that are

4   contained in your rationale that you keep

5   referring to are either legal cases or

6   statutes; isn't that correct?

7       A       That's some of what's referenced.

8   That's not all of what's referenced.  Most of

9   what's referenced is specific to U.S. Census

10  Bureau data as well as to research conducted

11  by other researchers around the United States

12  who are persons that are regarded as having

13  substantial expertise in the area of

14  employability and capacity to work and earn

15  money for persons with disability.

16              You'll notice that the

17  bibliography contains, I don't know the number

18  - - I'm going to estimate for you - - 18

19  different references, whereas the number of

20  court cases referenced include four.

21              We think those four cases deal

22  with issues that are critical, one of which

23  has to do with the importance of taking into

24  consideration the employability of the

25  individual.

1          Q       When you talk about employability,

2    you're talking about the likelihood that

3    somebody would hire a disabled individual,

4    right?

5          A       Not exactly.

6          Q       You're not talking about his

7    capacity to work.

8          A       Well, when we talk about

9    employability, employability is the second

10   step after an individual's capacity to work.

11         Q       And basically that's where you're

12   coming from in giving your opinion.  You're

13   coming from employability, right?

14         A       No, I'm coming from two

15   perspectives.  You know, the first perspective

16   is more theoretical.  Theoretically, all

17   persons who are in a non-comatose state, all

18   such persons have a capacity, theoretically,

19   of performing some type of job.

20               But, in addition to that, what I

21   believe is important to consider and what I

22   believe the Court believes is important to

23   consider, the probability of an individual

24   being employed.

25               Now, the probability of being

1     employed is really a function of two things,

2     the percentage of jobs in the labor market

3     that the individual retains the capacity to

4     perform - - that's number one - - and then,

5     number two, it's a function of employability

6     that would be specific to that group of people

7     that are most like the individual that you're

8     evaluating.

9              So, in this particular case, what

10    we're talking about is an individual that has

11    a high school equivalency diploma, we're

12    talking about an individual who's performed

13    semi-skilled work, and we're talking about an

14    individual that has severe limitations in

15    terms of labor market access, and we're

16    talking about a person who has the capacity to

17    perform fewer than one percent of the jobs in

18    his labor market.

19              Now, when you put all of that

20    together, you then have to ask yourself,

21    what's the probability of employment.  Under

22    the best case scenario, if you wanted to be as

23    optimistic as you could possibly be to the

24    point of being unrealistic, you'd be looking

25    at employment levels that would come in at

1    approximately .20 or less.  That's what you're

2    talking about.

3              In my opinion, that does not

4    constitute a level of potential employability

5    that would cause me to do anything other than

6    conclude that the individual is unemployable.

7         Q      So basically your opinion is

8    based on statistics.

9         A      Not just statistics.  It's based

10   on the unique traits and characteristics of

11   the person that I've been asked to evaluate.

12   I consider that individual's age, that

13   person's education, that person's work

14   history, and I consider both their exertional

15   and their non-exertional impairments, and I

16   then take into consideration what a realistic

17   assessment is in terms of the percentage of

18   work that this person would have the capacity

19   to perform in his labor market.

20             And after doing that, I then

21   arrive at a conclusion as to whether the

22   person has a non-severe work disability or a

23   severe work disability.  And in this case,

24   we're talking about someone with a severe work

25   disability with probable levels of employment

1    that are exceedingly low.

2         Q    So how is it that you can come to

3    that conclusion in light of Dr. Cremer's

4    opinion that this man can work and Lawrence

5    Foreman's opinion that he can work as a

6    dispatcher earning $31,000.00 a year?

7         A    I took into consideration what

8    each of them said, but I simply have an add-on

9    that they neglected to consider.  That add-on

10    is called the probability of employment.

11              The acid test is really the issue

12    of employability.  How employable is someone?

13    How likely is it that this person will be able

14    to compete in the labor market and obtain and

15    retain employment?

