### Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2         DISTRICT OF CONNECTICUT
 3
      SHAWN POULIOT,           )
 4                             )
           Plaintiff,          )
 5                             )
      -vs-           ) No. 3:02 CV 1302 (DJS)
 6                             )
      PAUL ARPIN VAN LINES, INC. and )
 7    ARPIN LOGISTICS, INC.,   )
                               )
 8         Defendants.         )
                               )
 9    AND RELATED ACTIONS      )
                               )
10
11
12
13       DEPOSITION OF ROLAND L. RUHL, PH.D., P.E.
14
15                Phoenix, Arizona
                  April 13, 2004
16
17
18
19
20
21
22  Prepared for:         Reported by:
23  MICHAEL A. STRATTON, ESQ.    PAUL GROSSMAN
                         Arizona Certified
24                       Court Reporter #50028
    (Copy)               CA CSR #1487
25
```

### Page 2

```
 1              INDEX
 2
 3  Examination:                   Page
 4  BY MR. GRADY                      5
    BY MR. GRADY                    117
 5  BY MR. CURCIO                   133
    BY MS. O'DONNELL                191
 6  BY MR. GRADY                    201
 7
 8
 9            EXHIBITS
10
    No.  Description                Page
11
    A  (Subpoena.)                    5
12
    B  (Deponent's graphs.)           5
13
    C  (Maxon Flipover Installation diagram.)  5
14
    D  (Platform Adjustment instructions.)  5
15
    E  (2002-184-E Notes.)            5
16
    F  (Photos.)                      5
17
    G  (Deponent's diagrams.)         5
18
    H  (Three pages of animations.)   5
19
    I  (Workstation systems.)         5
20
    J  (Shipping Order.)              5
21
    K  (Trans-Expo International Shipment Booking.)  5
22
    L  (Deponent's Preliminary Report.)  5
23
    M  (Deponent's load angles graphs.)  33
24
25
```

### Page 3

```
 1  N  (Excerpt of deposition of Shawn L. Pouliot.)  53
 2  O  (Color laser photos.)        57
 3  P  (Letter from Mr. Stratton to Dr. Ruhl,
       12-17-03.)                   156
 4
    Q  (Deponent's case list, 2000-2004.)  166
 5
```

### Page 4

```
 1       THE DEPOSITION OF ROLAND L. RUHL, PH.D., P.E.,
 2  taken at 9:40 a.m. on April 13, 2004, at the law offices
 3  of Mohr, Hackett, Pederson, Blakley & Randolph,
 4  Suite 1100, 2700 North Central Avenue, Phoenix, Arizona,
 5  before PAUL GROSSMAN, a Notary Public and Certified
 6  Court Reporter #50028 in and for the State of Arizona,
 7  pursuant to the Federal Rules of Civil Procedure.
 8       The plaintiff was represented by his
 9  attorneys, Stratton Faxon, by Michael A. Stratton, Esq.
10       The defendants Arpin were represented by
11  their attorneys, Lenihan, Grady & Steele, by Thomas J.
12  Grady, Esq. and Matthew J. Corcoran, Esq.
13       The defendant Festo Corporation was
14  represented by its attorneys, Adler, Pollack & Sheehan,
15  P.C., by Paul Curcio, Esq.
16       The defendants Trans-Expo, Kovac and Ramirez
17  were represented by their attorneys, Halloran & Sage,
18  LLP, by Susan O'Donnell, Esq.
```

Page 157

1 is that they were grammatical in nature. My wife, who
2 is an English teacher, usually reads my reports.
3  Q. I'll take the letter back.
4     But you don't know one way or the other
5 because you haven't saved any of those papers?
6  A. No, I have not.
7  Q. I'd like you to take a look at Exhibit L.
8  A. Okay.
9  Q. This is entitled a Preliminary Report, is
10 that correct?
11  A. Yes.
12  Q. Is it also your final report?
13  A. Well, I haven't issued any other report. I
14 have provided some more material. I didn't feel that
15 it -- that although we've had more material and I have
16 accumulated more material, that it has significantly
17 changed the report.
18  Q. Okay. On page 6 of 10 you list conclusions.
19  A. Page 6 of 10. Okay.
20  Q. Do you have any supplementation to conclusion
21 number 1?
22  A. I'm sorry. I don't believe so.
23  Q. Do you have any supplementation to conclusion
24 number 2?
25  A. I don't believe so.

Page 158

1  Q. Do you have any supplementation to conclusion
2 number 3?
3  A. Again, remember, I did discuss some of these
4 things in the dep today and I certainly hope you
5 understand that my testimony here today is part and
6 parcel of this.
7     But I did talk to under some situations with
8 some loads strapping, bracing may be an alternative, but
9 the Tuk-A-Way is not to be used with rolling loads.
10  Q. I'm sorry. I didn't hear the end of that.
11  A. There are some situations one might be able
12 to remedy the situation with bracing, blocking and
13 strapping. I don't believe that should be done given
14 the information exchanged in this case between Festo and
15 Trans-Expo.
16  Q. Is there an alteration to conclusion number 4
17 that you would like to make in order to have that
18 conclusion accurately reflect your current opinion?
19  A. Oh, it is in 4. So, fine. I was looking at
20 3. I'm sorry. I did cover it in 4, so I guess we're
21 fine.
22  Q. So there are no changes or supplementation to
23 conclusion number 3 nor any changes or supplementation
24 to conclusion number 4?
25  A. I don't believe so other than what I said

Page 159

1 verbally, that I don't think -- it's a general
2 proposition that can be done. I think it's -- it's a
3 little bit hard to do in this case unless we had more
4 information.
5  Q. Is there any deletion you would like to make
6 to conclusion number 4?
7  A. No, nothing I can think of.
8  Q. All right. Conclusion number 5, any
9 supplementation, addition or deletion to conclusion
10 number 5, Mr. Ruhl?
11  A. No.
12  Q. Conclusion number 6, any supplementation or
13 deletion, addition or change to conclusion number 6?
14  A. No, sir, I don't think so.
15  Q. What is your degree in?
16  A. Mechanical engineering, both at the
17 undergraduate and Ph.D. level.
