

Dr. Roland L. Ruhl
Ruhl Forensic, Inc
2025 N. 3rd Street. Suite 250
Phoenix, AZ 85004
(800) 235-2808 (Toll Free)
(602) 258-1077 (Fax)

## Preliminary Report

# Shawn Pouliot
# V.
# Paul Arpin Van Lines, Arpin Logistics, Inc.

**Our Case #2002-184-BE**

### Report Date:

January 14, 2004

### Prepared for:
**Michael A. Stratton**
**Stratton & Faxon**
59 Elm Street
New Haven, CT 06510
(866) 351-9500 (Office)
(203) 624-9100 (Fax)

### Prepared by:

Roland L. Ruhl, Ph.D., P.E.
rlruhl@ruhl.com



# DISCLAIMER

The author is awaiting additional discovery material.

The author will seasonably update this report by supplementation as additional material is received and/or additional research is conducted.

R U H L

F O R E N S I C

# BACKGROUND

Shawn Leo Pouliot, at the time of his accident on October 23, 2001, was an "owner/operator" for Arpin Logistics, West Warwick Industrial Park, P.O. Box 1302, Town of East Greenwich, State of Rhode Island 02818-0998. Arpin Logistics signed up Pouliot on March 16, 2001.

The truck, leased by Pouliot, was in for repairs (2000 Freightliner Classic). Arpin[1] provided a "loaner", a 1989 Peterbilt (manufactured by VW of Brazil, VIN 9DWWT7H39KC007826). This straight truck was equipped with a 24-foot van body manufactured by Supreme Corporation. The truck was equipped also with a Maxon "Tuk-A-Way" folding tailgate lift, model 72-25A. This particular lift has a 20" deep main platform and a 20" deep folding platform "beaver tail".

Shawn Pouliot was dispatched by Arpin to pick up and deliver several less than truckload (LTL) consignments. Among those involved was a pickup at Festo Regional Logistics, 430 Wireless Road, Hauppauge, NY 11788. The load consisted of two modules. One module was a hydraulics workstation which police measured as being 70 ¾" high by 69 ¾" long and 31" wide. Other documents suggest 72" high by 59" long by 33" high. The unit is supported by four (4) swivel caster wheels. It is believed that two (2) of the casters may be able to be locked. If so, they would typically be on the same end of the unit. The workstation was not palletized and only had "shrink wrap" to protect it from scratches.

A second large banded box on a skid was also shipped. The shipper, Festo, provided a handwritten bill of lading suggesting the combined weight as 755 pounds. A computer-generated bill of lading (Pouliot Deposition Exhibit B) seems to suggest a weight of 400 pounds. That same exhibit B also states under sender origin remarks "12 pads required" and "straps".

It is believed that the packages were "dock loaded" by at least two (2) Festo personnel. That is to say, the bed of the truck is at the same level as the dock or they are made compatible by use of a dock plate. However, the Maxon 72-25A Tuk-A-Way tailgate lift was not used.

Pouliot, in due course, arrived at his destination, Naugatuck Valley College, 750 Chase Parkway, Waterbury, CT 06708. Based on the police report, Pouliot pulled the delivery truck into a paved area bounded by Founders Hall on his left and Annex Building on his right. In front of his truck would be an elevated walkway connecting these two buildings. Near the rear of the truck, on the left, would be an 8-foot at grade-paved entrance, handicap accessible, into Founders Hall. Also to the right side would be a large ramp allowing access to the Annex Building. Based on the campus map, the approach to the walkway would be facing south. The police diagram and photos show the vehicle rotated clockwise in the paved area which places the rear of the truck closer to the at grade entrance to Founders Hall.

