Page 41

1 allow you to determine the angle change of the lift
2 platform as it travels up and down?
3   A.  Yes. I haven't done it, but you can do it.
4   Q.  How is that done?
5   A.  Well, it would be done several ways. One
6 would be simply to draw it to scale on a sheet of paper
7 and take a large compass and move the thing
8 progressively through its angles and measure them.
9       One could turn to a computer-aided design
10 program which would essentially do that in the virtual
11 environment and plot the answers for you or one could
12 derive the kinematic equations themselves and plot them
13 out.
14  Q.  Did you perform this analysis?
15  A.  No, sir, I did not. At this point we have
16 not.
17      We would -- it would -- to my way of thinking
18 it would be done only under the -- under the, really
19 under the auspices of an animation, not -- it really is
20 not necessary for any conclusions I reached.
21  Q.  Now, directing your attention to Exhibit D,
22 which we have already spoken about, and I believe that's
23 a blow-up of a platform adjustment page 10 taken from
24 the manual that was published in March of 2002 on a
25 72-25C Tuk-A-Way lift, right?

Page 42

1   A.  That's right.
2   Q.  Now, what was the purpose of enlarging the
3 page and drawing parallel -- a line parallel to the lift
4 platform in Figures 2A and B?
5   A.  Oh, I wished to measure the angle to compare
6 that to my test data, ultimately to compare it to the
7 test that Suzanne ran and to see that it -- it does
8 exactly what the Maxon manual suggests.
9       And if one splits the difference it should be
10 up as much at the top as it is at the bottom and I
11 believe that the measurements which are in front of me
12 which have been produced yesterday based upon my
13 calculations sort of extemporaneously over the phone
14 with Mr. Stratton convinced me that those measurements
15 on that page produced yesterday comport with everything
16 else I've said here to you. So it's further confirming
17 of what I'm telling you.
18  Q.  Is it fair to say that you used that
19 measurement in formulating your opinion?
20  A.  I did not use the measurement as shown on
21 page 9 because I didn't have it when I did it. I'm
22 saying now that I do have it it confirms everything that
23 I have said.
24  Q.  I'm talking about the measurement on Exhibit
25 D.

Page 43

1   A.  Yes, I used that measurement and I also
2 compared it to Suzanne's tests and it also comports with
3 the test data that I obtained at the scene -- or not at
4 the scene, at the test, to the extent one can obtain
5 that data given the damage to the lift.
6   Q.  Did you use the diagram that's shown in
7 Figure 2A on page 10 of Exhibit D as a basis for
8 formulating your conclusion that below van floor
9 measuring angle is 4.5 degrees?
10  A.  Yes. One basis.
11  Q.  If the figures are not to scale would it be
12 valid to measure any part of the drawing and correlate
13 that measurement to the dimensions of the actual lift
14 gate?
15  A.  If it were not to scale, no, then you
16 wouldn't use it for that.
17  Q.  And did you have any document or letter or
18 any kind of communication from Maxon that these drawings
19 were to scale?
20  A.  No. Didn't ask them one way or the other.
21  Q.  That's an assumption you're drawing on your
22 own, correct?
23  A.  That's absolutely correct, yes. But we also
24 tested it, so we know that's true.
25  Q.  Now, on the same page, that is, page 10 of

Page 44

1 Exhibit D, Figure 2B appears to be a drawing of a
2 properly adjusted lift gate when it is lowered to the
3 ground.
4   A.  That's correct.
5   Q.  Would you agree?
6   A.  Absolutely.
7   Q.  Does the picture show the rear tip of the
8 flipover touching the ground? That's Figure 2B.
9   A.  2B? Yes.
10  Q.  Does the picture show the support structure
11 underneath the main platform also touching the ground?
12  A.  It's a little hard to see, but it may be.
13 Yes, it may be. I think that's cutting the cheese too
14 fine.
15  Q.  Did you measure the distance from the bottom
16 of the support structure to the top surface of the main
17 platform?
18  A.  I measured from the ground up, yes, and it's
19 50 inches.
20  Q.  Was it in the order of 6 inches?
21  A.  Fifty inches from the ground.
22  Q.  From the bottom of the support structure to
23 the top surface of the main platform --
24  A.  Yes. It's 50 inches.
25  Q.  -- as shown in Figure 2B?

Page 45

1  A. You asked me where I measured them. That's
2  one of the measurements I made. There's other
3  measurements I've made that generally size the unit as
4  it — as it sat at the — at the inspection.
5  Q. Would you agree that the distance from the
6  front edge of the main platform of the support structure
7  to the rear edge of the deployed flipover is
8  approximately 39 inches?
9  A. Yes. I think the specs are 40, but 39 is
10 close enough.
11 Q. Okay. Directing your attention now to a
12 document that has at the top the entry 2002-184E Notes
13 marked Exhibit E, do you see that document?
14 A. Yes, sir, sure.
15 Q. Under the heading "Lift" there's a contact
16 name Victor with a phone number.
17 A. There is.
18 Q. Who is Victor?
19 A. Victor is an employee of Maxon lift that
20 Erica — that Suzanne talked to.
21 Q. Okay. Are the notes written below Victor's
22 name based on a conversation with Victor?
23 A. They are.
24 Q. The notes read, "This type of lift is
25 designed to start with a tip of lift angle upward 1/2 to

