**Page 81**

1  inconsistent with the other photographs.
2  Q. If you look at the photograph that shows the
3  unit with the lady standing next to it, those vertical
4  extrusions on the side, they don't extend beyond the
5  bottom of the frame, do they?
6  A. No, they do not.
7  Q. Okay.
8  A. But they extend beyond the edge of the table
9  top and the table top the police measured and the
10 photograph in the measurement shows that it's 58 3/4 and
11 it's got to be wider than that.
12       You've got to add whatever part of the
13 pilaster that is standing out that goes down
14 approximately to the edge of the -- well, I guess what
15 you'd call the base that holds the casters.
16       Now, the question is what is that measurement
17 because that measurement is going to be the real overall
18 width of the unit and that's the width that's going to
19 predominate when the unit is set on the lift gate.
20 Q. All of this Shawn Pouliot should have known,
21 right?
22 A. Pouliot didn't know anything.
23 Q. Well, he was working with the unit, wasn't
24 he?
25       MR. STRATTON: Objection.

**Page 82**

1        THE WITNESS: He had a unit loaded onto his
2  truck or the truck he was borrowing or loaned at Festo.
3  He has to unload it with the lift gate on the truck with
4  a load that completely subsumes or completely covers
5  almost all of the footprint of the unit.
6  BY MR. GRADY:
7  Q. He would have known the angle of the platform
8  and the beaver tail at 18 inches prior to ever putting
9  it on the lift, wouldn't he?
10       MR. STRATTON: Objection.
11       THE WITNESS: I don't know how that -- I
12 don't believe so, but --
13 BY MR. GRADY:
14 Q. You don't believe so?
15 A. No.
16 Q. Well, how did you unfold the lift when you
17 took it out?
18 A. You un -- you take it down and get it so that
19 the lift is out and away from the tuck position. Then
20 you unfold it and then you unfold the beaver tail.
21 Q. And at that time you see the angle of the
22 platform and the beaver tail before you move the lever
23 to lift it up to the van floor, right?
24 A. You can look at it. I don't know. When you
25 say you see the angle, I'm not quite sure what he would

**Page 83**

1  see.
2  Q. Straight to the eye.
3  A. He would see as it's on the ground as he
4  unfolds it, it's down there. There's going to be a
5  slope to the platform and the beaver tail angle will not
6  be the beaver tail angle that it will be when it's in
7  the air because the beaver tail does not sit against the
8  stops when it's on the ground because of the damage to
9  it and the wear and the worn shims.
10 Q. But, Doctor Ruhl, you don't unfold it on the
11 ground; you unfold it in the air, right?
12 A. That's correct. But that position is
13 somewhat variable as to where you do it.
14       MS. O'DONNELL: Can I see those pictures?
15       MR. GRADY: Yes.
16 Q. Did you examine the Shipment Booking Order
17 that is represented by Exhibit K?
18 A. Yes.
19 Q. Was Arpin provided with enough information to
20 safely move this unit?
21       MR. STRATTON: Objection.
22       MS. O'DONNELL: Objection.
23       MR. STRATTON: Objection. Assuming that
24 Trans-Expo is not an agent for Arpin.
25       THE WITNESS: Yeah, I think they were. They

**Page 84**

1  weren't provided with complete information, but your
2  question was were they, as I recall it, were they
3  required -- were they provided with enough information
4  to safely convey it and the answer is yes.
5        And the basis for that answer is, first of
6  all, the calculations I've made which suggest that if
7  nothing had been done beyond simply having the work gate
8  or having the lift gate, the Tuk-A-Way lift gate,
9  conform to Maxon's recommendation for maintenance it
10 would not have rolled off as he lowered it and because
11 we would not have reached the types of angles where our
12 tests indicate it rolled and we would not have reached
13 the angle that it did roll off at the actual accident
14 scene. So I guess that's my best answer that I can give
15 you.
16 BY MR. GRADY:
17 Q. Is there anywhere in that form that Arpin is
18 told how much this unit weighs?
19       MS. O'DONNELL: Object to that.
20       THE WITNESS: Yes, sure.
21 BY MR. GRADY:
22 Q. How much?
23 A. Well, it says two pieces and it says actual
24 weight is 400.
25 Q. Now, you know that's not true, right?

Roland L. Ruhl, Ph.D., P.E. (Prepared for: Michael A. Stratton, Esq.)                April 13, 2004
Pouliot v. Arpin

### Page 85

1  A.  Absolutely that's not true.
2  Q.  Do you know what the total weight of the two
3  units was?
4  A.  I'm taking your representation as being
5  correct and I think you came up with 1,020 plus or
6  minus. I'm -- we are trying to recall this
7  extemporaneously. I think it's about that.
8  Q.  That information has been produced by Festo
9  in their answers to interrogatories.
10  A.  Okay.
11  Q.  Not me.
12  A.  All right. Well, I read it from you because
13  I read transcripts where you represented it.
14  Q.  Now, in your report which is in Exhibit 11
15  you make the representation that the packages were dock
16  loaded by at least two Festo personnel. What's the
17  basis for that?
18  A.  I believe that's what Stratton mentioned.
19  Stratton said that.
20  Q.  Michael Stratton told you that?
21  A.  Yes.
22  Q.  And you make the statement on page 3, number
23  6, that the vehicle rotated clockwise in the paved area.
24  What's the basis for that statement?
25  A.  Pictures.

