Page 121

1 values there, but if we take the lowest values in your
2 test that prevailed, they are well above the value that
3 the worst case could be when the lift is near the ground
4 and if it was designed -- if it was configured as it was
5 designed the angle would never have a drop of more than
6 4 degrees because we'd have 4 1/2 degrees as the design
7 but we bought an extra half a degree by pointing the
8 truck downhill to start with, so we never get over 4
9 degrees.
10     And our first failure occurred at about 6 1/4
11 degrees, so we've got some distance in there. So that's
12 the basis for the conclusion that but for the
13 misalignment the accident would not have happened.
14     And, remember, my test data is more
15 conservative. In other words, I predict failures at a
16 lower angle than the actual single data point, the
17 single event accident that did occur.
18   Q  So I think you indicated that your
19 computation of the lift gate angle of the platform and
20 the flipover at the time of the extent was 8.75 degrees,
21 right?
22   A  I don't think that was -- oh, well, at --
23 yeah, the angle of the load would have been about -- I
24 predict would have been about 8.75 degrees, that's
25 correct.

Page 122

1   Q  And what should it have been?
2   A  Well, with a rolled load, zero. Or we got a
3 cart retention system which makes -- makes it
4 irrelevant.
5   Q  Well, at zero it would be level with the
6 platform floor, right?
7   A  Yes, that's right. We send out a platform
8 for a roll load that don't -- that isn't a tuck gate.
9   Q  But using this lift, assuming that that's the
10 case --
11   A  Yes.
12   Q  -- what should the computation of the lift
13 gate angle have been in order for it to be correct?
14   A  Well, if the lift gate met the manufacturer's
15 specs at the scene.
16   Q  Can you explain what those are
17 specifically --
18   A  Sure.
19   Q  -- if it met manufacturer's specs at the
20 scene?
21   A  Correct. Manufacturer's.
22   Q  And please indicate what you're referring to.
23   A  I'll try to. I'll do it with this example
24 here. This is our -- Mike has me on a austerity budget
25 and I don't have any demonstrative exhibits.

Page 123

1     Here's the platform. Here's the flipover or
2 the beaver tail, if you want to call it. When we as a
3 manufacturer wanted us to maintain it 50 inches off the
4 ground, this platform will be up in the air at the rear
5 4 1/2 degrees on level ground.
6     As I go down to the ground such that the tip
7 of the beaver tail touches the ground, I will still be
8 in a straight line and I will have a downward slope of
9 4 1/2 degrees. But Pouliot parked his truck nose
10 downhill by half a degree. So all of these things get
11 an extra half degree cranked into them.
12     So now at the top instead of being up at
13 4 1/2, we're with now up at 5 and at the bottom instead
14 of being down at 4 1/2 we're down at 4. Five and 4 is 9
15 and 4 1/2 and 4 1/2 is 9. So that's the difference.
16     Now, what happened here at the scene we
17 started down at about 3 degrees, so instead of being up
18 at 5 we're down at 3. By the time the china closet let
19 go at 18 inches we're down to approximately 8 3/4
20 degrees and we've -- ultimately if we made it the rest
21 of the way would have gone to essentially 12.
22   Q  So again can you tell me what the computation
23 of the lift gate angle at the time of the accident on
24 the platform in the flipover should have been in
25 accordance with manufacturer's specifications?

Page 124

1   A  Oh, okay. Yes. At 18 inches if it was -- if
2 it had manufacturer's specs it would be down
3 approximately just about one degree, A little under one
4 degree; three-quarters of a degree.
5   Q  So at 18 inches what you're saying is that
6 the angle of the declination angle would have been one
7 degree?
8   A  A little under that. Three-quarters of a
9 degree.
10   Q  What is the angle tolerance range between a
11 safe and an unsafe lift gate for the incident load?
12   A  Well, with a rolled load we don't want to
13 have any negative angle because rolling coefficients of
14 friction are very low.
15     For --
16   Q  I'm sorry  Go ahead
17   A  So, but for a sliding load -- in fact, Mark
18 Strauss, Doctor Strauss in our office just published
19 some tests on pallet sliding on flatbed trucks, on the
20 wood decks in flatbed trucks. Those numbers tend to be
21 more typical sliding coefficients of friction and that
22 those values are, as I said, typical values would be in
23 the range of .4 to .6 and sometimes even higher if it's
24 got a rough surface on the bottom. And at
25 manufacturer's specs we're likely not to go over .1. So

31 (Pages 121 to 124)

Page 125

1  I think that's my rough estimate for the arc tangent of
2  4 1/2 degrees.
3      And so we would seem to have a factor of
4  safety of about 4 and factors of safety of 4 are
5  generally considered by engineers to be very good
6  values. In fact, very few products will have values
7  beyond that. So that's -- that's the best I can say.
8      Q. If I understand your testimony correctly,
9  what I interpret what you're saying is that you really
10 don't think that this Tuk-A-Way lift at all should have
11 been used to unload this 800 pound unit which was on
12 wheels?
13     A. Not -- not without additional things being
14 done. That there be some way to block it or crib it
15 that's -- it just needs more help. But just to rely on
16 a lift gate itself to do it, even a lift gate that's
17 designed by Maxon based on my tests would have worked in
18 this case, it's -- it's just not the way to go.
19     Q. Now, just so I understand it correctly, in
20 formulating your conclusions and in providing the report
21 which appears in Exhibit L you did not rely upon the
22 installation instructions for the Tuk-A-Way 72-25A which
23 were received for the first time last night, is that
24 right?
25     A. With one small exception. The number or

