PAGESAVER        DEPOSITION OF ANTHONY M. GAMBOA, PH.D. 10/12/04

```
                                          3    Life Care Plan..................... 139-8
       UNITED STATES DISTRICT COURT       6    Comprehensive Rehabilitation
         DISTRICT OF CONNECTICUT               Consultants, Inc. Report........... 51-14
SHAWN POULIOT,           :                16   Curriculum Vitae of Anthony Gamboa.. 14-12
                         :                17   Notice to Take Deposition (Gamboa).. 5-25
         Plaintiff       :                18   Vocational Economic Assessment...... 26-15
                         :                19   1999 Tax Returns.................... 81-11
   v.                    : Civil Action No. 20  2000 Tax Returns.................... 81-11
                         : 3:02 CV 1302 (DIS) 21 2001 Tax Returns.................. 81-11
PAUL ARPIN VAN LINES, INC.; :             22   U.S. Dept. of Labor, Bureau of Labor
ARPIN LOGISTICS, INC.; THE :                   Statistics data.................... 79-4
FESTO CORPORATION; MICHAEL :              23   Letter (10/4/04)................... 12-15
D. KOVAC d/b/a TRANS-EXPO :               24   Letter (7/30/04)................... 27-23
INTERNATIONAL, ERICA RAMIREZ,:            25   Vocational Economics, Inc. Invoice. 41-6
IN HER CAPACITY AS AN    :                26   Vocational Economics, Inc. File.... 216-22
EMPLOYEE OF TRANS-EXPO   :                               - 0 -
INTERNATIONAL,           :
                         :                              ** NOTES **
         Defendants.     :
              - 0 -
   DEPOSITION OF ANTHONY M. GAMBOA, JR., Ph.D.
              - 0 -
      The deposition of ANTHONY M. GAMBOA, JR.,
Ph.D., taken before Andrea B. Grant, Court Reporter and
Notary Public in and for the Commonwealth of Kentucky,
on the 12th day of October, 2004, beginning at the hour
of 10:20 A.M. at the Summit Executive Suites, 4350
Brownsboro Road, Suite 110, Louisville, Kentucky 40207.
              - 0 -
          A B GRANT & ASSOCIATES
    Court Reporters & Legal Videographers
            P.O. Box 437106
         Louisville, KY  40253-7106
      (502) 262-2580  Fax (502) 254-7030
          Toll Free 1 (877) 582-2400

                         2
                  APPEARANCES:
FOR THE PLAINTIFF:    Michael R. Denison, Esq.
                      STRATTON FAXON
                      59 Elm Street
                      New Haven, CT  06510

FOR THE DEFENDANTS:   Thomas J. Grady, Esq.
                      Matthew J. Corcoran, Esq.
                      LENIHAN GRADY & STEELE
                      The Denison House
                      6 Canal Street
                      P. O. Box 541
                      Westerly, RI  02891-0541

                      James R. Oswald, Esq.
                      ADLER POLLOCK & SHEEHAN
                      2300 BankBoston Plaza
                      Providence, RI  02903-2443

                      Susan O'Donnell, Esq.
                      HALLORAN & SAGE, LLP
                      One Goodwin Square
                      225 Asylum Street
                      Hartford, CT  06103
              - 0 -
          STIPULATIONS:
      It is stipulated by and between counsel
for the respective parties that the deposition of
ANTHONY M. GAMBOA, JR., Ph.D., a witness herein, may
be taken at this time pursuant to Rule 30 of the
Federal Rules of Civil Procedure; that the deposition
may be taken via Stenomask by the Notary Public/Court
Reporter, and transcribed by her out of the presence of
witness; that the deposition was submitted to counsel
for the witness for reading and signature.
              - 0 -

                         3
          INDEX TO EXAMINATION:
                                      Page/Line
Mr. Grady................................ 5-14
Mr. Oswald............................... 100-10
Ms. O'Donnell............................ 218-15
              - 0 -
          INDEX TO EXHIBITS:
                                      Page/Line
 2   Curriculum Vitae of Dr. Thompson.... 109-20
```


EXHIBIT H

### 80

1  A    Yes, it is.
2  Q    And you selected the highest possible earning rate to be applied to Shawn's income status; isn't that correct?
5  A    It is.
6  Q    But there are a number of other earning rates that could apply to Shawn's status as well; isn't that true?
9  A    That is true.
10 Q    And so is would be appropriate to apply to him the median hourly earnings of a truck driver at $15.97 an hour; isn't that correct?
14 A    That would be correct if there was no other information that I had about Shawn Pouliot in terms of his actual earnings as a trucker. In other words, if there were no earning information on this 32-year-old individual - - I believe it was - - he was 31 years of age at the time of injury.
21      If there were no other earning information on him and if we just knew or if I just knew that he was a trucker, that's what I would have used. I would have used a median.
25      But I have two years of earning

### 81

1  information on this man and those two years of earning data indicate that he's an above average earner.
4  Q    Well, let's just talk about that then. I've have four tax returns here marked as exhibits. Exhibit 19 is the '99 tax returns for Shawn and Charity Pouliot. Exhibit Number 20 is the 2000 tax returns for Shawn and Charity Pouliot. Exhibit 21 is the '99 return of Shawn Pouliot.
11      Do you see those exhibits?
12 A    Not yet. You started with the year '99, did you say?
14 Q    Ninety-nine and 2000.
15 A    Okay.
16 Q    Those are the reports that you indicated that you relied upon in your report, right?
19 A    Yes.
20 Q    Would you look at those exhibits and tell me which of those exhibits you relied upon.
23 A    Yeah. Ninety-nine, we have - - in terms of total income, is $48,341.00. I'm sorry. I just misspoke. What we have in 1999

