# Shawn Pouliot
## vs.
## Paul Arpin Van Lines, et al.

## U.S. District Court - District of Connecticut
### Case No. 3:02 CV1302

## Deposition of Joseph Dankoff, M.D.
### Wednesday - April 7, 2004

Bish & Associates, Inc.
Stenotype Reporters
159 South Main Street
Suite 812
Akron, Ohio 44308
(330) 762-0031
Fax (330) 762-0300
(800) 332-0607

1428 Market Avenue, North
Canton, Ohio 44714
(330) 580-9181
Fax (330) 580-9183

Email: bishassociates@neo.rr.com
www.bish-associates.com



EXHIBIT K

**Page 9**

after the accident. He's only had one urinary infection following the accident. He did tell me that his bowel routine, as per usual routine for a paraplegic, goes well.

He did mention at one point along the way that Viagra -- he had tried Viagra for treatment of his erectile dysfunction. It didn't work for him now and it didn't work for him prior to the accident.

Q. Now, with respect to Defendant's Exhibit B, is that your handwriting?
A. Yes.
Q. Did you -- you were asked a question, "What is this patient's diagnosis within your specialty?"
A. Yes.
Q. How did you answer that question?
A. "Erectile dysfunction."
Q. And you were asked a question, "What is this patient's impairment rating to the effected area?" And how did you answer that?
A. Impotent.
Q. And on the last page there was a paragraph requesting additional comments, and would you explain what you wrote?

**Page 10**

A. Well, it states, "I am a urologist. I saw Shawn one time to discuss impotence, which he actually had before his accident."
Q. Do you know why you received this form?
A. I assumed that I was being asked for some medical information. I had received a form that had been -- that was appropriate -- signed for all appropriate HIPAA guidelines that I was being asked to fill something out in relationship to his medical past.

We get these -- we get these kind of forms all the time to be perfectly honest. We have no idea why they're being obtained.
Q. This -- the last page has a signature. Is that --
A. That's mine.
Q. That's your signature? And it bears what date?
A. January 17th, 2003.
Q. Was there a cover letter that accompanied this form?
A. Well, I have letters -- I have a letter that I received from a legal assistant to Mr. Stratton. I have a subsequent letter that I received in February from a Lawrence Forman at

**Page 11**

Comprehensive Rehab Consultants, Incorporated thanking me for completing this form, but I don't have a specific cover letter to accompany this.
Q. Let me show you a document that's a letter on Comprehensive Rehabilitation Consultants stationery dated January 16, 2003. Do you have that document in your file?
A. Oh, actually, I stand corrected. Yes, I do have a copy of that.
Q. You have that?
    MR. GRADY: I'd like to have that marked for identification, too, please.
    (Defendant's Exhibit Dankoff C
      was marked for identification.)
    THE WITNESS: So that -- that would be considered -- that's the cover letter that accompanied this other form?
BY MR. GRADY:
Q. Well, I'm asking you. I'll ask you to look at both of them.
A. I have these forms. They are next to each other in my chart. As far as whether I got them both at the same time or whether they came in separate mailings, I wouldn't know.

**Page 12**

Q. The letter of January 16, 2003, can you tell me in paragraph two whether or not it references Exhibit B?
A. It appears to, yes.
Q. It does?
A. Yes.
Q. Okay. So is that the letter -- the cover letter that accompanied Exhibit B?
A. As I said before, I have no idea whether I got those in two separate envelopes or whether they came at separate times. It would appear that the two of them came together, but under oath I can't absolutely tell you whether a year ago these two letters came together or whether they came separately. One would make the assumption they came together.
Q. When Shawn came to see you about his erectile dysfunction condition, did he explain to you why he came to you?
A. Not specifically. He had been referred to me by his primary care physician, Dr. Johnston.
Q. And do you know why he was referred to you?
A. No. For evaluation of his urologic

Page 13

status.

Q. Do you have an opinion to a reasonable medical certainty as to whether or not his condition of erectile dysfunction was related to the accident of October 23, 2001?

MR. STRATTON: Objection. Foundation.

THE WITNESS: My records indicate in several areas that Shawn admitted to me that he had tried Viagra. Whether it was under a physician's administration or not, I don't have that record -- I don't know that for a fact -- but that he had had erectile dysfunction prior to the accident.

As far as to the cause of his erectile dysfunction, at this point in time it would be very difficult to tell. I did at one point speculate that because he's a smoker that he may have had some form of small vessel disease. I said that in a letter to Dr. Johnston dated May 12, 2002.

BY MR. GRADY:

Q. But in any event, you didn't conclude that his condition was related to the accident of October 23, 2001?

Page 14

MR. STRATTON: Objection.

THE WITNESS: No, because Shawn had admitted to me that he had had erectile dysfunction prior to that accident. I guess my answer to your original question as to when he had developed erectile dysfunction, I don't know that for a fact because it was at some point in time in the past prior to when I saw him. But as to the day when he became impotent, I don't know that.

BY MR. GRADY:

Q. But in any event, he did admit to you that that condition preexisted the accident of October 23, 2001?

MR. STRATTON: Objection.

THE WITNESS: Yes.

BY MR. GRADY:

Q. Now, I'm going to show you another document and ask you if you've ever seen this document?

A. I don't believe so.

MR. GRADY: I'd like to have that marked for identification, please.

(Defendant's Exhibit Dankoff D was marked for identification.)

Page 15

THE WITNESS: Am I going to be asked information regarding that because I'm going to have to read it a lot closer if you're going to ask me information on that.

I mean, I just glanced through it. If you're going to ask me about information contained in there, I'm going to have to read it a lot closer than that because I've never seen that before. Or you're just wondering whether I've seen it before?

BY MR. GRADY:

Q. I'll put it in order first. My secretary put it together. Okay. I think we've got it.

A. Okay.

Q. Okay. On page 6 of this Defendant's Exhibit D, there is an indication of a surgical procedure for a penile implant. Did you make that recommendation?

A. Did I make the recommendation?

Q. Yes.

A. No.

Q. Thank you.

MR. GRADY: I have no further questions.

Page 16

MS. O'DONNELL: No questions.

MR. OSWALD: I don't have any questions.

- - -

BY MR. STRATTON:

Q. Doctor, how many times did you see Shawn Pouliot?

A. Twice.

Q. Twice. And what dates did you see him?

A. May 7th, 2002; June 13th, 2003.

Q. Okay. Is there any kind of record from your visit on June 13th, 2003?

A. Well, actually what had happened is that visit was a -- the transcription from the dictated chart note, as we subsequently found out months later, never came back from the transcriptionist so I don't have my exact dictated note from that visit.

The visit most likely revolved around some issues pertaining to his self-catheterization because subsequent to that visit I went ahead and scheduled Shawn for cystoscopic procedure, taking a look inside his bladder to try and determine if there was any restrictions that could be occurring. Perhaps