UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
SHAWN POULIOT,                  :
         Plaintiff              :
                                :
VS                              : 3:02CV1302(JCH)
                                :
PAUL ARPIN VAN LINES, INC.,     :
ET AL,                          :
         Defendants             :
- - - - - - - - - - - - - - - - x

Deposition of WILLIAM BURKE, Ph.D., taken at the offices of Stratton Faxon, 59 Elm Street, New Haven, Connecticut, before Audra Quinn, RPR, Licensed Shorthand Reporter #106, and Notary Public, in and for the State of Connecticut on June 14, 2005, at 10:00 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON CT 06443
(203)245-9583    (800)839-6867
FAX (203)245-2760
HARTFORD   NEW HAVEN   STAMFORD

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:

SANDRA L. SNADEN, ESQ.
STRATTON FAXON
59 Elm Street
New Haven, Connecticut 06510

ON BEHALF OF THE DEFENDANT:

KAREN FRINK WOLF, ESQ.
FRIEDMAN, GAYTHWAITE, WOLF & LEAVITT
Six City Center
P.O. Box 4726
Portland, Maine 04112



Page 3

1    WILLIAM BURKE, Ph.D.,
2  residing at 500 Market Street, Portsmouth, New
3  Hampshire, having first been duly sworn, deposed and
4  testified as follows:
5  DIRECT EXAMINATION
6  BY MS. SNADEN:
7    Q  Morning, Dr. Burke.
8    A  Morning.
9    Q  I introduced myself off the record, but I'll
10 do it now as well for purposes of the record. My name
11 is Attorney Sandra Snaden and I represent the Plaintiff
12 Shawn Pouliot in this action.
13       Now, I'm assume you've been through this
14 process before.
15   A  I have.
16   Q  So you know that all of your answers must be
17 verbal so that the court reporter can take them down.
18   A  I do.
19   Q  And we'll try to speak in turn so that we
20 won't be talking over one another.
21   A  Correct.
22   Q  If at any time I ask you a question that you
23 do not understand, please ask me to rephrase it or
24 clarify and I'd be happy to do so.
25   A  Okay.

Page 4

1    Q  If you answer a question I ask, I will assume
2  that you understand. Is that fair?
3    A  Fair.
4       (THEREUPON, PLAINTIFF'S EXHIBIT NO. 1,
5            NOTICE OF DEPOSITION,
6            WAS MARKED FOR IDENTIFICATION.)
7  BY MS. SNADEN:
8    Q  Sir, I'm handing you what I've just marked as
9  Plaintiff's Exhibit 1. Have you seen this document
10 before today?
11   A  I did.
12   Q  This is the Notice of Deposition for today's
13 deposition, and if you will note on the second page of
14 this document, second through fourth page of this
15 document, there is a document request that begins with
16 Schedule A. Do you see that, sir?
17   A  I do.
18   Q  I know that you've brought a large amount of
19 documents here with you this morning. Have you brought
20 everything in your possession, custody or control
21 relating to this case and Shawn Pouliot?
22   A  Yes.
23   Q  So you have no documents in your possession,
24 custody or control relating to Mr. Pouliot that you
25 have not brought with you today. Is that correct?

Page 5

1  A  That's correct.
2  Q  Now, with specific regard to request number
3 ten, I note among the materials that you've brought
4 with you are a couple of statistical pieces of
5 information, studies, whatnot.  In request number ten I
6 asked you to bring papers, studies, books,
7 publications, et cetera, et cetera.
8     I'm sorry, that's the wrong one.  I meant to
9 refer to request number 11.
10 A  Okay.
11 Q  Any studies upon which you relied or which
12 relate to the areas of testimony that you will be
13 giving in this case.
14    Other than the materials that you have
15 brought with you today, were there any other
16 statistical or informational materials upon which you
17 relied in forming your opinions in this case?
18 A  Sure.  I mean, I didn't reference them
19 specifically, but I relied upon the whole body of
20 literature regarding spinal cord injury and the care
21 and treatment of spinal cord injured patients that I've
22 just amassed over 30 years.
23 Q  Was there any document or book or treatise
24 that you specifically went to and looked at in forming
25 your opinions in this case other than what you've

Page 6

1 brought here today?
2  A  Well, I didn't look at it, but I brought it.
3 It's a textbook called Spinal Cord Medicine, and I
4 brought the chapter on functional outcomes and that's
5 what my plan is based upon, what are the outcomes.  So
6 I brought that chapter.
7  Q  I see.
8  A  Nothing else.
9  Q  Okay.  Now, if we could pull out your current
10 curriculum vitae, please, and have that marked as well.
11    (THEREUPON, PLAINTIFF'S EXHIBIT NO. 2,
12         CURRICULUM VITAE,
13       WAS MARKED FOR IDENTIFICATION.)
14 BY MS. SNADEN:
15 Q  Sir, I've just marked as Plaintiff's Exhibit
16 2 the curriculum vitae that you've brought with you
17 today.  Is this the most current version of your CV?
18 A  Yes.
19 Q  When was this version prepared?
20 A  It will tell you on the bottom of the last
21 page.
22 Q  It says 5/6/05.
23 A  Right.
24 Q  The CV that I had in my file that had been
25 previously provided to me is dated May 3rd of 2004.

