UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT,                          :
                                        :
                 Plaintiff              :
                                        :
v.                                      :   Civil Action No.
                                        :   3:02 CV 1302 (DIS)
PAUL ARPIN VAN LINES, INC.;             :
ARPIN LOGISTICS, INC.; THE              :
FESTO CORPORATION; MICHAEL              :
D. KOVAC d/b/a TRANS-EXPO               :
INTERNATIONAL, ERICA RAMIREZ,           :
IN HER CAPACITY AS AN                   :
EMPLOYEE OF TRANS-EXPO                  :
INTERNATIONAL,                          :
                                        :
                 Defendants.            :

- 0 -

**DEPOSITION OF ANTHONY M. GAMBOA, JR., Ph.D.**

- 0 -

The deposition of **ANTHONY M. GAMBOA, JR.,**

**Ph.D.**, taken before Andrea B. Grant, Court Reporter and

Notary Public in and for the Commonwealth of Kentucky,

on the 12th day of October, 2004, beginning at the hour

of 10:20 A.M. at the Summit Executive Suites, 4350

Brownsboro Road, Suite 110, Louisville, Kentucky 40207.

- 0 -

**A B GRANT & ASSOCIATES**
**Court Reporters & Legal Videographers**
**P.O. Box 437106**
**Louisville, KY  40253-7106**
**(502) 262-2580  Fax (502) 254-7030**
**Toll Free 1 (877) 582-2400**

TRUE COPY

**APPEARANCES:**

FOR THE PLAINTIFF:    Michael R. Denison, Esq.
                           STRATTON FAXON
                           59 Elm Street
                           New Haven, CT  06510

FOR THE DEFENDANTS:   Thomas J. Grady, Esq.
                           Matthew J. Corcoran, Esq.
                           LENIHAN GRADY & STEELE
                           The Denison House
                           6 Canal Street
                           P. O. Box 541
                           Westerly, RI  02891-0541

                           James R. Oswald, Esq.
                           ADLER POLLOCK & SHEEHAN
                           2300 BankBoston Plaza
                           Providence, RI  02903-2443

                           Susan O'Donnell, Esq.
                           HALLORAN & SAGE, LLP
                           One Goodwin Square
                           225 Asylum Street
                           Hartford, CT  06103

- 0 -

**STIPULATIONS:**

        It is stipulated by and between counsel for the respective parties that the deposition of **ANTHONY M. GAMBOA, JR., Ph.D.,**, a witness herein, may be taken at this time pursuant to Rule 30 of the Federal Rules of Civil Procedure; that the deposition may be taken via Stenomask by the Notary Public/Court Reporter, and transcribed by her out of the presence of witness; that the deposition was submitted to counsel for the witness for reading and signature.

- 0 -

**INDEX TO EXAMINATION:**

Page/Line

Mr. Grady.................................... 5-14

Mr. Oswald.................................. 100-10

Ms. O'Donnell............................... 218-15

- 0 -

**INDEX TO EXHIBITS:**

Page/Line

2       Curriculum Vitae of Dr. Thompson...... 109-20

3       Life Care Plan....................... 139-8

6       Comprehensive Rehabilitation
        Consultants, Inc. Report............. 51-14

16      Curriculum Vitae of Anthony Gamboa.... 14-12

17      Notice to Take Deposition (Gamboa).... 5-25

18      Vocational Economic Assessment........ 26-15

19      1999 Tax Returns..................... 81-11

20      2000 Tax Returns..................... 81-11

21      2001 Tax Returns..................... 81-11

22      U.S. Dept. of Labor, Bureau of Labor
        Statistics data...................... 79-4

23      Letter (10/4/04)..................... 12-15

24      Letter (7/30/04)..................... 27-23

25      Vocational Economics, Inc. Invoice.... 41-6

26      Vocational Economics, Inc. File....... 216-22

- 0 -

1    A N T H O N Y   G A M B O A,   J R.,   P h. D.,

2    called as a witness, being first duly sworn,

3    testified as follows:

4              MR. GRADY:  Good morning, sir.

5              THE WITNESS:  Good morning, sir.

6              MR. GRADY:  My name is Thomas

7         Grady.  I'm the attorney for Paul Arpin

8         Van Lines and Arpin Logistics.

9              I will state for the record that

10        it's 10:20 A.M.  The notice for

11        deposition for this morning was for

12        Robert L. Thompson to appear at 10

13        o'clock A.M. at this office and, in

14        lieu of his appearance, the deponee for

15        tomorrow, Dr. Gamboa, has shown up with

16        counsel for the plaintiff.

