1    consulted with me on the report.  Andrew Gluck

2    co-signed the report, which is a practice that

3    we have within Vocational Economics.  And Gwen

4    Holland also consulted with me on this report.

5                In addition, I - - I believe that

6    I had discussion with Terri Petruska, who is a

7    rehabilitation nurse with our company.  That

8    would be it.

9        Q     Directing your attention to

10   Defendant's Exhibit 18, which is your

11   vocational economic assessment, and

12   specifically to page nine, could you tell me

13   where the signatures are on that page or on

14   any page in that report?

15       A     There are no signatures on

16   Exhibit 18.

17       Q     So it's fair to say that the

18   vocational economic assessment that you

19   provided to us had no indication of who the

20   author was; is that correct?

21       A     I never provided you with a

22   vocational economic assessment.  I provided

23   Mr. Stratton with a vocational economic

24   assessment.

25       Q     Okay.  And this is what he

1    provided to us in response to discovery

2    requests.

3              MR. DENISON:  Objection.

4    BY MR. GRADY:

5         Q    Now, again, can you tell me by

6    looking at Exhibit 18 who the author of that

7    report is?

8         A    Given the fact that there are no

9    signatures on that report, it would not be

10   possible to identify the authors of the

11   report.  There was an executive summary

12   attached to the report sent on July 30, 2004,

13   and that executive summary contains two

14   signatures, that of Andrew Gluck and I.

15        Q    May I see that, please?

16        A    Sure.

17             MR. GRADY:  I'd like to have this

18        letter marked for identification,

19        please.  At the end, if you want to

20        request back your originals, I'll have

21        the girl make copies for you and we'll

22        substitute the copies for the originals.

23             (WHEREUPON, THE DOCUMENT WAS

24        MARKED FOR PURPOSES OF IDENTIFICATION

25        AS DEFENDANT'S EXHIBIT NUMBER 24.)

BY MR. GRADY:

Q    Now, this letter that you sent to Mr. Stratton on July 30th under your signature and the signature of Andrew Gluck that has been marked Defendant's Exhibit 24, can you tell me what part Mr. Gluck played in this report?

A    He simply concurred with the basic findings of the report. He read none of the information. We have two signatures on each report that leaves Vocational Economics to ensure that the standard method that we employ in all cases is adhered to.

He is no longer involved in this case in any way now that I'm involved in giving the discovery deposition.

Q    So you're telling me that basically he was a rubber stamp?

A    That certainly would be one way to look at it, a unique way, I will grant you that. But - -

Q    But that's an acceptable interpretation of what you said; is that correct?

A    Obviously, it's not an acceptable

1    interpretation of what I said.  Otherwise, I

2    wouldn't have made the comment that I did with

3    regard to the rubber stamp reference.

4         Q      He did not play any meaningful

5    part in any of the analytical work that was

6    done for Mr. Pouliot in the workup on this

7    case, correct?

8         A      That is correct.

9         Q      All he did was review the report

10   that you prepared - -

11        A      The findings, yes.

12        Q      - - and determined that it was

13   done in accordance with your procedures.

14        A      Precisely.

15        Q      And so what you're telling me is

16   that substantively he really didn't have

17   anything to do with this project.

18        A      I suppose that depends on how you

19   define substance, but we've certainly

20   established his role and function on it in

21   terms of signing the report.

22        Q      And did you write the report?

23        A      No.

24        Q      Who wrote the report?

25        A      The report is - - well, the

1    report has been written by a number of people.

2    The vocational economic rationale is a product

3    of maybe five or six people.

4                    I initially wrote the rationale

5    maybe about, oh, seven or eight, nine years

6    ago, but since then that rationale has been

7    revised, I'm going to estimate for you, three

8    or four times.

9                    So the rationale, itself, the

10   methodology that we employ, probably has

11   involved maybe six or seven people besides

12   myself.

13       Q       So did I understand you correctly

14   that the last five years or so that you've

15   been using that rationale?

16       A       Well, the rationale that's a part

17   of this report has been used, I'm going to

18   estimate for you, maybe for the past - - for

19   the past year.

20       Q       Past year?

21       A       That's what I would estimate, yes.

22       Q       Okay.  We'll come back to that.

23   Now, please explain the relationship between

24   Vocational Economics, Inc. and Dr. Thompson.

25       A       Dr. Thompson is a consultant to

1    Vocational Economics.  He is a contract

2    employee.  He is not employed by the company

3    per se.  He simply contracts with us on a

4    case by case basis.

