1  Lawrence Foreman?

2        A     I'm familiar with Larry Foreman,

3  yes.

4        Q     You're very familiar with Larry

5  Foreman, aren't you?

6        A     I know him.  I've met him on

7  probably a couple or three occasions.  I've

8  read many, many of his life care plans.  I

9  couldn't even tell you how many I've read,

10  many over the years.

11        Q     Did you read the one that he

12  provided in this case?

13        A     I did.

14        Q     And Defendant's Exhibit Six, you

15  read that plan?

16        A     Yes.

17        Q     And you know that he said that the

18  plaintiff, Shawn Pouliot, could work as a

19  dispatcher at a rate of $31,000.00 a year,

20  right?

21        A     That's right.

22        Q     And you know that Mr. Foreman's

23  background in the vocational field is as

24  extensive if not more so than yours, right?

25        A     I'm not that familiar with his

1    background in the vocational field.  I don't

2    know if - - if my memory serves me correctly,

3    he has a masters degree in rehabilitation

4    counseling and a law degree, if I'm not

5    mistaken.

6              I know he does primarily life care

7    plans and occasionally he will venture into the

8    vocational area as well.

9         Q     When you were retained by Mr.

10   Stratton in this case, were you told about

11   that up front?

12        A     When you say told about that, you

13   mean that Larry Foreman - -

14        Q     About Dr. Cremer's opinion that

15   Shawn Pouliot could work and about Larry

16   Foreman's opinion that he could work as a

17   dispatcher earning $31,000.00 a year.

18        A     No, I can assure that I was not

19   informed of that.

20        Q     When did you find out about that?

21        A     Sometime back in June when I read

22   the file.

23        Q     Do you have any idea why you were

24   retained in this matter after those opinions

25   had already been offered on behalf of the

1      plaintiff?

2          A      No.   I was retained because a

3      vocational economic assessment was requested

4      and then later a life care plan was requested.

5          Q      And in the preparation of your

6      report, you indicate that you rely on the

7      records of Comprehensive Rehab Consultants,

8      Inc., right?

9          A      I'm sorry?

10         Q      You rely on the records of

11     Comprehensive Rehab Consultants, Inc., right?

12         A      I considered those records, yes.

13         Q      And you discounted the opinion of

14     Mr. Foreman that Shawn Pouliot could work as a

15     dispatcher at $31,000.00 a year.

16         A      I didn't discount that.  I

17     considered that and I recognized that as

18     obviously an opinion that he has.  But, as I

19     said to you, that's only half the picture.

20                You know, theoretically, anyone,

21     unless they're comatose, has a capacity to

22     work.  The real issue is not work.  The issue

23     is how employable is the individual, how

24     likely is it that the individual will be able

25     to obtain and retain employment.  That's

1    what's critical.

2                And when you have an individual

3    that has the severity of impairments that this

4    person has and when you consider the standard

5    off of which I'm asked to operate, which is

6    the standard of reasonable degrees of

7    professional probability or certainly, when

8    you consider that standard, when you consider

9    the severity of this man's impairments, I

10   believe from a practical perspective he's

11   unemployable.

12               Now, true, the probability is not

13   zero, but it's so close to zero in terms of

14   the probability of obtaining and retaining

15   employment that justice is best served by

16   identifying this individual as unable to

17   perform any type of substantial gainful work

18   activity or jobs existing in insignificant

19   numbers; therefore, he is, from a practical

20   vocational perspective unemployable.

21        Q      Aren't Dr. Cremer and Mr. Johnson

22   bound by the same parameters as you are?

23        A      You'll have to ask them.  I don't

24   know what the parameters are.

25        Q      Well, they're giving the same

```
1     kind of opinions.
2          A     Well, first of all, I'm unaware
3     of what the standard off of which medical
4     people operate and it varies tremendously from
5     jurisdiction to jurisdiction.  I can say to
6     you that typically medical doctors define what
7     they believe to be the exertional capabilities
8     of an individual.
9                Sometimes, when asked if the
10    person is capable of working, they will render
11    an opinion that's yes or no.  But, in
12    rendering an opinion that someone is capable
13    of working, whether it be as a dispatcher or
14    as a security guard lying flat on your back
15    looking at a monitor and then simply going
16    into a voice activated computer to say that
17    someone has made an illegal entry, all of
18    these things I've seen over the years being
19    expressed, you know, as proof positive that
20    someone has the capacity to work, but, as I
21    said, that's only half the picture.
22               The other half of the picture is
23    employability.  And when you look at the
24    employability of an individual who is as
25    limited as this person, it's pretty obvious to
```

1   me and I think to a jury, I think to any

2   reasonable person, that this is not an

3   individual who is employable, and that's my

4   opinion.

