1   because they have a basis for what it is that

2   they're doing.

3          They believe that.  They think

4   that justice is best served by doing that and

5   they will argue that.  Now, I wouldn't.  I

6   disagree with that.  I think it's wrong, but

7   that doesn't mean that I don't hire people who

8   have differences of opinion with

9   me.  Otherwise, you would have a

10  very, very stilted, stilted administration

11  that would resemble the present Republican

12  administration in Washington, for goodness

13  sakes.

14       Q     Well, I mean, you don't want to

15  produce results that favor the defense, do you?

16       A     Let me - -

17            MR. DENISON:  Objection.  Asked

18            and answered.

19            THE WITNESS:  Let me say to you

20            that I simply produce what I believe is

21            accurate.  Are there instances where

22            the defense hires me to render an

23            opinion for them?  Of course.

24            When do they do that?  If they

25            have any brains, they do it when

1            there's a preexisting work disability.

2            That's when they do it. Do you see

3            advantageous that would be to the

4            defense under that circumstance?

5 BY MR. GRADY:

6        Q     But your entire field and your

7 entire focus is to support the plaintiffs'

8 trial lawyers' industry, isn't it?

9        A     That's inaccurate. My entire - -

10 in fact, when I first started doing this work,

11 the majority of my work was done for defense

12 attorneys, not plaintiffs' attorneys.

13            It changed when the government

14 started producing data in the early to middle

15 eighties that told us definitively what the

16 employment levels looked like for persons with

17 various types of disability.

18            That data is so beneficial to the

19 plaintiff's bar, most of the time. It's

20 enormously beneficial to the defense bar. You

21 know, I'm thinking of a wrongful termination

22 suit that I was just on in federal court in

23 Chicago and the allegation was that this woman

24 had a four hundred thousand dollar loss of

25 earning capacity. She was in her fifties.

1           She left her position after

2       having been accommodated for over a period of

3       eight years.  When she left, she immediately

4       applied for and was placed on Social Security

5       Disability.

6                   That's an ideal case for someone

7       who has command of the data that I have

8       command of because she didn't have a normal

9       worklife expectancy, you know, at the point at

10      which she ceased, you know, her employment.

11                  So all I'm saying to you is this.

12      What we do is data driven.  And I'm saying to

13      you that what the data tells us is enormously

14      advantageous to the plaintiff's bar, but there

15      are many cases where it's enormously

16      advantageous to the defense bar.

17                  Those cases exist whenever

18      there's a preexisting work disability prior to

19      the injury in question.

20          Q       Thank you, Doctor.

21                  (OFF THE RECORD)

22      BY MR. GRADY:

23          Q       Now, Dr. Gamboa, in the course of

24      preparing your report, you made reference to

25      the U.S.  Department of Labor Occupational

 1    Outlook Handbook; is that correct?

 2          A     Yes.

 3          Q     And I'd like you to take a look at

 4    Defendant's Exhibit 22, specifically at page -

 5    - that's not a good page.  Let me see.

 6    Wonder what page it is.  Oh, okay.  Page seven.

 7                Is that the document that you

 8    used to prepare that report?

 9          A     Yes.

10          Q     And I'm showing to you Exhibit 22,

11    right?

12          A     Yes.

13          Q     And have you read this entire

14    report, this entire Exhibit 22?

15          A     Probably not the entire exhibit

16    word for word, but I reviewed the exhibit.

17          Q     You treated that exhibit as one

18    that applies to employees only, right?

19          A     Yes.

20          Q     That exhibit applies both to

21    employees as well as to independent truckers

22    or owner/operators, doesn't it?

23          A     I believe that's correct, yes.

24          Q     So that it's capable of being

25    construed both ways.

```
1              A       Yes, it is.
2              Q       And you selected the highest
3      possible earning rate to be applied to Shawn's
4      income status; isn't that correct?
5              A       It is.
6              Q       But there are a number of other
7      earning rates that could apply to Shawn's
8      status as well; isn't that true?
9              A       That is true.
10             Q       And so is would be appropriate to
11     apply to him the median hourly earnings of a
12     truck driver at $15.97 an hour; isn't that
13     correct?
14             A       That would be correct if there
15     was no other information that I had about
16     Shawn Pouliot in terms of his actual earnings
17     as a trucker.  In other words, if there were
18     no earning information on this 32-year-old
19     individual - - I believe it was -- - he was 31
20     years of age at the time of injury.
21                     If there were no other earning
22     information on him and if we just knew or if
23     I just knew that he was a trucker, that's what
24     I would have used.  I would have used a median.
25                     But I have two years of earning
```

1    information on this man and those two years of

2    earning data indicate that he's an above

3    average earner.

