1      A      I'm not sure I understand your

2   question.

3      Q      Yeah, that was pretty poorly

4   phrased.  Let me try to clean it up.  You're

5   being asked to look at, in this case, Shawn

6   Pouliot and provide a vocational economic

7   assessment.

8              Would you be interested in other

9   vocational economic assessments that were done

10  for Shawn Pouliot by the Tony Gamboa in

11  California or the Tony Gamboa in Montana or

12  people that do what you do but other

13  individuals?

14             Would you be interested in

15  looking at those?

16     A      No.

17     Q      Why not?

18     A      I wouldn't be interested in

19  looking at them because, first of all, there

20  are very, very few people in the country who

21  do both the vocational and the economic.

22  That's number one.

23             So whenever you look at a

24  vocational expert's report or an economist's

25  report, it's really like telling half the

1    story.  That's number one.

2                    Number two, I realize that - - you

3    know, that different experts, and I'm talking

4    now about specifically different vocational

5    economic experts - - there are maybe 20 such

6    people functioning in the country - - can view

7    things differently and - -

8            Q       Subjective, right?

9            A       You know, we've established that

10   everything is subjective in one sense,

11   certainly in a social science.  So, you know,

12   reasonable people differ.

13                   And what I would prefer to do,

14   rather than having some type of bias as a

15   result of reading a report, you know, that a

16   colleague produced, I'd rather look at the raw

17   data off of which the colleague produced his

18   report and then come up with my own opinions

19   and then go back, and sometimes I've done

20   this, read the report that was generated.

21           Q       Sometimes - -

22           A       It's always afterwards.

23           Q       Sometimes you have gone back and

24   read --

25           A       Sure.

1        Q        - - the report generated by

2    somebody kind of in your shoes - -

3        A        Sure.

4        Q        - - but John Smith or Joe Jones,

5    some other guy that does what you do.

6        A        That's right.

7        Q        Why?  Why do you do that?

8        A        Usually because I'm asked to by an

9    attorney and the attorney wants assistance in

10   cross-examining the individual.

11       Q        No, I'm sorry.  Let me be more

12   clear.  You said that sometimes what you'll do

13   is you'll be asked to perform a vocational

14   economic assessment.  And you said I don't

15   want to look at somebody else's conclusion

16   because I don't want it to pollute my own,

17   right?

18       A        Yes.

19       Q        Right.  So you said that in

20   certain instances you have prepared vocational

21   economic assessments where after you've

22   created your vocational economic assessment,

23   you have gone then and looked at somebody

24   else's economic assessment - - vocational

25   economic assessment, right?

1      A      Yes.

2      Q      Why?

3      A      Because I was asked to by an

4   attorney.

5      Q      Okay.  You wouldn't normally do

6   that as part of your own investigation?

7      A      No.

8      Q      Why not?

9      A      You know, there's only so much

10   time in a day.  It really doesn't matter to me

11   what another vocational expert or another

12   economist or what another vocational economic

13   analyst has to say about a case.

14      Q      It doesn't provide some sort of

15   sounding board, some sort of kind of gut

16   check, hmm, to compare what your findings are

17   against somebody else's?

18      A      You know, I suppose it might,

19   but, to be very, very candid with you, I don't

20   do it and in part because, you know, there's

21   only so much time in a day.

22      Q      So, in fact, if there were an

23   economic assessment done in this case by

24   somebody else, you wouldn't be interested in

25   looking at that?

1      A      That's right.  What I typically

2   do when an economic assessment given to me by

3   an attorney or a vocational expert's report is

4   given to me and the attorney wants assistance,

5   I typically hand that over to somebody else in

6   the office for them to do that and then they

7   provide the assistance.

8           There are some instances were the

9   attorney may be someone that I've known for

10  many years and he will specifically say to me,

11  Tony, I want you to do this personally, I want

12  you to look at this and work with me and show

13  me how to cross-examine this guy.

14      Q      Are you aware in this case whether

15  there was an economic assessment done for

16  Shawn Pouliot before yours?

17      A      I have no idea whether there was

18  or wasn't.

19      Q      You weren't informed of that?

20      A      Yeah, I just said to you, I have

21  no idea whether there was -- - I have no

22  economic report in my file.

23      Q      So the answer is yes, you were not

24  informed of that.

25      A      That's correct.  I may have been

1    informed of that.  I don't know if I was or

2    wasn't.  I don't have any recall of it if I

3    was.

