1    Statistics.  What I do with that cash flow in

2    this particular instance, the 52,000, I first

3    add 25 percent to it for fringe benefits,

4    which is not shown, then I multiply that

5    product by .848 to arrive at the adjusted

6    earning column which is $55,000.00 - - 55,192.

7                    So what I'm doing is I'm

8    discounting the compensation package by the

9    probability of being alive and employed and

10   I'm doing that for every year.  Were you to

11   add up all of the separate joint probabilities

12   of being alive and employed from 31.4 years

13   through age 89, you would end up with a number

14   called that's called a worklife expectancy.

15   That number is 27.7 years.

16                    That's how a worklife expectancy

17   is derived.  It's not a linear statistic.

18   It's a non-linear statistic that's derived by

19   examining joint probabilities of being alive

20   and employed from a given age through age 89.

21        Q      What does that number mean, 27.7?

22        A      What that means basically is

23   this, is that if you take a 31.4 year old

24   male, that person does not have a one hundred

25   percent chance of working from 31 years of age

1    to 65 or 67, which is when he'd be eligible

2    for retirement where he would have received

3    his maximum Social Security benefits.

4                    People go through periods of

5    unemployment.  People die.  People are laid

6    off.  And all that I'm doing is I'm capturing

7    all of those probabilities or all of those

8    things that could cause a person not to be

9    employed and I'm discounting the cash flows

10   based on that probability.

11                   So, in this particular case, you

12   know, if you look and you say, well, Gamboa

13   started the analysis at 31, you know, he says

14   he has a 27-year worklife expectancy, what

15   happened - - you know, that takes you out to

16   what, is it 58 years - - you know, what

17   happened to the other nine years before he

18   would be eligible for maximum Social Security

19   benefits?

20        Q        Mm-hum.

21        A        What happened to them is I'm

22   discounting the cash flows based on those

23   probabilities of a person being alive and

24   employed with his level of education, who's

25   male and who is without a work disability,

1    without a work disability.  So that's step two.

2              Step three on this particular case

3    there are no numbers, there are no numbers

4    because I'm concluding that this individual is

5    100 percent occupationally disabled.

6         Q    That he has no future worklife.

7         A    That's right.  And that's the same

8    thing for step four.  There's no worklife

9    expectancy.  And step five is the present

10   value calculation.  I'm using a pure offset.

11        Q    Now, this worklife probability

12   method that I see on pages one through three,

13   are you the author or creator of this method?

14        A    No.

15        Q    Where did this method come from?

16        A    There's a man named Richard Posner

17   who's a federal court judge out of Chicago - -

18        Q    Mm-hum.

19        A    - - and he is the first person to

20   ever recommend this type of model.  He did

21   that in a federal court appellate decision

22   called O'Shea versus Riverway Towing.  He did

23   that back in '82 or '83.

24              Up until two or three years ago, I

25   would have answered that question by saying to

1    you that the author of this method are two

2    people who are economists named Brookshire and

3    Cobb.

4              They published an article in a

5    publication you might be familiar with.  It's

6    called For the Defense and they published this

7    article in For the Defense because they were

8    pointing out the inadequacies of the

9    Department of Labor worklife expectancies

10   because they ignored the issue of unemployment.

11             Their worklife expectancies were

12   derived by examining participation rates

13   without consideration for unemployment.  And

14   so their point was that the Department of

15   Labor publication overstated the worklife

16   expectancy.

17             Therefore, it was published in

18   For the Defense.

19        Q    And so your - - if I understand

20   your calculation, even had he not been

21   injured, at the age he was at when he was

22   injured, Mr. Pouliot would have had a worklife

23   expectancy of another 27.7 years.

24        A    Right.

25        Q    Are the data that you've described

1    earlier in your testimony that you rely on in

2    formulating your opinion of unemployability -

3    - are those all described in the Vocational

4    Economic Rationale information that we see

5    attached to your report?

6            A       No.

7            Q       Are there other data that you've

8    utilized in this case that aren't identified

9    in this rationale?

