UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT
    Plaintiff,

VS.                          CIVIL ACTION
                             NO.3:02 CV 1302(DJS)

PAUL ARPIN VAN LINES, INC.;
ARPIN LOGISTICS, INC.;
THE FESTO CORPORATION; MICHAEL
D. KOVAC, d/b/a TRANS-EXPO
INTERNATIONAL, ERICA RAMIREZ,
IN HER CAPACITY AS EMPLOYEE
OF TRANS-EXPO INTERNATIONAL,
    Defendants.

        DEPOSITION OF WILLIAM TWEEDY, taken on behalf of the Defendants (Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc.) pursuant to Rule 30 of the Federal Rules of Civil Procedure, on October 5, 2004, at the offices of Adams & Haydon, 1050 Main Street, Suite 22, East Greenwich, Rhode Island, before Frances D. Young, Notary Public, convening at 9:45 a.m.

                FRANCES D. YOUNG
                Court Stenographer

**CONDENSED TRANSCRIPT**


EXHIBIT A

Page 61

1  A. No.
2  Q. Did he provide you any --
3  A. He did want me to say something about the truck
4     that he used.
5  Q. What --
6  A. The truck was junk. I mean, I remember that. I
7     mean, the truck came up from West Virginia because
8     they couldn't use it down there. The truck wasn't
9     even supposed to be used.
10 Q. But you had observed the operation of the rear
11    lift after the accident with Mark Pouliot, right?
12 A. Yes.
13 Q. And you wrote this statement after you conducted
14    that inspection with Mark Pouliot, right?
15 A. Yes.
16 Q. And the only thing that you could find wrong with
17    the liftgate after that inspection was that you
18    felt that the liftgate was too small for the unit,
19    right?
20 A. Correct. It did tilt to the rear and it was too
21    small.
22 Q. Well, you don't say in here that it tilted to the
23    rear, right?
24 A. No, I don't say it on here, no, but it is shown on

Page 62

1     the video that Mark Pouliot shot.
2  Q. Now, did you provide that statement directly to
3     Shawn Pouliot?
4  A. I didn't. I mailed it to his home.
5  Q. Now, how do you know that Shawn spent the night of
6     October 22 at Arpin's Secaucus terminal?
7  A. I found out the following morning when I spoke to
8     him.
9  Q. He told you?
10 A. Yes.
11 Q. Did he tell you at that time he was with his
12    brother Mark?
13 A. He may have. I asked what the heck he was doing
14    down there, and why was he in Secaucus when he was
15    supposed to be over on Long Island.
16 Q. And what was his answer to that?
17 A. He didn't really have one. As a mater of
18    fact -- wait a minute. He wanted to -- he still
19    had a delivery on his truck.
20 Q. So he didn't make a delivery?
21 A. He didn't make one of the deliveries, and he
22    wanted to set it off at Arpin Secaucus, and I made
23    him deliver it the following morning.
24 Q. So he didn't make two of the three deliveries?

Page 63

1  A. Correct.
2  Q. Is it fair to say that if he had made that
3     delivery, that other delivery on that morning on
4     Long Island before he did the Festo job -- I'm
5     talking about the morning of the 23rd -- at the
6     time he got to Naugatuck the truck would have been
7     empty except for the Festo load?
8  A. Yes.
9  Q. So is it fair to say that if a photograph showed
10    other cargo in the back of the truck, that he
11    didn't make the delivery as instructed that
12    morning, as well?
13 A. That would be the case, yes.
14 Q. Okay.
15 A. Unless he picked something up in Secaucus, New
16    York to bring back to Rhode Island.
17 Q. Well, there would be some kind of paperwork
18    involved in that, wouldn't there?
19 A. Yes and no.
20 Q. Yes and no?
21 A. Yes, that we used to transfer stuff from Secaucus
22    up to Rhode Island all the time, and it wouldn't
23    be bill of ladings, it would just be, you know,
24    transfers in-house.

