UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SHAWN POULIOT                                        :
                                                     :          CIVIL ACTION NO.
                        Plaintiff                    :          3:02 CV 1302 (JCH)
                                                     :
v.                                                   :          JUDGE JANET C. HALL
                                                     :
PAUL ARPIN VAN LINES, INC. et al.                    :
                                                     :
                        Defendants                   :          February 8, 2006

## MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL

Pursuant to Rule 59 of the Federal Rules of Civil Procedure and Local Rule 7(a), the

defendants Paul Arpin Van Lines, Inc. and Arpin Logistics, Inc., hereby move for a new trial on

the following grounds:  (1)  the Court improperly refused to bifurcate the trial; (2) the Court

improperly refused to give a curative instruction on the inapplicability of the Federal Motor

Carrier Safety Act (FMCSA) Regulations to the issues in the case; (3) the Court improperly

refused to give a curative instruction following the "Golden Rule" argument made during

summation by plaintiff's counsel; (4) the Court improperly admitted a shocking portion of Dr.

Cremer's video deposition; (5) there was insufficient evidence to support the jury's verdict as to

apportionment of liability; and (6) the jury's verdict is excessive.

The general standard governing a motion for new trial under Rule 59 is well-settled.  "As

a general matter, [a] motion for a new trial should be granted when, in the opinion of the district

court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of

justice. . . .  A new trial may be granted, therefore, when the jury's verdict is against the weight

of the evidence."  *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2nd Cir.

1998) (internal citations omitted).  Moreover,

[t]he standards governing a district court's consideration of a Rule 59 motion for a

> new trial on the grounds that the verdict was against the weight of the evidence
> differs [sic] in two significant ways from the standards governing a Rule 50
> motion for judgment as a matter of law.  Unlike judgment as a matter of law, a
> new trial may be granted even if there is substantial evidence supporting the jury's
> verdict.  Moreover, a trial judge is free to weigh the evidence himself, and need
> not view it in the light most favorable to the verdict winner.

*Id.* at 133-34 (citing *Song v. Ives Labs, Inc.*, 957 F.2d 1041, 1047 (2nd Cir. 1992)); see *Manley v. Ambase Corp.*, 337 F.3d 237, 244 (2nd Cir. 2003) (Rule 59(a) "has a less stringent standard than Rule 50 in two significant respects").

In this case, the six aforementioned issues compel the conclusion that the jury has reached a seriously erroneous result.  A new trial therefore is warranted.

## I.    Bifurcation

This Court should reverse its pretrial ruling denying the defendants' motion to bifurcate the trial.  A review of the graphic and emotional damages evidence presented to the jury makes it clear that a bifurcated trial was necessary to permit a fair and impartial consideration of the liability issues in the case.  For that reason, this Court should set aside the jury's verdict and order a new, bifurcated trial.

Rule 42(b) of the Federal Rules of Civil Procedure governs bifurcation.  Rule 42(b) provides:

> The court, in furtherance of convenience or to avoid prejudice, or when separate
> trials will be conducive to expedition and economy, may order a separate trial of
> any claim, . . . or of any separate issue or of any number of claims . . . or issues,
> always preserving inviolate the right of trial by jury as declared by the Seventh
> Amendment to the Constitution or as given by a statute of the United States.

Bifurcation is "appropriate where, for example, the litigation of the first issue might eliminate the need to litigate the second issue . . . or where one party will be prejudiced by evidence presented against another party . . . ."  *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2nd Cir. 1999).

Moreover, "[b]ifurcation of proceedings into separate trials concerning liability and damages is appropriate when 'the evidence pertinent to the two issues is wholly unrelated' and the evidence relevant to the damages issue could have a prejudicial impact upon the jury's liability determination." *Helminski v. Ayerst Laboratories*, 766 F.2d 208, 212 (6th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985). In *Helminski*, the Sixth Circuit affirmed the District Court's decision to bifurcate a products liability case involving *in utero* injuries to the plaintiff <u>midway</u> through the plaintiff's case-in-chief because of the prejudicial impact of the next witness the plaintiff planned to call. *Id.* at 212-13; see *Lagudi v. Long Island R.R. Co.*, 775 F.Supp. 73, 74-76 (E.D.N.Y. 1991) (ordering bifurcation of §1983 action against L.I.R.R. police officers because "evidence about the plaintiff's alleged injuries may well serve only to confuse the jury as to the separate questions of liability and of damages"). As District Judge Carter noted in ordering bifurcation in *Buscemi v. Pepsico, Inc.*, 736 F.Supp. 1267 (S.D.N.Y. 1990), "evidence of harm to a plaintiff, regardless of the cause, may result in sympathetic jurors more concerned with compensating [a] plaintiff for his injury than whether or not [the] defendant is at fault." *Id.* at 1272. It is noteworthy that *Buscemi* was a bifurcated age discrimination trial because "the proposition that evidence on the question of damages may well have a prejudicial effect on the jury . . . *is all the more applicable to a personal injury action . . .*." *Lagudi*, 775 F.Supp. at 75 (emphasis added).

*Helminski* and *Lagudi* are far from the only cases in which the graphic or severe nature of a plaintiff's injuries was sufficient grounds to bifurcate a trial. See *Hines v. Joy Manufacturing Co.*, 850 F.2d 1146, 1148 & 1152-53 (6th Cir. 1988) (District Court properly bifurcated trial where miner had "serious and permanent injuries to his hips and legs"); *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 538 & 542-43 (8th Cir. 1977) (District Court properly bifurcated trial

where plaintiff was "severely injured . . . while using a water slide"); *Crummett v. Corbin*, 475 F.2d 816, 817 (6th Cir. 1973) (bifurcation proper to permit jury to separately consider liability and damages); *Beauchamp v. Russell*, 547 F.Supp. 1191, 1199-1200 (N.D. Ga. 1982) (ordering bifurcation where plaintiff was "severely and permanently injured" and liability was a "complicated issue"); *McKellar v. Clark Equip. Co.*, 101 F.R.D. 93, 94-95 (D. Me. 1984) (ordering bifurcation because evidence of plaintiff's severe injuries and lengthy treatment "holds a definite potential to adversely and improperly affect a jury's fair, impartial and objective consideration of the liability issues"); *Kushner v. Hendon Construction, Inc.*, 81 F.R.D. 93, 99 (M.D. Pa. 1979) (bifurcation appropriate because "the jury was able to consider the question of liability without knowing how extensively [the plaintiff] was injured").

The *McKellar* decision is especially noteworthy because of its factual similarity to the case at bar. As in the present case, the plaintiff in *McKellar* – a quadriplegic – had very severe injuries, a lengthy course of treatment, and severe economic and non-economic damages. *McKellar*, 101 F.R.D. at 94. Also as in the present case, *McKellar* involved hotly-contested issues of liability including the plaintiff's own contributory negligence and the proper apportionment of fault between the parties. *Id.* Given these facts, the District Court concluded that "[s]eparation of the liability and damages issues for purposes of trial is . . . the best means by which to obviate the likelihood of such unfair prejudice to either of the Defendants in this case." *Id.* at 95.

In this case, as in many of the above cases, the jury was inundated with graphic and emotional damages evidence. For example, the jury saw the portion of Dr. Cremer's video deposition in which he performed a live examination of the plaintiff, including close-up footage of his colostomy opening, urine storage bag, deep skin ulcer and desiccated leg muscles. The

jurors also heard both Dr. Cremer and Dr. Mushaweh testify in great detail as to the severe and irreversible nature of the plaintiff's condition and attendant harms of that condition – e.g., his loss of sexual function; his depression; his loss of all bowel and bladder control; the severe, burning nerve pain in his legs and the soles of his feet; and his greatly increased susceptibility to other injuries in the future, such as spiral leg fractures.

In addition to this graphic medical evidence, the jury heard the emotional testimony of Mark Pouliot, the plaintiff's brother.  Mark Pouliot described, in vivid detail, his brother's excellent pre-accident health and active pre-accident lifestyle, and then contrasted that description with the oft-horrifying details of the plaintiff's post-accident recovery period. Among other details that likely had a powerful emotional effect on the jury, Mark Pouliot testified about:

- the fact that the plaintiff's wife left him six months after the accident;

- the fact that the plaintiff contemplated suicide;

- the constant care that he and the plaintiff's mother have provided for the plaintiff since the accident; and

- the debilitating effects of the plaintiff's injuries and the medications that he takes to control his constant pain.

Finally, Mark Pouliot described a night after the plaintiff had returned to Ohio during which the plaintiff lost control of his bowels and/or bladder while still in bed and fell to the ground while attempting to get out of bed to clean the mess he had made.  He described for the jury finding the plaintiff lying on the floor crying, and hearing the plaintiff say that he did not want to go on living that way.[1]

---

[1] In its decision denying the defendants' motion to bifurcate, this Court stated that "[a]s I said, I will do my best to be certain that the jury makes its decision on a proper basis but the fact of the matter is they are going to see [the

Nor was Mark Pouliot the only witness to paint such a haunting picture of the plaintiff's post-accident life. The jury heard briefly from the plaintiff's mother who, like Mark Pouliot, testified about the enormous and heart-wrenching changes to the plaintiff's life that the accident had caused. In addition, during her testimony, the plaintiff's three young children were brought into the courtroom and paraded before the jury, ostensibly also as evidence on damages – but the sheer emotional impact of their presence cannot easily be discounted.

