added.); see also *Birgel v. Heintz*, 163 Conn. 23, 28 (1972).  Thus, "[a] generous award of noneconomic damages should be sustained if it does not shock the sense of justice." *Johnson v. Chaves*, 78 Conn. App. 342, 346-47, *cert. denied*, 266 Conn. 911 (2003).  There is no mathematical computation available to assess noneconomic damages which, by their nature, defy exactitude.  The plaintiff must, however, provide sufficient evidence for the trier to make a fair and reasonable estimate of damages.  Thus, examination of a damage award is always fact intensive.  Examination on a case by case basis is in order.

The plaintiff's treater, Dr. William Newman, testified Ms. Streeter suffered from depression, anxiety disorder, and adjustment disorder arising from the abduction to include her observations of behavioral changes in the children when first re-united with them.  Such changes, Newman testified, created increased stress, anxiety, and worry and were manifested by extreme fatigue and loss of energy.  Tr., 4/21/05, p.m., at pp. 8, 10-11.  He described her ongoing emotional pain as she feared the potential the children might again be taken by their father who was believed to be at large in Egypt.  The frustration and hopelessness of her twenty-two month search for the children was made evident by her testimony of the more than two hundred (200) days spent overseas in a frantic effort to find her children in Egypt at a time when terrorist attacks on this country (just nineteen days prior) provided a backdrop of fear and horror.  "[Y]ou feel hopeless.  You feel desperate.  You feel you're never going to get your kids back."  Tr., 4/19/05, p.m., p. 44.  She testified to worry she would not "have access to funds anymore to continue to pay for investigators and lawyers to help get the kids back."  Tr., 4/20/05, p.m. following recess, p. 16.  She took anti-depressants and began going to therapy.  Tr., 4/19/05, p.m., at 42-43.  At trial, she testified to continuing worry with regard to the children's socialization and, in the case of her daughter, to academic problems as well as to their

ability to form lasting relationships with life partners.[14] The defendant concedes the children have had psychological problems - to include post-traumatic stress disorder - since their return (Motion, at 3) and that they "have suffered severe emotional injuries, which partially stem from the fact that their father told the children to say that their mother was dead." Motion, at 4. The legitimacy of the plaintiff's depression, worry, and anxiety is clear and it was underscored by her presentation during two (2) full days of trial testimony. Cross-examination neither impeached her credibility nor diminished her personal ordeal.

The same is equally applicable to her damages on Count Three for loss of filial consortium. The photograph of this family's life pre-abduction was of a loving and physically active household. The plaintiff described the three of them "reading together a lot" and just doing "a lot of cool stuff ... we had science experiments running in the kitchen ... as much outdoor stuff as we could." Tr., 4/19/05, a.m., pp. 65, 74-77. She described going to the beach with them, kayaking, and playing in the garden (*Id.*, at 75). At night, "we would all line up on either one kid's bed or the other and read bedtime stories together." *Id.* She referred to them together as "the trolls," to her daughter as "Pumpkin," and to her son as "H-man." *Id.*, at 77. The testimony was that she was an active participant in their schooling, sitting on the Board of Trustees at the childrens' school for five (5) years and sometimes helping out in their classrooms. *Id.*, at 76-77. The defendant has agreed "a mother's losing 22 months of companionship and society with two young children, together with the depression and other emotional damage that accompanied that loss, is a very substantial loss." (Motion, at 4) (Emphasis added.) Defense counsel, in opening argument, had this to say regarding the unlawful taking of the children, "Anyone who hears that set of circumstances, those facts and circumstances, any reasonable person would be absolutely horrified and angered at hearing that sort

---

[14] Given the persistence of these fears, the court rejects the defendant's repeated assertions the plaintiff has not sustained a permanent injury. See e.g., Motion, at 4.

-23-

of prospect of innocent children being taken from their mother. There's no question about that. EJM shares those views." Tr., 4/19/05, a.m., at 10. It follows that, if liability were found in favor of the plaintiff, the damages flowing from the abduction and continuing to the present as a result of this "very substantial loss" would in fact be "very substantial." Contrary to the defendant's claim EJM was only passively involved in the kidnapping, there was a body of evidence from which the jury could have concluded EJM was an active participant - specifically, its failure to follow industry practice (according to its own expert) of "getting to know" pop-up customers before doing business with them, its agreement (by telephone) to arrange for this flight to Egypt given the many unusual circumstances (i.e., the demand the flight occur within thirty [30] hours of the call, the fact the trip was to be for just three [3] days with professional catering to be provided only on the flight to Egypt, the fact the children were to be accompanied only by an adult male [without even an inquiry whether that male was related to the children], the fact that the cost of the flight was far more than the cost of any other private charter within the experience of either of the EJM employees who testified to the arrangements [Raber and Montag], the fact that, despite knowing the destination, no effort was made to determine the existence of State Department warnings though available on the internet and known to EJM's sister company, and the fact that payment was made by a female entirely unknown to EJM, of a different last name than the children, and for whom no investigation or credit check was done. EJM did not simply stand at the gate and watch an adult male and two very young children board the airplane; it performed acts without which the abduction could not have occurred and it performed them with no investigation, on very short notice, and very profitably. In view of all that was known to EJM as a result of discovery (all of which was confirmed at trial) and given the court's pre-trial rulings, the defendant ought not have been surprised by the jury's finding of liability on all three (3) counts.

