**FORM 1**

## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

2006 ... 13 ⸱P 1: 35

Shawn Pouliot
_____

v.

Paul Arpin Van Lines, Inc. &
Arpin Logistics, Inc.
_____

**CIVIL CASE NO.** 3:02cv1302 (JCH)

### NOTICE OF APPEAL

1. Pursuant to F. R. A. P. 4(a)(1), Paul Arpin Van Lines, Inc. & Arpin Logistics, Inc. hereby gives notice and
                                          (appealing party)
appeals to the United States Court of Appeals for the Second Circuit from the following

Judgment or Order (attach the Judgment or Order):    Ruling on defendants'

motion for judgment as a matter of law and motion for a new trial

entered by District Court on 5/17/06.
_____

2. The Judgment /Order in this action was entered on    5/17/06     .
                                                              (date)

_____
Signature

Daniel J. Krisch
_____
**Print Name**

Horton, Shields & Knox, 90 Gillett St.

Hartford, CT  06105
_____
**Address**

Date: 6/13/06

(860) 522-8338
_____
**Telephone Number**

**Note:** You may use this form to take an appeal provided that it is received by the Office of the Clerk of the U.S. District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHAWN POULIOT,<br>    Plaintiff, | : | CIVIL ACTION NO.<br>3:02-cv-1302 (JCH) |
| | : | |
| v. | : | |
| | : | |
| PAUL ARPIN VAN LINES, INC.<br>and ARPIN LOGISTICS, INC,<br>    Defendants. | : | MAY 17, 2006 |

**RULING ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW
[Doc. No. 551], MOTION FOR A NEW TRIAL [Doc. No. 552], AND MOTION FOR
JUDGMENT ON/INVOLUNTARY DISMISSAL OF PLAINTIFF'S WITHDRAWN
RECKLESSNESS CLAIM [Doc. No. 549]**

I.    **INTRODUCTION**

The plaintiff, Shawn Pouliot ("Pouliot"), was a truck driver who was severely

injured while unloading freight from a truck owned by defendant Paul Arpin Van Lines,

Inc. The second defendant, Arpin Logistics, Inc., is the company that assigned Pouliot

to this delivery. Pouliot claimed that the defendants (collectively "Arpin"[1]) provided him

with a defective liftgate that they had failed to adequately inspect and service, and that

they failed to replace such liftgate with a safe alternative. Following trial, a jury found

negligence by both defendants. The jury awarded $993,100 in past economic

damages, $5,313,276 in future economic damages, $4,000,000 in past non-economic

damages, and $16,000,000 in future non-economic damages. In accordance with the

jury's verdict, judgment entered for Pouliot on January 26, 2006 in the amount of

$26,306,376.00.

---

[1]Although there are two defendants, they agreed to be treated as a single entity for the purposes
of the jury trial.

1

Arpin now moves for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure; for a new trial, pursuant to Rule 59 of the Federal Rules of Civil Procedure; and for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, or involuntary dismissal, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, of the plaintiff's recklessness claim, which he withdrew just before trial.

## II.   WITHDRAWN RECKLESSNESS CLAIM[2]

In response to the defendants' motion pertaining to the recklessness claim, the plaintiff has agreed to a voluntary dismissal under Fed.R.Civ.P. 41, of the recklessness claim that had survived this court's ruling on the defendants' motion for summary judgment. See Plf.'s Mem. Opp. Mot. New Trial & J. as a Matter of Law at 3 n.1 [hereinafter "Plf.'s Mem. Opp."]. Where a plaintiff seeks voluntary dismissal without prejudice after a trial on the merits has begun, the court "has considerable discretion" in deciding whether such dismissal is appropriate. See Wakefield v. Northern Telecom, Inc., 769 F.2d 109, 114 (2d Cir. 1985); see also Gravatt v. Columbia Univ., 845 F.2d 54, 56 n2 (2d Cir. 1988) (distinguishing Wakefield because it involved a case in which trial had already commenced). "In general, the court may allow such a dismissal if the defendant will not be prejudiced thereby." Id. (internal citation omitted.).

Pouliot did not specify in his memorandum whether he agrees to voluntary dismissal with prejudice, or only without prejudice. Id. In light of the fact that Pouliot has not submitted a stipulation of dismissal pursuant to Rule 41(a)(1) and in light of

---

[2]A recklessness claim was asserted against both defendants.

2

Rule 41(a)(2)'s statement that voluntary dismissal by order of the court is without prejudice unless the court orders otherwise, the court assumes that Pouliot has agreed only to voluntary dismissal without prejudice. The court declines to grant voluntary dismissal without prejudice, because plaintiff's counsel informed the court on the first day of trial that he was withdrawing the recklessness claim without then expressing any intention to seek voluntary dismissal without prejudice. The defendant would face substantial prejudice if the plaintiff was permitted a second trial on the recklessness claims at this late date, and the court would waste substantial resources.

The court grants the defendants' motion for involuntary dismissal pursuant to Rule 41(b), because the plaintiff failed to prosecute the recklessness claims.

## III.    MOTION FOR JUDGMENT AS A MATTER OF LAW

The defendants argue that they are entitled to judgment as a matter of law because "(1) the owner-operator agreement between the plaintiff and the defendants bars any liability for the defendants for injuries arising out of performance of that agreement; and (2) the plaintiff was an employee of the defendants." Defs.' Renewed Mot. J. as a Matter of Law [Doc. No. 551].

### A.    Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis. See Fed. R. Civ. P. 50. The standard under Rule 50 is the same as that for summary judgment: A court may not grant a Rule 50 motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise

3

considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation marks omitted). Thus, in deciding such a motion, "the court must give deference to all credibility determinations and reasonable inferences of the jury . . . and it may not itself weigh the credibility of the witnesses or consider the weight of the evidence." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted).  In short, the court cannot "substitute its judgment for that of the jury." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted).  Rather, judgment as a matter of law may only be granted if:

    (1)    there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

    (2)    there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

Galdieri-Ambrosini, 136 F.3d at 289 (quoting Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); see also Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997).