16         Q    So you don't deny that he has the

17    capacity to work as a dispatcher and you don't

18    deny the findings that Mr. Foreman and Dr.

19    Cremer make.  Really, what you're saying is

20    that because he's injured and he has these

21    kind of characteristics, the likelihood that

22    somebody would hire him in the marketplace is

23    slim; is that correct?

24         A    Yeah, it's not only slim, it's -

25    - it's very, very close to zero.  You know,

1    when you start talking about probabilities of

2    employment for a cohort group - - a cohort

3    group means someone of his comparable age, his

4    education.

5                    A cohort group would include

6    persons who are work-disabled, which he is.

7    You could also look at persons who have

8    physical disabilities, problems with physical

9    activity in combination with living

10   independently.

11                   When you look at those

12   probabilities, what I'm saying is that while

13   there's a theoretical construct of yes, this

14   person has the capacity to perform work, what

15   the real issue is is what do the probabilities

16   of employment look like.

17                   The probabilities of employment

18   that I'm giving you are not precise - - I can

19   produce them if you'd like me to ~ ~ but

20   they're very, very close.  And what I'm saying

21   to you is this.

22                   A probability of employment is

23   captured through survey research.  You ask for

24   persons to identify themselves as either

25   having a work disability or having some type

1    of physical disability that limits them in

2    terms of standing, walking, climbing,

3    carrying, et cetera.

4              Now, when you look at those two

5    different data sets and you come up with

6    probabilities that are very low, it's

7    important to keep in mind that the

8    probabilities only exist because there are

9    persons working either part-time or full-time

10   after having met the definitions that we're

11   talking about.

12             This is a man who hasn't worked in

13   three or four years.  So his probability of

14   actual employment would be even significantly

15   less than the cohort group that I'm looking at.

16             So all of that, when it's taken

17   into consideration, causes me to conclude that

18   from a practical perspective this man is not

19   going to obtain or retain employment.

20        Q    If the law doesn't retain the

21   requirement that you had with respect to

22   employability and the law is limited to the

23   capacity to work, you would agree with me,

24   wouldn't you, that Shawn Pouliot has the

25   capacity to work as a dispatcher if the job

1    were available?

2         A       Theoretically what you're saying

3    is correct, but you sound like - -

4         Q       Well, it's even more than

5    theoretical.  We have two experts who said he

6    can do it; isn't that right?

7         A       Yeah, but what they've said is - -

8         Q       So we're not coming out of the

9    air.

10        A       What you're saying is

11    theoretical.  You sound more like a

12    plaintiff's lawyer than a defense attorney.

13    Plaintiffs' lawyers call me and they say I

14    have a guy who's 55 years of age and he was

15    wrongfully killed, yeah, he didn't work for 20

16    years before he was wrongfully killed, but he

17    had a capacity to work through his life

18    expectancy.

19             Some plaintiffs' lawyers present

20    that, but as far as I'm concerned that doesn't

21    pass the giggle test in the courtroom, okay?

22    Neither does this particular case of Shawn

23    Pouliot.

24             If someone wants to go in a

25    courtroom and tell the trier of fact that this

1    guy is going to be employed, have at it.  I

2    don't think it passes the giggle test, and I

3    have the data to back that up with.  It's not

4    just an opinion.

5              I have data from the American

6    Community Survey, the Decennial Census

7    conducted by the Census Bureau, and the March

8    Supplement to the Current Population Survey

9    which has examined 22 years of employment for

10   persons with work disability.

11             This man has a severe work

12   disability.  He's not going anywhere in terms

13   of employment.  That's my opinion and that's

14   what I will share with the trier of fact.

15        Q      But again, coming back to the

16   essence of the issue, you don't deny that he

17   has the capacity to do this work as a

18   dispatcher.  Where you differ is whether or

19   not that capacity will likely result in

20   employment.

21        A      That's right.  In other words,

22   where I differ is that the capacity to work is

23   theoretical.  In order for there to realized

24   remuneration as a result of that capacity, the

25   person has to be employed.