18  Q. And what did you teach?
19  A. I taught freshman engineering design and
20 graphics at Cornell as well as some other short courses
21 and I taught mechanisms and kinematics of machinery and
22 vibrations, mechanical vibrations, automatic controls,
23 as an instructor primarily during summer sessions to
24 graduate students for the Cornell co-op program.
25     At Illinois I taught component design and

Page 160

1 taught -- it used to be called GE 232 and it's now
2 called GE 234 and 242 and now 342. And that's senior
3 project design. That is our capstone design course.
4 I've been course chairman on two separate occasions of
5 it.
6     I have advised somewhere in excess of 50,
7 probably closer to 60 or so senior design projects and
8 I'm happy to say I believe five of them won national
9 design awards. One was a portable crane device. And
10 additionally three or four department awards in design.
11 So that would have been my teaching responsibilities.
12  Q. When did you retire from teaching?
13  A. I actually physically retired from teaching
14 at the end -- I believe it was either the end of 2001 or
15 2002. I'd have to check. I officially retired, I
16 believe my resume says, I think I was officially retired
17 in 1999, but that was largely a bookkeeping activity. I
18 had to officially -- I was still hired back just as a
19 retired person, but I had to officially retire because
20 of the changes in the -- I would have lost benefits at
21 the U of I if I didn't. But I think my last classroom
22 teaching was either at the end of 2001 or 2002.
23  Q. Did you ever work for a motor carrier?
24  A. Never as an employee. I have had motor
25 carriers in my graduate students research.

Page 161

1   Q.   I'm talking about as an employee. Have you
2   ever worked for a motor carrier?
3   A.   No.
4   Q.   For a motor carrier?
5   A.   No.
6   Q.   Have you ever worked for a broker?
7   A.   No, sir.
8   Q.   Have you ever worked for a freight forwarder?
9   A.   No, sir.
10  Q.   Have you worked as a driver?
11  A.   No. I've driven. I'm a graduate of a truck
12  driving school, but I'm not a driver.
13  Q.   Have you ever worked in the shipping or
14  receiving department of a manufacturer?
15  A.   No. I've done some consulting work that
16  has -- has done or has been involved with shipping and
17  receiving aspects, but typically has been involved with
18  the material handling aspects of -- of the material
19  handling aspects of shipping and receiving.
20  Q.   Have you ever authored any articles that
21  dealt with the Federal Motor Carrier Safety Act?
22  A.   Yes. In a general --
23  Q.   What is -- what is that article?
24  A.   Well, I think that the articles or if you
25  want to call them maybe talks --

Page 162

1   Q.   I asked a specific question about have you
2   authored an article, and if you have fine. I'll be
3   happy to take that down.
4        MR. STRATTON:  Just for definition, an
5   article is something that's been published --
6        MR. CURCIO:  Yes.
7        MR. STRATTON:  -- in a magazine or
8   periodical?
9        MR. CURCIO:  Correct.
10       THE WITNESS:  No, I don't think so in that
11  classification.
12  BY MR. CURCIO:
13  Q.   Okay. Have you ever taught a course that
14  dealt with the requirements under the motor carrier
15  safety act?
16  A.   The Federal Motor Carrier Safety Act?
17  Q    Yes.
18  A.   I don't believe so.
19  Q.   Have you ever testified in a case in court
20  where there was an allegation that the Federal Motor
21  Carrier Safety Act was violated?
22  A.   Sure.
23  Q    Give me the names of the cases?
24  A.   I'll have to look them up.
25  Q.   I'll tell you what; I'm going to give you a

Page 163

1   list of cases that you've provided to us from 2000 to
2   2004 and if you could tell me looking at that list which
3   cases involved the Federal Motor Carrier Safety Act I'd
4   appreciate it.
5        MR. STRATTON:  You just want to have
6   Doctor Ruhl just mark the ones that involved the Federal
7   Motor Carrier Safety Act --
8        MR. CURCIO:  Sure.
9        MR. STRATTON:  -- rather than go through each
10  name?
11       MR. CURCIO:  Yes.
12       THE WITNESS:  Okay. This is the best I can
13  do.
14  BY MR. CURCIO:
15  Q.   All right. Okay. Have you indicated on the
16  sheets which of those cases that you've been involved
17  with involved your testimony in a court case that
18  alleged a violation of the Federal Motor Safety --
19  Federal Motor Carrier Safety Act?
20  A.   I have done my best. Some of them I have
21  poor recall and it's also -- it's generally in a
22  commercial vehicle accident you rely on the Federal
23  Motor Carrier Safety Act and a derivative of that,
24  namely the AAMVA Version 2 Commercial Study Guide which
25  is adopted by all fifty states as an indication of good

Page 164

1   custom and practice.
2        MS. O'DONNELL:  I'm sorry. The what guide?
3        THE WITNESS:  The AAMVA, American Association
4   of Motor Vehicle Administrators. The Version 2 is used
5   by all fifty states now almost intact, but some states
6   made some modifications in it. It's called the study
7   guide for the commercial driver's license. It's the
8   guide book that you study from to take the written test
9   which you take in all fifty states.
10  BY MR. CURCIO:
11  Q.   Okay. Let me -- I think I have your --
12  A.   So that these cases have had some issue here
13  which I believe to the best of my recollection we've
14  either relied upon the Federal Motor Carrier Safety Act
15  through the AAMVA Commercial Study Guide to either
16  define the custom and practice or to say it is an
17  outright violation. Many jurisdictions feel that to be
18  the domain of the jury itself and so that's kind of a
19  legal issue, but I've put the ones with a dot I believe
20  are there and the ones with a question mark may be
21  there.
22  Q.   Okay. The ones that are dotted and question
23  marked, can you tell me if any of those cases involved a
24  personal injury while cargo was being unloaded?
25  A.   Let's see. No. I'm trying to remember. I

Page 165

1  think that the -- I'll put a little star over here of
2  the ones -- a star is -- that would be a loading issue,
3  all right? Or an unloading issue, I guess.
4      MR. STRATTON: Involving personal injury?
5      THE WITNESS: Yes.
6      I don't recall. Whitman V Ryder, it's a
7  maintenance issue I think mainly
8  BY MR. CURCIO:
9      Q.  Have you starred those cases that you've --
10     A.  Yes.
11     Q.  -- you've been involved in that have --
12     A.  That I can identify, yes.
13     Q.  And what cases are those that -- and please
14 let me just finish the question so that it will all make
15 sense when it's transcribed.