Pouliot describes the accident in his deposition, which can be summarized as follows: He was alone and delivering by use of the Maxon Tuk-A-Way tailgate lift. He moved the "rolling" workstation to the platform which, at this point would have the beavertail extended and the main platform at bed height. He rolled the workstation onto the platform whereupon it would cover nearly all of the 72" by 40" platform. He began to lower the platform by use of the control lever at the right rear side of the rear body. As the platform descended, he noticed the far end of the workstation (driver's side) start to shift. He walked over and pushed that end back toward the truck. He returned to the right side and

---

1 There are two Arpin entities which shall be treated collectively for the purposes of this report.



# BACKGROUND (continued)

noticed that side also needed adjusting. At the moment of final instability, he was at the right rear corner of the vehicle when the unit rolled off the platform and the machine ended up on top of him. Pouliot felt the lift was approximately one-half the way down when the shifting occurred. The police measured the lift height after the accident and the rear surface of the beavertail was approximately 18 ¼" off the ground and the rear top of the main platform was 23 ½" off the ground. This is approximately 50% of the bed height, (bed height 50" approximately). This measurement is also consistent with the statement of Barry Groman.

Post occurrence photos of the open van show several pads in the area where the workstation was believed to be positioned. Also a blue strap is visible and believed to be used to hold the workstation to the inside horizontal rub rails to prevent it from rolling while in transit.

As a result of this accident, Shawn Pouliot has suffered permanent paralysis.

Other pertinent facts include:

Shawn Pouliot had a valid CDL license. A CDL license would be required to drive the subject vehicle.

Shawn Pouliot has had prior experience with moving vans and rear lift devices. He says he has never operated this style (Maxon Tuk-A-Way) before and had received no training on such a device from Arpin.

It appears the truck he was loaned and dispatched with did not possess any cribbing material or chocks or any lift device to install cribbing or chocks under the swivel caster wheels. It appears, also, that the strap(s), while sufficient in length to hold the unit to the side rub rails, may not have been of suitable length to assist in tying a load to the platform during descent, should that option be feasible without damage to the workstation.

Festo Corporation provided some information on its load, [incorrect in critical ways] including a desire not to palletize the work station [due to improper prior palletization that allowed damage to the work station wheels when the forks entered the pallet pockets] to Trans Expo, who in turn provided information to Arpin. Bill Tweedy was the dispatcher who verbally dispatched Pouliot without providing any paperwork or written instructions.

## MATERIALS REVIEWED

1.    Deposition of Shawn Pouliot dated 12/3/2002.

2.    Deposition of Heidi Kern dated 12/8/03.

3.    Deposition of Michael Kovak dated 10/23/03.

4.    Deposition of Erica Ramires dated 12/29/03.

5.    Police Investigation File.



# CONCLUSIONS

1.    For the purpose of commercial vehicle safety, Shawn Pouliot, owner/operator, is considered an "employee" of the motor carrier, Arpin. Arpin has a duty to insure that Pouliot has the knowledge and skills to safely drive. Arpin has a duty to insure there is a program of systematic maintenance and repair on the loaned vehicle. (FMSCA 390.5, 383 Sub-Part G and 396.3) The Maxon Tuk-A-Way lift is permanently attached to the truck. It has a maintenance manual with recommended periodic inspections and specific specifications for platform droop.

2.    The truck provided has a defective lift gate as it was damaged, deformed and severely worn. As a result, it was out of manufacturer specification - too much droop. This droop caused to the falling of the wheeled load. Due to distortion from impacts, the platform stops do not properly align. This allows the platform to appear more stable when unloaded. Due to poor stop alignment, significant droop occurs as it is loaded. This does not occur with a lift whose stops are properly aligned. Arpin dispatched Pouliot with a defective truck that was a cause of his injuries.

3.    The Maxon Tuk-A-Way should never be used with a wheeled load unless a "cart retention" system is installed. See Maxon literature. Arpin dispatched Pouliot with equipment not recommended by the manufacturer for this application unless equipped with the "cart retention system" for unloading the workstation. Maxon makes two other lifts usable on this truck that insure the platform remain level at all times.

4.    The workstation should never be lowered on a Tuk-A-Way tailgate lift lacking a cargo retention system unless it is cribbed or straps are used to secure the load to the platform. Further, the shippers use of shrink-wrap means the strap must go over the platform top ER mounting frame and no specifications exist to insure that strap tightening will not damage the unit. Likewise, it is not clear that jacking and cribbing the frame to raise the weight off the wheels or to socket the wheels in supports that will prevent rolling will not damage the product. Arpin failed to dispatch Pouliot with a properly selected and maintained lift and proper rigging equipment. Arpin failed to insure that Pouliot had the knowledge and skills to safely complete the job. These errors were causes of this accident.