Page 46

1  2 degrees up when the lift is up to the bed." What
2  would the angle of the lift gate be if the tip of the
3  lift was angled up 1/2 inch when the lift is up to the
4  bed?
5  A. You're misreading what she wrote. That's not
6  what she wrote. She wrote 2 to 2 1/2 inches up.
7  Q. 1/2 to 2 inches.
8  A. She wrote 1/2, but she meant 2 1/2 inches.
9  Q. How do you know that?
10 A. Because I talked to her about it.
11 Q. May I see that, please?
12 A. Sure.
13    MR. CURCIO: Is that one marked for an
14 exhibit yet?
15    MR. GRADY: This one here?
16    MR. CURCIO: No. The document that you were
17 just examining.
18    MR. GRADY: Yes. Exhibit E.
19    MR. CURCIO: Exhibit what?
20    MR. GRADY: E.
21    MR. CURCIO: E.
22 BY MR. GRADY:
23 Q. Okay. So it's your testimony that her intent
24 was to write 2 1/2 inches rather than 1/2 to 2 inches?
25 A. That's correct.

Page 47

1  Q. Okay. Referring now to a graph that appears
2  to have been created from measurements taken at the
3  scene, Exhibit F, do you see that?
4  A. I do.
5  Q. Those documents?
6  A. Yes.
7  Q. Would you tell me what those documents are?
8  A. Yes. The first page of the document is a
9  sketch of the features in the area where the unloading
10 occurred by Founders Hall.
11    And I took some dimensions there and took —
12 with the Smart Level took some angular measurements as a
13 method to try to assess what in probability would be the
14 angle of the bed as positioned at the scene. And that's
15 what that's all about.
16 Q. What equipment was used to reach a
17 measurement?
18 A. Tape measure, in fact two tape measures and a
19 Smart Level.
20 Q. How was it determined that the location being
21 measured was the same location as that of the parked
22 truck at the time of the accident?
23 A. Well, I had the photographs with me showing
24 the truck at the position of its unloading and I have
25 been to the scene and I know the wheel-base and track of

Page 48

1  the vehicle because I measured that.
2     And from that one can position the truck and
3  then assess essentially what you're saying are what are
4  the relative heights of the contact patch of the tire
5  which will determine the slope of the bed and then that
6  analysis is what I did.
7  Q. What calculations were required to convert
8  your raw measurements into usable data?
9  A. Basically the angular data was then treated
10 as the slope of the graph in the vicinity in which it
11 was taken and then those segments were pieced together
12 to come up with a grade line. The grade line then —
13 the truck was then positioned onto the grade line at a
14 slight angle to assess what would be the pitch of the
15 bed knowing where the four sets of wheels would contact
16 the sloping surface. That was the method of analysis.
17 Q. So is it fair to say that the result or the
18 conclusion for the angle of the truck, the result of
19 your computations and investigation at the time of the
20 accident was 1/2 a degree?
21 A. Yes.
22 Q. What's the known rate of error for this
23 calculation?
24 A. Well, the known rate of error essentially —
25 the components, a Smart Level will be accurate to within

Page 49

1  a 10th of a degree. The curves, if you will, that are
2  pieced together would likely have -- and the distances
3  were measured within an inch over distances of somewhere
4  approaching 33 feet, so that's going to be one part in
5  400. It will be essentially very accurate.
6       The assessment from going from highly
7  accurate angular measurements and highly accurate linear
8  measurements to composing the elevation by slope measure
9  based upon my experience is going to be well within 10
10 percent, 10 or 15 percent.
11      And the measurement of half a degree would
12 indicate that we certainly are pitched down slightly in
13 the front. So I would think that certainly we're --
14 it's less than 1 and more than zero and an average value
15 is about a half. I think that would be more than
16 adequate and I believe that the data would support an
17 accuracy greater than that.
18    Q.  Was the ground where the measurements were
19 taken relatively smooth or bumpy?
20    A.  Relatively smooth. It was a paved surface.
21 It was an asphaltic surface.
22    Q.  Would your calculation of ground slope be
23 more accurate if you had taken more slope measurements
24 at smaller intervals?
25    A.  Sure.

Page 50

1     Q.  Isn't this especially true if the surface is
2  bumpy?
3     A.  Sure.
4     Q.  Why didn't you directly measure the slope of
5  the ground from the location of the truck's front axle
6  to it's rear axle?
7     A.  That would not give me any information. It's
8  not the slope of the ground where the wheels are that
9  determine the angle of the bed. It's the effect of the
10 slope over the entire surface which creates a grade line
11 which when the truck is superimposed on it allows you to
12 estimate the change in elevation between the footprints
13 of the wheels. That's what creates a pitch angle in a
14 truck.
15    Q.  Directing your attention now to some 3D
16 drawings that you have in your file as shown by Exhibit
17 H, can you tell me what those represent?
18    A.  Sure. Let's see what we have here. Yeah.
19      What we have in H I believe is the latest
20 version -- excuse me, it's the latest version of our cab
21 model, if you will, in which we have the truck
22 represented based upon my measurements and supplemented
23 by data both from Peterbilt and from Supreme. Those are
24 the incomplete chassis and the body manufacturer.
25      The lift gate data, which comes from my