### Page 86

1       MR. CURCIO: I'm sorry. I didn't hear that
2  question.
3       Could you just read that back?
4  BY MR. GRADY:
5  Q.  You made the statement that the vehicle
6  rotated clockwise in the paved area. What is the basis
7  for that statement?
8  A.  The photographs taken of the truck at the
9  time of the accident, immediately after the accident.
10  Q.  What is the vehicle that you're referring to?
11  A.  The vehicle is the truck that he was driving,
12  the Peterbilt Supreme straight truck.
13  Q.  Are you saying that the truck rotated
14  clockwise at the time of the accident?
15  A.  Oh, no, no. I see -- I see what you're
16  saying. I understand your question now a little better.
17       No, the truck did not move, but the truck was
18  not perfectly aligned perpendicular or parallel to the
19  roadway by Founders Hall. It had been backed in and was
20  angled a bit. And I believe that is also shown in the
21  diagram of the police report, too. That's what I was
22  trying to say. It's not a big angle, but it is an
23  angle.
24  Q.  So in making your computations were you using
25  the police measurements or the Festo measurements of the

### Page 87

1  dimensions of the unit?
2  A.  In the -- in the graphics we used the police
3  measurements.
4  Q.  In the graphics. Are you talking about the
5  animations --
6  A.  Yes.
7  Q.  -- of the truck?
8  A.  Right, yes.
9  Q.  And how about in your report?
10  A.  I don't think I reached any conclusions based
11  on any difference between Festo and the police. The
12  only other place where I used it is the footprint little
13  diagram and that I show both 59 and 60 3/4. I show them
14  both.
15  Q.  On page 4, paragraph 1 of your report you
16  say, "At the moment of final instability he was at the
17  right rear corner of the vehicle when the unit rolled
18  off the platform."
19  A.  Yes.
20  Q.  Are you talking about on the ground or on the
21  lift?
22  A.  I don't know, sir. I don't know.
23       It seems to me that he probably is talking
24  about on the ground and I say that if -- mainly because
25  two reasons. One is you can't operate the lever unless

### Page 88

1  you're on the ground to lower it and, two, the unit -- I
2  don't know how he could even be standing up there unless
3  he's Spiderman, but I did show the picture both ways.
4  Q.  The animation doesn't show him at the corner
5  of the unit, does it?
6  A.  No, it doesn't. He was put in the center
7  basically to make a little room, but you can move it
8  over there. I think the geometric representation is
9  correct from a vertical dimension and -- but he --
10  wherever anybody believes he is, I can position it
11  there.
12  Q.  Well, your interpretation of the facts placed
13  him standing on the unit on the lift itself at the
14  corner.
15  A.  No. No, sir. Not quite true. I said there
16  seemed to me to be two possibilities and that we showed
17  in the drawing, one, what he would be -- where he would
18  be if he's positioned there, what would be the geometric
19  requirements to stay there. You can see it's almost --
20  he has to hang on to the thing not to fall back. And
21  the other is simply positioning of the center on the
22  ground and put your arms up to hold it, you can get an
23  idea of the size.
24       Now, depending upon where someone believes,
25  we can move it to the right or the left. I'm not

Page 89

1  offering an opinion on where he was positioned, although
2  it's more -- it's probably that he's on the ground but
3  it doesn't affect my opinion really. I'm not offering
4  medical testimony or anything like that.
5      Q.  Can you explain to me how the damage that
6  you've described with respect to the unit relates to the
7  causation of the accident damage?
8      A.  The damage with respect to the unit?
9      Q.  I'm talking about here the lift gate device.
10 Several times in the course of your testimony you've
11 mentioned damage --
12     A.  Oh, yes.
13     Q.  -- to the lift gate.
14     A.  Yes.
15     Q.  And I'm asking you now to tell me how you
16 integrate that damage in formulating your opinion with
17 respect to causation?
18     A.  Sure. The damage affects the understanding
19 as to the causation equation for the very reason that
20 you have examined me on earlier and that is what would
21 Pouliot see.
22         Without a load on it the beaver tail hangs up
23 and doesn't droop down as much as the rest of the
24 platform, so the beaver tail and the platform in total
25 don't -- don't droop as much when they are unloaded as

Page 90

1  when they would load. The reason is because the parts
2  as designed by Maxon are not fitting together where they
3  are supposed to fit and it has to accept the load to
4  elastically deflect to reach the stops and then at that
5  point it will not deflect further as our tests showed on
6  the exemplar. But initially there will be flexing as
7  the load is accepted onto the platform and it has to
8  work out or mediate this compliance due to previous
9  damage.
10        And so that's how it enters into there; that
11 certainly if Pouliot were trained on the lift he also
12 would not get the same visual appearance in the up
13 position with it unloaded as he would when it's loaded
14 because the parts are just not contacting each other
15 properly.
16     Q.  You state on page 6 of your report in the
17 conclusions that "Due to distortion from impacts the
18 platform stops did not properly align  This allows the
19 platform to appear more stable when unloaded  Due to
20 poor stop alignment significant droop occurs as it is
21 loaded."
22     A.  That's exactly what I said.
23     Q.  So is it your position that -- so that's your
24 position that the -- the improper alignment causes the
25 droop?