Page 126

1  their spec for it was given verbally over the phone to
2  Suzanne and we talked about that earlier, but I did not
3  perform a computation at that time as to what all this
4  means.
5      So the answer, the short answer I guess is
6  that no, I didn't. Obviously I couldn't have considered
7  it as stated in the manual because I saw the manual for
8  the first time this morning.
9      Q. Other than the notes that appear on Exhibit E
10 respecting an alleged conversation with Victor at Maxon,
11 is there any other written recording of specifications
12 from Maxon regarding the 72-25A lift in your file?
13     A. Not in my file. And Suzanne gave me her
14 notes, unless she were to have something that I don't
15 have, but certainly I would not have relied upon it.
16     Q. Does she maintain a separate file?
17     A. I don't think so.
18     Q. So that everything that she has is in your
19 file, right?
20     A. I think so, yes.
21     Q. So when you say other than Suzanne, what you
22 really mean is that it may be in her head but you know
23 of no paperwork that --
24     A. That's correct. That's correct.
25     Q. -- you have in the file?

Page 127

1      A. Yes.
2      Q. What specific lift gate maintenance should
3  Arpin have carried out that it did not carry out prior
4  to assigning this unit to Mr. Pouliot, lift gate
5  maintenance?
6      A. Well, the lift gate maintenance manual has --
7  first of all, as a sort of a starting point for my
8  answer, it does provide the maintenance steps which
9  should be undertaken and those should be integrated into
10 the ABC maintenance program that the manufacturer would
11 have.
12     But specifically it involves checking for
13 wearable items because the unit does wear and the
14 wearing shows up in the need to reshim.
15     Another issue we haven't talked about that is
16 a factor in the performance of it is the wear between
17 the bushings and the pins themselves. That is another
18 factor. And they are quite explicit about that in the
19 manual is checking that. That is one of the things that
20 should be periodically checked. So it's droop, droop
21 can be affected or remedied by shim. Wear on the pin,
22 the bushings and the pins, also affects droop and the
23 pins need to be replaced periodically.
24     Obviously these units operate in the real
25 world and in the real world things get banged around and

Page 128

1  things get deformed and they need to straighten things
2  out and make sure that the parts fit together in a
3  reasonable way.
4      Q. Did you find anything wrong with the pins on
5  this unit?
6      A. I never -- I did not take them out to check
7  them.
8      Q. They were snug, right?
9      A. Well, I wouldn't say that. I don't know one
10 way or the other, but I did not take them out. I mean
11 I --
12     Q. Then how can you say that maintenance needed
13 to be required for the pins? I'm not talking about in
14 general.
15     A. I'm talking in general.
16     Q. No, no. I'm talking about just this unit.
17     A. Oh, I don't know about the pins. I'm talking
18 in general.
19     Q. I'm talking about this unit.
20     A. I'm not talking in specific. Well, the only
21 thing is basically performance issues were out of spec
22 on droop is the bottom line and we are just not seeing
23 right. That's really also a problem. We have sort of
24 got to get the seating fixed before you can shim it
25 properly.

Page 129

1  Q.  But the seating problem goes away once the
2  load settles down on the platform, right?
3  A.  But it shouldn't. You shouldn't be operating
4  that way.
5  Q.  But it doesn't -- it doesn't cause the
6  accident?
7  A.  No, but it just -- you really need to get the
8  thing to seat right. Then you can shim it accurately.
9  Q.  Basically what I hear you say is that the
10 failure to address the droop problem is the specific
11 maintenance issue that Arpin failed to do
12 A.  Sure, that's it. But I also, as a predicate
13 to that, you've got to get the -- you don't want anybody
14 operating a unit that isn't a safe suitable platform and
15 if there's compliance in the platform it can't be safe.
16 You don't want to walk on a surface that's springy
17 underneath.
18 Q.  How should the lift gate operation be changed
19 if the vehicle is parked on a slope?
20 A.  Well, in our subject case the parking on the
21 slope actually helped things in both, you know, my test
22 doesn't count from the standpoint of it's got nothing to
23 do with anything, but Pouliot clearly had the down
24 slope. He helped things by parking it the way he did.
25 Q.  What training should Arpin have provided to

Page 130

1  Mr. Pouliot that it did not?
2  A.  Well, Pouliot needs the training because he
3  as the driver needs to know what he should check and so
4  he needs the training to what he should look for and how
5  he should use it and he doesn't -- Pouliot's experience
6  by my reading of the file is that he's more of an en
7  route driver. He's not a P&D driver and his normal
8  truck is not a straight truck. He normally drives a
9  Class A tractor that pulls a trailer, and as such his
10 experience and training is, if not exclusively, is at
11 least predominantly in dock to dock operations. P&D is
12 not necessarily dock to dock operations and he's not
13 been trained in this equipment. And so that's part --
14 that's part of the problem here.
15 Q.  I believe you indicated in your report that
16 this unit could have been strapped in order to safely
17 unload it on this lift, right?
18 A.  I think I've already answered that and the
19 answer is as a concept in the general case it can.
20     The problem is applying it to this case
21 because it's my opinion that basically you have to go up
22 and over the top to do it and we really don't have --
23 there's been no information developed in this case as to
24 what Festo is going to think of cinching down on those
25 top pieces. That's just not been developed. So that