### 82

1  is a number that is $48,431.00.
2  Q    And you're referring to Defendant's Exhibit 19; is that correct?
4  A    Yes.
5  Q    Is that a document that you used as a factual predicate in the writing of your report?
8  A    Yeah, either that or something very comparable to it. I have a recollection of actually looking at his W-2s and adding them up. But it's the same number.
12      So let's say, for all practical purposes, yes.
14 Q    And what document did you use for the 2000 return?
16 A    That's Exhibit 20. The earning figure coming off of the Schedule C is $80,287.00. So now we have two dollar figures in place, '99 and 2000.
20 Q    And I assume you added those two figures up and divided by two.
22 A    No, I didn't.
23 Q    What did you do?
24 A    I took the two figures, which are historical dollars, and I converted each

### 83

1  dollar to a year 2004 dollar based on the Consumer Price Index. So what I'm doing is I'm holding his historical earnings for the years '99 and 2000 constant in terms of purchasing power.
6       So I'm increasing the 48,000 by the multiplier of 1.139 to arrive at a 1999 earning figure stated in terms of 2004 dollars or 55,462. I then did the same thing for the year 2000, a multiplier of 1.102, to convert the eighty thousand dollar figure to 88,476.
12      I then added those two figures and took the average of that.
14 Q    Okay. Basically what you did was you computed the numbers in terms of 2004 values - -
17 A    Yes.
18 Q    - - added them together and then divided by two.
20 A    That's right.
21 Q    So that your number is a 2004 figure rather than a 2001 figure.
23 A    Rather than - -
24 Q    The value.
25 A    Right. Rather than a 1999 dollar

### 84

1  or a 2000 dollar, yes.
2      Q     You're speaking -- the value
3  that you assign is the value that the dollar
4  would have in 2004, not 2001; is that correct?
5      A     That's right.
6      Q     Now, with respect to the 2000
7  return, if I were to tell you that the return
8  was bogus, would that make a difference in
9  your computation?
10     A     Yes. It might. It would depend
11 upon which way it was bogus. Are you saying
12 that the dollar figure is greater or are you
13 saying that the dollar is less?
14     Q     I'm saying that the dollar figure
15 is much less.
16     A     Okay. If the dollar figure is
17 less, that would make a difference in my
18 calculation.
19     Q     If you were to use the '99 return
20 alone as a basis and discount the 2000 return
21 --
22     A     Mm-hum.
23     Q     -- and discount from that return
24 potential earnings as a dispatcher, he would
25 have a very limited loss; isn't that correct?

### 85

1      A     No, that's incorrect. That's
2  totally incorrect, what you just said.
3      Q     If he had the income that you say
4  is supported by Exhibit 19 of $48,431.00 and
5  he were able to work as a dispatcher with an
6  income of $31,000.00 a year, he would then
7  have a loss of about $17,000.00 a year, right?
8      A     Wrong.
9      Q     Well, how is that wrong?
10     A     When you're accessing lifetime
11 expected earnings or --
12     Q     I'm not talking about future
13 calculations yet. I'm talking about the first
14 year now.
15     A     Okay. It's wrong because it
16 assumes that the probability of employment
17 would be the same pre- and post-injury and
18 what we know is that it's not.
19     Q     But I'm asking you to assume that
20 it is. In other words --
21     A     If you're asking me to assume --
22     Q     I'm asking you to assume -- to
23 discount your second step about employability
24 --
25     A     Okay.

### 86

1      Q     -- and say that he has the
2  capacity to work and there's a job there for
3  him.
4      A     If you were to make the
5  assumption that the second step in the process
6  of assessing earnings needs to ignore
7  probabilities of employment, then what you
8  said it correct.
9            The only loss for that first year
10 would be whatever it was.
11     Q     About $17,000.00.
12     A     Sure. That's right.
13     Q     And if he had a worklife
14 expectancy of 27.7 years, which is the
15 standard you apply, and you use the pure
16 offset method, he would have a future loss of
17 about $469,000.00.
18     A     If you were to assume that the
19 worklife expectancy is the same post-injury,
20 identical to what it is pre-injury, what
21 you're saying is correct.
22     Q     And do you know what kind of work
23 Shawn was engaged in?
24     A     At the time of the injury?
25     Q     Yeah.

### 87

1      A     Yes.
2      Q     What kind of work?
3      A     He worked as an over-the-road
4  tractor-trailer driver going coast to coast.
5  He would transport high dollar merchandise,
6  anything from automobiles to priceless
7  artifacts.
8            So he was engaged in basically a
9  fairly specialized type of over-the-road
10 tractor-trailer driving.
11     Q     Was he engaged in general freight?
12     A     The best person to ask that to
13 would be him, not me. I believe he was,
14 however.
15     Q     Did you interview him?
16     A     Yes, I did.
17     Q     How long did you spend with him?
18     A     I have on here that I spent one
19 hour with him.
20     Q     What did he tell you?
21     A     He told me that he was from Akron,
22 Ohio; that his date of birth was 5/21/70; that
23 he completed a GED in 1986. Prior to that,
24 he completed 10 years of formal education.
25           He attended a Catholic high