Page 7

1 So roughly a year prior to that.  Can you tell me, if
2 you know, which items have been added in the last year
3 or so?
4  A  Probably nothing.
5  Q  Probably nothing?
6  A  Probably nothing.
7  Q  Now, I notice that it's been about five weeks
8 or so since the date that is listed on the last page
9 here of Exhibit 2.
10 A  Correct.
11 Q  Has there been anything since that date that
12 you need to add to your CV?
13 A  No.
14 Q  Sir, could you give me a background regarding
15 your education, please, starting with college.
16 A  Yes.  I went to Missouri State University and
17 received a bachelor's degree in psychology.  Then I
18 went to the University of South Florida and received a
19 Master of Arts and Rehabilitation Counselling.
20    Then I went to work for a while and later
21 went back to school at Florida State University and
22 received a Ph.D. in the Department of Counselling
23 Psychology in Rehabilitation Services.
24 Q  Between your Master's and your Ph.D. what
25 kind of work were you doing?

Page 8

1  A  I was working with kids, delinquent kids,
2 emotionally disturbed kids and disabled kids.
3  Q  In what capacity?
4  A  Primarily administrative and clinical.  I was
5 actually working directly with the kids.  At one point
6 I was the director of a halfway house.  I was involved
7 in developing community programs to deinstitutionalize.
8 It was during that period of least restrictive
9 alternative and deinstitutionalization in the mid
10 seventies to early eighties.  So I was largely involved
11 in designing community programs for disabled kids and
12 training staff and developing treatment technology and
13 so on until I went back for my Ph.D.
14 Q  And these children with disabilities, what
15 sorts of disabilities were you dealing with?
16 A  It was a range.  Initially they were
17 delinquent and disturbed.  Some were mentally retarded.
18 Some were physically disabled.  Later on they became
19 more neurologically disabled, some amputations, spina
20 bifida, spinal cord injuries, brain injuries from maybe
21 '79 to '85.
22 Q  So pretty much ran the gamut then?
23 A  Right.
24 Q  And then after you completed your Ph.D.?
25 A  After I finished my Ph.D. I was recruited to

Page 93

1  A  I don't know, but he would need a release.
2  Q  From Dr. Cremer?
3  A  Yes.
4  Q  Now, on page eight of 4-A --
5  A  Page eight where?
6  Q  Of Exhibit 4-A, middle of the page just above
7  where it says "recommendations," there's that little
8  three line paragraph. The last sentence which says,
9  "He is considered capable of returning to the labor
10 market in a sedentary capacity."
11 A  That's what Dr. Cremer and Larry Forman said
12 and those were the two people that everybody was
13 relying on at that time. So I didn't have any
14 disagreement with that. I mean if he was capable -- he
15 was considered capable of working, it would probably be
16 beneficial for him.
17 Q  So other than Dr. Cremer and Mr. Forman, do
18 you have any other independent information regarding
19 Mr. Pouliot's ability to return to work?
20 A  No. There was another issue, though, and I
21 mention in here that -- and I don't know whether it's
22 happened, but he was planning to go back to the
23 University of Akron and I don't know whether that
24 happened. Dr. Cremer said he was anticipating going
25 back in I think it was January of 2004. Then he was

Page 94

1  having the skin problems and he finally had a flap
2  surgery. So I wrote in my report that it's unlikely
3  that he went back to school, but if he wanted to go
4  back to school that's certainly an option as well.
5  Q  Now, were any of the conclusions in your
6  report based on the fact that Mr. Pouliot would be
7  returning to work?
8  A  No.
9  Q  So none of your conclusions were based on
10 whether he would be home during the day or whether he
11 would be at work eight hours a day?
12 A  No. Again, I base my -- the opinions
13 regarding his needs, what's been prescribed, what his
14 medical doctors have recommended, what the clinical
15 standards have said and what we can anticipate with
16 spinal cord patients.
17     MS. WOLF: Tell me when it would be a
18     good time to take a short break.
19     MS. SNADEN: Sure. A few more minutes.
20 BY MS. SNADEN:
21 Q  So would it make a difference to any of your
22 opinions whether Mr. Pouliot would be in the home all
23 day as opposed to not in the home all day?
24 A  No.
25 Q  At pages eight going over to nine on Exhibit

Page 95

1  4-A you state that "No recommendations are required to
2  provide a barrier free living environment as he has
3  built a wheelchair accessible home."
4  A  Correct.
5  Q  So the reason that you did not include any
6  recommendations in your report as to the wheelchair
7  accessible home was because it was already built?
8  A  Right.
9  Q  Do you contend that Mr. Pouliot is required
10 to absorb the cost for that wheelchair accessible home
11 on his own?
12 A  No. But that would be in past medical
13 expenses, so you wouldn't include it in future medical
14 expenses. It would be double dipping.
15 Q  In your opinion will the adaptations that he
16 has in this wheelchair accessible home require any
17 modifications or repairs over time?
18 A  Not any more than any typical house would,
19 and I've included a provision in my plan to provide for
20 that.
21     MS. SNADEN: All right. Let's break
22     here for a minute.
23     (THEREUPON, A RECESS WAS TAKEN
24     FROM 12:38 TO 12:46.)
25

Page 96

1  BY MS. SNADEN:
2  Q  All right. We're still looking at Exhibit
3  4-A here, and starting on page ten is what's listed as
4  "Appendix A, Rehabilitation and Life Care Plan."
5  A  Right.
6  Q  Now, this is the life care plan that you've
7  prepared for Shawn Pouliot in this case. Is that
8  correct?
9  A  Yes, that's correct.
10 Q  Did you provide the dollar figures that these
11 items will cost?
12 A  Yes, I did.
13 Q  Where is that information?
14 A  Right here.
15 Q  Oh, I'm sorry. What I meant to say was did
16 you ever total the amount?
17 A  No.
18 Q  Do you ever do that?
19 A  No.
20 Q  Is that something that is the responsibility
21 of the economist that is retained in a particular
22 case?
23 A  Yes.
24 Q  Now, have you had any conversations with a
25 gentleman named Dr. McCausland?