17             In anticipation that Dr. Thompson

18        was going to be deposed this morning,

19        in accordance with the notice of

20        deposition, we already premarked 16

21        exhibits.

22             Notice was received this morning

23        that Dr. Gamboa was going to show up at

24        10:10 A.M. when he called the office

25        for directions - - the place for the

1    deposition, for directions.  I

2    want to state for the record that

3    counsel have planes out of here

4    tomorrow and they may be forced to cut

5    the deposition short because of that

6    and, if so, we will continue the

7    deposition to another date.

8         MR. DENISON:  For the record, I

9    object to continuation of the

10    deposition for Dr. Thompson or Dr.

11    Gamboa.  We have plenty of time under

12    the rule and airline tickets could have

13    been made appropriately, as mine was.

14  BY MR. GRADY:

15    Q    Sir, would you state your full

16  name for the record.

17    A    Anthony M. Gamboa, Jr.

18    Q    And where do you live?

19    A    I live in Louisville, Kentucky.

20    Q    At what address?

21    A    11106 Owl Creek Lane.

22    Q    And what is your date of birth?

23    A    1/15/45.

24    Q    Now, I want to show you a document

25  that's been premarked Defendant's Exhibit 17.

1    It's a notice for deposition.  Have you seen

2    this document before?

3           A     Yes, I believe that's in the file.

4    That's the notice specific to the request for

5    documents which have been provided.

6           Q     Did you receive it and did you

7    review it?

8           A     No.

9           Q     You did not?

10          A     A staff person did.

11          Q     You never saw it -- - you never

12   looked at this?

13          A     I glanced at it.

14          Q     What's your answer?

15          A     I glanced at it.

16          Q     You glanced at it.

17          A     Yes.

18          Q     You know that there were

19   documents to be provided by October 7, 2004?

20          A     I have no recall of that.

21          Q     Would you like to refresh your

22   recollection, sir?

23          A     It wouldn't be refreshing it, it

24   would be creating it for the first time.  You

25   know, as I said to you, I glanced at it.  I'm

1    looking at this and it says to provide all

2    documents by October 7, 2004.

3        Q    You see that?

4        A    I see that, yes.

5        Q    And you've seen that for the

6    first time this morning?

7        A    Yes.

8        Q    That's your answer?

9        A    Yes.

10        Q    And appended to this notice of

11    deposition is a Schedule A with some 16

12    different species of documents requested; do

13    you see that?

14        A    Yes.

15        Q    And is it your testimony that

16    you've seen that for the first time this

17    morning, as well?

18        A    In terms of actually looking at

19    the items, yes.

20        Q    And counsel for the plaintiff

21    didn't bring your attention to it?

22        A    It was sent to our office and we

23    have persons in the office who handle that.  I

24    don't get into that.  In other words, when an

25    attorney requests documents, we simply provide

1    them, as long as they're reasonable.

2          A       Do these people work for you?

3          A       Of course.

4          Q       Are you charge?

5          A       Yes.

6          Q       Do you supervise them?

7          A       Yes.

8          Q       Okay.  And what you're telling me

9    is that this document got into the file and

10   there was no follow-up to make sure that it

11   was complied with; is that right?

12         A       I'm assuming that it was complied

13   with.

14         Q       You assume that?

15         A       Yes.

16         Q       Well, I'm stating for the record

17   that no documents have ever been provided to

18   me in accordance with that notice of

19   deposition and I believe no documents have

20   ever been provided to other counsel around

21   this table prior to this time.

22         A       All I can tell you is that on

23   Friday, a member of our staff spent a number

24   of hours copying everything that's on this

25   table and sending it, presumably, to the

1    person who sent this notice.

2         Q     Friday of what date, sir?

3         A     Whatever last Friday was.

4         Q     Do you know what last Friday was?

5    Do you know what today is?

6              MR. DENISON:  Objection.

7         Argumentative.

8              THE WITNESS:  Do I know what

9         today is?

10              MR. GRADY:  Yes.

11              THE WITNESS:  Is that a serious

12         question or - -

13              MR. GRADY:  Yes, it is.

14              THE WITNESS:  - -- is that

15         expression meant to be jovial?

16              MR. GRADY:  No, I'm asking if

17         you know.