5              He's been with us for, I'd say,

6    maybe four, five, six months.  We made a

7    decision at the beginning of the year to

8    retain the services of two physicians to

9    assist with life care planning.

10          Q     Prior to that time, were you

11   doing it without physicians?

12          A     Yes, we've been doing life care

13   plans for about 10 years.  We've had

14   registered nurses primarily involved in

15   putting life care plans together.  We've also

16   had some life care plans put together by

17   rehabilitation professionals, not M.D.s, but

18   Ph.D.s.

19          Q     So is it fair to say that, in the

20   exercise of your vocational economic function,

21   you hire the doctor to work for you?

22          A     Vocational Economics retains a

23   medical doctor - -

24          Q     Right.

25          A     - - to produce life care plans,

1    in some instances not to necessarily give the

2    testimony but simply to work directly with the

3    nurse in putting together the life care plan.

4         Q        And so he works for Vocational

5    Economics.

6         A        On a contractual basis, that's

7    right.

8         Q        Right.  Now, you know, of course,

9    that Dr. Thompson is not Board certified,

10   right?

11        A        You know, I would have to look at

12   his resume to answer that question.  I don't

13   know the answer to the question.

14        Q        Have you ever discussed that with

15   him?

16        A        No, I haven't.

17        Q        Never discussed it with him?

18   Have you seen his resume?

19        A        Which question would you like me

20   to answer?  The first?

21        Q        You indicated you never discussed

22   it with him, right?

23        A        Yes, that's correct.

24        Q        And then I asked you if you've

25   seen his resume.

```
 1              A      I have.
 2              Q      Do you know what the requirements
 3       are to be Board certified?
 4              A      Only in a general sense.  I'm not
 5       a medical doctor, so I'm not as familiar as a
 6       medical doctor would be with that issue.
 7              Q      That was not one of your
 8       inquiries when you hired him?
 9              A      Correct.
10              Q      You didn't ask him if he was Board
11       certified?
12              A      I never did.
13              Q      And Terri Petruska - -
14              A      Petruska.
15              Q      - - Petruska, she is an employee
16       of yours?
17              A      She is, a contract employee.
18              Q      And when you say contract
19       employee, I understand you to mean on a case
20       by case basis.
21              A      Your understanding is correct.
22              Q      You give her a 1099 at the end
23       of the year.
24              A      Correct.
25              Q      And she's been with your company
```

1    since January of 2003?

2         A       Yes.

3         Q       And she was first certified as a

4    life care planner in March of 2003; is that

5    right?

6         A       If that's what it says on her

7    curriculum vitae, that's accurate, yes.

8         Q       So at the present time she's had

9    the sum total experience of one and a quarter

10   years as a life care planner, right?

11        A       With Vocational Economics, yes.

12        Q       Did she have any experience as a

13   life care planner before that?

14        A       You really need to direct that

15   question to her, but I can tell that both of

16   the nurses that work for us have done after

17   care planning, which is very, very similar to

18   a life care plan.

19        Q       And - -

20        A       But it's not in the forensic

21   setting.

22        Q       And she was certified by the

23   American Association of Nurse Life Care

24   Planners in March of 2003, right?

25        A       I'm going to assume that what

1    you're saying is correct.  I really don't know.

2         Q     Do you know what the requirements

3    are to be certified by the American

4    Association of Nurse Life Care Planners?

5         A     I don't, but she would.

6         Q     Would it interest you to know

7    that you can get certified after one week?

8         A     I don't know whether that's

9    accurate or not.

10        Q     And would it interest you to know

11    that you could get certified as a life care

12    planner with a specialty in spinal cord

13    injuries after eight hours?

14        A     You're making that as a statement.

15        Q     Well, you employ her, right?

16        A     Yes, I do.

17        Q     And she doesn't have that much

18    experience in life care planning, does she?