5          Q      Isn't really the basic

6   requirement in terms of employability for

7   somebody who's a paraplegic is whether he can

8   drive a car and get back and forth to work?

9          A      No, employability extends far

10  beyond the issue of whether or not the person

11  is capable of driving a vehicle that has been

12  modified to accommodate disability.

13                There are many other issues that

14  are -- you know, that need to be considered

15  besides the ability to drive.

16         Q      In your vocational economic

17  assessment, you have a section entitled

18  Vocational Economic Rationale running from

19  page - - nine pages and you've referred to

20  that several times in the course of your

21  testimony.  I guess it's longer, 10 or 11

22  pages.

23                Did Vocational Economics prepare

24  that?

25         A      You asked me that question

1    previously.  Do you recall?

2            Q       Yeah.

3            A       Okay.

4            Q       And you answered that a number of

5    different people were involved in it.

6            A       Right.

7            Q       Did a lawyer prepare that?

8            A       No.  There were no lawyers

9    involved in the preparation of that document.

10           Q       And in that document, you start

11   out by discussing the Daubert case and Kumho;

12   is that correct?

13           A       Yes.

14           Q       Basically, you're talking about

15   legal decisions and case decisions that call

16   for interpretation, right?

17           A       Yes.

18           Q       And is this not fairly stated,

19   this Vocational Economic Rationale, an

20   interpretation of those decisions and other

21   laws that relate to the definition of

22   disability from Social Security or the Census

23   Bureau or the ADA; isn't that a fair statement?

24           A       Yes, I think that is a fair

25   statement, but I think it would be important

1    not to confuse the reading of the material,

2    the interpretation of the material in

3    producing a narrative, it would be a mistake

4    to assume that that's a legal interpretation.

5              Obviously, none of the persons

6    involved in the interpretation of the material

7    that is written are lawyers.  So, therefore,

8    their frame of reference in terms of reading

9    that information is specific to their

10   profession as opposed to the legal community.

11        Q      But aren't you, when you attach

12   that package to your report, asking the court

13   to adopt your rationale in support of your

14   numbers?

15        A      No, we don't ask the trier of

16   fact or the court to adopt anything.  We are

17   presenting it and they can consider it and

18   weigh it.  That's what rational decision

19   making is about.

20        Q      But aren't you telling the court,

21   this is the way disability should be construed?

22        A      I'm defining for the court the

23   way in which persons with my expertise and the

24   expertise of other vocational rehabilitation

25   people and vocational experts define

1    disability.

2              I will say to you and to the

3    Court that the Census Bureau differentiates

4    between impairment, disability and work

5    disability - - those have three very different

6    meanings for people within my profession - -

7    and the Court can certainly consider that.

8         Q    But aren't you asking the Court to

9    adopt that position as opposed to the position

10   of the Court accepting the testimony of the

11   treating doctor?

12        A    No, I don't think so.  I think

13   what I'm saying to the Court is you have

14   medical doctors who are best at defining,

15   particularly orthopedic people or

16   neurosurgeons, the exertional capabilities of

17   an individual.

18              Once those exertional

19   capabilities are defined, the next question

20   then becomes that of defining two things; are

21   there jobs the person can perform, number one,

22   and then, number two, what does employability

23   look like for someone with the type of

24   impairment that we're talking about that

25   results in a disability and a work disability,

1    what do those employment levels look like
2    based on this person's gender and level of
3    educational attainment and based on their
4    labor market access.
5                   Well, that's an area that I don't
6    consider to fall within the purview of medical
7    doctors.  I don't believe that if you asked a
8    medical doctor, what's the probability of
9    employment for a 29-year-old male with a
10   severe work disability they would be able to
11   say to you .19.  I don't believe they have
12   that knowledge.
13                  Now, maybe some of them do, but
14   I've yet to see one that does.
15        Q    Isn't this Vocational Economic
16   Rationale a legal opinion?
17        A    No, it's an expert vocational
18   economic opinion.  Or, excuse me, it's not
19   even that.  It's not an opinion at all.  The
20   Vocational Economic Rationale is nothing more
21   than the methodology that we employ in
22   examining all cases.
23        Q    But the methodology that you
24   employ is based upon your interpretation of
25   law, is it not?