4         Q      Well, let's just talk about that

5    then.  I've have four tax returns here marked

6    as exhibits.  Exhibit 19 is the '99 tax

7    returns for Shawn and Charity Pouliot.

8    Exhibit Number 20 is the 2000 tax returns for

9    Shawn and Charity Pouliot.  Exhibit 21 is the

10   '99 return of Shawn Pouliot.

11              Do you see those exhibits?

12        A      Not yet.  You started with the

13   year '99, did you say?

14        Q      Ninety-nine and 2000.

15        A      Okay.

16        Q      Those are the reports that you

17   indicated that you relied upon in your report,

18   right?

19        A      Yes.

20        Q      Would you look at those exhibits

21   and tell me which of those exhibits you relied

22   upon.

23        A      Yeah.  Ninety-nine, we have - - in

24   terms of total income, is $48,341.00.  I'm

25   sorry.  I just misspoke.  What we have in 1999

1    is a number that is $48,431.00.

2        Q    And you're referring to

3    Defendant's Exhibit 19; is that correct?

4        A    Yes.

5        Q    Is that a document that you used

6    as a factual predicate in the writing of your

7    report?

8        A    Yeah, either that or something

9    very comparable to it.  I have a recollection

10   of actually looking at his W-2s and adding

11   them up.  But it's the same number.

12            So let's say, for all practical

13   purposes, yes.

14       Q    And what document did you use for

15   the 2000 return?

16       A    That's Exhibit 20.  The earning

17   figure coming off of the Schedule C is

18   $80,287.00.  So now we have two dollar figures

19   in place, '99 and 2000.

20       Q    And I assume you added those two

21   figures up and divided by two.

22       A    No, I didn't.

23       Q    What did you do?

24       A    I took the two figures, which are

25   historical dollars, and I converted each

1   dollar to a year 2004 dollar based on the

2   Consumer Price Index.  So what I'm doing is

3   I'm holding his historical earnings for the

4   years '99 and 2000 constant in terms of

5   purchasing power.

6           So I'm increasing the 48,000 by

7   the multiplier of 1.139 to arrive at a 1999

8   earning figure stated in terms of 2004 dollars

9   or 55,462.  I then did the same thing for the

10  year 2000, a multiplier of 1.102, to convert

11  the eighty thousand dollar figure to 88,476.

12          I then added those two figures

13  and took the average of that.

14      Q    Okay.  Basically what you did was

15  you computed the numbers in terms of 2004

16  values - -

17      A    Yes.

18      Q    - - added them together and then

19  divided by two.

20      A    That's right.

21      Q    So that your number is a 2004

22  figure rather than a 2001 figure.

23      A    Rather than - -

24      Q    The value.

25      A    Right.  Rather than a 1999 dollar

1    or a 2000 dollar, yes.

2            Q      You're speaking - - the value

3    that you assign is the value that the dollar

4    would have in 2004, not 2001; is that correct?

5            A      That's right.

6            Q      Now, with respect to the 2000

7    return, if I were to tell you that the return

8    was bogus, would that make a difference in

9    your computation?

10           A      Yes.  It might.  It would depend

11   upon which way it was bogus.  Are you saying

12   that the dollar figure is greater or are you

13   saying that the dollar is less?

14           Q      I'm saying that the dollar figure

15   is much less.

16           A      Okay.  If the dollar figure is

17   less, that would make a difference in my

18   calculation.

19           Q      If you were to use the '99 return

20   alone as a basis and discount the 2000 return

21   - -

22           A      Mm-hum.

23           Q      - - and discount from that return

24   potential earnings as a dispatcher, he would

25   have a very limited loss; isn't that correct?

1      A      No, that's incorrect.  That's

2   totally incorrect, what you just said.

3      Q      If he had the income that you say

4   is supported by Exhibit 19 of $48,431.00 and

5   he were able to work as a dispatcher with an

6   income of $31,000.00 a year, he would then

7   have a loss of about $17,000.00 a year, right?

8      A      Wrong.

9      Q      Well, how is that wrong?

10      A      When you're accessing lifetime

11   expected earnings or - -

12      Q      I'm not talking about future

13   calculations yet.  I'm talking about the first

14   year now.

15      A      Okay.  It's wrong because it

16   assumes that the probability of employment

17   would be the same pre- and post-injury and

18   what we know is that it's not.