4         Q     You certainly don't recall being

5    informed that there was an economic assessment

6    performed for Shawn Pouliot that predates

7    yours.

8         A     I can't say that I do.  I can't

9    say that I have specific recall of that.

10         Q     Okay.  And again, that's

11   something that you wouldn't be interested in

12   anyway.

13         A     Not really, not unless the

14   attorney wanted some assistance in terms of

15   cross-examining someone.

16         Q     But for purposes of your analysis,

17   that's not something that you'd be interested

18   in.

19         A     Right.

20         Q     On page five of your vocational

21   economic assessment, the second paragraph, you

22   see it's a paragraph that begins with the

23   words "when consideration"?

24         A     Yes.

25         Q     If you look at the last line of

that paragraph, it reads "As a result of
injury, Mr. Pouliot is unable to perform any
type of substantial gainful work activity and,
therefore, is 100 percent occupationally
disabled."

        Do you see that?

A     I do.

Q     Is that still your opinion?

A     Yes.

Q     It is your opinion that Mr.
Pouliot is unable to perform any type of
substantial gainful work activity?

A     That's correct.

Q     You did not earlier testify today
that Mr. Pouliot is, in fact, able to perform
substantial gainful work activity but that it
depended upon the availability of jobs in the
marketplace?

A     Yes, and I characterized that as
him having a theoretical capacity to perform
work and earn money.  I acknowledge that there
is that theoretical capacity.

        I also stated that the percentage
of jobs that he retains the capacity to
perform would be less than one percent of the

1   jobs in the labor market and that doesn't

2   constitute jobs existing in significant

3   numbers.

4           But, in addition to that and over

5   and above that, he's clearly unemployable and

6   for that reason, he's 100 percent

7   occupationally disabled.

8       Q    What do you mean, in addition and

9   over and above that he's 100 percent

10  unemployable?  What do you mean by that?

11      A    No, I didn't say he's 100 percent

12  unemployable, I said - -

13      Q    All right.  What did you say?

14      A    I said, you know, in addition and

15  over and above that - -

16      Q    Yes.

17      A    - - okay - - he is clearly

18  unemployable which makes him 100 percent

19  occupationally disabled.

20      Q    Why is he unemployable?

21      A    Why is he unemployable?

22      Q    Yeah, I thought you stated earlier

23  that, in fact, there are certain kinds of work

24  that he can perform but that it depended upon

25  the availability of jobs in the marketplace.

1    A    What I stated previously, and

2  obviously the record will speak for itself, is

3  that he had a theoretical capacity - - has a

4  theoretical capacity to perform work.

5            Larry Foreman believes that he

6  can work as a dispatcher.

7    Q    Do you disagree with Mr. Foreman's

8  conclusion then?

9    A    Theoretically, I don't disagree

10  with it.  From a practical vocational economic

11  perspective, I disagree with it.  And I

12  disagree with it because this is a person who

13  has a severe disability and he has a severe

14  work disability and his limitations are such

15  that he retains only the capacity to perform

16  fewer than one percent of the jobs in his

17  labor market.

18    Q    But again, there you're not

19  talking about the capacity to work, you're

20  talking about the probability of employment,

21  correct?

22    A    Right, but what I'm saying is - -

23    Q    But as far as the just the

24  capacity to work is concerned, you don't

25  disagree with Mr. Foreman's conclusion.

1    A    Theoretically, I don't.  That's
2    right.
3    Q    But we're talking - - you talk
4    theoretically, but I'm talking about the
5    difference between the capacity to work and
6    the probability of getting work, which is what
7    you said were the two things that you look at,
8    right?
9    A    Yes.
10    Q    Okay.  So the first one, the
11    capacity to work, you don't disagree with Mr.
12    Foreman's conclusion that, as a capacity to
13    work issue, Mr. Pouliot could be employed as a
14    dispatcher for whatever number Larry Foreman
15    puts on it.
16    A    Theoretically, I do not agree with
17    that.  As I said earlier - -
18    Q    You do not agree with it or do
19    agree with it?
20    A    I misspoke.
21    Q    I thought so.
22    A    Yeah.  Yeah, theoretically, I
23    agree - -
24    Q    Fine.
25    A    - - that he has the capacity to

1    perform work as a dispatcher.  And earlier I

2    used as an example anyone who is not comatose

3    has a theoretical capacity to perform work.