10           A       I don't think so, not in the

11   rationale.  I've certainly identified today,

12   you know, data that's specific to persons with

13   a severe work disability which cause me to

14   conclude that this person is unemployable.

15           Q       You talked about a March

16   Supplement to the CPS.

17           A       Yes.

18           Q       The Census Bureau information,

19   Decennial Census.  Those are all data that you

20   relied upon in this particular case.

21           A       I considered, yes.  They're all

22   saying basically the same thing, I might add.

23           Q       Was any study or research

24   undertaken by your company to determine the

25   specificity of the labor market in either of

1    the states where Shawn Pouliot - - either

2    where he's currently living or where he

3    expressed an intention to live?

4           A       I don't know.  Probably not, but

5    I'm not sure.  We may have done an analysis of

6    - - if we did an analysis of the labor market

7    access, it would have been accurate.

8           Q       Right.

9           A       And I can tell you that, with his

10   restrictions, that that percentage - - given

11   his education and his work history, the

12   percent of jobs that he would have the

13   theoretical capacity to perform would be less

14   than one percent.

15          Q       But, as you sit here today, are

16   you aware if Vocational Economics did any

17   research into the labor market access in

18   Akron, Ohio?

19          A       Not specifically for this case,

20   no.

21                  MS. O'DONNELL:  Okay.  I'm all

22          set.  Thank you.

23                  MR. GRADY:  Nothing further.

24                  MR. OSWALD:  I just wanted to

25          join in -- just so that it was clear.

1        Although I've concluded my questioning

2        for you today, I do want the

3        opportunity obviously to review these

4        documents.

5            To that extent, I personally am

6        not closing my portion of the

7        examination.

8            MR. GRADY:  Right.  I'm not

9        closing my portion of the examination

10       either.

11           MS. O'DONNELL:  I join.  And just

12       while we're on the record, Attorney

13       Denison did hand me a document that I

14       think had been previously missing from

15       our package and it's identified one of

16       nine, Jim, where you had been talking

17       about two of nine.

18           We hadn't had that before.  So

19       this is being added - -

20           MR. GRADY:  Do we want to add

21       into the record as missing from the

22       record that was produced?

23           MR. OSWALD:  I think that the

24       answer is that - -

25           MR. DENISON:  It was in my

1       package.
2               MR. OSWALD:  -- - one of nine,
3       the page that Attorney O'Donnell is
4       referring to should be added, if
5       everyone agrees and, Doctor, if you
6       agree, to Exhibit Three as the page
7       immediately preceding page two of nine.
8               And you've got this marked.
9               MS. REPORTER:  We're going to
10      mark that 26.
11              MR. OSWALD:  Okay, great.
12              MS. REPORTER:  Mm-hum.
13              MR. DENISON:  One last.
14              MS. REPORTER:  Okay.
15              MR. OSWALD:  Tom, I'm going to
16      let you deal with your - -
17              MR. GRADY:  Yeah, thanks.
18              MS. REPORTER:  Go ahead.
19              MR. DENISON:  Dr. Gamboa is going
20      to reserve the right to read and sign.
21                      - 0 -

C-E-R-T-I-F-I-C-A-T-I-O-N


COMMONWEALTH OF KENTUCKY,

COUNTY OF JEFFERSON, To-wit;


      I, Andrea B. Grant, Court Reporter and Notary Public in and for the Commonwealth of Kentucky, do hereby certify;

      That on the 12th day of October, 2004, there appeared before me pursuant to notice and agreement of counsel, **ANTHONY GAMBOA, JR., Ph.D.,** as a witness in the previously entitled cause;

      That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

      That the deposition was taken by me via Stenomask and electronic recording and the foregoing transcript contains a true, full and correct transcription of all the testimony of said witness;

      That there was no request for signature by either the witness or counsel present;

      That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

      IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of October, 2004.

Andrea B. Grant
Notary Public, State at Large

My Commission Expires:
October 4, 2005