Page 64

1  Q. But you would know about it, right?
2  A. I should know about it, yes, unless Tony Dolan
3     down there sent something up to Mike that I wasn't
4     aware of.
5  Q. Now, your statement indicates that he was -- you
6     told him to dispatch on October 22, 2001?
7  A. Correct.
8  Q. After having reviewed the documents that already
9     appear in the exhibits would you agree that that's
10    a mistake on the date?
11 A. Yes.
12 Q. Is it fair to say that the written manifest that
13    appears on Exhibit A is actually the dispatch?
14 A. This is the day that I wrote it out, the day that
15    everything was signed for by me --
16 Q. That's the 21st?
17 A. -- to send out to Shawn. So the 21st was the day
18    he was supposed to leave.
19 Q. Okay.
20 A. And this was the actual date that he was supposed
21    to make his deliveries.
22 Q. The 22nd?
23 A. Yes.
24 Q. Did you ever see this rear lift before the

19 (Pages 61 to 64)

Frances D. Young, RMR
(401) 831-8033

Page 65

1  accident occurred?
2  A. Yes.
3  Q. Where did you see it?
4  A. It was in the yard at Arpin Logistics.
5  Q. How long was it in the yard?
6  A. About a week or two.
7  Q. Did you ever inspect it?
8  A. No.
9  Q. Did you ever operate it before the accident?
10 A. No. I did have many complaints about it, though.
11    The West Virginia terminal, they couldn't use it
12    down there. They weren't happy with it, so they
13    sent it up to our place in East Greenwich.
14 Q. What were the complaints?
15 A. The truck didn't run good, the liftgate wasn't any
16    good. Just --
17 Q. Who told you that?
18 A. What's his name? Bill -- I can't remember his
19    last name now. He ran Arpin in West Virginia.
20 Q. King?
21 A. No. Can't remember his last name now.
22 Q. Was he the -- the head of the --
23 A. Of West Virginia.
24 Q. -- the operation in West Virginia?

Page 66

1  A. Yes.
2  Q. But you do agree that at the time of the filming
3     of the liftgate with Mark Pouliot there was no
4     malfunction of the liftgate at that time?
5        MS. O'DONNELL: Objection.
6        MR. OSWALD: Objection.
7  A. Define malfunction. I mean, it was tilted back
8     and it was --
9  Q. Well, assume that the engineering is such that
10    it's supposed to tilt back.
11 A. No, it's not.
12 Q. That's the way it's made.
13 A. No, it's not.
14 Q. Well, assume that it is.
15 A. Okay, but it's not. I can't assume that. All
16    liftgates are made to be level and flat.
17       MR. DENISON: I'm going to object to that.
18    He's not an expert --
19       MS. O'DONNELL: Right.
20       MR. DENISON: -- and you're asking him to
21    assume a hypothetical.
22 Q. Other than the tilting to the rear and other than
23    the size of the liftgate being too small for the
24    unit, there was nothing else that you found wrong?

Page 67

1  A. No.
2  Q. Now, with respect to the size, you never did see
3     the size of the unit that was being transported on
4     the liftgate, did you?
5  A. No, I did not.
6  Q. So you really had no basis within which to say
7     that the liftgate was too small?
8        MR. OSWALD: Objection.
9  A. If it was two pieces as a registered order
10    accounted for, two piece at 100 cubic feet, that's
11    what I was basing my opinion on.
12 Q. And that was enough -- the liftgate was big enough
13    to handle that kind of a load?
14 A. It could have handled that load had he used it for
15    individual pieces. If you put both pieces on
16    there together and did not strap them down, no, it
17    was too small.
18 Q. Do you know actually what he did?
19 A. I know he put a piece on the thing and the machine
20    fell over on him. That's all I heard from the
21    people at the destination.
22 Q. Now, while this was happening with the camera with
23    Mark Pouliot, you were holding the camera, is that
24    right?

Page 68

1  A. Sometimes, yes.
2  Q. And Mark Pouliot was operating the lift while you
3     were holding the camera?
4  A. Yes.
5  Q. And this took place where?
6  A. Arpin Logistics.
7  Q. Is that the East Greenwich terminal?
8  A. Yes.
9  Q. And were you at that time employed by Arpin?
10 A. Yes.
11 Q. And do you know where Mark Pouliot got the camera?
12 A. The camera was his.
13 Q. It was his?
14 A. That's what he told me.
15 Q. Did he tell you when he bought it?
16 A. No.
17 Q. Would you agree with me that he was there filming
18    the rear lift within three to five days after the
19    accident happened?
20 A. Yes.
21 Q. And how did that take place?
22       MS. O'DONNELL: You mean how was it
23    arranged?
24       MR. GRADY: Let me rephrase the question.

20 (Pages 65 to 68)

Frances D. Young, RMR
(401) 831-8033