Although most of this evidence – with the notable exception of a portion of the Cremer video deposition – certainly was appropriate for the jury to consider when assessing damages, its graphic nature and powerful emotional impact likely prevented any fair consideration by the jury of the substantial liability issues in this case. This is especially so given that one of the defendants' principal claims was the plaintiff's own negligence. It is simply unrealistic to expect even the most well-intentioned jury to fairly and rationally consider the liability of a plaintiff about whom the jury has heard so much graphic damages testimony. Indeed, the jury's failure to apportion any liability, as well as the size of the jury's verdict, both buttress the conclusion that the failure to bifurcate the trial greatly hindered the jury's ability to consider liability.

Nor would bifurcation have been a hindrance to the expeditious presentation of evidence. Promotion of judicial efficiency is a relevant factor to consider in ruling on a motion for bifurcation. *Amato*, 170 F.3d at 316; *Witherbee v. Honeywell, Inc.*, 151 F.R.D. 27, 29-31 (N.D.N.Y. 1993). In the present case, almost every witness presented by both parties testified exclusively as to liability or damages. The only two exceptions were Dr. Mushaweh, who, while primarily a damages witness, also opined that the cause of the plaintiff's spinal injury was, in part, the Learnline Unit falling on him, and the plaintiff himself. Every other witness either was

---

plaintiff]." (Tr. 9/15/05, 20). There is a world of difference, however, between merely seeing the plaintiff sitting in the courtroom and hearing the aforementioned graphic and shocking testimony as to the details of his injuries.

exclusively a damages witness or a liability witness.  In consequence, there would have been almost no need to recall liability witnesses for the damages portion of the trial.  Thus, there would have been "little sacrifice to efficiency, convenience or judicial economy" in the bifurcation of this case.  *Id.* at 29-30 (*citing Buscemi*, 736 F. Supp. at 1272).  Finally, as the Sixth Circuit noted in affirming the bifurcation of a claim by a miner severely injured in an underground accident, "a paramount consideration at all times in the administration of justice is a fair an impartial trial *to all litigants*.  Considerations of economy of time, money and convenience of witnesses must yield thereto."  *Hines*, 850 F.2d at 1152 (emphasis added).

At the end of the day, the graphic and emotional damages evidence presented to the jury, along with the fact that the plaintiff's contributory negligence was a crucial liability issue, mandated a bifurcated trial.  Given that bifurcation would not have been inefficient, this Court should reverse its prior ruling and order a new, bifurcated trial.

## II.  Lack of A Curative Instruction on the FMCSA Regulations

This Court also should order a new trial because of its failure to give the curative instruction requested by the defendants regarding the inapplicability of the FMCSA Regulations.[2]  Following this Court's ruling that, as a matter of law, the Regulations had no relevance to the issues in the case, such a curative instruction was necessary because of the significant amount of testimony by the plaintiff's liability expert, and argument by plaintiff's

---

[2] The defendants submitted the following request (attached hereto as Exhibit "A") electronically to the Court and to plaintiff's counsel on January 16, 2006, prior to the close of the plaintiff's case-in-chief:

**Curative Jury Instruction:  FMCSA**

You have heard argument by counsel and testimony by some witnesses regarding certain Federal Motor Carrier  Safety Act regulations, and the application of those regulations to the conduct of the parties.  I instruct you now as [a] matter of law that those regulations have no bearing or relevance to your consideration of the parties' conduct.  You should therefore not consider those regulations in any manner in your deliberations.

counsel, about the duties supposedly created by the Regulations.[3]

Although a District Court has considerable latitude in deciding what language to use in conveying the applicable law to the jury and need not give every requested charge; see *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp.*, 849 F.2d 1336, 1349 (11th Cir.1987); instructions are improper if, on the whole, they give the jury a misleading or inadequate impression of the law. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.* 30 F.3d 339, 346 (2nd Cir. 1994). As such, a District Court has an independent obligation to correctly charge the jury on the determinative issues in the case. Thus, even in cases where there has been no request for an instruction or the request is defective, the court "must instruct the jury properly on the controlling issues in the case." *Management Systems Assoc. Inc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1177 (4th Cir. 1984); see *Bosse v. Litton Unit Handling Systems, Division of Litton Systems, Inc.*, 646 F.2d 689, 693 (1st Cir. 1981) ("[e]ven without requests the court has a duty to correctly and adequately charge the jury on the controlling issues in the case"). Therefore, although a court has substantial discretion and need not adhere to the precise words requested, "when a proposed instruction addresses an issue that is crucial to a fair presentation of the case to the jury, the trial court *has the obligation* to give an appropriate instruction on that issue . . . ." *Walker v. AT&T Technologies*, 995 F.2d 846, 849 (8th Cir. 1993) (emphasis added).

While the defendants have found no Second Circuit cases that deal directly with the failure to give a curative instruction in this situation, the Fifth Circuit addressed a very similar scenario in *Bode v. Pan American World Airways, Inc.*, 786 F.2d 669 (5th Cir. 1986). In *Bode*, the plaintiffs presented evidence of emotional distress resulting from their concern for the safety

---

[3] In diversity cases, federal law controls the procedural decision whether or not to give a requested instruction, but state law controls the substance of the instruction itself. *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1293 (4th Cir. 1995); *Kelliher v. General Transp. Services, Inc.*, 29 F.3d 750, 753-54 (1st Cir. 1994).

of friends and family when an airliner crashed into their Louisiana neighborhood. *Id.* at 672-73 However, Louisiana law forbade the recovery of damages for mental anguish resulting from concern for harm to other persons or their property. *Id.* at 672. Nevertheless, the District Court refused the defendants' request to charge the jury on that aspect of Louisiana law. *Id.* On appeal, the Fifth Circuit reversed because the jury "received no guidance that mental anguish occasioned by [concern for harm to others] is not compensable under Louisiana law. This failure mandates a reversal for retrial on this element of damages before a jury properly advised of the controlling rubrics." *Id.* at 672-73; see also *Kovacich v. Benjamin*, 951 F.2d 114, 116-17 (7th Cir. 1991) (District Court's refusal to charge on applicable provision of Indiana law crucial to defense reversible error).

In this case, there was significant testimony and argument about the defendants' alleged duties under the FMCSA Regulations prior to the Court's ruling that the Regulations were inapplicable as a matter of law. During his case-in-chief, the plaintiff presented the testimony of his liability expert, Dr. Roland Ruhl. During that testimony, plaintiff's counsel asked Dr. Ruhl about the basis for a duty on the part of Arpin to protect its drivers. Specifically, counsel asked:

> Q:    Based on your background and experience, Dr. Ruhl, does a trucking
>       company have a responsibility to provide safe equipment to its drivers?
>
> A:    Absolutely

(Tr. 1/11/06, Mottla & Ruhl Excerpt, 70). Counsel attempted to tie this obligation to Dr. Ruhl's personal knowledge and expertise, but Dr. Ruhl instead referred <u>exclusively</u> to the FMCSA:

> Q:    That's a requirement based on your knowledge and expertise?
>
> A:    *That comes under section 393 and 396 of the Federal Safety Regulations,*
>       *396*, basically whatever requires the motor carrier, that's the person that has the
>       number on the door. Motor carrier has to have a systemic program [of]
>       inspection, repair, and maintenance. . . .

(Tr. 1/11/06, Mottla & Ruhl Excerpt, 70-71) (emphasis added).  Continuing his answer, Dr. Ruhl

emphasized the particular importance of the words "inspection, repair and maintenance" from

the FMCSA as the source of this duty:

> . . .     All three of those words they are interrelated but they each have a
> sustained focus.  Maintenance is doing things in an orderly fashion and repair is
> promptly repairing something that you find poses a safety hazard.
>
> Q:     Now, Dr. Ruhl, does that mean that Arpin Logistics is a licensed motor
> carrier based on the research that you did?
>
> A:     Yes.
>
> Q:     They are subject to the federal regulations?
>
> A:     Mr. Pouliot was driving under their authority as a motor carrier.

(Tr. 1/11/06, Mottla & Ruhl Excerpt, 71).  This was the <u>only</u> testimony Dr. Ruhl offered

specifically on the existence of a duty.  He never testified to a different basis for a duty based on

his "knowledge and expertise."  In fact, the other witnesses who testified to a duty on the part of

Arpin simply confirmed the obligation to systematically "inspect, repair and maintain."

Furthermore, plaintiff's counsel repeatedly reinforced for the jury the importance of the

words of the FMCSA.  In his opening statement, counsel told the jury:  "In all cases you will

learn that *the law requires* that the trucking company *systematically prepare [repair], maintain*

*and inspect all of its equipment* and give its drivers safe equipment."  (Tr. 1/11/06, Plaintiff's

Opening Excerpt, 4) (emphasis added).   During his closing, counsel returned to this theme,

telling the jury, even after this Court's ruling, that, "[e]verybody that's testified in the case

including the last witness said that the motor carrier has an obligation to *systematically inspect,*

*repair and maintain their equipment* . . ."  (Tr. 1/18/06, Trial Summations, 3) (emphasis added).