The court rejects the argument the damages were duplicative. The jury was specifically

instructed for what injury damages were to be awarded, if at all, for emotional distress with regard to Counts One and Two and it was specifically instructed with regard to the claimed loss for filial loss of consortium and the injury for which they would compensate the plaintiff, if at all, for that cause of action. The court's prior rulings established that Massachusetts law, in cases involving intentional interference with the parent-child relationship, permitted recovery of damages for recovery costs, loss of filial consortium, and mental suffering. "In addition to compensation for loss of filial consortium and services, a parent may obtain damages for the cost of recovering the child as well as for 'mental suffering' or emotional distress which results from the interference." *Murphy v. I.S.K. of New England, Inc.*, 409 Mass. 842, 862 571 N.E. 2d 340, 352 (1991). Further, it is - at best - incongruous for defendant now to argue the damages awarded for Counts One and Two are the very damages awarded under Count Three when, as the plaintiff points out, it was as a result of EJM's Request to Revise that the plaintiff separated her allegations of loss of consortium and emotional distress into separate counts. *See e.g.*, Opp. Memo, at 10.

This court, thus, cannot conclude the verdict was duplicative. Nor does she conclude the verdict is inconsistent as a matter of state law. The defendant cites to a number of Connecticut cases in which a remittitur was ordered; these cases are factually distinguishable. *Buckman v. People Express, Inc.*, 205 Conn. 166 (1987) involved a plaintiff claiming emotional distress stemming from his employer's failure to continue his health coverage upon discharge. He claimed depression, an inability to eat or sleep, that he felt upset and teary, and that he felt inadequate as a husband and father. He sustained out-of-pocket damages of $1,594.95. To that amount, the jury added $50,000 - for a total award of $51,594.95. The Court ordered a remittitur of $35,000. While the Court took issue with the defendant's characterization of the claim as "several weeks of worry" and "relatively trivial" and noted the defendant knew the plaintiff had serious health problems and needed insurance, the Court also specifically noted that, contemporaneous with the plaintiff's injury, his wife was

-25-

enduring a difficult pregnancy and went to deliver the child two (2) months early (*Id.*, at 176), that the plaintiff made no claim or offered any proof of a permanent injury (*Id.*), and that the plaintiff subsequently discovered his wife's insurance carrier would cover a portion of their medical expenses. In the instant case, there was evidence of a permanent injury and there was no event other than the abduction which contributed to the plaintiff's injuries or medical treatment. In *Label Systems Corp. v. Aghamohammadi*, 270 Conn. 291 (2004), the claim arose as a result of a dispute between two former employees and their former employer and company president. The employees had been terminated for the taking of company property. They applied for and were awarded unemployment compensation benefits, which award the employer appealed. The employer then brought suit against the employees for conversion; the employees brought a counterclaim and asserted claims sounding in libel, vexatious litigation, abuse of process, slander, intentional and negligent infliction of emotional distress, wrongful discharge, and intentional interference with prospective contractual relations. The jury found the employees liable for conversion under circumstances warranting punitive damages and also found the employer liable for vexatious litigation; it awarded one employee $160,000 and the other employee $60,000, which awards were automatically doubled under § 52-568(1). The employers filed a motion for remittitur which the trial court denied. Our Supreme Court, giving every reasonable presumption to the correctness of the jury awards, concluded the evidence was sufficient to support the awards and determined the trial court did not abuse his discretion in denying the remittitur. While the facts have nothing in common with the case before this court, the Court distinguished *Buckman* in that the employers in *Label Systems* did not merely fail to act but undertook affirmative acts in pressing charges and in appealing the award of unemployment benefits (as EJM took affirmative steps), in that the employees claimed lasting emotional injuries (as there was evidence of here), and in that the jury in *Label Systems* appeared to the Court to evidence none of the "outrage" the *Buckman* Court found with regard to the defendant's overall conduct there (The Court noted the jury in *Label Systems* rejected

-26-

some of the employees' claims and reasoned that, if it were acting in outrage over the employer's conduct, it would reasonably have been expected they would have found for the employees on some others of the remaining counts.). In the case before the court, the fact this jury considered EJM's special defense of comparative negligence to Count Two (as indicated by their request for readback of testimony on that issue) is evidence their verdicts were not based on "outrage" over EJM's conduct and that they considered all of the evidence.

The court agrees it is more helpful to compare this verdict with verdicts in similar cases. *See e.g., Wood v. Bridgeport*, 216 Conn. 604, 611 (1990); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 824-25 (1997).[15] Admittedly, there is a lack of reported verdicts in child abduction cases. Thirteen (13) years ago, however, a Connecticut trial court awarded recovery costs of $86,499 and $800,000 "for the combined 'package' of loss of companionship, loss of parental rights, and emotional distress" to a mother whose four (4) children had been taken from her by her husband six and one-half (6-1/2) years earlier (The mother and children remained separated at the time of trial.). *Marshak v. Marshak*, 1992 WL 11168, aff'd, 226 Conn. 652 (1993). Noteworthy is that, as earlier stated, Massachusetts law specifically provides that loss of filial consortium and emotional distress claims are separate causes of action and thus damages flowing from loss of consortium as a result of interference with custodial relations is "additional" to (not "part of") the damages for emotional distress proximately caused by the interference. *Murphy, supra*, 571 N.E. 2d 540, 352, 409 Mass.