    Moreover, "weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party.'" This Is Me, Inc., 157 F.3d at 142 (quoting Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993)).  The court "must view the evidence in the light most favorable to the party in

whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (citation omitted); see also Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002) (court must draw all reasonable inferences in favor of the non-moving party). Additionally, in making its determination, the court "'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" Mickle, 297 F.3d at 120 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)). Thus, "[a] party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." Norton, 145 F.3d at 118.

> **B.    Discussion**

In this court's ruling on the defendants' motion for summary judgment, it considered and rejected both arguments that Arpin advances in support of its motion for judgment as a matter of law. The court now denies the motion for judgment as a matter of law for the reasons stated in its summary judgment ruling. Pouliot v. Paul Arpin Van Lines, Inc., 367 F.Supp.2d 267, 272-74 (2005).

## IV.    MOTION FOR A NEW TRIAL

Arpin argues that it is entitled to a new trial pursuant to Rule 59 because (1) the court refused to bifurcate the trial; (2) the court refused to instruct the jury on the inapplicability of the Federal Motor Carrier Safety Act (FMCSA) regulations to the issues in this case; (3) the court refused to give a curative instruction following plaintiff counsel's use of a "golden rule" argument in his summation; (4) the court admitted a portion of Dr. Cremer's videotaped deposition to which Arpin had objected; (5) the jury's

verdict as to apportionment of liability was not supported by sufficient evidence; and (6) the jury's verdict is excessive.

### A.    Standard of Review

"The decision whether to grant a new trial following a jury trial under Rule 59 is 'committed to the sound discretion of the trial judge.'" Stoma v. Miller Marine Svcs., Inc., 271 F.Supp.2d 429, 431 (E.D.N.Y. 2003) (quoting Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992). A new trial "'should be granted when, in the opinion of the district court, the jury reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." Id.

> This standard differs from the Rule 50 standard in two significant ways:
>
> Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence [herself], and need not view it in the light most favorable to the verdict winner.

Id. at 134 (citation omitted).  However, "a court should rarely disturb a jury's evaluation of a witness's credibility." Id.  "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992) (internal citations omitted).

"It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or

otherwise taking a 'second bite at the apple.'" Sequa v. GBJ Corp., 156 F.3d 136, 144

(2d Cir. 1998) (internal citation omitted).

### B.   Discussion

#### 1.   Bifurcation

Arpin argues that the court's denial of its motion to bifurcate the trial into

separate liability and damages phases prevented the jury from giving fair and impartial

consideration to the question of liability.

The issue of whether to bifurcate a trial falls within the discretion of the district

court. Johnson v. Celotex Corp., 899 F.2d 1281, 1289 (2d Cir. 1990). Within its

discretion, the court may order separate trials "where such an order will further

convenience, avoid prejudice, or promote efficiency." Amato v. City of Saratoga

Springs, 170 F.3d 311, 316 (2d Cir. 1999) (affirming, under the abuse of discretion

standard, a trial court's order to bifurcate a trial such that claims against two defendants

would be tried before claims against remaining defendants). Situations in which "the

litigation of the first issue might eliminate the need to litigate the second issue may

sometimes be appropriate for bifurcation, see id., but the court is aware of no case

holding that courts are required to bifurcate all trials that involve questions of liability as

well as questions of damages.

In the present case, the court concluded that bifurcation was inappropriate. As

the court reasoned in its original holding on this issue, bifurcation would have been of

limited value in avoiding prejudice. The jury would have had the opportunity to observe

Pouliot in the courtroom even if the trial was bifurcated, and the jury's observation of

7

Pouliot, who is a paraplegic as a result of his injury, was likely to present far more serious prejudice concerns than the testimony regarding his damages. The court also reasoned, based on its previous experience with bifurcated trails, that a bifurcated trial was likely to be inefficient as compared with a trial that was not bifurcated.

To prevent a liability verdict influenced by prejudice, the court instructed the jury that its verdict should not be influenced by sympathy for Pouliot and that it was not to consider damages unless it first found that Pouliot had proven his claim of negligence against Arpin. See Jury Charge § II [Doc. No. 534] (instructing the jury to consider only the evidence and not to be influenced by prejudice, sympathy, bias, or the consequences of the jury's decision); id. at § XXV (instructing jury not to consider the question of damages "unless and until" it finds Pouliot has proven his negligence claim against Arpin). Aware of no evidence that its instructions were confusing, in error, or contradictory, the court assumes that the jury followed them. See, e.g., Smith v. Texas, 543 U.S. 37, 46 (2004) (quoting Penry v. Johnson, 532 U.S. 782, 799-800 (2001)) ("We generally presume that jurors follow their instructions.").

The court finds that the jury's verdict on liability was not, as the defendants suggest, against the weight of the evidence.  Rather, Pouliot presented significant evidence to support his claim of negligence by Arpin. The court finds that its decision not to bifurcate the trial did not lead the jury to a "seriously erroneous result," nor a verdict that is "a miscarriage of justice."  It denies the motion for a new trial insofar as it is premised on the court's refusal to bifurcate the proceedings.

8

## 2.    Lack of Curative Instruction on FMCSA Regulations

Next, the defendants argue that they are entitled to a new trial because the court refused to give a curative instruction telling the jury that the Federal Motor Carrier Safety Act regulations did not apply to this case. The court did not give this requested instruction because it did not find it necessary. Although one witness, Dr. Roland Ruhl, did mention these regulations in his testimony, his discussion of them is confined to two pages of the transcript from the first of five days of evidence. See Trial Tr. (1/11/06) at 94-95 [Doc. No. 536]. Moreover, although the defendants argue that the plaintiff's attorney used language from the regulations in his opening and closing arguments, he did not mention the regulations by name. He argued that "the law requires that [a] trucking company systematically prepare, maintain and inspect all of its equipment and give its drivers safe equipment," Trial Tr. (1/11/06) at 6 [Doc. No. 536], and his summation stated, "[e]verybody that's testified in the case including the last witness said that the motor carrier has an obligation to systematically inspect, repair and maintain their equipment and to provide safe equipment to the drivers at all times including liftgates." Based upon the evidence, it was reasonable for the plaintiff to argue that Arpin had a common law duty to systematically prepare, maintain and inspect the liftgate on the truck it gave to Pouliot even though this court held during the trial that the FMCSA regulations did not cover the liftgate's operation. The defendants' own witnesses, Joseph Rocha and Veryl Paul Herbert, testified that Arpin, as a motor carrier, had an obligation to systematically inspect, repair and maintain the liftgate. Michael Montgomery testified that it was Arpin's responsibility to keep the truck it gave

9

Pouliot and the truck's liftgate in safe working order. None of these witnesses identified this obligation as existing because of the FMSCA regulations.