16     And you have starred those cases that involve
17 a personal injury during unloading of a commercial
18 vehicle, is that correct?
19     A.  Yes.
20     Q.  Okay.
21     A.  There's one.
22     Q.  Okay. What is that case?
23     A.  Mark Wise versus General Leasing and Tom
24 Prostter.
25     Q.  And where was that case tried?

Page 166

1      A.  It wasn't tried. I --
2      Q.  Where was that case pending?
3      A.  I believe it was in Illinois.
4      Q.  Do you recall the counsel who were involved
5  in that case?
6      A.  No.
7      Q.  Did you give deposition testimony in that
8  case?
9      A.  I'm sure I did.
10     Q.  And who did you testify on behalf of?
11     A.  Plaintiff.
12     Q.  What percentage of your testimony is on
13 behalf of plaintiffs, Mr. Ruhl?
14     A.  About 60, 40.
15     Q.  Sixty percent on behalf of plaintiffs, 40
16 percent on behalf of defendants?
17     A.  Yes, sir.
18     MR. CURCIO: We'll mark this the next
19 exhibit
20     (Deposition Exhibit Q was then
21     marked for identification.)
22 BY MR. CURCIO:
23     Q.  Did you visit the scene of this accident?
24     A.  Yes, sir.
25     Q.  And when did you visit the scene of the

Page 167

1  accident?
2      A.  I believe that was the day after the
3  inspection in -- in Rhode Island.
4      Q.  And did you learn from any source whether the
5  physical layout was the same at the time of your
6  inspection as it was at the time of the accident?
7      A.  Yes.
8      Q.  And was it the same?
9      A.  It was. I mean, I did it by looking at the
10 police photos and being there and having the police
11 photos with me and in the relevant area it was the same.
12     Q.  Okay. Did you observe a dock at the scene?
13     A.  I did not. Not in that area.
14     Having said that, there is a ramp which would
15 be on the right-hand side of the truck with a railing
16 that then goes up to sort of like a platform, but I
17 wouldn't call the platform a dock.
18     Q.  Okay. Did you observe a dock, a platform or
19 a ramp that would have been directly accessible to the
20 Arpin vehicle?
21     A.  Well, there was a ramp and it had a railing
22 protecting it. It looked to me that this was sort of to
23 go into what I viewed as the adjacent building, the
24 building on the right, not the one on the left, and I
25 don't know what interconnection there is between those

Page 168

1  buildings.
2      Q.  Okay. So you don't know whether that ramp
3  was directly accessible to the Arpin vehicle?
4      A.  Well, I guess I -- well, let me look at the
5  picture and I think I can answer your question better.
6  Unfortunately, the truck's in the way here.
7      I don't see anything that would be on the
8  right-hand side. If one goes under the overpass there
9  may be some bumpers or cushions -- I'm trying to get the
10 bearing in what direction it is.
11     There may be what looks to be a fairly
12 shallow -- I don't know if I'd call it a dock area or
13 not. I don't know if that's a picture -- if that's a
14 dock plate or not, but that would be on the other side
15 of the -- of the overpass, so --
16     Q.  I guess my question was did you observe
17 either in the photographs or when you made your
18 inspection any kind of a dock, a platform or a ramp that
19 would have allowed the truck to be backed in and
20 directly off-load the vehicle?
21     A.  As you've asked the question, no, I did not
22 see it and I don't see what you're saying memorialized
23 here, although that's a possibility in this one
24 photograph which is the other side of the overpass, but
25 it looks pretty low to me and I don't know what's behind

Roland L. Ruhl, Ph.D., P.E. (Prepared for: Michael A. Stratton, Esq.)  April 13, 2004
Pouliot v. Arpin

Page 169

1  it.
2  Q  So as we sit here today are you unaware of
3  such a dock, a ramp or a platform?
4  A  Yes.
5  Q  Looking at the exhibit to your report,
6  Exhibit 11
7      MS. O'DONNELL:  L, the preliminary report?
8      MR. CURCIO:  Yes. That's it.
9      THE WITNESS:  Okay
10 BY MR. CURCIO:
11 Q  And I would like to ask you to turn your
12 attention please to paragraph 6
13     MR. STRATTON:  Of the conclusions?
14     MR. CURCIO:  Of the conclusions, yes.
15     THE WITNESS:  Yes, sir.
16 BY MR. CURCIO:
17 Q  The first sentence says "The load shipped by
18 Festo consists of two modules," is that correct?
19 A  Yes, sir.
20 Q  Festo would be the consignor, would it not?
21 A  It would be.
22 Q  Who would be the consignee?
23 A  That would be Naugatuck.
24 Q  The community college?
25 A  Yes.

Page 170

1  Q  You go on to state in your conclusions in
2  paragraph 6 that, "One is a conventional box that is
3  palletized. This is a very standard configuration."
4  A  Yes.
5  Q  "The second module is a work station that is
6  not palletized, but rather has four swivel caster wheels
7  (two may be lockable to prevent tire rotation)." Is
8  that correct? Have I read that correctly?
9  A  You have.
10 Q  Do you know now that two in fact were
11 lockable to prevent tire rotation?
12 A  That's the testimony, yes.
13 Q  Okay. So we strike "two may be" and we put
14 "two were" in that sentence?
15 A  Okay. Fine.
16 Q  Now, you state, "However, the configuration
17 is even more difficult to handle than even a grocery
18 cart because it does not use two fixed wheels." Have I
19 read that correctly?
20 A  Yes, sir.
21 Q  In order to maximize the maneuverability of
22 the unit, would you want to have four swivel caster
23 wheels?
24 A  Sure.
25 Q  And you say further, "As such, this unit will

Page 171

1  not track, but rather move omni directionally."
2  A  Yes, sir.
3  Q  "Omni directionally" and you have that in
4  quotes?
5  A  I do.
6  Q  Okay. You state further, "As such it is
7  difficult to maneuver even on a level surface by a
8  single person."
9      Did you perform -- did you yourself attempt
10 to move this unit or any unit like it?