5.    However, based on the tests conducted by the author, it can be determined that had nothing different been done except align the platform and adjust shims so as to meet manufacturer's specifications for platform and beaver tail angles (platform up at top by as much that it is down at bottom and beaver tail parallel to platform) through proper shimming, the load would not have rolled off and the accident would not have happened.

6.    The load shipped by Festo consists of two modules. One is a conventional box that is palletized. This is a very standard configuration. The second module is a workstation that is not palletized, but rather has four (4) swivel caster wheels (two may be lockable to prevent tire rotation). However, the configuration is even more difficult to handle than even a "grocery cart" because it does not use 2 fixed wheels. As such, this unit will not track, but rather move "omni directionally." As such it is difficult to maneuver even on a level surface by a single person. Also the module is quite long and high (high center of gravity). It is believed Festo employees (plural) loaded both modules on the Arpin truck from their loading

RUHL

FORENSIC

## CONCLUSIONS (continued)

dock. Festo can foresee that either repackaging (palletizing) or special rigging (cribbing, straps) will be needed both in transit and in the final phase of unloading whether that be done by Arpin or Naugatuck Valley Community College that transcend simply protection of the pallet. The paperwork of Trans Expo (Trans-Expo International Shipment Booking) submitted by Erica Ramirez seems to memorialize instructions provided by Festo Corp. contains what is surely a critical dimensional error and also possibly a large weight error. Based on police post occurrence measurements and a photo of the police tape measure memorializing table width (1490 mm – 59 21/32") confirm that the overall width of 59" stated must be incorrect as the vertical posts and caster supports are additional, thereby suggesting the police measurement is correct. This is a critical dimension as the police measurement confirms that the lift gate width is too small for the load. Representations in the case [Grady, page 64-65, Kovak deposition] suggest the work station alone weighted 812 pounds. Festo's original estimate was 400 pounds for both modules, and even higher than the bill of lading listing with modules at 755 pounds. If true, this is a significant error with safety implications. As such, Festo has a duty to provide loading/unloading instructions for their non-palletized mobile product. Among the information needed by the shipper (or ultimate unloader) will be:

a. Weight and center of gravity and overall dimensions.

b. Acceptable lift points to elevate the product to get the caster wheels off the ground without damaging the product.

c. Acceptable lash points that can safely be used to secure the module to prevent rolling without damaging the product.

d. Notification of use of caster swivel wheels and the need to provide cribbing for the safe blocking.

Subject to continued discovery, it is not believe that Festo provided this information.

Finally, Festo needs to advise Arpin prior to arrival on the dock about the nature of the non-standard load (i.e. large, heavy, unpalletized load using only swivel caster wheels) so Arpin can send the proper equipment and properly trained personnel in sufficient numbers to get the job done safely.

R U H L

FORENSIC

# INSPECTIONS

On November 25, 2002, this author inspected the subject truck at an Arpin facility in West Warwick, RI.

The following is noted:

The lift is a Maxon 72-25A lift. Serial number 1288883. Consultation with the manufacturer revealed this unit was manufactured in December 1988.

A.    Evidence Spoilation.

Upon visual inspection, it was immediately noticed that the unit had recently been greased. Bright blue grease was running from many joints. It was fresh, tacky on the surface and without any dust accumulation whatsoever. Police at scene photographs show the joints to be dry. This is important to a forensic investigation because it is anticipated that the "dry" joints at the time of the accident will produce more vibration (stick/slip movement) than a freshly greased joint. As such, the tests run by this author (or anyone) may underestimate the ability of the lift to dislodge the casters on the safety plate deck and overcome static friction to initiate movement during descent. This author, and indeed all investigators, have been deprived the opportunity to observe and measure the effect of dry joints upon the stability of the workstation on the lift. This action is contrary to ASTM Standard 860.