Page 51

1  analysis and again supported by the exemplar test and
2  the data provided by Maxon, the testimony of 18 inches
3  at the time of tip-over and an anthropomorphic model
4  which comports with the dimensions and weight of
5  Pouliot, that being six foot three, 155 pounds, and that
6  there are two representations there which are my --
7  which have been placed as they are because they
8  represent to my best understanding what the various
9  witnesses, including Pouliot himself, are saying about
10 how they were positioned or how Pouliot was positioned
11 at the time this accident occurred. And so there they
12 are.
13      The drawings -- let me -- maybe this will
14 help you a little bit. The drawings that you see have
15 one common mathematical base in the machine and the
16 program will display it from any particular vantage
17 point by rotating around however you want to see it and
18 then the program's responsible for projecting it
19 consistent with the laws of visual perspective.
20      And so these three drawings are not really
21 independent in the sense they are just simply different
22 views of the same mathematical model that is contained
23 within that AutoCAD program.
24    Q.  Are the drawings part of an animation or are
25 they only still images?

Page 52

1     A.  They are still images. They can be animated.
2  We have not done it at this point because we are not --
3  I have not really talked to Mr. Stratton about
4  demonstrative exhibits.
5     Q.  What computer program did you use to create
6  the images?
7     A.  The images are created in a program called
8  AutoCAD. I believe it also works in -- I'd have to
9  check with my people who are more familiar with this
10 software, but it works in conjunction with another
11 program which I think is currently called Studio Max or
12 Studio 3D which is part of the AutoDesk suite of
13 programs which we use. I believe that the underlying
14 representation that you see there is done in AutoCAD 3D.
15 It's a true 3D representation.
16    Q.  Are the drawings to scale?
17    A.  Yes.
18    Q.  Why is the person shown in two different
19 positions?
20    A.  Because there is in the testimony at least
21 the inference that there is some ambiguity in where
22 Pouliot is. And I'm not trying to take sides. I just
23 said, hey, it's easy to move a figure around and we can
24 put it wherever he happens to think he might be.
25    Q.  What is the basis for showing him standing on

Page 53

1  the ground?
2      A.  I inferred that some of his testimony, and I
3  admit it is somewhat vague, but I at least came away
4  with the impression that it — part of the time he
5  seemed to lead me to believe that he was actually
6  standing on the platform and another time he seems to
7  say he's on the ground. So, since it's easy to show
8  both I just showed both at this point.
9          But I think one thing that you can see from
10 the representation is if he is standing on the platform
11 he's got to go through a pretty good rendition of
12 Spiderman. There's just no place to stand. This
13 trolley consumes virtually the complete footprint of the
14 lift.
15         And I have a little scale model here.
16 Goodness knows what happened when that came back from
17 the —
18         (Deposition Exhibit N was then
19          marked for identification.)
20     THE WITNESS: Oh, here it is. This shows --
21     MR. STRATTON: It's about 6 pages into the
22 first copy here.
23     MS. O'DONNELL: Right here?
24     MR. STRATTON: Yes.
25     THE WITNESS: The copy -- you can't play with

Page 54

1  the copy the way I can because really what I have is the
2  footprint of the platform, 72 by 40, and the footprint
3  of the trolley given two dimensions. There are two
4  dimensions that are floating around in this case.
5  There's a 59 inch dimension and there's a 69 3/4 inch
6  dimension for the long dimension of the unit.
7          Based upon the police photographs they are
8  measuring the width of the table and they measure it in
9  millimeters and I don't remember exactly what it was
10 1400 something like that work out the math. That comes
11 out to be 59 inches. But the width of the unit is
12 actually wider than that because the aluminum extrusion
13 pilasters on the end extend beyond the platform and the
14 frame for the casters extend beyond and that's not what
15 the police are measuring.
16 BY MR. GRADY:
17    Q.  How do you know what the police were
18 measuring?
19    A.  Because I show the photograph with their tape
20 measure right in it. You can look at their photograph
21 and see what they are measuring.
22    Q.  Can you show me that photograph?
23    A.  Sure. I'd be happy to.
24     MR. STRATTON: When you get to a good point I
25 just wanted to take five minutes.

Page 55

1     MR. GRADY: Yes.
2     Q.  Can I ask where you got this photograph?
3     A.  From Mr. Stratton.
4     MR. CURCIO: I'm sorry. Did you --
5     MR. GRADY: The --
6     THE WITNESS: He represented to me they are
7  police photographs.
8     MR. CURCIO: Show him a photograph. Can we
9  all see that?
10    THE WITNESS: Sure.
11 BY MR. GRADY:
12    Q.  Your representation is made that that
13 photograph was taken by the police in connection with
14 this accident?
15    A.  My understanding is — I understood
16 Mr. Stratton to tell me.
17    Q.  Is that photograph in the documents that you
18 produced for us?
19    A.  Sure. I mean, I gave my file over to the
20 office and they copied it in total.
21         That's one of them, yeah. There should be
22 more there.
23         (Discussion off the record.)
24 BY MR. GRADY:
25    Q.  Did you have access to Officer Blalock's

Page 56

1  deposition and exhibits at the time that you made your
2  analysis?
3     A.  I don't think so.
4     Q.  Let me show you a document. Is that the same
5  document as you just referred to me --
6     A.  Yes.
7     Q.  -- that's the basis for your determination
8  that you know how they measured the width and the length
9  of the unit --
10    A.  Yes.
11    Q.  -- at the time of the accident?
12    A.  No. That's a little bit -- you embellished
13 it just a little bit.
14         I said that I can tell and I have a sheet in
15 the file, if I find it I'll point it out to you, where I
16 have done a little analysis on what is shown in that
17 tape measure and it is clearly measuring the table top
18 and I invite you to look in the lower right-hand corner
19 of the photograph and I think you will see in that and
20 the picture in front of it that the width of the overall
21 unit must be wider than that because it does not subsume
22 the vertical aluminum extrusion pilasters nor does it
23 exclude the platform that showed the casters.
24    MR. GRADY: I'd like to have this document
25 marked for identification.