Page 91

1      A.  It causes -- it causes the droop, I guess
2  putting it this way. Due to improper alignment the
3  parts don't droop as much when they are unloaded as they
4  will when they are loaded. So it doesn't look like it's
5  drooping as much as it ultimately will droop when it
6  doesn't have a load on it and it takes the load to force
7  the parts into interference with the stops and that will
8  be at a lower angle.
9      Q.  How was the truck defective from when it was
10 dispatched?
11     A.  The truck was defective in that the lift
12 gate -- not the lift gate, the lift had not been
13 properly maintained. The droop, if you will, greatly
14 exceeded the recommendations of Maxon. This increases
15 the angle when you have an object on it that now can --
16     Q.  The angle of what?
17     A.  The angle of the platform and beaver tail
18 which, depending on where the casters are, will
19 determine the angle in sort of an integrated way as to
20 what the load will be. So, that's just -- it just
21 wasn't maintained and in my opinion that and that alone
22 would have prevented the accident, but --
23     Q.  Well, tell me exactly --
24     A.  I'm not through. There's more.
25     Q.  Tell me how it was not maintained?

Page 92

1      A.  So it was not maintained in that regard and
2  that the unit should have been trued up. The damage
3  from, which appears to me to have occurred by backing
4  up, someone backed the unit up with the tailgate down,
5  all right, and it bumped into something and that's what
6  sprung it, I believe, or they tried to back up and turn
7  at the same time with the unit down. That's what's
8  twisting the --
9      Q.  Are you talking about those two indentations
10 in the track, the U track where the beaver tail flange
11 fits when it's down?
12     A.  In part. But also I believe that the hinge
13 assemblies are also distorted so that they don't really
14 fit together.
15        It's true, you're correct, that there's
16 enough distortion so the beaver tail just doesn't get
17 down all the way like it will when it takes a load but
18 also in the area of the hingeing it's also -- it has
19 extra compliance that has to be worked out by the load.
20        But the second point is two things. We
21 sent -- we sent a boy to do a man's job. That's our
22 problem. Even though we are not anywhere near the load
23 limit, we're sending a lift which does not have the
24 types of fittings on it which Maxon provides as an
25 option. It was available at the time this was

Page 93

1  manufactured and sold and used, will fit on this unit
2  just fine. So we, as we know --
3      Q.  What kind of fittings are those?
4      A.  We are talking about the roll stop.
5      Q.  That's the cart retention system?
6      A.  Yes. The roll stop cart retention system.
7      Q.  Do you know what the limit of horizontal
8  force that that cart retention system can sustain?
9      A.  No, sir.
10     Q.  You don't have a clue, do you?
11         MR. STRATTON: Objection.
12         THE WITNESS: I don't know what it is
13  specifically.
14  BY MR. GRADY:
15     Q.  You don't know whether or not that cart
16  retention system would have kept this unit from rolling
17  off at all, do you?
18     A.  Oh, I don't think there's any question that
19  it would. You can -- you can make that determination
20  because once the thing is starting to roll we've already
21  decided that the rolling friction is very small. It's a
22  small number. The problem is once it gets off the edge
23  and now all 855 pounds or so rotates off on the person
24  underneath it and that's the problem. The biggest
25  problem is not letting it start to move to start with.

Page 94

1      Q.  This cart retention system is a piece of
2  aluminum that sticks up to hold it and it's on a hinge,
3  right?
4          MR. STRATTON: Objection.
5          THE WITNESS: I believe that is correct, yes.
6  BY MR. GRADY:
7      Q.  You don't know whether or not that would keep
8  an 812 pound unit on wheels from rolling off the back?
9          MR. STRATTON: Objection. Asked and
10  answered.
11         THE WITNESS: I believe that the rolling
12  friction that I see of 40 pounds is difficult to
13  comprehend that it cannot not do it at 40 pounds, the
14  number we talked about.
15  BY MR. GRADY:
16     Q.  So when you say that they sent a boy to do a
17  man's job, are you saying that they should have sent
18  more manpower?
19         MR. STRATTON: Objection.
20         THE WITNESS: That's certainly one, one
21  remedy.
22         There's several remedies here, several
23  different strategies can be applied. But the important
24  thing is that the lift gate is not a level lift gate
25  and, worse than that, it's angle is much more extreme

Page 95

1  than Maxon would want or has designed or specified in
2  it. And, additionally, they provide the options that
3  would allow the thing to operate. Your choices are
4  either then get the cart retention system or get a level
5  gate or do some other things.
6          There's other remedies that could be done,
7  but they would require certain questions to be asked by
8  Arpin of Festo, and that has to do with bracing,
9  blocking and tying the load on the platform with extra
10  tie-downs, but that cannot be done without more
11  information from Festo. We need to know what type of
12  forces would be on the top horizontal members of that
13  work station. If we cinch down on them, we need to know
14  are we going to create damage by doing that. And so
15  that is a possibility that can be done to compensate for
16  the shortcomings of this truck and it's lift gate.
17         Certainly sending two people with a load this
18  heavy that is on casters is certainly -- and given that
19  the footprint is so big compared to the platform, that
20  would be helpful, but the point is you just can't leave
21  a load loose on a dropped platform.
22  BY MR. GRADY:
23     Q.  The footprint that you described being so big
24  was not disclosed by the shipping form, right? You're
25  using the police measurements.