Page 131

1  idea just never had a chance to hunt.
2  Q.  You're answering that question not ever
3  having seen the unit, right?
4  A.  That's correct. But if you cinch down those
5  units we have to have some assurety that that unit is
6  not going to be damaged by cinching down on it. This is
7  not in a crate.
8  Q.  Do you agree that the lift is designed
9  geometrically to have droop as it descends?
10     MR. STRATTON:  Objection
11     THE WITNESS:  Plus 4 1/2 to minus 4 1/2. It
12 cannot -- there's no way it can operate. That's the
13 laws of geometry. It's a four bar linkage That's as
14 good as it can do.
15 BY MR. GRADY:
16 Q.  So, just so I understand, your position is
17 that from van floor level it travels through an arc of
18 4 1/2 degrees to the ground, van floor level, level at
19 the van floor?
20     MR. STRATTON:  Objection
21     THE WITNESS:  I must be missing something,
22 okay? When it's level with the bed, in other words, 50
23 inches off the ground, it will be up 4 1/2 degrees
24     MR. GRADY:  Well, okay Now I'm saying it's
25 rotated down so that it's level with the -- with the

Page 132

1  bed
2      MR. STRATTON:  It should never be level to
3  the bed
4      THE WITNESS:  Parallel to the bed?
5      MR. GRADY:  No, not parallel. Level with the
6  bed It's come down so it's level with the bed
7  Q.  Here's my question. I have got a geometric
8  problem here and I don't know how to solve it
9      MR. STRATTON:  There's 90 degrees
10     THE WITNESS:  There's a bed up there  We are
11 up at the 50 inch level. We are up 4 1/2 degrees. I
12 then have to come down 4 1/2 degrees to get horizontal
13 Now I will be horizontal and the bed is horizontal but I
14 will be below the bed I'll be below the bed 25 inches
15 and 25 more inches to go
16 BY MR. GRADY:
17 Q.  Is there any reason why you didn't perform
18 tests with brakes on your load platforms?
19     MR. STRATTON:  Objection to the form, brakes
20     THE WITNESS:  At the time it -- the only
21 question was whether the unit even had a wheel lock on
22 some of the wheels, but the testimony was that it did
23 not have  Those were not activated and we didn't even
24 know at the time whether it even had it, so the -- at
25 that stage of the case development the replication is to

Page 133

1  see if we -- if the roll off angle is consistent with
2  what we found happened and the answer is yes, it shows
3  exactly what happened.
4  BY MR. GRADY:
5      Q    I may have asked this already. If I did, I
6  apologize. But my understanding is that you did not
7  review Officer Blalock's deposition and the exhibits
8  appended to it in formulating your opinions in this
9  report, right?
10     A.   That's correct. I have some of the police
11 photos and measurements. Now, maybe they were also
12 marked in Blalock's dep, but I don't know that.
13     Q    You're aware, of course, that Officer Blalock
14 under subpoena duces tecum never produced the
15 photographs that you have in your file with his -- when
16 he came to the deposition?
17     A.   I have never seen his deposition so I don't
18 know.
19         MR. GRADY: I have no further questions.
20              EXAMINATION
21 BY MR. CURCIO:
22     Q    Mr. Ruhl, what was your assignment in this
23 case? What were you asked to do?
24     A.   Basically to investigate the accident. To
25 inspect the condition of the lift gate which is

Page 134

1  suspected as being a component in the accident and --
2  and it was my suggestion to Mr. Stratton that we ought
3  to just to make sure we understand what is going on in
4  this accident and test it to the extent that we can
5  reproduce the accident and make sure that we thereby
6  sort of understand how this all occurred.
7         It also would be obvious I think that once
8  that is done the videotape of the falling off of the
9  object would be one way we could show all of this to the
10 Court so that he could see how does this occur. I don't
11 suspect that most people probably intuitively understand
12 how the Tuk-A-Way works.
13     Q    How the work -- what works?
14     A.   Tuk-A-Way. That's the trade name for it.
15     Q    Oh, the Tuk-A-Way.
16     A.   This is called the Tuk-A-Way because it has
17 at its root a couple features. One is a four bar
18 linkage. It has then a folding main platform and a
19 folding beaver tail on the platform that sort of rolls
20 up and goes up and under the bed of a straight struck.
21 It doesn't work too well on a trailer pulled by a
22 semi-tractor, pulled by a Class A tractor.
23        So that is somewhat unique and I think that
24 it's -- it's just in understanding how the accident
25 happened you really need to know something about a

Page 135

1  rolling load and you need to know something about the
2  Tuk-A-Way. You need to know something about the
3  condition of the Tuk-A-Way.
4      Q    And which by my estimation thus far you've
5  charged the plaintiff in excess of $40,000 to accomplish
6  that assignment?
7      A.   Yes. Whatever the bill is, it is.
8      Q    During the questioning earlier this morning
9  you seemed to have some question in your mind as to
10 where the plaintiff was standing at the time of the
11 accident, is that correct?
12     A.   Yes. There is some ambiguity.
13     Q    Have you asked him?
14     A.   I have not.
15         Mr. Stratton has indicated that he says he's
16 on the ground.
17     Q    Have you talked to Shawn Pouliot?
18     A.   I have not.
19     Q    Do you understand that there are eyewitnesses
20 to this accident?
21     A.   Yes. Yes, I have gone through that, yes.
22     Q    It will go very smoothly this afternoon with
23 me, Mr. Ruhl, if you would answer the question "yes, no"
24 or "I don't know" and then provide whatever explanation
25 you'd like to provide. Okay?