18              THE WITNESS:  Today is Tuesday - -

19              MR. GRADY:  Okay.

20              THE WITNESS:  - - October 12th.

21              MR. GRADY:  Okay.

22              THE WITNESS:  Columbus Day.

23    BY MR. GRADY:

24         Q     And Friday was October 7th?

25         A     Let me see.  Sounds right.

```
1          Q      And yesterday was a holiday?
2          A      Yes.
3          Q      And where were they sent on
4    Friday?
5          A      I don't know.  Would you like me
6    to find out?
7          Q      No.
8          A      Okay.
9                 MR. GRADY:  I'm also stating for
10                the record that at the conclusion of
11                this deposition, I intend to continue
12                it, I'm not going to adjourn the
13                deposition until we receive all the
14                documents and we have a chance to
15                review them and we have adequate
16                preparation in order to interrogate you
17                about your knowledge of the plaintiff
18                and about this case.
19   BY MR. GRADY:
20         Q      I see in front of you a stack of
21   paper that's about six inches high; is that
22   your file?
23         A      It is.
24         Q      And is that what you sent out on
25   Friday?
```

1          A       Yes.

2          Q       Now, the notice to produce

3    documents on the bottom of page one of the

4    deposition notice indicates that they were to

5    be provided to us by October 7th, 2004,

6    Friday; is that right?

7          A       Yes.  You already asked me that

8    question and I already answered it.

9          Q       And so the proper response to

10   that line of inquiry is that you did not

11   provide them in accordance with the notice; is

12   that correct?

13         A       Yes, that's correct.  We may not

14   have received that notice until Thursday or

15   Friday.

16              MR. DENISON:  I'd like to put on

17         the record that this notice is dated

18         October 1st and that, in all

19         likelihood, there was insufficient time

20         to supply these documents by the 7th of

21         October given the scope of the request

22         and given the large volume of documents

23         requested.

24              MR. GRADY:  Please note that the

25         notice itself and the certification of

1    notice indicates that it was forwarded

2    on October 1st to Michael A. Stratton

3    of Stratton & Faxon by facsimile

4    transmission.

5        THE WITNESS:  I do have a copy

6    of what we received from the office of

7    Stratton Faxon, a letter dated October

8    4, 2004.  We received the document on

9    October 8th, 2004, which would have

10   been Friday, as opposed to October 7th

11   which I believe I stated earlier.

12       MR. GRADY:  I'd like to have this

13   document marked for identification,

14   please.

15       (WHEREUPON, THE DOCUMENT WAS

16   MARKED FOR PURPOSES OF IDENTIFICATION

17   AS DEFENDANT'S EXHIBIT NUMBER 23.)

18   BY MR. GRADY:

19       Q    Is it your testimony that this

20   letter from Attorney Stratton or his

21   assistant, Shannon Wickham which is dated

22   October 4th, 2004 was not faxed to your office

23   either?

24       A    It may have been.  In order for

25   me to determine that, though, I would have to

1    go through every piece of paper in front of me.

2         Q    Well, you didn't have any trouble

3    finding that letter, did you?

4         A    Obviously, I did not.

5         Q    Right.  Well, why don't you see

6    if you can find if there's a fax in your file.

7         A    Okay.

8              (WITNESS REVIEWING HIS FILES)

9              THE WITNESS:  No fax.

10   BY MR. GRADY:

11        Q    Now, did you have any

12   conversations with Attorney Stratton or

13   anybody from his office regarding this

14   deposition between October 1st and October 8th?

15        A    I had a telephone call with Mr.

16   Stratton on October 8th regarding the

17   scheduling of this deposition.

18        Q    And did you have any other

19   conversations with him between October 1st and

20   October 8th?

21        A    No.

22        Q    Did you have any telephone

23   conversations with anyone else in Mr.

24   Stratton's office between October 1st and

25   October 8th other than Mr. Stratton?

1          A      I don't believe so.

2          Q      Now, do you have your CV in your

3    file?

4          A      Yes.

5          Q      Do you want to get it so I can

6    refer to it with you and you can follow me?

7          A      Yes.

8          Q      Your CV and the schedule of your

9    work, depositions and testimony for the last,

10   it looks like, four years has been made

11   Defendant's Exhibit 16.

12                Is it fair to say that you went to

13   college at the old Boston Teacher's College in

14   Boston by Boston Latin School?  Is that where

15   you where you went to school?

16         A      It was called by that name many,

17   many years ago.  When I attended there, it was

18   Boston State College.

19         Q      But it's the same place, the same

20   location?

21         A      It later became State College at

22   Boston.  I'm sorry, your next question was

23   what?