19        A     Well, I think you really need to

20    direct that question to her because, as I said

21    earlier - -

22        Q     Well, you're her boss, aren't you?

23        A     Yes.

24        Q     Isn't that a proper line of

25    inquiry for the boss?

```
 1          A       I guess that's a function of your
 2    whole orientation to how you work with
 3    professional people.  You know, our
 4    orientation is not hierarchical.  We consider
 5    it to be a flat wheel, so we have people who
 6    are like the hub of the wheel and they all
 7    interact with one another.
 8                  So it's not the kind of
 9    regimented, rigid structure as you might find
10    in, let's say, certain types of corporations
11    or law firms, for that matter, that have a
12    real hierarchical type of organization.
13          Q       So basically she's on her own; is
14    that what you're telling me?
15          A       Well, you know, some people
16    certainly would interpret it that way.  We
17    interpret it as, you know, persons have a
18    professional environment in which they can
19    grow and flourish without having to be
20    terribly concerned about someone supervising
21    them in a manner whereby you're suggesting
22    that you know what's best.
23          Q       Is it fair to say that basically
24    when you prepare a life care plan that you use
25    software?
```

1       A       I don't prepare life care plans,

2   so you really would need to ask that question

3   to the people who do that, not to me.

4       Q       You're the boss, right?

5       A       Right.

6       Q       You don't know what they do?

7       A       That's right.  I don't

8   micromanage the business.  I can tell you that

9   we have software that enables us to compute

10  present value calculations on life care plans.

11              I don't know if there's software

12  that I would say is specific to producing the

13  plan, itself.  That's a very labor intensive

14  activity.

15              MR. OSWALD:  Tom, can I ask for

16          just a minute.

17              (OFF THE RECORD)

18  BY MR. GRADY:

19      Q       Can you tell me how many hours Dr.

20  Thompson has put into this case so far?

21      A       No.

22      Q       Do you have records that you can

23  provide that would tell me that?

24      A       He probably does.

25      Q       You don't keep records?

1         A       You know, each professional will

2    keep records in some instances with regard to

3    time.  I think he does, but I'm not sure.

4    Ask him.

5         Q       Doesn't he send you a bill?

6         A       He sends it to the office.  You

7    know, we have established that I don't

8    micromanage the business, so I have no idea

9    what he's billed.

10        Q       So he sends the bill to your

11   office?

12        A       Right.  We have a person who's the

13   chief operating officer.  That's what they do

14   for a living.

15        Q       That person would be - -

16        A       Dave Gibson.

17        Q       - - in charge of the billing.

18   That's Dave Givens?

19        A       Gibson.

20        Q       Gibson?

21        A       Yes.

22        Q       And he would know how many hours

23   Dr. Thompson has worked on this case so far?

24        A       Not without looking.  In other

25   words, he would be able to go to a file and,

1     in all probability, come up with that.

2          Q        That answer, right?

3          A        Pardon me?

4          Q        He would have the information to

5     provide me with that answer, right?

6          A        I believe so, yes.

7          Q        Right.   Dave Gibson is his name?

8          A        Yes.

9          Q        And the same thing would be true

10    with Terri Petruska?

11         A        Yes.

12         Q        And the same thing, if I put that

13    question to you, you can't tell me, right?

14         A        Right.

15         Q        You don't know?

16         A        Right.

17         Q        Were those documents provided last

18    Friday?

19         A        I don't know what was provided

20    last Friday.   What I do know is that whatever

21    was asked for, we provided it.   It was sent

22    out on Friday.   It was received in your office

23    on Monday morning at 8:30 A.M. - -

24         Q        Well, Monday was a holiday, right?

25         A        - - as reported to be by the

1    person who sent them out.  He was told that

2    it would be delivered to your office at 8:30

3    A.M. on Monday.  It's not a holiday all over

4    the country.

5            Q      It's a federal holiday, isn't it?

6            A      It's a federal holiday, but that

7    doesn't mean that UPS and Fed Ex doesn't

8    deliver on Monday.  It's my understanding that

9    it was delivered to your office on Monday

10   morning by 8:30.

11           Q      For your information, there was

12   nobody at my office Monday morning at - -

13           A      Well, then I bet there's a package

14   waiting outside your office.

15           Q      It's a federal holiday.  We were

16   en route to this deposition.  How much money

17   have you been paid, Vocational Economics, so

18   far in this case; can you tell me that?

19           A      I billed, and when I say I,

20   Vocational Economics billed - - in terms of

21   the economic analysis of the life care plan, I

22   billed fifteen hundred dollars and I believe -

23   - I don't have that here with me, but I

24   believe the vocational economic assessment, I

25   billed that at $3,000.00.