1        A        It's based on all of the things
2   that are contained within that rationale.
3        Q        Right.  And the things that are
4   contained in your rationale that you keep
5   referring to are either legal cases or
6   statutes; isn't that correct?
7        A        That's some of what's referenced.
8   That's not all of what's referenced.  Most of
9   what's referenced is specific to U.S. Census
10  Bureau data as well as to research conducted
11  by other researchers around the United States
12  who are persons that are regarded as having
13  substantial expertise in the area of
14  employability and capacity to work and earn
15  money for persons with disability.
16                You'll notice that the
17  bibliography contains, I don't know the number
18  - - I'm going to estimate for you - - 18
19  different references, whereas the number of
20  court cases referenced include four.
21                We think those four cases deal
22  with issues that are critical, one of which
23  has to do with the importance of taking into
24  consideration the employability of the
25  individual.

1          Q       When you talk about employability,

2     you're talking about the likelihood that

3     somebody would hire a disabled individual,

4     right?

5          A       Not exactly.

6          Q       You're not talking about his

7     capacity to work.

8          A       Well, when we talk about

9     employability, employability is the second

10    step after an individual's capacity to work.

11         Q       And basically that's where you're

12    coming from in giving your opinion.  You're

13    coming from employability, right?

14         A       No, I'm coming from two

15    perspectives.  You know, the first perspective

16    is more theoretical.  Theoretically, all

17    persons who are in a non-comatose state, all

18    such persons have a capacity, theoretically,

19    of performing some type of job.

20              But, in addition to that, what I

21    believe is important to consider and what I

22    believe the Court believes is important to

23    consider, the probability of an individual

24    being employed.

25              Now, the probability of being

1    employed is really a function of two things,

2    the percentage of jobs in the labor market

3    that the individual retains the capacity to

4    perform - - that's number one - - and then,

5    number two, it's a function of employability

6    that would be specific to that group of people

7    that are most like the individual that you're

8    evaluating.

9              So, in this particular case, what

10   we're talking about is an individual that has

11   a high school equivalency diploma, we're

12   talking about an individual who's performed

13   semi-skilled work, and we're talking about an

14   individual that has severe limitations in

15   terms of labor market access, and we're

16   talking about a person who has the capacity to

17   perform fewer than one percent of the jobs in

18   his labor market.

19             Now, when you put all of that

20   together, you then have to ask yourself,

21   what's the probability of employment.  Under

22   the best case scenario, if you wanted to be as

23   optimistic as you could possibly be to the

24   point of being unrealistic, you'd be looking

25   at employment levels that would come in at

1    approximately .20 or less. That's what you're

2    talking about.

3             In my opinion, that does not

4    constitute a level of potential employability

5    that would cause me to do anything other than

6    conclude that the individual is unemployable.

7        Q       So basically your opinion is

8    based on statistics.

9        A       Not just statistics. It's based

10   on the unique traits and characteristics of

11   the person that I've been asked to evaluate.

12   I consider that individual's age, that

13   person's education, that person's work

14   history, and I consider both their exertional

15   and their non-exertional impairments, and I

16   then take into consideration what a realistic

17   assessment is in terms of the percentage of

18   work that this person would have the capacity

19   to perform in his labor market.

20             And after doing that, I then

21   arrive at a conclusion as to whether the

22   person has a non-severe work disability or a

23   severe work disability. And in this case,

24   we're talking about someone with a severe work

25   disability with probable levels of employment

1    that are exceedingly low.

2         Q    So how is it that you can come to

3    that conclusion in light of Dr. Cremer's

4    opinion that this man can work and Lawrence

5    Foreman's opinion that he can work as a

6    dispatcher earning $31,000.00 a year?

7         A    I took into consideration what

8    each of them said, but I simply have an add-on

9    that they neglected to consider.  That add-on

10   is called the probability of employment.

11             The acid test is really the issue

12   of employability.  How employable is someone?

13   How likely is it that this person will be able

14   to compete in the labor market and obtain and

15   retain employment?

16        Q    So you don't deny that he has the

17   capacity to work as a dispatcher and you don't

18   deny the findings that Mr. Foreman and Dr.

19   Cremer make.  Really, what you're saying is

20   that because he's injured and he has these

21   kind of characteristics, the likelihood that

22   somebody would hire him in the marketplace is

23   slim; is that correct?