19      Q      But I'm asking you to assume that

20   it is.  In other words - -

21      A      If you're asking me to assume - -

22      Q      I'm asking you to assume - - to

23   discount your second step about employability

24   - -

25      A      Okay.

1    Q    - - and say that he has the
2    capacity to work and there's a job there for
3    him.
4    A    If you were to make the
5    assumption that the second step in the process
6    of assessing earnings needs to ignore
7    probabilities of employment, then what you
8    said it correct.
9    The only loss for that first year
10   would be whatever it was.
11   Q    About $17,000.00.
12   A    Sure.  That's right.
13   Q    And if he had a worklife
14   expectancy of 27.7 years, which is the
15   standard you apply, and you use the pure
16   offset method, he would have a future loss of
17   about $469,000.00.
18   A    If you were to assume that the
19   worklife expectancy is the same post-injury,
20   identical to what it is pre-injury, what
21   you're saying is correct.
22   Q    And do you know what kind of work
23   Shawn was engaged in?
24   A    At the time of the injury?
25   Q    Yeah.

1        A       Yes.

2        Q       What kind of work?

3        A       He worked as an over-the-road

4    tractor-trailer driver going coast to coast.

5    He would transport high dollar merchandise,

6    anything from automobiles to priceless

7    artifacts.

8                So he was engaged in basically a

9    fairly specialized type of over-the-road

10   tractor-trailer driving.

11       Q       Was he engaged in general freight?

12       A       The best person to ask that to

13   would be him, not me.  I believe he was,

14   however.

15       Q       Did you interview him?

16       A       Yes, I did.

17       Q       How long did you spend with him?

18       A       I have on here that I spent one

19   hour with him.

20       Q       What did he tell you?

21       A       He told me that he was from Akron,

22   Ohio; that his date of birth was 5/21/70; that

23   he completed a GED in 1986.  Prior to that,

24   he completed 10 years of formal education.

25                He attended a Catholic high

1    school and left at the end of the 10th grade.

2    He indicated to me that his injury date was

3    10/23/01.  He identified himself as a hands-on

4    type of guy, not a book type of guy.

5                    He said that he had been around

6    construction his entire life and that he

7    basically had the ability to engage in any

8    type of home construction or residential

9    construction activity.

10                   He stated that he had laid

11   flooring, he had worked as a journeyman

12   through the apprenticeship level; that he had

13   laid commercial flooring as well as

14   residential flooring; and that he actually

15   began engaging in that activity at 17 years of

16   age earning at a fairly high rate of pay, as

17   high as $15.00 per hour.

18                   He indicated that he had enough

19   experience by 30 years of age that he had

20   persons significantly older than himself that

21   he was involved in supervising.

22                   He has basically laid all types of

23   flooring materials, everything with the

24   exception of terrazzo.  He stated to me that

25   he obtained his commercial driver's license as

1     a result of having attended trucking school

2     and that he had worked for some of the best

3     companies in the United States.

4                He then described his injury that

5     occurred on 10/23/01.

6          Q     How did he describe that?

7          A     He said that he was unloading a

8     machine and that the machine fell on him.

9     Apparently, there was a defective tailgate

10    involved in the accident.  He indicated to me

11    that he severed his spinal cord at L1 level.

12               He said there was a complete

13    severance and that he had a cast from his

14    thigh down, a straight leg cast down, for a

15    number of months which caused major problems

16    for him with bed sores.

17               He then described what he

18    described initially as horrendous medical

19    issues.  He described problems with

20    incontinence.  He described issues associated

21    with catheterizing himself.

22               He indicated that he has a Texas

23    catheter that he uses and that he still has

24    problems with voiding, apparently, at

25    inappropriate times.  Shall I continue?

1          Q      Yeah.

2          A      He stated that at 10 years of age

3    he began actively working with his dad

4    involved in various types of construction

5    activities that included unloading carpet, as

6    well as laying carpet, as early as 10 years of

7    age.

8                 He then worked for his dad after

9    he left school from the period of 17 to 22

10   years of age and was involved primarily in

11   laying various types of flooring.

12                 At 22, he stated that he went on

13   his own, bought a truck on his own, and he

14   tried to engage in self-employment but that he

15   wasn't established enough to handle slow

16   times, meaning that he didn't have that much

17   in the way of customers, so that he would

18   always revert back during slow times to

19   activities involving construction and/or

20   landscaping.

21                 The work as a commercial driver

22   started at approximately 25 years of age.  He

23   stated that he was licensed to drive over the

24   road and that he initially started out working

25   at a local level in terms of driving between

1    the ages of 25 and 27.