4         Q    Let me direct your attention back

5    to this sentence that I was focussed on.  You

6    don't talk about probability of employment in

7    that sentence, right?

8         A    That's right.

9         Q    You just say Mr. Pouliot is

10   unable to perform any type of substantial

11   gainful work activity, correct?

12        A    Yes.

13        Q    Well, that's wrong, isn't it?

14        A    No, it's not.

15        Q    Isn't it wrong from the

16   standpoint of capacity to work?  You've just

17   said that you agree that, from a capacity to

18   work standpoint, he is employable, he is able

19   to perform substantial gainful work activity.

20             Your issue is whether there's jobs

21   available for him to fill; isn't that right?

22        A    No, that's incorrect.  My

23   position is what's stated, that he's unable to

24   perform any type, any type of substantial

25   gainful work activity.  He's not competitively

1    employable, in my opinion.

2        Q       Due to the unavailability of jobs

3    for him to fill; is that correct?

4        A       It's not just the unavailability.

5    That's certainly one of the factors.  But from

6    a practical perspective, this is an individual

7    who has severe and profound limitations.

8                It's not just the fact that he's a

9    paraplegic and it's not just the fact that he

10   has problems with bowel and bladder control

11   and it's not just the fact that he has some

12   limitations in terms of even transferring

13   himself, which would suggest, based on one of

14   the medical doctors, that he has some problems

15   with reaching.

16               It's not just those things.  It's

17   the fact that he has that in combination with

18   such a severely limited labor market access.

19   You know, this is not a Steve Hocking.

20               You know, Steve Hocking is much

21   more impaired than this man, but he has such an

22   extraordinary intellect that he, in fact, is

23   gainfully employed and is capable of

24   substantial gainful work activity.

25               I don't see that as being true

1    for Mr. Pouliot.

2        Q      And again, but it comes down, in

3    your opinion, the difference between you and

4    Larry Foreman is that for you it's a question

5    of whether there are jobs available for him in

6    the marketplace to perform.

7        A      It's not only a question of jobs

8    existing in significant numbers, it's

9    certainly that, but that feeds into the whole

10   issue of how employable is this individual.

11                He's a person that has, by

12   anyone's definition, a severe work disability.

13       Q      Right, and all that information

14   was available to Larry Foreman when he came to

15   his conclusion, right?

16       A      I have no idea what Larry Foreman

17   had.

18       Q      Assume with me that it was

19   available to him because it was.  He's got his

20   list of stuff he looked at and - -

21       A      Okay.

22       Q      - - it looks remarkably like

23   yours.

24       A      Okay.

25       Q      If we assume that all of that

1      information was available to Larry Foreman,

2      you would agree, from a capacity to work

3      standpoint, that Shawn is capable of doing

4      work.

5            A      I think I've made my position

6      pretty clear.

7            Q      That's fine.

8            A      Yeah, I don't see him capable of

9      engaging in any type of substantial gainful

10     work activity.

11           Q      Have you ever performed work in

12     the past for Michael Stratton or his present

13     law firm of Stratton Faxon or the prior law

14     firm of Koskoff & Koskoff that he worked for?

15           A      I believe I've done maybe one,

16     possibly two other cases for Mike Stratton.

17           Q      Was it for his prior law firm; do

18     you know?

19           A      I don't recall.

20           Q      Okay.  Was it recently?

21           A      I'd say it was within the past

22     year or so.

23           Q      Within the past year or so.

24     Where was that?

25           A      His office, if my memory serves me

1    correctly, was in New Haven.

2        Q      His offices in New Haven?

3        A      Yes.  And I know that I was in

4    New Haven in his office meeting one of his

5    clients and I want to say it was about a year

6    or so ago.

7        Q      Okay.  Different case, though,

8    right - -

9        A      Yes.

10       Q      - - we're not talking about Shawn

11   Pouliot?  Do you recall - - did you give

12   testimony in that case?

13       A      I don't remember.  I may have

14   given a video deposition in that case, but I'm

15   not sure.

16       Q      Taken down here?  Down here,

17   meaning in Louisville.

18       A      It might have been taken in New

19   Haven.  I think I did, but I'm not certain.

20       Q      Do you recall if it was for

21   Stratton Faxon?  Mike's partner is a gentleman

22   named Joel Faxon and his law firm is called

23   Stratton Faxon.  I'm wondering if that helps

24   you.