He also told them that, "[w]hat we're asking Arpin is simply [that] they *systematically inspect,*

*maintain and repair* this liftgate or give him another truck with a properly maintained liftgate.  If

they had done that in this case, all the evidence you have seen shows there's no way this load

comes off the back end."  (Tr. 1/18/06, Trial Summations, 4) (emphasis added).  Finally,

specifically addressing the court's charge to the jury, plaintiff's counsel explained the charge on

negligence and duty:  "First of all, Arpin had to have a duty.  Did they have a duty to

*systematically inspect, repair and maintain*?  You have heard they definitely have a duty to do

that."  (Tr. 1/18/06, Trial Summations, 14) (emphasis added).

Thus, not only did the plaintiff's own liability expert expressly testify that the FMCSA

was <u>the</u> source of the defendants' alleged duty to "systematically inspect, repair and maintain,"

plaintiff's counsel made those supposed obligations – as a foundation for the defendants' alleged

duty – a running theme in his argument to the jury.   However, in its ruling on January 18th, the

Court held that, as a matter of law, the FMCSA Regulations did not apply to the conduct of

either party.  As a result, all of the aforementioned testimony and argument were completely

irrelevant to the jury's consideration of the plaintiff's claims of negligence.

Given the substantial possibility that the jury could base its consideration of negligence

on regulations that it had repeatedly heard applied to the defendants' conduct, but which did not

actually apply as a matter of law, the defendants requested a curative instruction from the court.

Specifically, the defendants requested that the court instruct the jury as follows:

> You have heard argument by counsel and testimony by some witnesses regarding
> certain Federal Motor Carrier Safety Act regulations, and the application of those
> regulations to the conduct of the parties.  I instruct you now as matter of law that
> those regulations have no bearing or relevance to your consideration of the
> parties' conduct.  You should therefore not consider those regulations in any
> manner in your deliberations.

(Exhibit "A").  This was an absolutely correct statement of the law in this case, but the Court

refused to give the requested charge.

Moreover, it is likely that, having heard testimony and argument that the FMCSA created

a duty, the jury assumed that the Court's total silence on that point constituted implicit

recognition by the Court that the testimony and argument were accurate statements of the law.

In a similar context, involving the submission into evidence of a crucial exhibit without any

explanatory instructions by the court, the Fourth Circuit explained that:

> Instructions such as those in this case, which make no comment – in fact, do not
> even identify – the crucial issues in the claim *heighten the risk of confusing the
> jury*, given a jury's normal impulse to suppose that the very submission of such an
> exhibit without comment on the evidence or the assumption of law [on] which it
> is based *must imply some judicial assessment of probable merit*.

*Management Systems*, 762 F.2d at 1177 (emphasis added).

     Here, the question of duty was a crucial and necessary element of the plaintiff's

negligence claim.  The jury heard Dr. Ruhl's clear and express testimony that the FMCSA

created a duty on the part of the defendants.  They also heard counsel's repeated invocation of

the words of the statute, as explained by Dr. Ruhl, that the defendants had a duty to

"systematically inspect, repair and maintain."  Dr. Ruhl offered no other source for such a duty,

and the other witnesses generally parroted the same "systematically inspect, maintain and repair"

mantra.  Therefore, while this Court ruled that, as a matter of law, the FMCSA Regulations do

not apply to this case – thereby absolutely eliminating them as the source of any duty – it refused

to so instruct the jury.   As a result, the jury went into the deliberating room believing that the

FMCSA was the appropriate law to apply in this case on the question of duty, even though it

should not have been allowed to do so.

     In sum, it is likely, even probable, that the jury based its finding of duty on the FMCSA

Regulations, and assumed that the Court's silence on the issue constituted judicial acquiescence

with Dr. Ruhl's testimony that the FMCSA created a duty.  The jury certainly had every reason

to believe that, if Dr. Ruhl's testimony (and plaintiff's counsel's repeated invocation of it) was

contrary to law, the Court would have told it so.  Like the jury in *Bode* however, the jury here was allowed to deliberate and return a verdict based upon a legal principle that, as a matter of law, could not be applied to the case.  As a result, the Court's failure to instruct the jury that the FMCSA did not apply to create a duty on the part of the defendants requires that the verdict be set aside and a new trial ordered.

### III.   Lack of A Curative Instruction on the Plaintiff's "Golden Rule" Argument

This Court erroneously refused to give a curative instruction following the plaintiff's Golden Rule argument during summation.  This forbidden form of encouragement to the jury to put itself in the plaintiff's position – and base its award of damages thereon – prejudiced the defendants' right to have a fair and reasoned consideration of damages.  The Court therefore should have granted the defendants' request for a curative instruction immediately after the Golden Rule argument, and now should order a new trial due to the lack of such an instruction.

"A golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes" for purposes of determining damages.  *Murray v. Taylor*, 65 Conn. App. 300, 321 (2001).  Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.  *Id.*  As the 5th Circuit Court of Appeals explained long ago, a juror putting himself or herself in the plaintiff's place "would be no fairer judge of the case than would plaintiff herself."  *F.W. Woolworth Co. v. Wilson*, 74 F.2d 439, 442 (5th Cir. 1934).  A Golden Rule argument thus asks the jury to do precisely what it is not supposed to do, namely, decide the case based on passion and sympathy, rather than reason, logic and the evidence presented at trial. See *Nastri v. Vermillion Brothers, Inc.*, 46 Conn. Supp. 285, 289 (1998); see also 70 A.L.R. 2d 935, *Prejudicial Effect of Counsel's Argument, in Civil Case, Urging Jurors to Place Themselves*

*in the Position of Litigant or to Allow Such Recovery as They Would Wish if in the Same*

*Position,* §§3[a], 3[b] (listing numerous cases finding reversible error in Golden Rule

arguments).  As a result, these arguments are "universally condemned."  *Lovett ex rel. Lovett v.*

*Union Pacific Railroad Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000); see also *DeJesus v. Flick*, 7

P.3d 459, 464 (Nev. 2000); *Walton v. City of Manchester*, 666 A.2d 978, 980 (N.H. 1995).

       For example, in *DeJesus*, the plaintiff's counsel asked the jury "how do you put a value

on not using your fingers?  I don't know. . . .  I wouldn't take ten million dollars if I had to do

this."  *DeJesus*, 7 P.3d at 464.  He also requested that the jury "tap in a little bit to [the

plaintiff's] feelings . . . ."  *Id.* at 463.  The Supreme Court of Nevada held that those remarks

both "violated well-established standards of professional conduct . . . and resulted in a jury

verdict that was the product of passion and prejudice."  *Id.* at 464; see also *Lovett*, 201 F.3d at

1082-83 (hypothetical in closing asking jurors to imagine themselves as defendants improper,

but cured by strong instruction by trial court).

       Courts generally have held Golden Rule arguments require reversal unless one of two

circumstances exists: (a) the argument is not really a Golden Rule argument because counsel has

not specifically asked the jury to put themselves in the shoes of the plaintiff for purposes of

awarding damages, or (b) counsel has made a true Golden Rule argument, but that argument

constituted harmless error because the opposing party failed to object or the pernicious effect of

the argument was remedied by the trial court's curative instructions.

       An example of the first circumstance is *Marcoux v. Farm Service and Supplies, Inc.*, 290

F.Supp.2d 457 (S.D.N.Y. 2003).[4]  There, in a case involving a serious automobile accident,

plaintiff's counsel repeatedly asked the jurors if they could "imagine" what the impact must have

been like for the plaintiff and what the pain of the plaintiff's injuries must have felt like.  The

_____

[4] This Court expressly relied on *Marcoux* in its ruling on the defendants' request for a curative instruction.

14

court held that these comments were not Golden Rule arguments, stating that "they invited the jury to focus on the gravity of the plaintiff's injuries, but did not tell the jurors directly or implicitly *that they should award plaintiff the sum of damages that they themselves would desire if they found themselves 'in the plaintiff's shoes'." Marcoux*, 290 F.Supp.2d at 465 (emphasis added).

The *Marcoux* court distinguished those statements from true Golden Rule arguments, like those in *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53 (7th Cir. 1959), where counsel asked the jury to "give us the kind of deal that you would want to get" and asked "what is the eye worth and what could you get anybody to give it to you for"? The *Klotz* court concluded that these statements were " a deliberate appeal to the jury to substitute sympathy for judgment," and that reversal was required in spite of defense counsel's failure to object. *Klotz*, 267 F.2d at 54-55. The *Marcoux* court also distinguished *Callaghan v. A Lague Express*, 298 F.2d 349 (2nd Cir. 1962), where counsel argued that the jury "should treat [plaintiff] as you would like to be treated." *Callaghan*, 298 F.2d at 350-51.