---

[15] Though the defendant similarly concludes, it almost exclusively cites to verdicts in automobile, employment and several discrimination cases which are not as likely to stir the emotions of jurors as cases involving the disruption of family life caused by the illegal taking of children from a parent.

842, 863 (1991).[16]  Connecticut had not formally recognized the tort of child abduction when
*Marshak* was decided whereas Massachusetts has done so for some time now.  Additionally, the
defendants in *Marshak* were the mother, siblings, and friend of the childrens' father (the abductor);
in this case, the defendant was a private charter aircraft company who profited handsomely from its
conduct and whose motivation sharply contrasts with that of the co-conspirators in *Marshak*.  EJM's
conduct can thus be seen as more egregious because incited purely by corporate greed (a conclusion
underscored by the testimony of Raber and Montag).  EJM's citation to *Arthur v. Huschke*, 1999
Conn. Super. (LEXIS 2467, 1999 WL 740868 (1999) is unpersuasive because a PJR award and not
a jury award after a trial on the merits (Again, the defendant was the child's grandmother who
permitted her son and the child the use of her second home during the fifteen [15] year absence;
contrary to the present case, the defendant grandmother obtained no financial benefit from her
efforts.).  Nor are cases granting a remittitur or punitive damage awards particularly constructive.

More than eight (8) years ago, in *Pittman v. Grayson, et al.*, 1997 WL 370331 (S.D.N.Y.),
a New York jury awarded a total of $15 million against a commercial airliner for its aiding and
abetting a mother who flew with her two daughters from New York to Iceland in violation of a
Florida court's order, thus depriving the girls' fathers of their lawful custodial rights.  The claim
against Icelandair was premised entirely upon the airline's claimed role in actively conspiring with

---

[16] *Murphy* involved a mother's claim against the Hare Krishna religious organization
regarding her teenage daughter's voluntary participation in cult activities.  The jury awarded the
mother $350,000 for the intentional infliction of emotional distress and $20,000 for intentional
interference with her parental rights.  The judgment on the emotional distress count was vacated
and judgment was entered for the defendant because the trial court had erred in "allowing the jury
impermissably to consider the propriety of constitutionally protected religious beliefs." 571
N.E., 2d, at 354.

the mother to transport the girls out of the country.[17]  There was no claim for loss of filial consortium; thus, on a single claim of conspiring, the New York jury awarded a verdict almost twice the amount claimed excessive here under Count One (which, in *Pittman* also centered on the interference with custodial rights).  There is no indication in the opinion there was any claim the verdict should be set aside as excessive.

The claim the verdict is excessive as a matter of federal constitutional law is rested upon the premise the verdict[18] was a punitive verdict so excessive as to be violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Consideration of the three factors appropriately analyzed in determining the constitutionality of a punitive damages award[19] (as enunciated in *BMW of North America, Inc. V. Gore*, 517 U.S. 559 [1996]), is here misplaced.  *BMW* was a fraud case brought by the purchaser of a new BMW against a car manufacturer and dealer

---

[17] Without any reference to the amount of the verdict, the Court granted the defendant's motions to set aside the verdict and for a new trial - for reasons not here applicable.  It was persuaded by the fact that, as a common carrier, Icelandair did not have an unfettered right to choose who should or should not travel and it noted common carriers were "in a much different position than other third-parties who have been held liable for assisting one parent in depriving another of his or her parental rights." *Id.*, at 2.  The Court also articulated the interplay between the public's right to travel and a common carrier's duty to transport anyone who sought to use its services for payment of an approved fee (subject now to greater restrictions in view of 9/11/01).  EJM is not a common carrier; it is a contract or private carrier.  See Black's Law Dictionary, Fifth Edition, p. 249.  The *Pittman* Court also noted the tort of intereference with parental rights of custody under Section 700 of the Restatement (Second) of Torts had been recognized in various courts throughout the country (to include New York) and that, had the mother's conduct occurred more recently, it would have been in violation of 18 U.S.C. § 1204, the 1994 federal legislation prohibiting parental kidnapping. *Id.*, at 3.

[18] As earlier stated, this jury made two (2) awards based upon two (2) different causes of action.  In this court's view, it is therefore more appropriate to consider a verdict for $10 million and a verdict for $17 million as opposed to aggregating them as if the jury returned a single verdict and did not consider the differing losses to the plaintiff as permitted under Massachusetts law.