The Fifth Circuit case upon which the defendants rely, Bode v. Pan Am. World Airways, Inc., involved different issues from the instant case. 786 F.2d 669 (5th Cir. 1986). In Bode, the trial court had instructed the jury that they could award damages for mental anguish suffered by the plaintiffs "as a direct result" of a plane crash. The Fifth Circuit held that the trial court had erred in failing to instruct the jury that mental anguish over the peril, injury, and death suffered by friends and neighbors and over the destruction of one's neighborhood was not compensable under Louisiana law. Id. at 672-73. Bode is distinguished from the instant case because the Bode trial court had given a misleading instruction to the jury. Moreover, the Fifth Circuit found that the Bode jury had heard sufficient evidence of mental anguish over the peril, injury, and death suffered by friends and neighbors and the neighborhood's destruction to create a real concern that the damage award included recovery not permitted under Louisiana law. Here, in contrast, the court finds it very unlikely that the jury based its verdict on a misunderstanding of Arpin's duty to Pouliot. The jury heard only a few sentences of evidence referring to the FMCSA, and it then heard a greater amount of evidence as to Arpin's common law duty. Moreover, Arpin did not meaningfully contest the plaintiff's contention that it had a duty to systematically inspect, repair, and maintain the liftgate. Instead, it focused on arguing that the liftgate was not defective, and on the liability of

the plaintiff and a third party.[3]

The court finds that its instructions on Arpin's duty, which did not mention the FMCSA regulations, adequately and clearly conveyed the legal standard that the jury was to apply. See Kovacich v. Benjamin, 951 F.2d 114, 116 (7th Cir. 1991) (reviewing "an allegedly erroneous omission of an instruction with an eye towards the adequacy of the instructions actually given"). The defendants' requested curative instruction would likely have served only to distract the jury from the main issues in the case and to confuse the jury as to the proper legal standard for determining the defendants' duty to the plaintiff. The court denies the motion for a new trial insofar as it is premised on the argument that the court should have given a curative instruction on the FMCSA regulations.

### 3.    Golden Rule Argument

Next, the defendants argue that the court should have given a curative instruction in response to what it contends was a "golden rule" argument in the plaintiff's summation. Both Connecticut and federal courts prohibit counsel from instructing jurors to put themselves in the plaintiff's place and set damages at the value that they would wish to receive were they in the plaintiff's position. See Marcoux v. Farm Svc & Supplies, Inc., 290 F.Supp.2d 457, 463 (S.D.N.Y. 2003); Murray v. Taylor, 65 Conn.App. 300, 321 (2001). Golden Rule arguments are improper "because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Murray, 65 Conn.App. at 321;

---

[3]For this reason, the other case cited by the defendants, Kovacich v. Benjamin, 951 F.2d 114 (7th Cir. 1991), is also distinguishable. In Kovacich, the magistrate judge had declined to give an instruction that was necessary to support the defendant's main theory of the case. Id. at 117.

11

accord Marcoux, 290 F.Supp.2d at 463 (quoting Forrestal v. Magendantz, 848 F.2d

303, 309 (1st Cir. 1988)).  In his closing argument, the plaintiff's attorney argued:

> Let's imagine that Shawn Pouliot's disabilities were a job for one year.
> You had to live as Shawn Pouliot for one year with all the things we have
> discussed, 7 days a week, 365 days a year.  Thankfully at the end you
> can leave.  What would fair and just reasonable compensation for that
> period of time be, that one year?  What would be reasonable?  Would it
> be $500,000?  That would be more than [the damages figure counsel had
> requested].  It is times 47.  It is a 47 year life expectancy.  We know he
> may be dead for ten of it.  That needs to be compensated.  Death is
> worse than life.  47 year term.  How about $400,000 for the year?  That's
> more than [the damages figure counsel had requested].

Trial Tr. (1/18/06) at 28.  The defendants made no objection to this statement during

the summation.  Only after the argument did they request that the court give a curative

instruction.

As the court ruled at trial, Pouliot did not make a "Golden Rule" argument such

that his argument required a targeted curative instruction.  Although he did ask the jury

to imagine themselves in Pouliot's situation, he did not ask them to render a damages

verdict based upon the value they would wish to receive if they were in Mr. Pouliot's

situation.  See Marcoux, 290 F.Supp.2d at 463-66 (finding argument proper where

counsel repeatedly asked the jury if it could imagine being in the plaintiff's position,

because counsel "invited the jury to focus on the gravity of plaintiff's injuries, but did not

tell the jurors directly or implicitly that they should award plaintiff the sum of damages

that they themselves would desire if they found themselves 'in the plaintiff's shoes'")

(citing McNally v. Eckman, 466 A.2d 363, 371-73 (Del.1983)).  Rather, he asked them

to determine what would be "fair and just reasonable compensation" for someone in

that situation.