11 A  No, but I have moved carts with casters and
12 those without and I'm, of course, familiar with the
13 design of carts, industrial carts that are used to move
14 things and typically they never have four casters on
15 them just for that reason. They have two and two.
16 Q  A grocery cart is meant to be pushed from the
17 back forward in one direction, is that fair to say?
18 A  Absolutely true. Yes.
19 Q  You say, "Also the module is quite long and
20 high (high center of gravity)," is that correct?
21 A  Yes.
22 Q  How long was it?
23 A  Well, the police measurements are basically
24 69 3/4 and the width is about 33 and the height is about
25 72 plus or minus.

Page 172

1  Q  Instead of "quite long" should we put those
2  measurements into your report?
3  A  Well, you can do what you want. I wrote it.
4  Q  Would it be more accurate to put those
5  measurements in your report than to state it is "quite
6  long and high"?
7      MR. STRATTON:  Objection. More specific?
8      THE WITNESS:  More specific, but its height
9  is as tall as a six foot person, so --
10 BY MR. CURCIO:
11 Q  Is there some reason that you don't want to
12 be more specific in your report than you are?
13 A  I think the report may have discussed the
14 dimensions elsewhere. I'm trying to give a conclusion
15 and I found it important to the general -- in fact, the
16 dimensions are in the background and I'm trying to reach
17 a qualitative conclusion here as to the factors which
18 make it more difficult for a single person to move this
19 device around.
20 Q  Even though you've never attempted to move
21 the device around yourself?
22 A  I've moved similar devices and both casters,
23 and those were two and two as opposed to four and zero.
24 And, as I say, I'm familiar with practice in the moving
25 of things. You never design a device to move something

43 (Pages 169 to 172)

Page 173

1  of this weight and size which would have four casters.
2     Q.  You say it has a high center of gravity. Did
3  you measure the center of gravity of this piece of
4  equipment?
5     A.  No, sir, but I did see the equipment
6  pictures, and we've got the motors, the hydraulic
7  motors, high up. We're six feet high and this thing is
8  just another factor that should go into the decision as
9  to how to deal with it.
10    Q.  Is the answer to the question did you measure
11 the center of gravity "no"?
12    A.  No, sir, I didn't.
13    Q.  "It is believed," you say in your report,
14 "Festo employees (plural) loaded both models on the
15 Arpin truck from their loading dock." Have I read that
16 correctly?
17    A.  That is correct.
18    Q.  That information was provided to you by
19 Mr. Stratton, counsel for the plaintiff, is that
20 correct?
21    A.  That is correct.
22    Q.  Did Mr. Stratton provide you with any other
23 factual bases or factual information upon which you
24 based your opinions?
25        MR. STRATTON: Other than what he's already

Page 174

1  testified to here today?
2        THE WITNESS: I don't know quite how to
3  answer your question. I've told you the things he's
4  told me.
5  BY MR. CURCIO:
6     Q.  Is it your custom and practice to base your
7  expert opinion on representations made to you by
8  counsel?
9     A.  Sure.
10       MR. STRATTON: It's the nature of a
11 hypothetical.
12 BY MR. CURCIO:
13    Q.  Do you have -- do you have any independent
14 basis upon which to assert that Festo employees, plural,
15 loaded the modules on the Arpin truck from their loading
16 dock?
17    A.  No, sir, I don't recall that I do.
18    Q.  Sir, can you tell me what scientific test
19 that you employed in order to make the next statement
20 "Festo can foresee that either repackaging,
21 (palletizing) or special rigging (cribbing, straps) will
22 be needed both in transit and in the final phase of
23 unloading whether that be done by Arpin or Naugatuck
24 Valley Community College that transcend simply
25 protection of the pallet." What is the basis, the

Page 175

1  scientific basis, for that statement?
2     A.  Well, the scientific basis is that they have
3  complete knowledge of the product. They know its
4  height, weight, length, width, length. They know its
5  weight, although that information didn't make it all the
6  way down the trail. They obviously can move these
7  devices around. They are obvious experts in shipping.
8  We know that --
9     Q.  Sir, excuse me.
10       MR. STRATTON: He's answering the question.
11       MR. CURCIO: Well, we are going to have to
12 take it part by part.
13       MR. STRATTON: No. We will take it the way
14 he's answering the questions. If you don't like the
15 answer, you can't stop him.
16 BY MR. CURCIO:
17    Q.  Fine. You can answer and we'll break it up
18 when you're done.
19    A.  Fine. And the -- and we know that they did
20 palletize the product before and they palletized the
21 product after the accident.
22    Q.  Isn't it a fact, sir, that Festo didn't
23 palletize anything, that it's shipper palletized the
24 load and damaged the wheels and they were critical of
25 that?

Page 176

1     A.  They were critical of that, yes.
2     Q.  Whose responsibility is it under the Federal
3  Motor Carrier Safety Act to ensure that the load is
4  properly stored?
5     A.  The storage aspect of it under 393 --
6     Q.  And by "storage" I mean in the vehicle.
7     A.  You can infer that it -- actually, 393 has
8  more to do with the dropping of loads on a public
9  highway.
10       The load securement should a load come loose
11 is the responsibility of the driver except in those
12 situations where that hazard is a sealed load or by some
13 type of contract or agreement some other party has
14 accepted that responsibility. Normally speaking, it's
15 the driver's responsibility.
16    Q.  Are you aware of any contract or custom that
17 would in this particular instance cause the general
18 principle not to apply?
19    A.  Oh, no. Arpin is responsible for securing
20 the load absolutely.
21    Q.  In the next sentence of your conclusion you
22 say, "The paperwork of Trans Expo (Trans-Expo
23 International Shipping Booking) submitted by Erica
24 Ramirez seems to memorialize instructions." What do you
25 mean by "seems to memorialize"?

Page 177

1   A.   The representations are 59 inches. The
2   police measured the platform as 59, but yet we can see
3   geometrically it appears to be wider than that and the
4   police measured it at 69.
5   Q.   So when you say Erica Ramirez seems to
6   memorialize, what do you mean?
7   A.   Let me read it. Well, I'm saying the
8   dimensions which end up on the Trans-Expo sheet I
9   believe are based, since they are similar for all the
10  units from Festo, did come from Festo, but --
11  Q.   And is that a deduction that you make?
12  A.   Yes. I think it's also her testimony, as I
13  recall it. And that that is at variance with what the
14  police testified to and what is in evidence in the
15  photographs taken by the police measurements. And so
16  that's why I say it seems to indicate that there is a
17  dimensional error here.