B.    Physical Condition:

1.    The beaver tail, the main platform and the struts show impact damage which has "sprung", the deck and distorted the pivots. As such, it rests out of angular position, but settles under load. This needs to be straightened.

2.    The main platform "hangs down" at the rear (droops). Accumulated wear requires the user to adjust the thickness of a shim pad to insure the platform, at full up position, is "up" at top as much as it is "down" at the bottom.

3.    The bottoms of the struts have been ground down by moving the vehicle with the platform on the ground. Rebuilding needs to be done here also.

4.    Shims need to be applied between the platform and the beaver tail so the beaver tail does not droop relative to the platform.

5.    The bent arms and brackets need to be straightened.

C.    Tests:

**Test 1** – A surrogate workstation was built with a footprint, based on measurements by the police and using 4 (4") solid rubber tread swivel caster wheels. The total load weight was 800 pounds. As will be shown in later tests, the use of the maximum possible workstation load should provide NO significant further droop due to structural compliance.



# INSPECTIONS (continued)

The author ran four (4) tests in which the load either fell off or started to move at the following platform heights above the ground:

Test 1        Fell off 28"
Test 2        Fell off 18"
Test 3        Fell off 12"
Test 4        Started to move 18"

The reader is reminded that the truck was parked "downhill" at the front approximately 1.9 degrees.

The author then visited the accident scene at Naugatuck Valley Community College and took level measurements down the center of the paved driveway where Pouliot parked. That location allowed the truck to point "downhill" at the front just as the tests did. The slope at the accident scene would allow the bed to be approximately 0.5 degrees down in front.

The results obtained allow the following conclusions:

1. As the lift descends, the initial droop (by lift design) grows. The exemplar casters will start to roll generally in the same range of platform height as measured by the police.

2. Variability of actual height at incipient roll is to be expected due to initial caster swivel angle and how the wheel engages the raised cleats of the safety plate deck.

3. Locking the wheel on a set of casters, if only on one side, will not, in probability, prevent this accident, as roll off will initiate on the non-locked side.

**Test 2** – Suzanne Webb, MSCE, EIT, a degreed engineer and licensed engineering intern, operating under this author's direction and control, ran additional tests on March 4, 2003, on another exemplar. The purpose of these tests was to measure in detail change in platform angle for various load levels as a function of platform deck height above the ground. These tests were run at load levels varying from zero to 700 pounds.

Important conclusions reached are:

1. By design, the Tuk-A-Way lift will change angle approximately 9 degrees. The manufacturer recommends shimming so that it is equally "up" at top by the same amount is it is "down" at the bottom (approximately 4.5 degrees each way).



# INSPECTIONS (continued)

2.  The angle of both the platform and beaver tail is not measurably affected by load magnitude in the range tested (0 – 800 lbs.). That is to say angular deflection with increased load is minimal.



Dr. Roland L. Ruhl
Ruhl Forensic, Inc.
2025 N. 3rd Street, Suite 250
Phoenix, AZ 85004
(800) 235-2808 (Toll Free)
(602) 258-1077 (Fax)

Preliminary Report

# Shawn Pouliot
# V.
# Paul Arpin Van Lines, Arpin Logistics, Inc.

Our Case #2002-184-E

Report Date:

March 7, 2003

Prepared for:
Michael A. Stratton
Koskoff, Koskoff and Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT  06604
(203) 336-4421 (Office)
(203) 368-3244 (Fax)

Prepared by:

Roland L. Ruhl, Ph.D., P.E.
rlruhl@ruhl.com



# DISCLAIMER

The author is awaiting additional discovery material.

The author will seasonably update this report by supplementation as additional material is received and/or additional research is conducted.

# BACKGROUND

Shawn Leo Pouliot, at the time of his accident on October 23, 2001, was an "owner/operator" for Arpin Logistics, West Warwick Industrial Park, P.O. Box 1302, Town of East Greenwich, State of Rhode Island 02818-0998. Arpin Logistics signed up Pouliot on March 16, 2001.