Page 57

1      (Deposition Exhibit O was then
2      marked for identification.)
3  BY MR. GRADY:
4      Q.  Okay. Doctor, I have another document here
5  marked for identification that's excerpts from Shawn
6  Pouliot's deposition where he describes what happened
7  from page 5 through page 15, Exhibit M. Would you show
8  me in that transcript where it is that he said he was
9  standing on the ground at the time this accident
10 occurred?
11     A.  I can read it and see if it says it here.
12     MR. STRATTON:  Are you giving him a partial
13 transcript?
14     THE WITNESS:  Apparently.
15     MR. STRATTON:  Okay. We can -- just for the
16 record --
17     MR. GRADY:  I just read what it was.
18     MR. STRATTON:  Okay. This is -- just let me
19 read it again for the record. This is Mr. Pouliot's
20 deposition taken on December 3, 2002, pages 5 through
21 15. Wait a second. Five through 15 plus page 127 of
22 that deposition.
23     And the question, I guess, is within those
24 particular pages do you see anything where Mr. Pouliot
25 says he's on the ground.

Page 58

1  BY MR. GRADY:
2      Q.  At the time of the accident.
3      A.  Okay. I've tried to go -- one more page.
4  I'm sorry. I didn't realize there was another one.
5           Okay. Sir, your question?
6      MR. GRADY:  Do you want to read it back,
7  please?
8      (Whereupon, the record was then read
9      back by the reporter as requested.)
10     THE WITNESS:  On page 11 Mr. Stratton asked
11 him: "He's not walking on the actual lift itself.
12     "THE WITNESS:  No, sir. I was on the
13 ground."
14     You asked the question, "You're on the
15 ground?
16     "A.  I just walked to the other side.
17     "Q.  Now, if you remember, what part of the
18 unit hit your left shoulder?
19     "A.  I really can't tell you. I don't -- it
20 all happened so fast." And on and on it goes. Okay.
21 BY MR. GRADY:
22     Q.  So --
23     A.  That's where he said what you asked me.
24     Q.  At the time the accident happened doesn't he
25 say that he was standing on the lift?

Page 59

1      MR. STRATTON:  Objection.
2      THE WITNESS:  I -- I -- there is a inference
3  of that, but it doesn't mean that's what he's saying.
4  He talks about being at the corner and I think when he
5  says, his description of being at the corner has a
6  certain degree of ambiguity within it.
7      Having said all of that, I point out to you
8  that it is virtually ergonomically impossible for him to
9  lower the unit standing on the lower rear corner because
10 the lever is back at the right end of the bed below the
11 bed height.
12 BY MR. GRADY:
13     Q.  Didn't he describe what happened by saying
14 that he had been standing on the ground lowering the
15 unit, he saw it shift or move, he stopped the lift, he
16 then walked around on the ground to the other side and
17 adjusted the unit to his liking; he then returned to the
18 rear side and climbed up on the lift and was standing at
19 the corner facing the side of the lift when the accident
20 occurred?
21     MR. STRATTON:  Objection. This is not -- I
22 don't think this is Shawn Pouliot. I think this is
23 Doctor Ruhl who's the deponent today and I think you've
24 given him a transcript which clearly indicates
25 Mr. Pouliot is on the ground and you've given him a

Page 60

1  partial transcript I would suggest.
2      MR. GRADY:  He was not on the ground at the
3  time of the accident.
4      MR. STRATTON:  Well, the question is just a
5  completely improper question.
6      MR. GRADY:  It's not an improper question.
7      Q.  Would you answer the question, please?
8      A.  I don't recall with that degree of
9  specificity beyond what I've told you.
10     I inferred that it seemed possible and I
11 wanted to cover all possibilities and not make -- make a
12 decision myself. So since the program can show him in
13 an infinitude of positions easily I show him in those
14 two to present for everyone's edification.
15 BY MR. GRADY:
16     Q.  What was the purpose the purpose of showing
17 the person standing on the side edge of the lift gate?
18     A.  Well, the purpose is to show a couple things.
19 I mean, it does show a couple things because he's
20 geometrically accurate. It shows that the person would
21 have to be virtually Spiderman to do it.
22     You would have to have your toes in under the
23 footprint of the unit even to stand there. It would be
24 a very precarious position.
25     So I think those are some geometric