Page 96

1      A.  Well, no, not necessarily. Let me show you
2  the measurements that would be on the shipping unit.
3          This is -- there's 59. Let me hold it up for
4  everybody to see.
5      Q.  That's a good 6 inches to 8 inches on either
6  side, right, of the unit?
7      A.  It would be a half-inch is equal to one foot.
8  You would have one foot on each side. And if you
9  were -- now, if you're perfectly centered you would have
10  maybe 4 inches on either end. Actually, 3 1/2. It's 33
11  wide and the platform is only 40.
12     Q.  Now, do you agree that Pouliot himself could
13  have strapped this unit?
14         MR. STRATTON: Objection.
15         THE WITNESS: No, I don't agree with that at
16  all.
17  BY MR. GRADY:
18     Q.  You don't agree with that?
19     A.  I don't even know if he has the straps,
20  number one, and, number two, he can't strap the unit
21  unless he is assured that he will not do damage to the
22  top section of that unit because he's going to have to
23  cinch down on it.
24     Q.  Well, he could have strapped that unit right
25  through the openings in the bottom of the brace of the

Page 97

1 frame, couldn't he?
2   A.  The pictures that I see -- well, that
3 would -- that's not doing a pretty good job of
4 strapping. That's not where we want to do it.
5       MR. STRATTON: Are we talking about 3 inches
6 off the ground?
7       THE WITNESS: Yes That's not where you want
8 to do it
9 BY MR. GRADY:
10  Q.  Take a look at the photographs in Exhibit F.
11  A.  Okay.
12  Q.  There are openings on either end of the frame
13 that allow for strapping, aren't there?
14  A.  As Michael Jordan would say, "Not really."
15      Look at this photograph. That's what Pouliot
16 had to deal with. That's the unit in shrink wrap.
17  Q.  It's shrink wrapped but you can get straps
18 underneath the shrink wrap
19  A.  No. The problem we have is to keep it from
20 rolling we've got to tighten it down and force those
21 casters into the check-plate. Just putting it loosely
22 around it's like a parallelogram; it will just move and
23 the strap will just go with it. It's not getting us
24 where we've got to go.
25  Q.  Are you familiar with the principle in the

Page 98

1 transportation industry that an interstate carrier will
2 send one man for a load up to 500 pounds and over 500
3 pounds they send two men?
4   A.  That -- yes, I am. That is a -- a guideline
5 or standard which comes from a group that publishes
6 what's called the National Freight Classification
7 System, and that is a -- it is directed toward LTL
8 carriers. They also provide mediation services for
9 disputes between shipper and -- and the truck company
10 itself.
11      In other words, if you adopt that standard
12 then you -- every party agrees to do that, but in -- in
13 pick up and delivery, which is what we're talking about
14 here, which is one phase of less than truck load
15 shipping, that is all done by negotiation and it is a
16 negotiation between the shipper and the truck company as
17 to what occurs.
18      And if -- recently I just personally had
19 delivered to my house a work bench that weighed about
20 400 and some pounds and by -- and the shipper was
21 Watkins. They picked it up in Colorado, delivered it
22 here. It went through I think two cross docks before it
23 got to Phoenix and I was charged extra to have them put
24 it in my garage and they placed it on the garage floor
25 and I was charged an extra $30 to do that. That was by

Page 99

1 negotiation and everyone was clear who was going to do
2 what, but it was my understanding that they would bring
3 it, it would end up on my garage floor. I would have to
4 do nothing other than be there and make sure the garage
5 door was open. My wife was there to make sure it was
6 open. And then they would place it there and then for
7 that I was charged an extra $30. So, in the P&D market
8 all of that is done by negotiation and that should be
9 established up front.
10  Q.  Well, if Arpin only told Trans-Expo that the
11 two units weighed a total of 400 pounds, which is an
12 under-statement of the weight by 600 pounds, how can
13 they address that kind of a problem? They have to make
14 their plans based on what representations are made to
15 them.
16      MR. STRATTON: Objection
17 BY MR. GRADY:
18  Q.  Isn't that true?
19  A.  Not really. Not in a sense.
20      Yes, there are aspects to the -- to the
21 misstating of the weight, there's no question about
22 that, but the more important aspect of it is that it is
23 clearly marked on this that this is going to be a lift
24 gate delivery, it is going to be an inside delivery. It
25 is clear that this object is not palletized and that it

Page 100

1 is my understanding that Arpin knew that it was on
2 casters and that they -- it is also implicit in here
3 that it is not a dock delivery because "lift gate" is
4 checked.
5   Q.  One of those units is palletized, isn't it?
6   A.  Yes. But that's not the one that had the
7 accident.
8   Q.  It doesn't say which one is palletized and
9 which one isn't, does it?
10  A.  It doesn't say that on that, but I believe
11 the testimony was that Festo provided that information
12 to Ramirez, that it got to Trans-Expo. That is my
13 understanding. And that the concern was that they are
14 very much concerned about damage to the unit which had
15 led them to apparently previous unsatisfactory
16 relationships with the shipper in which a unit was
17 palletized and caused them to indeed no longer palletize
18 the unit.
19      If someone wrote in hand here "protect
20 wheels," wheels are things that are designed to roll on.
21 Wheels are designed to roll on. So somebody who wrote
22 this on a sticker somewhere recognized that something
23 here has wheels on it.
24      And I think it also says on one of the
25 versions of this -- now I don't know which one it is,