Page 136

1      A.   I'll try.
2      Q    How many eyewitnesses to the accident do you
3  understand that there are?
4      A.   I don't know specifically. Perhaps two.
5      Q    Have you talked to any of the eyewitnesses?
6      A.   I have not.
7      Q    When you indicate that your assignment was to
8  reproduce the conditions of the accident, is that
9  essentially a reconstruction of the accident?
10     A.   Yes. Yes, that's what the test was.
11     Q    Has your expert opinion ever been disallowed
12 as to the reconstruction of an accident when there have
13 been eyewitnesses to the accident?
14     A.   Boy, I don't know. I don't know. In
15 Illinois reconstruction, that is -- you can't -- it's
16 gone back and forth since the '50s with the Bachrodt
17 decision. You can't reconstruct speed in Illinois now
18 if there is a -- a eyewitness testimony. So beyond that
19 I don't know.
20     Q    You're not aware of any specific case --
21     A.   No, sir.
22     Q    -- where your expert opinion has been held
23 inadmissible because there have been eyewitnesses to the
24 accident, is that your testimony?
25     A.   No, sir. But it would be very common in

Page 137

1 Illinois because you can't reconstruct speed in Illinois
2 now with eyewitness testimony.
3   Q   Do you know what a Daubert challenge is?
4   A.  Sure.
5   Q   What is it?
6   A.  A Daubert challenge is a strategy, if you
7 will, whereby one side will attempt to get the testimony
8 of the other side's expert barred presumably on the
9 basis that the opinions are neither relevant nor
10 reliable.
11   Q   And has your opinion -- have your opinions
12 ever been the subject of a successful Daubert challenge?
13   A.  I don't know if it was a Daubert challenge.
14 My testimony was ruled inadmissible in one case almost
15 exactly ten years ago.
16   Q   And what was the name of that case?
17   A.  It was -- I'm trying to think. Deemer versus
18 Subzero Products is my recollection.
19   Q   I believe you testified that you have not
20 examined the Festo unit involved in this accident?
21   A.  That is correct.
22   Q   And have performed no scientific test or
23 calculation with respect to that equipment?
24        MR. STRATTON: Objection
25        THE WITNESS: I don't think that is quite

Page 138

1 true. I relied upon the police measurements and the
2 photographs of the unit to size the exemplar so that we
3 would reasonably position weight on the platform in a
4 way we would expect it to be done with the Festo
5 didactic unit.
6 BY MR. CURCIO:
7   Q   So what you have determined is the size of
8 the unit?
9   A.  Sure. That's the relevant -- the relevant
10 parameter is weight and then the next relevant parameter
11 is footprint and then casters.
12   Q   And what kind of casters are on the Festo
13 unit?
14   A.  Four inch.
15   Q   And do those casters lock?
16   A.  They do not.
17   Q   Do the wheels lock?
18   A.  What?
19   Q   Do the wheels lock?
20   A.  No. Neither the casters nor the wheels lock.
21   Q   On the Festo unit?
22   A.  No, no. On my exemplar.
23   Q   I'm sorry I was talking about the Festo
24 unit
25   A.  As I understand the information that has been

Page 139

1 developed, it is there are locking wheels on two of the
2 four casters and it is believed that at the time of the
3 accident the casters, which would be on the long
4 dimension, whether you believe it is 59 or 68 3/4 as the
5 police believe, that would be towards the rear of the
6 beaver tail.
7   Q   There were locking wheels on the Festo unit,
8 is that correct?
9   A.  I believe that there is testimony that there
10 are two locking wheels on it.
11   Q   Is that a "yes," a "no" or an "I don't know"?
12   A.  There are two locking wheels.
13   Q   Were there locking wheels on the test unit
14 that you tested?
15   A.  No, sir.
16   Q   Do you have any understanding at the time of
17 the accident whether the wheels on the Festo unit were
18 locked?
19   A.  Oh, I believe they were not. Pouliot
20 indicated he didn't even know they were there.
21   Q   In your opinion should they have been locked?
22   A.  Well, I would prefer that they would be
23 locked, but I don't --
24   Q   Again, sir, if you can answer the question
25 "yes, no" --

Page 140

1        MR. STRATTON: Hold it No
2 BY MR. GRADY:
3   Q   -- or "I don't know" and then give whatever
4 explanation you like.
5        MR. STRATTON: That's not how this deposition
6 is working, okay?
7        MR. CURCIO: I'd like to --
8        MR. STRATTON: You're not a judge.
9        MR. CURCIO: I'd like an answer to a
10 question.
11        MR. STRATTON: We're not in court, sir. If
12 you have a question he's going to give you the answer
13 If you don't like the answer -- if you don't like the
14 answer, that's just too bad
15        MR. CURCIO: Please read the question back
16 Please read the question back.
17        MR. STRATTON: We're not going to have any
18 yelling at the witness.
19        MR. CURCIO: I'm not yelling at anybody.
20        MR. STRATTON: Yes, you are.
21        MR. CURCIO: I'd just like to have the
22 question read back I don't think I have raised my
23 voice at all
24        MR. STRATTON: You're counsel You're not
25 the Court You're not the judge.