24         Q      It's the same place, same

25   location?

```
1              A      Same location, yes.
2              Q      And you got a B.S. in Education
3      with a major in English, right?
4              A      Yes.
5              Q      And so you got a - - really, a
6      teaching education, you were certified to be a
7      teacher coming out of there?
8              A      Yes.  I believe you just said
9      with a major in English.  The minor was in
10     English.  The major was in History.
11             Q      Okay.  And then you went to the
12     University of Miami at Ohio and obtained a
13     Masters in Education in Guidance and
14     Counseling; is that right?
15             A      Yes.
16             Q      And that took a year?
17             A      Yes.
18             Q      And then you went for your Ph.D.
19     in Guidance and Counseling?
20             A      Yes.
21             Q      And that took three years; is that
22     right?
23             A      Yes.
24             Q      That's Ohio State you went to?
25             A      Yes.
```

1    Q    Okay.  And at some point along
2  the way you took a six-month course, from
3  January of '87 through August of '87, in the
4  postdoctoral study and research in economic
5  assessment of earnings; is that right?
6    A    Yes, at the University of
7  Louisville.
8    Q    Up to that point in time, your
9  background was all in vocational guidance and
10  counseling, right?
11    A    Yes.
12    Q    And so for the first time, in
13  January of '87, you start to go into economics?
14    A    No.  In January of '87, I
15  completed an eight-month course of
16  individualized study examining not the broad
17  field of economics but the rather narrow field
18  of what has come to be known as forensic
19  economics as it pertains to litigation
20  associated with loss of earning capacity and
21  litigation associated with the value of future
22  health and medical care costs.
23    Q    So is it fair to say that your
24  entire background in economics has been with
25  respect to the forensic aspect?

1      A      Up to that point in '87, that
2   would be accurate, yes.
3      Q      Well, between '91 and '93, you
4   went to University of Chicago, School of
5   Business and the only economics courses you
6   took there was one in macroeconomics and one
7   in microeconomics, right?
8      A      No, the course in political
9   economy is an economics course.  Courses in
10   finance are generally considered to fall under
11   the rubric of economics.  It's a subset of
12   economics.
13      Q      Well, finance and statistics are
14   taught in ordinary business school without
15   respect to economics, aren't they?
16      A      It depends on what university
17   you're talking about.  In most universities,
18   finance, corporate finance, investments,
19   that's generally taught in either a department
20   of economics or a department of economics and
21   finance.
22      Q      Other than the courses that you
23   described, have you had any other educational
24   background in the field of economics?
25      A      No, all of my education is stated

1    in the curriculum vitae.  There's nothing in

2    addition to that.

3           Q     And you graduated with a degree

4    from Chicago in business, right?

5           A     Yes.

6           Q     You got an MBA.

7           A     Yes.

8           Q     You're a businessman.

9           A     I own a business, so that makes

10   me a businessman, yes.

11          Q     Right.  And that's what you set

12   out to be.

13          A     No, it's not.

14          Q     Well, why did you go to the

15   University of Chicago, School of Business?

16          A     I went to the University of

17   Chicago, School of Business to enable myself

18   to better manage and plan the company that was

19   in the process of growing.

20          Q     That was your business, right?

21          A     Yes.

22          Q     Now, attached to this exhibit is

23   a 22-page list of cases that you worked on in

24   the last four years.  Is it fair to say that

25   you're a professional expert witness?

1        A      I believe that that's a term

2    that's used by some persons to describe me.

3        Q      That's all you do.

4        A      No, that's about what I do maybe

5    five, 10 percent of the time.

6        Q      Okay.  What else do you do?

7        A      I provide a service that focusses

8    on valuing the effect of disability on loss of

9    earning capacity.  About half of my time is

10    spent in service delivery.

11              The other half of my time is

12    spent in the area of research and development,

13    presentations, training experts that we hire,

14    and engaging in the long-term planning of

15    Vocational Economics.

16        Q      Do you participate in the

17    training of all the experts that work for you?

18        A      No, I don't participate in

19    training experts that are in the medical area,

20    either nurses or medical doctors.

21        Q      Of the number of cases that

22    appear on those 22 pages of your testimony

23    report from January 1, 2003 through June 23,

24    2004, would you agree with me that you've only

25    testified in federal court nine times?

1    A    I don't know what the number is.

2    Q    Would you like to look at it?

3    A    Not really.  You know, if you've

4    looked at it and if you've counted it up - -

5    Q    You'll accept that?

6    A    Of course.

7    Q    Okay.

8    A    Of course.

9    Q    In what capacity have you

10   testified as an expert in federal court?

11   A    In the area of vocational economic

12   assessment.

13   Q    Were you testifying as a

14   vocational expert?