1      Q      May I see the documents that
2  you're referring to?
3              MR. GRADY:  I'd like to have this
4          document marked for identification,
5          please.
6              (WHEREUPON, THE DOCUMENT WAS
7          MARKED FOR PURPOSES OF IDENTIFICATION
8          AS DEFENDANT'S EXHIBIT NUMBER 25.)
9              MR. OSWALD:  Off the record for a
10         second.
11             (OFF THE RECORD)
12  BY MR. GRADY:
13     Q      Dr. Gamboa, this Defendant's
14  Exhibit 25 is an invoice number 41279.  Can
15  you tell me what that document represents?
16     A      Yes, this is the billing specific
17  to the comprehensive care plan or the life
18  care plan.  The medical doctor billed
19  $3,000.00, the rehabilitation nurse billed
20  $7,000.00, and then the billing for the
21  present value calculation performed by me was
22  billed at fifteen hundred dollars.
23     Q      Isn't that the information that
24  we just went through a whole line of inquiry
25  that you told me you couldn't provide me?

1           A       Not that I'm aware of.

2           Q       And didn't I ask you - - maybe I

3   was asking about hours or maybe I wasn't

4   clear.  Directing your attention to this

5   invoice, are you telling me that the

6   comprehensive care plan was provided by Dr.

7   Thompson?

8           A       Yes.

9           Q       Okay.  The comprehensive care

10  plan, does that appear in Dr. Thompson's

11  report?  In the life care plan?

12          A       The comprehensive care plan and

13  the life care plan are one in the same.

14          Q       That's the same thing.

15          A       Yes, and we just call it a

16  comprehensive care plan.

17          Q       And does Dr. Thompson have an

18  hourly rate?

19          A       He has an hourly rate, I know, for

20  depositions and court appearances.  And, in all

21  probability, he has an hourly rate for

22  professional time, but I don't know what it is.

23          Q       Are you familiar with Terri

24  Petruska's hourly rate?

25          A       Not off the top of my head, I'm

1    not, no.  But she does have an hourly rate

2    for both court appearances, depositions and

3    professional time spent on putting together a

4    life care plan.

5         Q      Does Vocational Economics have -

6    - own software that enables one to prepare a

7    life care plan?

8         A      No.

9         Q      It does not?

10        A      No.  We have software that

11   enables - - at least not that I'm aware of.

12   We have software that enables us to compute

13   present value calculations specific to future

14   health and medical care costs.

15             But, as I said earlier, the life

16   care plan itself is a pretty labor intensive

17   activity.  There's no software per se that

18   allows you to put the life care plan together.

19        Q      Do you know a Dr. William Burke?

20        A      If it's the same Burke that I'm

21   thinking of out of the State of Maine - -

22        Q      Yeah.

23        A      - - I know of him.  In fact, I

24   believe, I'm almost certain, that I've

25   performed present value calculations on some

1    of his life care plans.

2            Q        Did you ever interview him with

3    respect to the hiring - - when you were going

4    through the hiring process last January or the

5    January before for doctors or professionals to

6    prepare life care plans?

7            A        If we're talking about the same

8    Dr. Burke, the one I'm thinking of has a Ph.D.

9            Q        Yeah.

10           A        No, I've never interviewed him.

11   We're not interested in hiring Ph.D.s or we

12   were not interesting in hiring Ph.D.s for life

13   care plans.  We were only interested in

14   finding medical doctors.

15           Q        So it's fair to say that you

16   can't tell me from this Exhibit 25 how many

17   hours Dr. Thompson put in and how many hours

18   Terri Petruska put in.

19           A        That's right.

20           Q        How many hours did you put in?

21           A        In terms of the vocational

22   economic assessment?

23           Q        Yeah.

24           A        I'm sorry, that's my phone.  I'm

25   going to estimate for that I have a total

1    amount of hours on this case of maybe - - I'd

2    say anywhere from five to eight hours.

3         Q      Five to eight hours?

4         A      Yeah.  But vocational economic

5    assessments are not billed by the hour.  We

6    have what's called project billing on our

7    vocational economic assessments.

8         Q      So you do on a set fee?

9         A      Right.  When I do a vocational

10   economic assessment, the attorney is told on

11   the front end - -

12        Q      What it's going to cost him?

13        A      - - the cost - - he's told that

14   it's going in a range of twenty-five hundred

15   to thirty-five hundred dollars.

16        Q      So you indicated five to eight

17   hours; is that what you said?

18        A      That's what I would estimate, yes.

19        Q      On page two of your report, you

20   have a number of documents that indicates

21   information reviewed.  This is Defendant's

22   Exhibit 18.  Would you take a look at that?

23              MS. O'DONNELL:  What number is

24         that?