24        A    Yeah, it's not only slim, it's -

25   - it's very, very close to zero.  You know,

1   when you start talking about probabilities of
2   employment for a cohort group - - a cohort
3   group means someone of his comparable age, his
4   education.
5           A cohort group would include
6   persons who are work-disabled, which he is.
7   You could also look at persons who have
8   physical disabilities, problems with physical
9   activity in combination with living
10  independently.
11          When you look at those
12  probabilities, what I'm saying is that while
13  there's a theoretical construct of yes, this
14  person has the capacity to perform work, what
15  the real issue is is what do the probabilities
16  of employment look like.
17          The probabilities of employment
18  that I'm giving you are not precise - - I can
19  produce them if you'd like me to - - but
20  they're very, very close.  And what I'm saying
21  to you is this.
22          A probability of employment is
23  captured through survey research.  You ask for
24  persons to identify themselves as either
25  having a work disability or having some type

1    of physical disability that limits them in

2    terms of standing, walking, climbing,

3    carrying, et cetera.

4              Now, when you look at those two

5    different data sets and you come up with

6    probabilities that are very low, it's

7    important to keep in mind that the

8    probabilities only exist because there are

9    persons working either part-time or full-time

10   after having met the definitions that we're

11   talking about.

12             This is a man who hasn't worked in

13   three or four years.  So his probability of

14   actual employment would be even significantly

15   less than the cohort group that I'm looking at.

16             So all of that, when it's taken

17   into consideration, causes me to conclude that

18   from a practical perspective this man is not

19   going to obtain or retain employment.

20        Q    If the law doesn't retain the

21   requirement that you had with respect to

22   employability and the law is limited to the

23   capacity to work, you would agree with me,

24   wouldn't you, that Shawn Pouliot has the

25   capacity to work as a dispatcher if the job

1  were available?

2          A       Theoretically what you're saying

3  is correct, but you sound like - -

4          Q       Well, it's even more than

5  theoretical.  We have two experts who said he

6  can do it; isn't that right?

7          A       Yeah, but what they've said is - -

8          Q       So we're not coming out of the

9  air.

10         A       What you're saying is

11  theoretical.  You sound more like a

12 plaintiff's lawyer than a defense attorney.

13 Plaintiffs' lawyers call me and they say I

14 have a guy who's 55 years of age and he was

15 wrongfully killed, yeah, he didn't work for 20

16 years before he was wrongfully killed, but he

17 had a capacity to work through his life

18 expectancy.

19                 Some plaintiffs' lawyers present

20 that, but as far as I'm concerned that doesn't

21 pass the giggle test in the courtroom, okay?

22 Neither does this particular case of Shawn

23 Pouliot.

24                 If someone wants to go in a

25 courtroom and tell the trier of fact that this

1    guy is going to be employed, have at it.  I

2    don't think it passes the giggle test, and I

3    have the data to back that up with.  It's not

4    just an opinion.

5                    I have data from the American

6    Community Survey, the Decennial Census

7    conducted by the Census Bureau, and the March

8    Supplement to the Current Population Survey

9    which has examined 22 years of employment for

10   persons with work disability.

11                   This man has a severe work

12   disability.  He's not going anywhere in terms

13   of employment.  That's my opinion and that's

14   what I will share with the trier of fact.

15        Q     But again, coming back to the

16   essence of the issue, you don't deny that he

17   has the capacity to do this work as a

18   dispatcher.  Where you differ is whether or

19   not that capacity will likely result in

20   employment.

21        A     That's right.  In other words,

22   where I differ is that the capacity to work is

23   theoretical.  In order for there to realized

24   remuneration as a result of that capacity, the

25   person has to be employed.

1           This man, in my opinion, is not

2   employable.  So, therefore, he has a total

3   loss of earning capacity.

4       Q       And the basis for your position is

5   basically statistical analyses derived from

6   the census information that's provided from

7   time to time.

8       A       Only in part.  Only in part.  When

9   engaged in rational decision making, it's

10  necessary to use probability statistics.  You

11  know, as Robert Reuben talks about in his

12  book, An Uncertain Future, we're relegated to

13  a position of having to use probability

14  statistics to come up with reasonable

15  decisions.

16          So I'm using that, but I'm using

17  those probability statistics in a very, very

18  specific way.  I'm looking at the unique

19  attributes of this person that I've been asked

20  to evaluate.