2              At 27, he began over-the-road

3    work and his last employer was for a period of

4    nine months.  It was Paul Arpin Van Lines,

5    which is the company that he apparently

6    contracted with and drove basically all over

7    the United States.

8              He stated that he did own his own

9    truck at one time.  He stated the equipment

10   cost $125,000.00.  He functioned as an

11   independent contractor.  He stated that he's

12   not adverse to hard work.

13             He stated that he would never

14   refuse a load to carry, even if it was a load

15   that didn't earn him a significant profit.  He

16   indicated that he did that so as to establish

17   a customer base and relationships with persons

18   who wanted things picked up and delivered.

19             Since injury, he states that he

20   has done nothing of great significance.  He

21   states that he needs to do something.  He

22   tried engaging in an activity involving a

23   parking lot.  He tried to get accounts.  He

24   was able to do two accounts and he tried to

25   do this work over the phone and working with a

1    computer.

2                    He said that he was able to work

3    three or four hours a day, but it created

4    significant pressure in his back and that he

5    would have to lay down.

6                    He's hoping that surgery would

7    eliminate some of the back pain that he

8    experiences.  He's on very heavy medication,

9    as described by himself.  He states that he

10   takes 60 milligrams of Oxycontin per day; 7.5

11   milligrams of Percocet, he takes six of those

12   a day, as well as Neurontin, 800 milligrams,

13   three times a day.

14                   Also, he takes .5 milligrams of

15   Xanax for anxiety two times a day.  Also,

16   there's a medication he takes for nausea, as

17   well as medication for acid reflux.

18                   He states that he lives with his

19   mom.  He has custody of his three children,

20   but it's a situation whereby it's joint

21   custody.  There's a week on and a week off.

22                   He says he drives.  He says that

23   he needs some assistance with bathing and that

24   his mother will help him in terms of getting

25   into a shower, but he is capable, in most

1    instances or at most times, in terms of

2    bathing himself.  But his mother does help him

3    dress.

4              Anything that's physical presents

5    a problem, anything from shopping to going out

6    with his children.  He says he lives in a

7    situation where he's relying upon his mother

8    and that she, herself, has what he described

9    as significant, horrendous health problems.

10             He's hoping to move to Florida in

11   large part so as to avoid the winters that

12   result in him being more restricted than

13   during good weather.  That's basically the

14   totality of the information that I obtained

15   from him.

16        Q    Thank you, Doctor.  Now, in your

17   report, in that section I just referred to

18   which is the page two analysis and the

19   narrative that follows, I think that your - -

20   at least what I understood, the first analysis

21   was to be construed if he were an employee.

22   Is that - -

23        A    Yes.

24        Q    - - is that the idea?

25        A    Yes.

1      Q      In your notes you have that he

2  told you that he was an independent

3  owner/operator.

4      A      Yes.

5      Q      Why would you even consider

6  having a section that he was an employee?

7      A      It's not uncommon for

8  over-the-road tractor-trailer drivers who are

9  self-employed, particularly those who are

10  interested in high levels of earnings, which I

11  believe he is based on the information he's

12  given me and also based on the tax returns,

13  even the lower of the two tax returns - - he

14  always had the option of moving away from the

15  self-employment, which can be a real problem

16  sometimes, particularly from a financial

17  perspective.

18           You know, if you have debt

19  service on a hundred and twenty-five thousand

20  dollar vehicle plus all of the other expenses

21  associated with that type of business, not the

22  least of which is the unexpected increase in

23  gasoline prices, it's very easy for many of

24  those people to go under.

25           When they go under what they do

1      is they transfer their skills to a major

2      freight company and they go to work for that

3      company and they have a steady salary as

4      opposed to having to engage in both the

5      driving and the business aspects.

6                    Because of his historical level of

7      earnings, I considered that fifty-two thousand

8      dollar figure to be a reasonable estimate of

9      his earning capacity were he to leave the

10     self-employment and I ran that number out for

11     him as an employee with fringe benefits at a

12     level that would be equal to the national

13     average.

14                    And as a self-employed person,

15     I'm sure that he fully understands the

16     importance and significance of fringe benefits

17     and so I added that to the fifty-two thousand

18     dollar base figure.

19                    That 25 percent figure that I'm

20     using is a national average.  So I'm basically

21     putting the loss in a range and that range is

22     geared to his actual earnings for two years in

23     combination with the average earnings of

24     workers who earn at the top 10 percent or, I

25     should say, at the top decile of earnings.