25       A      No, I don't recall.

1       Q       Okay.  Do you recall where the
2   case was pending?
3       A       It was in Connecticut.
4       Q       Connecticut state court, you
5   believe?
6       A       I don't know.
7       Q       Do you recall any of the names of
8   any of the individuals involved, any of the
9   parties?
10      A       I don't.
11      Q       Okay.  Do you know if there is a
12  record of your deposition that you believe was
13  taken there, either the videotape itself or a
14  transcript?
15      A       Assuming that I gave a video dep?
16      Q       Or any kind of dep.  Is there a
17  record available?
18      A       Or a deposition.  I'm sure Mr.
19  Stratton would have that deposition.
20      Q       You don't think you testified in
21  court.
22      A       No, I'm sure I did not testify in
23  court in person.
24      Q       That's what I mean, actually.
25  Your deposition might have been used however

1    it was used.  But you, yourself, didn't appear

2    in court to testify in that particular case.

3         A     I believe that's correct, yes.

4         Q     Do you think that was the only

5    other time, other than the present case for

6    Shawn Pouliot, that you've done work for Mike

7    Stratton or his present law firm or his former

8    law firm?

9         A     There may have been one other

10   case, but I'm not certain that there was.

11        Q     Okay.  In your CV, you give a

12   big list of different places and cases, et

13   cetera, that you've testified in and you were

14   asked about that a little bit.

15             In each of those instances listed

16   in your CV, was your testimony received by the

17   court?

18        A     Yes.

19        Q     Okay.  And I believe - -

20        A     Are you talking about my

21   curriculum vitae or are you talking about the

22   Rule 26 - -

23        Q     No, I think I'm talking about your

24   curriculum vitae.  I thought that there was - -

25        A     Then I don't know what you're

 1   talking about.

 2            Q     Oh, I'm sorry, it's not the

 3   curriculum - -

 4                  MS. O'DONNELL:  No.

 5                  MR. OSWALD:  My fault.  It's

 6            part of the Rule 26 disclosure.  My

 7            fault.

 8                  THE WITNESS:  Oh, okay.

 9   BY MR. OSWALD:

10            Q     I'm talking about the big, long

11   list in landscape format of all the different

12   places you've testified via deposition or at

13   trial.

14            A     Yes.

15            Q     Do you know what I'm talking

16   about?

17            A     Yes.

18            Q     Are there any instances - - you

19   were asked this specific question earlier,

20   whether there were any instances where your

21   testimony was refused, I think, on a Daubert

22   challenge and you said no, not to your

23   knowledge, I believe, right?

24            A     I think I just said no, but - -

25            Q     Fair enough.  I don't mean to put

1    words - - if the answer is no, the answer is
2    no.  That's fine.
3                Are you aware of any instances
4    where your testimony was every criticized by
5    any the courts that that testimony was used in
6    front of?
7         A      Not that I can think of.
8         Q      You can't think of any instance
9    where you've ever testified where a court has,
10   even if it took your evidence, nonetheless
11   criticized your conclusion, your methods, your
12   procedure, anything about your conclusion?
13        A      Let me see if I understand your
14   question correctly.  You're saying that I'd
15   provide expert testimony in court - -
16        Q      Right.
17        A      - - and then the trial judge
18   issues some kind of a decision - -
19        Q      Correct.
20        A      - - and in that decision he
21   criticizes my conclusions and my work or
22   something of that like.
23        Q      Correct.
24        A      That's never happened.  Now, if it
25   has - - never happened that I know of.  If it

1   has, I'd sort of like to see that because that

2   would be very important to me to put that on

3   our web site because that's what we do.

4        Q    You would put that on your web

5   site?

6        A    Sure.  Absolutely.  Absolutely.

7   The objective is to disseminate information

8   and judges sometimes make mistakes because

9   they react to information that they sometimes

10  think is correct but isn't.

11            So, yeah, yeah.  We're pretty open

12  about what we do.

13       Q    Okay.  But again, just so that

14  we're clear, to your knowledge, that has never

15  happened.

16       A    That's never happened.  And what

17  I'm saying to you is that if it has happened,

18  I really would like to see that.

19       Q    And I'm drawing a distinction here

20  between - - the question that you were asked

21  earlier was did you ever get kicked out,

22  basically, on a Daubert challenge.