Here, plaintiff's counsel made a true Golden Rule argument, like those in *Klotz* and *Callaghan*, and unlike the argument in *Marcoux*. During his closing argument, counsel said the following to the jury:

> Let's imagine that Shawn Pouliot's disabilities were a job for one year. You had to live as Shawn Pouliot for one year with all the things we have discussed, 7 days a week, 365 days a year. Thankfully at the end you can leave. What would fair and just reasonable compensation for that period of time be, that one year? What would be reasonable? Would it be $500,000? That would be more than this [the amount requested by counsel]. It is times 47. It is a 47 year life expectancy. We know he may be dead for ten of it. That needs to be compensated. Death is worse than life. 47 year term. How about $400,000 for the year? That's more than this [the amount requested by counsel].

(Tr. 1/18/06, Trial Summations, 28). This is a clear and direct invitation to the jurors to put

themselves in the plaintiff's place and determine damages based on what <u>they</u> would charge to be him for a year.  If the jury heeded this request, it could not possibly have determined damages in a fair, reasoned and impartial manner because basing damages on the amount that the jurors would want if they were in the plaintiff's position is a sympathy-driven calculation.

Moreover, the context of this argument is significant:  It occurred in the middle of plaintiff's counsel offering his opinion to the jury as to the proper method for calculating damages.  After first suggesting that the jury compute its award of non-economic damages by trebling the amount of economic damages – based on the seriousness of the plaintiff's injuries – counsel then told the jury, "[i]f you are uncomfortable with that way of thinking, *how do we cross check to make sure it makes sense*."  (Tr. 1/18/06, Trial Summations, 28) (emphasis added).  The method suggested by counsel for this "cross check" was the aforementioned Golden Rule argument.  As such, it is clear that plaintiff's counsel not only asked the jury to walk a mile in the plaintiff's shoes, but also to calculate damages based on the journey.

In addition, the argument was not harmless.  An example of a circumstance where Golden Rule arguments have been excused as harmless is *Murray*, *supra*.  In *Murray*, counsel told the jury to "say to yourselves, if this happened to me, what do I think is a fair and just amount of money . . .?"  The Connecticut Appellate Court concluded that, although counsel "may have crossed the line into golden rule territory," the trial court did not abuse its discretion in refusing to set aside the verdict because opposing counsel did not make a timely objection <u>and</u> because the defendant suffered no injury as a result of the argument, in that the damage award did not seem excessive and the jury assessed 50% of the responsibility to the plaintiff.  *Murray*, 65 Conn. App. at 321-22.   Along similar lines, courts also point to the trial court's curative instructions as a basis for determining that a Golden Rule argument was harmless.  See *Nastri*,

46 Conn. Supp at 291.

Here, since <u>none</u> of the factors indicating harmlessness in *Murray* or *Nastri* are present, there is no basis to conclude that counsel's improper argument was harmless. Defense counsel immediately brought the argument to the Court's attention on the record and requested a curative instruction, which the Court refused to give. The jury then awarded the plaintiff in excess of $26 million, and apportioned none of the fault to him, in spite of substantial evidence that he was negligent. Because the Court did not instruct the jurors to do otherwise, it is entirely likely that both the size of the jury's award and its failure to apportion any liability to the plaintiff were the direct result of the jury's consideration of the case through the eyes of the plaintiff, rather than from the impartial perspective they should have had. This is a substantial harm to the defendants that can only be remedied by setting aside the verdict and ordering a new trial.

**IV.     Admission of Dr. Cremer's Video Deposition**

This Court also should reverse its ruling to admit the portion of Dr. Cremer's video deposition in which he conducts a live physical examination of the plaintiff because the probative value of that portion of the video was substantially outweighed by its prejudicial effect. Given the likely shocking impact of this evidence on the jury, a new trial is warranted.

Rule 403 of the Federal Rules of Evidence permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." FED. R. EVID. 403. As a general matter, the prejudice described by Rule 403 "involves some adverse effect beyond tending to prove a fact or issue that justifies admission." *Constantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174-75 (2nd Cir. 2000). In other words, evidence is unfairly prejudicial if it "has an undue tendency to suggest decision on an improper basis." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2nd Cir.

1997). As the 1972 Advisory Committee Notes to Rule 403 (cited by the Second Circuit in *Perry*) expressly note, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, *commonly, though not necessarily, an emotional one*." FED. R. EVID. 403, Advisory Committee Notes (1972) (emphasis added).

In this case, the challenged portion of Dr. Cremer's deposition presents precisely that danger; i.e., that it would encourage the jury to decide the case based on the jurors' visceral, emotional reaction to the footage in question. The videotape included, among other things, lingering close-ups of the plaintiff's colostomy opening, urine-filled catheter bag, deep skin ulcer and desiccated leg muscles. However, prior to this portion of the video, Dr. Cremer already had testified, in clear and comprehensive fashion, about these exact facts. The probative value of this evidence therefore was limited by its cumulative nature. See *United States v. Henderson*, 409 F.3d 1293, 1298 (11th Cir. 2005) (noting that because bias evidence already had been admitted, additional bias evidence would be less probative and cumulative).

Moreover, while this Court concluded, in its oral ruling denying the defendants' motion *in limine*, that "a picture is worth a thousand words," sometimes a picture can say too much. The shockingly graphic footage presented in Dr. Cremer's deposition – most notably the close-up of the plaintiff's colon poking out of his side and the deep and infected skin ulcer near the plaintiff's coccyx – likely had the improper emotional effect discussed in the Advisory Committee Notes to Rule 403. Even for the non-squeamish, the effect of these images was considerable, and its likely impact on the jury's impartial consideration of the issues in the case was substantial. As such, this Court should order a new trial.

## V.    Insufficient Evidence to Support Verdict on Apportionment

This Court also should order a new trial because the jury's verdict with respect to

apportionment of liability is against the great weight of the evidence. Specifically, the jury's failure to apportion any liability to the plaintiff should be set aside by the Court because there was clear and essentially uncontroverted evidence of the plaintiff's negligence.

As an initial matter, this Court should employ the federal standard for review of sufficiency claims under Rule 59. Although Connecticut law controls the substantive issue of apportionment; *Kreiser v. Hobbs*, 166 F.3d 736, 739 (5th Cir. 1999); the Second Circuit "has not resolved whether in a diversity action the sufficiency of the evidence is a question governed by state or federal law." *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2nd Cir. 1999). In the context of a Rule 50 motion, this is a distinction without a difference because the standard is the same. *Id.* at 429 n.9. However, the federal standard for sufficiency claims made under Rule 59 gives the Court greater latitude in evaluating the weight of evidence presented than does Connecticut law. See *DLC Management Corp.*, 163 F.3d at 133-34 ("[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict . . . [m]oreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner").

While there is a split among the other federal Circuits on this issue, the majority apply the federal standard. See *Ellis v. Weasler Eng., Inc.*, 258 F.3d 326, 336-37 (5th Cir. 2001); *To-Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 664 (7th Cir. 1998); *Charleston Area Medical Ctr., Inc. v. Blue Cross & Blue Shields Mut. of Ohio, Inc.*, 6 F.3d 243, 247 (4th Cir. 1993); *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3rd Cir. 1992); *Salter v. Westra*, 904 F.2d 1517, 1524 (11th Cir. 1990) (all holding federal standard applies to sufficiency challenges in diversity cases; but see *Morris v. Walmart Stores, Inc.*, 330 F.3d 854, 857 (6th Cir. 2003); *Gust v. Jones*, 162 F.3d 587, 593 (10th Cir. 1998); *Burke v. Deere & Co.*, 6 F.3d 497, 511

(8th Cir. 1993) (all applying sufficiency standard of forum state).  Given that this is an open

question in the Second Circuit, this Court should follow the majority rule and apply the federal

standard for sufficiency claims under Rule 59.

Although there are very few Second Circuit cases that discuss the application of this

standard to claims of comparative or contributory negligence, two decisions are noteworthy.  In

*Stoma v. Miller Marine Services*, 271 F.Supp.2d 429 (E.D.N.Y. 2003), District Judge Spatt

ordered a new trial because, in his "view, the jury's finding that Stoma was 90% contributorily

negligent constituted a clear and serious error warranting a new trial."  *Id.* at 431.  *Stoma* was a

Jones Act case in which a seaman was injured when he slipped while entering the passenger

cabin through a watertight hatch door on the aft deck.  *Id.* at 432.  In spite of credible testimony

that the plaintiff slipped because of his own failure to clean the rain and seawater off of the hatch

entryway; *id.* at 433; the District Court set aside the jury's finding on contributory negligence.

(Notably, the Court did so even though it found no reason to doubt the jury's finding that the

defendant was partially at fault.  *Id.*)

*Stoma* relies on *Akermanis v. Sea-Land Service, Inc.*, 688 F.2d 898 (2nd Cir. 1982), in

which the Second Circuit considered the propriety of the District Court's decision to order a new

trial on the ground that the jury's finding of 4% contributory negligence was serious error.