[19] Those three factors are degree of responsibility, the ratio between the amount of punitive damages awarded and the actual harm inflicted, and the comparison between the questioned award and penalties imposed in similar cases.

based upon the dealer's failure to disclose that the car had been repainted after being damaged prior to delivery. The jury had awarded $4 million in compensatory damages and $4 million in punitive damages. The Alabama Supreme Court conditionally affirmed an award of punitive damages but reduced the award of the same to $2 million. The U.S. Supreme Court reversed and remanded, finding the award grossly excessive in light of the low level of the dealer's reprehensibility of conduct and the 500 to 1 ratio between the award and the actual harm to the buyer. Gore's expert claimed the car was worth $4,000 less (or 10% of what Gore paid) than it would have been had it not been refinished. Significant was that Gore had driven the car for nine (9) months without noticing any flaw in its appearance and that he only learned of the same when he brought the car to an independent dealer to make it look "snazzier." *Id.*, at 563. The Court found the pre-sale work had not affected the car's performance, safety features, or appearance and further found BMW's conduct in not disclosing "evinced no indifference or reckless disregard for the health and safety of others." *Id.*, at 560.[20] Relevant - as the Court noted - was that the maximum civil penalty under Alabama law for violation of its Deceptive Trade Practices Act was $2,000.

EJM's assumption the verdict was punitive is based solely upon the amounts of the two (2) awards. No evidence was offered this court at argument or in the briefs to support a finding the jury awards were intended to punish. In fact, this court inquired of counsel at argument whether there had been any communications with jurors following the verdict and the response was in the negative. Thus, EJM can point to no juror comment or conduct in support of its contention the jury was intent on punishment or acted so as to send EJM a message. Nothing in the jurors' conduct throughout trial permits the conclusion they were other than thoughtful, fair-minded people who carefully considered the evidence (to include evidence offered in support of the defendant's special defense) and the

---

[20] The U.S. Supreme Court noted the Alabama Supreme Court interpreted the jury award of punitive damages as largely reflective of conduct outside the state of Alabama and noted the absence of any evidence of the same in that state. Thus, its inappropriateness. *Id.*, at 573-74.

charge on the law. They deliberated for approximately eight (8) hours over two (2) days. Moreover, nothing in the jurors' comments to the undersigned following the verdicts indicated a collectively vindictive spirit.

The general presumption in favor of upholding jury verdicts recognizes both that the amount of jury verdicts is a matter peculiarly within the province of the trier of fact and that the assessment of non-economic damages is particularly difficult because inherently subjective in nature and not susceptible to mathematical precision. See e.g., *Shegog v. Zabrecky*, 36 Conn. App. 737, 752-53 (1995). The task before this jury was made more difficult because it required the valuation of non-economic injuries resulting from the loss of what is arguably the most honored and deeply felt relationship in our society - the relationship between parent and child - and the emotional distress proximately caused by the tortious interference with a parent's custodial rights. That the amounts awarded were considerably higher than EJM anticipated offers no reason to set them aside under our law. Nor is the fact they were generous sufficient reason to set them aside. Having viewed the jury and listened to the evidence over more than two (2) weeks of trial and having observed the witnesses and assessed their credibility, this court was not surprised at the jury's return of very significant verdicts. The plaintiff presented a straightforward history of events as they occurred and of family life as it existed pre- and post-abduction and recovery; there were no histrionics and no blatant attempt to appeal to the jury's sympathy. In fact, the court cannot recall the plaintiff ever crying though she quietly dabbed at her eyes on one occasion. Permitting the facts to speak for themselves, in this court's view, earned the plaintiff the jury's admiration. She showed no anger and demonstrated no hostility toward either defense counsel or EJM - not when she was examined with

-31-

an eye toward the special defense of comparative negligence[21], not when an EJM employee testified it mattered not whether the children's mother knew of or consented to the flight, and not when, following the abduction, EJM would share no information with her (Her testimony was that the details of the flight were learned only through the discovery process.). For two (2) full days of testimony, she demonstrated a personal strength that made clear how it was she was able to overcome the poverty of her emotional spirit during the twenty-two (22) months without her children. Any observer of human behavior could discern the jury's admiration for her; that the jury found her to be honest, credible, and persuasive was not at all surprising to the court - and should not have been surprising to the defendant.

This court has carefully considered the defendant's request for remittur. Having done so, however, she cannot conclude, given all of the evidence before this jury, the verdicts shock her sense of justice. Nor is there any reason to conclude the jury was influenced by partiality, prejudice, mistake, or corruption. Nothing in their conduct suggested any impropriety nor has defendant offered any evidence of the same. Considering the evidence in the light most favorable to the plaintiff, as this court must, she concludes these verdicts - given the evidence, the defendant's conduct, the unique relationship between parent and child, and the losses and injuries sustained - fall "somewhere within the necessarily uncertain limits of fair and reasonable compensation." *Bruneau v. Seabrook,* 84 Conn. App. 667, 672-74 (2004). No reason presents for this court to substitute her

---

[21]The claim was based upon her failure to obtain from her ex-husband the children's passports when she learned - one week prior to the abduction - that he had taken the children to Cuba (and not to the Bahamas as she had been told) in August of 2001. There was then no restriction on his travel with the children; the children were safety returned to her following that trip to Cuba, and, under the Parenting Plan, he had one (1) week to return the passports. Her immediate response to learning of the trip to Cuba was to contact her lawyer to schedule an emergency court hearing so as to prevent the father from again taking the children out of the country. It was the plaintiff's belief the abduction occurred so as to avoid a court order restricting the father's travel with the children.

judgment for that of the jury to whom the parties entrusted this unique case and thus to become the seventh juror. Where, as here, there was sufficient evidence for the jury to find as it did, the litigants' right to have factual issues determined by a jury[22] is sufficient reason for this court not to tamper with its assessment of damages.