Moreover, even if the context of plaintiff counsel's suggestion that the jury imagine themselves in Pouliot's position for a year could have led jurors to believe they could consider the amount of damages they would wish to receive in Pouliot's position, the court's instructions on damages were sufficient to cure this misconception. Even though the court did not specifically discuss the plaintiff's closing argument in the jury charge, it did clearly instruct the jury that they were to determine damages based on the objective evidence, and not on the basis of sympathy or prejudice. See Jury Charge §XXX [Doc. No. 534] (instructing jury that damages decision cannot be based on speculation, guesswork, sympathy, bias, or prejudice)[4]; id. at §§ XXV (instructing the jury that Pouliot bears the burden of proving the extent of his damages with evidence "which is not merely subjective or speculative, but which allows for some objective decision of the amount of money that would compensate him for his injuries." ); id. at §§ XXV-XXVIII (instructing jury on Pouliot's burden of producing evidence of damages, and on what the jury may consider in calculating a damages award); see also Murray, 65 Conn.App. at 322 (finding jury instruction sufficient to cure prejudice from golden rule argument where, "[a]lthough the court did not specifically refer to the [golden rule]

---

[4]The court instructed the jury,

With regard to the determination of damages, you must not speculate or guess. You must bear in mind at all times that the burden is on Mr. Pouliot to prove that any claimed element of damage was a proximate consequence or result of the incident, as well as to prove the reasonable amount of any damages with respect to any such element.

Also remember that your decision cannot be based on sympathy. Sympathy can play no part in your decision. Sympathy, bias, or prejudice for or against any party should not have any influence upon you in reaching your verdict.

Jury Charge § XXX [Doc. No. 534].

13

argument in instructing the jury, it cautioned the jury not to base its decision on sympathy or prejudice toward either party"); Johnson v. Celotex Corp., 899 F.2d 1281, 1289 (2d Cir. 1990) (holding that counsel's invocation of a golden rule argument did not deny appellants a fair and impartial trial where, "[throughout the normal course of the trial and in the final charge, the trial judge instructed the jury to decide the case in a rational manner based on the evidence presented and not on emotions, sympathy, prejudice, or bias"). The defendants make no argument that the court's instructions on damages were confusing, in error, or contradictory. The court presumes that the jury followed them. See, e.g., Smith v. Texas, 543 U.S. 37, 46 (2004) (quoting Penry v. Johnson, 532 U.S. 782, 799-800 (2001)). The jury's verdict was not excessive, see Part IV.B.6, infra, and the court finds no other evidence to overcome the presumption that the jury followed its instructions.

The court does not find that Pouliot's closing argument led to a seriously erroneous result, or a miscarrimage of justice. It denies the motion for a new trial insofar as it is premised on the argument that the plaintiff gave an improper "golden rule" argument.

### 4.   Dr. Cremer's Videotaped Deposition Testimony

Next, Arpin argues that the jury was prejudiced by the admission into evidence of a portion of a videotaped deposition of Dr. Cremer, Pouliot's physician. Rule 403 of the Federal Rules of Evidence permits a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice," among other concerns. "Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair." Constantino v. Herzog, 203

14

F.3d 164, 174 (2d Cir. 2000) (citing Weinstein's Federal Evidence § 403.04[1][a] (2d ed.1997)). "The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission. Id. at 174-75 (internal citation omitted).

The video in question here depicts Dr. Cremer pointing out injuries on Pouliot's body, as well as his colostomy bag and catheter bag, while Pouliot lay on a bed in the hotel room in which the deposition took place. Arpin argues that the admission into evidence of this portion of the deposition encouraged a verdict impermissibly influenced by emotion. The court disagrees. Prior to trial, pursuant to Rule 403, the court viewed the videotape and considered the probative value and the prejudicial effect of admitting this testimony. While this type of evidence could be very prejudicial, it was this court's conclusion after viewing the video tape that the probative value was extremely high. Further, the court did not view the video tape as unfairly prejudicial. This court then concluded that the probative value clearly outweighed the prejudicial effect. Although Dr. Cremer did testify orally about Pouliot's injuries prior to showing them to the attorney conducting the deposition, the court found that the visual portion of the deposition (to which the court will refer, albeit imprecisely, as the "demonstration") was useful in illustrating and explaining the verbal explanation, and provided an insight into Pouliot's damages additional to that imparted by the verbal testimony that preceded it. It was highly probative of the extent of Pouliot's damages. Dr. Cremer conducted the demonstration in a professional manner, and neither he nor the plaintiff behaved emotionally during the demonstration. Moreover, the fact that the jurors viewed the demonstration on video created a sense of emotional distance that may not have been possible had Dr. Cremer conducted the demonstration of Pouliot's injuries live in the

15

courtroom. While Pouliot's ulcer, muscular degeneration, colostomy, and need for a catheter are themselves upsetting, the video showed no more than necessary to give jurors an understanding of the medical consequences of Pouliot's injury, and therefore was not unduly prejudicial. Its probative value substantially outweighed the danger, if any, of unfair prejudice.

The court finds no error in its ruling admitting the contested portion of the videotaped deposition, as set forth at greater length on the trial record. See Trial Tr. (1/12/06) at 6-10. It finds that this decision did not lead to a seriously erroneous result, nor a miscarriage of justice. It therefore denies the motion for a new trial insofar as it is based on the admission of Dr. Cremer's videotaped deposition.

### 5.    Verdict on Apportionment

Arpin argues that the court should order a new trial because the jury's verdict with respect to the plaintiff's comparative fault was against the weight of the evidence. It argues that the jury heard uncontroverted evidence that a loading dock was present at the community college at which Pouliot was delivering the load that injured him, and that he negligently did not use this dock.

As a preliminary matter, Pouliot argues that the defendants cannot pursue this argument because they did not preserve it at the time of trial. The plaintiff cites Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998), for the proposition that a defendant must challenge the sufficiency of the evidence to support a particular element of the claim before the jury retires in order to make a sufficiency argument on appeal. This case also held that a defendant had to preserve a sufficiency claim in this manner in order to raise it on a post-trial Rule 50(b) motion. Id. However, the

16

defendants assert their sufficiency argument pursuant to Rule 59, rather than Rule 50. A Rule 59(a) motion for a new trial is not limited to arguments made at trial. Grisanti v. Chioffi, No. CIV399CV490JBA, 2001 WL 777435, at *3 (Jun. 14, 2001).