18  Q.   Is that the critical dimensional error that
19  you were referring to?
20  A.   It is. And the critical part has to do with
21  the fact that it completely covers the platform and it
22  would be -- you cannot have a -- you can't stand on a
23  platform with the load at the same time and do that
24  safely in my estimation. It's just not enough room.
25  It's not a safe or suitable walking or working surface.

Page 178

1   Q.   It wasn't something that was safe for
2   Mr. Pouliot to do, is that correct?
3   A.   It was -- it was not. The surface he was
4   provided to have to secure the load was not enough
5   space.
6       There is no other platform to use. He has to
7   use that platform and there is -- there's not room for
8   him to be up there trying to manipulate the platform or
9   the trolley on the platform.
10  Q.   You say there's "possibly a large weight
11  error." Are you unsure about that?
12  A.   At the time that I wrote this I didn't have
13  the benefit of being as specific as I can now. I've
14  indicated that I have accepted Festo's, which I have
15  learned has been provided by Festo, but at the time I
16  learned of it it was the representation made by
17  Mr. Grady and, yes, I would be -- in fact, it would be
18  a -- a large discrepancy.
19  Q.   Between what and what?
20  A.   Well, between 400 pounds on the Trans-Expo, I
21  guess, manifest, if you will, or sales document and the
22  actual weight of the object.
23      It's also at variance with the bill of lading
24  constructed and the Court can think what it wants of it
25  but it's not clear to me what numbers were there at what

Page 179

1   points in time. It looks like 155 is written once and
2   then 155 became either 755 or 855 or 755 became at some
3   point a different number.
4   Q.   Do you know who made those errors?
5   A.   I have no idea. I have no idea.
6   Q.   Further down, and I believe we've
7   testified -- you've testified earlier this morning about
8   how you attempt to measure the Festo machine using
9   photographs that the police have supplied and I'm not
10  going to go back into that, so what I'd like to do is
11  skip down to where you state, "Festo's original estimate
12  was 400 pounds for both modules." What basis do you
13  have for determining that Festo made an original
14  estimate of 400 pounds?
15  A.   Because I believe Ramirez testified that she
16  got the information from Festo and she wrote down 400
17  pounds.
18  Q.   And have you seen a bill of lading listing
19  the modules at 755 pounds?
20  A.   Yes, sir.
21  Q.   Okay. What is a bill of lading?
22  A.   A bill of lading is a document that is
23  essentially -- it's the handshake for the shipment and
24  it will describe the shipment and then the driver signs
25  it and then at that point he has taken -- he takes

Page 180

1   control of the load.
2   Q.   Now, the driver is supposed to sign that
3   before he takes control of the load, is that correct?
4   A.   I believe that's correct.
5   Q.   And it's more than a handshake, is it not,
6   the bill of lading?
7   A.   Well, oh, I see what you're saying. I wasn't
8   thinking a handshake in terms of a gentlemen's
9   agreement.
10  Q.   Right.
11  A.   I'm thinking of a handshake in terms of I'm
12  passing the baton.
13  Q.   Okay. And that baton gets passed when the
14  driver accepts the load, is that correct?
15  A.   That's correct.
16  Q.   You've referenced as a source material that
17  you've used a book called Straight Truck, Driver
18  Handbook/Workbook, is that correct?
19  A.   Yes.
20  Q.   Do you consider that an authoritative text?
21  A.   Sure.
22  Q.   On matters having to deal with straight
23  trucks and their operation?
24  A.   Yes, sir, I do.
25  Q.   Would you agree, sir, with the definition of

Page 181

1  bill of lading in the volume Straight Truck, Driver
2  Handbook/Workbook that it is "a written contract between
3  the shipper and the carrier for transporting a shipment?
4  The paper identifies all freight in the shipment, the
5  consignee, the delivery location and the terms of the
6  agreement"?
7     A.  Well, I think the answer from my perspective
8  as an engineer, yes, but my -- I'm not a lawyer.
9     Q.  I understand.
10    A.  The legal issues are different.
11    Q.  I understand.
12    A.  But I certainly agree with what you've read
13 there as far as I understand it, but recognizing that
14 that's part of a bigger picture in terms of the
15 conveyance of information between the shipper, the
16 transit company and the receiver and then there's other
17 things that go on, too.
18    Q.  There's no question that Mr. Pouliot should
19 have filled out a bill of lading when he accepted this
20 cargo indicating its weight and signing off on that, is
21 that not true?
22        MR. STRATTON: Objection.
23        THE WITNESS: In terms of I thought he did
24 sign the paperwork, at least one of the two. There's
25 two different documents.

Page 182

1  BY MR. CURCIO:
2     Q.  Do you know when he signed that paper?
3     A.  I have no idea.
4     Q.  But before accepting the load he should have
5  known how much the cargo weighed, is that true?
6        MR. STRATTON: Objection.
7        THE WITNESS: As a general proposition, yes,
8  but it's irrelevant in this accident.
9  BY MR. CURCIO:
10    Q.  Okay. In your opinion, sir, who was
11 responsible for unloading this truck?
12    A.  Oh, the -- the document seems to
13 memorialize -- documentation -- I shouldn't say
14 document. There is no document per se.
15       It seems to memorialize that Arpin is --
16 Arpin's driver Pouliot has accepted the responsibility
17 to get the unit at least to the ground and more probably
18 into the building, but it is clear -- I don't know what
19 document number it is -- the sheet that was made out by
20 Trans-Expo indicates lift gate, indicates pallet-jacker,
21 and that the driver is going to -- going to have to get
22 it at least to the ground.
23    Q.  That was understood when Arpin and Pouliot
24 accepted the cargo, is that correct?
25        MR. STRATTON: Objection. Objection.

Page 183

1        MR. GRADY: Objection.
2        THE WITNESS: Well, I think it was understood
3  by Arpin. I'm not sure what Pouliot understood.
4  Probably nothing.
5        The representations that I've read in the
6  case seem to indicate that he was dispatched -- I can't
7  think of the name of the gentleman that gave the
8  statement -- that he really didn't get any information.