The truck, leased by Pouliot, was in for repairs (2000 Freightliner Classic). Arpin[1] provided a "loaner", a 1989 Peterbilt (manufactured by VW of Brazil, VIN 9DWWT7H39KC007826). This straight truck was equipped with a 24-foot van body manufactured by Supreme Corporation. The truck was equipped also with a Maxon "Tuk-A-Way" folding tailgate lift, model 72-25A. This particular lift has a 20" deep main platform and a 20" deep folding platform "beaver tail".

Shawn Pouliot was dispatched by Arpin to pick up and deliver several less than truckload (LTL) consignments. Among those involved was a pickup at Festo Regional Logistics, 430 Wireless Road, Hauppauge, NY 11788. The load consisted of two modules. One module was a hydraulics workstation which police measured as being 70 ¾" high by 69 ¾" long and 31" wide. The unit is supported by four (4) swivel caster wheels. It is believed that two (2) of the casters may be able to be locked. If so, they would typically be on the same end of the unit. The workstation was not palletized and only had "shrink wrap" to protect it from scratches.

A second large banded box on a skid was also shipped. The shipper, Festo, provided a handwritten bill of lading suggesting the combined weight as 755 pounds. A computer-generated bill of lading (Pouliot Deposition Exhibit B) seems to suggest a weight of 400 pounds. That same exhibit B also states under sender origin remarks "12 pads required" and "straps".

It is believed that the packages were "dock loaded" by at least two (2) Festo personnel. That is to say, the bed of the truck is at the same level as the dock or they are made compatible by use of a dock plate. However, the Maxon 72-25A Tuk-A-Way tailgate lift was not used.

Pouliot, in due course, arrived at his destination, Naugatuck Valley College, 750 Chase Parkway, Waterbury, CT 06708. Based on the police report, Pouliot pulled the delivery truck into a paved area bounded by Founders Hall on his left and Annex Building on his right. In front of his truck would be an elevated walkway connecting these two buildings. Near the rear of the truck, on the left, would be an 8-foot at grade-paved entrance, handicap accessible, into Founders Hall. Also to the right side would be a large ramp allowing access to the Annex Building. Based on the campus map, the approach to the walkway would be facing south. The police diagram and photos show the vehicle rotated clockwise in the paved area which places the rear of the truck closer to the at grade entrance to Founders Hall.

Pouliot describes the accident in his deposition, which can be summarized as follows: He was alone and delivering by use of the Maxon Tuk-A-Way tailgate lift. He moved the "rolling" workstation to the platform which, at this point would have the beavertail extended and the main platform at bed height. He rolled the workstation onto the platform whereupon it would cover nearly all of the 72" by 40" platform. He began to lower the platform by use of the control lever at the right rear side of the rear body. As the platform descended, he noticed the far end of the workstation (driver's side) start to shift. He walked over and pushed that end back toward the truck. He returned to the right side and noticed that side also needed adjusting. He decided to go up on the platform to better assess the

---

1 There are two Arpin entities which shall be tested collectively for the purposes of this report.



# BACKGROUND (continued)

situation. He was at the right rear corner of the workstation when the unit shifted again, sweeping him off the platform and the machine ended up on top of him. Pouliot felt the lift was approximately one-half the way down when the shifting occurred. The police measured the lift height after the accident and the rear surface of the beavertail was approximately 18 ¼" off the ground and the rear top of the main platform was 23 ½" off the ground. This is approximately 50% of the bed height, (bed height 50" approximately). This measurement is also consistent with the statement of Barry Groman.

Post occurrence photos of the open van show several pads in the area where the workstation was believed to be positioned. Also a blue strap is visible and believed to be used to hold the workstation to the inside horizontal rub rails to prevent it from rolling while in transit.

As a result of this accident, Shawn Pouliot has suffered permanent paralysis.

Other pertinent facts include:

Shawn Pouliot had a valid CDL license. A CDL license would be required to drive the subject vehicle.

Shawn Pouliot has had prior experience with moving vans and rear lift devices. He says he has never operated this style (Maxon Tuk-A-Way) before and had received no training on such a device from Arpin.