Page 61

1  conclusions, if you will, or geometric facts that may be
2  of interest to the Court in their determination or
3  evaluation.
4      Q.  Isn't that a representation of where
5  Mr. Pouliot claimed he was standing when the accident
6  occurred?
7          MR. STRATTON: Objection.
8          THE WITNESS: It's our best assessment of
9  taking his testimony and interpreting it or positioning
10 him in such a way that in -- that this is one
11 possibility. Those are the only two possibilities that
12 I could see from his testimony.
13 BY MR. GRADY:
14     Q.  Were you ever provided with Barry Groman's
15 deposition?
16     A.  No. But I've seen his measurement and I
17 understand he thinks he's on the platform to my
18 understanding.
19     Q.  But you weren't provided with his deposition
20 to review?
21     A.  I was not.
22     Q.  And were you told that Barry Groman was an
23 eyewitness?
24     A.  I believe he was there at the time of the
25 accident. I think his -- his testimony would indicate

Page 62

1  that he was watching. I think that is correct.
2      Q.  Is it your opinion that Mr. Pouliot could
3  have become pinned underneath the work station if he was
4  standing on the side of the lift gate as depicted in the
5  drawings?
6      A.  Yes, sure.
7      Q.  When the work station rolled off the lift?
8      A.  Yes, sure.
9          MR. CURCIO: Why don't we take a five minute
10 break.
11         (Whereupon, a short recess was then had
12         from 11:20 a.m until 11:37 a.m.)
13         MR. GRADY: Okay. We're back on the record.
14     Q.  I want to just clarify something,
15 Doctor Ruhl. When you were at the West Warwick, Rhode
16 Island facility conducting your examination on this
17 72-25A Tuk-A-Way lift, I understand your testimony to be
18 that you did not take any angle measurements of the
19 platform and flipover at 18 inches from the ground at
20 that time?
21     A.  I don't recall. Let me check my notes to see
22 if I did it at that specific value.
23         I did not take a measurement at that specific
24 value, that's correct.
25     Q.  Okay. Now, when you were there conducting

Page 63

1  your investigation at the West Warwick facility the load
2  platform that you were using, did that load platform
3  have brakes on the wheels?
4      A.  It did not.
5      Q.  There were no brakes on any of the wheels on
6  that load platform?
7      A.  That is correct.
8          MR. STRATTON: Objection. Asked and
9  answered.
10         THE WITNESS: That's correct.
11 BY MR. GRADY:
12     Q.  Now, what factors affect the measured angle
13 of the lift gate in the final analysis? You've already
14 referred to the grade at the scene.
15     A.  Yes.
16     Q.  Did you make any adjustment for the pitch
17 angle of the truck itself?
18     A.  Sure.
19     Q.  And how did you make that determination?
20     A.  The pitch angle was determined two ways. One
21 is by slope measurements of the ground and also by
22 measuring the bed height at the test location, which
23 should be approximately zero if it's on level ground.
24 It's not zero. It's 1.9 degrees downward.
25     Q.  So, but since you did not make a

Page 64

1  determination as to what the angle measurement of the
2  platform and the flipover were at 18 degrees, you did
3  not factor into the equation the pitch over -- the pitch
4  angle of the truck or the grade angle of the scene in
5  order to reach a final conclusion, is that correct?
6      A.  No, that's not correct. That's absolutely
7  wrong. I did all of the above.
8      Q.  I thought you just testified that you did not
9  take an angle measurement of the platform and the
10 flipover at 18 inches from the ground when you tested
11 the truck and the lift gate at the West Warwick
12 facility?
13     A.  That is correct. That's exactly right.
14     Q.  So, if I asked you what angle the platform
15 was at 18 inches you couldn't tell me?
16     A.  I can tell you. I'm going to tell you. At
17 the scene at 18 inches the platform angle was 8.75
18 degrees pitched down. The load angle was that. The
19 load was pitched down at 8.75 degrees.
20     Q.  That's with the load on it?
21     A.  Yes. Because of the damage to the unit its
22 angles are significantly different when it's unloaded
23 because it doesn't fit together right and it has to take
24 a load to get the parts to come into mating contact.
25 That's why you cannot do and it is inappropriate to do

Page 65

1 and is a waste of time to do the type of measurements we
2 did with the exemplar.
3   Q.  So now are you saying that the platform angle
4 at the scene was 8.75 degrees?
5   A.  Yes. The load was measured and calculated
6 from photographs. As to what the load angle is in space
7 at the top of the platform, we know that once the parts
8 are seated under load they follow the geometric laws of
9 the four bar linkage and going from 50 inches to ground
10 they will traverse 9 degrees.
11       We know how much the truck is pitched down
12 and we can correct that to level ground and also correct
13 it to what the angle would be for the same height at the
14 actual scene. All of that was done. At the end of the
15 day all that information is contained in these two
16 sheets.
17   Q.  But you didn't take the measurement -- when
18 you examined the lift itself with the 800 pound unit on
19 it at 18 inches, you did not measure what degrees that
20 lift gate was?
21   A.  That is correct.
22   Q.  So that your conclusions are basically
23 mathematical conclusions; they are not actual
24 measurements of the lift itself under the load?
25   A.  I don't understand your question from the

Page 66

1 standpoint that the conclusions are based on a
2 methodology rooted in science which is accurate and
3 which we have tested with an exemplar. We know it from
4 the basic science of the four bar linkage. We know it
5 from the material provided by the manufacturer and that
6 it was not appropriate in my estimation to risk injury
7 to additional people to have an 800 pound load loose on
8 a defective platform and to measure the angle when we
9 can obtain the same measurements safely notwithstanding
10 that it really wouldn't affect a conclusion anyway.
11       What we do know is that the angle is very
12 much larger than the design spec and that a unbraked
13 caster of approximately the same size as the subject
14 trolley will roll off in the range of heights as
15 testified to by the witnesses and measured by the police
16 ex post facto. That's what we learned.
17   Q.  Doctor Ruhl, in your file show me the
18 specification that tells you what the angle of the lift
19 gate should be, beaver tail and platform, at 18 inches
20 with a load of 800 pounds on it? Show me that in your
21 file the specification that you got from Maxon that
22 tells you that?
23   A.  I didn't get the specification from Maxon as
24 you have told me.
25   Q.  This is your own computation, right?