Page 101

1 there's a couple different versions been floating around
2 as I remember -- someone said "lift gate" and also one
3 of the documents seems to talk about a pallet move and
4 the pallet mover is going to be needed to take the
5 palletized object out.
6    Q.   But one cannot tell about what the weight is?
7    A.   Oh, here it is. "Need pallet-jack and lift
8 gate for delivery." So one --
9    Q.   But you can't tell from that document that
10 you have in your hand which is which, right?
11   A.   That's true. You can't tell which is which.
12   Q.   You mean it could be -- it could be that the
13 unit that's on wheels weighs 250 pounds and certainly
14 the driver could handle that in the unloading phase on
15 this lift, isn't that true?
16   A.   Oh, no, no, no, no, no, no, no, no, no. Now,
17 if it only weighs 200 pounds or let's push it, let's
18 keep pushing it. Let's say it weighs 15 pounds and if
19 it rolls off all it's going to do is bruise him.
20        So I think the argument maybe its propensity
21 to roll isn't going to be different, but perhaps one
22 could argue if it didn't weigh as much the injuries
23 might not be as much when it finally does roll off the
24 end of the cliff.
25   Q.   Well, he can get out of the way, can't he?

Page 102

1         MR. STRATTON: Objection.
2         THE WITNESS: Well, I think that's pretty
3 speculative if he's -- the thing is he is clearly trying
4 to position it and hold it in position.
5 BY MR. GRADY:
6    Q.   Right. That's not what he should have been
7 doing, right?
8         MR. STRATTON: Objection.
9         THE WITNESS: Well, I -- what else can he do?
10 At that point there's nothing he can do. He's got to
11 try and save the product.
12 BY MR. GRADY:
13   Q.   Let it roll off and get out of the way.
14   A.   Well, I don't think many people would do
15 that. At that point they'd have every reason to believe
16 they can stabilize the product.
17   Q.   He shouldn't have been behind the unit at
18 all, should he?
19        MR. STRATTON: Objection.
20        THE WITNESS: In a -- he shouldn't have had
21 to have stabilized the load, that is correct. I agree.
22 BY MR. GRADY:
23   Q.   Do you know whether or not this accident
24 would have happened if there were four brakes on the
25 wheels?

Page 103

1    A.   Four brakes?
2    Q.   Yes.
3    A.   I don't know. It couldn't have been any
4 worse. It couldn't hurt, but whether it would have
5 prevented the accident I don't know.
6         If they would have locked the wheels
7 completely the chances are it would have prevented it,
8 but we don't know what the performance would have been
9 of two, four, or whatever might have been on it.
10   Q.   Do you agree that the unit should have been
11 palletized and the wheels immobilized in order for this
12 unit to be shipped safely?
13   A.   Not necessarily. But palletizing is
14 obviously the more standard form and it would -- it
15 would certainly -- if it were palletized we then are out
16 of the area of concern with respect to any low rolling
17 because we now have to slide the unit.
18        We would get it to the ground and once we get
19 it to the ground we then -- if you have a pallet mover
20 you can move from there or if you have got a fork-lift
21 truck you can move it.
22        Another issue then arises is depending upon
23 how it's palletized, how easily it will be to get the
24 unit off the pallet. Pallets are about 4 1/2, 5 inches
25 off the ground and so that's another issue. It may well

Page 104

1 roll off just fine, but certainly it does not present
2 the type of potential for injury that we have in here.
3         So certainly palletizing is a standard way of
4 doing it, but again that's -- that is a negotiable item
5 between Festo and Arpin and if Festo wishes to ship
6 something with casters on it, that's fine, and Arpin
7 needs to simply have the methods and means, methods and
8 means to do -- to get that to the receiver safely.
9    Q.   Specifically what kind of a danger is
10 presented by swivel caster wheels supporting an 800
11 pound unit during the unloading process on this Maxon
12 72-25 Tuk-A-Way lift?
13   A.   Well, I think I covered that in the report,
14 but the thinking is that they've used four swivel
15 casters and the swivel casters are an issue that are a
16 little different than your grocery cart.
17        The grocery cart has swivels in the front and
18 has straight wheels in the rear so when you turn your
19 grocery cart to go down the aisle you move the bar and
20 you push and pull and you cause the nose to swing left
21 or right and that's how you actually negotiate the thing
22 down the aisles if you turn.
23        If you have four casters on it it would walk
24 like a crab. It could move sideways too. And so it can
25 move in any direction at all times. It has an

Page 105

1  additional degree of freedom to it that it does not have
2  when you have two casters and two straight wheels.
3      And casters and straight wheels are used on
4  grocery carts for a very important reason because if not
5  people would slide sideways into the person next to them
6  and we'd have cart collisions in the grocery store all
7  the time. So it is more difficult to negotiate an item
8  which has four casters to it as opposed to two casters
9  and two straight.
10     So, how that ends up is it makes it much more
11 difficult for a single person to negotiate, in other
12 words, get it from the bed of the body out into the
13 platform itself.
14     Q. Relative to the droop that you described, how
15 much does the flipover droop relative to the main
16 platform?
17     A. I've got to find the sheet here. I'm not
18 finding the sheet.
19     Oh, here it is. The bed is up at the rear
20 and down at the front 1.9 degrees.
21     Q. 1.9?
22     A. 1.9 degrees.
23     Q. Now, does that droop in that corner
24 contribute in any way to the accident?
25     A. No. Well, I mean, that's just a fact at --