Roland L. Ruhl, Ph.D., P.E. (Prepared for: Michael A. Stratton, Esq.)                                      April 13, 2004
Pouliot v. Arpin

Page 141

1      MR. CURCIO: Can we get the question read
2  back?
3      (Whereupon, the record was then read
4      back by the reporter as requested.)
5      MR. STRATTON: So, was there another
6  question?
7  BY MR. CURCIO:
8      Q   Is the answer finished?
9      A   I can go on if you want. I had additional
10 things that I thought were important to reaching that
11 conclusion.
12     Q   What is the conclusion, that they should be
13 locked?
14     A   The conclusion is that it is foreseeable that
15 they will not be locked because Pouliot has no training
16 in it. They are not -- they are not obvious as he would
17 be pushing it out. At least this unit has to be
18 equipped with the locking levers on the forward side,
19 not on the rear side.
20     The photographs I provided you show them on
21 the rear side. They are tucked under the platform.
22 There's no instruction that has been provided to lock
23 them. He doesn't even know they are there and I would
24 not expect in the absence of training that he would --
25 that he would look for them and they are not immediately

Page 142

1  obvious. That's all I can say.
2      Q   In your opinion should they have been locked?
3      A   Should they have been locked? I think I've
4  said I would prefer that they would have been locked.
5      I'm still not convinced that as a practice we
6  want to rely on those with a defective lift gate in a
7  rolling product. I don't look at the locking of the
8  wheels as a fail-safe remedy. It's not designed in a
9  life endangering situation. It's there to keep a
10 product from rolling around on a level floor.
11     We're asking it to do something when we
12 really don't have a performance back on it's use. It
13 may work, but it's not the way we should do it.
14     Q   In your opinion should they have been locked?
15     MR. STRATTON: Objection. Asked and
16 answered.
17     THE WITNESS: All I can say is I think it
18 would help. It couldn't hurt. But it's -- we need to
19 do more than just that.
20 BY MR. CURCIO:
21     Q   Do you plan on doing any testing to determine
22 whether your exemplar will roll off the lift gate if the
23 wheels are locked?
24     A   That -- if Mr. Stratton wants me to do that
25 we will be more than happy to do that.

Page 143

1      Q   Do you think it's necessary for you in order
2  to render an opinion in this case to perform that test?
3      A   I don't think we would need -- I assume that
4  the question that you would ask is if they were
5  locked --
6      MR. CURCIO: I'll ask the reporter to read
7  back the question that I asked.
8      (Whereupon, the record was then read
9      back by the reporter as requested.)
10     THE WITNESS: I guess -- I guess I see what
11 you're saying. I guess the problem is what opinion am I
12 going to render.
13     I guess the ultimate opinion is if the ones
14 that were on the unit at the time would they have
15 prevented the accident; that's a tougher question.
16     One might be able to infer an answer from
17 that if one was convinced that they had a good measure
18 of the torque resisting capabilities of the lock on the
19 wheels. One could probably answer it with that issue
20 alone.
21 BY MR. CURCIO:
22     Q   Do you intend to do any further testing?
23     A   If directed to by Stratton, we sure will.
24     Q   Do you think it necessary to do further
25 testing in order to render an opinion in this case?

Page 144

1      MR. STRATTON: Objection to the term.
2      THE WITNESS: I don't think I could answer an
3  additional question, but I don't think that it affects
4  in any way the reliability of the tests that I've
5  currently done.
6  BY MR. CURCIO:
7      Q   Well, when you're attempting to reconstruct
8  an accident do you want to -- is it -- is it important
9  to -- is it important to duplicate the conditions under
10 which the accident occurred?
11     A   Sure. That's why we don't have any locks on
12 it, because he didn't put them on.
13     Q   And how do you know that the locks were not
14 on?
15     A   Because his testimony at the time was he
16 didn't even know they existed. At the time we ran our
17 test --
18     Q   All right. Sir, again I think you've
19 answered the question.
20     A   Okay. Fine. Then I'm done.
21     Q   You believe that Mr. Pouliot has testified
22 that he did not put the locks on?
23     A   I believe he did. He didn't even know they
24 are there and so the tests were run on the assumption
25 that whether they are there or not doesn't make any

36 (Pages 141 to 144)

Page 145

1 difference if you don't put them on and whether they
2 would work or not doesn't make any difference if you
3 don't put them on.
4    Q.  But prior to doing your tests you didn't know
5 whether there were locks on the wheels or not, is that
6 it?
7    A.  No, sir. But I knew that he didn't have them
8 on.
9    Q.  You later found out that he did not have the
10 locks on?
11    A.  No. I knew that he didn't have -- he could
12 not have had them on, but I didn't know whether the unit
13 actually had them or not at that time.
14    Q.  And who -- there were two series of tests
15 that were done, is that correct?
16    A.  Yes.
17    Q.  And who performed those tests?
18    A.  Well, I was at the scene and I --
19    Q.  When you say -- I'm sorry. You were at the
20 scene?
21    A.  Of the test.
22    Q.  Okay.
23    A.  That was actually at the Arpin facility.
24    Q.  One series of tests were performed at the
25 Arpin facility?