15   A    No, I provide testimony as a

16   vocational economical analyst.  I do both the

17   vocational aspect of the case as well as the

18   economic aspect the case.

19   Q    Were you testifying in connection

20   with life care plans?

21   A    I have, yes.  Only in terms of the

22   present value of the future health and medical

23   care costs, not in terms of defining medical

24   care that's needed.

25   Q    I'm talking now about those nine

1    times in federal court.

2            A        Oh, I have no way of knowing.   I

3    don't know.

4            Q        Have you ever testified in the

5    State of Connecticut federal court system?

6            A        I don't know.

7            Q        Now, you also list a number of

8    publications that you have either authored or

9    been a part of, publications and

10   presentations, and I note a number of

11   publications having to do with traumatic brain

12   injury, but I note no publications having to

13   do with spinal cord compression injuries; is

14   that a fair statement?

15           A        Probably.

16           Q        And is it fair to say that most

17   of your work is directed at the forensic

18   aspect of this field?

19           A        When you say this field, do you

20   mean the field of traumatic - -

21           Q        Vocational economics.

22           A        It's pretty close to being a fair

23   statement.   I would characterize it by saying

24   that all of the work that I do is either

25   directly or indirectly related to litigation.

1          Q      Right.  You're an expert for hire.

2          A      You know, that, obviously, is a

3    perjured connotation which, you know, is used

4    oftentimes to make expert witnesses feel

5    uncomfortable.  If that's how you would like

6    to characterize me, so be it.

7          Q      I'm just asking you for you

8    answer.  It is yes or no?

9          A      I answered you.

10         Q      I didn't hear you say yes or no.

11         A      Why don't you ask the question

12   again.

13                MR. GRADY:  Would you read it

14         back, please.

15                (WHEREUPON, THE REPORTER READ

16         BACK THE LAST QUESTION.)

17                THE WITNESS:  Is that the

18         question?

19                MR. GRADY:  That's the question.

20                THE WITNESS:  Okay.  No.

21   BY MR. GRADY:

22         Q      And in reviewing your list of

23   presentations and publications, I notice that

24   you have appeared a number of times to groups

25   of trial lawyers, American Academy of Trial

1    Lawyers, American Association of Trial

2    Lawyers, State Association of Trial Lawyers;

3    is that correct?

4         A    It is.

5         Q    Right.  And is it fair to say

6    that most all of you work is done for

7    plaintiffs' lawyers?

8         A    Yes.

9         Q    Do you do any work as an economist

10   outside of litigation?

11        A    No.

12        Q    Now, you list in your work

13   experience that from January 1977 to the

14   present, Vocational Economics, Inc.  Who is

15   the owner of that corporation?

16        A    John P. Tierney, T-I-E-R-N-E-Y,

17   and I.

18        Q    And what percentage of the stock

19   does Mr. Tierney own?

20        A    Fifty percent.

21        Q    And what percentage do you own?

22        A    Fifty percent.

23        Q    And do you both own the same

24   voting shares, voting classes of stock?

25        A    Yes.

```
 1          Q      What does Mr. Tierney do?
 2          A      He works as a vocational economic
 3    analyst.
 4          Q      And what is your job title?
 5          A      Pardon me?
 6          Q      What is your job title?
 7          A      I'm a vocational economic analyst.
 8          Q      You're both vocational economic
 9    analysts.
10          A      Yes.
11          Q      Who is the president of the
12    company?
13          A      John P. Tierney.
14          Q      And who are the directors?
15          A      John Tierney and I are directors.
16          Q      And you've been so employed for
17    the last 27 and a half years.
18          A      No.
19          Q      How many years have you been so
20    employed?
21          A      I've been an employee of
22    Vocational Economics since 1988.  The company
23    was founded by me as the sole owner in January
24    of '77.
25          Q      So what did you do between
```

1    January of '77 and 1988?

2         A      You know, as indicated on my

3    curriculum vitae, I worked as a professor at

4    the University of Louisville from July of '71

5    through June of '88.

6         Q      So is it fair to say you did this

7    part-time?

8         A      Yes.

9         Q      And then, in 1988, you went into

10   it full-time?

11        A      Yes.

12        Q      Now, you prepared a report in this

13   case?

14        A      I did.

15        Q      Please state the names of the

16   people who worked on this report with you.

17        A      Linda Jones is my case manager.

18   She worked on the report.

19        Q      Now, in your report does that

20   appear anywhere?

21        A      It only appears as initials on the

22   initial report of LLJ.

23        Q      And who else worked with you on

24   this report?

25        A      I believe Dave Gibson might have