25              MR. GRADY:  Page two.

1                    MS. O'DONNELL:  What exhibit

2          number?

3                    MR.  GRADY:  It's the vocational

4          economic assessment.  Number 18.

5                    MS. O'DONNELL:  Okay.

6                    THE WITNESS:  Yes.

7     BY MR. GRADY:

8          Q     Do you see that?

9          A     I'm familiar with it, yes.

10         Q     Did you review all of those

11    documents?

12         A     Yes.

13         Q     Every single one of them?

14         A     Yes.

15         Q     These other people that you

16    mentioned, Dave Gibson, Andrew Gluck, somebody

17    by the name of Holland or Hollock, Linda

18    Jones, are they also paid on a contract basis?

19         A     No, all of the people that you've

20    just mentioned, including Gwen Holland, all of

21    them are employees, with the exception of

22    Andrew Gluck, I'm sorry.  He's a contract

23    employee.

24         Q     What kind of an employee is he?

25         A     You mean beyond being a contract

1  employee?

2      Q      Well, let me rephrase the

3  question.  What is his specialty?

4      A      He's a vocational economic

5  analyst.

6      Q      And so are you, right?

7      A      Yes.

8      Q      That's really your field.

9      A      Yes.

10     Q      Now, there are a number of

11  doctors' depositions that are listed on page

12  two.  Did you read their depositions together

13  with their medical records?

14     A      Medical reports, yes.

15     Q      Were you aware that Dr. Cremer

16  said that the plaintiff could work?

17     A      I don't recall whether he said

18  that specifically or not.  I read this stuff

19  back in July or June.  But it wouldn't matter

20  to me whether he said that or not.

21     Q      It wouldn't?

22     A      No, of course not.

23     Q      He's the treating physiatrist of

24  the plaintiff.  It doesn't matter to you.

25     A      That's right, it doesn't matter

1    to me.

2         Q    Okay.  You think that it makes no

3    difference what the treating physician says in

4    terms of medical opinion regarding ability to

5    work; is that correct?

6         A    I think that the medical doctor's

7    opinion regarding the ability to work contains

8    within it, whether or not the physician

9    realizes it, the issue of employability.

10              A person can retain the capacity

11   to work and perform some type of occupation,

12   but embedded in that is a probability called

13   employability.  We have that data.  We know

14   what the employment probabilities look like

15   for persons with work disability and for

16   persons with various types of impairment.

17              With that information, I'm able to

18   render opinions, within a reasonable degree of

19   professional probability or certainly, as to

20   whether or not a particular individual with a

21   specific type of work disability and a

22   specific type of physical disability, which in

23   this case includes issues associated with

24   being able to live independently and issues

25   associated with self care, we have the data.

1   We know, based on what the Census Bureau tells
2   us, what the probabilities look like for such
3   people.
4              And that's the real issue when
5   you talk about the ability to work.
6   Theoretically, anyone has the ability to work.
7   If they can even move their eyes, they
8   theoretically have the ability.
9       Q      So it's your position then that
10  this census material is of high priority and
11  that the treating physician's evaluation is of
12  no value; is that correct?
13      A      No, that's incorrect, what you
14  just said.  But what I'm saying is that it's
15  very important to take into consideration the
16  exertional restrictions that are defined by a
17  medical doctor.  It's very important to take
18  that into consideration.
19             When you take that into
20  consideration, you consider the individual's
21  labor market access, meaning what percentage
22  of the jobs existing in this person's local
23  economy do they realistically have the
24  capacity to perform.
25             And then you ask yourself the

1   question, given the nature of their

2   impairment, what's their probability look like

3   of employment, based on not just the census

4   data but based also on the unique qualities

5   and attributes of that individual.

6          So that if someone has the

7   capacity to perform less than one percent of

8   the jobs in his or her local labor market, my

9   conclusion is that that does not constitute

10  jobs existing in significant numbers and I

11  define such a person an unemployable.

12         Now, I will grant you that

13  unemployability is an absolute and there are no

14  absolutes in the area of social science - -

15  Q       You're basically giving a medical

16  opinion, aren't you?

17  A       Oh, no, not at all.  Not at all.

18  I'm giving a vocational opinion and then I'm

19  also defining loss of earning capacity in

20  terms of present value which has some

21  smattering of economics to it, but not much.

22  Q       You've been in the vocational

23  field for a long time, right?

24  A       Some people would say that, yes.

25  Q       You're not unfamiliar with