21          And when I look at the unique

22  attributes of this person and when I say,

23  well, the probability of persons most like him

24  is .20, it's a person with a severe work

25  disability - - I don't think anyone would

1  quibble with that - - but he is so far worse
2  off than someone who meets the definition of
3  having a severe work disability.
4              Most persons with severe work
5  disabilities are simply persons who are unable
6  to perform jobs existing in significant
7  numbers.  Now, he's like that.  He's unable to
8  do that.
9              But many of those persons who
10 have the inability to perform jobs existing in
11 significant numbers, they simply have various
12 types of orthopedic injuries.
13             Now, they don't have to worry
14 about catheterizing themselves five and six
15 and seven times a day.  They don't have to
16 worry about decubitus ulcers, which is what
17 took the life of Christopher Reeve recently
18 when one of those breakthroughs created
19 infection, it literally took his life.  This
20 man has that same problem, you know, because
21 he has no weight on his body.
22             So, you know, when we get into the
23 whole issue of employability, there are
24 sometimes close calls.  This isn't a close
25 call.  This is called a no-brainer.  This man

1    is not going back to work.

2                    And if anything thinks that they

3    can convince a jury otherwise, have at it.

4        Q    Thank you, Doctor.  Dr. Thompson

5    expresses no opinion regarding Shawn's

6    disability; do you know why?

7        A    You'll have to ask him that

8    question.

9        Q    You don't instruct him to do that?

10       A    I don't instruct anybody on my

11   staff in terms of how they render an opinion.

12   I have more faith in them than that.

13       Q    Well, you have this Vocational

14   Economic Rationale that you have already

15   indicated is really the basis of your

16   analyses, right?

17       A    Yes.

18       Q    You want to make that decision,

19   you don't want the doctor making that

20   decision, right?

21       A    I want to make what decision?

22       Q    About whether the man can work.

23       A    In terms of employability, yes.  I

24   don't think that's the province of a medical

25   doctor.  That's not to say that you might not

1    have some medical doctors that do have an

2    expertise.

3                    For instance, there's somebody

4    out in California at the University of

5    California, San Francisco, her name is Yellen.

6    She has that data. He's written articles on

7    employability for persons with severe

8    disabilities.

9                    Now, if he were giving an

10   opinion, I'd certainly consider it. Do I

11   think he would give an opinion that suggests

12   this guy is employable? Not if he adhered to

13   what he's published in terms of what the

14   government data tells us about such persons.

15            Q      Dr. Thompson's a psychiatrist?

16            A      Yes.

17            Q      Dr. Cremer is a physiatrist?

18            A      I can't remember. I thought he

19   was a -- maybe he is a physiatrist. I think

20   he is, yeah. I'm not sure, though, because I

21   haven't looked at this tile.

22            Q      All right. Take my word for it,

23   he is.

24            A      Okay. That's fine.

25            Q      And their field has to do with

1    rehabilitation medicine; is that correct?

2        A     Yes.

3        Q     And their - -

4        A     It has to do with physical and

5    psychological restoration.

6        Q     Right.

7        A     Yeah.

8        Q     And their objective is to get the

9    man back as whole as he can be - -

10       A     That's right.

11       Q     - - isn't that right?

12       A     Yes.

13       Q     Don't you find it unusual that Dr.

14    Thompson would not render an opinion about

15    this man's ability to work?

16       A     Well, I'm not sure that he

17    wouldn't if you asked him.

18       Q     Well, he provided us with a

19    report with no such comment.

20       A     Well, that's because he asked to

21    do something very specific.

22       Q     And you told him what to do.

23    Isn't that right?

24       A     You're belaboring under a

25    delusion that I somehow tell people what to

1    do.   Now, I understand how you might feel that

2    way depending upon the occupational

3    environment in which you grew up, but let me

4    say to you with great candor and great

5    sincerely, I don't tell anybody on my

6    professional staff what to do.

7                   If I had to tell them what to do,

8    I'd terminate them.  Do you see what I'm

9    saying to you?

10          Q      I heard what you said, sir.

11          A      Okay.

12          Q      But you would agree with me, too,

13   wouldn't you, that if he didn't do it your

14   way, he wouldn't work for you anymore, would

15   he?

16          A      People do things very different

17   than the way I do things in my company all the

18   time.  For instance, I've never used anything

19   other than a pure offset in the thousands of

20   cases that I've done over a 30-year period of

21   time.  I've never done anything but pure

22   offset.  I believe that.

23                   I have economists who work for me

24   who don't do that.  They'll use one and two

25   percent net discounts.  I can accept that