1            So, hence, we have a loss that's
2       in the range 1.738 to 1.774.
3            Q    Okay.  Thank you.  Directing your
4       attention to your original CV and the list of
5       cases that you've handled, of those 22 pages
6       are you able to identify any client in there
7       who employed you who was a defendant?
8            A    These are court appearances and
9       depositions.  I can tell you that the law firm
10      of Dowd & Dowd, I was in court with a couple
11      three years ago and I can also tell you that I
12      was in federal court for a defense attorney in
13      - - in March or April of this year.
14           I don't recall the defense
15      attorney's name, but it was a Chicago case
16      sometime around March or April and that case
17      should be in there.  I might be able to
18      identify it if I look through it real quickly.
19           Q    So basically two cases; is that
20      right?
21           A    There might be more than that in
22      there, but let me say to you that 98 to 99
23      percent of the referrals that our firm
24      receives and that I personally receive are
25      from plaintiffs' lawyers.

```
 1              Q      Okay.

 2              A      And so they are a very small

 3      percentage of court appearances, usually one

 4      or two a year.

 5              Q      So you have a bias toward the

 6      plaintiff's case, right?

 7              A      No, I don't have a bias toward the

 8      plaintiff's case.  The data that I used are

 9      simply compelling in terms of telling us what

10      we've always known.

11                      Persons with disability when they

12      work, and only about 30 to 40 percent of them

13      do work full-time - - when they work

14      full-time, they earn less.  And the other

15      thing we know about persons with disability is

16      they have significantly lower levels of

17      employment.  That's not news to anyone.

18                      What is news is that employment

19      levels form the building blocks of a worklife

20      expectancy and, hence, they have a

21      significantly reduced worklife.  So those two

22      elements combine to produce a loss of lifetime

23      expected earnings for persons with disability.

24                      That data is very, very

25      advantageous to the plaintiff's bar.
```

1          Q      Would you agree with me that Mr.

2      Foreman, when he prepared his evaluation of Mr.

3      Pouliot's condition, had the same kind of

4      employability data available to him that you

5      have to you?

6          A      I don't whether he does or

7      doesn't.  I can tell you this, that many

8      vocational experts in the country do not have

9      access to that data, they have great

10     difficulty understanding it.

11              More economists are familiar with

12     that data than there are vocational people.

13     But I will also tell you that there are a

14     significant number of vocational people who do

15     use that data and do discount for the

16     probability of employment when disability

17     exists.

18         Q      Have you spoke with Dr. Thompson

19     about his deposition or your deposition?

20         A      I have not.

21         Q      Have you spoke with Terri Petruska

22     about her deposition?

23         A      I have not.

24         Q      Have you ever been precluded from

25     testifying under a Daubert challenge?

```
 1            A       Never.

 2            Q       The disability definitions that

 3    you refer to in your rationale, in your

 4    Vocational Economic Rationale, none of those

 5    definitions preclude the activity of work, do

 6    they?

 7            A       What page are you on?

 8            Q       Well, it would be between pages

 9    one and 11.

10            A       Somewhere between pages one and

11    11?

12            Q       Yeah.

13            A       And so your question to me was

14    what, again?

15            Q       None of those definitions

16    preclude the activity of work.

17            A       That's correct, not per se.

18            Q       Thank you.  Did Shawn Pouliot

19    tell you how many hours a week he worked as an

20    owner/operator?

21            A       I think he did.  I believe - - I

22    don't have it noted, but I have a sense that

23    he would work however many hours it took per

24    week to generate revenue for his sole

25    proprietorship.
```

1              That's the sense that I have from

2      the interview.

3              MR. GRADY:  I don't have any more

4          questions at this time.

5              (OFF THE RECORD)

6              MR. OSWALD:  Mr. Gamboa, my name

7          is Jim Oswald.  I'm going to try to not

8          rehash the stuff that we've already

9          done, just kind of following up.

10     BY MR. OSWALD:

11             Q     Now, you were retained to provide

12     an expert opinion in this case, correct?

13             A     Yes.

14             Q     When were you retained?

15             A     June 23 of 2004.

16             Q     And you just said you were

17     retained to provide an expert opinion.  What

18     was your understanding at the time of the

19     expert opinion that you were to provide?

20             A     That I would define what effect

21     the injuries sustained by Shawn Pouliot would

22     have on his lifetime capacity to work and earn

23     money - -

24             Q     Sorry, you sped up at the end.

25     His lifetime capacity - -