23       A    Well, actually - -

24       Q    And the question that I'm asking

25  is slightly different.  You might not get

1    kicked out, your testimony might be received

2    in the sense of, hey, it is what it is, but

3    you have a judge, nonetheless, come back and

4    criticize either your conclusion or your

5    methods or your procedure.

6                    And you're not aware of that every

7    happening?

8        A        Yeah, not only am I unaware of

9    that ever happening, you know, I kind of like

10   rephrased what you said - -

11       Q        Uh-huh.

12       A        - - whereby I'm giving testimony

13   in court, my testimony is received, and then

14   the trial judge issues the decision and is

15   critical of what I've done or is critical of

16   my conclusions or whatever.

17                   That's never happened, to the

18   best of my knowledge.  And as I say now for

19   the third time, if it has I'd really like to

20   get a hold of that because that's something

21   that we'd respond to.

22                   We'd put it on our web site and

23   explain ourselves and have everybody take a

24   look at the decision of the judge and, you

25   know, the person who reads that can then

1   decide whether or not the judge was correct or

2   we were correct.

3           Q       In talking about Shawn's - - I

4   think you called it the probability of

5   employment, you said that the probability is

6   not zero, but I think you said it's .20; is

7   that the number that you used?

8           A       Yes, that was meant to be an

9   estimate for persons defined as having a

10  severe work disability with his level of

11  educational attainment.

12          Q       So .20, again, plain English,

13  you're talking one-fifth of one percent.

14          A       No, no, point 20.

15          Q       Point 20.

16          A       Yeah.  In other words,

17  approximately 20 percent - -

18          Q       Got it.

19          A       - - okay - - are employed either

20  part-time or full-time.

21          Q       Oh, I see.  I see.  Let me get

22  back to the probability of employment for a

23  second.  You said that the probability of

24  employment for Shawn is so close to zero that

25  justice is best served by defining Shawn as

1   unemployable.

2        A       Right.

3        Q       What did you mean, that justice

4   is best served by defining Shawn as

5   unemployable?

6        A       What I mean by that is that

7   probability statistics in a social science

8   that are specific to someone with a severe

9   work disability takes into consideration the

10  number of those people with severe work

11  disabilities who are either employed part-time

12  or full-time.

13              Now, many of those persons who

14  form that data set are persons who have had

15  back injuries or they lost a leg or they, you

16  know, had a disability from birth on and, you

17  know, they were capable of making significant

18  accommodations.

19              We're not talking about - - when

20  I use the term severe work disability, we're

21  not talking about persons who are either

22  paraplegics or quadriplegics, but the bulk of

23  the severely disabled work population is

24  comprised of persons who are not severely or

25  catastrophically injured but rather they have

1    orthopedic problems, most typically back

2    problems.

3                    So someone with a back problem

4    who's restricted to sedentary work may well be

5    often categorized as having a severe work

6    disability.  Well, that impairment and that

7    disability pales in comparison to someone

8    who's in a wheelchair who has problems in

9    terms of, you know, bowel and bladder control,

10   who has to catheterize himself four, five, six

11   times a day, who has severe limitations.

12                   So what I'm saying to you is that

13   I don't have the data that examines persons

14   with a severe work disability who are

15   paraplegic and who have problems with bowel

16   and bladder control that have to catheterize

17   themselves every day.

18                   Were that data to be made

19   available to me, I guarantee you that that

20   percentage or that probability would be

21   significantly below .20.  And so what I'm

22   saying to you is that it would probably come

23   in somewhere about maybe, maybe two, three,

24   four, five percent.

25                   And all I'm saying is that, yeah,

```
 1    we could probably take that five percent and

 2    discount the cash flow by 95 percent and say

 3    that best represents his after-injury expected

 4    earnings, but I don't really think that

 5    justice would best be served by that because

 6    what we do is not that precise and that is

 7    particularly true when you're applying it - -

 8    it, meaning the probability statistic - - to

 9    someone who has the type of impairment that

10    Mr. Pouliot has.

11         Q      Maybe my question wasn't clear.

12         A      That means my answer has to have

13    been a disaster.

14         Q      No, your answer is what it is.

15    Why is justice best served by defining Shawn

16    Pouliot as unemployable?

17         A      Okay.

18         Q      That's my simple question.

19         A      It's best served because the

20    scales that we have to measure are not

21    sophisticated enough.  For instance, let's

22    assume that I have a feather in my hand

23    dropped by a Blue Jay on his way south to

24    Miami.

25                If I place that feather on my
```