Although the Second Circuit reversed the District Court's decision on procedural grounds

(specifically, the use of a motion for remittitur as occasion to order a new trial), the Second

Circuit also held that "based on the evidence presented at trial, Judge Haight was acting within

his broad discretion in ruling that a finding of only four percent contributory negligence was

against the weight of the evidence and that a new trial should be granted."  *Id.* at 904.[5]

---

[5] Neither *Akermanis*, nor *Stoma*, lays down a clear rule as to the proper course of action when a court determines
that a jury's apportionment of fault is erroneous.  In *Akermanis*, the Second Circuit left it up to the discretion of the

Connecticut law – should this Court choose to apply it – like *Stoma* and *Akermanis* also permits a trial judge to set aside a jury's verdict based on the trial judge's determination as to contributory negligence. The clearest example of this is *Fox v. Town of Glastonbury*, 29 Conn. 204 (1860). In *Fox*, the jury returned a verdict for the estate of a plaintiff who drowned while attempting to drive her horse and buggy across a causeway on an inlet of the Connecticut River. *Id.* at 205-06. The basis for the verdict was the plaintiff's claim that the town had a legal duty to keep a railing along the causeway to prevent accidents of this type. *Id.* at 205. On appeal, the Supreme Court reversed the jury's verdict based on its conclusion that some fault should have been apportioned to the plaintiff because "no person of ordinary discretion in their circumstances, and exercising ordinary prudence and discretion, would have made such an attempt." *Id.* at 208. In the Supreme Court's view, no reasonable jury could have reconciled a plaintiff's verdict with the facts as to the plaintiff's own conduct. *Id.*; see also *Palomba v. Gray*, 208 Conn. 21 (1988); *Joanis v. Engstrom*, 135 Conn. 248 (1948); see also *McElroy v. Wilhite*, 903 So. 2d 627, 632-33 (La. App. 2005) (setting aside jury's verdict finding one driver 100 percent liable for accident based on evidentiary insufficiency and re-apportioning 80 percent of fault to other driver).

In this case, the chief mistake requiring correction by this Court in the jury's finding as to apportionment concerns the uncontroverted evidence of a dock at Naugatuck Valley Community College (NVCC).[6] The plaintiff himself testified that he "was instructed that there would be a

---

District Court whether to order a retrial on all liability issues, or only on the issue of apportionment. *Akermanis*, 688 F.2d at 907. In *Stoma*, the District Court gave the parties a choice – either a new trial on apportionment, or a court-made stipulation "reducing the plaintiff's contributory negligence apportionment to 50% . . . ." *Stoma*, 279 F.Supp.2d at 434-35.

[6] Indeed, the overall issue of the plaintiff's comparative fault, not merely the existence of the dock, was hotly contested at trial – e.g., with regard to the plaintiff's choice to step onto the liftgate behind the shifting Learnline Unit; his failure to strap the Unit to the truck before unloading it; his failure to lock the wheels on the Unit; and his failure to call for additional assistance when he realized the true weight of the Unit. It is likely that these facts

dock." (Tr. 1/13/06, Pouliot Except, 5). The plaintiff further testified that because this was a dock delivery, the use of straps and the weight of the Learnline Unit were irrelevant, and there was "no need" to test the condition of the liftgate when he left the defendants' facility in Rhode Island. (Tr. 1/13/06, Pouliot Except, 19, 20, 28). Indeed, Dr. Ruhl himself opined that "[i]f it is a dock loading, *it is a piece of cake*. The key is he was sent there. It is going to be a non dock load at the other end. That's not on the manifest. Dock load *this is a piece of cake*." (Tr. 1/11/06, Mottla & Ruhl Excerpt, 141).

In spite of the plaintiff's emphasis on the dock aspect of this delivery, the great weight of the evidence demonstrates that he simply ignored an available dock at NVCC. First, there was uncontroverted testimony from Daniel McCarthy, a long-time professor at NVCC of a suitable loading dock that had been used on numerous occasions to load and unload equipment.[7] McCarthy's testimony confirmed that of Officer James Blalock, who likewise described the existence and location of the suitable loading dock – in fact, Officer Blalock drew that dock onto Defendant's Exhibit 83 (the diagram/map of the NVCC grounds). There was also clear testimony – when examined in conjunction with Exhibit 83 – that the plaintiff's arrival route at NVCC took him directly by the dock mentioned by McCarthy, and that he saw the dock in question. All of the other events in this case flow from the plaintiff's improvident decision not to use the regular delivery dock at NVCC for this delivery. As such, the jury's apportionment verdict is against the great weight of the evidence and this Court should order a new trial.

**VI.    Excessiveness of the Verdict**

The $26,306,376 verdict for the plaintiff was excessive for several reasons:  (1) the jury

---

weighed heavily on the jury's mind as well, given that their two requested readbacks both involved testimony relevant to the plaintiff's negligence and that, based on the jury's note, the jurors spent over a day and a half deliberating about liability.

[7] A transcript of Mr. McCarthy's testimony is not yet available.

failed to discount the plaintiff's future economic damages to their present value; (2) the jury awarded economic damages in excess of the amount supported by the evidence; (3) the combination of these two miscalculations with respect to economic damages likely infected the jury's consideration of the proper measure of non-economic damages; (4) the amount of non-economic damages shocks the conscience (5) the verdict should be reduced by the amount of settlement payments received by the plaintiff; and (6) the verdict should be reduced by the amount of collateral source payments received by the plaintiff.  For these reasons, this Court should either order a new trial, or a substantial remittitur.[8]

Well established principles govern whether a verdict is excessive.  First, the Court must consider whether the evidence, when viewed most favorably to the non-moving party, reasonably supports the verdict.  *Mather v. Griffin Hospital*, 207 Conn. 125, 139 (1988).  "The trial court has the inherent power to set aside a jury verdict which, in the court's opinion, is either against the law or the evidence . . . .  Pursuant to this power, the trial court has the right and duty to set aside a verdict as being excessive or inadequate."  *Buckman v. People's Express, Inc.*, 205 Conn. 166, 174 (1987) (citations and internal quotations omitted).  Further,

> [t]he size of the verdict alone does not determine whether it is excessive.  The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption.

*Ham v. Greene*, 248 Conn. 508, 536, *cert. denied*, 528 U.S. 929 (1999).  "A direct showing of partiality, prejudice, mistake or corruption is not required."  *Malmberg v. Lopez*, 208 Conn. 675, 680 (1988).

---

[8] In a diversity case, the law of the forum state governs the nature and measure of damages.  See *Metz v. United Technologies Corp.*, 754 F.2d 63, 66-68 (2nd Cir. 1985) (applying Louisiana law to measure of damages in diversity case); *Liriano v. Hobart Corp.*, 960 F.Supp. 43, 44-46 (S.D.N.Y. 1997) (applying New York law to measure of damages in diversity case).

A.      *Failure to Discount Economic Damages to Present Value*

The jury awarded the plaintiff $6,306,376 in economic damages – consisting of $993,100 in past economic damages and $5,313,276 in future economic damages.  The award of future economic damages, however, is excessive because the evidence demonstrates that those damages were not discounted back to present value, in spite of the clear economic testimony presented on the subject.  Future damages "must be discounted to present value to reflect the fact that, even if there were no inflation, a dollar received today is worth more than the right to receive a dollar in the future."  *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 41 (2nd Cir. 1997).  When properly discounted to present value, the maximum award of future economic damages possibly supported by the evidence in this case is $3,709,979, and the maximum value supported by the great weigh of the evidence is $3,255,781.  Accordingly, this Court either should order a new trial or substantially reduce the award of future economic damages by way of a remittitur.

1.      *The Law*

Only two Connecticut Supreme Court cases discuss discount rates:  *Kiniry v. Danbury Hospital*, 183 Conn. 448, 462-64 (1981), and *Mather*, *supra*.  However, the discussion of discount rates in each is cursory and the facts of each differ significantly from the present case; as such, neither is controlling here.

In *Kiniry*, neither side presented any economic testimony.  On appeal, however, the parties apparently made post-hoc discount rate calculations concerning the plaintiff's earning capacity:  the defendant at approximately 1.5% (in an attempt to portray the verdict as excessive); the plaintiff at 0% (to show that it was not).  *Kiniry*, 183 Conn. at 462-64.  In response to these claims, the Supreme Court held only that

> [i]f, in addition, *it is assumed* that a zero percent discount rate more accurately
> represents the combined effect of current investment opportunities and the current

> rate of inflation, then the jury could reasonably have found the present value of
> Kiniry's net earning capacity to be in the vicinity of $1,500,000. With such a
> figure in mind, the total award of $1,800,000 falls within the necessarily uncertain
> limits of just damages. Because we have no reason to prefer the defendants'
> *assumptions* to those of the plaintiff, we must reject the argument that the jury
> verdict should have been set aside as excessive.

*Id.* at 463-64 (emphasis added).

*Kiniry* plainly is based on two predicate facts that differ greatly from the present case.
First, in *Kiniry* neither party put on any <u>actual evidence</u> at trial about discount rates. Therefore,
the defendants' appellate challenge – and appellate assumptions about the appropriate discount
rate – had no evidentiary foundation. In this case, on the other hand, the defendants did present
precisely that evidence. See discussion, *infra*. Second, *Kiniry* was decided in 1981, right after
the country had endured a prolonged period of extraordinarily high inflation. The assumption in
*Kiniry* that 0% better reflected the real rate of return clearly was based on that aberrant period.
Indeed, the Ninth Circuit expressly held as such in rejecting the same time period for calculating
discount rates in *Trevino v. United States*, 804 F.2d 1512, 1518 (9th Cir. 1986) ("[t]his span
includes the aberrational years 1974-82: years in which oil prices tripled from 1974 to 1979
[and] inflation reached double-digit proportions"). Obviously, that period is far different from
the present economic situation. For these reasons, *Kiniry* has no application to the present case.