## Motion for Assessment of Prejudgment Interest (#209)

The plaintiff has moved, under Mass. Gen. L. ch. 231, § 6B, that interest on the verdict be assessed at the rate of twelve percent (12%) from the date this action was commenced (May 15, 2002[23]) through entry of judgment. That statute, entitled "Interest added to damages in tort actions," reads:

> In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

Plaintiff asserts the assessment of this interest is a substantive right and should be awarded based on the law which governed the underlying claims. See e.g., *Hobart v. O'Brien,* 243 F.2d 735, 744-45 (1st Cir. 1957). EJM has objected and claims: 1) the motion is untimely under P.B § 16-35; 2) prejudgment interest is a procedural matter controlled by Connecticut law; and 3) even if prejudgment interest is a substantive matter, a separate conflict of laws analysis applies to

---

[22]Our Supreme Court has said that right "embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded." *Ham v. Greene,* 248 Conn. 508, 536 (1999).

[23] Plaintiff's motion incorrectly identifies the date suit was instituted as May 15, 2005. Ex. 1 to the instant motion clarifies the date.

prejudgment interest under the doctrine of depecage and that analysis favors the application of Connecticut law.

Conceding P.B. § 16-35 is not a model of clarity, defendant has argued this motion is untimely because a post-verdict motion that was not filed within ten (10) days of acceptance of the verdict (April 28, 2005) or by May 31 (the date to which the court extended the time by which EJM was to file its post-verdict motions) or by July 5 (the date to which the court extended the May 31 filing deadline). The court rejects this argument. By its terms, that section applies to motions in arrest of judgment - whether for extrinsic causes or causes apparent on the record, [24] motions to set aside a verdict, motions for remittitur, motions for additur, motions for new trials, and motions for collateral source reduction brought under C.G.S. § 52-225a. Thus, § 16-35 does not, as defendant argues, announce a rule of general applicability but is limited to seven (7) very specific motions - none of which is the motion in question. See defense counsel's own statement in "Authors' Comments" in the Practice Book Annotated, Comment 3, p. 565. Neither of the two (2) cases cited by EJM is relevant; *Small v. South Norwalk Savings Bank*, 205 Conn. 751 (1988), affirmed a denial of a motion to set aside as untimely under a predecessor statute and *Morgan Guaranty Trust Co. of New York v. Third National Bank of Hampden Co.*, 545 F.2d 758 (1st Cir. 1977), affirmed the trial court's denial of a motion to amend a computation of interest assessed as per M.G.L.A. c. 231 § 6B because that motion to amend was, under the Federal Rules of Practice, a 59(e) motion required to be served not later than ten (10) days after entry of the judgment and the motion before the court was filed forty-nine (49) days after the order entering judgment. § 6B contains no such time restraints nor does it require prior notice by the moving party. Additionally, a P.B. § 16-35 motion is directed to

---

[24] Horton and Knox, in their commentary in the annotated version of the Practice Book, posit motions in arrest of judgment for extrinsic causes are directed to juror misconduct and motions in arrest of judgment for causes apparent on the record are directed to insufficient complaints. Comments 3 (1) and (2), p. 566.

-34-

the <u>verdict</u>; it seeks to overturn or alter the verdict whereas prejudgment interest is directed to the judgment. Finally, our own Appellate Court has weighed in on the question when a motion requesting interest should be filed. At issue was C.G.S. § 37-3b which concerned post-judgment interest. Of that statute, the Court, in *Bower v. D'Onfro*, 45 Conn. App. 543 (1997), noted it did not provide for any time limit by which the motion must be filed nor did any other statute or rule of practice. *Id.*, at 549. It noted, "Common sense also dictates that a party seeking an award of postjudgment interest must file a posttrial motion because the award can be determined only after judgment has been rendered." (Citations omitted.) *Id.* Because, in the instant case, this court still has jurisdiction and because this court knows of no rule or statute requiring the plaintiff to file her motion by any of the dates suggested by defendant, the court is unpersuaded by the defendant's argument and rejects as entirely inappropriate its suggestion the plaintiff ought be sanctioned for filing the motion when she did. Nor does this court find defendant's argument of prejudice relevant in view both of the absence of any time restriction under either Massachusetts or Connecticut law and in view also of the fact there can be no prejudice so long as the defendant has been afforded a right to be heard before adjudication of the motion, a right EJM has here exercised.