The court agrees with Arpin that the federal standard of review for a Rule 59 motion, see Part IV.A., supra, applies in diversity actions, even when the defendant's argument is premised on insufficiency of the evidence. See 11 Charles Alan Wright et. al., Federal Practice & Procedure § 2802 (2d ed. 1995), cited in Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir. 1996) ("The grant or denial of a new trial [pursuant to Rule 59] is a matter of procedure governed by [federal] rules and not by state law or practice."). With regard to the Federal Rules of Civil Procedure, "[i]t is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law." Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 428 n.7 (1996) (internal citations omitted). Neither party argues, and the court does not find, that Rule 59 violates the Rules Enabling Act or the federal Constitution. Cf. Ellis v. Weasler Engineering Inc., 258 F.3d 326, 337 (5th Cir. 2001) (reaching the same conclusion with respect to a challenge to the sufficiency of the evidence under Rule 50).

The court does not find that the weight of the evidence at trial would require a finding of comparative fault. Although there was testimony that the community college had a loading dock that Pouliot did not use (the "higher dock"), this fact alone does not establish that Pouliot's failure to use this dock constituted negligence.

First, the weight of the evidence did not establish that Pouliot had a realistic option of using the higher dock. Pouliot testified that a representative from the college

told him that the college had no docks, other than the one that Pouliot ultimately used to unload the cargo, "accessible for what we were needing to do to get that unit where it needed to be." Trial Tr. (1/13/06) at 124:10-124:18; see also id. at 100:1-101:3 (stating that Pouliot realized his truck could not access the loading dock, brought this information to the attention of a representative of a man at the college, then found out at which dock the unit was to be unloaded, and then used that dock). Although Daniel McCarthy, a professor at the college, and James Blalock, a police officer, testified that the college had a loading dock in addition to the one Pouliot used, they did not testify to the accessibility of the higher dock on the day of the incident in question or to the appropriateness of its use for the particular truck Mr. Pouliot was driving. Moreover, neither testified as to whether the higher dock would have permitted Pouliot to move the cargo to its appropriate destination inside the college building.

Perhaps more importantly, even if unloading the cargo onto the higher dock might have obviated the need for a working liftgate, the evidence supports a conclusion that Pouliot could have safely unloaded the cargo using the liftgate, if Arpin had properly inspected and maintained the liftgate so that it was functioning properly at the time of the delivery in question. See Trial Tr. (1/11/06) at 132-36 [Doc. No.536] (expert opinion of Dr. Roland Ruhl). "Generally speaking, one to whom the duty of due care is owing has a right to assume that it will be performed, in the absence of circumstances indicating the contrary, and may excuse himself for an omission to take active measures, such as looking, listening, and making inspection, by proof that the defendant owed to him a duty of care, and that he relied upon the performance thereof." Darling v. Burrone Bros., Inc., 162 Conn. 187, 198 (1972); see Jury Charge

18

§XXII [Doc. No. 534]. The plaintiff presented sufficient evidence to support a finding that Arpin owed Pouliot a duty of care to provide him with a truck with a safely operable liftgate, and that Pouliot relied on Arpin performing this duty in deciding whether to take active measures in inspecting the liftgate before relying on it to unload cargo at the loading dock to which he was directed at the college. Therefore the court does not find that the weight of the evidence would support a finding that Pouliot was negligent in relying on the liftgate and not using the higher loading dock at the college. It denies the motion for a new trial insofar as it is premised on evidence of comparative fault.

### 6. Damages

Finally, Arpin seeks a new trial or remittitur because it claims that the damages the jury awarded to Pouliot are excessive. It argues that:

> (1) the jury failed to discount the plaintiff's future economic damages to their present value; (2) the jury awarded economic damages in excess of the amount supported by the evidence; (3) the combination of these two miscalculations with respect to economic damages likely infected the jury's consideration of the proper measure of non-economic damages; (4) the amount of non-economic damages shocks the conscience[;] (5) the verdict should be reduced by the amount of settlement payments received by the plaintiff; and (6) the verdict should be reduced by the amount of collateral source payments received by the plaintiff.

Defs.' Mem. Supp. Mot. New Trial at 23 [Doc. No. 552-2].

In deciding "remittitur motions in diversity cases, federal courts apply federal procedural standards and state substantive law." Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir. 1996) (internal citations omitted). The court considers the motion for a new trial or remittitur under the procedural standards of Rule 59 of the Federal Rules of Civil Procedure, but it looks to state substantive law to determine if the verdict was excessive. See id. A trial judge does not sit and vote as a juror; his or her personal

reaction to a jury's verdict is not a substitute for legal authority to alter that body's decision." Id. at 88. "Under Connecticut law, a court may grant remittitur only when the jury verdict is excessive as a matter of law." Id. at 90 (internal citations and quotation marks omitted).

> "Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake, or corruption.

Ham v. Greene, 248 Conn. 508, 536 (1999) (quoting Mather v. Griffin Hosp., 207 Conn.125, 138-39 (1988)). "A direct showing of partiality, prejudice, mistake or corruption [on the part of the jury] is not required." Malmberg v. Lopez, 208 Conn. 675, 680 (1988).

### a.    Discounting of Future Economic Damages Award to Present Value

Arpin argues that the jury failed to discount its award of future economic damages to present value. The Second Circuit has held that a federal district court determining whether it is appropriate to discount a damage award resulting from a state law cause of action must look first to state law discounting rules. See Matthews v. CTI Container Transport Intern. Inc., 871 F.2d 270, 280 (2d Cir. 1989) (citing O'Rourke v. Eastern Airlines, Inc., 730 F.2d 842, 857 n. 24 (2d Cir.1984)). Only "where a state has no definitive law governing the discounting of future nonpecuniary damages" is it

20

"reasonable to infer that the state court, if faced with the issue, would apply a discount
factor to the damages." Id. (citing Metz v. United Technologies Corp., 754 F.2d 63,
67-68 (2d Cir.1985)).