9  So there's one of set of exchanges and that's between
10 Festo, Trans-Expo and another set of exchanges between
11 Trans-Expo and Arpin and then on to Pouliot and all of
12 it didn't make it to Pouliot.
13 BY MR. CURCIO:
14    Q.  And you haven't asked Mr. Pouliot why he
15 started unloading the cargo at the community college,
16 right?
17    A.  I haven't talked to Pouliot about anything.
18    Q.  Can you tell me, sir, what the -- what the
19 National Motor Freight Classification is?
20    A.  Yes.
21    Q.  What is it?
22    A.  All right. It is a -- it is a -- I almost
23 want to use the word code, but that's a legal term and
24 it's not strictly what it is.
25        It is a set of guidelines which is

Page 184

1  promulgated for the less than truck load in the LTL
2  industry. I believe the body that writes these also
3  provides mediation services or at least dispute
4  resolution, and these set of rules can be adopted by
5  shipper and by carrier and in so doing they agree that
6  they are going to be guided by this. So that's --
7  that's what it is.
8     Q.  Do you have any indication that Festo and
9  Arpin agreed to these guidelines prior to the shipment
10 that's involved in this case?
11       MR. GRADY: Objection.
12       THE WITNESS: Yes, I do have a belief and I
13 don't believe that any of them ever heard of it. In
14 fact, I believe Mr. Grady specifically asked Ms. Ramirez
15 the very question and she shrugged her shoulders; she's
16 never heard of this.
17 BY MR. CURCIO:
18    Q.  So your understanding is what?
19    A.  Is that it was not -- it was not in play.
20    Q.  And is it your opinion that it has no
21 application to this case?
22    A.  Well --
23       MR. GRADY: Objection.
24       THE WITNESS: It's not binding in any way.
25 It's merely a set of recommendations that people can

Page 185

1  adopt as a way of doing business with each other, but in
2  many delivery situations that is not done and those
3  things are completely negotiable between the parties.
4  BY MR. CURCIO:
5      Q.  Is the driver supposed to inspect the cargo
6  before he accepts it?
7      A.  He is supposed to, yes.
8      Q.  And the driver can without any recourse by
9  his employer reject the cargo if he determines that the
10 cargo is unsafe, is that true?
11     A.  Yes.
12     Q.  By accepting the cargo and delivering it, is
13 it your opinion that Mr. Pouliot believed that he had
14 all of the necessary equipment to do the job that he
15 needed to do when he delivered this unit to the
16 community college?
17     A.  Yes, I think he did.
18     Q.  Sir, what's the basis of your statement that
19 Festo Corporation desired not to palletize the work
20 station?
21     A.  Well, it is the recollection I believe of
22 Ramirez that they were not palletizing it because they'd
23 been having damage and I believe it was United Airlines
24 that was the shipper of some of their units and that
25 they apparently, the way in which they were palletized,

Page 186

1  the casters got down between the slats and then when the
2  forks came in they would damage the casters. So they
3  decided not to palletize that.
4      Q.  You're saying that Festo Corporation made the
5  decision not to palletize this load?
6      A.  That -- that was their preference, yes. They
7  wanted to ship it unpalletized. That's my
8  understanding.
9      Q.  And who made that decision not to palletize
10 the load?
11     A.  I don't know, sir. I don't know who it was
12 at Festo, but clearly Festo at least in its approach but
13 based on Ramirez' testimony indicated that it's going to
14 be on wheels and they didn't want it damaged and it
15 would not be palletized.
16     Q.  Are you aware of any statement by any Festo
17 employee that the load, this load, should not be
18 palletized?
19     A.  I don't think so. Not the way you've asked
20 the question.
21     Q.  Sir, in your conclusion on page 7 of 10,
22 number 6, you end the paragraph by saying, "As such,
23 Festo has a duty to provide loading/unloading
24 instructions." Are you attempting to assert a legal
25 proposition there?

Page 187

1      A.  Oh, no. Nothing in my report should be
2  assumed that. And perhaps, unfortunately, these words
3  also have sort of a legal meaning, but so I guess the
4  word you object to is the -- did I use the word "duty"
5  or something?
6      Q.  Yes, you did.
7      A.  Where did I say that? Out of curiosity. I
8  don't see it.
9      Q.  Page 7 of 10.
10     A.  Yes.
11     Q.  The last full sentence before you have your
12 a, b, c and d.
13     A.  I think Festo needs to advise -- oh, way up
14 here. Yes. Well, that's custom and practice to say
15 that.
16     Q.  I see custom and practice.
17     A.  Custom and practice would be to --
18     Q.  Okay. So, how were you familiar with the
19 custom and practice used by shippers -- strike that --
20 used by the shipping department of manufacturers?
21     A.  Well --
22     Q.  What experience do you have as to the custom
23 and practice?
24     A.  Well, in the shipping of products it is often
25 necessary --

Page 188

1      Q.  I asked a question, sir. I'm asking for your
2  experience.
3      A.  Oh, well, the experience again is in
4  manufacturing operations where we ship products where we
5  need.
6      Q.  And what manufacturing operation was that
7  that you were involved in?
8      A.  Hydroline in Rockford, Illinois. They were a
9  technology audit and assessment client of the University
10 of Illinois. I was assigned to their project. We were
11 also looking at their shipping area, primarily material
12 handling and the processes that we -- I am familiar with
13 the types of brand labels that you buy for these
14 products including "Fragile, This side up, High center
15 of gravity," all the standard warnings to give people
16 the knowledge that they need about the product. This is
17 a very --
18     Q.  Sir.
19     A.  Yes.
20     Q.  Could you tell me, sir, whether a sign on the
21 Festo machine, "This side up," would have avoided this
22 accident?
23     A.  I don't think so. I gave that as an example.
24     Q.  How about a sign on the machine that says
25 "Fragile"?

Page 189

1  A. That might well be helpful.
2  Q. Would that have avoided this accident?
3  A. It may have if we said that.
4     The flip side was there we said this is a tie
5  point and you identify the tie points and someone
6  recognized that we need to lash the unit and we could do
7  it without damaging Festo's product because they have a
8  lift point or a tie point identified.