It appears the truck he was loaned and dispatched with did not possess any cribbing material or chocks or any lift device to install cribbing or chocks under the swivel caster wheels. It appears, also, that the strap(s), while sufficient in length to hold the unit to the side rub rails, may not have been of suitable length to assist in tying a load to the platform during descent, should that option be feasible without damage to the workstation.



# CONCLUSIONS

1.  For the purpose of commercial vehicle safety, Shawn Pouliot, owner/operator, is considered an "employee" of the motor carrier, Arpin. Arpin has a duty to insure that Pouliot has the knowledge and skills to safely drive. Arpin has a duty to insure there is a program of systematic maintenance and repair on the loaned vehicle. (FMSCA 390.5, 383 Sub-Part G and 396.3) The Maxon Tuk-A-Way lift is permanently attached to the truck. It has a maintenance manual with recommended periodic inspections and specific specifications for platform droop.

2.  The truck provided has a defective lift gate as it was damaged, deformed and severely worn. As a result, it was out of manufacturer specification - too much droop. This droop caused to the falling of the wheeled load. Due to distortion from impacts, the platform stops do not properly align. This allows the platform to appear more stable when unloaded. Due to poor stop alignment, significant droop occurs as it is loaded. This does not occur with a lift whose stops are properly aligned. Arpin dispatched Pouliot with a defective truck that was a cause of his injuries.

3.  The Maxon Tuk-A-Way should never be used with a wheeled load unless a "cart retention" system is installed. See Maxon literature. Arpin dispatched Pouliot with equipment not recommended by the manufacturer for this application unless equipped with the "cart retention system" for unloading the workstation. Maxon makes two other lifts usable on this truck that insure the platform remain level at all times.

4.  The workstation should never be lowered on a Tuk-A-Way tailgate lift lacking a cargo retention system unless it is cribbed or straps are used to secure the load to the platform. Further, the shippers use of shrink-wrap means the strap must go over the platform top ER mounting frame and no specifications exist to insure that strap tightening will not damage the unit. Likewise, it is not clear that jacking and cribbing the frame to raise the weight off the wheels or to socket the wheels in supports that will prevent rolling will not damage the product. Arpin failed to dispatch Pouliot with a properly selected and maintained lift and proper rigging equipment. Arpin failed to insure that Pouliot had the knowledge and skills to safely complete the job. These errors were causes of this accident.

5.  However, based on the tests conducted by the author, it can be determined that had nothing different been done except align the platform and adjust shims so as to meet manufacturer's specifications for platform and beaver tail angles (platform up at top by as much that it is down at bottom and beaver tail parallel to platform) through proper shimming, the load would not have rolled off and the accident would not have happened.

6.  The load shipped by Festo consists of two modules. One is a conventional box that is palletized. This is a very standard configuration. The second module is a workstation that is not palletized, but rather has four (4) swivel caster wheels (two may be lockable to prevent tire rotation). However, the configuration is even more different to handle than even a "grocery cart" because it does not use 2 fixed wheels. As such, this unit will not track, but rather move "omni directionally." As such it is difficult to maneuver even on a level surface by a single person. Also the module is quite long and high (high center of gravity) It is believed Festo employees (plural) loaded both modules on the Arpin truck from their loading

## CONCLUSIONS (continued)

dock. Festo can foresee that either repackaging (palletizing) or special rigging (cribbing, straps) will be needed both in transit and in the final phase of unloading whether that be done by Arpin or Naugatuck Valley Community College. As such, Festo has a duty to provide loading/unloading instructions for their non-palletized product. Among the information needed by the shipper (or ultimate unloader) will be:

a. Weight and center of gravity.

b. Acceptable lift points to elevate the product to get the caster wheels off the ground without damaging the product.

c. Acceptable lash points that can safely be used to secure the module to prevent rolling without damaging the product.

d. Notification of use of all caster swivel wheels, which will not track. Also, notice of the presence of wheel locks, if any, and their use.

Subject to continued discovery, it is not believe that Festo provided this information.

Finally, Festo needs to advise Arpin prior to arrival on the dock about the nature of the non-standard load (i.e. large, heavy, unpalletized load using only swivel caster wheels) so Arpin can send the proper equipment and properly trained personnel in sufficient numbers to get the job done safely.