Page 67

1       MR. STRATTON:  Objection.
2       THE WITNESS:  I got from them the data I
3 would need to make that calculation scientifically. I
4 got the data that the angular difference shall be split
5 4 1/2 up, 4 1/2 down. I confirmed that is correct with
6 the testimony.
7       It also comports with the scale with the
8 drawing which I believe is to scale which they provided
9 and I now know it also comports with the data that you
10 have obtained yesterday which is consistent with the
11 data Suzanne took over the phone, and from that I can
12 use the data at a safe height, namely this height when
13 it is in the up position, and calculate what it would be
14 in the down position.
15       I also point out that I must continue that
16 extrapolation to the conditions at the scene of the
17 accident because the test scene is different from the
18 scene of the accident. All of those things have to be
19 done. All of those things have been done.
20 BY MR. GRADY:
21   Q.  Is the 8.75 degree computation that you
22 arrive at before or after you factor in the grade?
23   A.  The as tested at 18 inches, that is what it
24 would read. Predicted at the scene it would actually be
25 slightly higher, okay? So --

Page 68

1   Q.  It would be less, wouldn't it?
2   A.  It would be --
3   Q.  You have to subtract the 1/2 degree that you
4 found for the grade, right?
5   A.  You would -- let me put it to you this way.
6 It is -- the data will change approximately 1.4 degrees
7 because we are going -- we are going to at the scene
8 have an angle which is worse by 1.4 degrees than we had
9 at the test because the truck at the test spotted us 1.9
10 degrees safety, but the accident scene only spotted us
11 half a degree of safety. So, in going -- extrapolating
12 the data from the test scene we have to give up a degree
13 and a half of rotation.
14       So all of the measurements at the scene
15 actually move up on the graph because the graph goes
16 from down to up. The negative values are on top on the
17 graph and values go up such that the actual droop or the
18 rotation, you call it, down at the rear, which is
19 correct, is actually 1.4 degrees worse at the scene than
20 it is at the test site.
21   Q.  But the way you make your overall computation
22 of 8.75 degrees, you subtract the pitch angle on the
23 truck and you subtract the grade angle to reach a net
24 angle value of the platform at beaver tail at the time
25 of the accident at 18 inches, isn't that correct?

Page 69

1    A.   Not quite. That's not what we did.
2         The platform and the beaver tail are
3    deflected. There are dents in the platform. The caster
4    that would be at the left forward position is sitting in
5    a damaged pocket and, therefore, one could take
6    measurements 'til the cows come home and you will not
7    get necessarily the information that you need.
8         The best way I found to do it was to leave
9    the Smart Level in the photograph, take a square on
10   picture and then measure the actual angles and in so
11   doing I can lock in the angle of the platform. That is
12   what causes the thing to roll off. That's the critical
13   angle.
14        Then knowing the differences in the bed
15   heights between test and accident scene, I can then take
16   the data of the four roll off points in my test and tell
17   you the height at which that equivalent item would have
18   rolled off if it were at the scene, not at the test
19   facility. So all those have been done and summarized --
20   is this an exhibit? No, it's not an exhibit.
21        (Whereupon, a short recess was then had
22        from 11:49 a.m until 11:51 a.m.)
23   BY MR. GRADY:
24   Q.   Doctor Ruhl, do you know what the work
25   station weighed at the time of the accident, the

Page 70

1    trolley?
2    A.   I have various estimates. The one I believe
3    is most accurate is the one that you provided through
4    your representations in this case of about approximately
5    820 pounds, I believe your representation is.
6    Q.   Do you know what horizontal force would be
7    required in order to move the incident unit, the
8    trolley, up that 2 1/2 inch incline on the back of the
9    rear lift?
10   A.   Do I know what the force to is roll the
11   trolley up?
12   Q.   Right.
13   A.   Given that it's a check-plate deck, and what
14   angle are we going to talk about on it?
15   Q.   I don't know. You said 4 1/2 degrees, right?
16   A.   Actually, more than that when it's at the
17   top. The --
18        MR. STRATTON: Are we talking about the lift
19   gate as designed or the actual lift gate involved in
20   this incident?
21        THE WITNESS: That's a good point, yes.
22        MR. GRADY: I'm talking about the lift gate
23   as designed.
24        MR. STRATTON: The design spec.
25        THE WITNESS: Okay. I can't answer your