Page 106

1  did I say accident? I'm sorry. That was at the test.
2  That was the conditions I had to operate under to test
3  it. That's the reality I was given, so I measured that
4  and I correct for it.
5      Now, the platform in real space was down 6/10
6  of a degree and the beaver tail dropped another 4
7  degrees beyond that and the load is part on the beaver
8  tail and part on the platform. So it sort of sees
9  part -- in other words, the contribution of the
10 additional angle of the beaver tail droop does not
11 increase the angle of the load a hundred percent because
12 all of it is not attributable to the load. So the load
13 is only part of it and the rest of the load is over
14 here.
15     The net result is as sitting there at the
16 accident scene, the platform, the load itself is going
17 downhill approximately a degree and a half and under the
18 worst case measurements 6/10 of a degree beyond that,
19 2.1.
20     Now, when we go to the accident scene we
21 don't have quite as much help to start with. We don't
22 have as steep a slope in the helping direction as we did
23 at the test scene, so everything would be lowered an
24 extra 1.4 degrees if we would translate this all to the
25 accident scene.

Page 107

1      So, all of that is shown really on this
2  little drawing. I think we did take the time and effort
3  to put this together for all of you.
4      Q. Would you answer my question, Doctor?
5      A. I thought I did.
6      Q. Did this droop contribute in any way to the
7  accident?
8      A. Well, sure.
9      Q. The answer is "yes"?
10     A. Yes.
11     Q. And the droop is only on one side of the
12 flipover, right?
13     A. No. It's more on one side than the other,
14 but it's -- there is some on both.
15     Q. The mass of the weight over the other three
16 wheels would cause the weight, as your photograph shows,
17 to be lifted off the beaver tail in the corner, right?
18     A. I don't think we in our test we ever got to
19 the situation where we did not have contact with all
20 four contact patches of the tires.
21     And although you do raise an interesting
22 point, is that if you measured the force under each
23 wheel under those situations due to the non-symmetry of
24 the twisting and the out of alignment of the two pieces
25 of the platform, you may not have uniform loads on all

Page 108

1  four wheels given that the unit is otherwise in that is
2  nominally symmetric. It appears to be nominally
3  symmetric.
4      Q. Nominally meaning it doesn't affect in a
5  material way the conclusion?
6      A. On a hard surface the actual CG of the unit
7  would be at the geometric center of the footprint.
8  That's what I mean. In other words, it doesn't have a
9  bias in any one direction, a significant bias.
10     But all of this, at the end of the day, the
11 bottom line is that it's just got too big an angle and
12 the angle gets worse as you lower it and finally you get
13 to the point where the china cabinet comes down.
14     Q. Do you believe that shimming would have
15 prevented the accident?
16     A. Yes. Shimming and geometrically
17 straightening it out. That goes with shimming.
18     I mean, it's got -- because we need to get
19 the initial -- we need to get it so it's taking a load
20 where Maxon designed to take the load and if it does and
21 it will not give any more, the angle is zero because
22 there will be no additional dropping of the load once
23 it's set. If it's properly against its stops, it will
24 work fine.
25     Q. According to the manual shimming is directed

Page 109

1  at remedying the condition of sag, right?
2      A.  Absolutely.
3      Q.  And sag is the drop or angle of decline
4  between the platform and the beaver tail, right?
5      A.  No, not really. The droop under Maxon's
6  design has only to do with the platform. The shimming
7  is first there. Then the -- the movable platform or the
8  beaver tail has to properly seat so that when it comes
9  into the down position it is seating properly on it's
10 stops and remains horizontal with the platform. It
11 should have no angle one way or the other to the main
12 platform.
13         But that angle of both units together is
14 determined only by the stop at the far end of the four
15 bar linkage which affects the main platform.
16         The diagram which Maxon provides to it's
17 clients to help them identify these problems is one of
18 the tattletale signs that you have a shim problem is
19 when it reaches the grounds you have a broken back
20 between the main platform and the beaver tail. They
21 aren't in a straight line any more.
22         And the reason -- I will try not to knock it
23 over this time -- if I stretch this out and I will call
24 this -- and I have a platform that's up here and then as
25 I come down it pitches down and in a perfect world when

Page 110

1  he get to the ground I will stop here. I will have a
2  4 1/2 degree angle and this will be flat as the dickens.
3         When I have too much droop and I start level
4  or below as opposed to up, when I go down at 50 inches
5  and travel my 9 degrees the first thing that happens is
6  the beaver tail hits too soon and can be optically seen
7  to have a fold in it. So that's one of the signs.
8         We now know, aha, we've got to shim it up and
9  get this whole thing back up so when we go in the up
10 position we are tilted up. That's what we're looking
11 for.
12     Q.  The remedy of shimming, however, if you look
13 at Exhibit D, is in the Table 1 and 2 stated is directed
14 at remediating sag, right?
15     A.  Absolutely.
16     Q.  Okay
17     A.  Sure.
18     Q.  That's the angle that you just described?
19     A.  True.
20     Q.  It doesn't have anything to do with the
21 overall platform-beaver tail angle in the course of the
22 arc from the top to the bottom?
23     A.  Well, I may be not completely understanding
24 your question.
25     Q.  Well, let me rephrase it. If you look at