Page 146

1    A.  On the actual unit.
2    Q.  And when you say "unit" you mean truck, is
3 that correct?
4    A.  The truck with this subject lift gate.
5    Q.  And when were those tests performed?
6    A.  I'll get something that's got a date on it
7 here.
8       They would have been performed on the 25th of
9 November, I believe.
10    Q.  What year?
11    A.  That would be 2002.
12    Q.  And would you describe what those tests
13 consisted of?
14    A.  Sure. The unit was positioned in their lot
15 for us. It was in a downhill slope, which is fine. We
16 inspected the vehicle and took the relevant dimensions.
17 "We," I'm saying I. And photographed it.
18       We had already prepared and had been prepared
19 under my direction a surrogate footprint, a platform
20 that holds sandbags.
21       The lift gate then was measured and various
22 slope measurements were taken generally in full up
23 position both loaded and empty. Photographs were taken
24 of the load and the Smart Level in the picture. Several
25 positions of the Smart Level in several positions.

Page 147

1       The unit then was run down after it had been
2 lubricated and photographed and measured at the point
3 where the load would begin to move and roll off.
4       That test was conducted four times, and it
5 showed that there was -- essentially the unit would roll
6 at a value or an angle value that would not have
7 occurred with a properly adjusted lift gate at the
8 accident scene. So that's -- that was the surmise.
9       Then also the damage was noted. And I'm
10 talking primarily about maladjustment, misadjustment of
11 the parts, poor fitting of the beaver tail on the main
12 platform. And let's see. What else would there be?
13       The damage to the journals and the journal
14 alignment which also affected this inability to seat
15 properly and then basically the poor -- because of all
16 of this and wear, the fact that it was improperly
17 shimmed and did not hold anywhere near factory
18 recommended maintenance items. And so that was the test
19 that we did.
20    Q.  Okay. And who besides yourself was present
21 from your organization for those tests?
22    A.  I was the only one there. Attorney Stratton
23 was with me. Mr. Grady was there the whole time and he
24 had someone else from his office with him. I don't
25 remember. I think it was a lady engineer. And there

Page 148

1 may have been a second person that arrived that spent
2 some time with him, too.
3       The company people were -- one person was in
4 and out. They did remove the vehicle from or positioned
5 it in the lot for us and then that gentleman, I believe,
6 left.
7    Q   Were these tests videotaped?
8    A.  I think they were, yes.
9    Q   And by whom were they videotaped?
10    A.  I'm trying to -- if -- who was running the --
11 either I was running it or Mike Stratton videoed it and
12 held the camera, I believe. That should have been
13 provided.
14    Q.  Have those videotapes been provided through
15 the course of discovery?
16       MR. STRATTON: I don't know. I would have
17 thought so.
18       MR. CURCIO: I would have, too.
19       THE WITNESS: Didn't you get a tape like
20 this?
21       MR. CURCIO: I have gotten tapes but not
22 videotapes of the test.
23       MR. STRATTON: Tom, you got a tape, didn't
24 you?
25       MR. GRADY: No

Page 149

1  THE WITNESS: Oh, well, then they were not.
2  Then there were only stills.
3  MS. O'DONNELL: Mike, the videotape that came
4  with Doctor Ruhl's package was the videotape of Mark
5  Pouliot with his key chain.
6  THE WITNESS: Oh, okay.
7  MR. STRATTON: Not this one. Okay.
8  MR. CURCIO: Will you provide us with a copy
9  of that videotape?
10  MR. STRATTON: Sure.
11  THE WITNESS: Maybe -- I don't know. Maybe
12  we did not get the camera to work. Maybe -- we tried
13  the power cord and we may not have any actual videotape
14  due to the fact that we couldn't get the camera to run
15  at the scene. I think I remember we went and got a
16  power cord and tried to run it off of AC and I don't
17  remember if we actually got it done or not.
18  MR. CURCIO: If there is a videotape I'd ask
19  that it be provided.
20  MR. STRATTON: Whatever there is we'll copy
21  it.
22  THE WITNESS: Whatever there is.
23  The fact that it apparently has not been
24  produced would mean that there is just nothing on the
25  tape. We'll confirm that.

Page 150

1  BY MR. CURCIO:
2  Q. There was a second test that your firm
3  undertook, is that true?
4  A. That's correct.
5  Q. And when was that done?
6  A. Well, there's a couple dates. Let's see if I
7  can get them off -- 3-4 and I believe 3-7 were the
8  dates. The tests were actually run on 3-4, but she went
9  back and got some more measurements on 3-7.
10  Q. And what year is that?
11  A. '03.
12  Q. And who performed those tests?
13  A. Suzanne Webb. She was assisted -- because
14  the stuff is pretty heavy, you really need two people.
15  She was assisted by Leon Dick. He's a mechanic in our
16  office. Leon built the platform also.
17  Q. Was this a different platform than the
18  platform that was used on November 25th of 2002?
19  A. Yes, it was. But the platform was only to
20  get the weight in the right spots. There was no roll
21  off testing.
22  Q. Did this platform have wheels?
23  A. I think it did and I think I've talked to
24  Mr. Grady about it, but I said I will need to check with
25  Leon but the notes he has memorialize that it did.