In *Mather*, only the plaintiff submitted economic testimony; and the plaintiff's economist
used a 0% discount rate for loss of earning capacity and cost of home health care. *Mather*, 207
Conn. at 145. The Supreme Court denied the defendant's excessiveness challenge in part
because the defendant had submitted no discount rate evidence, and commented that the
defendant "urges us to adopt the so-called adjusted discount rate method using an interest rate of
2 percent, which, the hospital alleges, results in a 'real rate of interest'. The hospital offers no
reason for preferring the adjusted discount rate method other than that it has been used by some

federal courts, and that it results in a lower damages award." *Id.* at 146.

As with *Kiniry*, there are two important differences between *Mather* and the present case. First, the defendant in *Mather*, like the defendant in *Kiniry*, presented no evidence of the appropriate discount rate. Second, both the great weight of caselaw from other jurisdictions, and the specific evidence presented at trial in this case, are compelling reasons why future economic damages must be discounted to present value at a rate that reflects economic reality.

In sum, neither *Kiniry* nor *Mather* are dispositive on the discount rate issue – especially given that, unlike the present case, neither defendant presented any evidence of the appropriate discount rate. Because of this dearth of relevant Connecticut caselaw, this Court should follow the numerous cases from other jurisdictions – including the Second Circuit – that squarely hold that any award of future economic damages must be discounted to present value.

*Ramirez*, *supra*, is such a case. In *Ramirez*, neither party put on any evidence of an appropriate discount rate and the District Court either failed to discount the award for future economic losses, or discounted them at 0%. *Ramirez*, 112 F.3d at 41-42. The Second Circuit held that either of these "alternatives are problematic. If she [the District Court] did not consider the time value of money, she violated this circuit's discounting requirement. If she found the discount rate to be 0%, she erred in failing to adduce data to support that result." *Id.* at 42. The Second Circuit therefore affirmed the District Court's grant of a remittitur, but vacated the judgment as to the amount of the remittitur and remanded the case for a recomputation incorporating an appropriate discount rate. *Id.* at 43. The Second Circuit further held that there was "no occasion for the introduction of new evidence pertaining to the discount rate. [The District Court] should be free, in the absence of existing historical evidence justifying her prior decision, to discount lost income and medical costs at the suggested 2% rate . . . ." *Id.*; see

*Ammar v. United States*, 342 F.3d 133, 147-49 (2nd Cir. 2003) (District Court erroneously failed to discount award of lost future earnings and future medical costs to present value); *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 746 (2nd Cir. 1988) (District Court erroneously failed to discount award of future medical costs to present value); *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39-40 (2nd Cir. 1980) (District Court erroneously failed to discount award of lost future earnings to present value to reflect effect of inflation).

As a matter of federal law, *Ramirez* and its brethren are all the offspring of *Chesapeake & Ohio Railway Co. v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916), in which the United States Supreme Court stated that

> in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to the circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, *the verdict should be made up on the basis of their present value only*.

241 U.S. at 488 (emphasis added); see *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536-37, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (quoting *Chesapeake*).

The Second Circuit is hardly alone in its requirement. See *Skalka v. Fernald Environmental Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999) (instructing District Court "to apply an appropriate discount rate" on remand); *Stephens v. Crown Equipment Corp.*, 22 F.3d 832, 836-37 (8th Cir. 1994) (reversing jury verdict for failure to apply discount rate); *Hull by Hull v. United States*, 971 F.2d 1499, 1511 (10th Cir. 1992) (District Court's failure to discount award to present value improper because "a zero discount rate ordinarily will not reflect economic reality"). Indeed, even those Circuits that have upheld jury verdicts that were not discounted have done so only where the parties presented no evidence of an appropriate discount rate. See *Kasper v. Saint Mary of Nazareth Hosp.*, 135 F.3d 1170 (7th Cir. 1998); *Meader v.*

*United States*, 881 F.2d 1056 (11th Cir. 1989).

Although most state courts, like Connecticut, have little or no law on discount rates, those courts that have addressed the issue are in accord with the prevailing federal view.  For example, in *Green v. General Motors Corp.*, 709 A.2d 205 (N.J. Super.), *cert. denied*, 718 A.2d 1210 (1998), the New Jersey Appellate Division expressly rejected the "total offset," i.e., 0% discount rate, method as contrary to "present reality":

> While in no way excusing defendant's failure to present evidence on this point, it is apparent to us that the jury's verdict should have been reduced to present value using some reasonable discount rate. . . .  [On remand the] judge may effect a remittitur after the parties present any necessary proofs concerning a fair market return on a balanced portfolio of prudent investments and a reasonable estimate of medical expense inflationary costs.  We recognize this is far from an exact science, but a total disregard of these factors, which in effect applies the total offset method, *flies in the face of present reality and demands our intervention to achieve substantial justice between these parties.*

*Id.* at 222-23 (emphasis added).  The law in other states echoes New Jersey's sensible view.  See, e.g., *Calva-Cerqueira v. United States*, 281 F.Supp.2d 279, 296-97 (D.D.C. 2003) (District of Columbia law); *DuPont v. Preston*, 9 P.3d 1193, 1200 (Colo. App. 2000), *aff'd on other grounds*, *Preston v. DuPont*, 35 P.3d 433 (Colo. 2001) (Colorado law); *Liriano*, 960 F.Supp. at 44-45 (New York law); *Budge v. Post*, 643 F.2d 372, 375-76 (5th Cir. 1981) (Texas law).

At the end of the day, there is no controlling authority under Connecticut law regarding the application of a discount rate, especially when clear evidence of a proper rate is presented at trial.  Therefore, this Court should adhere to the great weight of persuasive federal and state authority – including the clear law in the Second Circuit – and require that the plaintiff's future economic damages be discounted to present value at a rate commensurate with the evidence presented at trial.

2.    *The Evidence in this Case*

Three experts testified as to the proper measure of future economic damages:  Lawrence Forman and Dr. Anthony Gamboa for the plaintiff, and Dr. Alan McCausland for the defendants. Any reasonable consideration of their testimony requires a reduction of the jury's award to present value.

Forman, who created a lifecare plan for the plaintiff, testified only as to the actual cost of the items enumerated in that plan.  (Tr. 1/13/06, Forman Excerpt, 39-40).  The total cost of the Forman plan until the age of 70 is $4,084,423.57.  (Tr. 1/13/06, Forman Excerpt, 41).  In addition, Forman stated that if the plaintiff lived past the age of 70 (to the normal life expectancy, age 77, for an average white male), he would require an additional $55,816.39 per year.  (Tr. 1/13/06, Forman Excerpt, 41).  The total additional cost from age 70-77 therefore would be approximately $390,712.  However, Forman expressly testified on direct examination that he took neither inflation, nor the time-value of money, into account when making his calculations.  (Tr. 1/13/06, Forman Excerpt, 40).  On cross-examination, he reiterated this point and admitted that those calculations were for an economist to perform.  (Tr. 1/13/06, Forman Excerpt, 43).

Dr. Gamboa, who testified as to the plaintiff's lost earning capacity, employed what he termed the "pure offset" method of discounting.  (Tr. 1/13/06, Gamboa Excerpt, 40). Although his testimony as to the contours of this method was not clear, Dr. Gamboa, in response to questions by the Court, claimed to have discounted those damages to present value using a "one percent" real discount rate.  (Tr. 1/13/06, Gamboa Excerpt, 33, 45).  Based on that supposed rate, his total number for the present value of the plaintiff's future lost earning capacity was $1,738,530.  (Tr. 1/13/06, Gamboa Excerpt, 36).

Finally, Dr. McCausland – the only actual economist to testify at trial – explained the

basis for using of a discount rate of between 2-3% (except for medical items, for which the rate is less) when calculating the present value of future economic damages:  First, that such a rate represents a historical average of the real rate of interest over the past century – i.e., a return above the rate of inflation.  Second, that there are secure, long-term investments through United States government designed to give the investor a real return of 2.5% above the rate of inflation. (Tr. 1/17/06, McCausland Excerpt, 13-14).  On that basis, Dr. McCausland calculated the present value of the Forman lifecare plan as being either $2,097,772, or $2,551,970 (depending on which plan is being reduced to present value – Forman's plan as modified by Dr. Cremer, or Forman's plan as increased by him during his testimony).  (Tr. 1/17/06, McCausland Excerpt, 23, 25).  Dr. McCausland then calculated the present value of the plaintiff's lost future earnings as being $1,158,009.  (Tr. 1/17/06, McCausland Excerpt, 33).