The question whether the assessment of interest raises a substantial or procedural issue for the purpose of determining whether the law of Massachusetts or Connecticut should govern is more complex. The plaintiff cites to *Hobart, supra*, in arguing prejudgment interest is substantive in nature and, since this court has consistently held Massachusetts law governs all substantive issues, § 6B should apply. EJM cites to *Paine Webber Jackson* and *Curtis, Inc. v. Winters*, 22 Conn. App. 640 (1990), in support of its claim § 6B is procedural. There, the Court concluded this state's offer of judgment statute, § 52-192a, was "a procedural rule, punitive in nature, and enacted to promote fair and reasonable pretrial compromises of litigation." *Id., at 651.* (Citations omitted). It concluded, however, that § 37-3a, which allows the court, in its discretion, to award prejudgment

-35-

interest for the wrongful retention of money, was "a substantive law that required an analysis of the merits of the underlying claim" and pursuant to which any interest ordered was an element of the damages awarded on debts owing. *Id.*, at 651-52. In the Court's view, the pertinent question was whether, in determining the applicability of an interest statute, the court need undergo an analysis of the underlying circumstances or a determination of the facts. *Id.*, at 653. Thus, § 52-192a was procedural in its view because, under that statute, the interest awarded was not discretionary, was independent of the judgment, unrelated to any substantive issue, and "related only to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources." *Id.*, at 653-54. Similarly, EJM argues, § 6B involves no discretion by the court, can be calculated only after judgment has been rendered, is awarded upon a post-trial motion, and requires no analysis of the underlying circumstances or determination of facts. Under *Paine Webber*, EJM argues, § 6B can only be a procedural rule and, thus, the rule of the forum should govern.[25]

To argue that "the law of the forum applies to procedural issues" (Opp. Memo, at 3) ignores what *Paine Webber* has described as "the vexing question of which rules are 'procedural' and which 'substantive'" (22 Conn. App., at 640) - particularly because "'substance' and 'procedure' are the same keywords to very different problems." *Id.* (Citations omitted.) Streeter's response to the defendant is that § 6B is substantive because, unlike § 52-192a, prejudgment interest awards under § 6B are not designed to penalize a party for not having accepted an offer of judgment and thereby wasting judicial resources but are instead awarded as a matter of right. See *Bennett v. City of*

---

[25] EJM is here silent as to the practical effect of applying Connecticut prejudgment interest law except to offer that interest, as an element of damages, requires a jury trial under *Foley v. Huntington Co.*, 42 Conn. App. 712, 738 (1996). Opp. Memo, at 5. Nor would § 52-192a apply since no offer of judgment was ever filed.

*Holyoke*, 362 F.3d 1, 15 (1st Cir. 2004).[26] The purpose of awarding § 6B interest is "to compensate a damaged party for the loss of use of the unlawful detention of money." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 480 Mass. 704, 717 (1990). Thus, viewed in this light, § 6B has little in common in terms of its scope or purpose with this state's offer of judgment statute; in fact, the *Paine Webber* Court distinguishes between an offer of judgment statute and one for prejudgment interest. "Nor will we refuse to apply § 52-192a because our courts have sometimes labeled this a rule of 'prejudgment' interest . . . ." 22 Conn. App., at 651. This court is thus left with a Massachusetts court's description of its own statute as compensatory (and therefore "substantive") and the *Paine Webber* view that, because an award of § 6B interest requires no analysis of underlying issues, the rule is procedural.

EJM urges a separate conflict of laws analysis under the doctrine of depecage. "Depecage" is an invention of the courts that provides a "framework under which different issues in a single case . . . may be decided according to the substantive law of different states." (Internal quotation marks and citations omitted.) *Reichhold Chemicals, Inc. v. Hartford Accident & Indemnity Co.*, 252 Conn. 774, 783 n.5 (2000). Contrary to EJM's assertion, Connecticut did not expressly adopt the doctrine of depecage in *Reichhold* nor is it a universally accepted doctrine. This court questions whether prejudgment interest is a stand alone issue capable of a choice of law analysis independent of the damages choice of law determination she earlier made and iterated when she charged the jury. That question may, however, be moot because, for reasons next here to be discussed, this court concludes Massachusetts law applies whether depecage is employed or not.

The Restatement (Second) of Conflict of Laws § 171 comment (c) (2005) states, "The law selected by application of the rule of Restatement § 145 determines whether the plaintiff can recover interest and, if so, at what rate for a period prior to the rendition of judgment as part of the damages

---

[26] The Court also noted that, in the idiom of section 185(d) - remedies available to whistleblower plaintiffs such as the *Bennett* plaintiff was - prejudgment interest under § 6B was a "remed[y]" available in common law tort actions in Massachusetts. *Id., at 15.*

for a tort." EJM returns to its analysis of §§ 145 and 6 of the Restatement and concludes as it did

in its JNOV brief that Connecticut law should be applied. Here, EJM has specifically identified our

offer of judgment statute - § 52-192a - as the applicable statute and it correctly noted Streeter had

the opportunity to file an offer of judgment when she brought suit - but did not. It further noted

factor (f) of § 6 of the Restatement - certainty, predictability and uniformity of result - weighs in in

favor of Connecticut because applying prejudgment interest statutes assessing different interest rates

and mandating requests be made at differing procedural intervals can create unpredictability; in that

sense, EJM argues, applying Connecticut law protects the parties' justified expectations (§ 6[d]).