The Connecticut Supreme Court, in contrast to the Second Circuit Court of
Appeals, see, e.g., Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38, 41
(2d Cir. 1997), has refused to endorse any particular discount rate, or even to require
damage awards to be discounted to reflect the present value of money. See Mather v.
Griffin Hosp., 207 Conn. 125, 147 (1988) ("we recognize that economics is an inexact
science and we hesitate to adopt any particular method for computing the present value
of lost compensation and future costs.").[5] Rather, the Connecticut Supreme Court
requires that the parties be allowed to present evidence on the proper method of
calculating damages, and that the jury be permitted choose whether or not to credit any
evidence presented. Id. at 145 (internal citations omitted) ("Economic evidence and the
testimony of economic experts are appropriately weighed by the jury. . . [T]he
acceptance or rejection of an opinion of a qualified expert is a matter for the trier of fact
unless the opinion is so unreasonable as to be unacceptable to a rational mind.").
Therefore, Connecticut has definitive law on this matter, and it is appropriate to apply
state law.

The court instructed the jury in the manner required by Connecticut law, see Jury

---

[5]Although Arpin attempts to distinguish Mather from the present case on a factual basis, the
Mather court's holding that the question of the appropriate discount rate is one left for the jury to decide is
not limited to cases in which only one side presents evidence of discounting, nor to the particular discount
rate used by the economic expert.

21

Charge § XXXII [Doc. No. 534].[6]  Arpin did not object to charging the jury in this

manner.  Because the court does not find that its instructions were confusing, in error,

or contradictory, it presumes that the jury followed its instructions.  See Smith v. Texas,

543 U.S. 37, 46 (2004) (quoting Penry v. Johnson, 532 U.S. 782, 799-800 (2001)).

Moreover, it does not find that the size of the jury's verdict, when considered alongside

the testimony of the economic experts at trial, shows that they failed to follow the

instruction on present value.  Although Arpin argues that Dr. McCausland's testimony

as to the appropriate discount rate was more correct than that of Dr. Gamboa, the jury

may well have credited Dr. Gamboa's testimony above that of Dr. McCausland.  The

court does not find it necessary or appropriate to disturb this credibility assessment.

See DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998).

> **b.    Excessiveness of Economic Damages Award in Light of Damages Evidence**
>
> **i.    Past Economic Damages**

The jury awarded  $993,100 in past economic damages.  Although Pouliot

presented more detailed evidence of future economic damages than of past economic

damages, the record does contain sufficient evidence of past economic damages to

persuade the court that the past economic damages award is not excessive.  Based on

_____

[6]The court instructed the jury:

You have heard some testimony from expert witnesses who have discussed ways in which you might adjust your estimation of damages to account for certain economic factors such as inflation (that is, the idea that a service that costs a dollar today will cost more in the future) and the time value of money (that is, the idea that one dollar received today is worth more than the right to receive a dollar in the future).  As I mentioned before, you should weigh the experts' testimony just as you will weigh other evidence.  You are permitted to take economic factors into account in calculating a damage award, but you are not required to make any particular adjustments or to credit any witness's testimony regarding the present value of a future award.

Jury Charge § XXXII [Doc. No. 534].

22

statistical evidence, Dr. Gamboa estimated Pouliot's future lost wages, including fringe
benefits, at a rate of roughly $65,000 per year.  Dr. Gamboa also estimated that the jury
would need to subtract $217,746 in tax liability from the roughly $1.8 million lost wages
figure, which he derived by multiplying the statistically calculated income of
approximately $65,000 per year by a 27.7-year work-life expectancy.  If the jury inferred
that the taxes would have been evenly distributed from year to year, the yearly income
estimate would be reduced by taxes to an amount just over $57,100.  Multiplying this
figure by 4.3 years (between the accident and trial), the jury could have concluded that
Pouliot lost more than $245,500 in past earnings as a result of his injury.  Moreover, the
jury also received evidence that Pouliot actually earned significantly more than $65,000
per year in the years before his accident and that he had a very strong work ethic and
desire to build a business, which could have caused his earnings to increase quickly.
Thus, his past lost wages could have been even higher than the figure based on
Gamboa's estimates.

In addition, Larry Forman testified generally as to Pouliot's medical needs
following the accident.  There was also testimony concerning Pouliot's purchase of a
van and a bed and home improvements required to make his home accessible.[7]

Even if Pouliot did not directly seek past economic damages in closing argument,
evidence of these damages was presented at trial.  In light of the evidence presented,
the court does not find the jury's past economic damages award to be excessive as a
matter of law.  "[T]he award falls somewhere within the necessarily uncertain limits of

---

[7]The Continuum of Care plan contains cost figures for such items as they would
be needed in the future.

23

just damages," and its size does not "so shock[] the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake, or corruption." Ham v. Greene, 248 Conn. 508, 536 (1999) (internal citation omitted).

### ii.    Future Economic Damages

Next, Arpin argues that the future economic damages award of $5,313,276 should be reduced because it exceeds the estimates in Forman's Continuum of Care plan. The court disagrees.  The estimated future costs in the Continuum of Care plan totaled $4,084,423 up to age 70.  In addition, Dr. Gamboa gave a statistical estimate of lost wages that would total $1,738,530 for the 27.7 years of work-life expectancy that Pouliot would have had following the date of the accident.  If the jury accepted Dr. Gamboa's testimony regarding work-life expectancy and inferred that the lost wages were evenly distributed over time, it could reasonably arrive at a prorated figure of $1,468,650 for future lost wages.  This is the more conservative figure offered by Dr. Gamboa, who also testified that Pouliot's actual earnings prior to his injury were higher than those predicted according to statistical data.  Even the combination of the Continuum of Care plan costs to age 70 and the statistically-based future wages figure would equal an amount greater than the future economic damages that the jury awarded.

Arpin argues that the jury should have credited Dr. McCausland's testimony that Forman had included several ulcer surgeries in the Continuum of Care plan that Dr. Cremer had not stated would be necessary, thereby increasing the cost of the Continuum of Care plan by $454,198, when measured using Dr. McCausland's present value calculation. However, the court finds it reasonable, in light of the evidence

24

regarding the recent severity of Pouliot's ulcer, and that he had suffered more than one

by the time of trial, that the jury may have determined that there was a reasonable

probability that Pouliot would have needed such additional surgeries. Moreover, even if

the jury had determined that a few of the surgeries included in the Continuum of Care

plan had not been proven reasonably necessary, it could have concluded that Pouliot

was reasonably likely to have received a salary higher than that derived from statistical

evidence, in light of his earnings history in the years immediately preceding the

accident.