9  Q. Aside from the one company that the
10 University of Illinois did some consulting work for,
11 what makes you qualified to testify as to the custom and
12 practice used by manufacturers in their shipping
13 department?
14 A. Well, I don't -- I'm not sure I would ask the
15 Court to suggest in as lofty terms as you're suggesting.
16    I am suggesting that in the -- in the
17 specific areas I routinely see this. It is covered in
18 detail in the Accident Prevention Handbook of the
19 National Safety Council. It's routinely relied upon by
20 people who are concerned with material handling issues,
21 which I have been for some thirty years.
22 Q. Can you give me a reference, sir, in the
23 authoritative work that you have cited to a provision
24 that requires a shipper to provide unloading
25 instructions to a motor carrier? What's the citation to

Page 190

1  that?
2  A. I believe it is discussed in the Material
3  Handling Book, the Material Handling Handbook and
4  possibly also in the Accident Prevention Handbook. When
5  I get back to the office I'll check.
6  Q. Would you please provide those citations to
7  your counsel so he can provide them to me?
8  A. Certainly.
9  Q. How would cribbing have been used by the
10 carrier in this case to prevent this accident?
11 A. Well, using the word "cribbing," I'm not
12 looking at -- it's sort of like a dunnage between two
13 objects. But if we had in the truck additional 2 X 4s
14 and straps, it may be possible with the straps and
15 2 X 4s to create something equivalent to the cart
16 retention system in an ad hoc way.
17    In other words, getting in there, getting the
18 2 X 4s around those casters, getting the casters pointed
19 horizontally to the direction where the pitch is, get
20 the 2 X 4s down and lash the 2 X 4s.
21 Q. You're suggesting a possible way of securing
22 this cargo?
23 A. Exactly. Well, not securing. That part got
24 done in this case. When I say securing, securing it for
25 the trip. That was done.

Page 191

1     But getting it so that it can be unloaded
2  safely by securing it. I'm talking about the unloading
3  part when we have to use a lift that is a -- which is
4  out of spec and we now have to compensate for that in
5  some way.
6  Q. All right. So that when you were listing in
7  your finding of your report on page 7 of 10 various ways
8  of securing this unit, what you are giving is possible
9  ways of dealing with the problem lift gate?
10 A. Absolutely, sure.
11 Q. That's all I have.
12 A. Okay.
13    MS. O'DONNELL: I have some questions. Paul,
14 do you want me to go next?
15    MR. CURCIO: Yes.
16          EXAMINATION
17 BY MS. O'DONNELL:
18 Q. Good afternoon, Doctor Ruhl. It been quite a
19 while. Let me introduce myself. I'm Susan O'Donnell.
20 I represent Trans-Expo International and Erica Ramirez
21 in this case.
22    Doctor, in your testimony earlier today you
23 made a reference to the following phrase. I just want
24 to get some clarification.
25    The term used by you was "a boy was sent to

Page 192

1  do a man's job." Do you recall that testimony?
2  A. I do.
3  Q. When you said a boy was sent to do a man's
4  job were you referring to the personnel sent to do this
5  particular delivery or when you used the word "boy" were
6  you meaning the Maxon lift?
7  A. A very good question. I appreciate the
8  opportunity to be able to be a little more specific.
9     It was not a reference to personnel at all
10 and the reference to the personnel was unfortunate
11 because I can see it led you in that direction.
12    The lift is small relative to the load,
13 although we aren't even close to the load rating of the
14 Maxon. It's got a 2,500 pound load rating and we're not
15 even close.
16    But given that the load can't be secure and
17 he has to get up there and operate with it and there's
18 no room to operate, so it creates another problem with
19 working with it.
20 Q. Now, do I understand your earlier testimony
21 that you performed a number of tests using an exemplar
22 platform --
23 A. Yes.
24 Q. -- which applied weights of 400 pounds and
25 even up to 800 pounds?

### Page 193

1  A. Yes.
2  Q. And was that exemplar platform used on the
3  lift in question or on a substitute lift?
4  A. There actually were two platforms, one made
5  in Connecticut and one made in Arizona, and so each did
6  their respective jobs, so to speak.
7  The one is less pretentious in Arizona
8  because we are not trying to determine at what point it
9  would roll off. Remember, the hypothesis to be tested
10  was is there additional compliance in the Maxon lift
11  that can be identified as a function of load because we
12  couldn't do that with the actual lift because of the
13  existing damage. And the result of the test is that
14  there was no definable additional compliance.
15  Q. So, as I understand your earlier testimony,
16  that even at the weight range of 800 pounds there was no
17  additional deflection from the defect?
18  A. None that we could measure, that is correct.
19  And that should not be surprising because Maxon rates
20  this thing for 2,500 pounds and 800 is, you know, we're
21  not -- weight-wise we are not straining it at all.
22  Q. That was my next question. Does the Maxon
23  72-25A, do you know what the maximum weight capacity of
24  that lift was?
25  A. It's rated at 2,500. I would assume it has a

### Page 194

1  sizable factor of safety beyond that.
2  Q. Do I understand from your earlier testimony
3  that you determined the weight of the Festo unit that
4  ultimately was involved in this accident by relying upon
5  a question that had been posed by Mr. Grady during a
6  deposition?
7  A. That's where I learned of it. I learned of
8  it through the questions he asked. I did not actually
9  have the discovery -- the answers to discovery that
10  listed that, so I got it through Grady.
11  Q. And in connection with any of your tests, did
12  you weigh the Festo unit that had been involved in this
13  particular incident?
14  A. No, I've not.
15  Q. In your report, Preliminary Report, again I'm
16  going to refer back to that, you state that the weight
17  differential, if true, was a significant error with
18  safety implications.
19  A. Yes.
20  Q. And what do you mean by that?
21  A. Well, obviously the heavier it is the harder
22  it is going to be to manhandle. Paradoxically, it
23  doesn't increase. In other words, the propensity to
24  roll off is not enhanced by the weight. It's largely
25  independent of the weight.

### Page 195

1  But two things occur. One is with the
2  estimate of weight being what it is, we have had a
3  missed opportunity on the part of Arpin to try a
4  different strategy, although since they didn't tell
5  Pouliot anything anyway, you know, again the Court will
6  have to struggle with that. There's no scientific thing
7  to say about that.