R U H L

FORENSIC

# INSPECTIONS

On November 25, 2002, this author inspected the subject truck at an Arpin facility in West Warwick, RI.

The following is noted:

The lift is a Maxon 72-25A lift. Serial number 1288863. Consultation with the manufacturer revealed this unit was manufactured in December 1988.

A.     Evidence Spoilation

Upon visual inspection, it was immediately noticed that the unit had recently been greased. Bright blue grease was running from many joints. It was fresh, tacky on the surface and without any dust accumulation whatsoever. Police at scene photographs show the joints to be dry. This is important to a forensic investigation because it is anticipated that the "dry" joints at the time of the accident will produce more vibration (stick/slip movement) than a freshly greased joint. As such, the tests run by this author (or anyone) may underestimate the ability of the lift to dislodge the casters on the safety plate deck and overcome static friction to initiate movement during descent. This author, and indeed all investigators, have been deprived the opportunity to observe and measure the effect of dry joints upon the stability of the workstation on the lift. This action is contrary to ASTM Standard 860.

B.     Physical Condition:

1.     The beaver tail, the main platform and the struts show impact damage which has "sprung", the deck and distorted the pivots. As such, it rests out of angular position, but settles under load. This needs to be straightened.

2.     The main platform "hangs down" at the rear (droops). Accumulated wear requires the user to adjust the thickness of a shim pad to insure the platform, at full up position, is "up" at top as much as it is "down" at the bottom.

3.     The bottoms of the struts have been ground down by moving the vehicle with the platform on the ground. Rebuilding needs to be done here also.

4.     Shims need to be applied between the platform and the beaver tail so the beaver tail does not droop relative to the platform.

5.     The bent arms and brackets need to be straightened.

C.     Tests:

Test 1 – A surrogate workstation was built with a footprint, based on measurements by the police and using 4 (4") solid rubber tread swivel caster wheels. The total load weight was 800 pounds, roughly equal to the total load of the two modules. As will be shown in later



# INSPECTIONS (continued)

tests, the use of the maximum possible workstation load should provide <u>NO</u> significant further droop due to structural compliance.

The author ran four (4) tests in which the load either fell off or started to move at the following platform heights above the ground:

| | |
|---|---|
| Test 1 | Fell off 28" |
| Test 2 | Fell off 18" |
| Test 3 | Fell off 12" |
| Test 4 | Started to move 18" |

The reader is reminded that the truck was parked "downhill" at the front approximately 1.9 degrees.

The author then visited the accident scene at Naugatuck Valley Community College and took level measurements down the center of the paved driveway where Pouliot parked. That location allowed the truck to point "downhill" at the front just as the tests did. The slope at the accident scene would allow the bed to be approximately 0.5 degrees down in front.

The results obtained allow the following conclusions:

1. As the lift descends, the initial droop by (lift design) grows. The exemplar casters will start to roll generally in the same range of platform height as measured by the police.

2. Variability of actual height at incipient roll is to be expected due to initial caster swivel angle and how the wheel engages the raised cleats of the safety plate deck.

3. Locking the wheel on a set of casters, if only on one side, will not, in probability, prevent this accident, as roll off will initiate on the non-locked side.

**Test 2** -- Suzanne Webb, MSCE, EIT, a degreed engineer and licensed engineering intern, operating under this author's direction and control, ran additional tests on March 4, 2003, on another exemplar. The purpose of these tests was to measure in detail change in platform angle for various load levels as a function of platform deck height above the ground. These tests were run at load levels varying from zero to 700 pounds.

Important conclusions reached are:

1. By design, the Tuk-A-Way lift will change angle approximately 9 degrees. The manufacturer recommends shimming so that it is equally "up" at top by the same amount is it is "down" at the bottom (approximately 4.5 degrees each way).



## INSPECTIONS (continued)

2. The angle of both the platform and beaver tail is not measurably affected by load magnitude in the range tested (0 – 800 lbs.). That is to say angular deflection with increased load is minimal.