Page 71

1    question the way you have asked it because we need to
2    agree on several assumptions which I will have to make.
3         Let's start with the simplest one. If the
4    casters are oriented in the direction of travel that
5    they have no slip angle, if the surface is perfectly
6    flat and smooth and has an angle of inclination, then
7    essentially the force required to keep it moving will be
8    approximately equal to about 5 percent of the weight or
9    a little under.
10        That number will have some variability
11   depending upon how soft the casters are. Their rolling
12   resistance may be a little more or less than that and
13   there are some numbers in the file.
14        That is not necessarily the dispositive
15   question with respect to how Shawn Pouliot's accident
16   happened.
17   BY MR. GRADY:
18   Q.   But before we get to that, the 5 percent that
19   you're talking about is 5 percent of 800 pounds?
20   A.   Yes.
21   Q.   So roughly 200 pounds of horizontal force?
22   A.   No. We've got a math problem here.
23   Q.   Forty pounds?
24   A.   Yes. Okay. We've got a math problem here.
25   We've got a math problem here. I should have brought my

Page 72

1    calculator with, but I didn't.
2    Q.   Now, in the case, did you measure in your
3    computations when you were at West Warwick what the top
4    level of the lift was in terms of degrees?
5    A.   Yes. I have a variety of measurements and
6    they are the ones that are in the notes and they are
7    also contained on the calculation pages where the
8    photographs are folded out and I have extrapolated the
9    angles and all of those things.
10   Q.   Did you do an average of all the different
11   points that you made those calculations?
12   A.   In essence, I didn't do it exactly as you
13   said. I -- as you can see on the one sheet, I said
14   "Checks," this makes sense. I did it from two different
15   photographs. I did the computations, back-up
16   computations, based on the estimate of what percentage
17   of the slope is coming from the platform and what
18   percentage is coming from the beaver tail and comparing
19   to what one actually measured or protracted right off
20   the drawing itself.
21        And at the end of the day the load angle
22   measured for the platform when it is sitting there is
23   approximately 1 1/2 and perhaps as high as 2.1, but at
24   the end of the day I thought 1 1/2 was more accurate.
25        And then when you translate that to level

Page 73

1  ground that would then be 1 1/2 and 1.9 would be 3.4
2  degrees on level ground and that would be the angle at
3  the start. And from there it then follows essentially a
4  linear curve subtracting angles as you go down the 50
5  inches. So, if you start with a pitch up it takes you
6  longer to get into trouble and if you start with the
7  pitch down you get into trouble a lot sooner.
8    Q.  Are you able to compute what force would be
9  necessary to move the unit if two of the wheels were
10 locked given the same scenario?
11   A.  Yes, I understand your question. Again we
12 would have to agree on certain assumptions or we would
13 have to make additional tests.
14       The first thing we would have to do is -- is,
15 number one, we would have to decide what is the braking
16 effect -- that's really what it is -- what is the
17 braking effect on the wheel? How much torque is it
18 going to take to pull the axle in a horizontal direction
19 and get the wheel to rotate or slide, which would be a
20 higher number in general and then one could make that
21 assumption.
22       We need to know essentially how effective the
23 braking would be. That again requires that we know the
24 same assumptions and that the wheel has already oriented
25 itself so it has no slippage angle and the plane of the

Page 74

1  tire is in the direction that it would move.
2       We then need to have to make some assumptions
3  about the vibration of the platform and you certainly
4  need to know something about if he is moving or the
5  platform is bouncing or wiggling, and all of these
6  things will make it easier to start to move because
7  there's two problems. One is the calculations are
8  easier to move -- are easy to make for steady state
9  motion, but the problem is the start of the avalanche
10 and, in other words, getting it moving. It is
11 conditionally stable, but once it starts to move it can
12 keep going. Getting it to move generally takes a higher
13 force than keeping it moving, and also you have the
14 vagaries of the check-plate deck and the irregularities
15 of the platform's geometry to start with. All of these
16 things come into play.
17       The only thing you can say with certainty
18 from an engineering or scientific standpoint is that
19 having the brakes on couldn't hurt, but one would have
20 much more difficulty suggesting what improvement one
21 might have and, furthermore, what improvement one might
22 have in the subject ad hoc case, that is much more
23 difficult.
24       And I also would point out it was one of the
25 reasons I was critical of the greasing of the unit after

Page 75

1  the accident and before my test because that is
2  precisely one of the conditions which will assist in
3  dislodging an object which is conditionally stable and
4  that's the sticking of the linkage itself.
5    Q.  How long after the accident was the test
6  done?
7    A.  The test was considerably after the accident,
8  but based on the condition of the grease, as I discussed
9  in my report, the greasing was much more recent.
10   Q.  You're not able to say what the condition of
11 those joints were at the time of the accident, are you?
12   A.  Yeah. I look at the photographs and they are
13 dry. They don't have brand new grease on them.
14   Q.  At the time of the accident you took
15 photographs?
16   A.  Well, I can see the difference between my
17 photographs at the time of my inspection and the time of
18 the accident. I do not see any active grease. I
19 certainly don't see blue grease coming out, so I know
20 it's been greased since the accident. In fact, greased
21 very closely to the time of my actual test.
22   Q.  But, I mean, it was a substantial period of
23 time where the unit was not used from the time of the
24 accident to the time you saw it, right, over a year?
25   A.  It could be. I don't know. I did not have