Page 111

1  Exhibit D, Figure 2D, that's the sag shown in the
2  diagram, right?
3      A.  Yes. But that's not -- that what you see
4  there does not necessarily imply that there is anything
5  wrong with the seating between the beaver tail and the
6  main platform.
7          Put the thing up in the intermediate
8  position. What you should see is the beaver tail when
9  it's down will be absolutely flat with the main platform
10 and it's two stops and that arm that comes out will seat
11 and it will not, you know, you can't bounce it on one
12 side where it's kind of pitched up the way ours is. You
13 push on it, it goes down so far. You pull it out, it's
14 dead solid. You've got contact on its stops and it's
15 absolutely flat. Now, you got that, the beaver tail is
16 out of the picture.
17         Now, the problem now goes up to the front to
18 the main shims between the main platform and the front
19 end of the four bar linkage and there's where you have
20 got to shim it so that you have the proper angle.
21         So, there are two things that are done
22 independently. One, the angle between the beaver tail
23 and the platform which should always be flat at all
24 times and the stops in it and the linkage shouldn't be
25 bent in such a way that it kind of has a little give in

Page 112

1  it. It's good and solid and it's horizontal.
2          Then you go up to the front to the stops and
3  you adjust those shims so that you're up as much at the
4  top as you are at the bottom. You will be 4 1/2 up at
5  the top, 4 1/2 down at the bottom when you have got the
6  shims right.
7          Now, what you see in Exhibit D, Figure 2D,
8  the sag that occurs is not an indication that there's
9  anything wrong with the alignment between the beaver
10 tail and the main platform, only that the thing is just
11 coming so far down that the beaver tail has to give up
12 and is no longer seated, and that's an indication that
13 you have the shimming problem.
14         Now, there may be also be an alignment
15 problem between platform and beaver tail. Both have to
16 be checked, but generally this would be a symptomatology
17 associated with main shimming at the four bar linkage.
18     Q.  Doctor Ruhl, do you believe that Arpin knew
19 more about this cargo prior to the accident than did the
20 plaintiff?
21     A.  Wait a minute. Did Arpin know more?
22     Q.  More about this cargo prior to the accident
23 than did the plaintiff?
24     A.  Absolutely. They had some -- they had the
25 paperwork from -- from Festo and I understand that -- my

Page 113

1  understanding is that Pouliot was dispatched with no
2  information.
3      Q   And the paperwork that you are referring to
4  is Exhibit K, right?
5      A.  That's correct.
6          So it's not my testimony that the --
7          MR. STRATTON: I object. You might want to
8  go back a second. Exhibit K and about twenty other
9  documents. I just don't want to --
10         THE WITNESS: Oh, I didn't assume this was
11 exclusively. I was referring just to my document. Yes,
12 I don't have this.
13 BY MR. GRADY:
14     Q   Do you know what other documents provided
15 Arpin with information about the accident prior?
16     A.  Well, there's several sort of different
17 versions of this floating around with different pieces
18 of information on it.
19         The important point is that Pouliot didn't
20 get the information he needed to do the job he had to
21 do. That should come from Arpin. He wasn't given the
22 equipment and the resources to do the job he had to do,
23 and he didn't have the training that he should have on
24 this equipment.
25         Now, he doesn't require all three of those to

Page 114

1  fail to have an accident, but all three of those did
2  fail. And it's not my opinion that he has to receive
3  the paperwork in writing and that in custom and practice
4  that doesn't necessarily occur. They get it.
5      Q   Don't you agree that he had a pretty good
6  idea about the weight from moving it from the platform
7  into the truck and then from the truck onto the lift?
8          MR. STRATTON: Objection
9          THE WITNESS: I don't know. I don't know
10 what his knowledge was.
11         My understanding is that he didn't -- he
12 didn't move it onto the truck.
13 BY MR. GRADY:
14     Q   Did you read his deposition?
15     A.  Yes, I did.
16     Q   He said it was heavy, didn't he?
17     A.  Yes. But that's a qualitative, you know,
18 term. I don't see whether that tells us about accident
19 prevention necessarily.
20     Q   He knew it was on wheels, right?
21     A.  Yeah. He's pushing it and basically he's
22 pushing it onto a -- onto a lift platform that's going
23 to give when the load gets on it.
24     Q   And he knew or should have known that it had
25 brakes on it, right?

Page 115

1          MR. STRATTON: Objection.
2          THE WITNESS: Oh, no, I don't think that at
3  all.
4  BY MR. GRADY:
5      Q   And he knew or should have known that the
6  unit -- that the lift gate unit when unfolded out tilted
7  to the rear?
8          MR. STRATTON: Objection
9  BY MR. GRADY:
10     Q   He saw that before he ever put this unit on
11 the back of the lift, right?
12         MR. STRATTON: Objection.
13         THE WITNESS: He saw some of it. He didn't
14 see all of the because you don't see all of it until the
15 load's on it.
16 BY MR. GRADY:
17     Q   What factors in descending order do you
18 believe caused this accident?
19         MR. STRATTON: Objection to the question. In
20 fact we are not going to do descending order. We are
21 not going to do ascending, descending. Not relevant in
22 the case. Object to the question.
23         Don't answer the question.
24         MR. GRADY: Are you instructing him not to
25 answer?