Page 151

1  Q. Did the wheels have locks?
2  A. I don't know for certain. I don't believe
3  so.
4  Q. What was the purpose of the testing that was
5  done on 3-4 and 3-7 of 2003?
6  A. The testing was to supplement -- the purpose
7  was to fill in the gaps that we couldn't get from the
8  actual unit due to the damage that it had. And the --
9  the question or the hypothesis that was trying to be
10  tested or posed was in a properly aligned position
11  without geometric distortion to it how much compliance
12  is there, measurable compliance in the Maxon design
13  itself such that some of the angles that were seen
14  cannot be predicted completely from the four bar linkage
15  curve?
16  The answer to that is they can be predicted
17  accurately from the four bar linkage curve; that the
18  stroke or the angle stroke is -- is very linear, nearly
19  linear. It is repeatable and it does not show any
20  correlation with load.
21  Q. Did you put load on the lift?
22  A. Oh, yes. It went up from -- they ran it at
23  varying loads. That was the whole point, to see if you
24  could detect any trend here and that there really is no
25  trend.

Page 152

1  Q. Did the loads fall off?
2  A. No, no. There was no attempt to try and get
3  the load to fall off. It was either held on or blocked
4  or braced or something. It was just to put the load on
5  where it would be if it didn't fall off.
6  Q. So that the load in the second test could
7  have been braced --
8  A. Oh, yes.
9  Q. -- in order to prevent it from falling off?
10  A. Oh, sure. Absolutely. But, remember, also
11  because of the density of the load we are not
12  replicating the height factor.
13  In other words, there's a CG. There's no
14  attempt to make the CG that high. The CG is essentially
15  irrelevant to the onset of a rolling process.
16  Q. What does "CG" mean?
17  A. Center of gravity.
18  I would suspect that the Festo unit CG would
19  be higher up off the ground than ours was, but there is
20  no reason to control that. There's no reason to control
21  that in a rolling test.
22  Q. So the center of gravity is irrelevant in a
23  rolling test?
24  A. Yes, it is. If it were a tip-over test then
25  we would need to control that parameter. This was not a

Page 153

1  tip-over test.
2     Q.  This was not a tip-over accident, it was a
3  rolling accident?
4     A.  It was as far as getting started on the
5  platform.
6         Now, it's true once it fell off the platform
7  it tipped over, but we are not simulating that part. We
8  know it will tip over if it rolls off the platform. The
9  point is will it start to roll on the platform.
10    Q.  Did you perform any other tests?
11    A.  No.
12    Q.  I believe you indicated that prior to
13 performing the second test Suzanne Webb had some
14 conversation with a representative from Maxon named
15 Victor, is that correct?
16    A.  Yes, she did.
17    Q.  Do you know Victor's last name?
18    A.  I do not.
19    Q.  Do you know whether -- do you know what
20 Victor's position is with Maxon?
21    A.  I don't know. I know what I -- what I expect
22 her to do and that is to get to someone in either sales
23 engineering or engineering.
24    Q.  And there's nothing in Suzanne's notes that
25 indicates who Victor is?

Page 154

1     A.  No.
2     Q.  You have some computer generated diagrams, is
3  that correct?
4     A.  Yes.
5     Q.  And is there duplicatable software that can
6  be produced that will allow us to see what that -- what
7  that CAD program is?
8     A.  The short answer is yes.
9         I'll explain. Generally AutoCAD 3D is a very
10 popular program. It's all over the country. Everybody
11 uses it. So, yes, the file that we have can be put on
12 some type of media, like a floppy disc, except these
13 files tend to be bigger than a floppy disc. Usually
14 today we send them on a CD-ROM. And then basically
15 any -- they seem to be in a format that everybody
16 understands and that anybody who has AutoCAD can do his
17 thing with the file.
18    Q.  Is there some reason that that wasn't
19 produced with the materials that were produced to us
20 prior to your deposition?
21    A.  No, sir. It just didn't occur to me that you
22 would want that since we gave you the printouts
23 themselves, but if you want the actual --
24    Q.  Is it possible to get a floppy disc or a CD
25 of them?

Page 155

1     A.  Sure, sure. I have to -- I can't do it, but
2  we have technicians that can do it in the office.
3     Q.  Do you have a copy with you of the draft
4  report that you prepared for Mr. Stratton?
5     A.  I don't know that there was a draft. I don't
6  have any -- you know, the only copy I have is the final
7  copy and generally if there are draft copies generally I
8  just work on them and they are retired and we just throw
9  them away. We don't archive them, so to speak. So
10 there's -- and once a correction is made in a report it
11 becomes the only version that's on the disc and it
12 was -- it isn't a flight recorder situation. I don't
13 have anything like that.
14    Q.  You don't have any drafts of your report in
15 your file?
16    A.  No, sir. I mean, my file is my file. What's
17 there is there. I don't believe there are.
18    Q.  Do you have a copy of a draft report that
19 Mr. Stratton commented on?
20    A.  I don't believe so.
21    Q.  You sent Mr. Stratton a draft report, didn't
22 you?
23    A.  I don't recall one way or the other.
24    Q.  And Mr. Stratton sent you back comments on
25 your draft report, did he not?