With respect to the Forman plan, it is clear that the jury did not discount the plaintiff's future medical and care costs at all.  Indeed, Forman admitted that his numbers reflected no reduction to present day value, and the jury's total award of economic damages obviously includes Forman's unreduced number.  Therefore, in order to comply with the appropriate legal measure of future economic damages, Forman's dollar figure must be reduced to its present value.  With respect to Dr. Gamboa, although he claimed that his numbers reflected a one percent discount rate, his testimony on direct examination regarding the methodology of his discount rate was muddy, at best.  (Tr. 1/13/06, Gamboa Excerpt, 31-36).  Moreover, Dr. Gamboa admitted that he is not an economist – his degree is in education.  (Tr. 1/13/06, Gamboa Excerpt, 41-42).  This Court should therefore disregard his discount rate testimony – when balanced against that of Dr. McCausland – as being against the weight of the evidence.  *DLC Management*, 163 F.3d at 133-34.  As with Forman, Dr. Gamboa's dollar figure also must be

reduced to its proper present value.

Moreover, unlike the two Connecticut cases, *Mather* and *Kiniry*, discussed *supra*, there is credible evidence before the Court with which those reductions can be made, namely, the testimony of Dr. McCausland. As set forth above, Dr. McCausland is an expert economist; he lucidly explained the historical basis for his discount rates for the plaintiff's different future medical costs; and he offered a safe, long-term investment vehicle by which the plaintiff will receive a real rate of return of 2.5% above the rate of inflation. As such, this Court should either adopt Dr. McCausland's numbers for future economic damages, or order a new trial.

### B.    Portion of Economic Damages Unsupported by Evidence

It is well-settled that "[e]conomic damages normally require nontestimonial evidence . . . and must be proven to a reasonable degree of certainty." *Carrano v. Yale-New Haven Hospital*, 84 Conn. App. 656, 658 n.3 (2004) (citation omitted). "A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them." *Bracey v. Board of Education of City of Bridgeport*, 368 F.3d 108, 119 (2nd Cir. 2004) (quoting *Taliferro v. Augle*, 757 F.2d 157, 162 (7th Cir. 1985)).

### 1.    Past Economic Damages

At trial, the plaintiff did not introduce any documentary evidence to prove past economic damages. He did not introduce his medical bills, nor did he present any nontestimonial evidence on the amount of his past lost income. (In fact, both Dr. Gamboa and Dr. McCausland did not credit the plaintiff's tax returns, and those returns did not come into evidence.) The only mention of plaintiff's past economic loss was during summation, when plaintiff's counsel suggested that the amount of plaintiff's past medical expenses and lost wages was "$468,000, minus some taxes." (Tr. 1/18/06, Plaintiff's Summation, 25). Such "summation is not

evidence." *United States v. Arboleda*, 20 F.3d 58, 61 (2nd Cir. 1994); see *Fonck v. Town of Stratford*, 24 Conn. App. 1, 3, (1991) ("a statement by counsel, not under oath, of a material fact pertinent to the issues unsupported by evidence, and prejudicial to the opposing party, constitutes reversible error"); 4 L. Sand, et al., *Modern Federal Jury Instructions*, at 74-3 (2000) ("[a]rguments by lawyers are not evidence, because the lawyers are not witnesses").

By awarding $993,100 in past economic damages despite the complete lack of evidentiary support for such an award, the jury demonstrated that the court's instruction had failed to persuade them to disregard plaintiff's counsel's statement.[9] Because the court's instruction did not prevent the prejudice to the defendants from plaintiff's counsel's unsupported statement regarding the value of plaintiff's past economic damages claim, this court should order remittitur of this entire amount of the past economic damages award.

### 2. *Future Economic Damages*

The jury's award for the plaintiff's future economic loss similarly exceeds the amount of such damages supported by the evidence. A jury's award of future economic damages should be based on "an estimate of reasonable probabilities, not possibilities." *Marchetti v. Ramirez*, 240 Conn. 49, 54 (1997). When there is "a degree of medical certainty that the future medical expenses will be necessary," a jury may calculate future medical expenses based on the history of medical expenses to the date of trial. *Id.* at 55; see also 2 M. Minzer, J. Nates, C. Kimball, D. Axelrod & R. Goldstein, Damages in Tort Actions § 9.55[4], p. 9-80 ("[t]he cost and frequency of past medical treatment…may be used as a yardstick for future expenses if it can be inferred that the plaintiff will continue to seek the same form of treatment in the future") (internal quotation marks omitted).

---

[9] The jury's award was more than twice the amount plaintiff's counsel mentioned in summation.

In this case, the plaintiff introduced no evidence of his past medical expenses, so the jury was unable to use that yardstick in calculating future medical expenses. Furthermore, the plaintiff failed to prove that it was reasonably probable that he would require all of the treatment, care, and services he asked the jury to award to age 77. Indeed, the plaintiff's treating physiatrist, Dr. Cremer, testified that the plaintiff's average life expectancy is 67-68 years and that he had only a 50-50 chance of living past that age. (Tr. 12/16/05, Cremer Excerpt, 81-82, 118-119). While this 50% chance means that it is possible that the plaintiff will live past age 68, it does not mean that it is probable he will do so. Therefore, the plaintiff failed to prove to required degree of medical certainty that he will live past 67 or 68 years of age. Accordingly, the plaintiff did not prove that he will need care beyond that age.

Forman offered testimony setting the cost of meeting plaintiff's support care needs to age 70 and his medical and rehabilitative needs to age 77 at $4,084,423.57. (Tr. 1/13/06, Forman Excerpt, 41, 44-45, 46).[10] He also testified that if plaintiff lived to age 77, he would need an additional $55,816 per year. (Tr. 1/13/06, Forman Excerpt, 41). In his summation, Plaintiff's counsel asked the jury to award medical, rehabilitative, and support care damages totaling $4,434,423.50, a number that, in addition to plaintiff's medical and rehabilitative needs, included support care for plaintiff to age 77. (Tr. 1/18/06, Plaintiff's Summation, 23). Plaintiff's request for future care damages for a period of time up to age 70, let alone age 77, was unsupported by any medical opinion that it was reasonably probable that plaintiff would live that long. Accordingly, this Court should remit that portion of the jury's damages award that represents the period of time after the plaintiff's reasonably probable life expectancy of 67-68 years.

In addition, Forman testified that plaintiff's medical needs could only be provided or

---

[10] The only medical opinion on plaintiff's life expectancy came from plaintiff's treating physiatrist, Dr. Cremer, who testified that plaintiff's life expectancy is 67-68 years. (Tr. 12/16/05, Cremer Excerpt, 81-82).

prescribed by a doctor.  (Tr. 1/13/06, Forman Excerpt, 14, 16).  Forman conceded that when

preparing a life care plan, or continuum of care, he defers to the treating doctor on medical

decisions.  (Tr. 1/13/06, Forman Excerpt, 42).  He further testified that, in preparing his plan in

this case, he did exactly what Dr. Cremer recommended, deleting the items Dr. Cremer

suggested.  (Tr. 1/13/06, Forman Excerpt, 22).  This particular testimony was inaccurate and

misleading.  Dr. McCausland testified that, in present day value terms, Forman had added over

$500,000 in additional medical and care items to those that Dr. Cremer testified would likely be

medically necessary.  (Tr. 1/17/06, McCausland Excerpt, 24-26); (Def. I.D. Exh. 141 & 142).

Moreover, as plaintiff's counsel pointed out in his summation, Forman's continuum of care

included medical treatment <u>beyond</u> that prescribed or recommended by Dr. Cremer.  For

example, Forman's plan contemplated a decubitus ulcer surgery every four years, rather than the

single such surgery Dr. Cremer anticipated.  (Tr. 1/18/06, Trial Summations, 23).

> In the absence of medical testimony that certain future medical care and treatment would
be necessary, the jury's award was based on improper speculation or conjecture.   For this
reason, to the extent that Forman's plan calls for, and the jury awarded damages for, medical
care and treatment beyond that which Dr. Cremer recommended, this court should order a
remittitur of the excessive amount.

### C.    *Effect on Non-Economic Damages*

> Any reduction in economic damages calls for a reduction in non-economic damages as
well.  It is well-settled that if a jury's verdict was the product of a mistake, the trial judge has a
duty under Connecticut law to set it aside, or order a remittitur. See *Ham*, 248 Conn. at 536
(excessiveness considerations include whether "jury was influenced by partiality, prejudice,
mistake or corruption").

In the present case, it is likely that the jury's award of non-economic damages would have been less had the economic damages been correctly calculated.  In his closing argument, plaintiff's counsel asked the jury "to balance the harms and losses and make up for them by having a three to one balance [between economic and non-economic damages]. . . .  That's how we essentially get six million on the economic, 18 million on that [the non-economic damages]." (Tr. 1/18/06, Summations, 27-28).  Given this express invitation to calculate non-economic damages by trebling the amount of economic damages, a mistake on the latter is a mistake on the former.

D.      *Shocks the Conscience*

The amount of non-economic damages awarded should shock this Court's sense of justice.  *Buckman,* 205 Conn. at 174-75.  If the Court determines the verdict is excessive, it can order a remittitur, *id.,* or a new trial.  *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 558 & n.36, 569 (1989).  If the Court orders a remittitur, the award should not be the highest that the jury could have legitimately awarded but should be an amount the Court deems proper. *Buckman*, 205 Conn. at 177.