This court disagrees, however, that application of this state's prejudgment interest statute promotes

the needs of the interstate and international systems (factor [a] of § 6) or that it promotes the basic

policies underlying the field of tort law (factor [e]). In fact, since damages awarded an injured

person are intended to make whole that person (to <u>compensate</u> as opposed to punish), the argument

is clearly stronger that that factor prompts the application of § 6B. For all of the reasons this court

has earlier stated in her ruling of 12/27/04, consideration of § 145 factors weighs heavily in favor

of Massachusetts. It strikes this court as entirely inappropriate to apply this state's offer of judgment

statute in a case in which no offer of judgment was filed, when neither party is a citizen of this state,

when the injured party is a Massachusetts resident who has continuously resided there with her

family, when the act which initiated the abduction was performed there, and where the relationship

between the plaintiff and her children (indeed the relationship between the children and their father)

was centered. To conclude either § 52-192a or § 37-3a should govern does not promote this state's

interests while it totally ignores Massachusett's interest in affording its citizens the full measure of

damages its law provides. Further, it rejects the view of Massachusetts courts that the purpose of

M.G.L. § 6B is to compensate an injured person. Relevant perhaps is that, while our *Paine Webber*

Court has enunciated a test which prompts the conclusion both § 52-192a and M.G.L. § 6B are

procedural, the same Court concludes eleven years later that prejudgment interest is an element of

damages designed to compensate plaintiffs. See *Flynn v. Kaumeyer*, 67 Conn. App. 100, 105 (2001).

This court finds persuasive *Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d. 604, 614 (2d Cir. 1996). Upholding a Connecticut federal court's award of prejudgment interest pursuant to New York law in a case in which New York substantive law was applied, the Second Circuit had this to say:

> Connecticut follows the Restatement's approach with respect to prejudgment interest, and applies "[t]he local law of the state selected by [applicable choice of law principles to] determine [ ] whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between breach of contract and the rendition of judgment." Restatement (Second) Conflict § 207 cmt. e; see *Paine Webber Jackson & Curtis, Inc. v. Winters*, 579 A.2d 545, 551-53, 22 Conn. App. 640, 651-52 (1990)(sic).

The conclusion § 6B applies flows from this court's earlier decisions and is consistent with the application of the Restatement (Second) Conflict of Laws, Sections 6, 145, 171, and 207. The motion for assessment of interest under that statute is granted.


**Setoff**

The parties have stipulated to the following:

1) This action was instituted by the plaintiff on her own behalf and on behalf of her two minor children. She sought damages for herself and her children claiming emotional distress, loss of filial consortium, and costs of recovery. In addition to EJM and Anwar Wissa, Jr. (her ex-husband and the children's father), she sued Rifton Management, LLC, Bruderhof Communities in New York, Inc., and Enid Wissa (the children's grandmother). The case was dismissed as to the children. Before the trial of this matter, the plaintiff settled with Rifton and Bruderhof "on her own behalf and on behalf of H and V" for seventy thousand dollars ($70,000). Ex. 1 of Stipulation. The case against Enid Wissa was withdrawn.

2) The plaintiff also brought suit against Hope Amanda Smith and Enid Wissa in Superior Court in Massachusetts on July 21, 2003. Ms. Smith paid all or virtually all of the cost of the flight from Connecticut to Egypt. That complaint was brought on behalf of Ms. Streeter and on behalf of her children. Damages were sought for emotional distress, loss of filial consortium, false imprisonment of the children, and recovery costs. That case was settled as against Smith for payment of $450,000 to an irrevocable trust solely for the children. No payment was made by Enid Wissa in this action in return for her release.

-39-

3) Streeter brought suit on her own and the children's behalf in district court in Miami, Florida, as against Anwar Wissa, Sr. (the children's grandfather) and Ardaman & Associates, Inc. (the employer of Wissa, Sr. and Wissa, Jr.) and Enid Wissa, seeking damages for emotional distress, loss of filial consortium, false imprisonment of the children, and recovery costs. In settlement of this action, Wissa, Sr. paid personally to Streeter the sum of $475,000 on behalf of himself and Enid (There was no payment by Ardaman.). Additionally, Wissa, Sr., in settlement of the children's claims, transferred full ownership of a life insurance policy on him to an irrevocable trust for the children to be established by the plaintiff-mother. The parties have stipulated the present value of that policy is $90,000.00.

The defendant claims entitlement to setoffs for all amounts except the $90,000 present value of the life insurance policy - or $995,000 ($70,000 + $450,000 + $475,000) under M.G.L. c 231B § 4.[27] Streeter claims the only setoff properly applied is the $70,000 Rifton and Bruderhof paid to settle the claims against them in this suit. No direct apportionment claims have been asserted in this action.

M.G.L. § 4 provides for post-verdict setoffs when one join tortfeasor has been released from further liability in tort for the same injury to a person or property. In pertinent part, it provides:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury: (a) It shall not discharge any of the other tortfeasors from liability for the injury unless its terms so provide; but it shall reduce the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater[.] (b) It shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

The parties agree setoff in the amount of $70,000 paid by Rifton and Bruderhof in this action is appropriate and the court so finds.

Regarding the payment by Smith of $450,000 in the Massachusetts action, the plaintiff claims

---

[27]EJM's original claim for setoff was made as part of its JNOV brief dated 5/31/05; there, it made claim under the Massachusetts statute cited and/or C.G.S. § 52-216a. In its supplemental memorandum dated 9/20/05, EJM abandoned its claim under Connecticut law entirely.