The future economic damages award was not excessive in light of the evidence

presented at trial. "[T]he award falls somewhere within the necessarily uncertain limits

of just damages," and its size does not "so shock[] the sense of justice as to compel the

conclusion that the jury was influenced by partiality, prejudice, mistake, or corruption."

Ham, 248 Conn. at 536 (internal citation omitted).

### c. Effect of Alleged Miscalculations of Economic Damages on Non-Economic Damages

Having held that the jury's economic damage awards are not excessive, the

court finds no merit in Arpin's argument that the excessiveness of economic damages

caused the jury to award excessive non-economic damages.

### d. Non-Economic Damages Shocking to the Conscience

Next, Arpin argues that the non-economic damages award is excessive because

it shocks the conscience. Although "[t]he amount of a damage award is a matter

peculiarly within the province of . . . the jury," a remittitur is required if the "size of the

verdict so shocks the sense of justice as to compel the conclusion that the jury was

influenced by partiality, prejudice, mistake or corruption." Ham, 248 Conn. at 536.

25

The defendants cite, by way of comparison, two cases that involved lower jury verdicts than that at issue here. See Mather, 207 Conn. at 148-49; Gladstone v. Grinnan, No. CV 910316424, 1995 WL 780887, at *9 (Conn. Super. Dec. 15, 1995). Neither Mather nor Gladstone addressed the question of whether the verdicts could have been higher without shocking the conscience, and both were decided over a decade ago. A more recent Connecticut Superior Court ruling denied a remittitur where a jury awarded $22,710,000 in non-economic damages to a plaintiff who had been rendered paraplegic from a construction accident. See Pelletier v. Sordoni/Skanska Contr. Co., No. X06-CV-95-0155184 S, 2006 WL 760140 (Mar. 9, 2006). The non-economic damages award in Pelletier is $2,710,000 greater than the non-economic damage award in the instant case. Judge Alander held that this award did not "shock the court's sense of justice" because, following the accident that severed the plaintiff's spinal cord,

> [h]e no longer has the use of his legs. According to the medical testimony, he has a permanent impairment of 80% of his whole person. He has no voluntary control over his lower extremities, bowel, bladder or sexual function. He testified that he is in constant pain. The most basic of daily activities, such as getting out of bed, going to the bathroom, getting dressed and preparing a meal require significant time, effort and assistance to accomplish. At the time of the verdict, he had endured this pain, loss of function, and loss of life's activities for the past 11 years and, given his life expectancy, he can expect to bear it for 25 years more. Put simply, the enormity of the award is matched by the enormity of the plaintiff's damages.

Id. at *3. The jury in the instant case heard evidence of even more severe impairment and anguish. According to medical testimony, Pouliot has a permanent impairment of 92% of his whole person. Like Pelletier, he has lost all voluntary control over his legs, bowel, bladder, and sexual function and must struggle with routine daily activities.

26

The jury also heard that Pouliot suffers from a constant burning and pain sensation in his lower extremities; that he was suffering from, and had suffered in the past from, a skin ulcer so severe it reaches down to his bone and forces him to lay on his side for long periods of time; and that he has suffered severe loss of muscle mass and body weight, among other physical problems. It also heard that his wife divorced him after his injury and that he has struggled with depression and other mental anguish following his injury.

Pouliot had suffered these damages for 4.3 years prior to trial. Even Dr. Cremer's more conservative estimate of Pouliot's life expectancy suggests he may expect to continue to suffer such damages for approximately 32 or 33 years into the future, making the total length of time that the plaintiff has suffered and will suffer damages roughly equal to that in Pelletier. The jury also heard evidence that Pouliot has lost roughly seven to ten years of his life expectancy as a result of his injury, which could support further non-economic damages.

This court views the jury's verdict on non-economic damages as reasonable in light of all of the evidence of non-economic damages. The award does not shock the sense of justice. Rather, as in Pelletier, "the enormity of the award is matched by the enormity of the plaintiff's damages." Id. Moreover, this court is convinced that "[n]othing in the jurors' conduct throughout trial permits the conclusion they were other than thoughtful, fair-minded people who carefully considered the evidence . . . and the charge on the law." Streeter v. Executive Jet Management, Inc., No. X01-02-0179481, at 30-31 (slip. op.) (Conn. Super. Nov. 10, 2005). It is the court's view that the jury was attentive to the evidence presented and did not act with partiality or prejudice or

27

emotion.

### e.   Settlement Payments

Arpin also asks the court to reduce Pouliot's damages award by the amount of his settlement payments from Festo and Trans Expo Int'l. These settlement payments total $1,310,000.

The plaintiff concedes that settlement payments may be added to the trial award to determine if the total award shocks the conscience. See Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir. 1996). The settlement amount equals just under five percent of the jury's award. In light of the enormous damages that Pouliot has suffered, and the comparison to the facts and damage award discussed in the March 2006 Pelletier ruling, the court does not find that this amount raises the total award to a level that shocks the conscience.

Additionally, Arpin suggests that the court should order a remittitur in the amount of the settlement payments because Pouliot would otherwise receive double recovery for his injuries. See Peck v. Jacquemin, 196 Conn. 53, 71 n.19 (1985) ("[N]othing we say today in any way changes the time-honored rule than an injured party is entitled to full recovery only once for the harm suffered."). Connecticut General Statutes section 52-216a, which prohibits parties from introducing evidence of settlements with joint tortfeasors to a jury, permits a court to order a remittitur if it finds that a jury's verdict is excessive. However, payments to a plaintiff by settling co-defendants are not collateral sources and are not deducted from a verdict where the combination of the verdict and the settlement payments are not excessive as a matter of law. See Peck, 196 Conn. at 78 n.1 (Shea, J., concurring) (stating that the majority's construction of Conn.Gen.Stat.

28

§ 52-216a "permit[s] a reduction in a verdict for damages against one tortfeasor by amounts received from other tortfeasors only when the total would be excessive as a matter of law"); White v. Byelas Irrevocable Trust, 64 Conn.App. 506, 510-12 (2001). In the present case, the combined value of the verdict and the settlement payments is not excessive as a matter of law, and the court finds that the settlement payments do not require a remittitur.