8  So the weight then also enters the picture
9  obviously in a general sense that the risk of injury if
10  the device falls on someone clearly in a general way
11  will go up with weight. Clearly, if it weighs two
12  ounces it couldn't injure anybody and if it weighs two
13  tons and it falls on someone it's going to be difficult
14  not to believe that there would be very serious
15  injuries.
16  The weight itself enters in two ways. One is
17  the propensity for upscaling the injuries or essentially
18  the risk associated with it. The other thing is that it
19  just is harder to move around.
20  Q. Did you have any information which indicated
21  to you that Shawn Pouliot attempted to manhandle this
22  Learnline unit to prevent it from falling?
23  A. Well, I don't know if I would use the word
24  "manhandle." If I said it, then I said it. In looking
25  at the pictures of the size of it and how you'd have to

### Page 196

1  hold it, I don't think that that description is
2  unreasonable. But he indicated he had to adjust it. I
3  don't think he talked about the specific size of it.
4  But if he is on the ground, it's going to be -- and he's
5  at 58, the platform is at 18 inches, this thing is a
6  couple of inches over his head.
7  Q. But isn't it true, Doctor Ruhl, that even if
8  the Learnline unit weighed 400 pounds it would still be
9  your opinion that this particular lift without a cart
10  retention system was inappropriate for a unit on
11  wheels --
12  A. Yes.
13  Q. -- even if it weighed 400 pounds?
14  A. Yes. I think I've tried to be clear on that.
15  Q. Michael Kovac's deposition transcript was a
16  part of the packet of material that I understand you had
17  for your review, is that correct?
18  A. It was.
19  Q. Did you read Mr. Kovac's deposition
20  testimony?
21  A. I did.
22  Q. I'm going to refer to a particular section of
23  his testimony, so I'd ask if you could locate that.
24  It's Michael Kovac's deposition of October 23, 2003
25  A. Yes, ma'am.

Page 197

1    Q.   And I'd ask you to turn to page 72.
2    A.   Yes, ma'am.
3    Q.   Starting at line 14, Mr. Kovac made a
4  statement to the effect that "When a driver arrives to
5  pick up the cargo if there's a substantial variation
6  from what he's estimated that requires a larger truck or
7  it's too heavy for him to get into the truck or
8  whatever, the driver is instructed to call Dispatch and
9  Dispatch is supposed to follow up and let us know and
10 say, 'Look, this is way too -- way much bigger.' The
11 driver has to make a decision about whether or not this
12 is a feasible move." Do you see that?
13   A.   Yes.
14   Q.   Okay. Do you have any particular experience
15 or knowledge of the trucking industry to tell me whether
16 or not that's an accurate statement?
17   A.   Well, the experience comes from my graduating
18 from the S.O.S. Big Rig Driving School, and although
19 it's not particularly as important obviously truck
20 inspection is a part of -- Truck Safe America.
21        So, the -- I think that the subject area he's
22 talking about is fairly commonly understood in the
23 trucking industry or in the shipping industry
24 particularly with trucks and that assessment that he's
25 made is my opinion that in, speaking in a broad sense,

Page 198

1  painting with a broad brush, is generally true.
2        And that if he has been told that he's
3  picking up a box of ping-pong balls and awaiting him is
4  an M1 Abrams tank, obviously we've got a problem on our
5  hands. Or if he gets there and the containers are
6  placarded with the hazmat numbers and they are leaking,
7  he's got a problem.
8        I think that where I have a little difficulty
9  in this situation is a driver who is picking up a less
10 than truck load individual item in a dock environment
11 with essentially little information, virtually none
12 provided to him by his employer; the question is what is
13 he -- what is the difference that he is to detect?
14   Q.   I understand. So what you're saying is that
15 the statement where you have difficulty with it assumes
16 that the driver is provided with information by the
17 dispatcher as to what he expects to see when he gets
18 there?
19   A.   Exactly.
20   Q.   Okay. I just have a couple of other minor
21 questions.
22        In your report you refer to on page 5 a
23 deposition of Erica Ramirez dated 12-29-03
24   A.   I made a mistake.
25   Q.   I was hoping there wasn't a deposition in

Page 199

1  December of '03 that I didn't know about.
2    A.   I don't know how -- where that number came
3  up.
4    Q.   Is that an error in your report?
5    A.   It's got to be an error. I'm looking at the
6  dep right here and it says October 24th. I don't know
7  where I got the number. Obviously it's a typo that got
8  by me.
9    Q.   I've been informed that or at least it's my
10 understanding that Shawn Pouliot did a number of
11 deliveries with this truck that had been provided by
12 Arpin in the New York area.
13   A.   Yes, that's my understanding. I don't know
14 quite how many, but this -- it wasn't just this load.
15 There were other loads.
16   Q.   Did any of your investigation involve looking
17 into the -- either the type of cargo or the weights of
18 the cargo that had been involved in those earlier
19 shipments?
20   A.   No.
21   Q.   And why not?
22   A.   Well, I -- I didn't -- well, first of all, I
23 didn't know that any information would be available and,
24 secondly, I didn't see that it would be likely anything
25 that would be particularly useful to us.

Page 200

1        The issue here has to do with a very special
2  device, something that is sort of on wheels. It's not a
3  package and it's not a palletized load. So I did not --
4  and there's no -- there's no issue in this case that for
5  some reason the truck in aggregate would be overloaded.
6  So that would be one of the things that I would be
7  looking for, you know, if he rolled over going around a
8  turn or something or didn't pack it properly or it had a
9  high center on it. So I didn't see that as an issue in
10 the case.
11   Q.   So, is it fair to say you don't know whether
12 any of the other items of cargo that Pouliot delivered
13 with this truck with this lift gate was an item that was
14 on wheels that weighed in excess of 400 pounds?
15        MR. STRATTON: Just objection to it assuming
16 facts not in evidence.
17        THE WITNESS: No, no, I do not.
18 BY MS. O'DONNELL:
19   Q.   Okay. Doctor, in your experience or
20 education, your training, are you aware of any
21 regulation or requirement that a carrier send more than
22 one person where a load has a weight of in excess of 500
23 pounds?
24   A.   No. I don't think there's any rules that are
25 that hard and fast. I mean, they are just a bunch of