Page 76

1  control of the unit. I don't think it was on the road.
2    Q.  Well, I mean, you don't know but what at the
3  time of the accident the unit had been greased a day
4  before? You don't know that?
5    A.  There's no indication in the photographs. I
6  don't -- in the actual unit I don't see in the police
7  photographs any indication of grease coming out of the
8  joints that I would expect to see if it's been recently
9  greased and it's not there, so it does not look to be
10 freshly greased and one can look at my photographs and
11 look at the police ones and see that there's no real
12 grease coming out.
13   Q.  Now, I've had your preliminary report marked
14 for identification as Exhibit L. In the course of
15 making your report did you review a document that was
16 entitled a Trans-Expo International Shipment Booking
17 Order?
18   A.  Yes. There's several versions of this
19 floating around and, yes -- and I think I had seen it at
20 the time the report was written. I'm not sure that I
21 had actually seen the depositions of Ramirez and Kovac
22 at the time.
23   Q.  The Shipment Booking Order here has been
24 marked as Exhibit K.
25   A.  It may have been marked in Pouliot's dep,

19 (Pages 73 to 76)

Page 77

1  too.
2  Q.  Now, are you saying that the dimensions that
3  are noted for the trolley on this document are different
4  than the dimensions that are noted in the police report?
5  A.  A little bit; yes, they are.
6  Q.  And do you know which dimensions are
7  accurate?
8  A.  In one instance I believe I know one
9  measurement that I think is likely to be a bit
10 inaccurate and that is the 59 inches for the overall
11 width of the unit because the police measured it at
12 69 3/4.
13     The tape measure in the photograph, which
14 appears to be measuring the platform or the table top
15 but not the width of the object, is 1490 — between 1490
16 and 1492 millimeters and that cranks out to be
17 approximately 58 21/32 of an inch.
18 Q.  Is that Exhibit O you're referring to?
19 A.  Yes, yes.
20 Q.  That's a measurement of the depth of the desk
21 top, isn't it?
22 A.  That is the desk top, yes, sir.
23 Q.  The depth from front to rear, not from side
24 to side?
25 A.  That would be what I would call — well, they

Page 78

1  call it the length.  Again they are not consistent in
2  some of these reports either, by the way, but that would
3  be from the left side to the right side of the work
4  station as if you were working at the work station.
5  Q.  Can you make out the measurements from that
6  photograph?
7  A.  Yes.  I believe that you can count these
8  backwards and work your way back and you're at 58 and
9  you can see it's 58 and small change.  This — I
10 actually have a different photograph, thank goodness,
11 because that one is a little tough to do, I agree with
12 you.
13 Q.  This is the police photograph that shows 58.
14 A.  Well, I think what I'm getting at, Mr. Grady,
15 is I think I've got a better copy than O.  I mean, the
16 one in my possession is a little better, and it's 58 and
17 approximately a half.  And then if you go and you look
18 at you can see 140 centimeters, then you can see 150
19 centimeters and you can just — you can see those very
20 clearly.  That's not arguable in that photograph.
21     And if you do it both by inches and you do it
22 by centimeters or millimeters that I convert it to, they
23 both comport to the same number and it's approximately
24 58 3/4 at the end of the day.
25 Q.  That would be consistent with the 59 inches

Page 79

1  on the shop -- on the Shipment Booking Order, right?
2  A.  Well, but that's not the width of the object.
3  Clearly it must be more than another half-inch wide.
4  Those pilasters are wider than that and the pilasters,
5  if you look at -- I don't know if you marked it as an
6  exhibit.  I guess it would be Exhibit O.  Yeah, in
7  Exhibit O you can see the vertical aluminum pilaster.
8      Now, what you can't see is the pilaster as
9  it's mounted is diamond shaped and there's an indent in
10 the table top which accepts part of the thickness of the
11 pilaster, but it doesn't accept all of it so it sticks
12 farther out and then it goes down to the ground and
13 there is a horizontal piece that's sort of a base-plate,
14 if you will, and it has the casters mounted underneath
15 it.  And that clearly must be wider than 58.
16     If we agree that the table top is 1490
17 millimeters or 58 3/4 of an inch, there have to be a
18 couple more inches on each side at least.  The police
19 would indicate there's 10 inches more.  Now, maybe that
20 is a little too high, but the 59 is too low.
21 Q.  Have you ever seen actual photographs of the
22 unit standing in a standing position?
23     MR. STRATTON:  He saw it now.
24     THE WITNESS:  I mean the ones I have are the
25 police photos.

Page 80

1  BY MR. GRADY:
2  Q.  They show it on the ground, right, with the
3  exception of Exhibit O which you've submitted?
4  A.  I thought there were other ones that had the
5  thing standing up.  That wasn't the only one.
6      And it wasn't 'til more recently that I got
7  the one where it's on the side where you can see the
8  casters.
9      The problem with the casters, of course, is
10 when they are in the trailing position the lever is
11 always opposite of where you are.  Basically you push
12 from the rear and it's not there.
13 Q.  I've had a series of photographs marked as
14 Exhibit F.  These are photographs that Petra Milks from
15 Festo has testified are representative photographs, the
16 photographs of the unit involved in the accident.  Have
17 you ever seen those photographs before?
18 A.  No, I have not.  And the representation is
19 this is the unit?
20 Q.  That's the unit.
21 A.  Okay.  And they've got the table top
22 apparently back square again.  All right.
23     I'm sorting them here.  And the hydraulic
24 pump and the caster with the lock was -- no, it's on the
25 forward section.  Okay.  Yeah, but there's nothing here