Page 116

1          MR. STRATTON: I'm instructing him not to
2  answer.
3          MR. CURCIO: This might be a good point to
4  stop for some lunch.
5          MR. GRADY: Okay.
6          (Whereupon, the deposition was then
7          recessed at 12:58 p.m. until
8          1:16 p.m.)

29 (Pages 113 to 116)

Page 117

```
 1                Phoenix, Arizona
 2                April 13, 2004
 3                1:16 p.m.
 4
 5
 6           ROLAND L. RUHL,
 7  called as a witness herein, having been previously duly
 8  sworn, was examined and testified as follows:
 9
10                EXAMINATION
11  BY MR. GRADY:
12      Q.  Were you aware that there were Naugatuck
13  employees in the area that Shawn Pouliot could have
14  asked them to help unload this unit at the time?  Were
15  you ever told that?
16      A.  Could have asked?  I don't know one way or
17  the other.  No, I don't have any knowledge of where any
18  employees are or students.
19      Q.  Were you aware that some of the Naugatuck
20  employees had already brought in the first load?
21      A.  No, sir.
22      Q.  Now, on page 8 in B 5 of your report you talk
23  about bent arms and brackets.  Can you explain to me how
24  the bent arms and brackets on the rear lift contributed
25  to the accident?
```

Page 118

```
 1      A.  Yeah.  I think they contributed because they
 2  are the cause of the poor seating and that the flexing
 3  when you put the load on it to make it droop even more
 4  does not occur when it properly adjusted, so that's a
 5  ramification.
 6      Q.  What is the proper stability limit angle for
 7  a safe rear lift gate for this unit?
 8          MR. STRATTON:  Objection to the term "safe."
 9          THE WITNESS:  4 1/2 degrees is going -- it
10  would -- if you could get a drag factor, and I'm doing
11  this extemporaneously so I reserve a right to correct
12  the numbers.  I was just trying to be helpful.
13          4 1/2 degrees is going to generate a droop of
14  about 2 1/2 inches over 20 inches.  As such that's going
15  to be a ratio of about .1
16          So on a check-plate deck with a pallet you're
17  going to have a drag factor of .4 to .6, somewhere in
18  there.  So you'd probably have a factor of safety of 4
19  to 1.
20          And that would be okay, but not when you've
21  got something that can roll.  So, if it is properly
22  adjusted and the objects can generate a typical sliding
23  friction it's going to be okay, but not rolling objects.
24  So I guess that's the best way I can answer the
25  question.
```

Page 119

```
 1  BY MR. GRADY:
 2      Q.  Well, I guess what I'm trying to interpret
 3  from your answer then is that are you saying that there
 4  is no proper stability limit angle for a safe rear lift
 5  gate for this unit which is on wheels?
 6      A.  Yes.  I mean, we -- the unit should not be
 7  used for rolling objects because it does go to 4 1/2
 8  degrees or more and that is less than the foreseeable
 9  rolling resistance of an object.  So there's prima facie
10  conflict there for rolling objects that you must do
11  something to increase that number.
12          Well, if it's a sliding object then you've
13  solved the problem basically.  A palletized object 4 1/2
14  degrees it's improbable that it will slide off.  So
15  that's a very good factor for safety.
16          Rolling, the rolling resistances can be quite
17  low and I gave you one number.  They can actually be
18  lower than that.
19      Q.  So you answered that there is no proper
20  stability limit angle for safe rear lift gate for this
21  unit, 800 pounds on wheels?
22      A.  For rolling objects, yes, that's correct.
23      Q.  What's the basis, tests or analyses for your
24  opinion that had the lift gate angle been a few degrees
25  different this accident would not have occurred?
```

Page 120

```
 1      A.  Well, it goes back to the two graphs I
 2  provided and --
 3      Q.  We are talking about -- let me get the right
 4  exhibit here.  That's Exhibit M, this one here.
 5      A.  Yes, sir.  It says 2 of 2 on it, the one you
 6  have there.
 7      Q.  Two of 2 on the front and 1 of 2 on the back.
 8      A.  You want the 2 of 2 sheet.
 9          The little numbers that I have 2 up, 1, 2, 4
10  and 3, those were the heights off the ground where it
11  started to roll or did roll off and if you go from those
12  points on that line over you will see that the angle
13  where this occurred is minus 6.1 degrees at the low end
14  to a degree of approximately 8.5 degrees at the high
15  end.
16          Now, you notice I've got little faint lines
17  with arrows that go to the right.  That data is not
18  converted into the domain of the different ground slope
19  at the accident scene.
20          And we notice that the actual roll off our
21  test values are more conservative than the actual roll
22  off.  They actually rolled off sooner than what we
23  believe happened at the accident scene.  The accident
24  scene data is consistent with the highest value I have.
25          Now, but in any event, there's a range of
```