Page 156

1     A.  I don't recall one way or the other.
2         MR. CURCIO:  Would you mark that as an
3  exhibit, please?
4         (Deposition Exhibit P was then
5         marked for identification.)
6  BY MR. CURCIO:
7     Q.  Would you read Exhibit P into the record?
8     A.  Sure. It's dated December 12, 2003. And it
9  says, "Dear Roland: Please find corrections I made to
10 your draft report as well as copies of the deposition of
11 Erica Ramirez and Michael Kovac. Also enclosed is a
12 recent letter from Attorney Thomas Grady. Our deadline
13 to disclose you as an expert is January 15th. Please
14 call my office as soon as you review these materials."
15    Q.  And it's your testimony that you don't have a
16 copy of that draft report that's referenced in that
17 letter in your file?
18    A.  I do not.
19    Q.  And you don't have a copy of the corrections
20 that Mr. Stratton made to that draft report in your
21 file, is that your testimony?
22    A.  I do not.
23    Q.  Do you recall what corrections Mr. Stratton
24 made to your draft report?
25    A.  I don't recall specifically. My recollection

Page 157

1  is that they were grammatical in nature. My wife, who
2  is an English teacher, usually reads my reports.
3  Q. I'll take the letter back.
4  But you don't know one way or the other
5  because you haven't saved any of those papers?
6  A. No, I have not.
7  Q. I'd like you to take a look at Exhibit L.
8  A. Okay.
9  Q. This is entitled a Preliminary Report, is
10 that correct?
11 A. Yes.
12 Q. Is it also your final report?
13 A. Well, I haven't issued any other report. I
14 have provided some more material. I didn't feel that
15 it -- that although we've had more material and I have
16 accumulated more material, that it has significantly
17 changed the report.
18 Q. Okay. On page 6 of 10 you list conclusions.
19 A. Page 6 of 10. Okay.
20 Q. Do you have any supplementation to conclusion
21 number 1?
22 A. I'm sorry. I don't believe so.
23 Q. Do you have any supplementation to conclusion
24 number 2?
25 A. I don't believe so.

Page 158

1  Q. Do you have any supplementation to conclusion
2  number 3?
3  A. Again, remember, I did discuss some of these
4  things in the dep today and I certainly hope you
5  understand that my testimony here today is part and
6  parcel of this.
7  But I did talk to under some situations with
8  some loads strapping, bracing may be an alternative, but
9  the Tuk-A-Way is not to be used with rolling loads.
10 Q. I'm sorry. I didn't hear the end of that.
11 A. There are some situations one might be able
12 to remedy the situation with bracing, blocking and
13 strapping. I don't believe that should be done given
14 the information exchanged in this case between Festo and
15 Trans-Expo.
16 Q. Is there an alteration to conclusion number 4
17 that you would like to make in order to have that
18 conclusion accurately reflect your current opinion?
19 A. Oh, it is in 4. So, fine. I was looking at
20 3. I'm sorry. I did cover it in 4, so I guess we're
21 fine.
22 Q. So there are no changes or supplementation to
23 conclusion number 3 nor any changes or supplementation
24 to conclusion number 4?
25 A. I don't believe so other than what I said

Page 159

1  verbally, that I don't think -- it's a general
2  proposition that can be done. I think it's -- it's a
3  little bit hard to do in this case unless we had more
4  information.
5  Q. Is there any deletion you would like to make
6  to conclusion number 4?
7  A. No, nothing I can think of.
8  Q. All right. Conclusion number 5, any
9  supplementation, addition or deletion to conclusion
10 number 5, Mr. Ruhl?
11 A. No.
12 Q. Conclusion number 6, any supplementation or
13 deletion, addition or change to conclusion number 6?
14 A. No, sir, I don't think so.
15 Q. What is your degree in?
16 A. Mechanical engineering, both at the
17 undergraduate and Ph.D. level.
18 Q. And what did you teach?
19 A. I taught freshman engineering design and
20 graphics at Cornell as well as some other short courses
21 and I taught mechanisms and kinematics of machinery and
22 vibrations, mechanical vibrations, automatic controls,
23 as an instructor primarily during summer sessions to
24 graduate students for the Cornell co-op program.
25 At Illinois I taught component design and

Page 160

1  taught -- it used to be called GE 232 and it's now
2  called GE 234 and 242 and now 342. And that's senior
3  project design. That is our capstone design course.
4  I've been course chairman on two separate occasions of
5  it.
6  I have advised somewhere in excess of 50,
7  probably closer to 60 or so senior design projects and
8  I'm happy to say I believe five of them won national
9  design awards. One was a portable crane device. And
10 additionally three or four department awards in design.
11 So that would have been my teaching responsibilities.
12 Q. When did you retire from teaching?
13 A. I actually physically retired from teaching
14 at the end -- I believe it was either the end of 2001 or
15 2002. I'd have to check. I officially retired, I
16 believe my resume says, I think I was officially retired
17 in 1999, but that was largely a bookkeeping activity. I
18 had to officially -- I was still hired back just as a
19 retired person, but I had to officially retire because
20 of the changes in the -- I would have lost benefits at
21 the U of I if I didn't. But I think my last classroom
22 teaching was either at the end of 2001 or 2002.
23 Q. Did you ever work for a motor carrier?
24 A. Never as an employee. I have had motor
25 carriers in my graduate students research.