Where possible, it is useful to compare the challenged verdict with verdicts in similar cases.  *Wood v. Bridgeport*, 216 Conn. 604, 611 (1990).  Although there are few decisions governing verdicts where the plaintiff was left a paraplegic as a result of his injuries, another case involving a paraplegic plaintiff demonstrates the excessiveness of the award.  In *Gladstone v. Grinnan*, 1995 WL 780887, *9 (Conn. Super. 1995), the court held that a non-economic damages award of $5.8 million was not excessive for a 22-year-old woman left paraplegic as a result of an automobile accident.  The plaintiff was in a phone booth when the defendant, who had been driving recklessly, struck her.  The plaintiff was thrown 50 feet, suffered several broken

bones, severe psychological injuries affecting her self esteem, and "loss of feeling in her lower body mak[ing] even the most simple of life's functions difficult." *Id.* The plaintiff in this case was awarded almost 4 times as much as Ms. Gladstone, even though he has a shorter life expectancy.

Another instructive comparison is to *Mather.* There, the jury awarded $9 million in a general verdict to a child who was profoundly injured as a result of medical malpractice at his birth. 207 Conn. at 126. His injuries were permanent; he needed constant care for life; he would not be able to work; he would need speech and occupational therapy; and he would live a normal lifespan. *Id.* at 139. The plaintiffs presented evidence of over $7.5 million in economic damages for lost wages, medical care, future therapy, and equipment. *Id.* at 148. Despite the evidence of considerable economic loss and profound injuries, the jury awarded an amount of non-economic damages that was substantially less than the economic damages.

It is clear that the plaintiff here elicits considerable sympathy for what is obviously a serious injury. However, sympathy alone does not equate with fair and just compensation. Because it is clear that the jury was unduly influenced by sympathy in its award of non-economic damages, this Court should remit the non-economic damages to an amount that is reasonable under the circumstances or order a new trial.

 E. *Remittitur for Amount of Settlement Payments Received by Plaintiff*

Prior to trial, the plaintiff settled with two former defendants, Festo Corp. and TransExpo Int'l, and, in consideration for releasing his claims against them, received $1,310,000. Pursuant to Conn. Gen. Stat. §52-216a,[11] the Court should order a remittitur in the amount of those

---

[11] Conn. Gen. Stat. § 52-216a provides:

> An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at

settlement payments because they represent a double recovery by the plaintiff for his actual harms and losses. *See Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2nd Cir. 1996) ("[T]he district court may consider the settlement . . . and the jury verdict's alleged excessiveness in a motion under Fed. R. Civ. P. 59 for remittitur or a new trial.")

In this case, the jury awarded the plaintiff $26.3 million – over $2 million dollars <u>more</u> in damages than he requested. The fact that the amount of the award is substantially more than that which the plaintiff requested as fair compensation suggests that the jury's verdict, even before the settlement payments are considered, pushes up against, if not exceeds, the limits of just damages. Adding over $1.3 million to the verdict erases any doubt – at almost 15% more than what the plaintiff proposed to be fair compensation – that a recovery of over $27.6 million from alleged tortfeasors clearly falls outside the limits of just damages.

Moreover, it has long been recognized that a plaintiff may recover only once for injuries. *Peck v. Jacquemin*, 196 Conn. 53, 71 n.19 (1985) ("[N]othing we say today in any way changes the time-honored rule that an injured party is entitled to full recovery only once for the harm suffered"). By the terms of the Plaintiff's own request, the jury's verdict more than fully compensates him for his injuries. Thus, the Court should, at the very least, order a remittitur in the amount of the settlement payments received by Plaintiff in order to prevent double recovery.

F.       *Remittitur for Collateral Source Payments Received by Plaintiff*

The jury's economic damages award includes items of damages for which the defendants believe the plaintiff has received collateral source payments; specifically, medical and health

---

any time during the trial of the cause of action against any other joint tortfeasors, nor shall any other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury. If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . .

benefits and proceeds from accidents and/or disability insurance policies.[12]  The defendants

hereby request that the Court, pursuant to Conn. Gen. Stat. §52-225a, (1) schedule an evidentiary

hearing to receive evidence regarding any collateral source payments received by the plaintiff,

and (2) reduce the jury's award of economic damages by an amount equal to the total amount of

collateral source payments received less the total amount of premiums paid.

Whether the jury's verdict should be reduced by collateral source payments received by

the plaintiff is a substantive issue, and thus state law supplies the rule of decision.  *See*, *e.g.*,

*Fitzgerald v. Expressway Sewerage Const., Inc.*, 177 F.3d 71, 74 (1st Cir. 1999) ("Whether

damages in a tort suit are mitigable by payments originating with a third-party depends, quite

obviously, on substantive principles.  Hence, the state-law collateral source rule supplies the rule

of decision."); *see also Savona v. Gen. Motors Corp.*, 640 F. Supp. 6, 11 (D. Conn. 1985)

(applying, substantively, the Connecticut common law collateral source rule).  Conn. Gen. Stat.

§52-225a(a) provides that, in any civil action in which a plaintiff seeks to recover personal injury

damages, the court shall reduce the amount of the award for economic damages by collateral

source payments as follows:

> In any civil action, whether in tort or in contract, wherein the claimant seeks to
> recover damages resulting from . . . personal injury or wrongful death[,] . . . the
> court shall reduce the amount of such award which represents economic damages
> . . . by an amount equal to the [total amount of collateral source payments] less
> the [total amount of premiums paid to secure those payments], except that there
> shall be no reduction for (1) a collateral source for which a right of subrogation

---

[12] "Collateral sources" means:

> any payments made to the claimant, or on his behalf, by or pursuant to: (1) Any health or sickness
> insurance, automobile accident insurance that provides health benefits, and any other similar
> insurance benefits, except life insurance benefits available to the claimant, whether purchased by
> him or provided by others; or (2) any contract or agreement of any group, organization,
> partnership or corporation to provide, pay for or reimburse the costs of hospital, medical, dental or
> other health care services.  "Collateral sources" do not include amounts received by a claimant as
> a settlement.

Conn. Gen. Stat. §52-225b.

> exists and (2) that amount of collateral sources equal to the reduction in the
> claimant's economic damages attributable to his percentage of negligence . . . .

To effectuate such a reduction, § 52-225a(b) requires the court to hold a post-verdict evidentiary

hearing to receive evidence of collateral source payments.  The Legislature enacted § 52-225a to

prevent plaintiffs from recovering twice for injuries.  *Corcoran v. Taylor*, 65 Conn. App. 340,

344 (Conn. App. 2001).

In this case, the jury awarded the plaintiff economic damages for medical care and lost

earnings.  These are, by definition, damages for which an evidentiary hearing must be held

pursuant to § 52-225a.  Moreover, the Court's jury instructions contemplated the need for a

collateral source payment reduction.[13]  Therefore, to comply with both Connecticut law and its

jury instructions, the Court should (1) schedule an evidentiary hearing to receive evidence

regarding any collateral source payments received by Plaintiff, and (2) reduce the jury's

economic damages award by an amount equal to the total amount of collateral source payments

received less the total amount of premiums paid to secure those payments.

---

[13] In its jury instructions, the Court explained that "there are procedures . . . after the verdict to ensure that there is no double recovery" and told the jury that it should award damages knowing that the Court would make the necessary adjustments under the law.  Jury Instruction XXXI.

## VII.    Conclusion

For the foregoing reasons, this Court should set aside the jury's verdict and order a new trial; or, in the alternative, set aside the jury's verdict and order a substantial remittitur.

Respectfully submitted,

_____

Daniel J. Krisch, Esq.  CT 21994
Michael S. Taylor, Esq.  CT 14650
**Horton, Shields & Knox, P.C.**
90 Gillett Street
Hartford, CT 06105
(860) 522-8338
*fax* (860) 728-0401
dkrisch@hortonshieldsknox.com
mtaylor@hortonshieldsknox.com

Harold J. Friedman, Esq. CT 23785
Karen Frink Wolf, Esq. CT 26494
**Friedman. Gaythwaite, Wolf & Leavitt**
Six City Center, P.O. Box 4726
Portland, ME  04112-4726
(207) 761-0900
(207) 761-0186 (Fax)
hfriedman@fgwl-law.com
kwolf@fgwl-law.com

<u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was mailed via U.S. First Class Mail on February 8, 2006, to the following:

Michael A. Stratton, Esq.
**Stratton Faxon**
59 Elm Street
New Haven, CT  06510

Thomas J. Grady, Esq.
**Lenihan Grady & Steele**
6 Canal Street
PO Box 541
Westerly, RI 02891-0541

Harold J. Friedman, Esq.
Karen Frink Wolf, Esq.
**Friedman Gaythwaite Wolf & Leavitt**
Six City Center, P.O. Box 4726
Portland, ME  04112-4726

Roland F. Moots, Jr., Esq.
**Moots, Pellegrini, Spillane & Mannion**
46 Main Street, PO BOX 1319
New Milford, CT 06776-1319

_____

Daniel J. Krisch