EJM has no entitlement to this as setoff because no payment was made directly to Streeter. Streeter claims that, under § 4(a), EJM must show: (1) payment to Streeter for a release from her; and (2) that such payment was made to a joint tortfeasor for the same injuries as that for which the jury has awarded damages.

The unredacted version of the Settlement Agreement in the Massachusetts action (dated 12/22/04) states it is by and between Hope Amanda Smith (who paid for the flight) and Hope Noyes Smith (Hope Amanda Smith's mother-not a part to any action brought by Streeter) on the one hand and this plaintiff "on her own behalf and on behalf of her children H and V" and various other non-parties to any action[28]. Paragraph 3.3 therein provides "Streeter, on her own behalf and on behalf of H and V" . . . "release(s) and forever discharge(s)" Hope Amanda Smith and her mother "from and against all actions, causes of action, claims, suits, debts, damages . . . and demands whatsoever . . . that Streeter, H and V may have or may have had at any time . . . ."

Streeter cites *Noyes v. Raymond,* 28 Mass. App. Ct. 186, 190 (1990) for the proposition courts may not rewrite express terms of settlement agreements for purposes of applying this statute. Opp. Memo, at 5. While the Massachusetts Court does not there expressly so state, the proposition is sound. What the Court does state is, "The fact that the amount of a settlement is low in comparison to the plaintiff's estimate of her own damages, by itself, is, however not material." *Id.* The parties dispute whether this settlement was made "in good faith" as that phrase is used in § 4. The Court in *Noyes* speaks directly to that:

> A rule whereby a determination of lack of good faith could be based only on the amount of a settlement would "require trial courts to apply an unworkable standard to every settlement. It [would] clog our trial courts with unnecessary hearings, discourage the settlement of legitimate claims, and severely strain the resources of the parties

---

[28]They include the plaintiff's mother and various Streeter family trusts and trustees of those trusts.

and the trial and appellate courts of this state." (Citation omitted.)
*Id.*, at 191.

This court rejects the suggestion the defendant here attempts to rewrite the settlement agreement.

That the plaintiff chose to have all of the settlement funds put into a trust for her children does not

change the fact she voluntarily released all of her claims as well as those of her children. No reason

presents why the defendant under these circumstances should be penalized when, as here, the

defendant was not a party to the agreement and when the released claims and causes of action are

the very claims and causes of action for which the plaintiff was here compensated. The right of a

joint tortfeasor not so released (such as EJM) "is merely to have the value of any consideration given

for such a release subtracted from the total of damages found to have been suffered by the victim."

(Citations omitted.) *Grace v. Buckley,* 13 Mass. App. Ct. 1081, 435 N.E.2d 655, 657 (1982). The

amount paid by Smith - $450,000 - is a setoff on the judgment here entered against EJM.

With regard to the $475,000 paid "to Nina" in settlement of the Florida lawsuit (Ex. 2,

Section 1.1), that too was for a release of "all actions, causes of actions, claims, suits, damages . .

. whether now known or unknown . . ." this plaintiff had against Anwar Wissa, Sr. and his wife,

Enid Wissa. *Id.*, at 3.3. It is of no relevance that that was paid by an insurance company; it was paid

on behalf of the Wissas. Streeter claims the payment by that carrier covered only the false

imprisonment claim (Opp. Memo, at 8); she cites to Ex. A attached at DW 2296 (a page from the

insurance policy). DW2296 does not establish that the policy covered only false imprisonment; it

provides personal liability coverage for "personal injury or property damage caused by an occurrence

during the policy period." *Id* . "Personal injury" includes "bodily injury," "shock, mental anguish,

or mental injury" and "false imprisonment." *Id.*. Three counts are asserted in that action -

interference with custodial relations, false imprisonment and conspiracy. Streeter claimed a loss of

filial consortium, mental suffering, trauma, and manifestations of emotional distress, as well as

recovery costs. Count One, Para. 48. Thus, the injuries "to Nina" for which the carrier paid are the

-42-

same injuries here asserted as flowing from the abduction. Streeter executed a release of all claims asserted -- and all that could have ben asserted - without regard for whether they were negligent or intentional acts. The plaintiff attempts to impose upon the defendant a burden neither § 4 nor the case law interpreting the same imposes. Under the circumstances, not to permit a setoff of $475,000 is to result in a windfall for the plaintiff.

Total setoff is in the amount of $995,000.

The clerk of the court is ordered to enter judgment of twenty-seven million dollars ($27 million) in favor of the plaintiff as against EJM, then to assess prejudgment interest on that amount at the rate of 12% for the period beginning May 15, 2002, and ending this date, and then to deduct from that total sum the amount of $995,000 in setoff.[29]

So ORDERED this date.

_____, J.    11/10/05
B.J. SHEEDY

---

[29]Under M.G.L.c. 231 § 6B, prejudgment interest is computed on the entire amount of the verdict rather than on a net verdict after deduction of a setoff. See *Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 708 F.2d 1, 12 (1st Cir. 1983); *Harvey v. Essex Bancorp, Inc.*, 25 Mass App. Ct. 323, 325 (1988).

-43-