### f.    Collateral Source Payments

Finally, Arpin seeks a hearing to determing the amount of collateral source payments that Pouliot received; specifically, "medical and health benefits and proceeds from accidents and/or disability insurance policies." Defs.' Mem. Supp. Mot. New Trial at 37-38 [Doc. No. 552-2]. It seeks a remittitur in the amount of these payments. Both parties appear to agree that Connecticut law governs the recovery of collateral source payments, as a substantive issue.

Pouliot argues that, because Arpin did not request specific jury interrogatories to identify the specific items of economic loss for which the jury was compensating Pouliot, Arpin has failed to preserve their claim to any reduction for collateral source payments. Connecticut General Statutes section 52-225a "provides that the trial court shall reduce an award for economic damages by an amount equal to the total amount of collateral sources that have been paid for the benefit of the claimant, less any premium paid by or on behalf of the claimant to secure the benefit of such collateral source payments." Jones v. Kramer, 267 Conn. 336, 345 (2004). The Connecticut Supreme Court has interpreted this rule "to allow only payments specifically corresponding with items of damages included in the jury's verdict to be deducted as collateral sources from the

29

economic damages award." Id. at 348. The Jones court held that the defendant "bears the burden of proving that the verdict includes items of damages for which the plaintiff has received a collateral source benefit." Id. at 349. "Specifically, the defendant who is seeking a collateral source reduction must, at the conclusion of the evidence, submit interrogatories to the jury concerning the specific items of damages included within the verdict." Id. In Jones, no such interrogatories were submitted to the jury, and the Connecticut Supreme Court found that the information necessary to apply a collateral source reduction pursuant to Connecticut General Statutes section 52-225a was therefore missing. Id.

Arpin attempts to distinguish the instant case from Jones. In Jones, the jury awarded only part of the economic damages that the plaintiff had requested, whereas in the instant case, the jury awarded the full amount of economic damages requested. By its own terms, however, Jones unconditionally requires a defendant seeking a collateral source reduction to submit the aforementioned interrogatories to the jury. This court's verdict form did not include special interrogatories regarding the specific items of economic damages included in the jury award, and Arpin did not object to this omission.[8] Therefore, the court denies the motion for a hearing and remittitur premised on collateral source payments.

---

[8]Arpin's original proposed verdict form did ask the jury to give separate figures for medical care and lost earnings. However, Arpin does not argue that this satisfies the Jones requirement, and the court finds that Arpin was correct not to make this argument. Even if the court had used the verdict form that Arpin requested, it would have been inadequate to permit a collateral source reduction because it did not break down the past economic damages enough to show the specific medical expenses for which the jury intended to compensate the plaintiff. Moreover, Arpin did not press this issue after receiving the court's proposed draft jury form, which did not break down economic damages except as between past and future damages.

Case 3:02-cv-01302-JCH   Document 568   Filed 05/17/2006   Page 31 of 32

In light of its finding that the damages awarded were not excessive, the court denies Arpin's Rule 59 motion for remittitur or a new trial.

## V.    CONCLUSION

For the foregoing reasons, Arpin's Motion for Judgment as a Matter of Law [**Doc. No. 551**] and Motion for a New Trial [**Doc. No. 552**] are DENIED.  Arpin's Motion for Judgment on/Involuntary Dismissal of Plaintiff's Withdrawn Recklessness Claim [**Doc. No. 549**] is GRANTED as to the defendant's request for involuntary dismissal with prejudice, pursuant to Fed.R.Civ.P. 41(b), of the plaintiff's withdrawn recklessness claim.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 17th day of May, 2006.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SHAWN POULIOT

v.                                          3:02CV1302JCH

PAUL ARPIN VAN LINES, INC.,
ARPIN LOGISTICS, INC.,
THE FESTO CORPORATION,
MICHAEL KOVAC, d/b/a TRANS EXPO
INTERNATIONAL and ERICA RAMIREZ

## JUDGMENT

This matter came on for trial before a jury and the Honorable Janet C. Hall,

United States District Judge. On January 20, 2006, after deliberation, the jury returned

a verdict in favor of the plaintiff and against the defendants Paul Arpin Van Lines, Inc.

and Arpin Logistics, Inc. in the amount of $993,100.00 for past economic damages,

$5,313,276.00 for future economic damages, $4,000,000.00 for past non-economic

damages, and $16,000,000.00 for future non-economic damages. The jury did not find

The Festo Corporation negligent under C.G.S. § 52-572(h). In pretrial rulings all other

claims against The Festo Corporation, Michael Kovac, d/b/a Trans Expo International

and Erica Ramirez were dismissed.

Therefore, it is ORDERED and ADJUDGED that judgment is entered for the

plaintiff, Shawn Pouliot against defendants Paul Arpin Van Lines, Inc. and Arpin

Logistics, Inc. in the amount of $26,306,376.00 and the case is closed.

Dated at Bridgeport, Connecticut, this 26th day of January, 2006.

KEVIN F. ROWE, Clerk

By _Kristin W. Cody_
Deputy-in-Charge

Entered on Docket _1-26-06_

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via U.S. First Class Mail on June 13, 2006, to the following:

Michael A. Stratton, Esq.
Joel Faxon, Esq.
**Stratton Faxon**
59 Elm Street
New Haven, CT  06510

Roland F. Moots, Jr., Esq.
**Moots, Pellegrini, Spillane & Mannion**
46 Main Street, P.O. Box 1319
New Milford, CT 06776-1319

Steven D. Ecker, Esq.
**Cowdery, Ecker & Murphy**
750 Main Street, #910
Hartford, CT  06103-2703

Thomas J. Grady, Esq.
**Lenihan Grady & Steele**
6 Canal Street
PO Box 541
Westerly, RI 02891-0541

Harold J. Friedman, Esq.
Karen Frink Wolf, Esq.
**Friedman Gaythwaite Wolf & Leavitt**
Six City Center, P.O. Box 4726
Portland, ME  04112-4726

Daniel J. Krisch